# EXHIBIT A

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

THELEN REID BROWN RAYSMAN &
STEINER LLP, fka THELEN REID &
PRIEST LLP,

       Plaintiff and
       Counterdefendant,

       v

FRANÇOIS MARLAND,

       Defendant and
       Counterclaimant.
_____/

THELEN REID BROWN RAYSMAN &
STEINER LLP, fka THELEN REID &
PRIEST LLP,

       Counter-
       Counterclaimant,

       v

FRANÇOIS MARLAND, SUSANNAH MAAS &
PHILIPPE BRUNSWICK

       Counter-
       Counterdefendants.
_____/

No C 06-2071 VRW

ORDER

The law firm plaintiff, counterdefendant and counter-counterclaimant Thelen Reid Brown Raysman & Steiner LLP, formerly known as Thelen Reid & Priest LLP ("Thelen"), and Francois Marland ("Marland") agreed in 1999 to pursue litigation against a state-owned French bank for violation of various state and federal laws and regulations in connection with the bank's undisclosed interest in a California insurance company. The agreement was memorialized in a series of written agreements and amendments entered into over the next several years. Disagreements arose and in late 2002, Thelen and Marland entered into what Thelen contends is a release, the December 2002 agreement. The terms and validity of that December 2002 agreement are central to a series of motions now before the court and key to the litigation as a whole.

Marland, nominally the defendant but in fact the complaining party, alleges that this action represents the effort of a "prominent law firm to stifle a former client's efforts to arbitrate claims arising out of the law firm's self-dealing and dishonesty" in using Marland as the "whistleblower on the billion-dollar Executive Life fraud." Doc #72 at 29. Thelen alleges that Marland's claims were released by the December 2002 agreement.

Consequently, Thelen moves for summary judgment, pursuant to FRCP 56, on Thelen's first claim (for declaratory relief) and on Marland's first through fifth counterclaims (for breach of fiduciary duty; breach of contract; bad faith denial of contract; intentional misrepresentation - failure to disclose known facts; and negligence). Doc #181. In addition, Thelen moves for judgment on the pleadings, pursuant to FRCP 9 and 12, on Marland's fifth

2

affirmative defense (which variously states fiduciary misrepresentations, concealment, professional misconduct and failures to disclose). Id. Thelen also moves, pursuant to FRCP 65, for entry of a permanent injunction, or in the alternative, preliminary injunction against arbitration proceedings commenced in New York by Marland in February 2006. Id.

Thelen moves separately and in the alternative for summary judgment, also pursuant to FRCP 56, against Marland on his first counterclaim for breach of fiduciary duty and fifth counterclaim for negligence, on the argument that those claims are time-barred. Doc #144. Finally, Thelen moves separately and in the alternative for summary judgment, pursuant to FRCP 12(b)(7) and 19(a)-(b), against Marland on his second counterclaim for breach of contract, on the argument that Marland failed to join indispensable parties. Doc #173.

Marland seeks summary judgment against Thelen on Marland's first affirmative defense (for failure to state a claim), third affirmative defense (for failure to fulfill a condition precedent) and sixth through ninth affirmative defenses (for no representation by independent counsel; unfairness and lack of consideration; unconscionability, coercion and threat of client abandonment; and violation of the California Rules of Professional Conduct). Doc #184. In addition, Marland moves for summary judgment, also pursuant to FRCP 56, on his second counterclaim (for breach of contract), on Thelen's counter-counterclaims (for declaratory relief and for "money had and received") and on Thelen's affirmative defenses "insofar as they apply to Count Two

3

of Marland's Revised Amended Counterclaims" (for breach of contract).  Id.

Last, in this assortment of motions, counter-counterdefendant Susannah Maas ("Maas") moves to dismiss Thelen's counter-counterclaims against her, pursuant to FRCP 12(b)(2) and (b)(5).  Doc #171.

I

Despite the numerous motions at bar, the material facts are not disputed.  As explained below, what is disputed is not material to the disposition of claims at issue.

A

Thelen is a California limited liability partnership engaged in law practice.  Doc #11 at 1.  Marland is a citizen of France, a French attorney and currently a resident of Switzerland. Id.

In 1997, Marland approached the New York law firm of Reid & Priest, claiming to possess information about a July 1991 fronting agreement, or *contrat de portage*, through which Crédit Lyonnais, a French bank, had illegally acquired the insurance assets of Executive Life Insurance Company (ELIC), an insolvent California insurance company, at an auction conducted by the California Department of Insurance (CDOI) in 1991.  Doc #175, Ex B; Doc #11 (FAC) at ¶¶12-14; Doc #72 (Answer) at ¶¶12.  Marland wanted to know whether he could obtain a financial benefit by divulging

4

United States District Court
For the Northern District of California

1  to parties in the United States information about this *contrat de*

2  *portage* which he claimed to possess.  Doc #175, Ex B.  After Reid &

3  Priest merged with Thelen, Marrin, Johnson & Bridges in 1998,

4  Marland flew to San Francisco at the request of Gary Fontana, a

5  Thelen partner in San Francisco who had previously worked for other

6  clients on ELIC-related proceedings.  Id.

7        After Fontana's meeting with Marland in San Francisco,

8  Thelen partners met with representatives of CDOI and attempted to

9  negotiate an agreement between CDOI and Marland.  Doc #175, Ex D.

10 Thelen discussed having CDOI retain Thelen on a contingent-fee

11 basis to pursue a claim against Credit Lyonnais, with an

12 understanding that Thelen would share its legal fees with Marland

13 as a way to compensate him.  Doc #175, Ex D at 210:23-211:7, Ex E

14 at 13:21-14:7.  Thelen and CDOI could not agree on the terms of a

15 contingent-fee agreement, so CDOI retained other attorneys on an

16 hourly basis to file an action against Crédit Lyonnais.  Doc #175,

17 Ex E at 13:21-14:7, 14:12-17:8, 21:13-23.

18       Evidently still anxious to get in on the pursuit of

19 Crédit Lyonnais, Thelen then recommended that Marland initiate his

20 own *qui tam* lawsuit on behalf of the state of California and CDOI.

21 Doc #11 (FAC) at ¶20; Doc #72 (Answer) at ¶20.  In February 1999,

22 Thelen and Marland signed an attorney-client agreement, providing

23 that Thelen would file a *qui tam* lawsuit against Crédit Lyonnais

24 and advise or assist CDOI and/or the California Attorney General in

25 connection with the lawsuit, in exchange for a percentage of any

26 recovery that Marland received.  Doc #175, Ex G (February 1999

27 agreement).  Marland agreed to pay Thelen 40% of any gross recovery

28

if the case settled before November 1, 1999, and 50% if the case settled after that date.  Id at 2.  Paragraph 22 of the February 1999 agreement states:

> Either party shall have the right to withdraw from this Agreement without liability of any kind to the other provided that:
>
> (a) the party wishing to withdraw shall give thirty days written notice to the other;
>
> (b) the withdrawing party shall remain liable for any breach of its obligations under this Agreement prior to the date of withdrawal; and
>
> (c) the withdrawing party shall assign to the other party all its rights under this Agreement and any claim that may have [sic] to any recovery or award as a result of its pursuit of the qui tam litigation.

Doc #175, Ex G at ¶22.

To conceal Marland's role, Thelen then helped Marland incorporate an entity called RoNo LLC ("RoNo"), Doc #11 (FAC) at ¶20; Doc #72 (Answer) at ¶20, to serve as the named plaintiff in the *qui tam* lawsuit.  Marland alleges that, as part of this maneuver, Thelen rushed him to accept an unconsionable fee agreement and that Fontana signed the agreement without obtaining the necessary law firm approvals.  Doc #72 at 33, ¶13.  For reasons that will appear, the alleged lack of law firm approvals is not material.

On February 18, 1999, Thelen filed the *qui tam* lawsuit in San Francisco superior court.  Doc #11 (FAC) at ¶¶25-26; Doc #72 (Answer) at ¶¶25-26.  That same day, CDOI independently filed a separate complaint in Los Angeles County superior court against many of the same defendants.  Id.

Subsequently, and for reasons not clear in the record at bar, in May 1999, CDOI asked Thelen to represent CDOI in its

United States District Court
For the Northern District of California

lawsuit.  Doc #11 (FAC) at ¶27; Doc #72 (Answer) at ¶27.  In doing
so, CDOI agreed to allow Marland and Marland's European counsel,
Philippe Brunswick ("Brunswick") and Susannah Maas ("Maas"), to
share a portion of Thelen's legal fees if it succeeded in the
litigation.  Id.  CDOI and Thelen entered a written attorney-client
agreement on May 25, 1999.  Doc #175, Ex I.  CDOI agreed to pay
Thelen a sliding scale contingent fee.  Id at ¶5.  Thelen claims
that it informed Marland and Marland's European counsel of the
terms of CDOI's offer and of the potential conflicts between CDOI's
lawsuit and Marland's own *qui tam* lawsuit.  Doc #164-1 at ¶21.
Marland contends that Thelen never disclosed the conflicts that the
dual representation entailed.  Doc #72 at 34, ¶18.  Again a
dispute, but not one that matters.

Thelen alleges that Marland's claim to possess a copy of
the July 1991 *contrat de portage* was critical to CDOI's decision to
retain Thelen and CDOI's consent to Thelen's sharing fees with
Marland.  Doc #164 at 5, ¶21.  Marland contends that Thelen never
told him he had an obligation to preserve or produce evidence that
might have identified him as the whistleblower.  Doc #72 at 33,
¶12.  Marland does not dispute telling Thelen that he had the
*contrat de portage* and that he never produced it.  What Thelen told
Marland about his obligation to produce the *contrat de portage* or
did not tell him does not matter, as will be explained.

On June 2, 1999, Thelen and Marland executed a written
amendment to the February 1999 agreement under which Marland agreed
that Thelen would take all reasonable steps to dismiss the *qui tam*

\\

United States District Court
For the Northern District of California

action.  Doc #175, Ex J.  CDOI had requested this move in exchange for its agreement to retain Thelen.  Id.

On June 3, 1999, Thelen, Marland, Brunswick and Maas entered an agreement to associate counsel.  Doc #175, Ex K ("June 1999 agreement").  Under the agreement, Thelen agreed to pay Marland, Brunswick and Maas, jointly and severally, a total of 52.5% of the legal fees that it received from CDOI after December 31, 1999.  Id.

In addition, Thelen and Marland signed an amendment to their attorney-client agreement and to the fee-sharing agreement, under which Marland's recovery would be reduced in certain circumstances.  Doc #175, Ex L ("June 1999 side letter").  In the letter agreement, Marland agreed to the following:

> 1) I have agreed with you and your law firm that, if requested, I will voluntarily come to the United States to testify before a federal grand jury in Los Angeles concerning the subjects addressed in my memorandum so long as that appearance is subject to a confidentiality agreement with the U.S. Department of Justice that fully protects my identity and assures that me [sic] that I will not be compelled to produce documents that may be in my possession or control against my will.
>
> 2) Second, in the event you believe it is essential to the effective prosecution of the civil case in which TR&P is currently representing the Commissioner of Insurance, and you request my testimony in that case, I have also agreed with you and your law firm that I will voluntarily come to the United States to testify in court and to provide deposition testimony in that case in Europe.  You and I have agreed to make all reasonable efforts to find other competent witnesses who are willing to testify to the same facts and, thus, avoid the necessity of my testifying in the civil case.  However, we cannot be sure these efforts will succeed.
>
> 3) In the event that I become unable or unwilling to testify before the grand jury as provided in Paragraph 1, I hereby agree that the amounts payable to European

8

United States District Court
For the Northern District of California

1
2
3

Counsel under the Agreement to Associate Counsel dated
June 2, 1999 shall be reduced by two-thirds (66.67%) from
what they would otherwise be. (i.e., 21 2/3 percent of
total legal fees paid on or before 12/31/99 and 17.5
percent thereafter).

4
5
6
7
8

4) In the event that I testify before the grand jury as
provided in Paragraph 1, but become unable or unwilling
to testify in the civil case as provided in Paragraph 2,
I hereby agree that the amounts payable to European
Counsel under the Agreement to Associate Counsel dated
June 2, 1999 shall be reduced by one-half (50 percent)
from what they would otherwise be. (i.e., 32.5 percent
of the total legal fees on or before 12/31/99, and 26.25
percent thereafter).

9

Id.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

In July 2001, the California Attorney General elected to intervene in the *qui tam* action. Doc #175, Ex M at 142:24-143:4. The Attorney General objected to Thelen's continued representation of RoNo as the *qui tam* relator. Id at 144:20-145:16. On September 10, 2001, Thelen withdrew from representing RoNo in the *qui tam* action and assisted Marland in retaining other counsel. Id at 171:9-172:23; Doc #178, Ex 3. Later in September 2001, Thelen and Marland signed an amendment to the February 1999 agreement, memorializing Thelen's withdrawal as counsel of record for RoNo in the *qui tam* action. Doc #175, Ex N. Thelen, however, continued to serve as "general counsel" to RoNo and "counsel" to Marland. Id. Also in September 2001, the parties executed an Amendment to the Agreement to Associate Counsel. Doc #186, Ex 10. This agreement maintained the same 52.5%/47.5% ratio provided in the June 1999 agreement. Id.

26
27
28

Thelen alleges that by December 2001, CDOI's lawsuit had become much more costly than the parties had anticipated. Doc #164-1 at ¶28. Marland does not dispute this. Thelen wanted to

United States District Court
For the Northern District of California

ask CDOI for a non-recourse advance to the firm.  Id.  The June 1999 agreement required Thelen to pay to Marland, Brunswick and Maas a percentage of any fees received from CDOI.  Thelen approached Marland to negotiate a restructuring of their fee sharing relationship.  Id at ¶¶28-29.

In June 2002, Thelen requested that Marland produce the July 1991 *portage*.  Doc #177, Ex 1.  Thelen states that it needed the document because Thelen partner Karl Belgum was preparing to depose the key defense witnesses in the ELIC litigation.  Doc #175, Ex M at 105:24-107:7.  According to Thelen, Marland refused to produce the document and said for the first time that he had destroyed it.  Doc #164 at ¶30.  Again, Marland does not contest this.

Sometime prior to July 2002, Thelen approached Marland in an attempt to restructure the terms of their fee-sharing agreement.  Doc #11 (FAC) at ¶34; Doc #72 (Answer) at ¶34.  Negotiations ensued.  Id.  Thelen's general counsel, Wynne Carvill, met with Brunswick at Brunswick's office in Paris in June 2002.  Doc #175, Ex R at 75:7-25.

On July 8, 2002, pursuant to the terms of the February 1999 agreement, Thelen gave Marland 30 days' written notice of its decision to withdraw from representing him.  Doc #175, Ex S.  The notice stated:

> Dear Mr Marland:
> As you know, we are working with Philippe Brunswick to negotiate a new, definitive agreement governing our relationship.  We had hoped to have this in place by now, but the process is taking more time than we had anticipated.

United States District Court
For the Northern District of California

> Nevertheless, as we should clearly be able to conclude a new agreement during the month of July, we believe the time has come to send you thirty day (30) notice of termination of, and withdrawal from, the February 17, 1999 Attorney-Client Agreement pursuant to clause 22 of that document.  Please accept this letter as such notice.
>
> We would very much like to come to a new agreement within the next thirty days, but this notice is not contingent upon us doing so.

Id.  Thelen extended the notice period once, to August 30, 2002.

Doc #220, Ex 15.

On December 19, 2002, Thelen, Marland, Brunswick and Maas

In the six months following the June 2002 meeting in Paris, Carvill and Brunswick exchanged ten drafts of a "New Agreement to Associate Counsel."  Doc #176, Exs 3-36.

On December 19, 2002, Thelen, Marland, Brunswick and Maas entered a new agreement which replaced "any and all other agreements among them," effective July 1, 2002.  Doc #175, Ex T. Under the terms of the December 2002 agreement, the percentage of Marland and European Counsel's recovery was reduced from 52.5% to 35% of the fees paid to Thelen by CDOI.  Id at ¶B.2(a).  Thelen also agreed to resume its role as general counsel to RoNo and agreed to represent Marland, at no charge for up to $100,000 in fees, in the event that any ELIC defendant tried to block payments to him.  Id at ¶B.2(g)(iv)-(v).

The December 2002 agreement includes a "Mutual Release" provision that states:

> For the mutual consideration reflected herein, the parties hereby release and forever discharge one another from any and all claims they might have against one another for any breach by the other of any prior agreement between them or professional obligation of one to the other or any other obligation whether sounding in tort or contract, including, but not limited to, any claim that Marland or EC [European Counsel] failed to

11

perform any services, to deliver any documents or
otherwise to fulfill any obligations of any kind to TR&P,
or any claim that TR&P failed to perform any services, to
adequately protect the interests of its clients
(Marland/RoNo), to disclose any conflict, to obtain any
required waiver or otherwise to discharge any obligations
of any kind to Marland, RoNo or EC.

The parties expressly acknowledge and waive the
provisions of California Civil Code section 1542 * * *

Both Parties have had the benefit of the advice of
independent counsel in considering the significance of
this Mutual Release and neither is relying on the advice
of the other in deciding to enter it.

Id at ¶C.3.

The December 2002 agreement further required the parties
to obtain consent from CDOI:

Disclosure and consent: The Parties expressly acknowledge
that the fee splitting terms of this Agreement shall be
disclosed to the Commissioner, that the circumstances
leading to this change shall be disclosed to the
Commissioner and that his consent to this Agreement shall
be sought as part of an effort to obtain his agreement to
pay Advances as provided in paragraph N above.  <u>The
effectiveness of this entire Agreement is conditioned on
the Commissioner providing his consent.</u>

Id at ¶C.2(a) (emphasis in original).

On August 2, 2004, CDOI provided its consent.  Doc #175,
Ex U.  The signed consent states:

The California Department of Insurance ("CDOI") has
reviewed the New Agreement to Associate Counsel entered
into December 8, 2002 between Thelen Reid & Priest and
certain other parties referred to collectively therein as
European Counsel (the "Agreement"), a copy of which is
attached hereto.

CDOI hereby gives its consent, pursuant to Rule 2-200 of
the Rules of Professional Conduct of the State Bar of
California, to the fee sharing agreement contained in the
Agreement.

Id.

12

United States District Court
For the Northern District of California

Here is what matters.  If valid and enforceable, the December 2002 agreement displaces any claims that Marland might otherwise have against Thelen, if such claims arose before December 19, 2002.  Marland, however, alleges that Thelen used the litigation costs and the *portage* as a pretense to get Marland to enter into the December 2002 agreement that reduced his share of the recoveries from the ELIC litigation.  Doc #72 at 36-39. Marland claims that Thelen terminated the February 1999 agreement as a bargaining tool and that he was coerced into signing the December 2002 agreement through intentional misrepresentations and inadequate representation of his interests by Thelen.  Id at 37-39.

Thelen contends that, in reliance on the December 2002 agreement, it continued to expend time and resources on the ELIC litigation and ultimately succeeded in obtaining nearly $1 billion in settlements and judgments.  Doc #164 at ¶40.  Thelen has paid, and Marland has accepted, over $19 million pursuant to the terms of the December 2002 agreement.  Id.

According to Marland's privilege log, Marland, along with his attorneys Francois Chateau and Phillipe Brunswick, met with Andrew Hayes in September and December 2003.  Doc #143, Ex K, Nos 29, 48-49.  Hayes is Marland's counsel in this litigation.  As early as March 2004, Hayes prepared a "Memorandum re: Review and analysis re possible claims of RoNo."  Id at No 56.  On February 4, 2005, Hayes sent an email to Fontana at Thelen, officially terminating Thelen as general counsel for RoNo.  Doc #145, Ex A at TRP 010635.

\\

13

United States District Court
For the Northern District of California

1    On February 13, 2006, Marland commenced an arbitration

2 proceeding against Thelen in New York City, asserting that the

3 December 2002 agreement is unenforceable and that the release and

4 waiver provisions of that agreement are void.  Doc #11, Ex G.

5

6                                    B

7

8    Thelen initiated this action against Marland, seeking to

9 enforce the December 2002 agreement and to enjoin Marland from

10 pursuing the New York arbitration.  Doc ##1, 11.  Thelen seeks: a

11 declaratory judgment that (1) the December 2002 agreement is valid

12 and enforceable; (2) Marland has released Thelen from the claims

13 asserted in the New York arbitration proceeding; and (3) all claims

14 of Marland and RoNo against Thelen arising from Thelen's

15 performance of professional services for Marland or RoNo are barred

16 by the statute of limitations embodied in Cal CCP § 340.6.  Thelen

17 seeks an injunction prohibiting Marland from asserting any claims

18 against Thelen which are released by the December 2002 agreement

19 (including the claims asserted in the New York proceeding), and

20 seeks an injunction prohibiting Marland from pursuing the New York

21 arbitration proceeding.  Doc #11.

22    On May 23, 2006, Marland answered the complaint and

23 served counterclaims against Thelen asserting essentially the same

24 claims he had asserted in the arbitration, i e, that the December

25 2002 agreement never went into effect and that the February 1999

26 and June 1999 agreements remain valid and binding.  Doc #72.

27 Marland asserts counterclaims for (1) breach of fiduciary duty; (2)

28 breach of contract; (3) bad faith denial of contract; (4)

intentional misrepresentation - failure to disclose known facts; and (5) negligence.  Id.  In addition, Marland asserts the following affirmative defenses: (1) failure to state a claim; (2) failure to join an indispensable party; (3) failure to fulfill a condition precedent; (4) estoppel; (5) fiduciary misrepresentations, concealment, professional misconduct & failures to fully disclose; (6) no representation by independent counsel; (7) unfairness & lack of consideration; (8) unconscionability, coercion and threat of client abandonment; (9) violation of California Rules of Professional Conduct; (10) public policy against interfering with pending arbitrations; and (11) unclean hands.  Id.

In response, Thelen filed two counter-counterclaims against Marland and Marland's European counsel – Susannah Maas and Philippe Brunswick.  Doc #164.  Both counter-counterclaims are contingent on the court finding the December 2002 agreement invalid.  Id.  The first counter-counterclaim seeks a declaration of the rights and obligations of the parties in light of the parties' execution of the December 2002 agreement and the parties' subsequent conduct.  Id ¶¶ 44-49.  The second seeks a return of the $19 million Thelen paid to Marland, Maas and Brunswick, pursuant to the December 2002 agreement.  Id at ¶¶50-53.

\\

\\

\\

\\

15

II

Because it is key to the entire litigation, the court first addresses the parties' respective summary judgment motions centered on the December 2002 agreement.  In reviewing a summary judgment motion, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the nonmoving party.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v Liberty Lobby, 477 US 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id.  The burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp v Catrett, 477 US 317, 322-23 (1986).  Summary judgment is granted only if the moving party is entitled to judgment as a matter of law.  FRCP 56(c).

The nonmoving party may not simply rely on the pleadings, however, but must produce significant probative evidence, by affidavit or as otherwise provided in FRCP 56, supporting the claim that a genuine issue of material fact exists. TW Elec Serv v Pacific Elec Contractors Ass'n, 809 F2d 626, 630 (9th Cir 1987).  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  Thornhill Publishing Co, Inc v GTE Corp, 594 F2d 730, 738 (9th Cir 1979).  The evidence presented by the nonmoving party "is to be believed, and all justifiable

inferences are to be drawn in his favor." <u>Anderson</u>, 477 US at 255. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id at 249.


United States District Court

For the Northern District of California

A

Because the December 2002 agreement, if valid, trumps the other claims, the court first considers Thelen's motion for summary judgment on its claim for declaratory relief that the December 2002 agreement is valid.

The December 2002 agreement states that it "shall be construed and enforced under the laws of the state of California applicable to contracts to be wholly performed within the State." Doc #175, Ex T at 9.  The parties agree that California law governs the court's interpretation of the agreement.

Under Cal Civ Code § 1550, the essential elements for a contract are: (1) parties capable of contracting, (2) their consent, (3) a lawful object and (4) a sufficient cause or consideration.  In addition, any condition precedent in a contract must be performed before the promisor's duty of performance arises. Cal Civ Code § 1436.

Thelen argues that: (1) all conditions precedent to the December 2002 agreement have been met; (2) the signatories to the agreement were all competent adults capable of consent; (3) Marland, an attorney and "sophisticated businessman," consented to the agreement; (4) there was sufficient consideration for the

17

**United States District Court**
For the Northern District of California

agreement; and (5) the agreement had a lawful object: "to resolve disputes between the parties arising out of the prior agreements." Doc #181 at 18-21.

Marland does not dispute that the parties were capable of contracting and that they consented to the agreement.  Doc #226. Marland argues, however, that: (1) the December 2002 agreement never took effect because Thelen did not make the disclosures required by that agreement, and CDOI declined to approve the "entire agreement," both of which were preconditions to its effectiveness; (2) Thelen cannot carry its burden of proving that the December 2002 agreement was objectively fair and reasonable and supported by consideration, as required by California law; (3) Thelen cannot prove that it made the necessary disclosures to Marland required by California Rule of Professional Conduct 3-300 in advance of seeking approval of the December 2002 agreement; and (4) the December 2002 agreement was induced by fraud.  Doc #184 at 2; Doc #226 at 9-11, 23.  The court addresses these points in turn.

1

"A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed."  Cal Civ Code § 1436.  Marland argues that Thelen failed to fulfill the "disclosure and consent" provision of the agreement.  As described above, this provision states:

> Disclosure and consent: The Parties expressly acknowledge that the fee splitting terms of this Agreement shall be disclosed to the Commissioner, that the circumstances leading to this change shall be disclosed to the Commissioner and that his consent to this Agreement shall be sought as part of an effort to obtain his agreement to

pay Advances as provided in paragraph N above.  <u>The effectiveness of this entire Agreement is conditioned on the Commissioner providing his consent.</u>

Doc #175, Ex T at ¶C.2(a) (emphasis in original).

a

Marland first argues that Thelen failed to obtain CDOI's consent to the "entire agreement" as opposed to just the fee-sharing clause.  Doc #184 at 26.  Marland argues that the provision should be interpreted to require CDOI's consent to the "entire agreement."  Id at 26-27.  Thelen argues that the agreement only required CDOI's consent to the "fee-splitting terms" pursuant to Cal R Prof Conduct 2-200.  Doc #223 at 16.

Under California law, "a contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."  Cal Civ Code § 1636.  "The language of the contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."  Cal Civ Code § 1638.  When possible, the intention of parties entering into a written contract should be ascertained from the writing alone.  Cal Civ Code § 1639.  The "whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."  Cal Civ Code § 1641.  In addition, words in a contract that are wholly inconsistent with its nature, or with the main intention of the parties, shall be ignored.  Cal Civ Code § 1653.  If, even after applying these rules of construction, uncertainty remains, the language of the contract should be "interpreted most strongly

**United States District Court**

For the Northern District of California

against the party who caused the uncertainty to exist." Cal Civ Code § 1654.

Parol or extrinsic evidence is admissible to resolve an ambiguity. <u>WYDA Associates v Merner</u>, 42 Cal App 4th 1702, 1710 (1996). In such cases, the court engages in a two-step process: First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i e, whether the language is "reasonably susceptible" to the interpretation urged by a party. Id. If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step - interpreting the contract. Id. The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal. Id. The trial court's resolution of an ambiguity is also a question of law if no parol evidence is admitted or if the parol evidence is not in conflict. Id. Where the parol evidence is in conflict, the trial court's resolution of that conflict is a question of fact and must be upheld if supported by substantial evidence. Id. Furthermore, when two equally plausible interpretations of the language of a contract may be made, parol evidence is admissible to aid in interpreting the agreement, thereby presenting a question of fact which precludes summary judgment if the evidence is contradictory. Id.

Marland's moving papers do not direct the court to any extrinsic evidence supporting Marland's interpretation of the "disclosure and consent" provision. Doc #184. Instead, Marland

**United States District Court**

For the Northern District of California

relies on the "clear" intent of the provision stating that it "requires disclosure to the Commissioner of 'the circumstances leading to this change' and requires the Commissioner's consent 'to this Agreement' – not 'the fee splitting terms of this agreement.'" Doc #184 at 27.  Marland argues that "the two adjacent provisions are obviously connected, and their intent is clear: instead of obtaining the usual client approval for a fee-sharing agreement, the parties agreed to disclose why the fee-sharing agreement had changed and obtain the DOI's approve [sic] of the 'entire agreement,' including the releases."  Id.  The two adjacent provisions, in Marland's view, are those requiring disclosure of the: (1) "fee splitting terms" and (2) "circumstances leading to this change [in the fee splitting terms]."

In support of its contrary interpretation, Thelen first points to Cal R Prof Conduct 2-200, which requires a client's written consent to the terms by which two attorneys will divide *fees*.  Doc #223 at 16.  Rule 2-200(A) states:

> (A) A member shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder with the member unless:
>
> > (1) <u>The client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division</u>; and
>
> > (2) The total fee charged by all lawyers is not increased solely by reason of the provision for division of fees and is not unconscionable as that term is defined in rule 4-200.

Cal R Prof Conduct 2-200(A) (emphasis added).

\\

Thelen also points to the negotiation of the December 2002 agreement. Specifically, Thelen points to a letter from Carvill to Brunswick, in which Carvill wrote, "I am presenting an outline of the essential terms to the Commissioner * * * Please understand that, as this is a fee-splitting arrangement, the economic terms require his approval." Doc #220, Ex 39 at M2230.

Finally, Thelen points to the fact that it never tried to obtain a broader consent. Doc #223 at 17. Gary Cohen, general counsel for CDOI and the person who executed CDOI's consent, testified in deposition that Thelen never asked him to consent to any portion of the December 2002 agreement other than the fee-splitting terms:

> Q: Did anyone at Thelen ever tell you that the Department had to consent to anything more than the fee-sharing provision contained in the new agreement to associate counsel?
> Cohen: No.

Doc #219, Ex V at 38:25-39:3.

The court finds as a threshold determination that Thelen's extrinsic evidence constitutes "credible evidence concerning the parties' intentions" and, accordingly, establishes an ambiguity in the contract. WYDA at 1710. The "disclosure and consent" provision specifically references disclosure to the Commissioner of the "fee splitting terms of the Agreement" and does not reference any other specific terms. But the provision also calls for disclosure of "the circumstances leading to this change." The court finds that it is ambiguous whether "this change" refers to the change in the fee splitting terms or a broader change, such as the change from the prior agreements to the December 2002

United States District Court

For the Northern District of California

agreement.  Accordingly, the court, after "provisionally receiving" Thelen's extrinsic evidence, finds that the language of the provision is "reasonably susceptible to the interpretation urged" by Thelen.  WYDA at 1710.  The court admits the extrinsic evidence and proceeds to the "second-step" of contract interpretation under the California guidelines.  Id.

"The trial court's resolution of an ambiguity is also a question of law if no parol evidence is admitted or if the parol evidence is not in conflict."  WYDA at 1710.  Marland identifies for the first time in his reply brief "extrinsic evidence" purportedly supporting his interpretation.  Doc #236.  Marland argues that Thelen "went beyond the minimum that Rule 2-200 required, and disclosed why the fee-sharing agreement had changed." Doc #236 at 11.  In support, Marland cites a number of letters wherein Carvill tells Brunswick that disclosure of the "document issue" [Marland's destruction of the *contrat de portage*] was a necessary part of obtaining CDOI's consent.  Doc #220, Exs 20, 22, 24, 30.  Marland also identifies two email exchanges between Thelen and Cohen as well as Cohen's deposition testimony.  Doc #186, vol 1, Ex 2; vol 2 Exs 101, 102.  These all show Cohen stating that his consent, on behalf of CDOI, was a consent only as to the fee-sharing agreement, and that, during the time he was at CDOI, the department never took a position with regard to any other provision in the December 2002 agreement.  Id.

The court notes that both parties also cite to Carvill's deposition testimony taken in this litigation regarding what he understood the provision to mean.  The court declines to consider

United States District Court
For the Northern District of California

this testimony as extrinsic evidence.  California case law establishes an objective standard for contract interpretation. "[I]t is now a settled principle of the law of contract that the undisclosed intentions of the parties are * * * immaterial; and that the outward manifestation or expression of assent is controlling."  <u>Titan Group, Inc v Sonoma Valley County Sanitation Dist</u>, 164 Cal App 3d 1122, 1127 (1985).  Contractual language is not controlled by "what either of the parties intended or thought its meaning to be."  <u>Citizens Utilities Co v Wheeler</u>, 156 Cal App 2d 423, 432 (1957).

The court determines that Marland's extrinsic evidence is not "contradictory" to Thelen's extrinsic evidence.  Accordingly, resolution of the parties' intent does not depend on a finding of fact as to the "credibility" of the extrinsic evidence, and the court may interpret the "disclosure and consent" provision as a matter of law.  <u>WYDA</u> at 1710.

Based on its examination of the extrinsic evidence, the court agrees with Thelen that the parties intended to obtain CDOI's consent to only the fee-splitting terms of the agreement and not to the entire agreement.  The court looks to Rule 2-200 as evidence of surrounding circumstances.  "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."  Cal Civ Code § 1647.  The court also looks to Rule 2-200 as evidence of usage or custom observed in the context of fee-splitting agreements. General usages of trade or course of dealing may supplement or explain an agreement.  Cal Civ Code § 1655. The December 2002 agreement was a fee-splitting

United States District Court
For the Northern District of California

1  agreement governed by Rule 2-200.  The parties' written

2  communications leading up to the execution of the December 2002

3  agreement regularly referred to Rule 2-200, and the consent itself

4  specifically refers to the rule, stating:

5          CDOI hereby gives its consent, pursuant to Rule 2-200 of
           the Rules of Professional Conduct of the State Bar of
6          California, to the fee sharing agreement contained in the
           Agreement.

7
8  Doc #175, Ex U.  Even Marland refers to "approval for a fee sharing

   agreement" as "the usual client approval."  Doc #184 at 27.
9
   Marland offers no reason why Thelen would have intended a broader
10
   consent.
11
12          The court also looks to the subsequent conduct of the

13  parties.

14          Acts of the parties, subsequent to the execution of the
           contract and before any controversy has arisen as to its
15         effect, may be looked to in determining the meaning.  The
           conduct of the parties may be, in effect, a *practical*
16         *construction* thereof, for they are probably least likely
           to be mistaken as to the intent.  "This rule of practical
17         construction is predicated on the common sense concept
           that 'actions speak louder than words.'  Words are
18         frequently but an imperfect medium to convey thought and
           intention.  When the parties to a contract perform under
19         it and demonstrate by their conduct that they knew what
           they were talking about the courts should enforce that
20         intent."

21  1 Witkin, Summary of California Law, Contracts § 215 (10th ed 2005)

22  (emphasis in original) (citing Crestview Cemetery Assn v Dieden, 54

23  Cal 2d 744, 754 (1960)).  Here, Marland does not dispute that after

24  the December 2002 agreement was signed but before this controversy

25  arose, Thelen never attempted to obtain a broader consent.

26          Finally, Marland's "extrinsic evidence" is consistent

27  with the court's interpretation.  Cohen admits that he never took a

28  position regarding any provision of the agreement, other than the

25

fee-splitting provision.  The language Marland cites from the Carvill letters is consistent with the provision requiring disclosure of "the circumstances leading to" the change in the fee agreement.

<div align="center">b</div>

Marland next argues that Thelen failed to disclose to CDOI "the circumstances leading to" the change in the fee-sharing percentages.  Marland argues that Thelen represented to CDOI that Marland had breached an obligation to produce his copy of the *contrat de portage* to Thelen.  Doc #184 at 27.  This argument assumes that Marland's failure to produce the document (i e "the document issue") was not a genuine reason leading to the new agreement.  Marland fails to produce evidence to support this position.  Specifically, Marland does not establish that such a representation was an improper "disclosure."   The court discusses this in detail below in connection with Marland's arguments on "failure of consideration."  See infra, section IIA2.  The court incorporates that discussion by reference here.  Moreover, Marland points to nothing in the record indicating what he believes the "real" circumstances leading to the change were.

While the court recognizes that it is difficult for Marland to prove a negative, i e what Thelen did <u>not</u> disclose, Marland's counsel had ample opportunity to depose CDOI and Thelen witnesses and serve other discovery regarding discussions surrounding the December 2002 agreement.  Nonetheless, Marland points to no evidence regarding what was or was not said or "disclosed" about the agreement.  Marland does not specify what particular disclosure Thelen was supposed to make, and Marland

<div style="writing-mode: vertical-rl">United States District Court

For the Northern District of California</div>

United States District Court

For the Northern District of California

offers no extrinsic evidence in support of his interpretation of
this part of the disclosure provision.  (While Marland argues that
"Thelen's discovery responses admit that it never gave the side
letter agreement to CDOI nor discussed that agreement with the
CDOI," Doc #184 at 27, Marland does not explain the relevance of
this point.  Moreover, Marland does not direct the court to these
"discovery responses" in the record.)

        Even if Marland could establish a dispute of fact with
his submissions to the court – and the court finds that he cannot –
this would at most be a dispute of fact over what "the
circumstances leading to the change" actually were.  Marland's
burden here, however, is to show a disputed fact regarding what
Thelen told CDOI and *whether* those disclosures reflected the
circumstances leading to the new agreement.

        Marland seems to be arguing that Thelen had a duty to
disclose what Marland believes were Thelen's true motives in
negotiating the new agreement.  Marland speculates that Thelen's
true motives were simply to reduce Marland's share and maximize
Thelen's recovery, all while threatening Marland with withdrawal.
Doc #184.  Marland also speculates that Thelen lied to CDOI all
along regarding Marland's obligation to produce the *portage*.  Id at
27-28.  The court does not interpret the "disclosure and consent"
provision to include an intent by the parties to make such a
damaging disclosure to CDOI.  "A contract must receive such an
interpretation as will make it reasonable if it can be done without
violating the intention of the parties.  In the absence of contrary
indication, it is assumed that each term of an agreement has a
reasonable rather than an unreasonable meaning."

United States District Court
For the Northern District of California

<u>Binder v Aetna Life Ins Co</u>, 75 Cal App 4th 832, 852 (1999) (citations omitted).

Finally, as Thelen points out, the December 2002 agreement states "TR&P represents that it has orally disclosed to the Commissioner the fact that EC [European Counsel] is not in a position to produce a copy of any 'contrat de portage.'"  Doc #175, Ex T at C.2(c).  Accordingly, CDOI was on notice that the document was unavailable.  Marland is unclear as to what additional disclosures were required and why.  Lack of clarity does not create a disputed issue of fact.

2

Marland next argues that Thelen cannot prove that the December 2002 agreement was objectively fair and reasonable and supported by consideration, as required by California law.  Doc #184 at 26, 31-34.  Marland's briefing on this point is fragmented and confusing, but the court understands Marland to be making three arguments:

> (1) The December 2002 agreement was not fair and reasonable in accordance with Cal R Prof Conduct 3-300 and Cal Probate Code § 16004.  Id at 26, 33.
> (2) Under <u>Severson & Werson v Bollinger</u>, 235 Cal App 3d 1569, 1572 (1991), an attorney cannot seek a rate increase after the fee for engagement has already been established, unless he reserves the right to do so.  Id at 32.
> (3) The December 2002 agreement was not supported by genuinely new consideration as required by <u>Denton v Smith</u>, 101 Cal App 2d 841, 844 (1951).  Id at 26.

Marland's first two arguments are dealt with easily.  As discussed below in connection with Marland's Rule 3-300 argument, the court finds that Rule 3-300 is not applicable to the December

United States District Court
For the Northern District of California

2002 agreement.  See infra, section IIA3.  Nor does Cal Probate Code § 16004 apply:

> A transaction between the trustee and a beneficiary which occurs during the existence of the trust or while the trustee's influence with the beneficiary remains and by which the trustee obtains an advantage from the beneficiary is presumed to be a violation of the trustee's fiduciary duties. This presumption is a presumption affecting the burden of proof. <u>This subdivision does not apply to the provisions of an agreement between a trustee and a beneficiary relating to the hiring or compensation of the trustee.</u>

Cal Prob Code § 16004(c) (emphasis added).

A similar issue arose in <u>Ramirez v Sturdevent</u>, 21 Cal App 4th 904 (1994).  Ramirez retained Sturdevent on a contingency basis to represent her in a wrongful termination case.  The contingency agreement contained a provision permitting Sturdevent to withdraw upon reasonable notice.  Sturdevent expended significant resources litigating Ramirez's case, but the court granted summary judgment for the employer.  Sturdevent was uncertain about Ramirez's chances on appeal.  Sturdevent and Ramirez re-negotiated the contingency agreement to include additional terms: Ramirez would pay $500 per month against costs; she would pay appellate and post judgment costs as incurred; and she would agree to accept any settlement offer of at least $150,000.  After the court of appeal reversed the trial court's grant of summary judgment, the case settled.  Ramirez then sued Sturdevent for breach of fiduciary duty and sought to set aside the supplemental fee agreement.

Ramirez argued in part that the additional terms of the supplemental fee agreement gave an advantage to Sturdevent over Ramirez and, as a result, that the agreement violated Probate Code

**United States District Court**

For the Northern District of California

§ 16004.  The state court made two findings that are relevant here. First, the court found that Sturdevent had met the duty imposed by Probate Code § 16004 by producing evidence that "the transaction was conducted at arms-length with an intelligent, experienced, and sophisticated client."  Id at 916.  The court noted that "[Sturdevent] was entitled to withdraw from the case, and thus was entitled to negotiate the terms under which he would continue. Ramirez's interest in continuing with Sturdevent may have caused her to agree to terms she otherwise would have refused, but that fact does not by itself translate into duress or a breach of fiduciary duty."  Id at 918.

Second, the court held that § 16004 did not apply to the supplemental agreement in any event, pointing to the last sentence in the section: "This subdivision does not apply to the provisions of an agreement between a trustee and a beneficiary relating to the hiring or compensation of the trustee."  The court noted that this exemption had been "held to apply 'even where there is a pre-existing attorney-client relationship.'"  Id at 917 (quoting Walton v Broglio, 52 Cal App 3d 400, 404 (1975)).

Here, after Thelen notified Marland of its intent to withdraw pursuant to the attorney-client agreement with Marland and RoNo, the parties negotiated extensively over many months to reach the December 2002 agreement.  Doc #220, Ex 21-38.  As discussed below, the court finds that Marland, himself an experienced and sophisticated attorney, had the benefit of independent representation and advice from two other experienced and sophisticated attorneys, Chateau and Brunswick.  See infra, section

30

**United States District Court**
For the Northern District of California

IIA6.  Accordingly, under the ruling in <u>Sturdevent</u>, Marland does not and cannot show that the December 2002 agreement was the product of undue influence.  Moreover, as discussed below, the court finds that the December 2002 agreement was a re-negotiated attorney-client agreement, placing it within the exemption to § 16004(c).

Marland cites <u>Severson & Werson v Bollinger</u>, 235 Cal App 3d 1569, 1572 (1991), for the proposition that an attorney cannot seek a rate increase after the fee for engagement has already been established, unless he reserves the right to do so.  Doc #184 at 32.  This misstates the holding in <u>Severson</u> and is otherwise contrary to California law.  <u>Severson</u> provides only that a law firm cannot change its rates unilaterally and without notice.  Id at 1570-72.  Under <u>Sturdevent</u>, Thelen was entitled to re-negotiate its fee agreement with Marland.  See also <u>Vella v Hudgins</u>, 151 Cal App 3d 515, 519 (1984) ("A contingency fee contract may be modified by the parties at any time during the subject litigation.")

Marland last argues that the December 2002 agreement lacked sufficient consideration.

> Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise.

Cal Civ Code § 1605.  "A written instrument is presumptive evidence of a consideration."  Cal Civ Code § 1614.

Marland claims that Thelen's agreement to release Marland from any claims Thelen might assert against Marland for Marland's

United States District Court

For the Northern District of California

destruction of the *contrat de portage* was inadequate consideration because, according to Marland, Thelen knew from June 1999 onward that Marland was not going to produce the document.  Doc #184 at 27. Specifically, Marland faxed a letter to his French and American counsel on May 19, 1999 stating:

> I do not detain – and have not detained – documents other than those which have already been handed over to you, and which might be of interest in the frame of the American proceedings related to the above captioned matter.  Any other interpretations will be wrongful and will call for an action which I will ask you to proceed with.

Doc #186, volume 2, Ex 14.

Again, Marland misses the focus of his burden to show a dispute of material fact.  At most Marland shows a dispute over whether his failure to produce the *contrat de portage* placed him in breach of any agreement with Thelen.  The issue here, however, is whether Thelen released Marland from liability for any such breach as consideration for the December 2002 agreement.  Granted, such consideration would have no value if Marland is correct that Thelen never actually believed that Marland had a duty to maintain the document.  Thelen does not, however, have to show that the destruction of the document constituted a breach.  Rather, Thelen has to show that it honestly believed that the destruction *could* constitute a breach, exposing Marland to potential liability under the prior agreements, which Thelen could later waive to effect consideration for a new agreement.

> The compromise or release of a doubtful or disputed claim, which is not wholly void, is good consideration for a unilateral contract * * * and it is likewise sufficient for a bilateral contract. * * * The compromise or release of a claim wholly invalid, or valid but worthless, is not sufficient consideration. * * *

United States District Court

For the Northern District of California

> However, where the claim is doubtful or believed valid, the Restatement makes a distinction. The First Restatement required an honest and reasonable belief in the possible validity of the claim or defense, but the Second Restatement (§ 74(1)) substitutes an alternative requirement of doubtfulness in fact or law or of honest belief.

1 Witkin, Summary of California Law, Contracts § 215 (10th ed 2005) (citations omitted).

> (1) Forbearance to assert or the surrender of a claim or defense which proves to be invalid is not consideration unless
>
>> (a) the claim or defense is in fact doubtful because of uncertainty as to the facts or the law, or
>>
>> (b) the forbearing or surrendering party believes that the claim or defense may be fairly determined to be valid.
>
> (2) The execution of a written instrument surrendering a claim or defense by one who is under no duty to execute it is consideration if the execution of the written instrument is bargained for even though he is not asserting the claim or defense and believes that no valid claim or defense exists.

Restatement of Contracts (Second) § 74. See also <u>Booth v Bond</u>, 56 Cal App 2d 153, 157 (1942) ("The cancellation of a pre-existing debt, the release of security or the forbearance to sue, even though it subsequently appears that the forbearer might not have been successful in the suit, furnish sufficient consideration to uphold a contract.")

The court is satisfied that Thelen has shown beyond reasonable dispute both (1) an honest belief in Marland's obligation to retain the *contrat de portage* and (2) doubtfulness in fact and law under the parties' prior agreements regarding Marland's obligation to retain the *contrat de portage*.

First, Thelen points out that Marland testified in this litigation in March 2007 that he always maintained that he had the

33

*contrat de portage* and other documents and that the statement in

his May 1999 fax that he did not "detain" any other documents was

false at the time he made it:

> Marland: Concerning the Portage contract, I don't
> understand, or maybe I understand too well why Mr. Van
> Nest keeps asking me about the contract of Portage.  I
> always said that I had the contract of Portage and other
> documents.  I said that I would never produce the
> contract of Portage because if I did produce it, I would
> have the expression "whistleblower" attached to my name
> immediately * * * I always said that I was in possession
> of this document as well as other documents.
> * * *
>
> Q: The question is whether or not the statement that you
> do not detain documents other than those that have been
> handed over was truthful or not.
>
> Marland: Obviously it's false.  It was done specifically
> to prevent my being attacked and my home being broken
> into.  And also to calm down my criminal lawyer.
>
> Q: What do you mean by that?
>
> Marland: Because he's somebody who is very close to the
> legal environment, and he was very fearful for me, and he
> said to me I certainly hope that you don't have any
> documents at your home or elsewhere, hence the letter.

Doc #175, Ex A at 401:21-402:6; 402:22-24; 437:7-21.

This is consistent with Carvill's testimony that Carvill

and Marland told CDOI in 1999 that the *contrat de portage* was "in a

safe place."  Doc #219, Ex R at 350:5-25.  This is also consistent

with Fontana's testimony that, notwithstanding Marland's statement

that he might not produce the document, Fontana believed that

Marland had the document and would produce it if called upon.  Doc

#186, volume 3, Ex 3 (Fontana dep) at 74:14-15, 75:1-5.  Fontana

also testified that Marland told CDOI in February or March of 1999

that Marland would do everything he could to cooperate with CDOI.

Id at 75:10-14.  Fontana believed that Marland wrote the letter out

of fear for his safety but believed that Marland would "come to

**United States District Court**
For the Northern District of California

realize he was protected." Id at 76:1-13.  On May 25, 1999, six days after Marland faxed his letter stating he did not "detain" other documents, Fontana wrote a memo to Brunswick stating "[s]o long as the original of the "cdp" [*contrat de portage*] remains in safe keeping, there is no risk that it can be obtained without our client's consent."  Doc #186, volume 2, Ex 127 at 5.

Moreover, Carvill has testified that he believed Marland's destruction of the *contrat de portage* destroyed his value as a trial witness:

> Q: You told Brunswick that Marland's destruction of a document destroyed his value as a trial witness, correct?
>
> Carvill: Words to that effect.
>
> Q: Okay.  And you told Brunswick that because Marland had effectively destroyed his value as a trial witness, Thelen was entitled to reduce Marland's share of the overall recovery that went to Thelen and the European counsel, correct?
>
> Carvill: Not exactly.  I said it raised that issue.
>
> Q: You don't recall telling Brunswick that because Marland had destroyed his value as a trial witness, Thelen might be entitled to declare him in breach of the European Counsel agreement and receive nothing from Thelen's recovery in the Executive Life litigation?
>
> Carvill: The answer to that question is, yes, because you used the words "might be entitled."  In other words, I said that was a possibility, that was a real possibility we have to deal with.
>
> Q: You were of the opinion in the summer of 2002 that Marland's destruction of the contrat de portage destroyed his value as a trial witness, correct?
>
> [objection]
>
> Carvill: I was of the opinion that was most likely the case.

Doc #175, Ex R at 13:18-14:19.

\\

35

This is consistent with Karl Belgum's testimony:

> Q: Is there anything in the [June 1999 side letter]
> agreement which provides for Marland's recovery to be
> reduced based on his refusal or failure to produce
> documents? * * *
>
> Belgum: I always understood that his coming to trial to
> testify would subject him to a subpoena to produce
> documents.  All right.  He can't show up in a court in
> America, walk in a courtroom, and then say I'm not going
> to produce my documents.  He would be subject to being
> subpoenaed for his documents if he did that.  So I always
> believed that if he came – if he showed up in court in
> America, he would be putting his obligation to produce
> that document in play.

Doc #175, Ex M at 61:8-62:1.

Thelen also submits an August 2002 fax from Brunswick to Marland and Chateau.  Doc #176, Exs 17-18 (certified translation). This fax preceded a letter that Brunswick wrote to Carvill, wherein Brunswick argued that Marland had never agreed to produce the *contrat de portage* and that Thelen had no basis to re-negotiate the fee-sharing agreement simply because Marland had destroyed the document.  Doc #176, Ex 19.  Brunswick's August 2002 fax to Marland and Chateau attaches a draft of the letter to Carvill.  The fax also states:

> Dear Francois,
> Enclosed please find a draft letter which I propose that
> you send to Wynne Carvill following our discussion of
> Friday.
> As you can see, concerning Wynne, I am extremely firm and
> affirmative as to the fact that the TR&P request for
> renegotiation based on the absence of a "document" is
> totally unfounded.
> Between us, and in all confidentiality, the reality is
> not at all as I described it to Wynne.
> Indeed, when I return my entire file [sic], I found
> numerous documents that demonstrate that:
> 1 - At the time, Mr. X [Marland] had affirmed that he was
> in possession of a document and was able to communicate
> it if needed.
> 2 - This situation had been mentioned to the American
> authorities likely to take TR&P for counsel and to
> Jeffrey Isaacs.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1

2

3

4

5

6

> It seems to me that it results that there is a true
> problem in the affirmation made several times recently by
> Mr. X namely that the document would have been destroyed
> in 1994.
> It seems to me indeed that there is a risk that the
> American entities concerned will blame Mr. X for having
> affirmed that at the time, more particularly 1998, he was
> in possession of a document that today he indicates that
> he eliminated in 1994, and consequently that they blame
> him for having purely and simply lied to them.

Doc #176, Exs 17-18.

7

8

9

10

11

12

13

14

15

        While Marland attempts to diffuse this fax by explaining
that the 1994 date was a "misunderstanding," Marland does not
dispute the section of the fax describing his own affirmation that
he would produce the document if needed.  (Moreover, Thelen points
out in its reply that, although Marland cites to Carvill's
testimony as evidence of this "misunderstanding," Carvill in fact
never testified that he misunderstood Marland's story about
destroying the document.  Doc #233 at 19; Doc #234 at 7-9.)

16

17

18

19

20

21

22

23

24

25

26

27

28

        The combined evidence submitted by Thelen and summarized
above supports a finding of both (1) an honest belief by Thelen in
Marland's obligation to retain the *portage* and (2) doubtfulness in
fact regarding Marland's obligation to retain the *contrat de
portage*.  Marland has not produced sufficient evidence to raise a
material question of fact on either of these two points, each of
which, standing alone, supports a finding of adequate
consideration.  See Restatement of Contracts (Second) § 74(1).
Marland's May 1999 fax claiming that he did not "detain" the
*contrat de portage* does not satisfy the "significant probative
evidence" required of Marland.  The evidence is particularly weak
in light of Marland's testimony that the statement was false and
that he "always" said he had the *portage*.

37

United States District Court

For the Northern District of California

1    Furthermore, even assuming arguendo that Thelen did not

2  believe it had a valid claim against Marland, Marland does not

3  dispute that the December 2002 agreement, whereby Thelen

4  surrendered the claim, was executed by both parties and that this

5  execution was bargained for via substantial negotiations by

6  attorneys on both sides, meeting the requirements for consideration

7  under Restatement § 74(2).

8    Carvill testified that, during his June 2002 meeting with

9  Brunswick in Paris, Carvill raised concerns about Marland's

10 admitted destruction of the *contrat de portage* and that Brunswick

11 stated that Marland had never committed to produce the document.

12    Carvill: I met with Brunswick, and that is when the
      document issue began to be discussed * * *

13

14    Q: I understand.  Thank you.  And it was also in that
      time frame when you recall Mr. Brunswick saying to you,
15    in effect, that Mr. Marland had sent a fax in May of 1999
      stating that he wouldn't produce anymore documents? * * *

16    Carvill: No, it was in that time frame, particularly in
      our meeting with Brunswick, that I heard his position
17    about there being no commitment to produce the document.
      Whether he added that in writing back then or later, I
18    can't recall.

19 Doc #175, Ex R at 75:18-76:12.

20    After the June 2002 meeting, and in the six months that

21 followed, Carvill and Brunswick engaged in extensive negotiations

22 and exchanged ten drafts of a new agreement to associate counsel.

23 Doc #220, Exs 3-36; Doc # 219, Ex R (Carvill dep) at 246:13-20,

24 253:23-254:7.  During that time, they continued to discuss the

25 effect of Marland's admitted destruction of the *contrat de portage*.

26 Doc #219, Ex R (Carvill dep) at 188:4-189:14.  Doc #220, Exs 9-

27 14,16,19-20, 23-24, 28, 30-32.  Carvill stated that Marland's

28 conduct called into question the representations that Thelen and

**United States District Court**
For the Northern District of California

1    Marland made to CDOI in 1999.  Doc #220, Ex 22.  Carvill told

2    Brunswick that Thelen might pursue a claim against Marland for

3    breach of the parties' agreements.  Id, Ex 13 at M1814.  Carvill

4    also stated that Thelen might be entitled to invoke the June 1999

5    side letter agreement.  Doc #219, Ex R (Carvill dep) at 13:22-

6    15:15.

7         For his part, Brunswick told Carvill that he believed

8    that Thelen was "misrepresenting the document situation," acting

9    "in bad faith" and violating duties owed to Marland.  Doc #219, Ex

10   R (Carvill dep) at 146:7-147:4.  For example, on August 28, 2002,

11   Brunswick wrote to Carvill and argued that Marland had never agreed

12   to produce the *portage* and that Thelen had no basis to re-negotiate

13   the fee-sharing agreement based on the *portage*.  Doc #220, Ex 19.

14        These negotiations culminated in the execution of the

15   December 2002 agreement wherein the parties mutually released each

16   other from all claims, known and unknown.  Accordingly, the court

17   finds, and Marland does not dispute that, whether or not Thelen had

18   a valid claim, Thelen's surrender of the claim was bargained for in

19   the course of substantial negotiations.  This surrender satisfies

20   the consideration requirement under Restatement § 74(2).  The

21   California courts have often referred to the Restatement of

22   Contracts to assist it in resolving novel questions of contract

23   law, and there is no reason to think they would not do so in this

24   case.  See e g <u>Drennan v Star Paving Co</u>, 51 Cal 2d 409 (1958)

25   (adopting the Restatement of Contracts position); <u>Schaefer v</u>

26   <u>Williams</u>, 15 Cal App 4th 1243 (1993) (citing with approval the

27   Restatement of Contracts).

28   \\

1   Moreover, the court finds that the December 2002
2   agreement was supported by other consideration that constitutes
3   adequate consideration independent of the release of claims
4   relating to the *portage*.  See <u>Sturdevent</u>, supra at 916 ("As
5   Sturdevant was entitled to withdraw from the case, it was no breach
6   of fiduciary duty to fail to inform Ramirez otherwise.  It follows
7   that Sturdevant was further entitled to negotiate those conditions
8   under which he would continue to represent Ramirez, and that his
9   agreement to continue his representation afforded the consideration
10  for Ramirez's consent to the terms of the supplemental agreement.")
11  Similarly, having already withdrawn from the prior attorney-client
12  agreement, Thelen's agreement to continue its representation of
13  RoNo constituted consideration for Marland's consent to the terms
14  of the December 2002 agreement.  Likewise, Thelen's agreement to
15  represent Marland against efforts by ELIC defendants to block
16  payments also afforded consideration.

17  Marland's cited case <u>Denton v Smith</u>, 101 Cal App 2d 841,
18  844 (1951), is distinguishable on its facts.  In <u>Denton</u>, an
19  attorney filed an action for $1,361.56 alleged due to him for legal
20  services rendered to the defendant in connection with determining
21  the interest of the defendant in the estate of his deceased wife.
22  The California court of appeal upheld the state trial court's
23  judgment that the contract sued upon was without consideration
24  where the attorney did not agree to perform any services for the
25  defendant which would not already be performed by the attorney for
26  the administrator of the estate.  Id.
27  \\
28  \\

Accordingly, as detailed in the above discussion, the court finds as a matter of law that the December 2002 agreement was supported by adequate consideration.

**3**

Marland next argues that Thelen failed to make the disclosures to Marland required by Cal R Prof Conduct 3-300 before seeking consent from CDOI for the December 2002 agreement. Doc #184 at 30. Thelen correctly points out, however, that Rule 3-300 governs an attorney's conduct in entering into a business transaction with a client and, accordingly, does not apply to the December 2002 agreement. Rule 3-300 states:

> A member shall not enter into a business transaction with a client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied:
>
> (A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and
>
> (B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and
>
> (C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition.

Cal R Prof Conduct 3-300.

The court again applies the California guidelines for contract interpretation, described above. Thelen argues that, based on surrounding circumstances, the December 2002 agreement should be interpreted as a re-negotiated fee agreement and/or a

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

settlement agreement.  Doc #223 at 19-23.  Thelen points out that the February 1999 original attorney-client agreement contained an express withdrawal provision, stating that either party could withdraw on thirty days' written notice.  Doc #175, Ex G at ¶22. On July 8, 2002, Thelen faxed Marland written notice of its intent to withdraw and then, at Marland's request, extended the notice period to August 30, 2002.  Doc #219, Ex S; Doc #220, Ex 15.  After Thelen withdrew from representing Marland, the parties negotiated extensively, over many months, before executing the December 2002 agreement.  Doc #220, Exs 21-38.

Thelen also argues that the agreement should be interpreted as a settlement.  Thelen points out that, prior to executing the agreement, Thelen claimed that Marland had breached his obligations under the prior agreements.  See evidence cited at Doc #223, footnotes 95-98.  Likewise, Marland accused Thelen of misleading him, acting in bad faith and breaching duties owed under the attorney-client relationship.  See evidence cited at Doc #223, footnotes 99-102.  The December 2002 agreement effected a settlement of all claims, known and unknown, between Thelen and Marland.  Doc #175, Ex T at C.3.

In making his Rule 3-300 argument, Marland does not specifically direct the court to any "extrinsic evidence" as such. Marland does argue in the fact section of his motion that "[t]he record shows that Thelen approached this as a business negotiation, not an attorney-client matter."  Doc 184 at 19.  In support, Marland points to an email written by Fontana's partner, stating: "As a matter of principle, he [Marland] had a hard time with the concept of renegotiating a deal (as I said to Gary [Fontana] later,

United States District Court
For the Northern District of California

this line truly made me want to throw up, these are the people who brought you the Vichy Gvt)." Doc #186, Ex 77. While a tasteless remark about its own client, the court does not see how Thelen's slur evidences a contract for a business transaction, and Marland affords no explanation. Marland next points to a February 2002 memo, wherein Fontana wrote that Marland "complained bitterly that we were treating him as a 'business partner' rather than as a client of the firm." Doc #186, Ex 80, n3. Marland's statement, however, is not evidence and fails to show that Thelen actually *was* treating him as a "business partner" let alone to show that the agreement was one for a business transaction. FRE 801. Finally, Marland points to Fontana's deposition testimony in this action. Doc #184 at 19. As stated above, the court will not consider after-the-fact testimony on the parties' intent where California law requires evidence of intent *manifested at the time of contracting*. In any event, Marland misrepresents the cited testimony. Doc #224 at 19.

In sum, Marland's "extrinsic evidence" fails to establish an ambiguity. Marland points to no language in the contract "reasonably susceptible" to his business transaction interpretation, and the court finds none on its own.

The court finds, based on the clear language of the agreement, that it is not a contract for a business transaction but rather a re-negotiated retention agreement and a settlement agreement. Regarding the first interpretation, the contract states:

> Whereas TR&P also desires to re-negotiate the fee splitting terms under the Original Agreement [referring to the February 1999 Attorney Client Agreement], for

43

United States District Court
For the Northern District of California

> various reasons that were discussed among the parties
> during the preceding months.  Doc # 175, Ex T at 1.

> TR&P and Marland agree that their previously terminated
> Attorney Client Agreement shall be deemed to be re-
> instated and immediately superseded by this Agreement
> except that TR&P shall resume its role as general counsel
> to RoNo as provided in the September 18, 2001 Amendment
> to the Attorney Client Agreement.  Doc # 175, Ex T at
> B.2(g)(iv).

"Rule 3-300 is not intended to apply to the agreement by which the

member is retained by the client, unless the agreement confers on

the member an ownership, possessory, security, or other pecuniary

interest adverse to the client.  Such an agreement is governed, in

part, by rule 4-200."  Cal R Prof Conduct 3-300, Discussion.  The

court finds nothing in the agreement that confers on Thelen a

pecuniary interest adverse to Marland.  Rather, the agreement

establishes a 35/65 split of legal fees paid by CDOI to Thelen.

Marland can point the court to no terms in the agreement

establishing a business relationship or suggesting an adverse

interest, and the court can find none on its own.

In addition to being a retention contract, the court also

interprets the December 2002 agreement as a settlement agreement

based on the mutual release language copied above [see section I].

As such, Thelen correctly points out that the contract is governed

by Cal R Prof Conduct 3-400:

> A member shall not:

> (A) Contract with a client prospectively limiting the
> member's liability to the client for the member's
> professional malpractice; or

> (B) Settle a claim or potential claim for the member's
> liability to the client for the member's professional
> malpractice, unless the client is informed in writing

44

> that the client may seek the advice of an independent
> lawyer of the client's choice regarding the settlement
> and is given a reasonable opportunity to seek that
> advice.

Cal R Prof Conduct 3-400.

Marland cites no authorities, and the court knows of none, in which Rule 3-300 was applied to a contingency agreement, a fee-splitting agreement or a settlement agreement. Accordingly, the court agrees with Thelen and finds that Rule 3-300 does not apply.

4

Finally, Marland argues that the December 2002 agreement was induced by fraud. Doc #226 at 9-11. Marland's evidence is again problematic.

To show that he has a triable fraud claim, Marland must point to facts that show that (1) Thelen made a material misrepresentation of fact, (2) with knowledge or belief of its falsity, (3) with the intent to defraud, and (4) Marland actually and justifiably relied on the misrepresentation. Engalla v Permanente Medical Group, Inc, 15 Cal 4th 951, 974 (1997); Mirkin v Wasserman, 5 Cal 4th 1082 (1993). Marland identifies four purported "misrepresentations" that he claims were the "main arguments Thelen made in support of its demand for a better deal." Doc #226 at 9:

First, according to Marland's opposition brief, "Thelen's main accusation was that the DOI had retained Thelen and agreed to compensate Marland based on their [Thelen and Marland's] representation that Marland had a copy of the portage that DOI did not have and that Marland would produce the document if needed or

45

United States District Court

For the Northern District of California

requested, and that Marland had now breached that representation." Doc #226 at 9.  Marland's brief does not identify any specific statement made to him by Thelen on this topic.  Marland does not cite to any evidence even suggesting that such a statement was made.  Even if Thelen made the statement, Marland provides no evidence showing that the statement was false, that Thelen had an intent to defraud or that Marland relied on the statement.

Second, Marland claims that Wynne Carvill told Marland that Marland was "counsel to the Commissioner" and that his destruction of the *portage* was spoliation of evidence that could be attributed to the Insurance Commissioner.  Id at 10-11.  Thelen admits that, in corresponding with Brunswick, Carvill did use the term "counsel to the Commissioner."  But Thelen points out that (1) there is no evidence that Carvill believed the statement to be false; (2) Carvill testified that he believed the statement was true when he made it, doc #235, Ex B at 376; (3) Marland's cited documents say nothing about spoliation being attributable to the Commissioner, doc #186, ex 43; (4) there no evidence that Carvill had an intent to defraud or that Marland relied on the statement.

Third, according to Marland's opposition brief, Thelen "concealed" from him that Thelen had told CDOI in August 2002 that Marland did not have the *portage*.  Doc #226 at 11.  Thelen points out that this is false, as Marland admits that Thelen told him in October 2002 that "LeVine [a Department lawyer] had been told that Marland was not going to produce the document," doc #226 at 11, and the new agreement was not executed until December 2002.  Moreover, Marland again fails to present evidence showing that Thelen

\\

United States District Court

For the Northern District of California

concealed information, that there was an intent to defraud or that Marland relied on the concealment.

Fourth, according to Marland, Thelen made false statements to him to the effect that it "wanted to get the Commissioner to approve [the December 2002 agreement] as soon as possible" and concealed from Marland its decision to "slow down" the ELIC litigation "as much as possible" through the end of 2002 and wait for a new Commissioner to approve the December 2002 agreement. Doc #226 at 11. Marland's cited documents show Thelen representing to Marland in July 2002 that Thelen's negotiations with CDOI could not proceed until Thelen had reached an agreement with European Counsel. Doc #186, Exs 39, 43. Marland does not show how these statements were false. Marland's other cited documents, id at exs 75 & 121, do not support his assertion that Thelen agreed to slow down the ELIC litigation. The documents state that Thelen committed to investing an additional $2 million to litigating the ELIC matter even though they had not yet obtained CDOI's consent to modify the fee-sharing agreement with European Counsel. Even if Thelen had made a decision to "slow down," Marland does not show how this decision was concealed from him or that such concealment was material to his decision to enter the December 2002 agreement. At most, the alleged concealment caused Marland to feel rushed to enter the agreement. But it is difficult to see how Marland can make this claim given that he continued negotiating and did not execute the agreement for a full five months following the alleged misrepresentations.

In sum, the "misrepresentations" Marland identifies are not supported by admissible evidence. In order to survive summary

United States District Court
For the Northern District of California

judgment, Marland was required to "set forth, by affidavit or as otherwise provided in Rule 56, '*specific facts* showing that there is a genuine issue for trial.'"  TW Elec Services Inc v Pacific Elec Contractors Ass'n, 809 F2d 626, 630 (9th Cir 1987) (emphasis in original) (quoting FRCP 56(e)).  Marland does not provide specificity with respect to (1) the content of the statements; (2) the times, dates and places of the statements; (3) the identity of the speakers; or (4) what bases he has for believing the statements to be false.  Further, Marland does not even argue, much less support, that he actually, justifiably and detrimentally relied on these alleged statements.

    Finally, Thelen points out that Marland, when asked under oath to identify the specific lies he believed Thelen had told him, gave evasive and non-responsive answers.  Doc #175, Ex A (Marland dep) at 245:19-270:04.  For example:

> Q: In what ways do you believe you were lied to in connection with negotiations of the 2002 agreement?
>
> A: In what ways at that time?
>
> Q: Then or now.
>
> A: At the time, had I been able to imagine that these people were swindling me, it's clear that I wouldn't have done business with them, but how could I imagine that a lawyer worthy of that name could play with his client as if with a marionette.  It's true that I don't speak English very well.  It's true that I don't - I'm not familiar with American law.  It's true that I don't have any other lawyers who are litigators in California law, but would I have had to hire another California law litigator that I would have then had to have verified by a third California law litigator * * *
>
> Q: Mr Marland, all I want to know from you is in connection with the 2002 agreement, what lies do you believe were made by the Thelen lawyers to you * * *
>
> A: All of the reproaches that I was talking about are not specifically linked to this, that or the other protocol.

United States District Court

For the Northern District of California

1
2
3
4
5
6

> Excuse me for the word, but seems to me as if there is
> here a conspiracy.  Every manipulation, every bad action
> of the protocol of 2002 seems all to work together.  And
> if you ask me specifically for what reproaches I would
> have for the agreement of 2002, this is something that I
> would have to insert into a totality and you know this
> very well, because Gary prepared a document that made
> me with all of my trust sign, and I have understood
> everything, this document allowed, this document allowed
> you to have absolution for everything that you had done
> wrong.  That's my answer.

7
8
9

> Q: Are there specific facts that you now believe you were
> given by the Thelen lawyers in connection with the
> negotiations of this agreement that you now believe were
> false?

10

> A: I don't understand the question, but if I do
> understand it, I have already answered it.

11    Id at 245:19-250:19.

12    Marland also testified that he did not recall speaking

13    with Fontana on the telephone in the second half of 2002.  Doc

14    #235, Ex A at 126:5-9.  While Marland met with Fontana twice during

15    that period, he could not recall what was discussed at either

16    meeting.  Id at 126:10-127:19.  Similarly, Marland testified that

17    he met with Carvill only once in New York and recalled that they

18    "spoke very little given that Carvill doesn't speak French and

19    [Marland] speaks so little English."  Id at 112:8-16, 130:5-12.

20    Marland did not negotiate over any of the terms of the agreement

21    with Carvill.  Id at 130:15-131:7.  Marland's recollection of his

22    meeting with Carvill is so vague that, if he saw Carvill today, he

23    would not recognize him.  Id at 113:14-116:16, 135:9-10.

24    Marland further testified that he did not review the

25    draft agreements exchanged by Carvill and Brunswick.  Id at 135:15-

26    22.  He could not recall whether he had reviewed any of the emails

27    between Carvill and Brunswick where Carvill made claims against

28    Marland.  Id at 150:11-18.  Marland also admitted that he signed

49

the December 2002 agreement without reading it.  Id at 158:23-160:8.

**5**

In his notice of motion, Marland states that he is seeking summary judgment on his first, third, sixth, seventh, eighth and ninth affirmative defenses.  Doc #184.  In these affirmative defenses, Marland alleges that (1) Thelen's amended complaint failed to state a claim, because Thelen did not plead that the December 2002 agreement is fair and reasonable (first); (2) Thelen failed to fulfill a condition precedent (third); (3) Marland did not have the benefit of independent counsel to advise him regarding the December 2002 agreement (sixth); (4) the release and fee-sharing provisions are unfair and lack consideration (seventh); (5) the release and fee-sharing provisions are unconscionable and were procured through client abandonment (eighth); and (6) Thelen violated the Rules of Professional Conduct in negotiating the December 2002 Agreement (ninth).  Doc #72.

In his points and authorities, Marland argues only that (1) Thelen failed to fulfill a condition precedent; (2) Thelen failed to plead and cannot prove that it made disclosures to Marland as required under Cal Rule Prof Conduct 3-300; and (3) Thelen failed to plead and cannot prove that the December 2002 agreement was fair, reasonable and supported by adequate consideration.  Doc #184.  These arguments relate only to Marland's first, third, seventh and ninth affirmative defenses.  These arguments have already been rejected by the court for reasons discussed above.  Marland's motion for summary judgment on his sixth and eighth affirmative defenses is not supported by his

United States District Court

For the Northern District of California

points and authorities. Accordingly, Marland's motion for summary judgement on his affirmative defenses is DENIED.

6

The court finds that Thelen has met its burden of proof on the validity of the December 2002 agreement. Thelen has established, without opposition, that the signatories to the agreement were all competent adults capable of consent. Thelen points out that Marland is a sophisticated businessman and lawyer. Doc #175, Ex A (Marland dep) at 13:17-14:13, 18:51-21, 32:2-37:21. Marland received a law degree from the University of Paris X Law School (Nantere) and practiced law in France from 1979 to 1987. Id. In 1987, Marland created the 2M Investment Corporation and began purchasing interests in a wide variety of industries. Id. Until he sold his business in 1992, Marland oversaw the acquisition of more than seventy companies. Id.

As stated above, Marland received advice from attorneys Francois Chateau and Philippe Brunswick throughout his relationship with Thelen. Chateau is licensed to practice law in Paris and New York and is fluent in English and French. Doc #176, Ex 1. Chateau represents European companies with interests in the United States and United States companies investing in Europe. Id. Chateau also advises clients in contract negotiations, intellectual property issues and international tax planning. Id. Philippe Brunswick graduated from the University of Paris Law School in 1976. Doc #175, Ex C (Brunswick dep) at 11:12-16. Brunswick has drafted and negotiated contracts in both French and English. Id at 18:12-22. Brunswick began representing Marland around 1987, including drafting and negotiating contracts for Marland's companies and, on

United States District Court
For the Northern District of California

one occasion, negotiating a settlement agreement following litigation.  Id at 54:24-57:25; Doc #175, Ex A (Marland dep) at 63:10-16.  In sum, there is no evidence that Marland or his attorneys were incapable of understanding the terms of the December 2002 agreement.

As detailed above, Thelen has established beyond reasonable dispute that there was sufficient consideration for the agreement and that all conditions precedent to the agreement were met.

Also discussed above, Thelen points out that the agreement was governed by Cal R Prof Conduct 3-400 (governing an attorney's conduct in negotiating a settlement of claims or potential claims by a client).  Rule 3-400 requires the attorney to (1) inform the client in writing that the client may seek the advice of an independent lawyer of the client's choice regarding the settlement; and (2) give the client a reasonable opportunity to seek that advice.  Cal R Prof Conduct 3-400(B).  Thelen establishes, and Marland does not dispute, that Thelen complied with this rule.  The first draft agreement Carvill sent to Brunswick stated, "[Thelen], on the one hand, and [Marland, Brunswick and Maas] on the other, are each represented by and are relying exclusively on their own counsel and neither is relying on the other for legal advice regarding this Agreement, its terms or effect, or its enforceability under the laws of any jurisdiction."  Doc #220, Ex 3 at M2128.  Carvill included this or similar language in each draft he sent to Brunswick and in the drafts he sent to Marland directly.  Id at Exs 5-6, 11-14, 21, 25, 29, 31.  Moreover, it is undisputed that Marland had a reasonable opportunity to

United States District Court

For the Northern District of California

consult with independent counsel and did so.  Brunswick and Chateau provided Marland with legal advice over a six-month period.  See evidence cited in Doc #223 at footnotes 111-118.  California courts have upheld as valid settlement agreements between attorneys and clients where the client waived and released all known and unknown claims.  <u>Winet v Price</u>, 4 Cal App 4th 1159 (1992).

Finally, as detailed above, charges and counter-charges of bad faith were made by both sides, and terms were drafted, edited and re-written.  In the end, Thelen and Marland compromised their positions and resolved their claims through the December 2002 agreement.  Marland does not dispute that this is a "lawful object."  See Restatement of Contracts (Second) § 74; <u>Winet v Price</u>, 4 Cal App 4th 1159 (1992).

* * *

For all the above reasons, Thelen's motion for summary judgment on its first claim for declaratory relief that the December 2002 agreement is valid is GRANTED.

B

The court next addresses the parties' respective motions on the counterclaims and counter-counterclaims.

1

*Marland's Second & Third Counterclaims*

In his second counterclaim, Marland seeks damages for Thelen's alleged breach of the June 1999 fee-sharing agreement. Doc #72 at 45-47.  In his third counterclaim, Marland seeks damages for Thelen's alleged "bad faith denial" of the existence of the

February 1999 and June 1999 agreements.  Id at 47-48.  As discussed
above, the December 2002 agreement replaced "any and all other
agreements" between the parties, and the court has found that the
December 2002 agreement is valid and enforceable as a matter of
law.  Moreover, California does not recognize the tort of bad faith
denial of contract.  Freeman & Mills, Inc v Belcher Oil Co, 11 Cal
4th 85 (1995).  Accordingly, Thelen's motion for summary judgment
on Marland's second and third counterclaims is GRANTED.  Marland's
motion for summary judgment on his second counterclaim is DENIED.

**2**

*Marland's First, Fourth & Fifth Counterclaims*

In his first, fourth and fifth counterclaims, Marland
seeks damages for breach of fiduciary duty, fraud and legal
malpractice, respectively.  Doc #72 at 41-51.  Thelen argues that
Marland's first and fifth counterclaims are barred by the
applicable one-year statute of limitations under Cal CCP § 340.6.
Doc #144.

The court need not reach Thelen's statute of limitations
argument.  To the extent Marland's first, fourth and fifth
counterclaims allege conduct occurring prior to the execution of
the December 2002 agreement, they are barred by the mutual release
provision of that agreement.  At the summary judgment hearing,
counsel for Thelen pointed out that Thelen's statute of limitations
motion was brought in part because these counterclaims include
allegations of conduct post-dating the December 2002 agreement.But
these allegations do not suffice to withstand summary judgment once
the December 2002 agreement has been held valid.  Marland's first,
fourth and fifth counterclaims rest on 48 numbered allegations,

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

beginning at page 29 of his revised amended answer and
counterclaims.  Doc #72.  Of these, only paragraphs 3(c), 16 and
41-46 allege conduct post-dating December 2002.  Paragraph 3(c) and
paragraphs 41-46 deal with Thelen's alleged failure to obtain
CDOI's consent to the "entire agreement" discussed at length in
IIA1a.  Paragraph 16 fails to allege a misrepresentation
independent of the December 2002 agreement.  Having found that
agreement valid, Marland's first, fourth and fifth counterclaims
fail.

Accordingly, Thelen's motion for summary judgment on
Marland's first, fourth and fifth counterclaims is GRANTED.

3

*Thelen's Counter-Counterclaims*

Thelen's counter-counterclaims are contingent on the
court finding that the December 2002 is not valid and enforceable.
Doc #164-1 at ¶¶45, 52.  Accordingly, Marland's motion for summary
judgment on Thelen's counter-counterclaims is MOOT and DENIED.
Finally, and for the same reasons, Susannah Maas's motion to
dismiss Thelen's counter-counterclaims, Doc #171, is MOOT and
DENIED.  Philippe Brunswick and Susannah Maas are no longer parties
to this action.

III

The court next addresses Thelen's motion for preliminary
or permanent injunction of the New York arbitration.  Equitable
remedies, including permanent injunction and specific performance,
are "designed to enforce substantive law rights."  <u>Sullivan By and
Through Sullivan v Vallejo City Unified School Dist</u>, 731 F Supp

**United States District Court**

For the Northern District of California

947, 956 (ED Cal 1990) (citation omitted ).  "[A]s a general rule, when forum state law defines the underlying substantive right, state law also governs the availability of such equitable remedies as a permanent injunction, specific performance * * *" Charles Alan Wright, et al, 19 Federal Practice and Procedure § 4513 at 447 (1996).  Accordingly, California law determines Thelen's right to permanent injunctive relief.

"A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action for tort or other wrongful act against a defendant and that equitable relief is appropriate." Syngenta Crop Protection, Inc v Helliker, 138 Cal App 4th 1135, 1166-67 (2006).  Cal Civil Code § 3422 states that a court may grant a permanent injunction "to prevent the breach of an obligation existing in favor of the applicant: (1) Where pecuniary compensation would not afford adequate relief; (2) Where it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief; (3) Where the restraint is necessary to prevent a multiplicity of judicial proceedings; or (4) Where the obligation arises from a trust."

It is clear from the above discussion that the parties have litigated their claims here to final resolution.  Indeed, this order eliminates those claims.  This resolution binds the parties on the litigated claims and moots the necessity of injunctive relief.  To the extent there remain other claims not here litigated, those claims may be arbitrated or litigated elsewhere.  Injunctive relief is not required here.  Accordingly, Thelen's motion for a permanent injunction barring Marland from proceeding with the New York arbitration is DENIED AS MOOT.

United States District Court
For the Northern District of California

IV

For the reasons given above, Thelen's motion for summary judgment on its first claim for declaratory relief that the December 2002 agreement is valid is GRANTED.  Thelen's motion for summary judgment on Marland's second and third counterclaims is GRANTED.  Thelen's motion for summary judgment on Marland's first, fourth, and fifth counterclaims is GRANTED.  Thelen's motion for summary judgment on Marland's fifth affirmative defense is GRANTED.  Thelen's motion for permanent injunction of the New York arbitration is DENIED AS MOOT.  Marland's motion for summary judgment on Marland's affirmative defenses is DENIED.  Marland's motion for summary judgment on Marland's second counterclaim is DENIED.  Marland's motion for summary judgment on Thelen's affirmative defenses to count two of Marland's counterclaim is DENIED AS MOOT.  Marland's motion for summary judgment on Thelen's counter-counterclaims is DENIED AS MOOT.  Susannah Maas's motion to dismiss Thelen's counter-counterclaims is DENIED AS MOOT.

The trial, currently scheduled to commence on August 6, 2007, is VACATED.  The clerk is DIRECTED to close the file and terminate all motions.

SO ORDERED.

_____

VAUGHN R WALKER

United States District Chief Judge

57

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
For the Northern District of California