# EXHIBIT 1

# Hayes & Hardy LLP

## FACSIMILE COVER SHEET

**To:** Robert M. Blum

**Tel. No.:** 415-369-7277

**Fax No.:** 415-369-8615

From: Andrew W. Hayes

Date: February 13, 2006

Re: Demand for Arbitration

Total Pages: 10, including this cover page

Please call 917-770-0180 if there are any problems with this transmission

---

Please find attached materials filed today with the American Arbitration Association.

Feb 13 2006 4:31PM The Civic Foundation (203) 625-4520 p.2
Case 3:07-cv-05663-VRW  Document 5-2  Filed 11/07/2007  Page 3 of 11

AAA WebFile

Page 1 of 2

# Online Filing Demand For Arbitration/Mediation Form

This concludes your filing.
Thank you for submitting your claim to the AAA.
Your claim confirmation number is: 002-B2X-ZJ5

To institute proceedings, please send a copy of this form and the Arbitration Agreement to the opposing party.

Your dispute has been filed in accordance with: Commercial Dispute Resolution Procedures
This Claim has Been Filed For: Arbitration
Filing Fee: $15,000.00

## Additional Claim Information

**Claim Amount:** $35,000,000.00

**Claim Description:** The claims are brought by a client against his former counsel and self-described "partner" in pursuing certain whistleblower claims. The claims are for breach of fiduciary duty, misrepresentation, and professional negligence. Petitioner seeks damages including disgorgement of all fees obtained pursuant to counsel's retainer with a second client using Petitioner's confidential information, and other relief.

**Arbitration Clause:** 23.) All disputes which may arise concerning this Agreement shall be submitted to binding arbitration under the rules and regulations of the American Arbitration Association using a single arbitrator. The arbitration shall take place in New York City or such other place as the parties may agree. The arbitrator shall issue a written decision setting forth findings of fact and conclusions of law, which decision shall be final and binding on all parties. The arbitrator's award may be enforced in any court having jurisdiction by filing a petition to enforce such award. The cost of filing, including reasonable attorney's fees, may be recovered by the party that initiates the action to have the award enforced.

**Hearing Locale Requested:** New York, NY
**Contract Date:** 02/17/1999
**Number of Neutrals:** 1

## Claimant

**Francois Marland-RoNo LLC**
**Type of Business:** Investor

Name: Francois Marland
Company Name: RoNo LLC
Address: C/O Hayes & Hardy Llp
45 Rockefeller Center, Suite 2000
#31
New York, NY 10111 - 2000
Tel#: 212-332-2840
Fax#:
Email: ahayes@andrewhayes.net
Include in Caption: Both

## Representatives

Name: Andrew Hayes
Company Name: Hayes & Hardy LLP
Address: 45 Rockefeller Center, Suite 2000
New York, NY 10111 - 2000
Tel#: 212-332-2840
Fax#:
Email: ahayes@andrewhayes.net

## Respondent

**Thelen Reid & Priest LLP**
**Type of Business:** Partnership

Name:
Company Name: Thelen Reid & Priest LLP
Address: 101 Second Street, Suite 1800
San Francisco, CA 94105 - 3606
Tel#: 415-371-1200
Fax#: 415-371-1211
Email: rblum@thelenreid.com
Include in Caption: Company

## Representatives

To institute proceedings, please send a copy of this form and the Arbitration Agreement to the opposing party. Your demand/submission for arbitration/mediation has been received on 02/13/2006.

## DESCRIPTION OF CLAIMS

1. Petitioner François Marland herein seeks to enforce his rights under his February 16, 1999 Attorney-Client Agreement with his former counsel, Thelen Reid & Priest LLP ("TRP") and to recover damages for TRP's malpractice and breaches of fiduciary duty towards Marland prior to, during, and concerning that agreement. The most significant instances of TRP's misconduct are set forth below.

2. In the second half of 1998, Marland (a Frenchman living in Switzerland) met Gary Fontana, the TRP partner who took charge of Marland's representation, regarding a possible whistleblower action involving the use of secret fronting agreements to conceal the interests of banks owned by the French state in the 1991 acquisition of Executive Life, an insolvent California insurance company. From the inception of this representation, Fontana and TRP gave Marland clearly wrong advice about his options and obligations, failed to protect his information and his interests, and maneuvered to use his information for TRP's own financial benefit, at Marland's expense.

3. Instead of filing a _qui tam_ action, or taking other action to ensure Marland's treatment as a whistleblower, TRP first sought to have Marland – a fact witness to the underlying events – paid on a contingent fee as a consultant to one of the parties in interest, with TRP serving as Marland's counsel.

4. As TRP later wrote, the firm considered itself a "partner" with Marland in seeking to capitalize on his information, based on Fontana's own knowledge of the parties and some of the events at issue in the underlying fraud. However, TRP was also acting as Marland's counsel (as it later also confirmed in writing). Thus from the

inception of its representation, TRP was "wearing two hats", and failed to make adequate disclosure of its intentions and actions to its client/partner, Marland.

5. TRP's efforts to profit directly from Marland's information tainted its entire representation of him. For example, TRP negotiated for months with the California Department of Insurance ("DOI") regarding a potential retainer of Marland <u>and</u> TRP. TRP told Marland that it was in his interest to have such an agreement, but failed to explore, or advise Marland, of his other options – such as pursuing a whistleblower agreement with the DOI in which the DOI would choose its own counsel.

6. TRP also failed to take reasonable steps to ensure the confidentiality of Marland's information. As a result, the DOI began its own investigation and obtained information that made Marland's information less valuable.

7. At the same time, Fontana told Marland (who was very concerned about protecting his anonymity, for fear of reprisal) that he could remain anonymous, and that he would not have to produce any documents he did not want to produce. Marland told Fontana that this was important to him, and relied on TRP's advice. At no time did Fontana or TRP tell Marland that he had an obligation to preserve or produce evidence he did not want to produce.

8. In February 1999, when it became clear that the DOI was going to file its own action based on the investigation that Marland's information had sparked, TRP negotiated an unconscionable contingent fee agreement with Marland as a <u>qui tam</u> whistleblower, under which TRP would get at least 50% of Marland's recovery (unless the case settled in 1999, in which case it would get 35%) – *even if* the California Attorney

General ("AG") intervened in the qui tam action and TRP did no actual work litigating the case.

9. TRP then filed a qui tam action the same day as the DOI filed its own action – February 17, 1999. After this filing, TRP continued to use its representation of Marland to secure a second retainer with the DOI. Marland agreed to this based on TRP's advise that it was in his interest to do so and on the understanding that TRP would share its fees from that representation with Marland so that the net result was the same as if the fees had been recovered in the qui tam action. Fontana has recently acknowledged that this principle was the basis on which TRP pursued the second retainer with the DOI.

10. Nevertheless, TRP's pursuit of a retainer with the DOI reflected its elevation of its interests ahead of its client's. In particular, negotiations regarding cooperation between the DOI, the AG, and TRP over the two pending actions were complicated by TRP's insistence that it serve as lead counsel for both the AG (who would intervent in the qui tam action) and the DOI.

11. In April 1999, TRP told Marland that it had proposed to the AG and the DOI that the parties should agree to work together, with the AG's office leading the litigation, and postpone any issues regarding allocation of recoveries until the end of the litigation. The AG has since told Marland that it never received such a proposal.

12. When TRP did sign a retainer with the DOI, in May 1999, it failed to disclose its potential conflicts of interest from this dual representation and failed to obtain any waiver from either Marland or the DOI. TRP also failed to advise the DOI of its prior advice to Marland that he did not have to produce any documents he did not want to

produce – even though Marland had reminded TRP, in writing days before this second retainer, that he would not produce any more documents relating to the matter.

13. TRP's retainer with the DOI also called for Marland to dismiss the qui tam lawsuit in favor of the DOI's action. Marland agreed to this condition on the understanding (noted above) that TRP would share its fees from the DOI action with him as if they were obtained in the qui tam action, according to the terms of the Attorney-Client Agreement.

14. In June 1999, TRP had Marland sign a blatantly unlawful amendment to his Attorney-Client Agreement which provided for Marland's share of any recovery to be reduced by half if he was unable or unwilling to testify in the pending civil litigation. This amendment shows TRP's disregard for legal constraints on attorney-client agreements.

15. When the AG's office decided to intervene in the action in 2001, the AG told the DOI that TRP had a clear and unwaivable conflict of interest in representing both Marland and the DOI. TRP responded by falsely telling both the DOI and the AG that it had obtained a clear and unequivocal conflict waiver from Marland – when in fact TRP had obtained no waiver at all from Marland. Indeed, TRP had not even sought such a waiver.

16. After seeking and obtaining a very limited waiver from Marland in September 2001, TRP failed to advise its other client, the DOI, that Marland's limited waiver required TRP to put Marland's interests ahead of TRP's in the event of any actual conflict.

17. As noted, the underlying litigation concerned the use of secret fronting agreements to conceal the interests of banks owned by the French state in the acquisition of an insolvent California insurance company, as well as the subsequent cover-up of those fronting agreements from regulatory scrutiny. This litigation involved hundreds of witnesses on two continents, millions of pages of documents, complex regulatory issues, and multiple criminal investigations and charges. Despite all that, TRP told Marland in 2002 TRP that it could not have anticipated that the litigation would take over three years and cost over $10 million. Citing these "unanticipated" pressures, TRP told Marland that it needed to renegotiate the Attorney-Client Agreement to ensure that TRP made a profit from the representation.

18. TRP also falsely told Marland in 2002 that they needed to renegotiate its reainer because the DOI was (TRP claimed) angry with Marland and wanted to exclude Marland from any recoveries due to his refusal to produce an incriminating document he had previously described to TRP. Reminded that Marland had told TRP in May 1999 he would not produce that or any other document, TRP's responded that the DOI (its other client) was unaware of that refusal – which, as noted, was based on TRP's own advice to Marland. In any event, this entire issue was a pretext: the DOI has stated that it did not direct TRP to renegotiate or terminate its agreement with Marland.

19. When Marland balked at renegotiating, TRP then purported to terminate the Attorney-Client Agreement in August 2002, and told Marland that this meant he would be excluded from *any* recoveries or any share of TRP's fees.

20. TRP then coerced Marland to sign a new attorney-client agreement under which the initial retainer agreement was reinstated and then modified so that

Marland's share of any award was cut in half. The amended agreement also purported to release TRP from any claims, known or unknown – a clause that was procured by fraud, void as against public policy, and unenforceable.

21. After Marland retained additional counsel in late 2004 who were independent of TRP, TRP refused over a dozen requests and pleas from that new counsel to discuss the evolution of its representation of Marland. More recently, TRP again completely ignored a request from Marland's counsel to discuss the evolution of the parties' relationship and Marland's concerns – leaving no alternative but to file this proceeding to enforce Marland's rights under the Agreement and applicable fiduciary law.

22. In sum, based on the above:

a. TRP's advice to Marland was flatly contrary to law on several key points, and clearly skewed to reflect TRP's interest to maximize its own role and recovery from any litigation.

b. TRP's negotiation of its 1999 retainer by the DOI – and its failed negotiations with the AG – breached its duties to Marland by placing its interests ahead of his and failing to obtain his informed consent.

c. TRP further breached its fiduciary duties to Marland in 2001 by falsely telling the AG that Marland had given a waiver, when in fact no waiver had been given and the waiver that was given, later in 2001, required TRP to place Marland's interests ahead of the DOI's in the event of any conflict.

  d. TRP cannot justify the 2002 amendment to the Attorney-Client Agreement as fair and reasonable, as required by Section 18 of the Restatement of the Law Governing Lawyers regarding amendments to retainer agreements.

  e. TRP also cannot enforce the 2002 amendment to the Attorney-Client Agreement because it never complied with the condition of Marland's limited September 2001 waiver — on the contrary, it consistently placed the DOI's interests ahead of Marland's.

  f. The purported waiver in the amendment to the Attorney-Client Agreement is also void because it was procured by fraud, without full disclosure by TRP, as a fiduciary, of its client's rights, and as against public policy applicable to an ongoing attorney-client relationship.

  g. As a consequence of its repeated, intentional breaches of duties to Marland TRP, as a disloyal fiduciary, should be required to forfeit its compensation received from its representation of the DOI. In the alternative, and at the very least, Marland is entitled to the recovery provided for in the 1999 Attorney-Client Agreement, which contains the arbitration clause that gives rise to this action.