# EXHIBIT 2

KEKER & VAN NEST, LLP
ROBERT A. VAN NEST - #84065 (rvannest@kvn.com)
WENDY J. THURM - #163558 (wthurm@kvn.com)
STEVEN K. YODA - #237739 (syoda@kvn.com)
710 Sansome Street
San Francisco, CA  94111-1704
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188

Attorneys for Plaintiff
THELEN REID & PRIEST LLP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THELEN REID & PRIEST LLP,

                        Plaintiff,

     v.

FRANÇOIS MARLAND,

                     Defendant.

Case No. C 06-2071 VRW

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## <u>INTRODUCTION</u>

1.     Plaintiff Thelen Reid & Priest LLP ("Thelen") brings this action pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, to enforce an agreement between it and Defendant François Marland ("Marland"), which they entered into in December 2002 ("the December 2002 Agreement").  *See* Ex. E.

2.     Thelen is a California limited liability partnership and a law firm with an office in San Francisco, California.  Thelen was formed in July 1998 as the result of a merger between Thelen, Marrin, Johnson & Bridges and Reid & Priest.

3.     Marland is a citizen of the Republic of France, a French attorney, and currently a resident in Switzerland.

4.     Thelen previously had an attorney-client relationship with Marland.

5.     On February 13, 2006, Marland initiated an arbitration proceeding against Thelen

1    in New York, asserting claims arising from Thelen's representation of him ("the New York

2    arbitration proceeding"). *See* Ex. G.

3        6.    In the December 2002 Agreement, Marland, (on behalf of himself and RoNo, *see*

4    *infra*, ¶ 20) released Thelen from any and all claims arising from their attorney-client

5    relationship, whether sounding in contract or tort, including the very claims asserted in the New

6    York arbitration proceeding.  In addition, the claims asserted in the New York arbitration

7    proceeding are barred by the statute of limitations.  Furthermore, the December 2002 Agreement

8    does not contain an arbitration clause.

9        7.    Thelen requests that the Court declare that the December 2002 Agreement is valid

10   and enforceable; declare that Marland released Thelen from all claims arising out of their

11   attorney-client relationship, including the claims asserted in the New York arbitration

12   proceeding; declare that the claims asserted in the New York arbitration proceeding are barred by

13   the statute of limitations; and enjoin Marland from pursuing the New York arbitration

14   proceeding against Thelen and from interfering with this action.

15                                    **JURISDICTION**

16       8.    Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332(a)(2).  All of

17   Thelen's partners are citizens or legal permanent residents of the United States.  Marland is a

18   citizen of France.  The claims being asserted by Marland in the New York arbitration

19   proceeding, which are subject to releases and barred by the statute of limitations, are valued by

20   him at $35 million.  *See* Ex. G at 2.

21       9.    Personal jurisdiction over Marland in California is proper because Marland, in the

22   December 2002 Agreement, consented to jurisdiction in the State of California.  *See* Ex. E ¶ C.9.,

23   at 9.  Furthermore, Marland purposefully availed himself of professional relationships with

24   lawyers in California to pursue litigation in California.  The exercise of jurisdiction over Marland

25   comports with traditional notions of fair play and substantial justice.

26                                       **VENUE**

27       10.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).  A substantial

28   part of the events giving rise to this claim occurred in San Francisco County.  Thelen has an

2

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   office in San Francisco.  The Thelen attorneys with whom Marland primarily interacted are from

2   Thelen's San Francisco office.  The December 2002 Agreement was negotiated, in part, in San

3   Francisco.  And, in February 1999, at Marland's direction, Thelen initiated litigation on his

4   behalf in San Francisco County Superior Court.

5   **INTRADISTRICT ASSIGNMENT**

6   11.     For the reasons stated in, *supra*, ¶ 10, this action arises out of San Francisco

7   County.  Accordingly, this action is properly assigned to either the San Francisco Division or

8   Oakland Division.  *See* Civil L.R. 3-2(d).

9   **GENERAL ALLEGATIONS**

10  **A.      Background**

11  12.     In 1991, Executive Life Insurance Company ("ELIC"), then one of California's

12  largest insurance companies, became insolvent and was seized by the California Department of

13  Insurance ("CDOI").  As part of ELIC's rehabilitation, CDOI conducted an auction of the junk

14  bond portfolio and insurance assets of ELIC.

15  13.     A consortium of European companies led by Altus Finance S.A. ("Altus"), a

16  subsidiary of Crédit Lyonnais, was the winning bidder at the auction.  Under the terms of the bid,

17  Altus agreed to purchase the junk bonds and a separate group led by La Société Mutuelle

18  d'Assurance Artisanale de France ("MAAF"), a French insurance company, purchased ELIC's

19  annuities and insurance policies using a California insurance company, Aurora National Life

20  Assurance Company ("Aurora"), that was created for this purpose.  At the time of the bidding,

21  Crédit Lyonnais and Altus were owned by the Government of France.

22  14.     In fact, through a series of undisclosed fronting agreements (called *contrats de*

23  *portage* in France), Altus and Crédit Lyonnais secretly owned and controlled Aurora and the

24  insurance assets acquired from the ELIC estate.  State and federal laws at the time prohibited

25  banks operating in the United States and foreign government-owned companies from owning or

26  controlling a California insurance company.  Since Crédit Lyonnais was a bank operating in the

27  United States and one that was majority-owned by the French government, the acquisition was

28  illegal.

3

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

15.     In 1997, before the illegality of Crédit Lyonnais's conduct had been exposed, Marland approached the New York law firm of Reid & Priest and informed the firm that he possessed information about a *contrat de portage*, which showed that Altus and Crédit Lyonnais secretly owned and controlled Aurora and the insurance assets acquired from the ELIC estate.

16.     In July 1998, as a result of the merger between Thelen, Marrin, Johnson & Bridges and Reid & Priest, Marland came to San Francisco and met with Thelen to discuss ways in which Marland might derive a financial benefit from his information and, at the same time, protect his identity.

17.     Thelen prepared a "white paper" which described details about the *contrat de portage* and explained why its nondisclosure to CDOI violated state and federal law. Marland and his French lawyer, Philippe Brunswick ("Brunswick"), reviewed and approved the "white paper."

18.     Thelen suggested presenting the "white paper" to CDOI to see if CDOI would be interested in pursuing claims against Crédit Lyonnais and to see if it would be willing to compensate Marland for his information. Marland and Brunswick authorized Thelen to present the "white paper" to CDOI.

19.     Between October 1998 and February 1999, Thelen met with representatives of CDOI and attempted to negotiate an agreement between CDOI and Marland. Thelen kept Marland and Brunswick fully informed of the status of these negotiations. Ultimately, CDOI failed to offer Marland compensation that was acceptable to him.

**B.      The February 1999 Agreement**

20.     In February 1999, Thelen recommended that Marland initiate his own *qui tam* lawsuit on behalf of the State of California and CDOI. Marland approved. With Marland's consent, Thelen established a Delaware limited liability corporation named RoNo, LLC ("RoNo"), of which Marland was the sole beneficial owner. RoNo would officially serve as the named plaintiff in Marland's *qui tam* lawsuit, in order to protect Marland's identity.

21.     On February 17, 1999, Thelen and Marland signed a formal attorney-client agreement ("the February 1999 Agreement"). *See* Ex. A.

22.     The February 1999 Agreement acknowledged that Thelen's "attorneys have been engaged in an effort to persuade [CDOI] to initiate legal proceedings against Crédit Lyonnais . . . . While [CDOI] has indicated a willingness to retain [Thelen] to conduct a further investigation and pursue potential claims against [Crédit Lyonnais], [CDOI] has been unwilling to date to pay [Marland] . . . for the information that he has provided, nor has it been willing to pay legal fees to [Thelen] that are adequate to allow [Thelen] to fully compensate [Marland] for the information and strategic assistance that he has provided . . . ." *See* Ex. A ¶ 2.

23.     Under the terms of the February 1999 Agreement, the parties agreed, among other things, that Thelen would file a *qui tam* complaint against Crédit Lyonnais in San Francisco County Superior Court and advise or assist CDOI and/or California's Attorney General in connection with the *qui tam* lawsuit.  *See* Ex. A ¶¶ 6(a), 6(c).

24.     In exchange for Thelen's services, Marland agreed to pay Thelen a percentage of any recovery he received in the *qui tam* lawsuit.  If the case settled before November 1, 1999, Marland agreed to pay Thelen 40% of any gross recovery.  *See* Ex. A ¶ 7(a).  Otherwise, Marland agreed to pay Thelen 50% of any gross recovery.  *See* Ex. A ¶ 7(b).

25.     On February 18, 1999, Thelen filed a *qui tam* complaint against Crédit Lyonnais, MAAF, and others in San Francisco Superior Court (Case No. CGC-99-301344).  The contents of the complaint and overall strategy were reviewed and approved by Marland and Brunswick prior to the complaint's filing.  The complaint remained under seal for over two years, until June 19, 2001, when California's Attorney General elected to intervene in, and proceed with, the lawsuit.

26.     Also on February 18, 1999, CDOI independently filed a separate complaint in Los Angeles County Superior Court against many of the same defendants, using separate counsel.

27.     Subsequently, CDOI asked Thelen to represent CDOI in its lawsuit.  In exchange for Thelen's services, CDOI offered to pay Thelen a percentage of any recovery it obtained.  *See* Ex. B ¶ 5.  CDOI refused to directly compensate Marland for his information, but CDOI did not object to Thelen sharing with Marland a portion of the legal fees it collected from CDOI.  Thelen informed Marland and Brunswick of CDOI's overture, and they agreed on the terms and

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    conditions under which Thelen would represent CDOI.

2        28.    Marland and Brunswick authorized Thelen to represent CDOI in CDOI's lawsuit,

3    provided that they and Susannah Maas ("Maas") (another of Marland's European lawyers) be

4    allowed to share in Thelen's legal fees.

5        29.    In May 1999, Thelen and CDOI executed an attorney-client agreement by which

6    Thelen agreed to represent CDOI in its litigation.  *See* Ex. B.  Thelen obtained both Marland's

7    consent to represent CDOI and CDOI's consent to share fees with Marland, Brunswick, and

8    Maas.

9    **C.    The June 1999 Agreement to Associate Counsel**

10        30.    Thelen, Marland, Brunswick and Maas signed a fee-sharing agreement in June

11   1999 ("the June 1999 Agreement to Associate Counsel").  *See* Ex. C.

12        31.    Under the terms of the June 1999 Agreement to Associate Counsel, if CDOI's

13   case settled on or before December 31, 1999, Thelen agreed to pay Marland, Brunswick and

14   Maas a total of 65% of the legal fees paid to it by CDOI.  *See* Ex. C ¶ 2(a).  Otherwise, Thelen

15   agreed to pay 52.5% of the legal fees paid to it by CDOI.  *See* Ex. C ¶ 2(b).

16        32.    In exchange, Marland, Brunswick and Maas agreed to assist Thelen's prosecution

17   of CDOI's lawsuit by, among other things, investigating facts, securing documents or testimony,

18   and accommodating all other reasonable requests by Thelen.  *See* Ex. C ¶ 1.

19        33.    In an addendum to the June 1999 Agreement to Associate Counsel, Marland

20   agreed to substantially reduce his (and his European lawyers') share of Thelen's fees in the event

21   his testimony was reasonably required and he failed to testify.  *See* Ex. D ¶ 3, at 2.

22   **D.    The December 2002 Agreement**

23        34.    Prior to July 2002, Thelen approached Marland in an attempt to restructure the

24   terms of their fee-sharing relationship based on a number of factors, including the changed

25   economics of the prolonged litigation.  Negotiations ensued.

26        35.    On July 8, 2002, pursuant to the terms of the February 1999 Agreement (*see* Ex.

27   A ¶ 22(a)), Thelen gave Marland 30 days' written notice of its decision to withdraw from its

28   representation of him.

6

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

36.     In late July 2002, Marland informed Thelen that, contrary to his earlier representations, he in fact did not possess any copies of the *contrat de portage*.  (In a deposition subsequently conducted in December 2004, Marland testified that he had destroyed his copies of the *contrat de portage* in July 2001.)  Negotiations continued.

37.     During the negotiations, Marland raised a number of concerns and made a number of allegations regarding Thelen's representation of him.  Among other things, Marland claimed that Thelen had misled him about the *qui tam* lawsuit, acted in bad faith in agreeing to represent CDOI, and otherwise breached duties owed to him under their attorney-client relationship.

38.     By December 2002, Thelen and Marland worked out a resolution of their disagreements and mutual claims, and signed a new Agreement ("the December 2002 Agreement").  *See* Ex. E.

39.     Under the terms of the December 2002 Agreement, Thelen, Marland, Brunswick and Maas agreed that the December 2002 Agreement replaced the February 1999 Agreement, the June 1999 Agreement to Associate Counsel, "and any and all other agreements" between them. Ex. E at 1.

40.     Under the terms of the December 2002 Agreement, Thelen agreed to pay Marland, Brunswick and Mass a total of 35% of Thelen's "Net Recovered Fees" (i.e., 35% of the legal fees paid to Thelen by DOI after subtracting unreimbursed expenses).  *See* Ex. E ¶ B.2.(a), at 3.

41.     Under the terms of the December 2002 Agreement, Thelen and Marland (and Marland's European lawyers) mutually "release[d] and forever discharge[d] one another from any and all claims they might have against one another for any breach by the other of any prior agreement between them or professional obligation of one to the other or any other obligation whether sounding in tort or contract, including but not limited to . . . any claim that [Thelen] failed to perform any services, to adequately protect the interests of its clients (Marland/RoNo), to disclose any conflict, to obtain any required waiver or otherwise to discharge any obligations of any kind to Marland, RoNo, or [Marland's European lawyers]" (the "Released Claims").  Ex. E ¶ C.3., at 7-8.

42.     Furthermore, by "expressly acknowledg[ing] and waiv[ing]" the provisions of CAL. CIV. CODE § 1542, Marland also released Thelen from all claims of which he was not aware.  Ex. E ¶ C.3., at 8.

43.     Marland consulted independent counsel and accepted the mutual release.  *See* Ex. E ¶ C.1., at 7 ("[Thelen], on the one hand, and [Marland and Marland's European lawyers], on the other, are each represented by and are relying exclusively on their own counsel and neither is relying on the other for legal advice regarding this Agreement"); Ex. E ¶ C.3., at 8 ("Both Parties have had the benefit of the advice of independent counsel in considering the significance of this Mutual Release").

44.     The CDOI consented to the December 2002 Agreement in writing.  *See* Ex. F.

45.     The December 2002 Agreement does not contain an arbitration clause.  *See* Ex. E.

46.     To date, the CDOI has paid Thelen $54,371,000 in attorneys fees.  Of that, Thelen has paid Marland (and Marland's European lawyers) $19,025,682 (35%), pursuant to the December 2002 Agreement.  Marland has accepted these payments.

**E.     Marland Retains New Counsel to Replace Thelen**

47.     In or about August 2004, Marland retained Andrew Hayes ("Hayes"), and the law firm of Boies, Schiller & Flexner LLP, to represent him in the *qui tam* lawsuit and other ELIC-related matters.  Thelen ceased representing Marland for any purpose relating to the *qui tam* lawsuit, the ELIC-related matters, or any other matter whatsoever.

48.     On February 13, 2006, Marland commenced an arbitration proceeding against Thelen in New York City with the American Arbitration Association by filing a Demand for Arbitration pursuant to Section 23 of the February 1999 Agreement.  Ex. G.  Purporting to act on behalf of himself and RoNo, Marland seeks to recover $35 million in damages for alleged acts of malpractice and breaches of fiduciary duty by Thelen.

49.     Marland's claims, set forth in the "Description of Claims" of the Demand for Arbitration, allege that Thelen's advice to Marland was erroneous; that Thelen breached its duties to Marland by placing its interests ahead of his; that Thelen breached fiduciary duties to Marland by saying Thelen had a waiver of conflicts from Marland when Thelen allegedly did

not; that the December 2002 Agreement is not fair and reasonable and is unenforceable; that the
release and waiver provisions of the December 2002 Agreement are void and against public
policy; and as a consequence Thelen should forfeit to Marland $35 million, or alternatively pay
Marland a greater share of attorneys fees.  Ex. G ¶ 22(a)-(g).

## CLAIMS FOR RELIEF

### Claim One
### (Declaratory Relief)

50.     Thelen incorporates by reference the allegations contained in Paragraphs 1
through 49, inclusive.

51.     The December 2002 Agreement is a valid and enforceable contract.  Thelen has
performed all terms and conditions of the December 2002 Agreement and all conditions
precedent have been performed or occurred.  Marland has ratified the December 2002
Agreement by, among other things, accepting payments made pursuant to the December 2002
Agreement.

52.     Marland initiated an arbitration proceeding against Thelen in New York pursuant
to the February 1999 Agreement.  In his arbitration demand, Marland asserts claims that were
waived and released by the terms of the December 2002 Agreement.  Marland also asserts that
the December 2002 Agreement is invalid and unenforceable.

53.     An actual, immediate, justiciable controversy has arisen between Thelen and
Marland regarding whether the December 2002 Agreement is valid and enforceable.

54.     Thelen seeks a declaratory judgment from the Court that the December 2002
Agreement is valid and enforceable.

### Claim Two
### (Declaratory Relief)

55.     Thelen incorporates by reference the allegations contained in Paragraphs 1
through 54, inclusive.

56.     Marland has initiated an arbitration proceeding against Thelen in New York,
asserting claims that arise from Thelen's representation of him.  *See* Ex. G.

57.     In the December 2002 Agreement, Marland released Thelen from the Released Claims, which include the claims asserted in the New York arbitration proceeding.

58.     An actual, immediate, justiciable controversy has arisen between Thelen and Marland regarding whether Marland has released Thelen from the Released Claims, which include the claims asserted in the New York arbitration proceeding.

59.     Thelen seeks a declaratory judgment from the Court that Marland has released Thelen from the Released Claims, which include the claims asserted in the New York arbitration proceeding.

**Claim Three**
**(Declaratory Relief)**

60.     Thelen incorporates by reference the allegations contained in Paragraphs 1 through 59, inclusive.

61.     To the extent that Marland or RoNo actually was injured by any allegedly wrongful acts or omissions by Thelen, such actual injury was sustained more than one year prior to February 13, 2006, the date of the initiation of the New York arbitration proceeding.

62.     Thelen ceased representing Marland and RoNo in the *qui tam* lawsuit, in any matters relating to ELIC, and in any matters whatsoever more than one year prior to February 13, 2006, the date of the initiation of the New York arbitration proceeding.

63.     Marland discovered, or, through the use of reasonable diligence, should have discovered, the facts constituting the allegedly wrongful acts or omissions set forth in the arbitration demand more than one year prior to February 13, 2006, the date of the initiation of the New York arbitration proceeding.

64.     Thelen seeks a declaratory judgment from the Court that any and all claims by Marland, on behalf of himself and RoNo, against Thelen for any wrongful act or omission in the course of Thelen's performance of professional services for Marland or RoNo are barred by the statute of limitations embodied in CAL. CIV. PROC. CODE § 340.6.

**Claim Four**
**(Injunctive Relief)**

65.    Thelen incorporates by reference the allegations contained in Paragraphs 1 through 64, inclusive.

66.    Marland has initiated an arbitration proceeding against Thelen in New York, asserting claims that arise from Thelen's representation of him and RoNo.

67.    In the December 2002 Agreement, Marland released Thelen from the Released Claims, which include the claims Marland asserted in the New York arbitration proceeding.

68.    Thelen seeks a preliminary and permanent injunction, prohibiting Marland, himself or through his agents, including RoNo, from asserting any claims against Thelen which are released by the December 2002 Agreement, including the claims asserted in the New York proceeding, from pursuing the New York arbitration proceeding and from interfering with this action.

## PRAYER FOR RELIEF

WHEREFORE, Thelen prays for the following relief:

69.    A judgment against Marland according to the declaratory relief sought;

70.    A preliminary and permanent injunction, prohibiting Marland, himself or through his agents, including RoNo, from asserting any claims against Thelen which are released by the December 2002 Agreement, including the claims asserted in the New York proceeding, from pursuing the New York arbitration proceeding and from interfering with this action;

71.    Its costs and fees in this action;

72.    Such other and further relief as the Court may determine is just and proper.

Dated:  May 3, 2006                                    KEKER & VAN NEST, LLP


                                                       By: /s/ Robert A. Van Nest
                                                       ROBERT A. VAN NEST
                                                       Attorneys for Plaintiff
                                                       THELEN REID & PRIEST LLP

# EXHIBIT A



# ATTORNEY-CLIENT AGREEMENT

Thelen Reid & Priest, LLP ("TR&P") and Francois Marland ("Client"), individually and as the beneficial owner of RoNo, LLC ("RoNo") hereby agree as follows:

### Background

1. Client has heretofore provided information to TR&P concerning certain matters within his personal knowledge relating to the circumstances under which Credit Lyonnais, S. A., Altus Finance, S.A. and other entities (collectively the "Altus Defendants") came to acquire control of certain portions of the bond portfolio and insurance assets of Executive Life Insurance Company ("ELIC").

2. Using that information and their own knowledge of events surrounding the ELIC rehabilitation/liquidation proceedings TR&P attorneys have been engaged in an effort to persuade the California Department of Insurance to initiate legal proceedings against Credit Lyonnais, Altus and other companies and individuals that acquired the bond portfolio and insurance assets of ELIC. While the Department has indicated a willingness to retain TR&P to conduct a further investigation and pursue potential claims against the Altus Defendants, it has been unwilling to date to pay any fee to Client for the information that he has provided, nor has it been willing to pay legal fees to TR&P that are adequate to allow TR&P to fully compensate Client for the information and strategic assistance that he has provided, and expects to provide, in pursuing these claims.

3. Client wishes to file a California False Claims Act (Qui Tam) complaint on behalf of the State of California and the Commissioner of Insurance against the Altus Defendants and pursue these claims with or without the assistance and participation of the Commissioner

4. At Client's request TR&P has caused RoNo to be formed as a Delaware limited liability corporation and has filed applications required for RoNo to be qualified to do business in the state of California. The parties understand that Client is and will remain, directly or indirectly, the beneficial owner of RoNo.

5. Client wishes to engage TR&P to represent his interests, individually and as embodied in RoNo, in pursuing possible recoveries against the Altus Defendants on behalf of the Commissioner and the State of California.

### Scope Of Services

6. TR&P agrees to provide all legal assistance and legal advice reasonably necessary to investigate and pursue claims against the Altus Defendants arising under California law in connection with the transactions by which they acquired control over the junk bond portfolio and insurance assets of ELIC, including:

      (a).    filing a qui tam complaint in San Francisco County Superior Court and pursuing claims against the Altus Defendants in that litigation;



Page 1

(b).   filing a motion to reopen the ELIC rehabilitation/liquidation proceedings in Los Angeles County Superior Court and pursuing claims against the Altus Defendants in that proceeding;

(c).   providing legal advice and assistance to the Commissioner of Insurance and/or the California Attorney General in connection with the qui tam litigation;

(d).   negotiating possible settlements with one or more of the Altus Defendants;

(e).   initiating or participating in other civil or administrative actions relating to possible claims arising out of the transactions described herein; and

(f).   Representing Client's interests in any appellate proceedings that may arise from any of the foregoing actions.

### Attorney Fees

7.  In consideration for the services to be performed in connection with this representation, Client agrees to pay TR&P a fee calculated as follows:

(a).  <u>Settlement Prior to November 1999.</u>  In the event and to the extent that any of the claims against the Altus Defendants are settled prior to November 1, 1999, TR&P shall be paid a fee equal to forty (40%) of any gross recovery that Client or RoNo receives from any source as a result of the pursuit of these claims.

(b).  <u>Subsequent Recoveries.</u>  In the event and to the extent that claims against the Altus Defendants are settled or result in a judgment on or after November 1, 1999, TR&P shall be paid fifty percent (50%) of any gross recovery that Client or RoNo receives from any source as a result of the pursuit of these claims.

(c)  <u>Partial Offset.</u>  The amounts otherwise payable to TR&P as legal fees pursuant to subparagraphs (a) or (b) above shall be reduced by fifty percent (50 %) of the legal fees, if any, that TR&P is awarded by a Court, or recovers by way of settlement, for serving as counsel in the qui tam litigation.



## Costs And Disbursements

8.)   Client shall reimburse TR&P for all costs and disbursements that TR&P incurs in the investigation and prosecution of the claims that are the subject of this Agreement, including filing fees, service of process charges, local and long distance travel (including meals, lodging, transportation and airfare ), reproduction and photocopying costs, deposition transcripts, witness fees, long distance telephone and telecopier charges, postage, messenger and overnight delivery fees and charges for computerized legal research. For this purpose Client shall maintain a disbursement account with TR&P in an amount of not less than $20,000.  TR&P will send Client monthly statement describing the expenses charged to the account, but the invoices will be paid from the disbursement account as long as sufficient funds remain.  If the balance in the disbursement account drops below $10,000, TR&P will have the right to require that the account be restored to a balance of $20,000.  All costs and disbursements reasonably incurred in the investigation or prosecution of these claims shall be reimbursed to Client (or TR&P, if it has incurred disbursements not previously reimbursed) out of any gross recovery before any allocation of legal fees or recoveries pursuant to paragraph 7.

9.)   TR&P shall have the right to ask that the Client make arrangements to pay costs and disbursements items exceeding $5000 and shall not incur any individual cost or disbursement in excess of $1000 without prior approval from Client.

## European Counsel

10.)   With the concurrence of TR&P, Client may, retain and associate counsel in France or elsewhere in Europe to assist in investigating and prosecuting these claims. TR&P agrees to cooperate with such counsel in developing strategies and negotiating with the Altus Defendants in Europe.  Such counsel shall initially not participate in any litigation filed in the United States without the express consent of TR&P.  All expenses incurred by Client for legal fees for such European counsel shall be borne by Client.  TR&P shall reimburse client for one-half (50%) of the fees incurred for such European counsel to the extent that TR&P recovers its contingent legal fees or is awarded legal fees by a court in an amount sufficient to make the reimbursement.

## Attorney's Lien

11.)   Client, for himself and RoNo, hereby grants TR&P a lien on the claims or causes of action that are the object of this representation, on any sums recovered by way of settlement, and on any judgment that may be recovered, for the sums and percentage shares referred to in this Agreement for payment of attorneys fees due to TR&P pursuant to Paragraph 6.



## Substitution Or Discharge Of Attorneys

12.)    TR&P shall be entitled to receive its contingent share of any settlement of or judgment on any of the claims that are the subject of this Agreement to the full extent allowable under California law, notwithstanding any decision by Client to discharge TR&P or to substitute other counsel in its place before or after such settlement or judgment is achieved.

## Favorable Outcome Not Guaranteed

13.)    Nothing in this Agreement and nothing said by TR&P to Client or any of his representatives shall be construed as a promise or guarantee about the outcome of this representation or the value of any claims that may be pursued.  Client acknowledges that all statements made by TR&P concerning these matters are statements of opinion only.

## Charges To Client Contingent On Recovery

14.)    The parties expressly understand that, in the event no recovery is obtained on the claims that are the subject of this Agreement, TR&P shall not make any charges to Client other than for costs and disbursement expenses incurred, nor shall Client be liable to pay any charges other than for costs or disbursements that TR&P may have incurred.

## Errors And Omissions Insurance

15.)    TR&P maintains errors and omissions insurance coverage that is applicable to the services that it is to render pursuant to this Agreement.

## Confidentiality

16.)    TR&P and Client each agree to maintain the confidentiality of any non-public information provided by Client concerning the background of the ELIC transactions and to disclose such information only (i) to parties and attorneys directly involved in the investigation or prosecution of the ELIC claims who have a need to know, or (ii) as may be required by law.

## Attorneys Fees Not Set By Law.

17.)    Client acknowledges that the attorney fees to be paid pursuant to this Agreement are not set by law and have been fairly negotiated between the parties.

## Notices.

18.)    All notices, requests, consents and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile (with the hard copy mailed by first class mail) or mailed (first class postage prepaid) or sent by overnight courier to the parties hereto at the following addresses or facsimile numbers:



If to TR&P to:

> THELEN REID & PRIEST LLP
> 2 Embarcadero Center
> Suite 2100
> San Francisco, CA 94111-3995
> Telecopier: 415-421-1068
> Attention: Gary Fontana, Esq.

If to Client, to:

> Francois Marland
> c/o Susana Maas
> Rue Eynard
> Geneva, Switzerland
> Telecopier: (41-22) 319-7333

All such notices, requests, consents and other communications will (i) if delivered personally to the address as provided in this Section, be deemed given upon delivery, (ii) if delivered by facsimile to the facsimile number as provided in this Section, be deemed given upon receipt, and (iii) if delivered by mail in the manner described above or by overnight courier to the address as provided in this Section, be deemed given upon receipt. Either party hereto from time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other party.

### No Assignments.

19.)  No party hereto may assign all or any portion of its rights or obligations hereunder without the prior written consent of the other party.

### Entire Agreement.

20.)  This Agreement represents the entire agreement between the parties hereto with respect to the subject matter hereof. Neither party hereto has made any representation or warranty to the other party hereto with respect to the subject matter hereof except as expressly set forth in this Agreement.

### Severability.

21.)  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision hereof. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be construed to be only so broad as is enforceable.

## Termination and Right to Withdraw

22.) Either party shall have the right to withdraw from this Agreement without liability of any kind to the other provided that:

>       (a)     the party wishing to withdraw shall give thirty days written notice to the other;

>       (b)     the withdrawing party shall remain liable for any breach of its obligations under this Agreement prior to the date of withdrawal; and

>       (c)     the withdrawing party shall assign to the other party all its rights under this Agreement and any claim that may have to any recovery or award as a result of its pursuit of the qui tam litigation.

## Arbitration of Disputes

23.) All disputes which may arise concerning this Agreement shall be submitted to binding arbitration under the rules and regulations of the American Arbitration Association using a single arbitrator. The arbitration shall take place in New York City or such other place as the parties may agree. The arbitrator shall issue a written decision setting forth findings of fact and conclusions of law, which decision shall be final and binding on all parties. The arbitrator's award may be enforced in any court having jurisdiction by filing a petition to enforce such award. The cost of filing, including reasonable attorney's fees, may be recovered by the party that initiates the action to have the award enforced.

## Effective Date

24.) This Agreement shall be construed and enforced under the laws of the State of California applicable to agreements made and to be wholly performed with such State.

25.) This Agreement shall be effective upon execution by both parties.

In witness whereof, the parties have executed this Agreement on the dates shown below.

February 17 1999

FRANCOIS MARLAND, individually and as beneficial owner of RoNo, LLC

February 17 1999

THELEN, REID, & PRIEST LLP

By: Gary L. Fontana

# EXHIBIT B

## ATTORNEY-CLIENT AGREEMENT

Thelen Reid & Priest, LLP ("TR&P") and Chuck Quackenbush both in his capacity as Commissioner of the California Department of Insurance ("CDOI") and his capacity as the rehabilitator/liquidator of Executive Life Insurance Company ("ELIC"), hereinafter referred to as "Commissioner," agree as follows:

### Background

1.)   Information has been brought to the attention of the staff of the CDOI which raises questions concerning certain aspects of the manner by which Altus Finance, S.A. ("Altus"), Credit Lyonnais, S.A. ("Credit Lyonnais"), Mutuelle Assurance Artisanale de France ("MAAF") and other domestic and foreign interests (hereinafter, collectively, the "ELIC defendants") obtained control of the assets and business operations of ELIC following its seizure by the CDOI in 1991.

2.)   The Commissioner wishes to retain the services of TR&P to assist him and his staff in investigating these issues and determining the extent, if any, to which the sale and transfers were achieved in violation of California law and, if so, whether legal remedies are available to redress those violations for the benefit of former policyholders of ELIC.

### Scope Of Services

3.)   With the assistance of the CDOI staff, TR&P agrees to provide all legal assistance and legal advice reasonably necessary to accomplish the following tasks:

     a.    investigate the circumstances under which Altus Finance, MAAF and their joint venture partners obtained control over the assets and business operations of ELIC;

     b.    review the applications that were submitted to the CDOI in connection with the transfers and determine the extent to which those applications were accurate and fully complied with the requirements of the California Insurance Code;

     c.    investigate the relationships between and among Altus Finance, MAAF and Credit Lyonnaise and to determine whether the relationships that existed were fully and accurately disclosed to the CDOI and to the courts as required by California law;

     d.    make recommendations to the Commissioner supported by the results of TR&P's factual and legal research concerning possible claims that may exist and develop a proposed strategy for pursuing them; and

sf:340717.v4

e.  represent the Commissioner in negotiations and in any judicial or administrative proceedings, including appeals, that may be required in order to effectively enforce any claims that the Commissioner may have against ELIC.

## Retention Of Investigators And Other Experts

4.)  Subject to the approval of the Commissioner, TR&P may employ such experts, investigators and financial advisors in the United States and Europe as may be necessary to investigate and enforce any claims and remedies the Commissioner may have.  Fees charged by such persons shall be paid by the Commissioner.

## Attorney Fees

5.)  In consideration for the services to be performed in connection with this representation, the Commissioner agrees to pay TR&P a fee calculated as follows:

a.  13 percent of all proceeds between $0 and $150 million, plus
b.  7 percent of all proceeds between $150 million and $300 million, plus
c.  5 percent of all proceeds between $300 million and $500 million, plus
d.  7 percent of all proceeds above $500 million.

These percentages shall apply to all monies collected from whatever source as a result of the prosecution of claims that have arisen as a result of the fraudulent or otherwise illegal conduct of ELIC defendants and shall be determined on the basis of the gross proceeds.

## Cost And Disbursements

6.)  The Commissioner shall pay all costs and expenses that TR&P reasonably incurs in the investigation and prosecution of the claims that are the subject of this Agreement, including filing fees, service of process charges, travel (including meals and lodging), reproduction and photocopying costs, deposition transcripts, witness fees, long distance telephone and telecopier charges, postage, messenger and overnight delivery fees and charges for computerized legal research.  TR&P shall submit properly documented invoices to the Commissioner on a monthly basis listing all costs and disbursements incurred in the course of the representation. Such invoices shall be paid within thirty days of the date received.

7.)  TR&P shall have the right to ask that the Commissioner make arrangements to pay expenses exceeding $5000 and shall not incur any individual expense in excess of $2500 without prior approval from the Commissioner or a member of his staff.

sf.340717.v4

European Counsel

8.)  TR&P may, in consultation with the Commissioner, retain and compensate counsel in Europe to assist it in investigating and prosecuting these claims.

## Attorney's Lien

9.)  The Commissioner hereby grants TR&P a lien on the claims or causes of action that are the object of this representation, on any sums recovered by way of settlement, and on any judgment that may be recovered, for the sums and percentage shares referred to in this Agreement for payment of attorneys fees (pursuant to Paragraph 5) or reimbursement of costs of expenses (pursuant to Paragraphs 6 and 7).

## Settlement And Compromise Of Claims

10.)  The Commissioner shall retain the sole authority to settle or compromise the claims that are the subject of this Agreement, PROVIDED HOWEVER that he shall inform TR&P of the terms of any proposed compromise or settlement at least 48 hours prior to presenting or accepting a settlement or compromise, and PROVIDED FURTHER, that he shall not propose or accept any settlement or compromise that is not adequate to allow TR&P to recover at least eighty percent (80%) of the legal fees incurred by TR&P (at TR&P's standard hourly rates), plus all costs and disbursements incurred by TR&P (including legal fees to be paid to associated counsel) without first obtaining TR&P's written consent.

## Substitution Or Discharge Of Attorneys

11.)  TR&P shall be entitled to receive its contingent share of any settlement of or judgment on any of the claims that are the subject of this Agreement to the full extent allowable under California law, notwithstanding any decision by the Commissioner to discharge TR&P or to substitute other counsel in its place before or after such settlement or judgment is achieved.

## Favorable Outcome Not Guaranteed

12.)  Nothing in this Agreement and nothing said by TR&P to the Commissioner or any of his representatives or employees shall be construed as a promise or guarantee about the outcome of this representation or the value of any claims that may be pursued.  The Commissioner acknowledges that all statement made by TR&P concerning these matters are statements of opinion only.

sf.340717.v4

## Confidentiality

13). Any documents and information provided to the Commissioner directly or indirectly by TR&P during the course of its investigation of these claims and marked as "Confidential" shall be treated as such and shall not be disclosed to any person without the prior consent of TR&P.

## Errors And Omissions Insurance

14.) TR&P maintains errors and omissions insurance coverage that is applicable to the services that it is to render pursuant to this Agreement.

## Waiver of Conflicts of Interest

15.) TR&P has disclosed to the Commissioner the fact that it currently represents the Allied Group in litigation adverse to the Department of Insurance concerning its Proposition 103 roll back liabilities. The Commissioner is also aware of the fact that TR&P represents RoNo, LLC and its beneficial owners and will continue to do so during the course of this litigation. The Commissioner hereby waives any conflict of interest that does or may exist with respect to those representations and further agrees to waive any other conflict of interest that may arise as a result of TR&P future representation of clients with interests adverse to the Department of Insurance, provided however, that this waiver shall not extend to any matter related to Executive Life or to the claims that are the subject of this agreement.

## Effective Date

16.) This Agreement shall be effective upon execution by both parties.

In witness whereof, the parties have executed this Agreement in San Francisco, California on the dates shown below.

May 25, 1999

Chuck Quackenbush, Commissioner of the
California Department of Insurance

_By_ _Richard N. Roth_

By

May 25, 1999

Thelen Reid & Priest LLP

_Karl Belgum_

By: Karl Belgum

sf.340717.v4

# EXHIBIT C

# AGREEMENT TO ASSOCIATE COUNSEL

Thelen, Reid & Priest L.L.P., ("TR&P"), SCP Brunswick & Associates ("Brunswick"), Susana Maas ("Maas"), and Francois Marland ("Marland") (jointly "European Counsel" or "EC") hereby agree as follows:

## RECITALS

**WHEREAS**, TR&P has been retained to serve as counsel by the Commissioner of the California Department of Insurance (the "Commission") to investigate the circumstances under which Altus Finance, SA. ("Altus") and other French, Swiss and American companies were able to obtain control over the assets and business operations of Executive Life Insurance Company ("ELIC"), to represent the Commissioner in litigation currently pending against Altus and other defendants in Federal District Court in Los Angeles, California and to pursue other legal claims that the Commissioner may have arising out of the same facts and circumstances (hereinafter referred to as the "ELIC claims").

**WHEREAS**, Marland is an attorney who is a graduate of the University of Paris X School of Law and is knowledgeable about French law, including legal requirements applicable to commercial transactions, and further is aware of the background of the entities and events that are to be investigated by TR&P and the circumstances under which certain of the transactions were completed.

**WHEREAS**, Brunswick is a lawfirm with offices in Paris, France which employs attorneys admitted to practice in France and other European countries who are knowledgable about international financial transactions and methods of investigating non-public transactions in France and elsewhere in Europe.

**WHEREAS**, Maas has experience with Swiss law and the backgrounds of certain of the companies and individuals who were involved in the acts which are the subject of TR&P's investigation.

**WHEREAS**, European Counsel have assisted TR&P to date and are willing to continue to assist TR&P in the investigation and prosecution of the ELIC claims.

**NOW, THEREFORE**, in consideration for the mutual agreements contained herein and for other good and valuable consideration, the parties agree as follows:

**1. Assistance to Be Provided by European Counsel.** EC agrees to provide legal assistance, information, and strategic advice as requested by TR&P in connection with its investigation and prosecution of the ELIC claims on behalf of the Commissioner. Such advice and assistance shall include (i) assisting in the investigation and development of facts; (ii) preparing documents and assisting in development of legal and negotiating strategies; (iii)

Page 1

DOCS_SF #373304 v1 /801K01!.DOC

doing legal research concerning matters arising under the laws of France, Switzerland and other European countries; (iv) drafting legal process and pleadings for use in any European proceedings that may be required in order to secure documents or testimony; (v) accommodating all other reasonable requests of TR&P relating to the investigation and prosecution of these claims.

**2. Fees to be Paid to European Counsel.** TR&P agrees to pay to EC, jointly, a portion of the legal fees that TR&P receives for its representation of the Commissioner in pursuing the ELIC claims as follows:

(a). Sixty-five percent (65%) of the legal fees paid to TR&P as a result of any judgment entered or settlement agreement executed on or before December 31, 1999; and

(b). Fifty-two and one-half percent (52.5%) of any judgment entered or settlement agreement executed on or after January 1, 2000.

Payment to EC shall be made in the form of a cashiers check or wire transfer payable to Maas, or as directed by her, and shall be made within ten (10) business days following TR&P's receipt of readily available funds. Such percentages shall be computed after deduction for any expenses incurred by TR&P in connection with its representation of the Commissioner or RoNo, LLC that have not been fully reimbursed at the time the legal fees are paid. In addition to paying EC a portion of the legal fees it receives, TR&P shall reimburse EC for any disbursement or expense payments advanced by EC pursuant to paragraph 3 of this Agreement, to the extent that TR&P receives payment for these expenses pursuant to its fee agreement with the Commissioner. TR&P shall have no obligation to pay any costs or expenses incurred by EC in fulfilling their obligations under Paragraph 2.

**3. Payment of Cost and Disbursements by European Counsel.** EC agree to pay all costs and disbursements that they incur in connection with their investigation and prosecution of the ELIC claims, including filing fees, service of process charges, travel (including transportation, meals and lodging), reproduction and photocopying costs, deposition transcripts, witness fees, long distance telephone and telecopier charges, postage, messenger and overnight delivery fees and charges for computerized legal research. TR&P will request that the Commissioner reimburse EC for such costs and expenses, but cannot guarantee that he will agree to do so.

**4. General Provisions.**

4.1 Execution in Counterparts. For the convenience of the parties hereto, this Agreement may be executed in counterpart.

Page 2

DOCS_SF #373304 v1 /801K01!.DOC

4.2 <u>Notices</u>. All notices, requests, consents required to be in writing by the terms of this Agreement, shall be deemed to have been duly given only if (a) delivered personally or by facsimile (with the hard copy mailed by first class mail), (b) mailed (first class postage prepaid) or (c) sent by overnight courier to the parties hereto at the following addresses or facsimile numbers:

<u>If to TR&P to:</u>

THELEN REID & PRIEST LLP
2 Embarcadero Center
Suite 2100
San Francisco, CA 94111-3995
Telecopier: 415-421-1068
Attention: Gary Fontana, Esq.

<u>If to EC, to:</u>

SCP Brunswick & Assoc.
51 Avenue Raymond Pont Care
75116 Paris, France
Telecopier: (331) 5365-0564
Attention: Philippe Brunswick

     and

Francois Marland
Le Grand Merliage
72, roste de Bellebouche
1252 Gy. Switzerland
Telecopier: (41-22) 759-9093

     and

Susana Maas
Rue Eynard
Geneva, Switzerland
Telecopier: (41-22) 319-7333

All such notices, requests, consents and other communications will (i) if delivered personally to the address as provided in this Section, be deemed given upon delivery, (ii) if delivered by facsimile to the facsimile number as provided in this Section, be deemed given upon receipt, and (iii) if delivered by mail in the manner described above or by overnight courier to the address as provided in this Section, be deemed given upon receipt. Any party hereto from



Page 3

DOCS_SF #373304 ~1 /801K01!.DOC

time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other party.

    4.3  <u>No Assignments</u>.  No party hereto may assign all or any portion of its rights or obligations hereunder without the prior written consent of the other parties.

    4.4  <u>Entire Agreement</u>.  This Agreement represents the entire agreement between the parties hereto with respect to the subject matter hereof.  No party hereto has made any representation or warranty to the other party hereto with respect to the subject matter hereof except as expressly set forth in this Agreement.

    4.5  <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision hereof.  If any provision of this Agreement is so broad as to be unenforceable, such provision shall be construed to be only so broad as is enforceable.

    4.6  <u>Joint Liability</u>.  SCP Brunswick & Assoc., Susana Maas and Francois Marland shall be jointly and severally responsible for their obligations under this Agreement and shall be solely responsible for allocating the burdens and benefits of this agreement among themselves.

    4.7  <u>Amendment</u>.  This Agreement may be amended only by a written agreement executed by each of the parties hereto.

    4.8  <u>Governing Law and Consent to Jurisdiction</u>.  This Agreement shall be construed and enforced under the laws of the State of California applicable to agreements made and to be wholly performed with such State.  By signing this Agreement, EC and each of them hereby consent to jurisdiction in the State of California to enforce any rights arising hereunder.

    4.9  <u>Counterparts</u>.  This Agreement may be executed in counterparts.

Page 4

**IN WITNESS WHEREOF,** this Agreement has been signed by and on behalf of the parties hereto on the dates indicated below.  It shall take effect when signed by all parties.

Dated: June 3, 1999

THELEN REID & PRIEST LLP

By: _____
Name:  Gary Fontana
Title:  Partner

Dated: June 2, 1999

By: _____
Francois Marland

Dated: June 2, 1999

SCP Brunswick & Assoc

By: _____
Name:
Title:

Dated: June 3th, 1999

By: _____
Susana Maas

Page 5

# EXHIBIT D

Confidential
Attorney - Client Privilege.

Novotel London Waterloo Hotel
113 Lambeth Road
SE1 7LS
June 2, 1999

Mr. Gary L. Fontana, Esq.
Thelen, Reid & Priest, LLP
Two Embarcadero Center, Suite 2100
San Francisco, CA 94111

Re: Participation as Witness in U.S. Litigation

Dear Gary:

As you are aware from conversations that we have had and from the text of a memorandum that I wrote to you and Philippe Brunswick on May 28, 1999, I had a limited, but important, role in introducing Altus, S.A. to MAAF in the summer of 1991 regarding an involvement in the bidding for Executive Life Insurance Company. That role is described in greater detail in that memorandum. Despite my limited role, there are circumstances under which my testimony concerning the events described in that memo may become critically important to the successful prosecution of both civil and criminal cases against Credit Lyonnais and other defendants in the United States.

In recent months, I have come under very substantial pressure in France to limit or avoid participation in any such litigation in the United States. As a result of that pressure, it is possible that I may, in the future, become unable or unwilling to provide that testimony and fulfill all of the obligations that I undertook when I executed the European Counsel Agreement earlier today. Therefore, I am writing this letter to confirm our mutual understandings concerning the role that I have agreed to play insofar as possible testimony is concerned and the way in which the terms of the European Counsel Agreement will be modified if, in the future, I am unable or unwilling to testify.

1). I have agreed with you and your law firm that, if requested, I will voluntarily come to the United States to testify before a federal grand jury in Los Angeles concerning the subjects addressed in my memorandum, so long as that appearance is subject to a confidentiality agreement with the U.S. Department of Justice that fully protects my identity and assures that me that I will not be compelled to produce documents that may be in my possession or control against my will;

2). Second, in the event you believe it is essential to the effective prosecution of the civil case in which TR&P is currently representing the Commissioner of Insurance, and you request my testimony in that case, I have also agreed with you and your law firm that I will voluntarily come to the United States to testify in court and to provide deposition testimony in that case in Europe. You and I have agreed to make all reasonable efforts to find other competent witnesses who are willing to testify to the same facts and, thus, avoid the necessity of my testifying in the civil case. However, we cannot be sure that these efforts will succeed.

3). In the event that I become unable or unwilling to testify before the grand jury as provided in Paragraph 1, I hereby agree that the amounts payable to European Counsel under the Agreement to Associate Counsel dated June 2, 1999 shall be reduced by two-thirds (66.67 %) from what they would otherwise be. (I.e., 21 2/3 percent of total legal fees paid on or before 12/31/99, and 17.5 percent thereafter).

4). In the event that I testify before the grand jury as provided in Paragraph 1, but become unable or unwilling to testify in the civil case as provided in Paragraph 2, I hereby agree that the amounts payable to European Counsel under the Agreement to Associate Counsel dated June 2, 1999 shall be reduced by one-half (50 per cent) from what they would otherwise be. (I.e., 32.5 percent of total legal fees on or before 12/31/99, and 26.25 percent thereafter).

This letter shall be treated as an amendment to the RoNo attorneys fee agreement and the Agreement to Associate European Counsel executed as of June 2, 1999 by ourselves, Susana ("the EC Contract") Maas and Philippe Brunswick. Both Mr. Brunswick and Ms. Maas are aware of this change in the terms of the Agreement to Associate Counsel and have consented to it. +

Very truly yours,

Francois Marland

cc: Philippe Brunswick
Francois Chateau
Susana Maas

+ The validity performance of this agreement is strictly subject to the validity and enforceability of the EC Contract which is deemed to be a condition precedent to this agreement.

DOCS_SF #373308 v1 /201_011.DOC

# EXHIBIT E

## NEW AGREEMENT TO ASSOCIATE COUNSEL

Thelen, Reid & Priest L.L.P. ("TR&P"), on the one hand, and SCP Brunswick & Associates ("Brunswick"), Susannah Maas ("Maas"), and Francois Marland ("Marland") (jointly "European Counsel" or "EC"), on the other, hereby enter into the following agreement (the "Agreement") effective July 1, 2002:

## RECITALS

WHEREAS TR&P and Marland entered into an Attorney Client Agreement ("Attorney Client Agreement") dated February 17, 1999, pursuant to which Marland and RoNo retained TR&P to serve as counsel in its legal actions against Altus and others, related to the sale of certain business and other assets of Executive Life Insurance Co. ("ELIC"), which Attorney Client Agreement was amended on September 18, 2001 by a "Amendment to Attorney Client Agreement" and thereafter terminated by TR&P pursuant to a July 8, 2002 letter; and

WHEREAS thereafter, with the express consent of Marland and RoNo, TR&P entered into an Attorney Client Agreement with the Commissioner of the California Department of Insurance ("DOI") dated May 25, 1999 ("Commissioner Agreement"), wherein TR&P agreed to serve as counsel to the Commissioner in litigation pending against Altus Finance, SA. ("Altus") and other defendants in the Federal District Court in Los Angeles arising out of defendants' actions to obtain control over the business and other assets of ELIC and to pursue those and whatever other claims the Commissioner may have arising out of the same facts and circumstances (hereinafter referred to as the "ELIC claims"); and

WHEREAS TR&P and European Counsel then entered into an Agreement to Associate Counsel ("Original Agreement") executed on June 3 and June 30, 1999, completed with a side letter of June 2, 1999, and amended on September 18, 2001, where by the parties would jointly prosecute the ELIC claims; and

WHEREAS TR&P desires to re-negotiate the Commissioner Agreement in order to obtain advances, but needs to restructure the agreements between the parties as a predicate to such negotiations with the Commissioner; and

WHEREAS TR&P also desires to re-negotiate the fee splitting terms under the Original Agreement, for various reasons that were discussed among the parties during the preceding months; and

WHEREAS to facilitate TR&P's negotiations with the Commissioner the parties desire to replace the Attorney Client Agreement and Original Agreement and any and all other agreements between TR&P, on the one hand, and either Marland, RoNo or the European Counsel, on the other, with this new Agreement as the sole agreement between them;

NOW THEREFORE, in consideration for the mutual agreements contained herein and for other good and valuable consideration, the parties hereto agree as follows:

A.   **Definitions**

1.   The "Litigation" as used herein means any lawsuit in which TR&P has been retained to represent the California Insurance Commissioner ("Commissioner") or RoNo LLC ("RoNo") with respect to claims arising out of the Executive Life Insurance Company rehabilitation and transactions related thereto, including

- *Harry W. Low v. Altus Finance S.A., et al.*, U.S. Dist. Ct., C.D. Cal., Case No. 99-02829 AHM (CWx)(the "Commissioner's Action");

- *State of California ex rel. RoNo v. Altus Finance S.A.*, U.S. Dist. Ct., C.D. Cal., Case No. CV 01 8587 AHM (CWx), including the California Attorney General's complaint in intervention in that action captioned *State of California ex rel. RoNo v. Altus Finance S.A.*, (referred to collectively herein as the "*RoNo* Action");

- *Sierra National Insurance Holdings, Inc. v. Credit Lyonnais S.A.*, U.S. Dist. Ct., C.D. Cal., Case No. 01-01339 AHM (CWx) (the "*Sierra* Action").

- *Carranza-Hernandez v. Altus Finance Corporation*, U.S. Dist. Ct., C.D.Cal., Case No. CV 99 08375 AHM;

- *Carranza-Hernandez v. Artemis S.A.*, U.S. Dist. Ct., C.D. Cal., Case No. CV 00 09593 AHM (CWx);

- *Harry W Low v. SDI Vendome S.A., et al.*, U.S. Dist. Ct., C.D. Cal., Case No. CV 02-5983 AHM.

2.   "Net Recovered Fees" as used herein means the amount of fees recovered by TR&P as a result of its representation of the Commissioner on the ELIC claims in the Commissioner's Action or RoNo on its claims in the *RoNo* Action, after payment of "Reimbursed Expenses."

3.   "Reimbursed Expenses" as used herein means any expenses reasonably incurred by TR&P, the beneficial owner of RoNo, Brunswick or EC in connection with their representation of or contribution to the Commissioner in the Commissioner's Action or of RoNo in the *RoNo* Action not already fully reimbursed by the Commissioner or RoNo; and said expenses shall be reimbursed out of fee recoveries in the Commissioner's Action or in the *RoNo* Action prior to the calculation of Net Recovered Fees.

B.   **Services and Compensation**

1.   Assistance to Be Provided by European Counsel

(a)     EC agrees to provide legal assistance, information and strategic advice as requested by TR&P in connection with its investigation and prosecution of the ELIC claims on behalf of the Commissioner.

(b)     Upon the request of TR&P, and unless disabled or otherwise unavailable for reasons beyond his control, Marland agrees to come to the United States and testify before a federal grand jury or in the Commissioner's Action on the following terms and conditions:

(i)     With respect to grand jury testimony, Marland agrees to appear voluntarily in Los Angeles so long as that appearance is subject to a confidentiality agreement with the United States Department of Justice that protects his identity and assures him that he will not be compelled to produce documents against his will that may be in his possession or control.

(ii)     TR&P will make all reasonable efforts to avoid the necessity of Marland testifying in the Commissioner's case. In the event that TR&P determines that such appearance cannot be avoided without prejudice to the position of the Commissioner, Marland agrees to voluntarily provide deposition testimony in Europe and come to the United States to testify in court.

(iii)     This paragraph B.1(b) supercedes any prior agreement between the parties on the subject of Marland either appearing to testify or provide documents in connection with the Litigation or any proceedings related thereto.

2.     Fees to be Paid to European Counsel

(a)     The Formula

Except as provided herein below, TR&P agrees to pay to EC, jointly, a portion of the legal fees that TR&P receives for its representation of the Commissioner on the ELIC claims in the Commissioner's Action or RoNo in the *RoNo* Action in the amount of thirty-five percent (35%) of the Net Recovered Fees.

(b)     Payment process

Payment to EC shall be made in the form of a cashiers check or wire transfer payable to Maas, or as directed by her, and shall be made within ten (10) business days following TR&P's receipt of readily available funds from the Commissioner. In the event of a dispute between the parties regarding such payment, TR&P shall immediately pay to EC any and all undisputed amounts. In the event any third-party disputes EC's right to receive such payment, TR&P shall nevertheless pay such amounts unless a court order or other valid legal process bars TR&P from making such payments.

(c)     Expense reimbursement

The parties agree that TR&P will pay Reimbursed Expenses out of recovered fees prior to the calculation of Net Recovered Fees. To the extent insufficient fees are recovered to pay all Reimbursed Expenses, reimbursement shall be made to each party proportionately based on the total Reimbursed Expenses to which each party is entitled. Except as provided in this paragraph, TR&P shall have no obligation to pay any costs or expenses incurred by EC in fulfilling their obligations under this Agreement to prosecute and support the Litigation.

Separate and apart from the formula stated in subparagraphs (a) above, TR&P also agrees to reimburse EC for any litigation expenses advanced to TR&P by EC, to the extent TR&P obtains reimbursement for such expenses from the Commissioner.

**(d)    Advances by the Commissioner**

In light of the substantial investment of professional time being made by TR&P in working on the Litigation, which time has not yet been compensated, TR&P may seek to obtain from the Commissioner one or more advances of funds to TR&P to be credited against any future right to recovery of attorneys fees in the Commissioner's Action. All such advances of funds to TR&P that are actually received by TR&P are referred to herein as **"Advances."** TR&P may request that such Advances be made subject to an agreement by the Commissioner that such Advances will be non-recourse, i.e., that TR&P's obligation to repay those Advances will be waived to the extent the ultimate obligation of the Commissioner to pay attorneys fees to TR&P is less than the amount of such Advances.

**(e)    Security for European Counsel**

European Counsel is, subject to the following provisions, entitled to fifteen percent (15%) of the Advances.

(i)    If permitted by the Commissioner, EC shall be immediately paid fifteen percent (15%) of each of the Advances.

(ii)    If payment to EC of a portion of the Advances is not permitted by the Commissioner, but the Commissioner does permit an escrow arrangement as described herein, TR&P agrees to set aside fifteen percent (15%) of any Advances for services performed, and to place such funds in an interest bearing escrow account as security for the payment to EC of its share of the Net Recovered Fees at the end of the case. The funds in that escrow account may only be used to pay EC its share of the Net Recovered Fees when TR&P is entitled to a recovery of fees under the Commissioner's Agreement. Under no circumstances may the funds in the escrow account be claimed by TR&P. The term **"Net Advances"** as used herein refers to the Advances less the principal amount thereof placed into escrow as security for EC. In the event there is no recovery, the escrowed funds will be refunded to the Commissioner together with any interest earned thereon.

(iii)    The escrow account shall be established by TR&P and EC on terms that reflect the above provisions and provide that the escrowed funds plus interest shall be disbursed to EC upon any of the following events: (i) entry of final judgment in the Commissioner's

Action, (ii) execution of a settlement agreement in the Commissioner's Action resolving the case as to all defendants, or (iii) the written consent of both EC and TR&P.

      (iv)    The escrow account shall bear interest in favor of the EC.

      **(f)**     **Settlement of Final Fees**

In the event fees paid by the DOI are reduced by the amount of one or more Advances, the amounts paid by TR&P to EC under the formula in subparagraph (a) shall be calculated as follows:

      (i)    <u>If the DOI allows immediate payment to EC of 15% of Advances, or if an</u> escrow is established as provided in B.2(e) above, then upon receipt of any fee award:

      (A)    TR&P shall first pay Reimbursed Expenses out of the fees paid to it by DOI. The amount of any deducted Advances shall then be added back to the remainder of such fees paid by DOI to calculate the Net Recovered Fees.

      (B)    The formula in subparagraph (a) shall be used to determine the amount due from TR&P to EC. In applying the formula, <u>to the extent TR&P has paid 15% of each Advance to EC, TR&P shall pay the balance due under the formula. If instead, TR&P has</u> escrowed a portion of the Advances for the benefit of EC, the escrowed amount shall first be used to pay the fees due to EC under the formula, and then the remainder (if any) due to EC shall be paid from the fees paid to TR&P. For example, if the formula were to indicate that seven million dollars ($7 million) was due to EC, but three million dollars ($3 million) had been paid or escrowed for the benefit of EC, TR&P would be obligated to pay EC four million dollars ($4 million) <u>in addition to the portion escrowed</u>.

      (C)    In the event the Commissioner charges TR&P interest on Advances or discounts fees ultimately paid to TR&P to reflect interest on the Advances, then the cost of the interest shall be borne by TR&P and EC in the proportion that each shared in the Advances. For example, if the Advances total $2 million, the principal amount in the escrow account would be $300,000; if the Commissioner "charges" $100,000 in interest on the Advances, then 15% (or $15,000) of the $100,000 is to be borne by EC, and the balance of the interest would be borne by TR&P. Otherwise, the escrowed funds shall accrued interest for the benefit of EC and the interest shall not be included in the calculation of the amounts payable to EC.

      (ii)    If there is no escrow established as provided in B.2(e) above, then upon receipt of any fee award:

      (A)    TR&P shall first pay EC out of the fee award paid to it by DOI 17.647058% of any Advances previously received by TR&P ("EC True Up") to bring TR&P and EC to an 85/15 split that would have existed if 15% of Advances had been escrowed.

      (B)    TR&P shall next pay Reimbursed Expenses out of the fees paid to it by DOI as a fee award.

(C)     To calculate the Net Recovered Fees, the amount of any deducted Advances and the EC True Up shall then be added back to the remainder of such fee award paid by DOI.

(D)     The formula in subparagraph (a) shall be used to determine the amount due from TR&P to EC.  The EC True Up shall be credited against that amount and the balance paid to EC from the remainder of fee award paid by DOI.

(iii)     Whether or not there is an escrow, TR&P payments to EC pursuant to the formula may be up to and include the total amount of fees paid by DOI if necessary under the formula; however, under no circumstances shall application of the formula in subparagraph (a) obligate TR&P to pay to EC any portion of amounts advanced to it by DOI except as provided in the security provisions above.

The foregoing provisions concerning Advances are intended to provide TR&P with flexibility to re-negotiate the Commissioner Agreement with the DOI.  The parties to this Agreement recognize that there is no assurance that the Commissioner will re-negotiate the Commissioner Agreement.  The parties hereto also acknowledge that there is no assurance that TR&P will continue with its representation of the Commissioner in the Commissioner's Action.

(g)     **Other Consideration**

(i)     European Counsel and the beneficial owner of RoNo agree not to appeal the decision in the *RoNo* Action and to bring to a conclusion the representation of RoNo by all outside counsel.  In reaching this decision, European Counsel and the beneficial owner of RoNo are relying on current litigation counsel for RoNo (Beck DeCorso) rather than TR&P.

(ii)     To facilitate the close out of the *RoNo* Action, TR&P will pay the outstanding and future invoices due the Beck DeCorso for its services to RoNo up to the amount previously paid by EC.  Thereafter, Beck DeCorso fees shall be paid by TR&P and EC on a 50/50 basis.  Said payments by TR&P (as with the prior payments to Beck DeCorso by beneficial owner of RoNo) are "Reimbursed Expenses" subject to the reimbursement provisions of this Agreement.

(iii)     In the event of any recovery by or to either RoNo or TR&P as a result of the *RoNo* Action, whether denominated "fees" or otherwise, said recovery shall be included in the calculation of Net Recovered Fees and distributed based on the application of the formula herein.

(iv)     TR&P and Marland agree that their previously terminated Attorney Client Agreement shall be deemed to be re-instated and immediately superceded by this Agreement except that TR&P shall resume its role as general counsel to RoNo as provided in the September 18, 2001 Amendment to the Attorney Client Agreement.

(v)     TR&P and Marland agree that in the future TR&P will provide legal services to Marland in the event that an action is commenced in the United States to block or otherwise prevent the distribution to EC of the funds to which EC is entitled under paragraph B.2 above.  TR&P shall provide such services without charge for fees (as opposed to disbursements) up to

the first one hundred thousand dollars ($100,000) in fees and thereafter at TR&P's then current usual and customary rates.

(vi)    TR&P acknowledges that the past performance of the EC in connection with the Original Agreement together with the consideration recited herein is good and sufficient consideration for the performance of this Agreement and that EC's past performance shall not be raised as grounds for any further revision in the formula set forth in B.2(a) above.

C.    **Other Terms**

1.    **Representation by Counsel**

TR&P, on the one hand, and European Counsel, on the other, are each represented by and are relying exclusively on their own counsel and neither is relying on the other for legal advice regarding this Agreement, its terms or effect, or its enforceability under the laws of any jurisdiction. Marland specifically waives any conflict that might otherwise arise from the fact that pursuant to the Attorney Client Agreement TR&P represented him with respect to the *RoNo* Action and related matters, and he acknowledges that he is relying on the advice of separate and independent counsel with respect to his decision to enter into this new Agreement and its meaning under California law.

2.    **The Commissioner**

(a)    Disclosure and consent:  The Parties expressly acknowledge that the fee splitting terms of this Agreement shall be disclosed to the Commissioner, that the circumstances leading to this change shall be disclosed to the Commissioner and that his consent to this Agreement shall be sought as part of an effort to obtain his agreement to pay Advances as provided in paragraph B above.  The effectiveness of this entire Agreement is conditioned on the Commissioner providing his consent.

(b)    Confidentiality:  The Parties further agree that any copy of the Agreement disclosed to the Commissioner or others (or portion thereof so disclosed) shall redact the name of Marland and any references that would be tantamount to disclosing his identity.  The parties further agree to take all necessary and lawful steps to continue to preserve the confidentiality of his identity.

(c)    Other Issues:  TR&P represents that it has orally disclosed to the Commissioner the fact that EC is not in a position to produce a copy of any "contrat de portage."

3.    **Mutual Release**

For the mutual consideration reflected herein, the parties hereby release and forever discharge one another from any and all claims they might have against one another for any breach by the other of any prior agreement between them or professional obligation of one to the other or any other obligation whether sounding in tort or contract, including, but not limited to,

any claim that Marland or EC failed to perform any services, to deliver any documents or otherwise to fulfill any obligations of any kind to TR&P, or any claim that TR&P failed to perform any services, to adequately protect the interests of its clients (Marland/RoNo), to disclose any conflict, to obtain any required waiver or otherwise to discharge any obligations of any kind to Marland, RoNo or EC.

The parties expressly acknowledge and waive the provisions of California Civil Code section 1542, which reads:

> **Civil Code Section 1542:** A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

Both Parties have had the benefit of the advice of independent counsel in considering the significance of this Mutual Release and neither is relying on the advice of the other in deciding to enter into it.

**4.     Notices**

All notices, requests, consents and other communications required to be in writing shall be deemed duly given only if (a) delivered personally or by facsimile (with hard copy by first class mail), or (b) mailed first class postage prepaid, or (c) sent by overnight courier, to the parties hereto at the following addresses or facsimile numbers:

**If to TR&P -**

Gary Fontana, Thelen Reid & Priest LLP, 101 2d Street, San Francisco, CA, USA 94105. Facsimile 415-371-1211.

**If to European Counsel --**

Philippe Brunswick, Avocat, SCP Brunswick & Assoc., 51 Avenue Raymond Pont Care, 75116 Paris, France.  Facsimile 331-5365-0564,

and

Francois Marland, Avocat, domiciled at SCP Brunswick & Assoc., 51 Avenue Raymond Pont Care, 75116 Paris, France.  Facsimile 331-5365-0564,

and

Susannah Maas, Avocat, 6 Rue Eynard, Geneva, Switzerland.  Facsimile 41-22-319-7333.

All notices, requests, consents and other communications will be deemed, if done as required herein, given upon delivery in the case of personal delivery and otherwise upon dispatch. Any party hereto may change the address or facsimile number or other information for purposes of notice by giving notice of the change as provided herein.

5.    **No Assignment**

No party may assign its rights or obligations hereunder without the prior written consent of the other parties.

6.    **Entire Agreement**

This Agreement represents the entire agreement between the parties hereto with respect to the subject matter hereof.

7.    **Joint and Several Liability**

Except where responsibility is allocated to one of them by name, SCP Brunswick & Assoc., Susana Maas and Francois Marland shall be jointly and severally responsible for their obligations under this Agreement and shall be solely responsible for allocating the burdens and benefits of this Agreement among themselves.

8.    **Amendment**

This Agreement may be amended only in writing executed by each of the parties hereto.

9.    **Governing Law and Consent to Jurisdiction**

This Agreement shall be construed and enforced under the laws of the State of California applicable to contracts to be wholly performed within the State. By signing this Agreement, EC and each of them hereby consent to jurisdiction in the State of California to enforce any rights arising hereunder and consent to service of process in the same manner as provided for the provision of notice herein.

10.    **Execution in Counterparts**

For the convenience of the parties hereto, this Agreement may be executed in counterparts.

    **IN WITNESS WHEREOF**, this Agreement has been signed by and on behalf of the parties hereto on the dates indicated below. It shall take effect when signed by all parties.

Dated: December 19, 2002                    THELEN REID & PRIEST LLP

By: _____
Partner

Dated: December __, 2002

By: _____
François Marland

Dated: December 6, 2002

SCP Brunswick & Assoc.

By: _____
Philippe Brunswick

Dated: December 7, 2002

By: _____
Susannah Maas

12/4/02/Draft 10

# EXHIBIT F

## CONSENT

The California Department of Insurance ("CDOI") has reviewed the New Agreement to Associate Counsel entered into December 8, 2002 between Thelen Reid & Priest and certain other parties referred to collectively therein as European Counsel (the "Agreement"), a copy of which is attached hereto.

CDOI hereby gives its consent, pursuant to Rule 2-200 of the Rules of Professional Conduct of the State Bar of California, to the fee sharing agreement contained in the Agreement.

Dated: ~~July~~ August 2, 2004

California Department of Insurance

By: _____

Name: Gary M. Cohen
Title: General Counsel

# EXHIBIT G

# Hayes & Hardy LLP

## <u>FACSIMILE COVER SHEET</u>

<u>To:</u>                       <u>Tel. No.:</u>                    <u>Fax No.:</u>
Robert M. Blum          415-369-7277              415-369-8615

From:  Andrew W. Hayes

Date: February 13, 2006

Re:    **Demand for Arbitration**

**Total Pages:  10, including this cover page**

**Please call 917-770-0180 if there are any
problems with this transmission**

Please find attached materials filed today with the American Arbitration Association.

Feb 13 2006 4:31PM The Olive Foundation 625 4528 p.2
Case 3:06-cv-00063-VRW Document 1-3 Filed 05/03/2006 Page 49 of 57
AAA WebFile

Page 1 of 2

# Online Filing Demand For Arbitration/Mediation Form

This concludes your filing.
Thank you for submitting your claim to the AAA.
Your claim confirmation number is: 002-B2X-ZJ5

To institute proceedings, please send a copy of this form and the Arbitration Agreement to the opposing party.

Your dispute has been filed in accordance with: Commercial Dispute Resolution Procedures

This Claim has Been Filed For: Arbitration

Filing Fee: $15,000.00

### Additional Claim Information

**Claim Amount:** $36,000,000.00

**Claim Description:** The claims are brought by a client against his former counsel and self-described "partner" in pursuing certain whistleblower claims. The claims are for breach of fiduciary duty, misrepresentation, and professional negligence. Petitioner seeks damages including disgorgement of all fees obtained pursuant to counsel's retainer with a second client using Petitioner's confidential information, and other relief.

**Arbitration Clause:** 23.) All disputes which may arise concerning this Agreement shall be submitted to binding arbitration under the rules and regulations of the American Arbitration Association using a single arbitrator. The arbitration shall take place in New York City or such other place as the parties may agree. The arbitrator shall issue a written decision setting forth findings of fact and conclusions of law, which decision shall be final and binding on all parties. The arbitrator's award may be enforced in any court having jurisdiction by filing a petition to enforce such award. The cost of filing, including reasonable attorney's fees, may be recovered by the party that initiates the action to have the award enforced.

**Hearing Locale Requested:** New York , NY

**Contract Date:** 02/17/1999

**Number of Neutrals:** 1

## Claimant

**Francois Marland-RoNo LLC**
**Type of Business:** Investor

| | |
|---|---|
| **Name:** Francois Marland | **Name:** Andrew Hayes |
| **Company Name:** RoNo LLC | **Company Name:** Hayes & Hardy LLP |
| **Address:** C/O Hayes & Hardy Llp<br>45 Rockefeller Center, Suite 2000 #31<br>New York, NY 10111 - 2000 | **Address:** 45 Rockefeller Center, Suite 2000<br>New York, NY 10111 - 2000 |
| **Tel#:** 212-332-2840 | **Tel#:** 212-332-2840 |
| **Fax#:** | **Fax#:** |
| **Email:** ahayes@andrewhayes.net | **Email:** ahayes@andrewhayes.net |
| **Include in Caption:** Both | |

*(Representatives)*

## Respondent

**Thelen Reid & Priest LLP**
**Type of Business:** Partnership

| |
|---|
| **Name:** |
| **Company Name:** Thelen Reid & Priest LLP |
| **Address:** 101 Second Street, Suite 1800<br>San Francisco, CA 94105 - 3606 |
| **Tel#:** 415-371-1200 |
| **Fax#:** 415-371-1211 |
| **Email:** rblum@thelenreid.com |
| **Include in Caption:** Company |

*(Representatives)*

To Institute proceedings, please send a copy of this form and the Arbitration Agreement to the opposing party.
Your demand/submission for arbitration/mediation has been received on 02/13/2006.

## DESCRIPTION OF CLAIMS

1.      Petitioner François Marland herein seeks to enforce his rights under his February 16, 1999 Attorney-Client Agreement with his former counsel, Thelen Reid & Priest LLP ("TRP") and to recover damages for TRP's malpractice and breaches of fiduciary duty towards Marland prior to, during, and concerning that agreement. The most significant instances of TRP's misconduct are set forth below.

2.      In the second half of 1998, Marland (a Frenchman living in Switzerland) met Gary Fontana, the TRP partner who took charge of Marland's representation, regarding a possible whistleblower action involving the use of secret fronting agreements to conceal the interests of banks owned by the French state in the 1991 acquisition of Executive Life, an insolvent California insurance company. From the inception of this representation, Fontana and TRP gave Marland clearly wrong advice about his options and obligations, failed to protect his information and his interests, and maneuvered to use his information for TRP's own financial benefit, at Marland's expense.

3.      Instead of filing a qui tam action, or taking other action to ensure Marland's treatment as a whistleblower, TRP first sought to have Marland – a fact witness to the underlying events – paid on a contingent fee as a consultant to one of the parties in interest, with TRP serving as Marland's counsel.

4.      As TRP later wrote, the firm considered itself a "partner" with Marland in seeking to capitalize on his information, based on Fontana's own knowledge of the parties and some of the events at issue in the underlying fraud. However, TRP was also acting as Marland's counsel (as it later also confirmed in writing). Thus from the

inception of its representation, TRP was "wearing two hats", and failed to make adequate disclosure of its intentions and actions to its client/partner, Marland.

5.     TRP's efforts to profit directly from Marland's information tainted its entire representation of him. For example, TRP negotiated for months with the California Department of Insurance ("DOI") regarding a potential retainer of Marland and TRP. TRP told Marland that it was in his interest to have such an agreement, but failed to explore, or advise Marland, of his other options – such as pursuing a whistleblower agreement with the DOI in which the DOI would choose its own counsel.

6.     TRP also failed to take reasonable steps to ensure the confidentiality of Marland's information. As a result, the DOI began its own investigation and obtained information that made Marland's information less valuable.

7.     At the same time, Fontana told Marland (who was very concerned about protecting his anonymity, for fear of reprisal) that he could remain anonymous, and that he would not have to produce any documents he did not want to produce. Marland told Fontana that this was important to him, and relied on TRP's advice. At no time did Fontana or TRP tell Marland that he had an obligation to preserve or produce evidence he did not want to produce.

8.     In February 1999, when it became clear that the DOI was going to file its own action based on the investigation that Marland's information had sparked, TRP negotiated an unconscionable contingent fee agreement with Marland as a qui tam whistleblower, under which TRP would get at least 50% of Marland's recovery (unless the case settled in 1999, in which case it would get 35%) – *even if* the California Attorney

General ("AG") intervened in the qui tam action and TRP did no actual work litigating the case.

     9.     TRP then filed a qui tam action the same day as the DOI filed its own action – February 17, 1999. After this filing, TRP continued to use its representation of Marland to secure a second retainer with the DOI. Marland agreed to this based on TRP's advise that it was in his interest to do so and on the understanding that TRP would share its fees from that representation with Marland so that the net result was the same as if the fees had been recovered in the qui tam action. Fontana has recently acknowledged that this principle was the basis on which TRP pursued the second retainer with the DOI.

     10.     Nevertheless, TRP's pursuit of a retainer with the DOI reflected its elevation of its interests ahead of its client's. In particular, negotiations regarding cooperation between the DOI, the AG, and TRP over the two pending actions were complicated by TRP's insistence that it serve as lead counsel for both the AG (who would intervent in the qui tam action) and the DOI.

     11.     In April 1999, TRP told Marland that it had proposed to the AG and the DOI that the parties should agree to work together, with the AG's office leading the litigation, and postpone any issues regarding allocation of recoveries until the end of the litigation. The AG has since told Marland that it never received such a proposal.

     12.     When TRP did sign a retainer with the DOI, in May 1999, it failed to disclose its potential conflicts of interest from this dual representation and failed to obtain any waiver from either Marland or the DOI. TRP also failed to advise the DOI of its prior advice to Marland that he did not have to produce any documents he did not want to

produce – even though Marland had reminded TRP, in writing days before this second

retainer, that he would not produce any more documents relating to the matter.

13.      TRP's retainer with the DOI also called for Marland to dismiss the qui

tam lawsuit in favor of the DOI's action.  Marland agreed to this condition on the

understanding (noted above) that TRP would share its fees from the DOI action with him

as if they were obtained in the qui tam action, according to the terms of the Attorney-

Client Agreement.

14.      In June 1999, TRP had Marland sign a blatantly unlawful amendment

to his Attorney-Client Agreement which provided for Marland's share of any recovery to

be reduced by half if he was unable or unwilling to testify in the pending civil litigation.

This amendment shows TRP's disregard for legal constraints on attorney-client

agreements.

15.      When the AG's office decided to intervene in the action in 2001, the

AG told the DOI that TRP had a clear and unwaivable conflict of interest in representing

both Marland and the DOI.  TRP responded by falsely telling both the DOI and the AG

that it had obtained a clear and unequivocal conflict waiver from Marland – when in fact

TRP had obtained no waiver at all from Marland.  Indeed, TRP had not even sought such

a waiver.

16.      After seeking and obtaining a very limited waiver from Marland in

September 2001, TRP failed to advise its other client, the DOI, that Marland's limited

waiver required TRP to put Marland's interests ahead of TRP's in the event of any actual

conflict.

17.     As noted, the underlying litigation concerned the use of secret fronting agreements to conceal the interests of banks owned by the French state in the acquisition of an insolvent California insurance company, as well as the subsequent cover-up of those fronting agreements from regulatory scrutiny. This litigation involved hundreds of witnesses on two continents, millions of pages of documents, complex regulatory issues, and multiple criminal investigations and charges. Despite all that, TRP told Marland in 2002 TRP that it could not have anticipated that the litigation would take over three years and cost over $10 million. Citing these "unanticipated" pressures, TRP told Marland that it needed to renegotiate the Attorney-Client Agreement to ensure that TRP made a profit from the representation.

18.     TRP also falsely told Marland in 2002 that they needed to renegotiate its retainer because the DOI was (TRP claimed) angry with Marland and wanted to exclude Marland from any recoveries due to his refusal to produce an incriminating document he had previously described to TRP. Reminded that Marland had told TRP in May 1999 he would not produce that or any other document, TRP's responded that the DOI (its other client) was unaware of that refusal – which, as noted, was based on TRP's own advice to Marland. In any event, this entire issue was a pretext: the DOI has stated that it did not direct TRP to renegotiate or terminate its agreement with Marland.

19.     When Marland balked at renegotiating, TRP then purported to terminate the Attorney-Client Agreement in August 2002, and told Marland that this meant he would be excluded from *any* recoveries or any share of TRP's fees.

20.     TRP then coerced Marland to sign a new attorney-client agreement under which the initial retainer agreement was reinstated and then modified so that

Marland's share of any award was cut in half. The amended agreement also purported to release TRP from any claims, known or unknown – a clause that was procured by fraud, void as against public policy, and unenforceable.

21.     After Marland retained additional counsel in late 2004 who were independent of TRP, TRP refused over a dozen requests and pleas from that new counsel to discuss the evolution of its representation of Marland. More recently, TRP again completely ignored a request from Marland's counsel to discuss the evolution of the parties' relationship and Marland's concerns – leaving no alternative but to file this proceeding to enforce Marland's rights under the Agreement and applicable fiduciary law.

22.     In sum, based on the above:

a.   TRP's advice to Marland was flatly contrary to law on several key points, and clearly skewed to reflect TRP's interest to maximize its own role and recovery from any litigation.

b.   TRP's negotiation of its 1999 retainer by the DOI – and its failed negotiations with the AG – breached its duties to Marland by placing its interests ahead of his and failing to obtain his informed consent.

c.   TRP further breached its fiduciary duties to Marland in 2001 by falsely telling the AG that Marland had given a waiver, when in fact no waiver had been given and the waiver that was given, later in 2001, required TRP to place Marland's interests ahead of the DOI's in the event of any conflict.

d. TRP cannot justify the 2002 amendment to the Attorney-Client Agreement as fair and reasonable, as required by Section 18 of the Restatement of the Law Governing Lawyers regarding amendments to retainer agreements.

e. TRP also cannot enforce the 2002 amendment to the Attorney-Client Agreement because it never complied with the condition of Marland's limited September 2001 waiver — on the contrary, it consistently placed the DOI's interests ahead of Marland's.

f. The purported waiver in the amendment to the Attorney-Client Agreement is also void because it was procured by fraud, without full disclosure by TRP, as a fiduciary, of its client's rights, and as against public policy applicable to an ongoing attorney-client relationship.

g. As a consequence of its repeated, intentional breaches of duties to Marland TRP, as a disloyal fiduciary, should be required to forfeit its compensation received from its representation of the DOI. In the alternative, and at the very least, Marland is entitled to the recovery provided for in the 1999 Attorney-Client Agreement, which contains the arbitration clause that gives rise to this action.