# EXHIBIT 4

DONALD W. CARLSON [Bar No.: 79258] dcarlson@ccplaw.com
GUY D. CALLADINE [Bar No.: 99431] gcalladine@ccplaw.com
CARLSON, CALLADINE & PETERSON LLP
353 Sacramento Street, 16th Floor
San Francisco, California 94111
Telephone:     (415) 391-3911
Facsimile:     (415) 391-3898

ANDREW W. HAYES (*pro hac vice* application pending)
HAYES & HARDY, LLP
1 Rockefeller Plaza, Suite 1005
New York, New York 10020
Telephone (212) 554-3120
Facsimile: (212) 332-3121

Attorneys for Defendant
FRANÇOIS MARLAND

CARLSON CALLADINE & PETERSON, LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THELEN REID & PRIEST LLP, plaintiff and counterclaim-defendant )<br><br>)<br>)<br>)<br>v.                                                      )<br>)<br>)<br>FRANÇOIS MARLAND, defendant             )<br>)<br>─────────────────────────  )<br>)<br>FRANÇOIS MARLAND,  counterclaimant  )<br>)<br>)<br>v.                                                      )<br>)<br>)<br>THELEN    REID    &    PRIEST    LLP,  )<br>counterclaim-defendant | CASE NO.:   C-06-2071 VRW<br><br><br>**ANSWER AND COUNTER CLAIMS** |

Defendant François Marland, though his undersigned counsel, as and for answer to the plaintiff Thelen, Reid & Priest LLP's ("TRP") Amended Complaint in this action, avers as follows:

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1.      Admits that Plaintiff Thelen Reid & Priest LLP ("Thelen") purports to bring this action pursuant to 28 U.S.C. § 2201 to enforce an alleged contract between Thelen and three persons identified collectively as "European Counsel" in the purported agreement, one of whom is defendant Marland, and otherwise states that Paragraph 1 of the Amended Complaint contains legal statements that do not require an answer.

2.      Admits, upon information and belief, the allegations contained in Paragraph 2 of the Amended Complaint.

3.      Admits the allegations contained in Paragraph 3 of the Amended Complaint.

4.      Admits that Thelen represented Marland, both personally and as "General Counsel" for RoNo LLC ("RoNo", an entity Thelen incorporated to represent Marland's interests in the litigation that gives rise to this action), from at least August 1998 through and including 2005 for Marland personally, and February 1999 through 2005 for RoNo.

5.      Admits that on February 13, 2006, Marland and RoNo filed a demand for arbitration, AAA case number 50 180 T 00086 06, styled <u>Francois Marland and RoNo LLC v. Thelen, Reid & Priest LLP</u> (the "Arbitration"), refers to Exhibit G to the Amended Complaint for the contents thereof, and refers to Marland and RoNo's Amended Description of Claims filed in that arbitration, attached hereto as Exhibit A, for the contents thereof.

6.      To the extent Paragraph 6 of the Amended Complaint states facts and not legal conclusions to which a response is not required, Marland denies that the "December 2002 Agreement" is valid and enforceable, for the reasons set forth in Affirmative Defenses One through Eleven, set forth in paragraphs 69 through 111 below and incorporated herein by reference. Marland further denies that the "December 2002 Agreement" could validly release any claims on behalf of RoNo (whose sole officer was a Thelen paralegal, and whose General Counsel was – and remained – Thelen). Marland also denies the final sentence of Paragraph 6, and refers

2

to Section B.2(g)(iv) of the "December 2002 Agreement", which expressly provides that Thelen "shall resume its role as general counsel to RoNo as provided in the September 18, 2001 Amendment to the Attorney-Client Agreement" – an Amendment that specifically adopted and incorporated the February 1999 Attorney-Client Agreement between Marland and Thelen, which does contain an arbitration clause. Thus, even if the December 2002 Agreement were valid, which it is not, Thelen is still, indisputably, required to arbitrate its disputes with RoNo arising from its conduct as RoNo's general counsel.

7.      States that Paragraph 7 of the Amended Complaint contains legal conclusions and prayers to which no response is required.

8.      Admits that Marland is a citizen of France, domiciled in Switzerland, and that Marland and RoNo (a Delaware LLC whose principal place of business is California) seek over $35 million in damages in the Arbitration; lacks sufficient knowledge or information to admit or deny the allegation regarding the citizenship or legal permanent resident status of the relevant persons who hold equity interests in Thelen's partnership; and states that the balance of Paragraph 8 contains legal conclusions to which no answer is required.

9.      Admits that Marland retained Thelen's California lawyers to represent both him personally and RoNo as its General Counsel with respect to the matters giving rise to this action, refers to the "December 2002 Agreement" for the contents thereof, and states that the balance of Paragraph 9 of the Amended Complaint sets forth legal conclusions to which no response is required.

10.     States that Paragraph 10 of the Amended Complaint sets forth legal conclusions to which no response is required.

11.     States that Paragraph 11 of the Amended Complaint sets forth legal conclusions to which no response is required.

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

3

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

12.     Admits.

13.     Admits.

14.     Admits.

15.     Admits that in about early 1998, Marland contacted Reid & Priest regarding the *contrat de portage* between Altus and Credit Lyonnais.

16.     Admits that in or about August 1998, Marland met with Fontana, a Thelen partner, in San Francisco to discuss how he could lawfully profit from disclosure of his information while protecting his anonymity, but otherwise denies the allegations in Paragraph 16 of the Amended Complaint.

17.     Denies, except admits that Marland relied on Thelen's advice in agreeing to the circulation of a memorandum (referred to in the Amended Complaint as a "white paper") to prospective clients proposing that Thelen or another firm of Thelen's choosing be retained to prosecute legal claims arising out of the undisclosed *portage* between Credit Lyonnais and MAAF, with Marland compensated on a contingent fee basis.

18.     Admits that Marland relied on Thelen's advice in agreeing to present the "white paper" to the California Department of Insurance ("DOI"), and that the white paper proposed that the DOI retain Thelen and compensate Marland on a contingent fee basis as a consultant, but *denies* that Thelen suggested to the DOI or any other prospective client that it compensate Marland directly as a whistleblower, as permitted under applicable law – as opposed to retaining Thelen, who would then compensate Marland.

19.     Denies, on information and belief, that Thelen ever tried to negotiate compensation for Marland directly as a whistleblower with the DOI, as opposed to negotiating a retainer in which Thelen would represent the DOI and compensate Marland as a consultant.  Denies that Marland or his French counsel, Philippe Brunswick (who, as Thelen knew, was not admitted to

4

practice in the US nor familiar with American law), were kept fully informed of Thelen's communications with the DOI. For these reasons, on information and belief Marland denies that any "offer" was ever solicited from the DOI for his services alone, as opposed to in conjunction with Thelen, as suggested by the last sentence of Paragraph 19.

20.     Admits.

21.     Admits.

22.     Admits that Paragraph 22 purports to quote passages from the February 1999 Attorney-Client Agreement between Marland and Thelen; denies that Thelen kept Marland fully informed of its negotiations with DOI; and refers to that entire document for the contents thereof.

23.     Admits that Paragraph 23 purports to quote from the February 1999 Attorney-Client Agreement between Marland and Thelen, and refers to that document for the contents thereof.

24.     Admits that the February 1999 Attorney-Client Agreement provided for Thelen to receive a 40% contingent fee from Marland's relator's share if the case settled in less than ten months (and regardless of whether the Attorney General intervened in the *qui tam* litigation), and 50% if the case settled at any time thereafter (again, regardless of whether the Attorney General intervened), and refers to that document for the contents thereof.

25.     Admits that Marland relied on Thelen's advice in agreeing to file the *qui tam* action referred to in the Amended Complaint, refers to the referenced pleading for the contents thereof, and otherwise denies the allegations in Paragraph 25.

26.     Admits.

27.     Admits that in May 1999, Thelen advised Marland that it had reached an agreement with the DOI to substitute in as counsel in the DOI's action, and admits that Marland consented to that representation on the express condition (to which Thelen agreed) that any fees recovered by

Carlson Calladine & Peterson LLP
353 Sacramento Street
16th Floor
San Francisco, CA 94111

5

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1  Thelen in the DOI action would be shared between Thelen and Marland on the same terms as if

2  they had been recoveries obtained pursuant to the February 1999 Attorney-Client Agreement –

3  *i.e.*, Marland would receive 60% of any such fees if the cases settled by the end of 1999, and 50%

4  of any fees thereafter.  Marland denies that Thelen sought or obtained Marland's informed consent

5  to waive any conflicts arising from Thelen's dual representation in 1999, 2000, or until September

6  2001.  Marland denies that Thelen disclosed to Marland all of the oral understandings and

7  representations between Thelen and DOI regarding the terms and conditions of Thelen's dual

8  representation, except that Thelen told Marland that the DOI wanted Marland to dismiss the

9  *qui tam* action, and Thelen advised Marland that it was in his interest to do so.  Marland otherwise

10  denies the allegations in Paragraph 27 of the Amended Complaint, except admits that he received

11  a copy of what Thelen represented to be the DOI-Thelen retainer agreement.

12          28.     Denies the allegations contained in Paragraph 28 of the Complaint, except admits

13  that in June 1999, Marland and Thelen agreed to protect Marland's identity as the whistleblower

14  by including Brunswick and Susannah Maas in a group, referred to collectively as "European

15  Counsel", who would enter into a fee-sharing agreement with Thelen, the economic terms of

16  which would (as Thelen has admitted) mirror the economic terms of the February 1999 Attorney-

17  Client Agreement.  Marland also admits that, in addition to the "fig leaf" of the European Counsel

18  agreement, Marland and Thelen also discussed the possible additional compensation of Brunswick

19  for work advising Thelen regarding French law and matters related to the case as it progressed.

20          29.     Admits, upon information and belief, that Thelen and the DOI entered into an

21  attorney-client agreement in May 1999; admits that Marland consented to Thelen's dual

22  representation (and to the demand that Marland dismiss the *qui tam* action) on the express

23  condition that any fees recovered by Thelen in the DOI action would be shared between Thelen

24  and Marland on the same terms as if they had been obtained pursuant to the February 1999

6

Attorney-Client Agreement; lacks knowledge of the timing, terms and conditions of the DOI's consent to Thelen's fee-sharing with Marland and the European Counsel except for the documents produced in this action; and denies that Thelen sought or obtained Marland's informed consent to waive any conflicts arising from the dual representation, or from the DOI's demand that Marland dismiss the *qui tam* action, from May 1999 until September 2001.

30.     Admits.

31.     Admits that the terms of the June 1999 Agreement to Associate Counsel between Thelen and the "European Counsel" (Marland, Brunswick, and Maas) were intended to mirror the economic terms of the February 1999 Attorney-Client Agreement, modified slightly to reflect Thelen's agreement to pay Brunswick a separate and additional contingent fee compensation for his ongoing assistance with the case (5% if the case settled before the end of 1999, and 2.5% thereafter), and refers to the referenced agreement, as amended in September 2001, for the contents thereof.

32.     Admits that Brunswick negotiated for, and obtained, additional compensation in exchange for his agreement to provide services to Thelen related to the litigation; admits that Marland agreed to cooperate with Thelen consistent with his obligations as Thelen's client and Thelen's prior advice to Marland that he could remain anonymous and would not have to produce any documents that would identify him as the whistleblower.  Marland denies that Maas was expected to provide any material amount of assistance or advice to Thelen, and avers that her inclusion along with Marland and Brunswick in the June 1999 Agreement to Associate Counsel reflected what Fontana referred to as the "fig leaf" nature of the agreement – *i.e.*, to compensate Marland for his role as the whistleblower through the device of a fee-sharing agreement.

33.     Admits that when Marland reiterated his concerns over disclosure of his role in June 1999, Thelen proposed that the European Counsel's share of any recoveries be cut by 2/3 if

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

7

Marland was unable or unwilling to testify before the grand jury, and by ½ if Marland was unable or unwilling to testify in the civil litigation, and the European Counsel agreed to these reductions.

34.     Admits that beginning in about December 2001, Thelen told Marland that:

a.  Thelen had not anticipated the duration and cost of the litigation,

b.  Thelen had not anticipated that the California Attorney General would intervene in the *qui tam* litigation and seek to disqualify Thelen as counsel to the DOI, based on its conflict of interest and its refusal to cooperate with the AG,

c.  Thelen wanted to restructure its retainer with the DOI to obtain cash advances, and needed to amend its agreement with the European Counsel to do so, and

d.  Thelen's management felt that the sharing percentages between Thelen and the European Counsel did not reflect the amount of work spent by the parties on the case.

Marland denies that there were any "factors" other than these which prompted Thelen to seek to renegotiate the agreements (which had, in fact, just been re-confirmed in an "Amendment to Attorney-Client Agreement" and "Amendment Agreement to Associate Counsel", each dated September 18, 2001). Marland admits that he negotiated with Thelen in response to its request.

35.     Admits that on or about July 8, 2002, Thelen sent Marland a letter that referred to Thelen's ongoing effort to renegotiate the parties' agreements, and which purported to give 30 days' notice of its intent to terminate the February 1999 Attorney-Client Agreement, but denies that Thelen ever complied with the conditions set forth in the Attorney-Client Agreement and applicable as a matter of law for effecting any such termination.

36.     Admits that Marland told Thelen in late July 2002 – months after Thelen had stated that it needed to renegotiate its retainer – that he no longer had any copy of the *contrat de portage*; admits that Marland testified in December 2004 that he destroyed all his papers relating to Credit Lyonnais (who had been lenders to his former company), including the *contrat de portage*, in July

8

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

2001 after receiving personal threats and after Brunswick's offices had been burgled and files relating to Marland rifled; and admits that Marland continued to negotiate with Thelen regarding a revised agreement after Thelen gave its purported termination notice.

37.     Denies the allegations contained in Paragraph 37, except admits that Marland objected to the timing and manner of Thelen's negotiations, and objected to the reasons given as contrary to Thelen's prior representations (*e.g.*, Thelen knew in 1998 that Marland was not an active member of the bar, but claimed in 2002 that the fee-sharing agreement might be challenged on that basis), lacking any factual basis (*e.g.*, Thelen was claiming hardship just months after re-confirming the fee-sharing terms in September 2001), and evincing bad faith (*e.g.*, Thelen claimed that if it quit the case, Marland would receive nothing from any of their agreements).  Apart from his concerns over Thelen's effort to renegotiate the parties' agreement, Marland continued to believe that Thelen's ongoing representation of him and RoNo was consistent with applicable ethical standards and in Marland's best interests, and indeed Thelen insisted that it had acted and would continue to act in the best interests of Marland and RoNo.

38.     Admits that, in response to Thelen's ultimatum, Marland and the other European Counsel had no choice but to accept a new agreement in December 2002 that purported to reduce the European Counsel's share of recoveries from the DOI action *and* from the *qui tam* action by 1/3 (*i.e.*, to 35% of the total recovery), and refers to that agreement for the contents thereof.

39.     Refers to the December 2002 "New Agreement to Associate Counsel" for the contents thereof, including particularly Section B.2(g)(iv), which expressly provides for Thelen to "resume its role as general counsel to RoNo as provided in the September 18, 2001 Amendment to the Attorney Client Agreement" of February 1999, which contains an arbitration clause.

9

40.     Admits that the December 2002 "New Agreement to Associate Counsel" purported to modify Thelen's share of any recoveries in both the DOI action and the *qui tam* action, and refers to the referenced document for the terms thereof.

41.     Admits that the December 2002 "New Agreement to Associate Counsel" has a clause purporting to provide for mutual releases, the effectiveness of which Marland disputes on various grounds set forth below and elsewhere, and refers to that document for contents thereof.

42.     States that Paragraph 42 of the Complaint sets forth a legal conclusion to which no response is required; to the extent this Paragraph is deemed to contain a factual assertion, Marland denies that any purported waiver was effective for the reasons set forth in Affirmative Defenses One through Eleven below and incorporated herein by reference.

43.     Denies that Marland had the benefit of, or relied on, "the advice of independent counsel" with respect to the release in the December 2002 "New Agreement to Associate Counsel".

44.     Denied; Exhibit F of the Amended Complaint shows that in 2004, the CDOI belatedly consented to the revised fee-sharing provision of the December 2002 "New Agreement to Associate Counsel" – even though the agreement itself stated that the validity of the "entire agreement" was conditioned on the Commissioner providing "his consent to this Agreement".

45.     Denied; Section B.2(g)(iv) of the December 2002 "New Agreement to Associate Counsel" expressly provides for Thelen to "resume its role as general counsel to RoNo as provided in the September 18, 2001 Amendment to the Attorney Client Agreement" of February 1999, which contains an arbitration clause.  Thus, the February 1999 arbitration agreement was incorporated by reference in the December 2002 agreement with regard to Thelen's ongoing representation of RoNo.

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

10

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

46.     Lacks knowledge or information sufficient to admit or deny the amounts paid to Thelen from the DOI, and avers that Thelen has refused to provide confirmatory details of such payments, but admits that Thelen has sent over $19 million to the European Counsel, in care of Maas, as provided for in the June 1999 Agreement to Associate Counsel and subsequent amendments thereto.

47.     Admits that Marland retained Andrew Hayes, then of Boies, Schiller & Flexner LLP, as his counsel in or about July 2004, but denies that Thelen thereafter ceased representing the interests of Marland or RoNo (for whom Thelen continued to serve as General Counsel until 2005, pursuant to the September 18, 2001 Amendment to the February 1999 Attorney-Client Agreement).

48.     Admits that Marland and RoNo commenced the above-described Arbitration in New York, the venue designated for arbitration in the February 1999 Attorney-Client Agreement, on February 13, 2006.

49.     Admits that Marland's and RoNo's claims in the referenced arbitration are as set forth in the Amended Description of Claims, attached hereto as Exhibit A, and refers to that document for the contents thereof.

## Claim One

50.     Marland incorporates by reference his responses to Paragraphs 1 through 49 of the Amended Complaint as if set forth fully herein.

51.     Denies that the 2002 "New Agreement to Associate Counsel" ever became effective and/or is valid and enforceable, for the reasons set forth in Affirmative Defenses One through Eleven, set forth below and incorporated herein by reference.  Marland also specifically denies that he has "affirmed" the purported contract by any affirmative action on his part, or by not stopping Thelen from wiring funds – which would be due and payable under the original

11

Agreement to Associate Counsel in any event – to the European Counsel, care of Susannah Maas – who is the designated recipient of funds in the original, June 1999 Agreement to Associate Counsel and subsequent amendments thereto.

52.     Admits that Marland and RoNo commenced the above-referenced Arbitration in New York, refers to the Amended Description of Claims in that proceeding for the contents thereof, attached hereto as Exhibit A, and denies that any of the claims asserted therein are barred by any valid release or waiver.

53.     States that Paragraph 53 of the Amended Complaint sets forth legal conclusions which Marland is not required to admit or deny.

54.     Admits that Thelen purports to seek a declaratory judgment regarding claims and defenses that are the subject of a prior pending arbitration.

### **Claim Two**

55.     Marland incorporates by reference his responses to Paragraphs 1 through 54 of the Amended Complaint as if set forth fully herein.

56.     Admits that Marland and RoNo filed the above-referenced Arbitration, and admits that the claims in the Arbitration arise from Thelen's representation of both Marland and RoNo.

57.     States that Paragraph 57 of the Complaint states a legal conclusion to which no response is required; to the extent a response is required, Marland denies that the December 2002 Agreement ever became effective, or is valid and enforceable, for the reasons set forth in Affirmative Defenses One through Eleven set forth below.

58.     States that Paragraph 58 of the Amended Complaint sets forth legal conclusions which Marland is not required to admit or deny.

59.     Admits that Thelen purports to seek a declaratory judgment regarding claims and defenses that are the subject of a prior pending arbitration.

12

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

**Claim Three**

60.     Marland incorporates by reference his responses to the Paragraphs 1 through 59 as if set forth fully herein.

61.     Denies the allegations contained in Paragraph 61 of the Amended Complaint.  In particular and without limitation, Marland sustained no actual injury until at least August 2005, when the dismissal of the *qui tam* action was affirmed by the California Supreme Court, and when Thelen concluded and presented for approval settlements of the *qui tam* action and the DOI action that favored Thelen, and Thelen's new client, the DOI, over Marland.   In addition, and also without limitation, Thelen lied to Marland about whether the December 2002 agreement was approved by the Commissioner, falsely telling Marland that the requisite approval was obtained by 2004, when in fact the Commissioner had only approved of the fee-sharing clause in that agreement.

62.     Denies the allegations contained in Paragraph 62 of the Amended Complaint.

63.     Denied; in particular and without limitation, in late 2004 and early 2005, Marland's new counsel repeatedly asked Thelen to discuss the facts relating to Thelen's representation of Marland and RoNo, and Thelen responded that it was not able to have such a discussion given the pendency of the ELIC litigation, which lasted through the summer of 2005.  In sum, Paragraph 63 of the Amended Complaint alleges that Marland should lose his claims because he did not sue Thelen in the midst of the litigation on the merits between the DOI and the defendants in the underlying litigation.

64.     Admits that Thelen purports to seek a declaratory judgment regarding claims and defenses that are the subject of a prior pending arbitration.

13

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

**Claim Four**

65.     Marland incorporates by reference his responses to Paragraphs 1 through 64 as if set forth fully herein.

66.     Admits that Marland and RoNo filed the above-referenced arbitration, and admits that the claims in the arbitration arise from Thelen's representation of both Marland and RoNo.

67.     Denies that the 2002 "New Agreement to Associate Counsel" ever became effective and/or is valid and enforceable, for the reasons set forth in Affirmative Defenses One through Eleven, set forth below and incorporated herein by reference.

68.     Admits that Thelen purports to seek an injunction regarding claims and defenses that are the subject of a prior pending arbitration.

**First Affirmative Defense**

**(Failure to State a Claim)**

69.     The December 2002 "New Agreement to Associate Counsel" purports to amend and supersede prior attorney-client agreements between Thelen, Marland, and RoNo, and includes two specific provisions for Thelen to represent RoNo and Marland personally.

70.     To enforce an amendment to an attorney-client agreement such as the December 2002 agreement, Thelen has the affirmative burden of alleging (and later proving) that the terms of the amendment were objectively fair and reasonable.  Thelen is of course aware of this rule. Moreover, Marland's and RoNo's February 13, 2006 Notice of Arbitration expressly claimed that the December 2002 Agreement was not enforceable because, *inter alia*, it was not fair and reasonable.

71.     Thelen has chosen not to allege that the terms of the December 2002 Agreement are fair and reasonable, either in its Complaint or its Amended Complaint.

14

72.     Each of Thelen's claims in this action rest on Thelen's ability to enforce the December 2002 Agreement.

73.     The Amended Complaint therefore fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

### (Failure to Join an Indispensable Party)

74.     RoNo was incorporated by Thelen as a Delaware LLC with its principal place of business in California.  RoNo's sole Manager from the time of its inception through the filing of this action was Dana Fox, a onetime Thelen employee and a California resident.

75.     Thelen served as RoNo's counsel of record in the *qui tam* litigation pursuant to the February 1999 Attorney-Client Agreement from that time through late 2001.  Thelen also served as RoNo's "general counsel" pursuant to both the September 18, 2001 Amendment to the Attorney Client Agreement and the December 2002 New Agreement to Associate Counsel, through 2005.

76.     RoNo and Marland are each petitioners in the above-referenced arbitration, although Thelen seeks a declaratory judgment regarding only Marland's claims, and seeks to enjoin only Marland from pursuing his claims in the arbitration.

77.     Thelen chose to omit RoNo from this action because, *inter alia*, its inclusion would destroy the diversity jurisdiction on which this action rests.

78.     Recognizing this problem, Thelen unsuccessfully sought to dispute RoNo's status as a petitioner in the arbitration with the AAA.  Thelen's counsel in the arbitration protested RoNo's status as a petitioner with the AAA, claiming that Thelen was not obligated to arbitrate any disputes with RoNo.

79.     The AAA has rejected Thelen's objection to RoNo's status as a petitioner in the arbitration, and has ruled that RoNo is a party to the arbitration.

15

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

80.     Accordingly, this action should be dismissed based on Thelen's failure to join an indispensable party, since joinder is impossible because doing so would remove the basis for this court's jurisdiction.

### Third Affirmative Defense

### (Failure to Fulfill a Condition Precedent)

81.     Section C.2(a) of the December 2002 "New Agreement to Associate Counsel" states:  "The effectiveness of this entire Agreement is conditioned on the Commissioner providing his consent."  This provision was not in the June 1999 Agreement to Associate Counsel, and was included because the parties had agreed to condition the effectiveness of the "entire agreement", including the releases, on the Commissioner providing his consent.

82.     Thelen's Complaint and its related papers carefully avoided even suggesting that such consent was ever given, and instead pleaded "ratification" as a basis to enforce the release in the December 2002 agreement.  For that reason, Marland moved to dismiss Thelen's original Complaint in this action under Fed. R. Civ. P. 9(e), based on Thelen's failure to plead the occurrence of all conditions precedent to the effectiveness of the December 2002 "New Agreement to Associate Counsel."

83.     Thelen responded by filing an Amended Complaint which added the allegation that the Commissioner had consented to the agreement, and attached as Exhibit F a copy of that purported approval.

84.     Exhibit F to the Amended Complaint shows why Thelen initially tried to elide this issue:  the document – dated August 2004 and included without a cover page or transmittal letter – shows that the Commissioner did *not* approve the "entire agreement," but only the revised fee-sharing formula in the agreement.  Since that consent that was required anyway as a matter of law,

16

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1    the argument that this limited approval was actually a broader approval renders the entire last

2    sentence of Section C.2(a) redundant.

3        85.    In addition, Marland is informed and believes that Thelen specifically sought to

4    obtain a broader approval of the entire December 2002 agreement, and the Commissioner declined

5    to provide it.  This understanding is further corroborated by the format and timing of the consent:

6    a single page, without letterhead or a cover letter, dated 20 months after the agreement itself –

7    which was shortly after Thelen was informed that Marland had retained new counsel.

8        86.    Because the Commissioner never provided the approval that was a condition

9    precedent to the December 2002 agreement, that agreement never came into effect.  Thus the

10   release clause upon which Thelen's claims in this action rely is unenforceable.

11       87.    Although the December 2002 agreement never took effect, Thelen represented to

12   Marland in 2004 that the Commissioner had provided the requisite consent, and that the agreement

13   was, in fact, in effect.  Marland trusted and believed Thelen's representation up until the point

14   when he noted the omission of any such allegation in Thelen's March 2006 Complaint.

15       88.    Because the December 2002 agreement never came into effect, but Thelen told

16   Marland that it had, and Thelen acted as if it had, Thelen's obligations are set governed by (i) the

17   February 1999 Attorney-Client Agreement, as amended on September 18, 2001 (which itself was

18   never validly terminated), (ii) ethical rules applicable to Thelen's *de facto* representation of RoNo

19   from 2002 through 2005 (as provided for in the December 2002 Agreement, which purported to

20   revive the September 18, 2001 Amended Attorney-Client Agreement), and (iii) the June 1999

21   Agreement to Associate Counsel (which was modified in tandem with the Attorney-Client

22   Agreement on September 18, 2001, and which was only purportedly terminated by the December

23   2002 agreement).

24

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

17

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

## Fourth Affirmative Defense

## (Estoppel)

89.     Separate and apart from the preceding, Thelen was estopped from seeking to renegotiate the 1999 Attorney-Client Agreement and the June 1999 Agreement to Associate Counsel because Thelen told Marland, in 1999, that the DOI wanted Marland to abandon the *qui tam* action, and Marland followed Thelen's advice, relying on Thelen's agreement to share its fee award in the DOI action with Marland according to the terms of the parties' February 1999 Attorney-Client Agreement.

90.     Specifically, from May 1999 onward and up to late 2004, Marland and RoNo heeded Thelen's advice that they abandon the *qui tam* action, and provided no advice or information to the California Attorney General.  This course of conduct angered the Attorney General, who later refused to provide any relator's share or compensation for Marland from the settlements that the Attorney General negotiated with various settling defendants in 2005.

91.     Thelen was therefore estopped from seeking to renegotiate the share of its recoveries to be paid to Marland and the European Counsel below the amounts set forth in the February 1999 Attorney-Client Agreement and the June 1999 Agreement to Associate Counsel. As a further result of Thelen's acts and omissions detailed above, Thelen is estopped from seeking to enforce the December 2002 agreement.

## Fifth Affirmative Defense

## (Fiduciary Misrepresentations and Failures to Fully Disclose)

92.     Thelen, as a fiduciary of and counsel to Marland and RoNo, was required under California law and the California Rules of Professional Responsibility to fully disclose all of the facts and circumstances relating to Marland's rights under the December 2002 agreement, including without limitation, under the release clause.

18

93.     Thelen did not make that full disclosure, nor did it ensure that other, independent counsel familiar with California law made that disclosure.  On the contrary, Thelen defrauded and wrongly coerced Marland into signing the release clause by, *inter alia*, making various material and false representations, including false representations about the effectiveness of its notice of termination of the February 1999 Attorney-Client Agreement, the DOI's intentions towards Marland, and Marland's rights if he did not agree to cut the European Counsel's share of the recovery in the DOI action and the *qui tam* action by 1/3.  As a result of Thelen's failure to make full disclosures, the December 2002 agreement, and in particular the release clause, is void and unenforceable.

## Sixth Affirmative Defense

### (No Representation by Independent Counsel)

94.     The release clause in the December 2002 agreement is invalid and void as against public policy because Marland had not had, and was not relying on, the advice of "separate and independent counsel with respect to his decision to enter into this new Agreement and its meaning under California law", as stated in Section C.1 of that agreement.

95.     Thelen was aware that Marland did not have the advice of separate and independent counsel familiar with California law regarding the effect of the release clause.  While Thelen had arranged in 2001 for another firm (Beck deCorso) to represent RoNo as its "litigation counsel" in the *qui tam* action, Beck DeCorso was not asked to advise Marland or RoNo regarding their potential claims against Thelen, and did not advise Marland or RoNo regarding their potential claims against Thelen.  Thelen was aware of this fact, and any representations to the contrary (in the December 2002 agreement or elsewhere) are false.

19

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

**Seventh Affirmative Defense**

**(Unfairness and Lack of Consideration)**

96.     Separate and apart from the preceding, the release and reduced fee-sharing clauses in the December 2002 agreement are invalid and unenforceable because they are not objectively fair and reasonable, as is required for a modification of an attorney-client agreement.

97.     As noted, the parties had re-affirmed and ratified the initial terms of their fee-sharing agreement – based on the February 1999 Attorney-Client Agreement – in September 2001, *increasing* the compensation to be paid to the European Counsel from 50% to 52.5%, to reflect the additional compensation from Thelen to Brunswick for his services going forward.

98.     Thelen has not alleged, and cannot prove, that anything happened in the months immediately following the September 2001 amended agreements that would justify revising those agreements to drastically reduce the monies payable to Marland and the European Counsel. Indeed, all of the grounds cited by Thelen during that time related to matters that were known or could have been anticipated in 1999, much less 2001.

99.     In fact, as Thelen acknowledged in 2001, its real grounds for seeking to renegotiate its representation of Marland and RoNo were (1) Thelen's desire to renegotiate its retainer with the Commissioner to obtain advances, and (2) Thelen's perceived need to ensure that it made a profit from the litigation, and (3) Thelen's management's belief that Marland and the European Counsel's compensation exceeded their contribution to the time spent by counsel on the case (ignoring the fact that the Marland was being compensated for being the whistleblower, in lieu of compensation in the *qui tam* action).

100.     California law places the affirmative burden on Thelen to plead and prove that any such change was substantively fair and reasonable.  Thelen cannot meet that burden.  Accordingly,

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

20

the revised fee-sharing terms in the December 2002 agreement are void and unenforceable as against public policy.

101.    The release and reduced fee-sharing clauses in the December 2002 agreement are also invalid and unenforceable because they are not supported by adequate consideration, and the recited purported consideration is illusory:  i.e., the European Counsel agreed to give up 1/3 of their recovery, and gave a global release of unknown claims, in exchange for Thelen's agreement to do no more than honor its legal obligations to its clients Marland and RoNo while continuing to represent the Commissioner.

**Eighth Affirmative Defense**

**(Unconscionability; Coercion; Threat of Client Abandonment)**

102.    The release and revised fee-sharing provisions in the December 2002 agreement are void and unenforceable because they are unconscionable and inequitable, and were procured through Thelen's improper threat of client abandonment.

**Ninth Affirmative Defense**

**(Violation of the California Rules of Professional Conduct)**

103.    Thelen's conduct throughout its representation of Marland and RoNo involved numerous violations of the California Rules of Professional Conduct, including, *inter alia*, failing to fully disclose conflicts of interest, and proposing and drafting agreements to compensate Marland (or reduce his compensation) based on his providing testimony to the grand jury and in the civil litigation.

104.    Specifically, and in addition, the release and revised fee-sharing provisions in the December 2002 agreement are void and unenforceable because they contravene the California Rules of Professional Conduct.

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

21

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

## Tenth Affirmative Defense

### (Public Policy Against Interfering with Pending Arbitrations)

105.     There is a strong public policy in favor of enforcement of arbitration agreements according to their terms, with all doubts resolved in favor of arbitration.  Thelen's proposed declaratory judgments, to say nothing of its proposed injunction, squarely contravene that settled policy.

106.     The Court should therefore decline to exercise whatever jurisdiction it may have under the Declaratory Judgment Act to issue any declaratory judgment regarding the claims or defenses at issue in the arbitration, and should decline to exercise its equity jurisdiction to enjoin the arbitration.

## Eleventh Affirmative Defense

### (Unclean Hands)

107.     As noted above, Thelen has behaved inequitably, placing its own interests before those of its clients, and comes to this Court with unclean hands.  On that basis alone, Thelen is precluded from seeking to enforce an agreement procured by such improper conduct.

108.     As further noted above, Thelen stonewalled for months in response to repeated requests for basic information about its representation of Marland and RoNo.  On the eve of trial in the underlying litigation (before Judge Matz in the Central District of California), Thelen stated that any discussion of Marland's concerns be postponed until after the trial.

109.     In this action, Thelen's Complaint tried to obscure the fact that it had not actually obtained the Commissioner's approval that it knew was necessary to enforce the release clause at issue here.

22

110. Thelen has even refused to provide any details regarding the amounts it has received from the Commissioner, even after Marland's counsel suggested that it had provided conflicting information about how much it has received.

111. Such hardball tactics might be acceptable from parties at arms'-length in civil litigation. But such conduct should be unacceptable from a law firm in a dispute with a former client about basic matters of the integrity of the firm's conduct, particularly when that firm then comes into court seeking an injunction and summary dismissal of all of the client's claims. Because Thelen comes to this Court with unclean hands, the Court should deny any proposed preliminary injunction.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff François Marland prays that Plaintiff take nothing from this action, that the Complaint be dismissed with prejudice, and that the Court enter judgment awarding Marland such other and further relief as may be just and appropriate, including

a. Disgorgement of all fees and compensation earned in violation of Thelen's duties to RoNo and Marland under the California Rules of Professional Conduct and applicable fiduciary law;

b. costs and fees incurred in connection with this action; and

c. such other and further relief as may be appropriate.

///

///

///

///

///

///

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

## COUNTER CLAIM

### Preliminary Statement – Nature of the Case

1.    This is an action by a prominent law firm to stifle a former client's efforts to arbitrate claims arising out of the law firm's self-dealing and dishonesty.  Thelen alleges that all of the claims of Defendant Francois Marland in his pending arbitration were released by an amended fee-sharing agreement between Thelen, Marland (Thelen's client in his role as the whistleblower on the billion-dollar Executive Life fraud), and others.  Thelen seeks an injunction stopping the arbitration and declaratory judgment that all of Marland's claims are untimely.

2.    The substantive question posed by this action is whether a firm that agrees to take a billion-dollar *qui tam* case on contingency and then finds itself short of cash can coerce the whistleblower to give up 1/3 of his recovery and give a global release – and enforce that release when the client later discovers the firm was dishonest in its dealings with him, the court, and state officials.  Marland is prepared to litigate that issue in whichever forum (arbitration or court) is most appropriate and expeditious, and filed for arbitration based on the arbitration clause in his Attorney-Client Agreement (which, by express written amendment, also governed disputes between Thelen and Marland's wholly-owned company, RoNo LLC).  A copy of those arbitration claims is attached hereto as Exhibit A.

3.    These Counterclaims seeks damages, disgorgement, and other monetary relief arising out of Thelen's breaches of its fiduciary duty, self-dealing, erroneous and damaging advice, coercion, concealment, and misrepresentations of fact and law to its clients, Marland and RoNo.  The conduct at issue began with Thelen's misguided 1998 proposal to have Marland, a fact witness, compensated on a contingent fee; was compounded by Thelen's negotiations with the California Department of Insurance and its disastrous decision to refuse cooperation with the California Attorney General from 1999 onward; included Thelen's coercion and

24

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

misrepresentations designed to get Marland to reduce his recovery by 1/3, as reflected in the purported December 2002 amendment; and continued up through this month, when Thelen belatedly disclosed that it had not obtained the Insurance Commissioner's approval of the December 2002 amendment, as it had claimed and as was required for that agreement to take effect.

4.     As a result of its unethical and wrongful conduct, Thelen has received and retained over $35 million from the Department of Insurance – including $10 million pursuant to the void December 2002 amendment – all of which it paid out to its partners as equity income.  As a disloyal and intentionally dishonestly fiduciary, Thelen should be required to disgorge those funds back to its clients, Marland and RoNo, whose interests Thelen betrayed.  Thelen should also be required to pay other and further damages incurred by Marland and RoNo, including lost revenue from the state-court *qui tam* action – abandoned on Thelen's advice; lost potential revenue from a federal *qui tam* action Thelen never pursued; the time value of money lost from the delays created by Thelen's gamesmanship between the AG and the DOI; the costs of attorneys' fees on two continents dealing with Thelen's unethical conduct; and other consequential damages allowed by law.

## Conditional Nature of the Counterclaims

5.     Because Marland's and RoNo's arbitration claims are still pending, they need not be asserted as counterclaims now.  However, out of an abundance of caution and to avoid any possible claim of waiver, Marland and RoNo present these counterclaims now, *conditionally*, in the event that Marland's Second Affirmative Defense (Failure to Join an Indispensable Party) is dismissed and Marland's and RoNo's demand for arbitration is permanently stayed or dismissed for any reason.

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

25

**Facts Common to All Counts**

6.      Marland met with Thelen in August 1997 regarding his knowledge of a secret "portage" agreement used by Credit Lyonnais in connection with the purchase of Executive Life Insurance Co. from receivership in 1991.  Instead of filing a *qui tam* action, or taking other action to ensure Marland's treatment as a whistleblower, Thelen first sought to have Marland – a fact witness to the underlying events – paid on a contingent fee as a consultant to one of the parties in interest, with Thelen serving as Marland's counsel.

7.      Thelen was candid that it considered itself a "partner" with Marland in seeking to capitalize on his information, based on Thelen partner Gary Fontana's self-described expertise with the parties and the events at issue in the underlying fraud.  However, Thelen also acknowledged that it was representing Marland, both directly and as "General Counsel" for RoNo LLC ("RoNo"), an entity Thelen incorporated to preserve Marland's anonymity, from late 1997 onward.

8.      From the beginning of Fontana's involvement in the representation, in the second half of 1998, he focused on reaching a deal with the DOI.  Thelen negotiated for months with the California Department of Insurance ("DOI") regarding a potential retainer of Marland and Thelen. Thelen told Marland that it was in his interest to have such an agreement, but failed to explore, or advise Marland, of his other options – such as pursuing a whistleblower agreement with the DOI in which the DOI would choose its own counsel, or filing other state or federal qui tam actions based on insurance contracts that state and federal agencies had purchased from Executive Life.

9.      Thelen also failed to take reasonable steps to ensure the confidentiality of Marland's information when negotiating with the DOI.  As a result, the DOI began its own investigation and obtained information that made Marland's information less valuable.

Answer                                                                                  **Case No.:** C-06-2071 VRW

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

10.     At the same time, Fontana told Marland (who was very concerned about protecting his anonymity, for fear of reprisal) that he could remain anonymous, that he would not have to produce any documents that would identify him as the whistleblower, and that they could control what documents to withhold from the Attorney General even if the latter chose to intervene in the *qui tam* action.  Marland told Fontana that this was important to him, and relied on Thelen's advice, which was consistent with his understanding that French civil law generally barred the use of documentary evidence in France from American legal proceedings.

11.     At no time did Fontana or Thelen tell Marland that he had an obligation to preserve or produce evidence that might identify him as the whistleblower – nor did Thelen explain to Marland that there were ways to produce relevant documents without being identified as the whistleblower.

12.     In February 1999, it became clear that the DOI was going to file its own action based on the investigation sparked by Thelen's disclosure of Marland's confidential information to the DOI.  Thelen then hurried Marland to accept an unconscionable contingent fee agreement with Marland as a *qui tam* whistleblower, under which Thelen would get at least 50% of Marland's recovery (unless the case settled in 1999, in which case it would get 35%) – even if the California Attorney General ("AG") intervened in the qui tam action and Thelen did no actual work litigating the case.  This agreement – referred to as the "February 1999 Attorney-Client Agreement" – contains the arbitration clause that is the basis for this proceeding.

13.     Thelen filed a *qui tam* action on behalf of RoNo, the entity Thelen created to represent Marland's interests and protect his identity as the whistleblower, the same day as the DOI filed its own action – February 18, 1999.

14.     After this filing, Thelen continued to use its representation of Marland and RoNo to secure a second retainer with the DOI.  Marland agreed to this proposed second retainer based on

27

Thelen's advice that it was in his interest to do so and on the express understanding that Thelen would share its fees from the DOI action with Marland under the same formula that applied to recoveries in the *qui tam* action, to compensate Marland for his role as the whistleblower.

15.     From 1999 through 2004 (*i.e.*, even after the purported December 2002 amendment), Fontana and Thelen repeatedly acknowledged this principle of compensation to Marland as the basis on which Thelen was allowed to pursue the second retainer with the DOI.

16.     In April 1999, Thelen told Marland that it had proposed to the AG and the DOI that the parties should agree to work together, with the AG's office leading the litigation, and postpone any issues regarding allocation of recoveries, including allocation between Thelen and Marland, until the conclusion of the litigation.  The AG has since told Marland that it never received such a proposal.

17.     While Thelen was ultimately successful in leveraging its relationship with Marland into a second agreement with the DOI, at no time in these negotiations did Thelen disclose to Marland its potential conflicts of interest from this dual representation, nor did Thelen obtain any waiver from Marland relating to its representation of the DOI.

18.     Thelen also failed to advise the DOI of its prior advice to Marland that he did not have to produce any documents that would identify him as the whistleblower, even though Marland had reminded Thelen, in writing days before this second retainer, that he would not produce any more documents relating to the matter out of concern for his security.

19.     Thelen's retainer with the DOI also called for Marland to abandon and seek to dismiss the *qui tam* lawsuit in favor of the DOI's action.  Marland agreed to this condition on the understanding (noted above) that he would be compensated by receiving an equivalent share of the recovery in the DOI action, according to the terms of the February 1999 Attorney-Client Agreement.  This agreement was reflected in a June 1999 "Agreement to Associate Counsel"

28

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

between Thelen, Marland, and two of Marland's European lawyers, who along with Marland were referred to as the "European Counsel" to disguise the fact that the purpose of this agreement was simply to compensate Marland for his role as the whistleblower.

20.     The June 1999 Agreement provided for a slightly higher percentage payment to the European Counsel (65% if the case settled in 1999, 52.5% afterwards) than the payment to Marland under the February 1999 Attorney-Client Agreement (60% and 50%) to reflect Thelen's agreement to pay an additional contingent fee to Brunswick, one of the other European Counsel, for work on the case going forward.

21.     Also in June 1999, when Marland expressed concern about his security, Thelen pressured Marland to sign a blatantly unlawful amendment to his Attorney-Client Agreement which provided for Marland's share of *any* recovery (including in the *qui tam* litigation) to be reduced by 2/3 if he was unable or unwilling to testify before the grand jury, and ½ if he was unable or unwilling to testify in the pending civil litigation.  This amendment shows Thelen's consistent disregard for applicable ethics rules, and its willingness to use Marland's well-founded fear of retaliation as a cudgel to enrich Thelen at its client's expense.

22.     When the AG's office decided to intervene in the action in about July 2001, the AG told the DOI that Thelen had a clear and unwaivable conflict of interest in representing both Marland and the DOI.  The AG also complained that Thelen and the DOI were not cooperating with the AG's investigation of the claims.  Thelen responded by falsely telling both the DOI and the AG that it had obtained a clear and unequivocal conflict waiver from Marland – when in fact Thelen had obtained no waiver at all from Marland.  Indeed, Thelen had not even sought such a waiver.

23.     After seeking and obtaining a very limited waiver from Marland in September 2001, Thelen failed to advise its other client, the DOI, that Marland's limited waiver required Thelen to put Marland's interests ahead of Thelen's in the event of any actual conflict.

24.     After both sides reiterated, in writing, that Marland's compensation as the whistleblower should be the same regardless of which action any recoveries were obtained in, the parties in September 2001 executed amendments to both the February 1999 Attorney-Client Agreement and the June 1999 Agreement to Associate Counsel which reconciled the two agreements and provided for Marland (together with the European Counsel) to receive 52.5% of the total recoveries and fee awards in either the *qui tam* action or the DOI action.

25.     The September 2001 Amendment to Attorney-Client Agreement also responded to the AG's conflict claims by providing for new counsel, chosen by Thelen, to substitute in as "litigation counsel" for RoNo in the qui tam action, with Thelen continuing as "general counsel" to RoNo.

26.     As noted, the underlying litigation concerned the use of secret fronting agreements to conceal the interests of banks owned by the French state in the acquisition of an insolvent California insurance company, as well as the subsequent cover-up of those fronting agreements from regulatory scrutiny.  This litigation involved hundreds of witnesses on two continents, millions of pages of documents, complex regulatory issues, and multiple criminal investigations and charges.  Thelen had in fact anticipated in early 1999 that the defendants might mount a vigorous defense.  Yet just months after signing the September 2001 amendments to the Attorney-Client Agreement and the fee-sharing agreement, Thelen told Marland that it could not have anticipated that the litigation would take over three years and cost over $10 million (as Thelen claimed it had incurred up to that point).  Citing these "unanticipated" pressures, and making varying claims about its actual lodestar to date, Thelen told Marland that it needed to renegotiate

the Attorney-Client Agreement to enable Thelen to get advances from the DOI, and to ensure that Thelen made a profit from the representation.

27.     When Marland balked at renegotiating, Thelen then gave notice in July 2002 that it was terminating the February 1999 Attorney-Client Agreement.  Thelen did not, however, assign to Marland and RoNo its share of the proceeds from the qui tam action, which was a condition precedent of its right to terminate under the Attorney-Client Agreement.  Thelen did not do so, of course, because its termination notice was expressly given as a bargaining tool in an effort to renegotiate its retainer with Marland.

28.     Thelen also did not take any other steps required by law and applicable ethics rules in connection with its July 2002 notice of termination.  Instead, Thelen misrepresented the facts and threatened Marland, all in an effort to get him to reduce his share of the combined recoveries and fees from the litigation.

29.     In particular, Thelen told Marland that this termination meant he would be excluded from any recoveries or any share of Thelen's fees.  When Thelen made that threat, it knew or should have known that the law would not permit such a result.

30.     Thelen also told Marland that the Attorney General could dismiss RoNo from the qui tam case for failure to cooperate.  This was contrary to Thelen's previous advice to Marland, in 1999, that the AG could not stop Marland from sharing in any recovery of the *qui tam* action. Moreover, of course, the possibility of dismissal of the qui tam action for non-cooperation was itself the result of Thelen's own advice to ignore and not cooperate with the AG's investigation.

31.     When Marland still balked at Thelen's proposed renegotiation, Thelen falsely stated that the need to renegotiate was because the DOI was angry with Marland and wanted to exclude Marland from any recoveries due to his refusal to produce an early version of the *portage* agreements that Marland had previously described to Thelen.  Reminded that Marland had told

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

31

Thelen in May 1999 he would not produce that document because it would identify him as the whistleblower, Thelen responded that the DOI (its other client) was unaware of that refusal – again ignoring the fact that Marland's understanding was based on Thelen's own disastrously misguided advice.

32.     In any event, the entire document production issue was a pretext twice over: Thelen had been demanding a greater share of the recoveries for months before this issue even arose, and the DOI was informed in November 2002 that Marland was unable to produce to document, and did not refuse any compensation to him.  Indeed, the DOI later stated that it did not direct Thelen to renegotiate or terminate its agreement with Marland.

33.     As part of Thelen's escalating campaign of pressure and threats to get Marland and the European Counsel to agree to a revised retainer, Fontana made multiple false statements of fact and law regarding Marland's rights and options under the existing agreements and statements – later flatly contradicted by Fontana himself in sworn deposition testimony – regarding Marland's status as counsel to the Commissioner.  Thelen refused to report on the settlement negotiations relating to the underlying litigation – including proposed settlements of the qui tam action.  Thelen refused to provide more than the vaguest details of specific threats made by certain defendants in the settlement negotiations relating to the underlying litigation regarding their intention to retaliate against Marland – information that could be highly valuable to Marland in his efforts to deal with ongoing threats of retaliation against him in Europe.

34.     Using these and other unethical and wrongful pressure tactics, Thelen finally coerced Marland and the other European Counsel to sign an amended agreement in December 2002.  This December 2002 amendment had three clauses relating to representation of Marland and RoNo:  it provided the initial Attorney-Client Agreement was reinstated and then superseded by the new agreement; it provided that Thelen would continue to represent RoNo pursuant to the

32

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

September 2001 amendment to the February 1999 Attorney-Client Agreement, and it provided for Thelen to represent Marland if any defendant sought to block payments to Marland.

35.     The December 2002 amendment also cut Marland and the European Counsel's recovery one-third, from 52.5% to 37% of the total fees and recoveries in either the *qui tam* or the DOI action.

36.     The December 2002 amendment also had a global release clause, which recited that Marland release Thelen from all claims, known or unknown.

37.     The December 2002 amendment stated, in Section C.2(a), that the effectiveness of the "entire agreement" was conditioned on approval by the Commissioner of the Department of Insurance of the Agreement.

38.     Thelen told Marland and the European Counsel at the time that this provision meant precisely what it said – the Commissioner's approval of the *entire* agreement, including the releases, was required before any portion of the agreement would take effect.

39.     Thelen reported to Marland in early 2003 that it had not yet obtained this approval from the outgoing Insurance Commissioner, and was seeking approval from the new commissioner.  After further discussions in 2003 regarding possible amendments to the parties' agreements, Thelen stated that the Commissioner had approved the amendment and all issues relating to fees were resolved.

40.     Thelen's statement was false.  The Commissioner never approved the entire December 2002 amendment; only the revised fee-sharing provision in that agreement.  Thus the December 2002 amendment, by its own terms, never went into effect.

41.     Thelen concealed from Marland and the European Counsel the fact that the Commissioner never approved the December 2002 amendment from at least 2004 up to and

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

33

1    including the filing of Thelen's initial Complaint in this action, which of course sought to use the

2    releases in that amendment to block the arbitration and summarily dismiss Marland's claims.

3        42.    Marland believed Thelen's report that the Commissioner had approved the

4    December 2002 amendment until shortly before May 3, 2006, when Marland noticed that Thelen's

5    Complaint was oddly silent on the issue, and instead alleged that the release in the December 2002

6    amendment was valid because Marland had purportedly "ratified" the agreement.

7        43.    Marland therefore filed a motion to dismiss Thelen's original Complaint for failure

8    to allege compliance with conditions precedent, under Fed. R. Civ. P. 9(e).  Thelen responded by

9    filing an Amended Complaint that added an allegation that the Commissioner had approved the

10   December 2002 amendment, but the document attached to the complaint in support of this

11   assertion – a one-page document dated August 2004, not on letterhead and without any cover letter

12   – contradicts that allegation, since it conveys only the Commissioner's approval of the fee-sharing

13   provision in the December 2002 amendment, not any other part of the agreement.

14       44.    The timing of the Commissioner's limited consent is also notable.  August 2004

15   was shortly after Thelen was advised that Marland had retained new counsel.  This coincidence

16   suggests the possibility that Thelen reacted to the news of Marland's new counsel by reviving the

17   issue of the December 2002 amendment with the Commissioner, in a last-ditch effort to give

18   Thelen the benefit of the release clause, but was only able to obtain approval of the revised fee-

19   sharing clause.

20       45.    After Marland retained his own counsel in late 2004, Thelen also refused over a

21   dozen requests and pleas from that new counsel to discuss the evolution of its representation of

22   Marland.  More recently, Thelen again completely ignored a request from Marland's counsel to

23   discuss the evolution of the parties' relationship and Marland's concerns – leaving no alternative

24   but to file the Arbitration to enforce Marland's rights.

34

**Answer**                                                    **Case No.:** C-06-2071 VRW

46.     Thelen has also refused repeated requests to clarify the amounts it has received from the DOI, despite having given conflicting reports to Marland and the European Counsel about the amounts received.

## CLAIMS FOR RELIEF

### Claim One

### (Breach of Fiduciary Duty)

47.     Marland incorporates by reference the allegations contained in Counterclaim Paragraphs 1 through 46, above, as if set forth in full herein.

48.     Beginning in at least 1998 onward and continuing through 2005, Thelen owed fiduciary duties to (a) Marland, both in its typical role as Marland's counsel and as his self-described "partner" in seeking to capitalize on Marland's information, and (b) RoNo, which Thelen created to serve as the actual plaintiff in the *qui tam* action, and which Thelen advised as its "general counsel" pursuant to the September 2001 agreement.

49.     Marland trusted and relied on Thelen as his counsel/partner to place his and RoNo's interests ahead of Thelen's own; to provide honest, accurate and disinterested advice regarding their legal rights, duties, and options; to accurately and fully report all relevant facts and issues relating to the representation; to fully disclose all conflicts and potential conflicts, and to act ethically within the bounds of the California Rules of Professional Conduct.

50.     Thelen's advice and representation of Marland and RoNo, detailed above, breached its fiduciary duties to Marland and RoNo in numerous ways, including principally

a.     Thelen's self-interested initial proposed "white paper", which required a potential client to retain both Marland *and* Thelen, and compensate Marland, a fact witness, on contingency fee;

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

35

b.      Thelen's failure to obtain a confidentiality agreement from the DOI when discussing Marland's information;

c.      Thelen's failure to consider alternatives to the negotiated agreement with the DOI that it pursued in late 1998;

d.      Thelen's self-dealing negotiations with the DOI and the AG in early 1999 and its failure to fully disclose those negotiations to Marland;

e.      Thelen's erroneous, incomplete, and short-sighted advice to Marland regarding preservation of his anonymity;

f.      Thelen's contradictory and disastrously misguided advice to Marland to refuse cooperation with the AG's investigation of the *qui tam* action;

g.      Thelen's exploitation of Marland's concerns over his safety to induce Marland to sign unethical agreements in June 1999 that effectively compensated him for giving his testimony;

h.      Thelen's insistence on renegotiating the September 2001 amended agreements just months after they had been signed;

i.      Thelen's escalating campaign of pressure and threats to get Marland and the European Counsel to agree to a revised retainer, including multiple false statements of fact and law regarding Marland's rights and options under the existing agreements, the Commissioner's intentions towards Marland, and statements – later flatly contradicted by Fontana in deposition testimony – regarding Marland's status as counsel to the Commissioner;

j.      Thelen's exploitation of Marland's prior agreement to abandon the *qui tam* action, in favor of a recovery in the DOI action, as a basis to threaten Marland with no recovery at all if he did not agree to reduce his fee;

36

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

k. Thelen's refusal to report on the settlement negotiations relating to the underlying litigation – including proposed settlements of the *qui tam* action;

l. Thelen's refusal to provide more than the vaguest details of specific threats made by certain defendants in the settlement negotiations regarding their intention to retaliate against Marland – information that could be highly valuable to Marland in his efforts to deal with ongoing threats of retaliation against him in Europe;

m. Thelen's active opposition to RoNo's efforts to obtain even the smallest direct compensation from the settlements of the underlying litigation, which included the *qui tam* litigation – even though the parties' agreements called for such compensation to be shared between RoNo and Thelen;

n. Thelen's failure and refusal to provide any confirming details or specifics regarding the funds received to date from the Commissioner; and

o. Thelen's false statements regarding the Commissioner's approval of the December 2002 amendment, including its concealment of that fact that the Commissioner never approved the "entire agreement" up to May 2006, in response to Marland's motion to dismiss Thelen's Complaint.

51. Each of these breaches of Thelen's professional and fiduciary duties was a substantial factor in causing harm to Marland and RoNo, including actual lost revenue, lost opportunities for revenue, lost opportunities to protect Marland and his family from retaliation, the time value of money eventually obtained, and the cost of additional counsel hired to do the work of protecting RoNo's and Marland's interests that Thelen was supposed to do, but had failed and refused to do.

52. In addition to Marland's and RoNo's actual, out-of-pocket damages and lost

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

37

1    revenue, Thelen's conduct as an intentionally disloyal and dishonest fiduciary can only be

2    properly remedied if it is required to disgorge and forfeit all of its compensation earned during the

3    course of its disloyal conduct to its clients, RoNo and Marland.

4
5    53.    The amount of damages caused by Thelen's breaches of fiduciary duty is at least

6    equal to the roughly $35 million that Thelen has obtained to date (with millions more that may be

7    recovered pending an appeal), plus the other types of damages noted above, and the cost of this

8    proceeding and the pending arbitration action, the precise amounts of which will be determined at

9    trial.

10                                      **Claim Two**

11                                  **(Breach of Contract)**

12
13   54.    Marland incorporates by reference the allegations contained in Counterclaim

     Paragraphs 1 through 53 as if set forth in full herein.
14
15   55.    The February 1999 Attorney-Client Agreement, as amended by the Amendment to

16   Attorney-Client Agreement, dated as of September 18, 2001, is a valid and binding attorney-client

17   agreement between Thelen, Marland, and RoNo.

18   56.    Thelen's purported termination of the February 1999 Attorney-Client

19   Agreement was invalid for several reasons set forth above, including particularly
20
21        a.    Thelen's failure to fulfill a condition precedent of that termination clause by

22              assigning its interest in the recovery of the qui tam action to Marland and RoNo;

23        b.    Thelen's failure to obtain court approval for that termination, as required under

24              court rules and the California Rules of Professional Conduct; and

25        c.    Thelen's admission that its termination was a tactic to renegotiate its fee.

26   57.    Moreover, even if Thelen validly terminated the February 1999 Attorney-

27
28

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

                                          38

Client Agreement, which it did not, it reinstated that agreement in the December 2002 amendment, which also expressly provided for Thelen to resume its representation of RoNo as its general counsel, pursuant to the September 2001 Amendment to Attorney-Client Agreement, which incorporated the February 1999 Attorney-Client Agreement. Because Thelen cannot justify the provision in the December 2002 amendment that drastically reduced Marland's compensation, it cannot enforce that provision of the amendment, and is required to compensate Marland and the European Counsel based on the terms set forth in the June 1999 Agreement to Associate Counsel.

58.     The June 1999 Agreement to Associate Counsel, itself, had no termination clause. Thelen never purported to terminate the June 1999 Agreement to Associate Counsel, except as part of the purported December 2002 amendment, which recited that it replaced the June 1999 Agreement to Associate Counsel.

59.     For the reasons set forth above, the December 2002 amendment never took effect. Thus the June 1999 Agreement to Associate Counsel remains in effect to this day.

60.     Under the June 1999 Agreement to Associate Counsel, Thelen is obligated to pay the European Counsel 52.5% of the fees recovered in the DOI action (as those terms are defined in the agreement itself).

61.     Thelen has advised Marland that it has only paid 37% of the fees recovered in the DOI action. Thelen has also given different and apparently conflicting reports regarding its fees received to date, which are apparently around $50 million. Thelen has refused Marland and RoNo's requests to provide any clarification or backup to corroborate its conflicting statements about its fees to date.

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

39

62.     Thelen is therefore in breach of its obligations under the June 1999

Agreement to Associate Counsel, and owes Marland and the European Counsel the difference

between the 37% of fees paid to date and the 52.5% of fees due and owing, plus interest, and

52.5% of all future net recoveries from the DOI action.

**Count Three**

**(Bad Faith Denial of a Contract)**

63.     Marland incorporates by reference the allegations contained in

Counterclaim Paragraphs 1 through 62 as if set forth in full herein.

64.     Since 2004, Thelen has represented to Marland that the Commissioner had

approved the December 2002 amendment, and that the June 1999 Agreement to Associate Counsel

and the February 1999 Attorney-Client Agreement were therefore superseded.

65.     Thelen made those representations to Marland as a fiduciary, both as his

lawyer and as his self-described "partner".

66.     Thelen knew that its representation regarding the amendment was false.

Because the Commissioner had only approved the fee-sharing provision of the December 2002

amendment, and not the release and other provisions, a condition precedent to the effectiveness of

the December 2002 amendment never occurred, the amendment never took effect, and the parties'

prior agreements were therefore still in effect.

67.     Thelen intended to induce Marland to act in reliance upon the

representation.  Indeed, Thelen also intended to induce the Court to rely on the same premise:

Thelen's preliminary injunction motion asked this Court to enjoin Marland and summarily dismiss

all of his claims, without the benefit of discovery, in reliance on the release clause in the

December 2002 amendment.

68.     Marland reasonably relied on Thelen's representation regarding the status of

40

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

the parties' agreements, up until the point where a careful review of Thelen's Complaint indicated a careful omission of any allegation that the Commissioner had actually approved the December 2002 amendment, and an alternative allegation that Marland had somehow "ratified" the amendment.

69.     Marland was harmed by his reliance on Thelen's false statements, in various ways, including by incurring additional costs and expenses with various counsel, deferring or choosing not to pursue various actions, including actions and claims that he could have asserted during the pendency of the underlying litigation if Thelen had disclosed the fact that the December 2002 amendment had not taken effect.

70.     Thelen is therefore liable to Marland for bad faith denial of contract, and is liable for actual and exemplary damages, in an amount to be determined at trial.

## Claim Four

### (Intentional Misrepresentation—Failure to Disclose Known Facts)

71.     Marland incorporates by reference the allegations contained in Counterclaim Paragraphs 1 through 70 as if set forth in full herein.

72.     Thelen was a fiduciary of Marland and RoNo.

73.     As a fiduciary, Thelen had a duty to disclose material facts known to it and not known to Marland and RoNo, and had a duty not to misrepresent legal or factual matters known to it and not known to its clients.

74.     Thelen failed to disclose fully disclose various material facts to Marland, including its self-dealing negotiations with the DOI and the AG in early 1999 and afterwards, its failure to obtain approval of the December 2002 amendment from the Commissioner; and its settlement negotiations with certain defendants and with the AG and the DOI in 2004 and 2005 of both the DOI action and the *qui tam* action.

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

75.     Thelen also refused to disclose or report to Marland more than the vaguest details of specific threats made by certain defendants in the settlement negotiations regarding their intention to retaliate against Marland – information that could be highly valuable to Marland in his efforts to deal with ongoing threats of retaliation against him in Europe.

76.     During Thelen's escalating campaign of pressure and threats to get Marland and the European Counsel to agree to a revised retainer, Thelen also made multiple false statements of fact and law regarding Marland's rights and options under the existing agreements, the Commissioner's intentions towards Marland, and statements – later flatly contradicted by Fontana in deposition testimony – regarding Marland's status as counsel to the Commissioner.

77.     Thelen has also refused and failed to provide any confirming details or specifics regarding the funds received to date from the Commissioner.

78.     As a result of both Thelen's nondisclosures and its misrepresentations, Marland has suffered damages, in the form of increased litigation costs, lost profits and recoveries that could have been obtained had Thelen fully disclosed relevant facts, and other costs and damages the precise amounts of which will be determined at trial.

**Claim Five**

**(Negligence)**

79.     Marland incorporates by reference the allegations contained in Counterclaim Paragraphs 1 through 78 as if set forth in full herein.

80.     Thelen's conduct at various points in its representation also constituted professional negligence.  In particular, Thelen negligently failed to take reasonable steps to ensure the confidentiality of Marland's information when negotiating with the DOI.  As a result, the DOI began its own investigation and obtained information that made Marland's information less

42

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

valuable.  Subsequently, the DOI filed its own action based on the investigation sparked by

Thelen's negligent disclosure of Marland's confidential information to the DOI.

81.     Thelen also was negligent in its advice to Marland regarding his rights and

obligations as a *qui tam* whistleblower.  In particular, Thelen affirmatively misrepresented

Marland's discretion to withhold documents because they might identify him as the whistleblower.

Thelen also failed to advise Marland regarding other means by which the documents could be

produced without identifying him, as well as ways in which he could lawfully seek to frustrate

efforts to obtain his personal documents.

82.     Thelen also failed to cause RoNo to pay taxes due and owing under

California law, and failed to advise Marland of this deficiency.

83.     As a result of Thelen's negligence, Marland has suffered damages the precise

amounts of which will be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Marland prays that the Complaint be dismissed in its entirety, that Plaintiff

take nothing from this action, and that the Court enter judgment awarding Marland the following:

A.      On the First Counterclaim, damages in the form of

(i) disgorgement of all fees and consideration received to date by Thelen, which

amount is not less than $35,000,000, with the precise amount to be determined by an

accounting of funds received to date by Thelen,

(ii) disgorgement of any future fee awards, and

(iii) such consequential, other, and further damages as permitted by law and as

determined at trial;

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

B.      On the Second Counterclaim, damages

(i) in an amount reflecting the amounts paid to date to the European Counsel and the amounts payable under the February 1999 and June 1999 agreements, as amended in September 2001, which amount is not less than $10,000,000, with the precise amount to be determined by an accounting of funds received to date by Thelen,

(ii) 17.5% of any future fee awards to Thelen, and

(iii)  such other and further damages as permitted by law and as determined at trial;

C.      On the Third Counterclaim, damages in the form of forfeiture and disgorgement of all the funds received to Thelen to date, which is not less than $35,000,000, with the precise amount determined at trial, and such consequential, other and further damages as may be permitted by law;

D.      On the Fourth Counterclaim, damages in an amount to be determined at trial;

E.      On the Fifth Counterclaim, damages in an amount to be determined at trial; Together with Marland's attorneys' fees, costs and expenses incurred as a result of or in connection with this action and any related action or arbitration, and such other and further relief as the Court may deem just and proper

Dated:  May 23, 2006                    CARLSON, CALLADINE & PETERSON LLP


____/S/_____
Donald W. Carlson
Guy D. Calladine
Attorneys for Defendant
FRANÇOIS MARLAND

44

**EXHIBIT A**

## AMENDED DESCRIPTION OF PETITIONERS' CLAIMS

1.        Petitioners François Marland and RoNo LLC herein seeks to enforce
their rights under the February 17, 1999 Attorney-Client Agreement with his former
counsel, Thelen Reid & Priest LLP ("TRP") and to recover damages for TRP's
malpractice and breaches of fiduciary duty towards their clients Marland and his wholly-
owned LLC, RoNo.  The most significant instances of TRP's breaches and misconduct
are set forth below.

2.        In the second half of 1998, Marland (a Frenchman living in
Switzerland) met Gary Fontana, the TRP partner who took charge of Marland's
representation, regarding a possible whistleblower action involving the use of secret
fronting agreements to conceal the interests of banks owned by the French state in the
1991 acquisition of Executive Life, an insolvent California insurance company.  From the
inception of this representation, Fontana and TRP gave Marland clearly wrong advice
about his options and obligations, failed to protect his information and his interests, and
maneuvered to use his information for TRP's own financial benefit, at Marland's
expense.

3.        Instead of filing a qui tam action, or taking other action to ensure
Marland's treatment as a whistleblower, TRP first sought to have Marland – a  fact
witness to the underlying events – paid on a contingent fee as a consultant to one of the
parties in interest, with TRP serving as Marland's counsel.

4.        As TRP later wrote, the firm considered itself a "partner" with Marland
in seeking to capitalize on his information, based on Fontana's own knowledge of the
parties and some of the events at issue in the underlying fraud.  However, TRP was also

acting as Marland's counsel (as it later also confirmed in writing). Thus from the

inception of its representation, TRP was "wearing two hats", and failed to make adequate

disclosures of its intentions and actions to its client/partner, Marland.

      5.      TRP's efforts to profit directly from Marland's information tainted its

entire representation of him. For example, TRP negotiated for months with the

California Department of Insurance ("DOI") regarding a potential retainer of Marland

<u>and</u> TRP. TRP told Marland that it was in his interest to have such an agreement, but

failed to explore, or advise Marland, of his other options – such as pursuing a

whistleblower agreement with the DOI in which the DOI would choose its own counsel,

or filing other state or federal *qui tam* actions based on insurance contracts that state and

federal agencies had purchased from Executive Life.

      6.      TRP also failed to take reasonable steps to ensure the confidentiality of

Marland's information when negotiating with the DOI. As a result, the DOI began its

own investigation and obtained information that made Marland's information less

valuable.

      7.      At the same time, Fontana told Marland (who was very concerned

about protecting his anonymity, for fear of reprisal) that he could remain anonymous, and

that he would not have to produce any documents he did not want to produce. Marland

told Fontana that this was important to him, and relied on TRP's advice. At no time did

Fontana or TRP tell Marland that he had an obligation to preserve or produce evidence he

did not want to produce, nor did TRP explain to Marland that there were ways to produce

relevant documents without being identified as the whistleblower.

8.      In February 1999, when it became clear that the DOI was going to file its own action based on the investigation that Marland's information had sparked, TRP negotiated an unconscionable contingent fee agreement with Marland as a *qui tam* whistleblower, under which TRP would get at least 50% of Marland's recovery (unless the case settled in 1999, in which case it would get 35%) – *even if* the California Attorney General ("AG") intervened in the *qui tam* action and TRP did no actual work litigating the case. This agreement – the February 1999 Attorney-Client Agreement, contains the arbitration clause that is the basis for this proceeding.

9.      TRP then filed a *qui tam* action the same day as the DOI filed its own action – February 18, 1999, on behalf of RoNo, the entity that it had created to represent Marland's interests and protect his identity as the whistleblower. After this filing, TRP continued to use its representation of Marland and RoNo to secure a second retainer with the DOI. Marland agreed to this based on TRP's advice that it was in his interest to do so and on the understanding that TRP would share its fees from that representation with Marland so that the net result was the same as if the fees had been recovered in the *qui tam* action. Fontana and Thelen have repeatedly acknowledged that this principle was the basis on which TRP was allowed to pursue the second retainer with the DOI.

10.     Nevertheless, TRP's pursuit of a retainer with the DOI reflected its elevation of its interests ahead of its client's. In particular, negotiations regarding cooperation between the DOI, the AG, and TRP over the two pending actions were complicated by TRP's insistence that it serve as lead counsel for both the AG (who would then intervene in the *qui tam* action) and the DOI and by TRP's failure to understand how to fully protect Marland's anonymity.

11.     In April 1999, TRP told Marland that it had proposed to the AG and the DOI that the parties should agree to work together, with the AG's office leading the litigation, and postpone any issues regarding allocation of recoveries until the end of the litigation.  The AG has since told Marland that it never received such a proposal.

12.     When TRP did sign a retainer with the DOI, in May 1999, it failed to disclose its potential conflicts of interest from this dual representation and failed to obtain any waiver from either Marland or the DOI.  TRP also failed to advise the DOI of its prior advice to Marland that he did not have to produce any documents he did not want to produce – even though Marland had reminded TRP, in writing days before this second retainer, that he would not produce any more documents relating to the matter.

13.     TRP's retainer with the DOI also called for Marland to dismiss the *qui tam* lawsuit in favor of the DOI's action.  Marland agreed to this condition on the understanding (noted above) that TRP would share its fees from the DOI action with him as if they were obtained in the *qui tam* action, according to the terms of the February 1999 Attorney-Client Agreement.  This agreement was reflected in a June 1999 Agreement to Associate Counsel – *i.e.*, a fee-sharing agreement – between TRP, Marland, and two of Marland's European lawyers, who along with Marland were referred to as the "European Counsel" to disguise the fact that the purpose of this agreement was (as Fontana has testified) to compensate Marland for his role as the whistleblower.

14.     Also in June 1999, TRP had Marland sign a blatantly unlawful amendment to his Attorney-Client Agreement which provided for Marland's share of any recovery to be reduced by half if he did not testify in the pending civil litigation.  This

amendment – which reduced to an agreement to pay Marland for his testimony – shows TRP's disregard for legal constraints on attorney-client agreements.

15.     The fee-sharing percentages in the June 1999 Agreement were slightly different from those in the February 1999 Attorney-Client Agreement to reflect TRP's agreement to pay an additional 5% contingent fee to one of the other European Counsel, a French lawyer, for work on the case going forward.

16.     After both sides reiterated, in writing, that recoveries (both the relator's share and fee awards) should be shared among the parties on the same basis regardless of which action they were obtained in, the parties in June 2001 executed amendments to both the February 1999 Attorney-Client Agreement and the June 1999 Agreement to Associate Counsel which provided for Marland (together with the European Counsel) to receive 52.5% of the total recoveries and fee awards in either the *qui tam* action or the DOI action.

17.     When the AG's office decided to intervene in the action in about July 2001, the AG told the DOI that TRP had a clear and unwaivable conflict of interest in representing both Marland and the DOI.  TRP responded by falsely telling both the DOI and the AG that it had obtained a clear and unequivocal conflict waiver from Marland – when in fact TRP had obtained no waiver at all from Marland.   Indeed, TRP had not even sought such a waiver.

18.     After seeking and obtaining a very limited waiver from Marland in September 2001, TRP failed to advise its other client, the DOI, that Marland's limited waiver required TRP to put Marland's interests ahead of TRP's in the event of any actual conflict.

19.     As noted, the underlying litigation concerned the use of secret fronting agreements to conceal the interests of banks owned by the French state in the acquisition of an insolvent California insurance company, as well as the subsequent cover-up of those fronting agreements from regulatory scrutiny.  This litigation involved hundreds of witnesses on two continents, millions of pages of documents, complex regulatory issues, and multiple criminal investigations and charges.  TRP had in fact anticipated in early 1999 that the defendants might mount a vigorous defense.  Yet just months after signing the June 2001 amendments to the Attorney-Client Agreement and the fee-sharing agreement, TRP told Marland that it could not have anticipated that the litigation would take over three years and cost over $10 million (as TRP claimed it had incurred).  Citing these "unanticipated" pressures, and making varying claims about its actual lodestar to date, TRP told Marland that it needed to renegotiate the Attorney-Client Agreement to ensure that TRP made a profit from the representation.

20.     When Marland balked at renegotiating, TRP then purported to terminate the Attorney-Client Agreement in August 2002.  TRP did not, however, assign to Marland and RoNo its share of the proceeds from the qui tam action, as was a condition of its right to terminate.  TRP also did not take any other steps required by law and applicable ethics rules in connection with the termination of its representation.  Instead, TRP misrepresented the facts and threatened Marland, all in an effort to get him to reduce his share of the combined recoveries and fees from the litigation.

21.     In particular, TRP told Marland that this termination meant he would be excluded from *any* recoveries or any share of TRP's fees, even though TRP knew or should have known that the law would not permit such a result.  TRP also told Marland

that the Attorney General could dismiss RoNo from the *qui tam* case for failure to

cooperate. This was contrary to TRP's previous advice that the AG could not stop

Marland from sharing in any recovery of the qui tam action, and in any event any lack of

cooperation with the Attorney General was based on TRP's own advice.

      22.      Also, after Marland balked at TRP's proposed renegotiation, in late

2002 TRP falsely told Marland that they needed to renegotiate its retainer because the

DOI was (TRP claimed) angry with Marland and wanted to exclude Marland from any

recoveries due to his refusal to produce an incriminating document he had previously

described to TRP. Reminded that Marland had told TRP in May 1999 he would not

produce that or any other document, TRP responded that the DOI (its other client) was

unaware of that refusal – which, in any event, was based on TRP's own disastrously

misguided advice to Marland. In any event, the entire document production issue was a

pretext twice over: TRP had been demanding a greater share of the recoveries for months

before this issue even arose, and the DOI has stated that it did not direct TRP to

renegotiate or terminate its agreement with Marland.

      23.      Using these and other pressure tactics, TRP finally coerced Marland to

sign a new attorney-client in December 2002, which provided the initial Attorney-Client

Agreement was reinstated and then superseded by the new agreement, which cut the

European Counsel's share of any award was cut by one-third, from 52.5% to 37%. The

new agreement provided for TRP to continue to represent RoNo as its "General

Counsel", pursuant to a 2001 agreement that itself expressly referred back to and

incorporated the February 1999 Attorney-Client Agreement, and also provided for TRP

to represent Marland in response to any effort by any defendant to block payments to

Marland.  And, most importantly to TRP, the December 2002 agreement had a global

release clause, which recited that Marland release TRP from all claims, known or

unknown.

24.      The December 2002 stated that the effectiveness of the entire

agreement was conditioned on approval by the Commissioner of the Department of

Insurance of the agreement.  Up until May 3, 2006, when Marland filed a motion to

dismiss TRP's action in federal court that sought to block this arbitration, TRP had not

disclosed to Marland that the Commissioner never approved the December 2002

Agreement.  Instead, the Commissioner approved only the revised fee-sharing formula in

the December 2002 agreement; not any of the other provisions.  Thus the December 2002

agreement never went into effect, and TRP sought to conceal that fact up to and including

its initial Complaint in the federal action it filed to block this arbitration.

25.      Moreover, the Commissioner's limited consent was not obtained by

TRP until August 2004 – shortly after TRP was advised that Marland had retained new

counsel.  The coincidence of this timing suggests that TRP reacted to the news of

Marland's new counsel by pressing the Commissioner to approve the December 2002

Agreement so that TRP could have the benefit of a global release clause that was

included in that agreement, but still was only able to obtain approval of the revised fee-

sharing clause.

26.      Even if the Commissioner had approved the entire December 2002

agreement, the global release clause was procured by fraud, void as against public policy,

and unenforceable, for several reasons.

27.        After Marland retained additional counsel in late 2004 who were independent of TRP, TRP refused over a dozen requests and pleas from that new counsel to discuss the evolution of its representation of Marland.  More recently, TRP again completely ignored a request from Marland's counsel to discuss the evolution of the parties' relationship and Marland's concerns – leaving no alternative but to file this proceeding to enforce Marland's rights under the Agreement and applicable fiduciary law.

28.        TRP continues to claim that the December 2002 agreement is in effect, and has paid Marland (who, together with his European counsel, are parties to the June 1999 and December 2002 fee-sharing agreements) only 37% of Thelen's fee award, instead of the 52.5% that would be due pursuant to the parties' February 1999 and June 1999 agreements.

29.        TRP has also given different and apparently conflicting reports regarding its fees received to date, which are apparently around $50 million.  TRP has refused Petitioners' requests to provide any clarification or backup to corroborate its conflicting statements about its fees to date.

30.        In sum, based on the above:

a.   TRP's advice to Marland was flatly contrary to law on several key points, harmed Marland's and RoNo's interest and ability to pursue their claims in the *qui tam* litigation, and was clearly skewed to reflect TRP's interest to maximize its own role and recovery from any litigation.

b.   TRP's negotiation of its 1999 retainer by the DOI – and its failed negotiations with the AG – breached its duties to Marland by placing its interests

ahead of his and failing to obtain his informed consent. TRP also harmed Marland's and RoNo's interests by failing to pursue alternative opportunities for Marland to recover as a whistleblower, such as by filing *qui tam* complaints based on losses suffered by state and federal governmental units on insurance contracts they had purchased from Executive Life, which TRP was aware of in early 1999.

c. TRP's negotiation of the June 1999 amendment that provided for Marland's recovery to be reduced if he did not testify was a breach of TRP's professional duties and harmed Marland's and RoNo's interests by damaging Marland's credibility as a witness.

d. TRP further breached its fiduciary duties to Marland and RoNo in 2001 by falsely telling the AG that Marland had given a waiver, when in fact no waiver had been given and the waiver that was given, later in 2001, required TRP to place Marland's interests (including his interest in RoNo) ahead of the DOI's in the event of any conflict.

e. TRP's purported termination of the February 1999 Attorney-Client Agreement was void for failure to fulfill a condition precedent and failure to comply with applicable ethical rules. Even if that termination was effective, it did not relieve TRP of its continuing duties to Marland and RoNo as (purportedly) former clients.

f. The December 2002 agreement, by its own terms, never took effect, because the effectiveness of the entire agreement was conditioned on the Commissioner's approval of the agreement, and that approval was never obtained.

g.   The December 2002 agreement, even if it might otherwise be effective is also void and unenforceable because TRP cannot justify it as fair and reasonable, as required by Section 18 of the Restatement of the Law Governing Lawyers, and applicable California law, regarding amendments to retainer agreements.

h.   TRP also cannot enforce the 2002 agreement because it never complied with the condition of Marland's limited September 2001 waiver – on the contrary, it consistently placed the DOI's interests ahead of Marland's, up through and including its negotiation of settlements with the defendants, at which time TRP refused even to advise Marland of the status or substance of the negotiations.

i.   The purported waiver in the December 2002 agreement is also void because it was procured by fraud, without full disclosure by TRP, as a fiduciary, of its client's rights, and as against public policy applicable to an ongoing attorney-client relationship.

j.   As a matter of simple contract enforcement, TRP owes Marland (as a member of the European Counsel) the difference between what it has paid to date under the ineffective December 2002 agreement (about $15 million), and what is payable under the February 1999 Attorney-Client Agreement and the June 1999 fee-sharing agreements, both as amended in June 2001 – i.e., about $10 million.

k.   In addition to the foregoing amounts that are past due and payable, TRP, as a disloyal fiduciary that repeatedly and intentionally breached its duties to Marland and RoNo and placed its own interests ahead of its clients', should be

required to forfeit the balance of its compensation received from the DOI, which

Petitioners are informed and believe to be approximately $25 million.