# EXHIBIT 5

KEKER & VAN NEST, LLP
ROBERT A. VAN NEST - #84065 (rvannest@kvn.com)
WENDY J. THURM - #163558 (wthurm@kvn.com)
BENEDICT Y. HUR - #224018 (bhur@kvn.com)
STEVEN K. YODA - #237739 (syoda@kvn.com)
710 Sansome Street
San Francisco, CA  94111-1704
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188

Attorneys for Plaintiff, Counter-Defendant
        and Counter-Counterclaimaint
THELEN REID & PRIEST LLP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THELEN REID & PRIEST LLP,<br><br>        Plaintiff/Counter-Defendant,<br><br>    v.<br><br>FRANÇOIS MARLAND,<br><br>        Defendant/Counter-Claimant. | Case No. C 06-2071 VRW<br><br>**THELEN REID & PRIEST LLP'S ANSWER TO FRANCOIS MARLAND'S COUNTERCLAIMS AND COUNTER-COUNTERCLAIMS AGAINST FRANCOIS MARLAND, PHILIPPE BRUNSWICK & SUSANNAH MAAS** |
| THELEN REID & PRIEST LLP,<br><br>        Counter-Counter-Claimant,<br><br>    v.<br><br>FRANÇOIS MARLAND, PHILIPPE BRUNSWICK, and SUSANNAH MAAS,<br><br>        Counter-Counter-Defendants. | |

## **Preliminary Statement – Nature of the Case**

1.      Thelen admits that it is a law firm.  Thelen admits that its First Amended Complaint alleges, among other things, that the claims Marland is asserting in the New York Arbitration Proceeding were released by the December 2002 Agreement.  Thelen admits that Marland once was its client in an action arising from the insolvency of Executive Life Insurance

1

Company.  Thelen admits that, in its First Amended Complaint, it prays for, among other things, an injunction prohibiting Marland from pursuing the New York Arbitration Proceeding and a declaratory judgment that Marland released Thelen of the claims he is asserting in the New York Arbitration Proceeding.  Except as so admitted, Thelen denies all other allegations in Paragraph 1.

2.      Thelen admits that a document purporting to be an "Amended Description of Petitioners' Claims" is attached at Marland's Counterclaims as Exhibit A.  Except as so admitted, Thelen denies all other allegations in Paragraph 2 or is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 2.

3.      Thelen admits that Marland's Counterclaims purport to seek damages (partially in the form of disgorgement) arising from Marland's purported claims for breach of fiduciary duty, breach of contract, bad faith denial of a contract, intentional misrepresentation, and negligence.  Except as so admitted, Thelen denies all other allegations in Paragraph 3.

4.      Thelen admits that it has received over $35 million in attorneys' fees from the California Department of Insurance ("CDOI") and has distributed its net income from these attorneys' fees to its partners.  Except as so admitted, Thelen denies all other allegations in Paragraph 4.

**<u>Conditional Nature of the Counterclaims</u>**

5.      Thelen states that Paragraph 5 sets forth a legal conclusion to which no response is required.

**<u>Facts Common to All Counts</u>**

6.      Thelen admits that, in 1997, Marland met with Francois Chateau, a partner then at the law firm of Reid & Priest, regarding his knowledge of a "portage" agreement used by Credit Lyonnais in connection with the purchase of Executive Life Insurance Co. from receivership in 1991.  Except as so admitted, Thelen denies all other allegations in Paragraph 6.

7.      Thelen admits that it previously represented Marland directly and served as RoNo's general counsel.  Except as so admitted, Thelen denies all other allegations in Paragraph 7.

8.    Thelen admits that, in or about late 1998, Thelen partners met and spoke with representatives of CDOI in an attempt to negotiate an agreement between CDOI and Marland whereby Marland would be compensated for his information and other assistance that he had offered to provide to the CDOI.  Except as so admitted, Thelen denies all other allegations in Paragraph 8.

9.    Thelen denies all allegations in Paragraph 9.

10.    Thelen admits that Fontana advised Marland that, using various devices, Marland's identity could be protected for a period of time, but not indefinitely, especially if he had to be a witness at trial.  Except as so admitted, Thelen denies all other allegations in Paragraph 10.

11.    Thelen denies all allegations in Paragraph 11.

12.    Thelen admits that, in February 1999, Thelen and Marland entered into an agreement under which, among other things, Thelen agreed to file a *qui tam* complaint and Marland agreed to pay Thelen 50% of any gross recovery for claims settled or adjudicated on or after November 1, 1999.  Except as so admitted, Thelen denies all other allegations in Paragraph 12.

13.    Thelen admits that, on February 18, 1999, it filed a *qui tam* action on behalf of RoNo.  Thelen also admits that CDOI filed its own action on that same day.  Except as so admitted, Thelen denies all other allegations in Paragraph 13.

14.    Thelen denies all allegations in Paragraph 14 or is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 14.

15.    Thelen denies all allegations in Paragraph 15.

16.    Thelen denies all allegations in Paragraph 16.

17.    Thelen denies all allegations in Paragraph 17.

18.    Thelen denies all allegations in Paragraph 18.

19.    Thelen admits that Marland had agreed to dismiss the *qui tam* action.  Thelen admits that the June 1999 Agreement states that Thelen will share with Marland, Philippe Brunswick and Susannah Maas, jointly, 52.5% percent of the fees Thelen receives from CDOI if

3

ANSWER AND COUNTERCLAIMS OF THELEN REID & PRIEST LLP
Case No. C 06-2071 VRW

the case settled or was brought to judgment after 1999.  Except as so admitted, Thelen denies all other allegations in Paragraph 19.

20.     Thelen admits that, under the June 1999 Agreement, Thelen agreed to pay European Counsel 65% of the legal fees paid to it by CDOI if the case settled in 1999 or 52.5% thereafter.  Except as so admitted, Thelen denies all other allegations in Paragraph 20.

21.     Thelen admits that Marland agreed to reduce his share by 2/3 if he became unable or unwilling to testify before the grand jury and by 1/2 if he testified before the grand jury but became unable or unwilling to testify in the pending civil litigation.  Except as so admitted, Thelen denies all other allegations in Paragraph 21.

22.     Thelen admits that in about July 2001, the Attorney General advised CDOI that he believed that Thelen had a conflict of interest in representing CDOI in its litigation and RoNo in the *qui tam* action.  Except as so admitted, Thelen denies all other allegations in Paragraph 22.

23.     Thelen admits that, in September 2001, it obtained a formal written waiver from Marland.  Except as so admitted, Thelen denies all other allegations in Paragraph 23.

24.     Thelen admits that, in September 2001, Thelen and Marland executed an "Amendment to Attorney-Client Agreement."  Except as so admitted, Thelen denies all other allegations in Paragraph 24.

25.     Thelen admits that the Amendment to Attorney-Client Agreement stated that Thelen would withdraw as RoNo's counsel of record in the *qui tam* action, and Beck DeCorso would substitute in as counsel of record for RoNo in the *qui tam* action.  Except as so admitted, Thelen denies all other allegations in Paragraph 25.

26.     Thelen admits that the CDOI litigation involved hundreds of witnesses on two continents, millions of pages of documents, complex regulatory issues, and multiple criminal investigations and charges.  Thelen admits that it approached Marland in an attempt to restructure the terms of their fee-sharing relationship based upon the economics of the prolonged litigation.  Except as so admitted, Thelen denies all other allegations in Paragraph 26.

ANSWER AND COUNTERCLAIMS OF THELEN REID & PRIEST LLP
Case No. C 06-2071 VRW
381236.03

27.     Thelen admits that, in July 2002, it notified Marland that it was terminating the February 1999 Agreement.  Except as so admitted, Thelen denies all other allegations in Paragraph 27.

28.     Thelen denies all allegations in Paragraph 28.

29.     Thelen denies all allegations in Paragraph 29.

30.     Thelen denies all allegations in Paragraph 30.

31.     Thelen denies all allegations in Paragraph 31.

32.     Thelen denies all allegations in Paragraph 32.

33.     Thelen denies all allegations in Paragraph 33.

34.     Thelen admits that, in December 2002, it and European Counsel (including Marland) signed a "New Agreement to Associate Counsel," which provided, among other things, that the February 1999 Attorney-Client Agreement was reinstated and immediately superseded by the new agreement; that Thelen would resume its role as general counsel to RoNo as provided in the September 2001 Amendment to the February 1999 Attorney-Client Agreement; and that Thelen would provide legal services to Marland in the event that an action is commenced in the United States to block or otherwise prevent the distribution of funds under the new agreement. Except as so admitted, Thelen denies all other allegations in Paragraph 34.

35.     Thelen denies all allegations in Paragraph 35.

36.     Thelen admits that the December 2002 Agreement contains a mutual release provision.  Except as so admitted, Thelen denies all other allegations in Paragraph 36.

37.     Thelen denies all allegations in Paragraph 37.

38.     Thelen denies all allegations in Paragraph 38.

39.     Thelen admits that it informed Marland in early 2003 that the outgoing Insurance Commissioner had not yet consented to the fee-sharing provision in the December 2002 Agreement.  Except as so admitted, Thelen denies all other allegations in Paragraph 39.

40.     Thelen denies all allegations in Paragraph 40.

41.     Thelen denies all allegations in Paragraph 41.

381236.03

42.    Thelen is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 42.

43.    Thelen admits that Marland filed a motion to dismiss Thelen's original Complaint.  Thelen admits that it filed an Amended Complaint in which it added an allegation that CDOI consented to the December 2002 Agreement in writing.  Except as so admitted, Thelen denies all other allegations in Paragraph 43.

44.    Thelen denies all allegations in Paragraph 44.

45.    Thelen denies all allegations in Paragraph 45.

46.    Thelen denies all allegations in Paragraph 46.

## CLAIMS FOR RELIEF
### Claim One
### (Breach of Fiduciary Duty)

47.    Thelen incorporates by reference its responses to Paragraphs 1 through 46, above, as if set forth in full herein.

48.    Paragraph 48 states a legal conclusion to which no response is required.

49.    Thelen is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 49.

50.    Thelen denies all allegations in Paragraph 50, including its subparagraphs.

51.    Thelen denies all allegations in Paragraph 51.

52.    Thelen denies all allegations in Paragraph 52, including its subparagraphs.

53.    Thelen denies all allegations in Paragraph 53.

### Claim Two
### (Breach of Contract)

54.    Thelen incorporates by reference its responses to Paragraphs 1 through 53, above, as if set forth in full herein.

55.    Paragraph 55 states a legal conclusion to which no response is required.

56.    Thelen denies all allegations in Paragraph 56, including its subparagraphs.

ANSWER AND COUNTERCLAIMS OF THELEN REID & PRIEST LLP
Case No. C 06-2071 VRW

381236.03

57.     Thelen admits that the December 2002 Agreement provided, among other things, that the February 1999 Attorney-Client Agreement was reinstated and immediately superseded and that Thelen would resume its role as general counsel to RoNo as provided in the September 2001 Amendment to the February 1999 Attorney-Client Agreement.  Except as so admitted, Thelen denies all other allegations in Paragraph 57.

58.     Thelen admits that the December 2002 Agreement replaced, among other things, that the June 1999 Agreement to Associate Counsel.  Except as so admitted, Thelen denies all other allegations in Paragraph 58.

59.     Thelen denies all allegations in Paragraph 59.

60.     Thelen denies all allegations in Paragraph 60.

61.     Thelen admits that is has Marland that it has paid European Counsel 35% of the fees Thelen received from CDOI prior to June 2006.  Except as so admitted, Thelen denies all other allegations in Paragraph 61.

62.     Thelen denies all allegations in Paragraph 62.

## Count Three
### (Bad Faith Denial of Contract)

63.     Thelen incorporates by reference its responses to Paragraphs 1 through 62, above, as if set forth in full herein.

64.     Thelen admits that it has represented to Marland that the February 1999 Attorney-Client Agreement and the June 1999 Agreement to Associate Counsel were superseded by the December 2002 Agreement.  Except as so admitted, Thelen denies all other allegations in Paragraph 64.

65.     Thelen denies all allegations in Paragraph 65.

66.     Thelen denies all allegations in Paragraph 66.

67.     Thelen denies all allegations in Paragraph 67.

68.     Thelen denies all allegations in Paragraph 68.

69.     Thelen denies all allegations in Paragraph 69.

70.     Thelen denies all allegations in Paragraph 70.

7

**Claim Four**
**(Intentional Misrepresentation—Failure to Disclose Known Facts)**

71. Thelen incorporates by reference its responses to Paragraphs 1 through 70, above, as if set forth in full herein.

72. Paragraph 72 states a legal conclusion to which no response is required.

73. Paragraph 73 states a legal conclusion to which no response is required.

74. Thelen denies all allegations in Paragraph 74.

75. Thelen denies all allegations in Paragraph 75.

76. Thelen denies all allegations in Paragraph 76.

77. Thelen denies all allegations in Paragraph 77.

78. Thelen denies all allegations in Paragraph 78.

**Claim Five**
**(Negligence)**

79. Thelen incorporates by reference its responses to Paragraphs 1 through 78, above, as if set forth in full herein.

80. Thelen denies all allegations in Paragraph 80.

81. Thelen denies all allegations in Paragraph 81.

82. Thelen denies all allegations in Paragraph 82.

83. Thelen denies all allegations in Paragraph 83.

**PRAYER FOR RELIEF**

This section contains no factual allegations and thus requires no response.

**AFFIRMATIVE DEFENSES**

Thelen asserts the following affirmative defenses. To the extent any of the defenses, in whole or in part, serve merely to negate an element of Marland's counterclaims, Thelen in no way seeks to relieve Marland of his burden of proof or persuasion on that element.

**First Affirmative Defense**
**(Release)**

84.    Marland's counterclaims are barred by the release provision in the December 2002 Agreement.

**Second Affirmative Defense**
**(Consent)**

85.    Marland's counterclaims are barred by the doctrine of consent.  In the December 2002 Agreement, Marland consented to and approved all of the alleged acts and omissions about which he now complains.

**Third Affirmative Defense**
**(Promissory Estoppel)**

86.    Marland's counterclaims are barred by the doctrine of promissory estoppel.  In the December 2002 Agreement, Marland clearly and unambiguously released Thelen of the counterclaims he now asserts against it.  In reliance upon Marland's promise, Thelen continued to expend significant time and resources on the litigation and ultimately was successful in obtaining nearly $1 billion in settlements and judgments from the defendants in the case.  Thelen has paid Marland, and Marland has accepted, over $19 million pursuant to the terms of the December 2002 Agreement.

**Fourth Affirmative Defense**
**(Failure to State a Claim)**

87.    Marland's counterclaims fail to state claim for which relief may be granted.

**Fifth Affirmative Defense**
**(Statute of Limitations)**

88.    Marland's counterclaims are barred by the statute of limitations prescribed by CAL. CIV. PROC. CODE §§ 337, 338(d), and/or 340.6.

**Sixth Affirmative Defense**
**(Novation)**

89.    Marland's counterclaims are barred by the doctrine of novation.

9

**Seventh Affirmative Defense**
**(Prevention of Performance/Excuse)**

90.     Marland himself breached the contracts and obligations on which he seeks damages.  Marland's breaches prevented Thelen's performance and excused any obligation to perform.

**Eighth Affirmative Defense**
**(Accord and Satisfaction)**

91.     Marland's counterclaims are barred by the doctrine of accord and satisfaction.

**Ninth Affirmative Defense**
**(Waiver)**

92.     Marland's counterclaims are barred by the doctrine of waiver.  Marland has waived, relinquished, and/or abandoned any claim for relief against Thelen respecting his counterclaims.

**Tenth Affirmative Defense**
**(Cancellation of Contract)**

93.     Marland's counterclaims are barred because the contracts on which he seeks damages were cancelled.

**Eleventh Affirmative Defense**
**(Modification of Contract)**

94.     Marland's counterclaims are barred because the contracts on which he seeks damages were modified.

**Twelfth Affirmative Defense**
**(Abandonment of Contract)**

95.     Marland's counterclaims are barred because the contracts on which he seeks damages were abandoned.

381236.03

**Thirteenth Affirmative Defense**
**(Performance)**

96.     Marland's counterclaims are barred because Thelen has fully performed its obligations to Marland under the December 2002 Agreement, including paying Marland over $19 million in fees.  Full performance of an obligation extinguishes it.

**Fourteenth Affirmative Defense**
**(Failure to Mitigate)**

97.     While denying any and all liability, Thelen affirmatively states that any recovery by Marland should be reduced to the extent that he has failed to mitigate his alleged damages.

**Fifteenth Affirmative Defense**
**(Contributory Negligence)**

98.     While denying any and all liability, Thelen affirmatively states that Marland was careless and negligent with respect to the matters alleged in the counterclaims, and that said carelessness and negligence proximately contributed to and was a proximate cause of any damage alleged by Marland.

**Sixteenth Affirmative Defense**
**(No Damages)**

99.     Marland's counterclaims are barred because Marland has not suffered any damages.

**Seventeenth Affirmative Defense**
**(CAL. CIV. CODE § 47)**

100.    The alleged actions of Thelen are privileged pursuant to CAL. CIV. CODE § 47.

ANSWER AND COUNTERCLAIMS OF THELEN REID & PRIEST LLP
Case No. C 06-2071 VRW

381236.03

**THELEN'S COUNTERCLAIMS AGAINST FRANCOIS MARLAND, PHILIPPE BRUNSWICK AND SUSANNAH MAAS**

For its counterclaims to Marland's Counterclaims, Thelen alleges as follows:

**PARTIES**

1.      Thelen is a law partnership whose partners are citizens or legal permanent residents of the United States.

2.      Francois Marland is a French attorney and a citizen of France.

3.      Upon information and belief, Philippe Brunswick is a French attorney and a citizen of France.

4.      Upon information and belief, Susannah Maas is a Swiss attorney and a citizen of Switzerland.

**JURISDICTION**

5.      Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332(a)(2).  All of Thelen's partners are citizens or legal permanent residents of the United States.  Marland is a citizen of France.  Upon information and belief, Brunswick is a citizen of France and Maas is a citizen of Switzerland.

6.      Personal jurisdiction over Marland, Brunswick, and Maas in California is proper because Marland, Brunswick and Maas, in the December 2002 Agreement, consented to jurisdiction in the State of California.  *See* Thelen's Amended Complaint for Declaratory and Injunctive Relief ("Am. Compl."), attached hereto as Exhibit 1 at Ex. E, ¶ C.9., at 9.  In addition, the actions and events underlying the dispute between Thelen on the one hand, and Marland, Brunswick, and Maas on the other hand, occurred in California.  Marland, Brunswick and Maas, and each of them, purposefully availed themselves of professional relationships with lawyers in California in connection with litigation in California.  Brunswick and Marland have been present in California on at least four occasions in connection with events related to the ELIC litigation or the negotiation of the contracts and amendments that are the subject of this proceeding.  On information and belief, Maas regularly travels to the United States, including California, on business trips and has sufficient contacts to make her subject to general jurisdiction in the United

States.  The exercise of jurisdiction over Marland, Brunswick and Maas comports with

traditional notions of fair play and substantial justice.

### FACTS COMMON TO ALL COUNTS

7.      The relationship between the parties stems from a complex series of transactions

through which Crédit Lyonnais, a French bank, and other parties, illegally acquired the assets of

Executive Life Insurance Company ("ELIC"), an insolvent California insurance company,

through an auction conducted by the California Department of Insurance ("CDOI") in 1991 and

1992.

8.      In 1997, Marland approached Francois Chateau, a partner in the New York law

firm of Reid & Priest, and informed the firm that he possessed information about an undisclosed

fronting agreement, or *contrat de portage*, through which Crédit Lyonnais had illegally owned

and controlled the company that had acquired the insurance assets of ELIC's.  Marland claimed

that he possessed copies of a partially-executed July 1991 *contrat de portage* ("the July 1991

*portage*") between Altus Finance and the French insurance company, MAAF.  Among other

things, Marland asked Reid & Priest whether he could obtain a financial benefits by divulging

information about the *contrat de portage* to parties in the United States.  Reid & Priest agreed to

investigate the matter and to attempt to formulate a strategy through which Marland might

achieve his objective, while at the same time avoiding any public disclosure of his identity.

9.      Thereafter, with Marland's approval and consent, Reid & Priest entered into

negotiations with representatives of the National Organization of Life and Health Guaranty

Associations ("NOLHGA"), one of the defrauded bidders in the 1991 auction, and sought to

interest NOLHGA in signing an agreement to compensate Marland for the information and

documents that he claimed to have.  Those negotiations continued on and off until October 1998.

10.      In July 1998, Reid & Priest merged with Thelen, Marrin, Johnson & Bridges to

form Thelen.  In August 1998, Marland met Gary Fontana ("Fontana"), a Thelen partner located

in San Francisco who had previously worked for other clients on the ELIC conservation and

rehabilitation proceedings.  During that meeting and at other times both before and after the

meeting, Marland told Fontana that he had copies of the July 1991-*portage* and described the

13

1    circumstances under which he had obtained this document.  In response, Fontana told Marland

2    that the existence of such a fronting arrangement had not been publicly disclosed in the course of

3    the ELIC conservation proceedings, so that CDOI likely had no knowledge of this agreement.

4         11.    With the assistance of Brunswick and Marland, Thelen prepared a detailed "white

5    paper," which described the *contrat de portage* and explained why its nondisclosure to CDOI

6    violated state and federal law.  The "white paper" provided limited information about Marland,

7    but his name was reported only as "Mr. X" and his true identity was kept secret.  Marland and

8    Brunswick reviewed and approved the "white paper" and authorized its release to NOLHGA in

9    the hope that it would persuade NOLHGA to sign an agreement to compensate Marland (Mr. X)

10   for his information and assistance in prosecuting claims against Credit Lyonnais, Altus Finance

11   and MAAF.

12        12.    In October 1998, Fontana advised Marland and Brunswick that if NOLHGA was

13   unwilling to proceed with litigation, CDOI also had standing to pursue claims against Crédit

14   Lyonnais and the other parties involved in the fraudulent purchase of ELIC's assets.  Fontana

15   recommended that Thelen contact CDOI on Marland's behalf to see if it would be interested in

16   using Marland's information.  Accordingly, Marland and Brunswick authorized Thelen to

17   present the "white paper" to CDOI.

18        13.    Between October 1998 and February 1999, Thelen partners met with

19   representatives of CDOI and attempted to negotiate an agreement between CDOI and Marland.

20   Thelen kept Marland and Brunswick fully informed of the status of these negotiations.  To foster

21   a possible agreement with CDOI, and based on representations to Thelen by Marland, Thelen

22   emphasized Marland's "unique access" to "information and documents."  In connection with

23   these negotiations, Marland provided Thelen with a draft affidavit describing his receipt of the

24   *contrat de portage* and stating that Altus and MAAF possessed two out of the three copies of the

25   July 1991 *portage* agreement.  The affidavit contained no reference to the location of the third

26   copy, but Marland told Thelen that he was holding the document in a "safe place."

27        14.    While these negotiations continued, CDOI initiated its own investigation of the

28   allegations regarding possible *contrats de portage*.  As a result of that investigation, in January

---

14

ANSWER AND COUNTERCLAIMS OF THELEN REID & PRIEST LLP
Case No. C 06-2071 VRW

381236.03

1    1999, one of the parties to the ELIC transactions produced copies of various other *portage*

2    contracts relating to the ELIC insurance assets and Aurora National Life Assurance Company.

3    The July 1991 *portage* agreement, as described by Marland, was not among them.  Following the

4    January 1999 disclosure of the other *portage* agreements, however, Marland represented to

5    CDOI that he had a copy of an even earlier *contrat de portage*, dated July 1991.

6           15.    As of February 1999, CDOI indicated a willingness to retain Thelen and to allow

7    Marland to share in Thelen's legal fees.  Ultimately, however, CDOI failed to offer

8    compensation that was acceptable to Marland.

9           16.    In February 1999, as a result of the failed negotiations with CDOI, Thelen

10   recommended that Marland initiate his own *qui tam* lawsuit on behalf of the State of California

11   and CDOI.  Marland and Brunswick approved and authorized Thelen to file the *qui tam* lawsuit.

12   To protect Marland's identity as the relator in the *qui tam* lawsuit, Thelen established a Delaware

13   limited liability corporation named RoNo, LLC ("RoNo"), which served as the named plaintiff in

14   the *qui tam* lawsuit from its inception until the dismissal of the lawsuit in 2005.

15          17.    On February 17, 1999, Thelen and Marland signed a formal attorney-client

16   agreement (the "February 1999 Agreement"), which provided that Thelen would file a *qui tam*

17   complaint against Crédit Lyonnais and advise or assist CDOI and/or the California Attorney

18   General in connection with the *qui tam* lawsuit, in exchange for a percentage of any recovery

19   that Marland received in the *qui tam* lawsuit.  Specifically, if the case settled before November 1,

20   1999, Marland would pay Thelen 40% of any gross recovery; otherwise, Marland would pay

21   Thelen 50% of any gross recovery.  *See* Exh. A.  Thelen entered into the February 1999

22   Agreement in reliance upon Marland's representation that he had unique access to information

23   and documents, including the *contrat de portage*, which could be used in the *qui tam* lawsuit.

24          18.    On February 18, 1999, Thelen filed a *qui tam* complaint against Crédit Lyonnais

25   and others in San Francisco Superior Court (Case No. CGC-99-301344).  Marland and

26   Brunswick reviewed and approved the contents of the complaint prior to its filing.

27          19.    Also on February 18, 1999, CDOI independently filed a separate complaint in Los

28   Angeles County Superior Court, raising almost identical claims against many of the same

1  defendants as in Marland's *qui tam* case.

2       20.    Subsequently, in May 1991, CDOI asked Thelen to represent CDOI in its lawsuit.

3  CDOI realized that there were substantial advantages to having Thelen serve as its counsel,

4  including Fontana's significant knowledge about the history of the ELIC proceedings and his

5  unique access to Marland and the information and documents in Marland's possession.

6  Accordingly, CDOI asked Thelen to substitute as counsel on the basis of a sliding scale,

7  contingent fee agreement.

8       21.    As part of the proposed arrangement, CDOI agreed to allow Marland to share a

9  portion of the legal fees that Thelen would receive if it were successful in the litigation.

10  Marland's claim to possess one of the three known copies of the July 1991 *contrat de portage*

11  was critical to CDOI's decision to retain Thelen and CDOI's consent to Thelen's sharing fees

12  with Marland and his European lawyers: as of May 1999, CDOI had not yet obtained a copy of

13  the July 1991 *contrat de portage*. Thelen informed Marland and Brunswick of the terms of

14  CDOI's offer, of the potential conflicts between the CDOI representation and the *qui tam* claims,

15  and of CDOI's insistence that Marland agree to dismiss the *qui tam* case if the California

16  Attorney General would agree. Marland and Brunswick consented to the terms of the CDOI

17  proposal and authorized Thelen to represent CDOI in CDOI's lawsuit provided that they and

18  Maas—Marland's Swiss lawyer—be allowed to share in Thelen's legal fees.

19       22.    On May 25, 1999, Thelen and CDOI signed a formal attorney-client agreement,

20  under which CDOI agreed to pay Thelen a percentage of any recovery it received. *See* Exh. B.

21       23.    On June 3, 1999, Thelen, Marland, Brunswick and Maas entered into an

22  agreement (the "June 1999 Agreement") under which Thelen agreed to share any legal fees it

23  received from CDOI with Marland, Brunswick and Maas (described together in the June 1999

24  Agreement as "European Counsel"). *See* Exh. C. Specifically, if CDOI's case settled on or

25  before December 31, 1999, Thelen agreed to pay Marland, Brunswick and Maas 65% of the legal

26  fees paid to it by CDOI; otherwise, Thelen agreed to pay 52.5% of the legal fees paid to it by

27  CDOI.

28

ANSWER AND COUNTERCLAIMS OF THELEN REID & PRIEST LLP
381236.03              Case No. C 06-2071 VRW

24.     The fee-sharing arrangement was intended to compensate Marland for the information and documents he had in his possession and for his cooperation in prosecuting CDOI's lawsuit.  Accordingly, in exchange for a percentage share of the legal fees, Marland, Brunswick and Maas agreed to assist Thelen's prosecution of CDOI's lawsuit by, among other things:

> provid[ing] legal assistance, information, and strategic advice as requested by [Thelen] . . . . Such advice and assistance shall include (i) assisting in the investigation and development of facts; (ii) preparing documents and assisting in development of legal and negotiating strategies; (iii) doing legal research concerning matters arising under the laws of France, Switzerland and other European countries; (iv) drafting legal process and pleadings for use in any European proceedings that may be required in order to secure documents or testimony; (v) accommodating all other reasonable requests of [Thelen] relating to the investigation and prosecution of these claims.

Exh. C at 1-2.

25.     In an addendum to the June 1999 Agreement (the "June 1999 Side Agreement"), which was signed the same day, Marland agreed to reduce substantially the share of Thelen's fees paid to Marland, Brunswick and Maas in the event that his testimony was reasonably required and he failed to come to the United States to testify.  Specifically, Marland agreed that "the amounts payable to European Counsel under the [June 1999 Agreement] shall be reduced by two-thirds (66.7%) from what they would otherwise be (I.e. [sic] 21 2/3 percent of total legal fees paid on or before 12/31/99, and 17.5 percent thereafter)."  *See* Exh. D ¶ 3, at 2.  Further, Marland agreed that in the event he testified before the grand jury, but became "unable or unwilling to testify in the civil case," the fees paid to European Counsel would be reduced by 50% from what they otherwise would be.  *Id.* ¶ 4, at 2.

26.     In or about May and June 1999, Marland began to make conflicting statements regarding his possession of the July 1991 *contrat de portage*.  For example, during an interview by federal prosecutors in London, England, Marland initially denied that he ever had a copy of any *contrat de portage*.  However, Marland subsequently explained to Thelen that he did in fact posses a copy of the July 1991 *contrat de portage*, but feared criminal prosecution in France if he admitted on the record that he had retained a copy of the document.  Based on the various

17

1    statements that he, Brunswick and Chateau (who had since left Thelen) made at the time of the

2    London FBI interview and in the weeks and months thereafter, Thelen believed that Marland had

3    retained possession of the July 1991 *portage* agreement and that he was keeping it in a safe

4    place.

5           27.    By December, 2001, CDOI's lawsuit had become much more costly than the

6    parties had anticipated.  Thelen had incurred over $7 million in legal fees, and there was no

7    prospect of an early settlement.  Thelen wanted to ask CDOI to provide a non-recourse advance

8    to the firm, in anticipation of the expected contingency fee payments down the road.  Without a

9    cash advance, Thelen intended to withdraw from its role as lead counsel for the Commissioner,

10   and so informed Marland.  But, under the June 1999 Agreement, Thelen could not obtain any

11   fees from CDOI without paying 52.5% to Marland, Brunswick and Maas, which made a possible

12   non-recourse advance unrealistic.

13          28.    Therefore, in December 2001, Thelen approached Marland in an attempt to

14   restructure the terms of their fee-sharing relationship.  Negotiations ensued.

15          29.    By June 2002, the existence of the July 1991 *contrat de portage* that Marland

16   claimed to have possessed had become a key issue in CDOI's lawsuit because the defendants

17   there vigorously denied that any such documents ever existed.  In order to undermine the

18   credibility of the two key defense witnesses (Jean-Francois Henin and Jean-Claude Seys) who

19   had denied the existence of the document, Thelen requested that Marland produce the July 1991

20   *portage*.  Marland refused to produce the document and said for the first time that he had

21   destroyed it.

22          30.    On July 8, 2002, pursuant to the terms of the February 1999 Agreement (*see* Exh.

23   A ¶ 22(a)), Thelen gave Marland 30 days' written notice of its decision to withdraw from its

24   representation of him.

25          31.    During a meeting with Thelen in July 2002, Marland told Thelen that he had

26   destroyed one copy of the July 1991 *contrat de portage* in 1994, after his release from a brief

27   imprisonment by the French authorities.

28

18

32.     Subsequently, in a letter to Thelen dated November 1, 2002, Marland explained that he had possessed two copies of the July 1991 *contrat de portage*, but had destroyed both of them.  Marland said that he had kept one copy at his ski lodge in Geneva and had stored the other copy in a "safe place" before bringing it back to France at the beginning of 2001.  Marland explained that he destroyed the first copy on December 20, 1994, upon his return from prison in France: "I was angry just as I told you, and burned all of the various documents I had and notably, the copy that was at the house."  Marland explained that he kept the second copy of the *contrat de portage* until the summer of 2001, until burglaries at Brunswick's home and office, combined with "pressures by telephone," prompted him to destroy this copy along with all other documents and correspondence regarding RoNo, ELIC, and Thelen.  Marland sought to excuse this destruction by claiming that the *contrat* and other documents "no longer seemed necessary to me since the CDOI had at the time . . . all of the documents and evidence necessary to charge the defrauders."  Consistent with this letter, Marland later testified in a deposition in December 2004 (taken by the defense in the CDOI case) that he had destroyed his last copy of the July 1991 *contrat de portage* in July 2001.

33.     In reaction to Marland's admissions, Thelen reminded Marland and Brunswick that the existence of a copy of the July 1991 *contrat de portage* "was an essential part of our agreement to represent [Marland] and was a critical factor in [CDOI's] agreement to hire us and to pay [Marland]" via the June 1999 Agreement.  Moreover, Thelen informed Brunswick that Marland's destruction of the *contrat de portage*—a document which was central to Marland's testimony and critical to his own credibility—effectively destroyed Marland's value as a trial witness for CDOI.

34.     On December 19, 2002, Thelen, Marland, Brunswick and Maas entered a new agreement (the "December 2002 Agreement"), which replaced the February 1999 Agreement, the June 1999 Agreement, "and any and all other agreements" among them.  *See* Exh. E.  Under the terms of the December 2002 Agreement, Thelen, Marland, Brunswick and Maas mutually "release[d] and forever discharge[d] one another from any and all claims they might have against one another for any breach by the other of any prior agreement between them or professional

1   obligation of one to the other or any other obligation whether sounding in tort or contract . . . ."

2   *Id.* ¶ C.3, at 7.

3       35.     Under the terms of the December 2002 Agreement, Thelen agreed to pay

4   Marland, Brunswick and Mass a total of 35% of Thelen's "Net Recovered Fees" (i.e., 35% of the

5   legal fees paid to Thelen by DOI after subtracting unreimbursed expenses).  *Id.* ¶ B.2.(a), at 3.

6       36.     On February 13, 2006, Marland commenced an arbitration proceeding against

7   Thelen in New York City asserting, *inter alia*, that the December 2002 Agreement is not fair and

8   reasonable and is unenforceable, and that the release and waiver provisions of the December

9   2002 Agreement are void.

10      37.     On May 23, 2006, Marland filed an Answer and Counterclaims in this action,

11  asserting, *inter alia*, that the December 2002 Agreement never went into effect, and that the

12  February 1999 Agreement and the June 1999 Agreement remain valid and binding agreements

13  among Thelen, Marland, Brunswick and Maas.  *See* Answer and Counterclaims ¶¶ 54-62.

14      38.     To date, Marland, Brunswick and Maas have received, pursuant to the December

15  2002 Agreement, 35% of the net fees recovered by Thelen prior to June 2006—namely an

16  aggregate amount of $19,025,682.

17                      **FIRST COUNTERCLAIM**
                        **(Declaratory Relief)**
18
19                  (against Marland, Brunswick and Maas)

20      39.     Thelen incorporates by reference the allegations contained in Paragraphs 1

21  through 38, inclusive.

22      40.     If the Court determines that the December 2002 Agreement is not valid and

23  enforceable for any reason, Thelen then seeks a declaration of the rights and obligations of

24  Thelen, Marland, Brunswick and Maas, as they existed prior to the parties' execution of the

25  December 2002 Agreement on December 19, 2002.

26      41.     Without a restructured fee-agreement, Thelen intended to withdraw from

27  representing the CDOI in the ELIC litigation.  Thelen informed Marland of its intent to withdraw

28  if a new fee-sharing agreement was not reached.

ANSWER AND COUNTERCLAIMS OF THELEN REID & PRIEST LLP

42.     Thelen provided 30-days written notice of its withdrawal from the February 1999 Attorney-Client Agreement.

43.     Marland breached his obligations under the June 1999 Agreement and the June 1999 Side Agreement by, among other things, failing to provide and refusing Thelen's request for a copy of the *contrat de portage*, and actively concealing from Thelen the fact that he destroyed all copies of the *contrat de portage* in his possession.

44.     In light of Marland's counterclaims, an actual, immediate, justiciable controversy has arisen between Thelen, on the one hand, and Marland, Brunswick and Maas, on the other hand, regarding the rights and obligations of the parties as they existed prior to the execution of the December 2002 Agreement, in the event the Court determines that the December 2002 Agreement is not valid or enforceable for any reason.

## SECOND COUNTERCLAIM
### (Money Had and Received)

(against Marland, Brunswick & Maas)

45.     Thelen incorporates by reference the allegations contained in Paragraphs 1 through 44, inclusive.

46.     Thelen has paid—and Marland, Brunswick and Maas have accepted—an aggregate amount of $19,025,682 pursuant to the December 2002 Agreement.

47.     If the Court determines that the December 2002 Agreement is void and unenforceable for any reason, then Marland, Brunswick and Maas are no longer entitled to 35% of the net fees recovered by Thelen from CDOI.

48.     Thelen is therefore entitled to be re-paid the sum of $19,025,682 received by Marland, Brunswick and Maas from Thelen under the December 2002 Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Thelen prays for the following relief:

49.     Repayment of the sum of $19,025,682;

50.     A judgment against Marland, Brunswick and Maas according to the declaratory relief sought;

21

51.     Its costs and fees in this action; and

52.     Such other and further relief as the Court may determine is just and proper.


Dated:  September 29, 2006                              KEKER & VAN NEST, LLP



                                                By:  /s/ Robert A. Van Nest
                                                     ROBERT A. VAN NEST
                                                     Attorneys for Plaintiff
                                                     THELEN REID & PRIEST LLP

22

# EXHIBIT A



# ATTORNEY-CLIENT AGREEMENT

Thelen Reid & Priest, LLP ("TR&P") and Francois Marland ("Client"), individually and as the beneficial owner of RoNo, LLC ("RoNo") hereby agree as follows:

## Background

1. Client has heretofore provided information to TR&P concerning certain matters within his personal knowledge relating to the circumstances under which Credit Lyonnais, S. A., Altus Finance, S.A. and other entities (collectively the "Altus Defendants") came to acquire control of certain portions of the bond portfolio and insurance assets of Executive Life Insurance Company ("ELIC").

2. Using that information and their own knowledge of events surrounding the ELIC rehabilitation/liquidation proceedings TR&P attorneys have been engaged in an effort to persuade the California Department of Insurance to initiate legal proceedings against Credit Lyonnais, Altus and other companies and individuals that acquired the bond portfolio and insurance assets of ELIC. While the Department has indicated a willingness to retain TR&P to conduct a further investigation and pursue potential claims against the Altus Defendants, it has been unwilling to date to pay any fee to Client for the information that he has provided, nor has it been willing to pay legal fees to TR&P that are adequate to allow TR&P to fully compensate Client for the information and strategic assistance that he has provided, and expects to provide, in pursuing these claims.

3. Client wishes to file a California False Claims Act (Qui Tam) complaint on behalf of the State of California and the Commissioner of Insurance against the Altus Defendants and pursue these claims with or without the assistance and participation of the Commissioner

4. At Client's request TR&P has caused RoNo to be formed as a Delaware limited liability corporation and has filed applications required for RoNo to be qualified to do business in the state of California. The parties understand that Client is and will remain, directly or indirectly, the beneficial owner of RoNo.

5. Client wishes to engage TR&P to represent his interests, individually and as embodied in RoNo, in pursuing possible recoveries against the Altus Defendants on behalf of the Commissioner and the State of California.

## Scope Of Services

6. TR&P agrees to provide all legal assistance and legal advice reasonably necessary to investigate and pursue claims against the Altus Defendants arising under California law in connection with the transactions by which they acquired control over the junk bond portfolio and insurance assets of ELIC, including:

    (a).    filing a qui tam complaint in San Francisco County Superior Court and pursuing claims against the Altus Defendants in that litigation;



(b).    filing a motion to reopen the ELIC rehabilitation/liquidation proceedings in Los Angeles County Superior Court and pursuing claims against the Altus Defendants in that proceeding;

(c).    providing legal advice and assistance to the Commissioner of Insurance and/or the California Attorney General in connection with the qui tam litigation;

(d).    negotiating possible settlements with one or more of the Altus Defendants;

(e).    initiating or participating in other civil or administrative actions relating to possible claims arising out of the transactions described herein; and

(f).    Representing Client's interests in any appellate proceedings that may arise from any of the foregoing actions.

**Attorney Fees**

7.  In consideration for the services to be performed in connection with this representation, Client agrees to pay TR&P a fee calculated as follows:

(a).  <u>Settlement Prior to November 1999.</u>  In the event and to the extent that any of the claims against the Altus Defendants are settled prior to November 1, 1999, TR&P shall be paid a fee equal to forty (40%) of any gross recovery that Client or RoNo receives from any source as a result of the pursuit of these claims.

(b).  <u>Subsequent Recoveries.</u>  In the event and to the extent that claims against the Altus Defendants are settled or result in a judgment on or after November 1, 1999, TR&P shall be paid fifty percent (50%) of any gross recovery that Client or RoNo receives from any source as a result of the pursuit of these claims.

(c)  <u>Partial Offset.</u>  The amounts otherwise payable to TR&P as legal fees pursuant to subparagraphs (a) or (b) above shall be reduced by fifty percent (50 %) of the legal fees, if any, that TR&P is awarded by a Court, or recovers by way of settlement, for serving as counsel in the qui tam litigation.



Page 2

## Costs And Disbursements

8.)    Client shall reimburse TR&P for all costs and disbursements that TR&P incurs in the investigation and prosecution of the claims that are the subject of this Agreement, including filing fees, service of process charges, local and long distance travel (including meals, lodging, transportation and airfare ), reproduction and photocopying costs, deposition transcripts, witness fees, long distance telephone and telecopier charges, postage, messenger and overnight delivery fees and charges for computerized legal research. For this purpose Client shall maintain a disbursement account with TR&P in an amount of not less than $20,000.  TR&P will send Client monthly statement describing the expenses charged to the account, but the invoices will be paid from the disbursement account as long as sufficient funds remain.  If the balance in the disbursement account drops below $10,000, TR&P will have the right to require that the account be restored to a balance of $20,000.  All costs and disbursements reasonably incurred in the investigation or prosecution of these claims shall be reimbursed to Client (or TR&P, if it has incurred disbursements not previously reimbursed) out of any gross recovery before any allocation of legal fees or recoveries pursuant to paragraph 7.

9.)    TR&P shall have the right to ask that the Client make arrangements to pay costs and disbursements items exceeding $5000 and shall not incur any individual cost or disbursement in excess of $1000 without prior approval from Client.

## European Counsel

10.)    With the concurrence of TR&P, Client may, retain and associate counsel in France or elsewhere in Europe to assist in investigating and prosecuting these claims. TR&P agrees to cooperate with such counsel in developing strategies and negotiating with the Altus Defendants in Europe.  Such counsel shall initially not participate in any litigation filed in the United States without the express consent of TR&P.  All expenses incurred by Client for legal fees for such European counsel shall be borne by Client.  TR&P shall reimburse client for one-half (50%) of the fees incurred for such European counsel to the extent that TR&P recovers its contingent legal fees or is awarded legal fees by a court in an amount sufficient to make the reimbursement.

## Attorney's Lien

11.)    Client, for himself and RoNo, hereby grants TR&P a lien on the claims or causes of action that are the object of this representation, on any sums recovered by way of settlement, and on any judgment that may be recovered, for the sums and percentage shares referred to in this Agreement for payment of attorneys fees due to TR&P pursuant to Paragraph 6.



## Substitution Or Discharge Of Attorneys

12.)   TR&P shall be entitled to receive its contingent share of any settlement of or judgment on any of the claims that are the subject of this Agreement to the full extent allowable under California law, notwithstanding any decision by Client to discharge TR&P or to substitute other counsel in its place before or after such settlement or judgment is achieved.

## Favorable Outcome Not Guaranteed

13.)   Nothing in this Agreement and nothing said by TR&P to Client or any of his representatives shall be construed as a promise or guarantee about the outcome of this representation or the value of any claims that may be pursued.  Client acknowledges that all statements made by TR&P concerning these matters are statements of opinion only.

## Charges To Client Contingent On Recovery

14.)   The parties expressly understand that, in the event no recovery is obtained on the claims that are the subject of this Agreement, TR&P shall not make any charges to Client other than for costs and disbursement expenses incurred, nor shall Client be liable to pay any charges other than for costs or disbursements that TR&P may have incurred.

## Errors And Omissions Insurance

15.)   TR&P maintains errors and omissions insurance coverage that is applicable to the services that it is to render pursuant to this Agreement.

## Confidentiality

16.)   TR&P and Client each agree to maintain the confidentiality of any non-public information provided by Client concerning the background of the ELIC transactions and to disclose such information only (i) to parties and attorneys directly involved in the investigation or prosecution of the ELIC claims who have a need to know, or (ii) as may be required by law.

## Attorneys Fees Not Set By Law.

17.)   Client acknowledges that the attorney fees to be paid pursuant to this Agreement are not set by law and have been fairly negotiated between the parties.

## Notices.

18.)   All notices, requests, consents and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile (with the hard copy mailed by first class mail) or mailed (first class postage prepaid) or sent by overnight courier to the parties hereto at the following addresses or facsimile numbers:



If to TR&P to:

>THELEN REID & PRIEST LLP
>2 Embarcadero Center
>Suite 2100
>San Francisco, CA 94111-3995
>Telecopier: 415-421-1068
>Attention: Gary Fontana, Esq.

If to Client, to:

>Francois Marland
>c/o Susana Maas
>Rue Eynard
>Geneva, Switzerland
>Telecopier: (41-22) 319-7333

All such notices, requests, consents and other communications will (i) if delivered personally to the address as provided in this Section, be deemed given upon delivery, (ii) if delivered by facsimile to the facsimile number as provided in this Section, be deemed given upon receipt, and (iii) if delivered by mail in the manner described above or by overnight courier to the address as provided in this Section, be deemed given upon receipt. Either party hereto from time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other party.

## No Assignments.

19.)     No party hereto may assign all or any portion of its rights or obligations hereunder without the prior written consent of the other party.

## Entire Agreement.

20.)     This Agreement represents the entire agreement between the parties hereto with respect to the subject matter hereof. Neither party hereto has made any representation or warranty to the other party hereto with respect to the subject matter hereof except as expressly set forth in this Agreement.

## Severability.

21.)     The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision hereof. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be construed to be only so broad as is enforceable.

## Termination and Right to Withdraw

22.)   Either party shall have the right to withdraw from this Agreement without liability of any kind to the other provided that:

      (a)   the party wishing to withdraw shall give thirty days written notice to the other;

      (b)   the withdrawing party shall remain liable for any breach of its obligations under this Agreement prior to the date of withdrawal; and

      (c)   the withdrawing party shall assign to the other party all its rights under this Agreement and any claim that may have to any recovery or award as a result of its pursuit of the qui tam litigation.

## Arbitration of Disputes

23.)   All disputes which may arise concerning this Agreement shall be submitted to binding arbitration under the rules and regulations of the American Arbitration Association using a single arbitrator.  The arbitration shall take place in New York City or such other place as the parties may agree.  The arbitrator shall issue a written decision setting forth findings of fact and conclusions of law, which decision shall be final and binding on all parties.  The arbitrator's award may be enforced in any court having jurisdiction by filing a petition to enforce such award.  The cost of filing, including reasonable attorney's fees, may be recovered by the party that initiates the action to have the award enforced.

## Effective Date

24.)   This Agreement shall be construed and enforced under the laws of the State of California applicable to agreements made and to be wholly performed with such State.

25.)   This Agreement shall be effective upon execution by both parties.

In witness whereof, the parties have executed this Agreement on the dates shown below.

February 17 1999

                      FRANCOIS MARLAND, individually and as beneficial owner of RoNo, LLC

February 17 1999

                      THELEN, REID, & PRIEST LLP

                      By:  Gary L. Fontana

# EXHIBIT B

# ATTORNEY-CLIENT AGREEMENT

Thelen Reid & Priest, LLP ("TR&P") and Chuck Quackenbush both in his capacity as Commissioner of the California Department of Insurance ("CDOI") and his capacity as the rehabilitator/liquidator of Executive Life Insurance Company ("ELIC"), hereinafter referred to as "Commissioner," agree as follows:

## Background

1.)    Information has been brought to the attention of the staff of the CDOI which raises questions concerning certain aspects of the manner by which Altus Finance, S.A. ("Altus"), Credit Lyonnais, S.A. ("Credit Lyonnais"), Mutuelle Assurance Artisanale de France ("MAAF") and other domestic and foreign interests (hereinafter, collectively, the "ELIC defendants") obtained control of the assets and business operations of ELIC following its seizure by the CDOI in 1991.

2.)    The Commissioner wishes to retain the services of TR&P to assist him and his staff in investigating these issues and determining the extent, if any, to which the sale and transfers were achieved in violation of California law and, if so, whether legal remedies are available to redress those violations for the benefit of former policyholders of ELIC.

## Scope Of Services

3.)    With the assistance of the CDOI staff, TR&P agrees to provide all legal assistance and legal advice reasonably necessary to accomplish the following tasks:

a.    investigate the circumstances under which Altus Finance, MAAF and their joint venture partners obtained control over the assets and business operations of ELIC;

b.    review the applications that were submitted to the CDOI in connection with the transfers and determine the extent to which those applications were accurate and fully complied with the requirements of the California Insurance Code;

c.    investigate the relationships between and among Altus Finance, MAAF and Credit Lyonnaise and to determine whether the relationships that existed were fully and accurately disclosed to the CDOI and to the courts as required by California law;

d.    make recommendations to the Commissioner supported by the results of TR&P's factual and legal research concerning possible claims that may exist and develop a proposed strategy for pursuing them; and

sf.340717.v4

e.   represent the Commissioner in negotiations and in any judicial
     or administrative proceedings, including appeals, that may be
     required in order to effectively enforce any claims that the
     Commissioner may have against ELIC.

### Retention Of Investigators And Other Experts

4.)     Subject to the approval of the Commissioner, TR&P may employ such experts, investigators and financial advisors in the United States and Europe as may be necessary to investigate and enforce any claims and remedies the Commissioner may have.  Fees charged by such persons shall be paid by the Commissioner.

### Attorney Fees

5.)     In consideration for the services to be performed in connection with this representation, the Commissioner agrees to pay TR&P a fee calculated as follows:

a.   13 percent of all proceeds between $0 and $150 million, plus
b.   7 percent of all proceeds between $150 million and $300 million, plus
c.   5 percent of all proceeds between $300 million and $500 million, plus
d.   7 percent of all proceeds above $500 million.

These percentages shall apply to all monies collected from whatever source as a result of the prosecution of claims that have arisen as a result of the fraudulent or otherwise illegal conduct of ELIC defendants and shall be determined on the basis of the gross proceeds.

### Cost And Disbursements

6.)     The Commissioner shall pay all costs and expenses that TR&P reasonably incurs in the investigation and prosecution of the claims that are the subject of this Agreement, including filing fees, service of process charges, travel (including meals and lodging), reproduction and photocopying costs, deposition transcripts, witness fees, long distance telephone and telecopier charges, postage, messenger and overnight delivery fees and charges for computerized legal research.  TR&P shall submit properly documented invoices to the Commissioner on a monthly basis listing all costs and disbursements incurred in the course of the representation.  Such invoices shall be paid within thirty days of the date received.

7.)     TR&P shall have the right to ask that the Commissioner make arrangements to pay expenses exceeding $5000 and shall not incur any individual expense in excess of $2500 without prior approval from the Commissioner or a member of his staff.

sf.340717.v4

European Counsel

8.)     TR&P may, in consultation with the Commissioner, retain and compensate counsel in Europe to assist it in investigating and prosecuting these claims.

### Attorney's Lien

9.)     The Commissioner hereby grants TR&P a lien on the claims or causes of action that are the object of this representation, on any sums recovered by way of settlement, and on any judgment that may be recovered, for the sums and percentage shares referred to in this Agreement for payment of attorneys fees (pursuant to Paragraph 5) or reimbursement of costs of expenses (pursuant to Paragraphs 6 and 7).

### Settlement And Compromise Of Claims

10.)     The Commissioner shall retain the sole authority to settle or compromise the claims that are the subject of this Agreement, PROVIDED HOWEVER that he shall inform TR&P of the terms of any proposed compromise or settlement at least 48 hours prior to presenting or accepting a settlement or compromise, and PROVIDED FURTHER, that he shall not propose or accept any settlement or compromise that is not adequate to allow TR&P to recover at least eighty percent (80%) of the legal fees incurred by TR&P (at TR&P's standard hourly rates), plus all costs and disbursements incurred by TR&P (including legal fees to be paid to associated counsel) without first obtaining TR&P's written consent.

### Substitution Or Discharge Of Attorneys

11.)     TR&P shall be entitled to receive its contingent share of any settlement of or judgment on any of the claims that are the subject of this Agreement to the full extent allowable under California law, notwithstanding any decision by the Commissioner to discharge TR&P or to substitute other counsel in its place before or after such settlement or judgment is achieved.

### Favorable Outcome Not Guaranteed

12.)     Nothing in this Agreement and nothing said by TR&P to the Commissioner or any of his representatives or employees shall be construed as a promise or guarantee about the outcome of this representation or the value of any claims that may be pursued. The Commissioner acknowledges that all statement made by TR&P concerning these matters are statements of opinion only.

Page 3                                                    sf.340717.v4

## Confidentiality

13).    Any documents and information provided to the Commissioner directly or indirectly by TR&P during the course of its investigation of these claims and marked as "Confidential" shall be treated as such and shall not be disclosed to any person without the prior consent of TR&P.

## Errors And Omissions Insurance

14.)    TR&P maintains errors and omissions insurance coverage that is applicable to the services that it is to render pursuant to this Agreement.

## Waiver of Conflicts of Interest

15.)    TR&P has disclosed to the Commissioner the fact that it currently represents the Allied Group in litigation adverse to the Department of Insurance concerning its Proposition 103 roll back liabilities. The Commissioner is also aware of the fact that TR&P represents RoNo, LLC and its beneficial owners and will continue to do so during the course of this litigation. The Commissioner hereby waives any conflict of interest that does or may exist with respect to those representations and further agrees to waive any other conflict of interest that may arise as a result of TR&P future representation of clients with interests adverse to the Department of Insurance, provided however, that this waiver shall not extend to any matter related to Executive Life or to the claims that are the subject of this agreement.

## Effective Date

16.)    This Agreement shall be effective upon execution by both parties.

In witness whereof, the parties have executed this Agreement in San Francisco, California on the dates shown below.

May 25, 1999                          Chuck Quackenbush, Commissioner of the
                                      California Department of Insurance


                                      _____
                                      By

May 25, 1999                          Thelen Reid & Priest LLP


                                      _____
                                      By:   Karl Belgum

sf.340717.v4

# EXHIBIT C

## AGREEMENT TO ASSOCIATE COUNSEL

Thelen, Reid & Priest L.L.P., ("TR&P"), SCP Brunswick & Associates ("Brunswick"), Susana Maas ("Maas"), and Francois Marland ("Marland") (jointly "European Counsel" or "EC") hereby agree as follows:

## RECITALS

WHEREAS, TR&P has been retained to serve as counsel by the Commissioner of the California Department of Insurance (the "Commission") to investigate the circumstances under which Altus Finance, SA. ("Altus") and other French, Swiss and American companies were able to obtain control over the assets and business operations of Executive Life Insurance Company ("ELIC"), to represent the Commissioner in litigation currently pending against Altus and other defendants in Federal District Court in Los Angeles, California and to pursue other legal claims that the Commissioner may have arising out of the same facts and circumstances (hereinafter referred to as the "ELIC claims").

WHEREAS, Marland is an attorney who is a graduate of the University of Paris X School of Law and is knowledgeable about French law, including legal requirements applicable to commercial transactions, and further is aware of the background of the entities and events that are to be investigated by TR&P and the circumstances under which certain of the transactions were completed.

WHEREAS, Brunswick is a lawfirm with offices in Paris, France which employs attorneys admitted to practice in France and other European countries who are knowledgable about international financial transactions and methods of investigating non-public transactions in France and elsewhere in Europe.

WHEREAS, Maas has experience with Swiss law and the backgrounds of certain of the companies and individuals who were involved in the acts which are the subject of TR&P's investigation.

WHEREAS, European Counsel have assisted TR&P to date and are willing to continue to assist TR&P in the investigation and prosecution of the ELIC claims.

NOW, THEREFORE, in consideration for the mutual agreements contained herein and for other good and valuable consideration, the parties agree as follows:

1. **Assistance to Be Provided by European Counsel,** EC agrees to provide legal assistance, information, and strategic advice as requested by TR&P in connection with its investigation and prosecution of the ELIC claims on behalf of the Commissioner. Such advice and assistance shall include (i) assisting in the investigation and development of facts; (ii) preparing documents and assisting in development of legal and negotiating strategies; (iii)

Page 1

DOCS_SF #373304 v1 /801K01!.DOC

doing legal research concerning matters arising under the laws of France, Switzerland and other European countries; (iv) drafting legal process and pleadings for use in any European proceedings that may be required in order to secure documents or testimony; (v) accommodating all other reasonable requests of TR&P relating to the investigation and prosecution of these claims.

  **2. Fees to be Paid to European Counsel.** TR&P agrees to pay to EC, jointly, a portion of the legal fees that TR&P receives for its representation of the Commissioner in pursuing the ELIC claims as follows:

    (a). Sixty-five percent (65%) of the legal fees paid to TR&P as a result of any judgment entered or settlement agreement executed on or before December 31, 1999; and

    (b). Fifty-two and one-half percent (52.5 %) of any judgment entered or settlement agreement executed on or after January 1, 2000.

Payment to EC shall be made in the form of a cashiers check or wire transfer payable to Maas, or as directed by her, and shall be made within ten (10) business days following TR&P's receipt of readily available funds. Such percentages shall be computed after deduction for any expenses incurred by TR&P in connection with its representation of the Commissioner or RoNo, LLC that have not been fully reimbursed at the time the legal fees are paid. In addition to paying EC a portion of the legal fees it receives, TR&P shall reimburse EC for any disbursement or expense payments advanced by EC pursuant to paragraph 3 of this Agreement, to the extent that TR&P receives payment for these expenses pursuant to its fee agreement with the Commissioner. TR&P shall have no obligation to pay any costs or expenses incurred by EC in fulfilling their obligations under Paragraph 2.

  **3. Payment of Cost and Disbursements by European Counsel.** EC agree to pay all costs and disbursements that they incur in connection with their investigation and prosecution of the ELIC claims, including filing fees, service of process charges, travel (including transportation, meals and lodging), reproduction and photocopying costs, deposition transcripts, witness fees, long distance telephone and telecopier charges, postage, messenger and overnight delivery fees and charges for computerized legal research. TR&P will request that the Commissioner reimburse EC for such costs and expenses, but cannot guarantee that he will agree to do so.

  **4. General Provisions.**

  4.1 Execution in Counterparts. For the convenience of the parties hereto, this Agreement may be executed in counterpart.

Page 2

DOCS_SF #373304 v1 /801K01!.DOC

4.2 <u>Notices</u>. All notices, requests, consents required to be in writing by the terms of this Agreement, shall be deemed to have been duly given only if (a) delivered personally or by facsimile (with the hard copy mailed by first class mail), (b) mailed (first class postage prepaid) or (c) sent by overnight courier to the parties hereto at the following addresses or facsimile numbers:

<u>If to TR&P to:</u>

THELEN REID & PRIEST LLP
2 Embarcadero Center
Suite 2100
San Francisco, CA 94111-3995
Telecopier: 415-421-1068
Attention: Gary Fontana, Esq.

<u>If to EC, to:</u>

SCP Brunswick & Assoc.
51 Avenue Raymond Pont Care
75116 Paris, France
Telecopier: (331) 5365-0564
Attention: Philippe Brunswick

and

Francois Marland
Le Grand Merliage
72, roste de Bellebouche
1252 Gy. Switzerland
Telecopier: (41-22) 759-9093

and

Susana Maas
Rue Eynard
Geneva, Switzerland
Telecopier: (41-22) 319-7333

All such notices, requests, consents and other communications will (i) if delivered personally to the address as provided in this Section, be deemed given upon delivery, (ii) if delivered by facsimile to the facsimile number as provided in this Section, be deemed given upon receipt, and (iii) if delivered by mail in the manner described above or by overnight courier to the address as provided in this Section, be deemed given upon receipt. Any party hereto from



Page 3

DOCS_SF #373304 ~1 /R01K01!.DOC

time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other party.

4.3 No Assignments. No party hereto may assign all or any portion of its rights or obligations hereunder without the prior written consent of the other parties.

4.4 Entire Agreement. This Agreement represents the entire agreement between the parties hereto with respect to the subject matter hereof. No party hereto has made any representation or warranty to the other party hereto with respect to the subject matter hereof except as expressly set forth in this Agreement.

4.5 Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision hereof. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be construed to be only so broad as is enforceable.

4.6 Joint Liability. SCP Brunswick & Assoc., Susana Maas and Francois Marland shall be jointly and severally responsible for their obligations under this Agreement and shall be solely responsible for allocating the burdens and benefits of this agreement among themselves.

4.7 Amendment. This Agreement may be amended only by a written agreement executed by each of the parties hereto.

4.8 Governing Law and Consent to Jurisdiction. This Agreement shall be construed and enforced under the laws of the State of California applicable to agreements made and to be wholly performed with such State. By signing this Agreement, EC and each of them hereby consent to jurisdiction in the State of California to enforce any rights arising hereunder.

4.9 Counterparts. This Agreement may be executed in counterparts.

Page 4

**IN WITNESS WHEREOF,** this Agreement has been signed by and on behalf of the parties hereto on the dates indicated below. It shall take effect when signed by all parties.

Dated: June 3, 1999

Dated: June 3, 1999

Dated: June 3, 1999

Dated: June 3th, 1999

THELEN REID & PRIEST LLP

By: _Gary L. Fontana_
Name:  Gary Fontana
Title:  Partner

By: _____
Francois Marland

SCP Brunswick & Assoc

By: _____
Name:
Title:

By: _____
Susana Maas

Page 5

# EXHIBIT D

*Confidential*
*Attorney - Client Privilege.*

Novotel London Waterloo Hotel
113 Lambeth Road
SE1 7LS
June 2, 1999

Mr. Gary L. Fontana, Esq.
Thelen, Reid & Priest, LLP
Two Embarcadero Center, Suite 2100
San Francisco, CA 94111

Re: Participation as Witness in U.S. Litigation

Dear Gary:

As you are aware from conversations that we have had and from the text of a
memorandum that I wrote to you and Philippe Brunswick on May 28, 1999, I had a limited, but
important, role in introducing Altus, S.A. to MAAF in the summer of 1991 regarding an involvement in the
bidding for Executive Life Insurance Company. That role is described in greater detail in that
memorandum. Despite my limited role, there are circumstances under which my testimony concerning
the events described in that memo may become critically important to the successful prosecution of both
civil and criminal cases against Credit Lyonnais and other defendants in the United States.

In recent months, I have come under very substantial pressure in France to limit or
avoid participation in any such litigation in the United States. As a result of that pressure, it is possible
that I may, in the future, become unable or unwilling to provide that testimony and fulfill all of the
obligations that I undertook when I executed the European Counsel Agreement earlier today. Therefore, I
am writing this letter to confirm our mutual understandings concerning the role that I have agreed to play
insofar as possible testimony is concerned and the way in which the terms of the European Counsel
Agreement will be modified if, in the future, I am unable or unwilling to testify.

1). I have agreed with you and your law firm that, if requested, I will voluntarily come
to the United States to testify before a federal grand jury in Los Angeles concerning the subjects
addressed in my memorandum, so long as that appearance is subject to a confidentiality
agreement with the U.S. Department of Justice that fully protects my identity and assures that me
that I will not be compelled to produce documents that may be in my possession or control
against my will;

DOCS_SF #373308 v1 /701_011.DOC

2). Second, in the event you believe it is essential to the effective prosecution of the civil case in which TR&P is currently representing the Commissioner of Insurance, and you request my testimony in that case, I have also agreed with you and your law firm that I will voluntarily come to the United States to testify in court and to provide deposition testimony in that case in Europe. You and I have agreed to make all reasonable efforts to find other competent witnesses who are willing to testify to the same facts and, thus, avoid the necessity of my testifying in the civil case. However, we cannot be sure that these efforts will succeed.

3). In the event that I become unable or unwilling to testify before the grand jury as provided in Paragraph 1, I hereby agree that the amounts payable to European Counsel under the Agreement to Associate Counsel dated June 2, 1999 shall be reduced by two-thirds (66.67 %) from what they would otherwise be. (I.e., 21 2/3 percent of total legal fees paid on or before 12/31/99, and 17.5 percent thereafter).

4). In the event that I testify before the grand jury as provided in Paragraph 1, but become unable or unwilling to testify in the civil case as provided in Paragraph 2, I hereby agree that the amounts payable to European Counsel under the Agreement to Associate Counsel dated June 2, 1999 shall be reduced by one-half (50 per cent) from what they would otherwise be. (I.e., 32.5 percent of total legal fees on or before 12/31/99, and 26.25 percent thereafter).

This letter shall be treated as an amendment to the RoNo attorneys fee agreement and the Agreement to Associate European Counsel executed as of June 2, 1999 by ourselves, Susana Maas and Philippe Brunswick. (the EC Contract") Both Mr. Brunswick and Ms. Maas are aware of this change in the terms of the Agreement to Associate Counsel and have consented to it. +

Very truly yours,

Francois Marland

cc: Philippe Brunswick
Francois Chateau
Susana Maas

+ The Validity, performance of this agreement is strictly subject to the validity and enforceability of the EC Contract which is deemed to be a condition precedent to this agreement.

DOCS_SF #373308 v1 /801_011.DOC

# EXHIBIT E

# NEW AGREEMENT TO ASSOCIATE COUNSEL

Thelen, Reid & Priest L.L.P. ("TR&P"), on the one hand, and SCP Brunswick & Associates ("Brunswick"), Susannah Maas ("Maas"), and Francois Marland ("Marland") (jointly "European Counsel" or "EC"), on the other, hereby enter into the following agreement (the "Agreement") effective July 1, 2002:

## RECITALS

WHEREAS TR&P and Marland entered into an Attorney Client Agreement ("Attorney Client Agreement") dated February 17, 1999, pursuant to which Marland and RoNo retained TR&P to serve as counsel in its legal actions against Altus and others, related to the sale of certain business and other assets of Executive Life Insurance Co. ("ELIC"), which Attorney Client Agreement was amended on September 18, 2001 by a "Amendment to Attorney Client Agreement" and thereafter terminated by TR&P pursuant to a July 8, 2002 letter; and

WHEREAS thereafter, with the express consent of Marland and RoNo, TR&P entered into an Attorney Client Agreement with the Commissioner of the California Department of Insurance ("DOI") dated May 25, 1999 ("Commissioner Agreement"), wherein TR&P agreed to serve as counsel to the Commissioner in litigation pending against Altus Finance, SA. ("Altus") and other defendants in the Federal District Court in Los Angeles arising out of defendants' actions to obtain control over the business and other assets of ELIC and to pursue those and whatever other claims the Commissioner may have arising out of the same facts and circumstances (hereinafter referred to as the "ELIC claims"); and

WHEREAS TR&P and European Counsel then entered into an Agreement to Associate Counsel ("Original Agreement") executed on June 3 and June 30, 1999, completed with a side letter of June 2, 1999, and amended on September 18, 2001, where by the parties would jointly prosecute the ELIC claims; and

WHEREAS TR&P desires to re-negotiate the Commissioner Agreement in order to obtain advances, but needs to restructure the agreements between the parties as a predicate to such negotiations with the Commissioner; and

WHEREAS TR&P also desires to re-negotiate the fee splitting terms under the Original Agreement, for various reasons that were discussed among the parties during the preceding months; and

WHEREAS to facilitate TR&P's negotiations with the Commissioner the parties desire to replace the Attorney Client Agreement and Original Agreement and any and all other agreements between TR&P, on the one hand, and either Marland, RoNo or the European Counsel, on the other, with this new Agreement as the sole agreement between them;

NOW THEREFORE, in consideration for the mutual agreements contained herein and for other good and valuable consideration, the parties hereto agree as follows:

A.   **Definitions**

1.     The "Litigation" as used herein means any lawsuit in which TR&P has been retained to represent the California Insurance Commissioner ("Commissioner") or RoNo LLC ("RoNo") with respect to claims arising out of the Executive Life Insurance Company rehabilitation and transactions related thereto, including

- *Harry W. Low v. Altus Finance S.A., et al.*, U.S. Dist. Ct., C.D. Cal., Case No. 99-02829 AHM (CWx)(the "Commissioner's Action");

- *State of California ex rel. RoNo v. Altus Finance S.A.*, U.S. Dist. Ct., C.D. Cal., Case No. CV 01 8587 AHM (CWx), including the California Attorney General's complaint in intervention in that action captioned *State of California ex rel. RoNo v. Altus Finance S.A.*, (referred to collectively herein as the "*RoNo* Action");

- *Sierra National Insurance Holdings, Inc. v. Credit Lyonnais S.A.*, U.S. Dist. Ct., C.D. Cal., Case No. 01-01339 AHM (CWx) (the "*Sierra* Action").

- *Carranza-Hernandez v. Altus Finance Corporation*, U.S. Dist. Ct., C.D.Cal., Case No. CV 99 08375 AHM;

- *Carranza-Hernandez v. Artemis S.A.*, U.S. Dist. Ct., C.D. Cal., Case No. CV 00 09593 AHM (CWx);

- *Harry W Low v. SDI Vendome S.A., et al.*, U.S. Dist. Ct., C.D. Cal., Case No. CV 02-5983 AHM.

2.     "Net Recovered Fees" as used herein means the amount of fees recovered by TR&P as a result of its representation of the Commissioner on the ELIC claims in the Commissioner's Action or RoNo on its claims in the *RoNo* Action, after payment of "Reimbursed Expenses."

3.     "Reimbursed Expenses" as used herein means any expenses reasonably incurred by TR&P, the beneficial owner of RoNo, Brunswick or EC in connection with their representation of or contribution to the Commissioner in the Commissioner's Action or of RoNo in the *RoNo* Action not already fully reimbursed by the Commissioner or RoNo; and said expenses shall be reimbursed out of fee recoveries in the Commissioner's Action or in the *RoNo* Action prior to the calculation of Net Recovered Fees.

B.   **Services and Compensation**

1.     Assistance to Be Provided by European Counsel

(a)    EC agrees to provide legal assistance, information and strategic advice as requested by TR&P in connection with its investigation and prosecution of the ELIC claims on behalf of the Commissioner.

(b)    Upon the request of TR&P, and unless disabled or otherwise unavailable for reasons beyond his control, Marland agrees to come to the United States and testify before a federal grand jury or in the Commissioner's Action on the following terms and conditions:

(i)    With respect to grand jury testimony, Marland agrees to appear voluntarily in Los Angeles so long as that appearance is subject to a confidentiality agreement with the United States Department of Justice that protects his identity and assures him that he will not be compelled to produce documents against his will that may be in his possession or control.

(ii)    TR&P will make all reasonable efforts to avoid the necessity of Marland testifying in the Commissioner's case. In the event that TR&P determines that such appearance cannot be avoided without prejudice to the position of the Commissioner, Marland agrees to voluntarily provide deposition testimony in Europe and come to the United States to testify in court.

(iii)    This paragraph B.1(b) supercedes any prior agreement between the parties on the subject of Marland either appearing to testify or provide documents in connection with the Litigation or any proceedings related thereto.

2.    Fees to be Paid to European Counsel

(a)    The Formula

Except as provided herein below, TR&P agrees to pay to EC, jointly, a portion of the legal fees that TR&P receives for its representation of the Commissioner on the ELIC claims in the Commissioner's Action or RoNo in the *RoNo* Action in the amount of thirty-five percent (35%) of the Net Recovered Fees.

(b)    Payment process

Payment to EC shall be made in the form of a cashiers check or wire transfer payable to Maas, or as directed by her, and shall be made within ten (10) business days following TR&P's receipt of readily available funds from the Commissioner. In the event of a dispute between the parties regarding such payment, TR&P shall immediately pay to EC any and all undisputed amounts. In the event any third-party disputes EC's right to receive such payment, TR&P shall nevertheless pay such amounts unless a court order or other valid legal process bars TR&P from making such payments.

(c)    Expense reimbursement

The parties agree that TR&P will pay Reimbursed Expenses out of recovered fees prior to the calculation of Net Recovered Fees. To the extent insufficient fees are recovered to pay all Reimbursed Expenses, reimbursement shall be made to each party proportionately based on the total Reimbursed Expenses to which each party is entitled. Except as provided in this paragraph, TR&P shall have no obligation to pay any costs or expenses incurred by EC in fulfilling their obligations under this Agreement to prosecute and support the Litigation.

Separate and apart from the formula stated in subparagraphs (a) above, TR&P also agrees to reimburse EC for any litigation expenses advanced to TR&P by EC, to the extent TR&P obtains reimbursement for such expenses from the Commissioner.

### (d)    Advances by the Commissioner

In light of the substantial investment of professional time being made by TR&P in working on the Litigation, which time has not yet been compensated, TR&P may seek to obtain from the Commissioner one or more advances of funds to TR&P to be credited against any future right to recovery of attorneys fees in the Commissioner's Action. All such advances of funds to TR&P that are actually received by TR&P are referred to herein as **"Advances."** TR&P may request that such Advances be made subject to an agreement by the Commissioner that such Advances will be non-recourse, i.e., that TR&P's obligation to repay those Advances will be waived to the extent the ultimate obligation of the Commissioner to pay attorneys fees to TR&P is less than the amount of such Advances.

### (e)    Security for European Counsel

European Counsel is, subject to the following provisions, entitled to fifteen percent (15%) of the Advances.

(i)    If permitted by the Commissioner, EC shall be immediately paid fifteen percent (15%) of each of the Advances.

(ii)    If payment to EC of a portion of the Advances is not permitted by the Commissioner, but the Commissioner does permit an escrow arrangement as described herein, TR&P agrees to set aside fifteen percent (15%) of any Advances for services performed, and to place such funds in an interest bearing escrow account as security for the payment to EC of its share of the Net Recovered Fees at the end of the case. The funds in that escrow account may only be used to pay EC its share of the Net Recovered Fees when TR&P is entitled to a recovery of fees under the Commissioner's Agreement. Under no circumstances may the funds in the escrow account be claimed by TR&P. The term **"Net Advances"** as used herein refers to the Advances less the principal amount thereof placed into escrow as security for EC. In the event there is no recovery, the escrowed funds will be refunded to the Commissioner together with any interest earned thereon.

(iii)    The escrow account shall be established by TR&P and EC on terms that reflect the above provisions and provide that the escrowed funds plus interest shall be disbursed to EC upon any of the following events: (i) entry of final judgment in the Commissioner's

Action, (ii) execution of a settlement agreement in the Commissioner's Action resolving the case as to all defendants, or (iii) the written consent of both EC and TR&P.

      (iv)    The escrow account shall bear interest in favor of the EC.

      **(f)**    **Settlement of Final Fees**

In the event fees paid by the DOI are reduced by the amount of one or more Advances, the amounts paid by TR&P to EC under the formula in subparagraph (a) shall be calculated as follows:

      (i)    <u>If the DOI allows immediate payment to EC of 15% of Advances, or if an</u> escrow is established as provided in B.2(e) above, then upon receipt of any fee award:

      (A)    TR&P shall first pay Reimbursed Expenses out of the fees paid to it by DOI. The amount of any deducted Advances shall then be added back to the remainder of such fees paid by DOI to calculate the Net Recovered Fees.

      (B)    The formula in subparagraph (a) shall be used to determine the amount due from TR&P to EC. In applying the formula, <u>to the extent TR&P has paid 15% of each Advance to EC, TR&P shall pay the balance due under the formula. If instead, TR&P has</u> escrowed a portion of the Advances for the benefit of EC, the escrowed amount shall first be used to pay the fees due to EC under the formula, and then the remainder (if any) due to EC shall be paid from the fees paid to TR&P. For example, if the formula were to indicate that seven million dollars ($7 million) was due to EC, but three million dollars ($3 million) had been paid or escrowed for the benefit of EC, TR&P would be obligated to pay EC four million dollars ($4 million) <u>in addition to the portion escrowed.</u>

      (C)    In the event the Commissioner charges TR&P interest on Advances or discounts fees ultimately paid to TR&P to reflect interest on the Advances, then the cost of the interest shall be borne by TR&P and EC in the proportion that each shared in the Advances. For example, if the Advances total $2 million, the principal amount in the escrow account would be $300,000; if the Commissioner "charges" $100,000 in interest on the Advances, then 15% (or $15,000) of the $100,000 is to be borne by EC, and the balance of the interest would be borne by TR&P. Otherwise, the escrowed funds shall accrued interest for the benefit of EC and the interest shall not be included in the calculation of the amounts payable to EC.

      (ii)    If there is no escrow established as provided in B.2(e) above, then upon receipt of any fee award:

      (A)    TR&P shall first pay EC out of the fee award paid to it by DOI 17.647058% of any Advances previously received by TR&P ("EC True Up") to bring TR&P and EC to an 85/15 split that would have existed if 15% of Advances had been escrowed.

      (B)    TR&P shall next pay Reimbursed Expenses out of the fees paid to it by DOI as a fee award.

(C)     To calculate the Net Recovered Fees, the amount of any deducted Advances and the EC True Up shall then be added back to the remainder of such fee award paid by DOI.

(D)     The formula in subparagraph (a) shall be used to determine the amount due from TR&P to EC. The EC True Up shall be credited against that amount and the balance paid to EC from the remainder of fee award paid by DOI.

(iii)     Whether or not there is an escrow, TR&P payments to EC pursuant to the formula may be up to and include the total amount of fees paid by DOI if necessary under the formula; however, under no circumstances shall application of the formula in subparagraph (a) obligate TR&P to pay to EC any portion of amounts advanced to it by DOI except as provided in the security provisions above.

The foregoing provisions concerning Advances are intended to provide TR&P with flexibility to re-negotiate the Commissioner Agreement with the DOI. The parties to this Agreement recognize that there is no assurance that the Commissioner will re-negotiate the Commissioner Agreement. The parties hereto also acknowledge that there is no assurance that TR&P will continue with its representation of the Commissioner in the Commissioner's Action.

(g)     **Other Consideration**

(i)     European Counsel and the beneficial owner of RoNo agree not to appeal the decision in the *RoNo* Action and to bring to a conclusion the representation of RoNo by all outside counsel. In reaching this decision, European Counsel and the beneficial owner of RoNo are relying on current litigation counsel for RoNo (Beck DeCorso) rather than TR&P.

(ii)     To facilitate the close out of the *RoNo* Action, TR&P will pay the outstanding and future invoices due the Beck DeCorso for its services to RoNo up to the amount previously paid by EC. Thereafter, the Beck DeCorso fees shall be paid by TR&P and EC on a 50/50 basis. Said payments by TR&P (as with the prior payments to Beck DeCorso by beneficial owner of RoNo) are "Reimbursed Expenses" subject to the reimbursement provisions of this Agreement.

(iii)     In the event of any recovery by or to either RoNo or TR&P as a result of the *RoNo* Action, whether denominated "fees" or otherwise, said recovery shall be included in the calculation of Net Recovered Fees and distributed based on the application of the formula herein.

(iv)     TR&P and Marland agree that their previously terminated Attorney Client Agreement shall be deemed to be re-instated and immediately superceded by this Agreement except that TR&P shall resume its role as general counsel to RoNo as provided in the September 18, 2001 Amendment to the Attorney Client Agreement.

(v)     TR&P and Marland agree that in the future TR&P will provide legal services to Marland in the event that an action is commenced in the United States to block or otherwise prevent the distribution to EC of the funds to which EC is entitled under paragraph B.2 above. TR&P shall provide such services without charge for fees (as opposed to disbursements) up to

the first one hundred thousand dollars ($100,000) in fees and thereafter at TR&P's then current usual and customary rates.

(vi)    TR&P acknowledges that the past performance of the EC in connection with the Original Agreement together with the consideration recited herein is good and sufficient consideration for the performance of this Agreement and that EC's past performance shall not be raised as grounds for any further revision in the formula set forth in B.2(a) above.

## C.    Other Terms

### 1.    Representation by Counsel

TR&P, on the one hand, and European Counsel, on the other, are each represented by and are relying exclusively on their own counsel and neither is relying on the other for legal advice regarding this Agreement, its terms or effect, or its enforceability under the laws of any jurisdiction. Marland specifically waives any conflict that might otherwise arise from the fact that pursuant to the Attorney Client Agreement TR&P represented him with respect to the *RoNo* Action and related matters, and he acknowledges that he is relying on the advice of separate and independent counsel with respect to his decision to enter into this new Agreement and its meaning under California law.

### 2.    The Commissioner

(a)    Disclosure and consent:  The Parties expressly acknowledge that the fee splitting terms of this Agreement shall be disclosed to the Commissioner, that the circumstances leading to this change shall be disclosed to the Commissioner and that his consent to this Agreement shall be sought as part of an effort to obtain his agreement to pay Advances as provided in paragraph B above.  The effectiveness of this entire Agreement is conditioned on the Commissioner providing his consent.

(b)    Confidentiality:  The Parties further agree that any copy of the Agreement disclosed to the Commissioner or others (or portion thereof so disclosed) shall redact the name of Marland and any references that would be tantamount to disclosing his identity.  The parties further agree to take all necessary and lawful steps to continue to preserve the confidentiality of his identity.

(c)    Other Issues:  TR&P represents that it has orally disclosed to the Commissioner the fact that EC is not in a position to produce a copy of any "contrat de portage."

### 3.    Mutual Release

For the mutual consideration reflected herein, the parties hereby release and forever discharge one another from any and all claims they might have against one another for any breach by the other of any prior agreement between them or professional obligation of one to the other or any other obligation whether sounding in tort or contract, including, but not limited to,

any claim that Marland or EC failed to perform any services, to deliver any documents or otherwise to fulfill any obligations of any kind to TR&P, or any claim that TR&P failed to perform any services, to adequately protect the interests of its clients (Marland/RoNo), to disclose any conflict, to obtain any required waiver or otherwise to discharge any obligations of any kind to Marland, RoNo or EC.

The parties expressly acknowledge and waive the provisions of California Civil Code section 1542, which reads:

> **Civil Code Section 1542:** A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

Both Parties have had the benefit of the advice of independent counsel in considering the significance of this Mutual Release and neither is relying on the advice of the other in deciding to enter into it.

### 4.    Notices

All notices, requests, consents and other communications required to be in writing shall be deemed duly given only if (a) delivered personally or by facsimile (with hard copy by first class mail), or (b) mailed first class postage prepaid, or (c) sent by overnight courier, to the parties hereto at the following addresses or facsimile numbers:

**If to TR&P -**

Gary Fontana, Thelen Reid & Priest LLP, 101 2d Street, San Francisco, CA, USA 94105. Facsimile 415-371-1211.

**If to European Counsel --**

Philippe Brunswick, Avocat, SCP Brunswick & Assoc., 51 Avenue Raymond Pont Care, 75116 Paris, France.  Facsimile 331-5365-0564,

and

Francois Marland, Avocat, domiciled at SCP Brunswick & Assoc., 51 Avenue Raymond Pont Care, 75116 Paris, France.  Facsimile 331-5365-0564,

and

Susannah Maas, Avocat, 6 Rue Eynard, Geneva, Switzerland.  Facsimile 41-22-319-7333.

All notices, requests, consents and other communications will be deemed, if done as required herein, given upon delivery in the case of personal delivery and otherwise upon dispatch. Any party hereto may change the address or facsimile number or other information for purposes of notice by giving notice of the change as provided herein.

### 5.   No Assignment

No party may assign its rights or obligations hereunder without the prior written consent of the other parties.

### 6.   Entire Agreement

This Agreement represents the entire agreement between the parties hereto with respect to the subject matter hereof.

### 7.   Joint and Several Liability

Except where responsibility is allocated to one of them by name, SCP Brunswick & Assoc., Susana Maas and Francois Marland shall be jointly and severally responsible for their obligations under this Agreement and shall be solely responsible for allocating the burdens and benefits of this Agreement among themselves.

### 8.   Amendment

This Agreement may be amended only in writing executed by each of the parties hereto.

### 9.   Governing Law and Consent to Jurisdiction

This Agreement shall be construed and enforced under the laws of the State of California applicable to contracts to be wholly performed within the State. By signing this Agreement, EC and each of them hereby consent to jurisdiction in the State of California to enforce any rights arising hereunder and consent to service of process in the same manner as provided for the provision of notice herein.

### 10.   Execution in Counterparts

For the convenience of the parties hereto, this Agreement may be executed in counterparts.

**IN WITNESS WHEREOF**, this Agreement has been signed by and on behalf of the parties hereto on the dates indicated below. It shall take effect when signed by all parties.

Dated: December _19_, 2002                    THELEN REID & PRIEST LLP

By: _____
                Partner

Dated: December ___, 2002         By: _____
                                          François Marland

Dated:  December __6__, 2002      SCP Brunswick et Assoc.

                                  By: _____
                                          Philippe Brunswick

Dated:  December __8__, 2002      By: _____
                                          Susannah Maas

12/4/02/Draft 10