# EXHIBIT 7

1   KEKER & VAN NEST, LLP
    ROBERT A. VAN NEST - #84065
2   WENDY J. THURM - #163558
    BENEDICT Y. HUR - #224018
3   BENJAMIN BERKOWITZ - #244441
    710 Sansome Street
4   San Francisco, CA  94111-1704
    Telephone:  (415) 391-5400
5   Facsimile:  (415) 397-7188

6   Attorneys for Plaintiff, Counter-Defendant, and
    Counter-Counter-Claimant
7   THELEN REID BROWN RAYSMAN & STEINER LLP
            fka THELEN REID & PRIEST LLP

8

9                       UNITED STATES DISTRICT COURT

10                     NORTHERN DISTRICT OF CALIFORNIA

11                         SAN FRANCISCO DIVISION

12

| | |
|---|---|
| 13  THELEN REID BROWN RAYSMAN & STEINER LLP, fka THELEN REID & PRIEST LLP, | Case No. C 06-2071 VRW |
| 15         Plaintiff and Counter-Defendant, | **PLAINTIFF THELEN REID BROWN RAYSMAN & STEINER LLP'S NOTICE OF MOTION AND MOTION FOR** |
| 16         v. | **(1)   SUMMARY JUDGMENT;** |
| 17  FRANÇOIS MARLAND, | **(2)   JUDGMENT ON THE PLEADINGS;** |
| 18         Defendant and Counter-Claimant. | **(3)   PERMANENT INJUNCTION, OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION** |
| 19  THELEN REID BROWN RAYSMAN & STEINER LLP, fka THELEN REID & PRIEST LLP, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| 21         Counter-Counter-Claimant, | Date:      May 10, 2007 |
| 22         v. | Time:      2:00 p.m.<br>Dept:      Courtroom 6 |
| 23  FRANÇOIS MARLAND, SUSANNAH MAAS and PHILIPPE BRUNSWICK, | Judge:     Hon. Vaughn R. Walker |
| 25         Counter-Counter-Defendants. | |

26

27

28

---

392680.02

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ...................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...............................1

I.    INTRODUCTION ...............................................................................1

II.    UNDISPUTED MATERIAL FACTS ................................................4

    A.    François Marland is an attorney and sophisticated businessman............4

    B.    Throughout his relationship with Thelen, Marland received independent legal advice from two sophisticated and experienced attorneys. ....................................................................5

        1.    François Chateau has been Marland's attorney since 1994. ........5

        2.    Philippe Brunswick was Marland's attorney from the late 1980's until the summer of 2005. ................5

    C.    Marland sought legal advice from Chateau about how he might profit from the information he had about an illegal transaction. ...............6

    D.    Thelen pursued options for Marland to profit from his information while maintaining his anonymity.............7

    E.    The Department retained Thelen and allowed it to share fees with Marland. ...............9

    F.    The California Attorney General intervened in the *qui tam* action. ......11

    G.    Thelen sought to restructure the parties' fee sharing agreement to better reflect Thelen's and Marland's relative contributions to the Department's case. .............11

    H.    In June, 2002, Marland told Thelen that he destroyed the *contrat de portage*. .............12

    I.    Thelen General Counsel Wynne Carvill took over negotiations with Marland and Brunswick.............12

    J.    Thelen withdrew from its Attorney-Client Agreement with Marland and RoNo. .............13

    K.    Carvill and Brunswick engaged in extensive negotiations leading to the December 2002 New Agreement to Associate Counsel .............13

    L.    Thelen and Marland executed the New Agreement to Associate Counsel .............15

i

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND OTHER RELIEF;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. C 06-2071 VRW

392680.02

# TABLE OF CONTENTS
### (cont'd)

**Page**

M.  Brunswick and Chateau independently represented and advised
    Marland about the December 2002 Agreement before Marland signed
    it. .................................................................................................................16

N.  Thelen obtained the required consent of the Department. ...................................17

O.  Thelen paid Marland, and Marland accepted, more than $19 million in
    payments made under the December 2002 Agreement. .........................................17

III.  ARGUMENT ...................................................................................................................18

A.  The Court should grant summary judgment on Thelen's first claim for
    declaratory relief because the facts are undisputed that the December
    2002 Agreement is valid and enforceable. .............................................................18

    1.  The December 2002 Agreement is a valid contract. ...................................18

    2.  All conditions precedent to the December 2002 Agreement
        have been met. ..........................................................................................20

B.  The Court should grant Thelen summary judgment on Marland's fifth
    affirmative defense. .................................................................................................21

    1.  Marland failed to plead his fraud affirmative defense with
        specificity. ................................................................................................21

    2.  Marland cannot prove he was induced to enter into the
        December 2002 Agreement by Thelen's intentional
        misrepresentation or fraudulent concealment. ............................................22

C.  Even if Marland could plead or prove he was induced into the
    Agreement by fraud, he knowingly accepted benefits under the
    Agreement and thereby ratified it. .........................................................................24

D.  Marland's second and third counterclaims are barred by the plain
    terms of the December 2002 Agreement. ................................................................24

E.  Marland's first, fourth and fifth counterclaims are barred by the
    December 2002 Agreement. .....................................................................................25

F.  The Court should permanently enjoin the New York arbitration
    commenced by Marland in February 2006. ............................................................26

IV.  CONCLUSION ...............................................................................................................28

392680.02

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Chaganti v. Ceridian Benefts,*
    2004 WL 1877733 (N.D.Cal. Aug. 23, 2004) ........................................................26

*In re GlenFed, Inc. Securities Litigation,*
    42 F.3d 1541 (9th Cir. 1994) ...............................................................................21

*Glen Holly Enterprise, Inc. v. Tektronix, Inc.,*
    100 F. Supp. 2d 1086 (C.D.Cal. 1999) ...............................................................21

*LAWI/CSA Consolidated, Inc. v. Wholesale & Retail Food Distributing,*
    849 F.2d 1236 (9th Cir. 1988) ...............................................................................26

*Murr Plumbing, Inc. v. Scherer Brothers Financial Services,*
    48 F.3d 1066 (8th Cir. 1995) ...............................................................................22

*Neubronner v. Milken,*
    6 F.3d 666 (9th Cir. 1993) ...........................................................................21, 22

*State of Alaska v. Native Village of Venetie,*
    856 F.2d 1384 (9th Cir. 1988) ...............................................................................27

*Textile Unlimited, Inc. v. A.BMH & Co., Inc.,*
    240 F.3d 781 (9th Cir. 2001) ...............................................................................27

*World Group Securities v. Ko,*
    2004 WL 1811145 (N.D.Cal. Feb. 11, 2004) ......................................................27

## STATE CASES

*Donnelly v Ayer,*
    183 Cal. App. 3d 978 (1986) ...............................................................................20

*Engalla v. Permanente Medical Group, Inc.,*
    15 Cal. 4th 951 (1997) ...........................................................................................23

*Eustache v. Lynch,*
    43 Cal. App. 2d 486 (1941) ...............................................................................24

*Federal Deposit Insurance Corp v. Dureau,*
    212 Cal. App. 3d 956 (1989) ...............................................................................24

*Fidelity & Deposit Co. v. Charter Oak Fire Insurance Co.,*
    66 Cal. App. 4th 1080 (1998) ...............................................................................26

*Freeman & Mills, Inc. v. Belcher Oil Co.,*
    11 Cal. 4th 85 (1995) ...........................................................................................25

*LeClercq v. Michael,*
    88 Cal. App. 2d 700 (1948) ...............................................................................24

**TABLE OF AUTHORITIES**
(cont'd)

**Page(s)**

*Lloyd's Underwriters v. Craig and Rush, Inc.*,
   26 Cal. App. 4th 1194 (1994) .................................................25

*Meyer v. Benko*,
   55 Cal. App. 3d 937 (1976) ...................................................18

*Mirkin v. Wasserman*,
   5 Cal. 4th 1082 (1993) ..........................................................23

*Niederer v. Ferreira*,
   189 Cal. App. 3d 1485 (1987) ................................................25

*Wilhelm v. Pray, Price, Williams & Russell*,
   186 Cal. App. 3d 1324 (1986) ................................................23

*Winet v. Price*,
   4 Cal. App. 4th 1159 (1992) .............................................25, 26

**FEDERAL STATUTES**

Federal Rule of Civil Procedure 9 ...........................................1, 21

Federal Rule of Civil Procedure 56 ...............................................1

Federal Rule of Civil Procedure 65 ...............................................1

**STATE STATUTES**

California Civil Code § 1542 ................................................15, 26

California Civil Code § 1550 .......................................................18

California Civil Code § 1589 .......................................................24

California Civil Code § 1614 .......................................................19

California Civil Code § 1636 .......................................................25

California Civil Code § 1638 .......................................................20

California Civil Code § 1643 .......................................................20

California Rules of Professional Conduct Rule 2-200(A)(1) .........................21

California Rules of Professional Conduct Rule 3-400 ...........................19, 20

392680.02

1

## NOTICE OF MOTION

2       PLEASE TAKE NOTICE that at 2:00 p.m. on May 10, 2007, or at such other date and

3    time ordered by this Court, located at 450 Golden Gate Avenue, San Francisco, California,

4    Plaintiff, Counterclaim-Defendant, and Counter-Counterclaimant Thelen Reid Brown Raysman

5    & Steiner LLP ("Thelen") will, and hereby does, move this Court for entry of an order granting

6    summary judgment for Thelen on its First Claim and on Marland's First through Fifth

7    Counterclaims.  Thelen also seeks an order granting judgment on the pleadings or, in the

8    alternative, summary judgment, on Marland's Fifth Affirmative Defense.  Finally, Thelen seeks

9    entry of a permanent injunction, or in the alternative, preliminary injunction, of the New York

10   arbitration commenced by Marland in February, 2006.

11       Thelen's motion for judgment on the pleadings is brought pursuant to Federal Rules of

12   Civil Procedure 9 and 12 as Marland has failed to plead his Fifth Affirmative Defense of Fraud

13   with the requisite specificity and cannot prove the necessary facts.  Thelen's motion for summary

14   judgment is brought pursuant to Federal Rule of Civil Procedure 56 as there are no genuine

15   issues of material fact that prevent prompt adjudication.  Thelen's motion for permanent or, in

16   the alternative, preliminary injunction is brought pursuant to Federal Rule of Civil Procedure 65.

17       This motion is based upon the Memorandum of Points and Authorities, the declarations

18   and supporting exhibits submitted herewith, the pleadings and papers on file, and such other oral

19   argument and documentary evidence as may be presented at the hearing of this motion.

20

## MEMORANDUM OF POINTS AND AUTHORITIES

21

## I.     INTRODUCTION

22       This dispute arises out of the Executive Life Insurance Company ("ELIC") litigation,

23   where the California Department of Insurance sued Credit Lyonnais and other French parties for

24   fraud in the purchase of ELIC's junk bond and insurance assets.  Defendant François Marland is

25   a French lawyer and sophisticated businessman who claimed to have information and documents

26   about Credit Lyonnais's secret financial relationship with the company that purchased ELIC's

27   insurance assets through the Department's ELIC liquidation proceedings.

28

392680.02

1  Thelen advised Marland and his two independent attorneys, Francois Chateau and

2 Philippe Brunswick, on how Marland might capitalize on his inside information while

3 maintaining his anonymity.  Thelen tried, without success, to interest the Department in paying

4 Marland directly for his information, through a whistleblower agreement.  With that avenue

5 closed, Thelen then sought to be retained by the Department on a contingent fee basis, on the

6 condition that the firm could share a portion of its fees with Marland.  When the Department,

7 Thelen and Marland could not come to terms, Thelen filed a *qui tam* action in San Francisco

8 Superior Court against Credit Lyonnais and others.  With Thelen's assistance, Marland formed a

9 limited liability company named RoNo to serve as the *qui tam* relator, and protect his

10 confidentiality.  Under a written attorney-client agreement, Marland agreed to pay Thelen's legal

11 fees through a percentage of any monetary award he recovered as the *qui tam* relator.

12  Three months later, the Department changed course, and asked Thelen to represent it in a

13 separate federal court action for fraud filed against Credit Lyonnais.  This direct action by the

14 Department was more likely to lead to a recovery because the Insurance Commissioner stood in

15 the shoes of the ELIC policyholders as the ELIC conservator.  In contrast, RoNo's *qui tam* action

16 faced difficult legal hurdles, most notably the question of whether the ELIC insurance assets

17 would be considered "state funds" under the *qui tam* statute.

18  After consulting with Marland, Brunswick and Chateau, and gaining their consent,

19 Thelen took charge of the Commissioner's case.  In keeping with Marland's original goals,

20 Thelen entered into a written fee-sharing agreement with Marland.  Under this agreement,

21 executed in June 1999, Thelen agreed to pay Marland 52.5% of the attorneys' fees Thelen

22 received from the Department.

23  Beginning in late 2001, and throughout 2002, Thelen and Marland negotiated a new,

24 overall agreement to govern their relationship.  From June 2002 on, Thelen was represented in

25 the negotiations by its General Counsel, Wynne Carvill; Marland was represented by Brunswick.

26 The impetus for these negotiations was Thelen's view that the June 1999 fee-sharing agreement

27 did not equitably apportion the benefits and risks of prosecuting the Department's case.  By

28

2

1    December, 2001, Thelen had invested more than $7 million in attorney and paralegal time, and

2    the prospect of a judgment or settlement was still years off.

3         During these negotiations, Thelen learned that Marland had destroyed his two copies of

4    the key "inside" document that he had represented were "in a safe place."  Thelen believed that

5    Marland breached the parties' agreements, and told him and Brunswick so.  Brunswick

6    responded angrily, claiming that Marland had never promised to produce the document, and that

7    Thelen was acting in bad faith and breaching duties owed to Marland.

8         In December, 2002, Thelen and Marland executed a new, definitive agreement, resolving

9    all claims between them.  Thelen agreed pay Marland a smaller, but still significant percentage

10   of the fees it received from the Department (35%).  Thelen also agreed that, despite Marland's

11   destruction of his documents, Marland's performance under the parties' prior agreements was

12   good and adequate consideration.  Thelen and Marland also agreed to a broad and mutual release

13   of claims.

14        In 2004, and again in 2005, Thelen negotiated substantial settlements with several of the

15   French defendants, totaling more than $700 million.  After Thelen received its fees from the

16   Department, it paid Marland the 35% share owed under the December 2002 agreement—

17   payments totaling more than $19 million.   At the time Marland accepted the $19 million, he was

18   being advised by yet a third independent lawyer, Andrew Hayes, who was investigating possible

19   claims by Marland against Thelen.

20        With the $19 million in hand, Marland then initiated an arbitration in New York,

21   claiming that he was induced to enter the December 2002 Agreement through fraud, and

22   asserting claims for breach of fiduciary duty and professional negligence dating back to the

23   inception of his relationship with Thelen.   Thelen responded by filing this action, seeking a

24   declaratory judgment that the December 2002 Agreement is valid and enforceable and for an

25   injunction of the New York arbitration.  Marland then asserted as counterclaims the claims he

26   first asserted in the arbitration.

27        Thelen now seeks summary judgment on its declaratory relief claim.  The December

28   2002 Agreement is a valid contract and should be enforced.  The Agreement was negotiated by

3

392680.02

1    experienced and sophisticated attorneys (Carvill for Thelen; Brunswick for Marland) over a six

2    month period.  Terms were drafted, edited, and re-written.  Charges and counter-charges of bad

3    faith were made by both sides.  In the end, Thelen and Marland compromised their positions and

4    resolved their claims. Marland has not pled, must less proved, that he was induced to enter into

5    the Agreement through fraud.  Thelen also seeks summary judgment on Marland's five

6    counterclaims, which are precluded by the plain terms of the Agreement.  Finally, Thelen asks

7    the Court to enjoin the New York arbitration, now that it is clear the parties will litigate their

8    claims to resolution in this action.

9

10              **II.    UNDISPUTED MATERIAL FACTS**

11   **A.    François Marland is an attorney and sophisticated businessman**

12          François Marland is a citizen of France, and resides in Geneva, Switzerland.[1]  Marland

13   received a law degree from the University of Paris X Law School (Nantere).[2]  He practiced law

14   in France between 1979 and 1987.[3]  In that capacity, Marland "participated in the negotiation of

15   contracts" and held himself out as knowledgeable about commercial law in France.[4]

16          Marland is also a sophisticated businessman.  In 1987, Marland created the 2M

17   Investment Corporation, and began purchasing interests in a wide variety of industries.[5]  Marland

18   hired lawyers to advise his company on contracts, acquisitions, and real estate transactions—

19   indeed, "for everything that's necessary in the life of a corporation."[6]  Until he sold his business

20   in 1992, Marland oversaw the acquisition of more than seventy companies.[7]

21

22

23

_____

24   [1]  Thelen's First Amended Complaint ("FAC"), Docket Item No. 11, ¶ 3; Revised Amended
     Answer and Counterclaims, Docket No. 72 ("Answer") ¶ 3.
25   [2]  Declaration of Wendy J. Thurm, Ex. A (Deposition of François Marland), at 13:17-18.
26   [3]  Thurm Decl., Ex. A (Marland Depo.) at 18:15-21; 13:23-14:13.
     [4]  Thurm Decl., Ex. A (Marland Depo.) at 32:2-33:5.
27   [5]  Thurm Decl., Ex. A (Marland Depo.) at 33:16-34:16.
     [6]  Thurm Decl., Ex. A (Marland Depo.) at 36:4-10.
28   [7]  Thurm Decl., Ex. A (Marland Depo.) at 35:8-14; 37:16-21.

4

392680.02

**B.      Throughout his relationship with Thelen, Marland received independent legal advice from two sophisticated and experienced attorneys.**

**1.      François Chateau has been Marland's attorney since 1994.**

François Chateau is a citizen of France and the United States, and resides in New York.[8] He is licensed to practice law in Paris and New York, and is fluent in English and French.[9]  Since March 1, 1999, Chateau has been a partner in the New York office of Salans, an international law firm with offices in the United States, Europe and Asia.[10]  Chateau represents European companies with interests in the United States, and United States companies investing in Europe.[11]  Chateau also advises client in contract negotiations, intellectual property issues, and international tax planning.[12]  Before joining Salans, Chateau maintained his international law practice with several other United States law firms with offices in New York, including, for a short time, Thelen's predecessor firm.[13]  Chateau has been Marland's attorney continually since 1994, and remains his attorney today.[14]

**2.      Philippe Brunswick was Marland's attorney from the late 1980's until the summer of 2005.**

Philippe Brunswick graduated from the University of Paris Law School in 1976.[15] Brunswick advises corporations in Europe and the United States on a wide variety of legal issues focusing his legal practice on companies with complex financial problems.[16]  Brunswick has drafted and negotiated contracts in both French and English.[17]  Brunswick has extensive litigation experience, as well, having represented clients in most of the business courts in France.[18]

---

[8]  Declaration of Benedict Y. Hur, Ex. 1.
[9]  Hur Decl., Ex. 1.
[10]  Hur Decl., Exs. 1, 2; Thurm Decl., Ex. B (Chateau Depo.) at 26:23-27:3.
[11]  Hur Decl., Ex. 1.
[12]  Hur Decl., Ex. 1.
[13]  Thurm Decl., Ex. B (Chateau Depo.) at 22:15-27:3.
[14]  Thurm Decl., Ex. A (Marland Depo.) at 52:4-10; Ex. B (Chateau Depo.) at 31:16-22.
[15]  Thurm Decl., Ex. C (Deposition of Philippe Brunswick) at 11:12-16.
[16]  Thurm Decl., Ex. C (Brunswick Depo.) at 13:14-14:21.
[17]  Thurm Decl., Ex. C (Brunswick Depo.) at 18:12-22.
[18]  Thurm Decl., Ex. C (Brunswick Depo.) at 19:16-20:23.

5

Brunswick met Marland in 1987.[19]  Within the next year, Brunswick began representing Marland's distribution companies.[20]  Brunswick drafted and negotiated contracts for Marland's companies, including, on one occasion, a settlement agreement following litigation.[21]  After Marland sold his business, Brunswick began to advise Marland on personal legal matters.[22]  In 1998, Marland retained Brunswick to advise him on matters related to Crédit Lyonnais.[23]  Brunswick continued to represent Marland until the summer of 2005.[24]

**C.     Marland sought legal advice from Chateau about how he might profit from the information he had about an illegal transaction.**

In 1991, Executive Life Insurance Company ("ELIC"), then one of California's largest insurance companies, became insolvent and was seized by the California Department of Insurance.  As part of ELIC's rehabilitation, the Department conducted an auction of ELIC's junk-bond portfolio and insurance assets.[25]  A consortium of European companies, led by Altus Finance S.A, a subsidiary of Crédit Lyonnais, was the winning bidder at the Department's auction.  Altus agreed to purchase ELIC's bonds, and a supposedly separate and independent consortium of European insurance companies, led by La Societe Mutual Assurance Artisinale de France ("MAAF"), agreed to acquire and operate ELIC's insurance business.[26]

In fact, MAAF was a front acting solely for the benefit of Altus and Crédit Lyonnais.  Through a series of secret agreements, Altus and Crédit Lyonnais controlled MAAF.[27]  Since Crédit Lyonnais was a federally-licensed bank operating in the United States and one that was majority-owned by the French government, the transaction by which Crédit Lyonnais obtained ELIC's junk-bond portfolio and insurance assets was illegal.[28]

---

[19]  Thurm Decl., Ex. C (Brunswick Depo.) at 54:24-55:2
[20]  Thurm Decl., Ex. C (Brunswick Depo.) at 56:4-10; Ex. A (Marland Depo.) at 62:18-62:5..
[21]  Thurm Decl., Ex. C (Brunswick Depo.) at 57:3-13-25.
[22]  Thurm Decl., Ex. C (Brunswick Depo.) at 56:23-57:1; Ex. A (Marland Depo.) at 63:10-16
[23]  Thurm Decl., Ex. C (Brunswick Depo.) at 71:4-10.
[24]  Thurm Decl., Ex. C (Brunswick Depo.) at 71:11-21.
[25]  FAC, ¶ 12; Answer, ¶ 12.
[26]  FAC ¶13; Answer ¶ 13.
[27]  FAC ¶ 14; Answer ¶ 14.
[28]  FAC ¶ 14; Answer ¶ 14.

1    Starting in 1994, Marland tried to interest Chateau in representing him with regard to a

2    possible claim against Crédit Lyonnais.  Marland first told Chateau that he was aware of a secret

3    fronting agreement—known as a *contrat de portage* in French—between Altus and MAAF

4    related to the purchase of ELIC's insurance assets.[29]  Later on, Marland told Chateau that he had

5    a copy of the *contrat de portage* between Altus and MAAF.[30]  Chateau took no action on

6    Marland's behalf until 1998, by which time Chateau was practicing with the law firm of Reid &

7    Priest in New York, which was in the process of merging with Thelen, Marrin, Johnson &

8    Bridges.[31]  Chateau introduced Marland to Gary Fontana, a Thelen partner located in San

9    Francisco who had previously represented clients in the ELIC conservation and rehabilitation

10   proceedings.[32]  Fontana and Marland met for the first time in person in August, 1998, in San

11   Francisco.[33]  Fontana and Marland discussed, in English, whether legal means were available by

12   which Marland might  profit from disclosure of his information while protecting his anonymity.[34]

13   **D.    Thelen pursued options for Marland to profit from his information while**
         **maintaining his anonymity.**
14

15   In the fall of 1998, Thelen contacted the Department, and explained that Thelen had a

16   client (called Mr. X) with information and documents suggesting that Crédit Lyonnais had

17   fraudulently purchased ELIC's insurance assets.[35]  Thelen stated that Mr. X would be willing to

18   present his information to the Department, but wanted to be compensated for it.[36]  Thelen

19   proposed that the Department pay Marland as a whistleblower, which the Department rejected.[37]

20   Thelen also discussed having the Department retain Thelen on a contingent-fee basis to

21   pursue a claim against Crédit Lyonnais, with the understanding that Thelen would share its legal

22

23   [29]  Thurm Decl., Ex. B (Chateau Depo.) at 63:12-25.

24   [30]  Thurm Decl., Ex. B (Chateau Depo.) at 69:7-71:4.

     [31]  Thurm Decl., Ex. B (Chateau Depo.) at 72:17-74:23.

25   [32]  Thurm Decl., Ex. B (Chateau Depo.) at 34:10-21.

26   [33]  Thurm Decl., Ex. D (Deposition of Gary Fontana) at 195:24-196:9.

     [34]  FAC ¶ 16; Answer ¶ 16; Thurm Decl., Ex. D (Fontana Depo.) at 196:11-17.

27   [35]  Thurm Decl., Ex. D (Fontana Depo.) at 202:9-12; 207:10-209:23.

28   [36]  Thurm Decl., Ex. D (Fontana Depo.) at 209:13-23.

     [37]  Thurm Decl., Ex. D (Fontana Depo.) at 210:19-22; Ex. E (Depo. of Harry LeVine) at 19:1-10.

7

fees with Marland as a way to compensate him.[38]  As part of these discussions, Thelen arranged for Marland and Brunswick to speak (anonymously) with Harry Levine and Willard Roberts of the Department.[39]  During this call, in early February 1999, Marland told LeVine and Roberts about the copy of the *contrat de portage* he was keeping "in a safe place."[40]  Thelen and the Department could not agree on the terms of a contingent-fee agreement, and the Department retained other attorneys on an hourly basis to file an action against Crédit Lyonnais.[41]

While Thelen was in discussions with the Department, Thelen recommended to Marland and Brunswick that, if a deal with the Department could not be worked out, Marland should file a *qui tam* action against Crédit Lyonnais.[42]  Marland approved this strategy.[43]  With Marland's consent, Thelen established a Delaware limited liability corporation named RoNo LLC, of which Marland is the sole beneficial owner.[44]  To protect Marland's anonymity, RoNo would serve as the named plaintiff in the *qui tam* lawsuit.[45]  On February 17, 1999, Thelen and Marland (for himself and RoNo) signed an attorney-client agreement ("the February 1999 Agreement"), which, among other things, authorized Thelen to file a *qui tam* complaint against Crédit Lyonnais on behalf of RoNo.[46]  Marland agreed to pay Thelen 40% of any gross recovery if the case settled before November 1, 1999, and 50% if the case settled after that date.[47]

Thelen negotiated this agreement with Marland and Brunswick, acting as Marland's attorney.[48]  Before the agreement was signed, Fontana and Brunswick discussed paragraph 22 of the agreement, which provided that either Marland or Thelen could withdraw from the agreement

---

[38]  Thurm Decl., Ex. D (Fontana Depo.) at 210:23-211:7; Ex. E (LeVine Depo.) at 13:21-14:7.
[39]  Thurm Decl., Ex. E (LeVine Depo.) at 92:14-94:1.
[40]  Thurm Decl., Ex. D (Fontana Depo.) at 59:22-60:21.
[41]  Thurm Decl., Ex. E (LeVine Depo.) at 13:21-14:7; 14:12-17:8; 21:13-23.
[42]  FAC ¶ 20; Answer ¶ 20.
[43]  FAC ¶ 20; Answer ¶ 20
[44]  FAC ¶ 20; Answer ¶ 20.
[45]  FAC ¶ 20; Answer ¶ 20.
[46]  FAC ¶¶ 21, 23; Answer ¶¶ 21, 23; Thurm Decl., Ex. G, ¶ 6; Ex. F (Deposition of Stephen V. O'Neal), at 29:15-31:17.
[47]  Thurm Decl., Ex. G, ¶ 7.
[48]  Thurm Decl., Ex. B (Chateau Depo.) at 91:16-95:4; Ex. D (Fontana Depo.) at 263:24-265:20.

8

on 30 days' notice.[49]  Fontana told Brunswick that one of the circumstances that might lead

Thelen to withdraw was if the litigation became uneconomical for the firm.[50]

On February 18, 1999, Thelen filed a *qui tam* complaint against Crédit Lyonnais, MAAF

and others in San Francisco Superior Court.  The same day, the Department filed its action in

Los Angeles Superior Court against many of the same defendants.[51]

On May 19, 1999, Marland faxed a memo, in English, to Fontana, Brunswick, Chateau,

and Harvey Termine (Marland's criminal defense attorney in France).[52]  In the memo, Marland

stated that he "did not detain—and have not detained—documents other than those which have

already been handed over to you."[53]  Marland also stated that protecting his identity was of

paramount importance and that he might withdraw from the *qui tam* action if his anonymity

could not be maintained.[54]  Last month, Marland testified under oath that the statement that he

"did not detain—and had not detained" any documents he hadn't given to Thelen was false at the

time he made the statement.[55]  Marland also testified, "I *always* said that I had the *contrat de*

*portage* and other documents."[56]

**E.      The Department retained Thelen and allowed it to share fees with Marland.**

In May, 1999, the Department asked Thelen to represent it in its lawsuit against the

French defendants.[57]  Marland consented to the dual representation.[58]  The Department and

Thelen executed a written attorney-client agreement on May 25, 1999.[59]  The Department agreed

to pay Thelen a sliding-scale contingent fee.[60]

---

[49]  Thurm Decl., Ex. D (Fontana Depo.) at 263:24-265:20; Thurm Decl., Ex. G, ¶ 22; Ex. F (O'Neal Depo.), at 29:15-32:20.
[50]  Thurm Decl., Ex. D (Fontana Depo.) at 263:24-265:20.
[51]  FAC ¶ 25, 26; Answer ¶ 25, 26.
[52]  Thurm Decl., Ex. H; Ex. A (Marland Depo.) at 432:22-434:11.
[53]  Thurm Decl., Ex. H.
[54]  Thurm Decl., Ex. H.
[55]  Thurm Decl., Ex. A (Marland Depo.) at 436:20-437:14.
[56]  Thurm Decl., Ex. A (Marland Depo.) at 401:24-402:2 (emphasis added).
[57]  FAC ¶ 27; Answer ¶ 27.
[58]  FAC ¶ 27; Answer ¶ 27.
[59]  FAC ¶ 29; Answer ¶ 29.
[60]  Thurm Decl., Ex. I ¶ 5; Ex. F (O'Neal Depo.), at 172:23-173:12.

392680.02

Between June 1 and 3, 1999, Fontana, Marland, Brunswick and Chateau (who had since left Thelen for Salans, but still represented Marland) held several in-person meetings in London.[61]  During those meetings, Thelen and Marland executed a number of agreements.  First, Thelen and Marland executed an amendment to the February 1999 Agreement, under which Marland agreed that Thelen would take all reasonable steps to dismiss the *qui tam* action.[62]  The Department had requested this move in exchange for its agreement to retain Thelen.[63]

Second, Thelen, Marland, and Marland's European attorneys, Philippe Brunswick and Susannah Maas, also entered into an agreement to associate counsel ("the June 1999 Agreement").[64]  Under the June 1999 Agreement, Thelen agreed to pay Marland, Brunswick, and Maas, jointly and severally, a total of 52.5% of the legal fees that it received from the Department after December 31, 1999.[65]  Fontana recommended to Marland, Chateau and Brunswick that Marland agree to dismiss the *qui tam* and go forward with the fee-sharing agreement because he believed that the Department's case was much more likely than the *qui tam* to result in a substantial settlement, and thus, a payment to Marland.[66]

Finally, Thelen and Marland signed an amendment to their attorney-client agreement and to the fee-sharing agreement ("the June 1999 Side Letter"), under which Marland's recovery would be reduced in certain circumstances: (1) Marland's recovery would be reduced by two-thirds if he "was unable or unwilling" to travel to the United States to testify before the grand jury investigating Crédit Lyonnais; and (2) Marland's recovery would be reduced by one-half if he "was unable or unwilling" to travel to the United States to testify at the civil trial in the Department's case against Crédit Lyonnais, where he might be compelled to produce

---

[61]  Thurm Decl., Ex. A (Marland Depo.) at 456:6-457:11; Ex. B (Chateau Depo.) at 112:5-14.
[62]  Thurm Decl., Ex. J; Ex. D (Fontana Depo.) at 192:20-193:24.
[63]  Thurm Decl., Ex. J; Ex. D (Fontana Depo.) at 189:6-191:22.
[64]  FAC ¶ 30; Answer ¶ 30.
[65]  Counterclaims, ¶ 21; Thurm Decl., Ex. K.
[66]  Thurm Decl., Ex. B (Chateau Depo.) at 113:5-115:14; Ex. D (Fontana Depo.) at 118:20-120:18.

10

392680.02

1  documents.[67]  Two weeks after the London meetings, Marland sought privileged and confidential

2  legal advice from Brunswick about his agreements with Thelen.[68]

3  **F.      The California Attorney General intervened in the *qui tam* action.**

4       In June 2001, the Attorney General elected to intervene in the *qui tam* action.[69]  In early

5  August, the Attorney General objected to Thelen's concurrent representation of the Department

6  in its action against the French defendants and of RoNo in the *qui tam* action.[70]  With Marland's

7  consent, on September 10, 2001, Thelen withdrew as counsel of record for RoNo in the *qui tam*

8  action, and law firm of Beck DeCorso substituted in.[71]  Later in September 2001, Thelen and

9  Marland signed an amendment to the February 1999 Agreement, memorializing Thelen's

10  withdrawal as counsel of record for RoNo in the *qui tam* action, and Thelen's agreement to serve

11  as "general counsel" to RoNo and as "counsel" to Marland.[72]

12

13  **G.      Thelen sought to restructure the parties' fee sharing agreement to better reflect Thelen's and Marland's relative contributions to the Department's case.**

14       In late 2001, Thelen approached Marland about re-negotiating the fee-sharing agreement

15  due to the cost and duration of the Department's action.[73]  At that time, Thelen had invested

16  more than $7 million in billable time in prosecuting the Department's case.[74]  Fontana and

17  Marland discussed the concept of amending the June 1999 fee-sharing agreement to protect

18  Thelen "on the low end"—*i.e.*, the situation where the Department settled its case for an amount

19  that resulted in fees to Thelen below its invested billable time, after paying Marland 52.5%.[75]  In

20  April and May, 2002, Thelen, Brunswick and Chateau exchanged draft amendments to the June

21  1999 fee-sharing agreement.[76]

22  _____

23  [67]  Thurm Decl., Ex. L; Ex. M (Deposition of Karl Belgum) at 61:2-68:8.
   [68]  Thurm Decl., Ex. O (Marland's Revised  Privilege Log), Document No. 16

24  [69]  Thurm Decl., Ex. M (Belgum Depo.) at 142:25-143:4.
   [70]  Thurm Decl., Ex. M (Belgum Depo.) at 144:20-145:16.

25  [71]  Thurm Decl., Ex. M (Belgum Depo.) at 171:9-172:23; Declaration of Karl Belgum, Ex. 3.

26  [72]  Thurm Decl., Ex. N; Ex. F (O'Neal Depo.), at 246:11-18.
   [73]  FAC ¶ 34; Answer ¶ 34.

27  [74]  Thurm Decl., Ex. P, at TRP 004310; Ex. F (O'Neal Depo.) at 235:14-236:2.

28  [75]  Thurm Decl., Ex. M (Belgum Depo.) at 265:2-268:17.
   [76]  Thurm Decl., Ex. M (Belgum Depo.) at 265:2-271:10; Ex. Q; Ex. B (Chateau Depo.) at

11

**H.    In June, 2002, Marland told Thelen that he destroyed the *contrat de portage*.**

In early June, 2002, Thelen partner Karl Belgum was preparing to depose the key MAAF witnesses in Paris.[77]  MAAF had not produced the version of the *portage* that Marland claimed to have.[78]  And the French defense witnesses who had been deposed by June 2002 had denied the essential facts of Marland's story, and were claiming that the agreements that were produced were not *portages*.[79]  Belgum e-mailed Brunswick, asking to obtain or even just see a copy of the *contrat de portage* Marland had described to Thelen in 1998 and 1999.[80]  Marland responded directly by e-mail, stating that he did not have a copy of the *contrat de portage*.[81]  Shortly thereafter, Marland told Thelen that he had destroyed his copy of the *portage* in 1994.[82]

**I.    Thelen General Counsel Wynne Carvill took over negotiations with Marland and Brunswick.**

Thelen Chairman Richard Gary asked the firm's General Counsel, Wynne Carvill, to take over the negotiations with Marland and Brunswick regarding a new structure for the parties' fee agreement.[83]  On June 26, 2002, Carvill met with Brunswick, at Brunswick's office in Paris.[84]  Carvill raised concerns about Marland's admitted destuction of the *contrat de portage* and Brunswick stated that Marland had never committed to produce the *contrat de portage*.[85]  Carvill and Brunswick did not reach an agreement on a new fee-sharing structure,[86] and Carvill came away from the meeting with the view that Thelen and Marland might end up in litigation.[87]

---

159:14-161:7.
[77] Thurm Decl., Ex. M (Belgum Depo.) at 105:24-107:7.
[78] Thurm Decl., Ex. M (Belgum Depo.) at 105:24-107:7.
[79] Thurm Decl., Ex. M (Belgum Depo.) at 105:24-107:7; Declaration of Gary Fontana, Ex. 1.
[80] Fontana Decl., Ex. 1.
[81] Fontana Decl., Ex. 1.
[82] Thurm Decl., Ex. R (Deposition of Wynne Carvill at 239:14-240:16; 393:17-24; 399:11-401:5; Ex. A (Marland Depo.) at 112:8-114:18.
[83] Thurm Decl., Ex. R (Carvill Depo.) at 316:23-317:17.
[84] Thurm Decl., Ex. R (Carvill Depo.) at 75:7-25.
[85] Thurm Decl., Ex. R (Carvill Depo.) at 75:13-76:12.
[86] Thurm Decl., Ex. M (Belgum Depo.) at 275:3-10.
[87] Thurm Decl., Ex. R (Carvill Depo.) at 234:11-235:2.

12

**J.      Thelen withdrew from its Attorney-Client Agreement with Marland and RoNo.**

On July 8, 2002, Carvill faxed to Marland, Brunswick and Maas written notice of Thelen's intent to withdraw from its representation of Marland and RoNo within 30 days.[88]  On August 2, 2002, Carvill extended the notice of withdrawal until August 30, 2002.[89]  Carvill understood that by withdrawing, Thelen forfeited its claim for legal fees in the *qui tam* action.[90]

**K.      Carvill and Brunswick engaged in extensive negotiations leading to the December 2002 New Agreement to Associate Counsel**

After the June 2002 meeting in Paris, and in the six months that followed, Carvill and Brunswick exchanged ten drafts of a "New Agreement to Associate Counsel."[91]  Brunswick provided Carvill with substantial edits and comments on the various drafts, and, occasionally sent Carvill redlined drafts of his own.[92]  Carvill and Brunswick also communicated extensively, by telephone and in writing, regarding proposed terms and the parties' respective positions on how the fees to be paid by the Department to Thelen should be allocated.[93]

One of the key topics discussed by Carvill and Brunswick was the effect of Marland's destruction of the *contrat de portage*.[94]  Carvill discussed with Brunswick that Marland's admitted destructed of the document in 1994 called into question the representations that Thelen and Marland made to the Department in 1999.[95]  Carvill told Brunswick that Thelen might pursue a claim against Marland for breach of the parties' agreements.[96]  Carvill also stated that Thelen might be entitled to invoke the June 1999 Side Letter, under which Marland's recovery would be reduced if he was "unable or unwilling" to testify in the Department's civil trial.[97]

---

[88]  Thurm Decl., Ex. S; Ex. A (Marland Depo.) at 103:6-105:15.
[89]  Hur Decl., Ex. 18; Ex. R (Carvill Depo.) at 261:3-24; *see also* Thurm Decl., Ex. F (O'Neal Depo.) at 33:7-16.
[90]  Thurm Decl., Ex. R (Carvill Depo.) at 262:18-263:8.
[91]  Hur Decl., Exs. 3–36.
[92]  Thurm Decl., Ex. R (Carvill Depo.) at 253:23-254:7.
[93]  Hur Decl., Exs. 3-36; Thurm Decl., Ex. R (Carvill Depo.) at 246:13-20.
[94]  Thurm Decl., Ex. R (Carvill Depo.) at 188:4-189:14; Hur Decl., Exs. 9-14, 16, 19-20, 23-24, 28, 30-32.
[95]  Hur Decl., Ex. 22 at M 4460-1.
[96]  Hur Decl., Ex. 13 at M 1814.
[97]  Thurm Decl., Ex. R (Carvill Depo.) at 13:22-15:15.

1     For his part, Brunswick told Carvill that he believed that Thelen was "misrepresenting the

2 document situation," acting "in bad faith," breaching "the agreements," and violating duties

3 owed to Marland.[98]  For example, on August 28, 2002, Brunswick wrote to Carvill, and argued

4 that Marland had never agreed to produce the *portage* to Thelen or the Department.  Brunswick

5 also stated Thelen had no basis to re-negotiate the fee-sharing agreement simply because

6 Marland had destroyed a key document.[99]

7     But Brunswick's August 28 letter to Carvill misrepresented his understanding of the

8 facts.  Just the day before, Brunswick had faxed a draft of his letter to Marland and Chateau,

9 stating:

> 10  As you can see, concerning Wynne, I am extremely firm and affirmative as to the
> 11  fact that the TR&P request for renegotiation based on the absence of a document
>     is totally unfounded.
>
> 12  Between us, and in all confidentiality, this situation is not at all as I described it to
>     Wynne
> 13
> 14  Indeed, when I return my entire file, I found numerous documents that
>     demonstrate that:
>
> 15  1 – At the time, Mr. X had affirmed that he was in possession of a document and
>     was able to communicate it if needed. . . .
> 16
> 17  It seems to me that . . . there is a true problem in the affirmation made several
>     times recently by Mr. X, namely that the document would have been destroyed in
>     1994.
> 18
> 19  It seems to me indeed that there is a risk that the American entities concerned will
>     blame Mr. X for having affirmed . . . [in] 1998, he was in possession of a
> 20  document that today he indicates that he eliminated in 1994, and consequently
>     that they blame him for having purely and simply lied to them.[100]

21     Even with these facts at hand, Brunswick continued to press Marland's claim that Thelen

22 was acting in bad faith, had breached its fiduciary duties, and put its interests ahead of

23 Marland's.[101]

24

25 _____

[98]  Thurm Decl., Ex. R (Carvill Depo.) at 146:7-147:4; *see also* Hur Decl., Ex. 16.
26 [99]  Hur Decl., Ex. 19 at M 2676.
[100]  Hur Decl., Exs. 17-18 (certified translation).  The Court specifically found that Marland
27 waived any privilege with respect to this document by inadvertently producing the document to
Thelen, and never identifying it on a privilege log.  *See* Order, Docket No. 130, at 19-21.
28 [101]  Hur Decl., Ex. 28.

14

392680.02

**L.       Thelen and Marland executed the New Agreement to Associate Counsel**

After months of extensive negotiations, Thelen, Marland, Brunswick, and Maas entered into the New Agreement to Associate Counsel in December 2002 (the "December 2002 Agreement").[102]  This Agreement states that: (1) the February 1999 Agreement, as amended, was "terminated by TR&P [Thelen] pursuant to a July 8, 2002 letter"; and (2) the parties desire to replace "any and all other agreements" between Thelen, Marland, RoNo, and European Counsel [Brunswick and Maas] with this Agreement "as the sole Agreement between" the parties.[103]  At the request of Marland and Brunswick, Thelen agreed to resume (following the termination) its role as general counsel to RoNo.[104]

The December 2002 Agreement reflects a compromise and settlement. Thelen agreed to pay Marland, Brunswick, and Maas a total of 35% of the legal fees paid by the Department to Thelen, after subtracting unreimbursed expenses.[105]  Thelen also agreed that, despite Marland's destruction of the *contrat de portage*, Marland's performance under the parties' prior agreements was good and adequate consideration, and that Thelen would not seek further revisions to the fee-sharing formula as a result of Marland's wrongful conduct.[106]

For his part, Marland agreed with Thelen to:

> release and forever discharge one another from any and all claims they might have against one another for any breach by the other of any prior agreement between them or professional obligation of one to the other or any other obligation whether sounding in tort or contract, including but not limited to . . . any claim that [Thelen] failed to perform any services, to adequately protect the interests of its clients (Marland/RoNo), to disclose any conflict, to obtain any required waiver or otherwise to discharge any obligations of any kind to Marland, RoNo, or [Brunswick and Maas]."[107]

By "expressly acknowledg[ing] and waiv[ing]" the provisions of California Civil Code § 1542, Marland and Thelen also released each other from all claims, known and unknown.[108]

---

[102]  Thurm Decl., Ex. T; Ex. R (Carvill Depo.) at 104:12-25.
[103]  Thurm Decl., Ex. T, p. 1.
[104]  Thurm Decl., Ex. T, at ¶ B.2.(g)(iv); Ex. R (Carvill Depo.), at 249:3-250:23.
[105]  FAC ¶ 40; Answer ¶ 40.
[106]  Thurm Decl., Ex. T, ¶ B.2.(g)(vi).
[107]  Thurm Decl., Ex. T, ¶ C.3.
[108]  Thurm Decl., Ex. T, ¶ C.3.

15

1    During negotiations, Carvill discussed the mutual release provision with Brunswick.[109]

2    Brunswick also sent Carvill comments and proposed edits to the mutual release language in the

3    various drafts.[110]  On at least two occasions, Brunswick e-mailed Marland a copy of his proposed

4    edits to the mutual release language.[111]

5

6    **M.    Brunswick and Chateau independently represented and advised Marland about the December 2002 Agreement before Marland signed it.**

7    Brunswick represented to Carvill that he was Marland's attorney and was negotiating the

8    agreement on behalf of Marland, "his client."[112]  Brunswick never told Carvill that Marland had

9    limited the scope of Brunswick's negotiating authority.[113]  When Marland spoke to Carvill, he

10   referred to Brunswick as "his attorney."[114]  Marland never told Carvill that Brunswick's

11   authority to negotiate the agreement was limited in any way.[115]

12   Carvill understood that Brunswick and Chateau were advising Marland.[116]  Brunswick

13   never told Carvill that he was relying on Thelen to provide legal advice to Brunswick or Marland

14   about the proposed agreement.[117]  Carvill's understanding is confirmed by Marland's privilege

15   log in this lawsuit, which describes more than twenty *privileged and confidential*

16   communications between and among Brunswick, Chateau and Marland between late June 2002

17   and December 2002 regarding the draft agreement with Thelen.[118]  Indeed, Marland admits that

18   he spoke with Chateau and Brunswick about the December 2002 Agreement before signing it.[119]

19

20

21   [109]  Thurm Decl., Ex. R (Carvill Depo.) at 252:12-253:15; Hur Decl., Ex. 24, at M 2437.

22   [110]  Thurm Decl., Ex. R (Carvill Depo.) at 253:23-254:7; Hur Decl., Ex. 30, at M 4251; Ex. 32, at M 4218.

23   [111]  Hur Decl., Exs. 32-33.

     [112]  Thurm Decl., Ex. R (Carvill Depo.) at 238:6-24; 254:18-255:2

24   [113]  Thurm Decl., Ex. R (Carvill Depo.) at 238:6-9.

25   [114]  Thurm Decl., Ex. R (Carvill Depo.) at 243:25-244:5.

     [115]  Thurm Decl., Ex. R (Carvill Depo.) at 243:25-244:5.

26   [116]  Thurm Decl., Ex. R (Carvill Depo.) at 92:14-93:23; 155:14-156:4.

     [117]  Thurm Decl., Ex. R (Carvill Depo.) at 247:2-249:2.

27   [118]  Thurm Decl., Ex. O (Marland's Revised Privilege Log), Document Nos. 1, 8, 37, 39, 42-44, 47, 69-70, 72-76, 78, 80-82, 86, 110-111, and 114.

28   [119]  Thurm Decl., Ex. A (Marland Depo.) at 60:24-61:4; 62:6-15; 64:22-:65:2.

16

1  Brunswick explained various terms to Marland and reported modifications to the draft

2  agreement.[120]  Brunswick kept Marland up to date on a number of points in the negotiations.[121]

3  **N.    Thelen obtained the required consent of the Department.**

4          The December 2002 Agreement provides that "the fee-splitting terms of this Agreement

5  shall be disclosed to the Commissioner" and that his consent "shall be sought as part of an effort

6  to obtain his agreement to pay Advances."[122]  On August 2, 2004, the Department provided its

7  consent.[123]  The signed consent states:

8          The California Department of Insurance ("CDOI") has reviewed the New
           Agreement to Associate Counsel entered into December 8, 2002 between
9          [Thelen] and [Marland], a copy of which is attached hereto.  CDOI hereby gives
           its consent, pursuant to Rule 2-200 of the Rules of Professional Conduct of the
10         State Bar of California, to the fee sharing agreement contained in the
           Agreement.[124]

11
   **O.    Thelen paid Marland, and Marland accepted, more than $19 million in payments**
12         **made under the December 2002 Agreement.**

13          In May 2004, the Department received $110 million in partial settlement of its claims

14  against the French defendants.  After the Department paid Thelen its contingent fee from this

15  partial settlement, Belgum sent Marland, Brunswick, Maas and Chateau an e-mail, enclosing

16  Thelen's calculations for how much was owed under the December 2002 Agreement.  Belgum

17  stated, "If you have comments, questions, objections or corrections regarding the calculation of

18  the amount, please let me know . . . ."[125]  Having heard no objections, Thelen then wired

19  $5,000,832 to Maas on June 18, 2004.[126]  In December 2005, the Department received additional

20  monies as part of other settlements.[127]  Fontana then e-mailed Maas, confirming that Thelen

21  should use the same wire information as it used in June 2004, in order to pay Marland the 35% of

22  Thelen's fees owed under the December 2002 Agreement.[128]  Thelen was again instructed to

23  ─────────────────────
    [120]  Thurm Decl., Ex. A (Marland Depo.) at 64:22-:65:2; 135:15-22.

24  [121]  Thurm Decl., Ex. A (Marland Depo.) at 82:12-83:16.

    [122]  Thurm Decl., Ex. T, ¶ C.2.
25
    [123]  Thurm Decl., Ex. U; Ex. V (Deposition of Gary Cohen) at 34:7-18.
26  [124]  Thurm Decl., Ex. U.

    [125]  Belgum Decl., Ex. 1.
27  [126]  Declaration of Roger J. Robles, Jr., Exs. 1-4.

    [127]  Robles Decl., Ex. 5.
28  [128]  Fontana Decl., Ex. 2.

1    wire the 35% share directly to Maas,[129] and did so, wiring more than $14 million to Maas.[130]

2            At the time Marland accepted Thelen's payments pursuant to the December 2002

3    Agreement, he was being advised by his current counsel, Andrew Hayes.  According to

4    Marland's privilege log, Brunswick, Chateau, and Hayes, met in September and December

5    2003.[131]  As early as March, 2004, before the first payment was made, Hayes prepared a

6    "Memorandum re: Review and analysis re possible claims of RoNo" and sent the memo to

7    Chateau.[132]  By February 2005, Hayes had threatened legal action against Thelen, based in part,

8    on the events leading to the December 2002 Agreement.[133]

9                            **III.    ARGUMENT**

10   **A.    The Court should grant summary judgment on Thelen's first claim for declaratory**
11   **relief because the facts are undisputed that the December 2002 Agreement is valid**
     **and enforceable.**

12           **1.    The December 2002 Agreement is a valid contract.**

13           A valid contract must have four elements:  parties capable of contracting; the parties'

14   consent; a lawful object; and sufficient consideration.  Cal. Civ. Code § 1550.  The December

15   2002 Agreement satisfies each of these requirements.  First, the signatories to the Agreement

16   (Carvill, Marland, Brunswick and Maas) were are all competent adults capable of consent.

17           Second, Marland consented to the Agreement.  "The existence of mutual consent is

18   determined by objective rather than subjective criteria, the test being what the outward

19   manifestations of consent would lead a reasonable person to believe."  *Meyer v. Benko*, 55 Cal.

20   App. 3d 937, 942-43 (1976) (citations omitted).  Marland is an attorney and sophisticated

21   businessman with extensive experience working with attorneys, including Brunswick and

22   Chateau, on complicated business transactions.[134]  There is no evidence that Marland was

23   incapable of understanding the terms of the December 2002 Agreement.

24

---

25   [129] Fontana Decl., Ex. 3.
26   [130] Robles Decl., Ex. 6.
     [131] Thurm Decl., Ex. O (Marland's Revised Privilege Log), Nos. 29, 48-49.
27   [132] Thurm Decl., Ex. O (Marland's Revised Privilege Log), No. 56.
     [133] Declaration of Robert Blum, Ex. 1, at TRP 010634
28   [134] *See supra* footnotes 2-24.

392680.02

Third, there was sufficient consideration. *See* Cal. Civ. Code § 1614 ("A written instrument is presumptive evidence of a consideration."). Extensive negotiations preceded the December 2002 Agreement.[135] Thelen claimed that Marland had breached his obligations under the parties' agreements, including his destruction of the *contrat de portage*.[136] Marland accused Thelen of misleading him, acting in bad faith, and breaching duties owed to him under the attorney-client relationship.[137] These claims were resolved through the Agreement.

Finally, the December 2002 Agreement had a lawful object: to resolve disputes between the parties arising out of the prior agreements. In that regard, Thelen complied with applicable law in negotiating the Agreement. Thelen informed Marland in writing that he may seek advice from independent counsel, and then provided Marland with ample opportunity to consult with his independent counsel, Brunswick and Chateau, before signing the Agreement. Thelen complied with the Rules of Professional Conduct. Rule 3-400 provides:

A member shall not:

(A) Contract with a client prospectively limiting the member's liability to the client for the member's professional malpractice; or

(B) Settle a claim or potential claim for the member's liability to the client for the member's professional malpractice, unless the client is informed in writing that the client may seek the advice of an independent lawyer of the client's choice regarding the settlement and is given a reasonable opportunity to seek that advice.

The very first draft agreement Carvill sent to Brunswick stated, "[Thelen], on the one hand, and [Marland, Brunswick and Maas] on the other, are each represented by are relying exclusively on their own counsel and neither is relying on the other for legal advice about this Agreement, it terms or effect, or its enforceability under the laws of any jurisdiction."[138] Carvill included this or similar language in each draft he sent to Brunswick, and in the drafts he sent to Marland directly.[139]

---

[135] *See supra* footnotes 91-101.
[136] *See supra* footnotes 91-101.
[137] *See supra* footnotes 91-101.
[138] Hur Decl., Ex. 3, at M 2128.
[139] Hur Decl., Exs. 5-6, 11-14, 21, 25, 29, 31.

19

392680.02

1    Moreover, it is undisputed that Brunswick and Chateau provided independent legal

2    advice to Marland about the December 2002 Agreement, including the release provision.

3    Brunswick discussed the release with Carvill, and suggested modifications to the provision

4    before the Agreement was signed.[140]  Thelen complied with Rule 3-400 in negotiating the mutual

5    release of claims with Marland.  *See Donnelly v Ayer*, 183 Cal. App. 3d 978 (1986) (discussing

6    former Rule 6-102).

7          **2.      All conditions precedent to the December 2002 Agreement have been met.**

8    The effectiveness of the December 2002 Agreement was conditioned on the Insurance

9    Commissioner's consent to the fee-sharing provision of the Agreement.[141]  Section C.2(a) of the

10   December 2002 Agreement states:

11         The Parties expressly acknowledge that *the fee splitting terms of this Agreement*
           *shall be disclosed to the Commissioner*, that the circumstances leading to this

12         change shall be disclosed to the Commissioner and that his consent to this
           Agreement shall be sought as part of an effort to obtain his agreement to pay

13         Advances as provided in paragraph B above. <u>The effectiveness of this entire</u>
           <u>Agreement is conditioned on the Commissioner providing his consent.</u>[142]

14

15   The Commissioner consented to the fee-sharing terms of the December 2002 Agreement on

16   August 2, 2004.[143]

17   Marland contends that the Agreement required the Commissioner to consent to the

18   Agreement as a whole, and not just to the fee-splitting terms.  He then argues that Thelen never

19   obtained the required consent, and the Agreement never became effective.  To reach this

20   conclusion, Marland re-arranges the words in section C.2.(a) to read that "approval by the

21   Commissioner of '*this entire agreement*'" was a condition precedent to the contract.[144]

22   Marland's interpretation should be rejected because it is inconsistent with the plain

23   language of the Agreement.  Cal. Civ. Code §§ 1638, 1643.  Marland's view is also inconsistent

24   with Carvill's intent in drafting that provision.  Carvill testified that he understood Rule 2-200 of

---

25   [140]  *See supra* footnotes 112-121.

26   [141]  Thurm Decl., Ex. T, ¶ C.2(a).

     [142]  Thurm Decl., Ex T, ¶ C.2(a) (italics added, underlining in original).

27   [143]  Thurm Decl., Ex. V.

28   [144]  Marland's Mot. Dismiss Amended "Counter-Counterclaims," Docket Item No. 84, at 5.

20

392680.02

the Rules of Professional Conduct to require Thelen to obtain the Commissioner's written

consent fee-splitting terms of the Agreement.[145]   Rule 2-200 requires a client's written consent to

the terms of the division of fees; it does not require the client's consent to every term of an

agreement to associate counsel.  *See* Cal. R. Prof Cond. 2-200(A)(1).

**B.     The Court should grant Thelen summary judgment on Marland's fifth affirmative defense.**

Marland has not adequately pled, and cannot prove, that Thelen induced him to sign the

December 2002 Agreement through fraud.

**1.     Marland failed to plead his fraud affirmative defense with specificity.**

Marland's chief defense to the enforceability of the December 2002 Agreement is that it

was procured by fraud.[146]  But Marland's defense lacks the required specificity.  "In all

averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated

with particularity."  Fed. R. Civ. Proc. 9(b).  When pleading fraud, a party "must adequately

specify the statements it claims were false or misleading, give particulars as to the respect in

which [the party] contends the statements were fraudulent, state when and where the statements

were made, and identify those responsible for the statements."  *In re GlenFed, Inc. Securities*

*Litigation*, 42 F.3d 1541, 1548 n.7 (9th Cir. 1994) (en banc).  The party pleading fraud must also

specify "such facts as the times, dates, places, and benefits received, and other details of the

alleged fraudulent activity."  *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).

"[A]llegations such as '[d]uring the course of discussions in 1986 and 1987,' and 'in or about

May through December 1987' do not make the grade under Rule 9(b)."  *Glen Holly Enter., Inc.*

*v. Tektronix, Inc.*,  100 F. Supp. 2d 1086, 1094 (C.D.Cal. 1999)(quotations omitted).  "The

[party] must set forth what is false or misleading about a statement, and why it is false.'"  *Id.*

(quoting *GlenFed*, 42 F.3d at 1548).  Rule 9 imposes these specificity requirements so that

parties accused of fraud have sufficient "notice of the particular misconduct which is alleged to

---

[145]   Thurm Decl., Ex R (Carvill Depo.) at 178:19-187:22.
[146]   Answer, ¶ 92-110.

392680.02

1   constitute the fraud charged so that they can defend against the charge and not just deny that they

2   have done anything wrong."  *Neubronner*, 6 F.3d at 671.

3          Marland's fifth affirmative defense accuses Thelen of fraud in a general manner without

4   pleading the facts in sufficient detail to permit Thelen to defend itself.  Marland fails to allege

5   specific statements of material facts; allege his basis for believing the statements to be false; or

6   allege his actual and justifiable reliance on the statements in executing the December 2002

7   Agreement.[147]  He fails to identify the specific statements made to him, or the times, dates, and

8   places of the alleged misrepresentations.[148]  Significantly, at no point does Marland allege that he

9   actually and detrimentally relied on any of the representations or concealments.[149]

10         Because it does not detail any of the alleged frauds with particularity, Marland's fifth

11  affirmative defense is inadequate as a matter of law and summary judgment is appropriate.  *See*

12  *Murr Plumbing, Inc. v. Scherer Bros. Financial Services*, 48 F.3d 1066, 1070 (8th Cir. 1995) ("A

13  district court may enter summary judgment dismissing a [pleading] alleging fraud if the

14  [pleading] fails to satisfy the requirements of Rule 9(b).").

15         **2.      Marland cannot prove he was induced to enter into the December 2002
                     Agreement by Thelen's intentional misrepresentation or fraudulent**
16  **concealment.**

17         Just as Marland's pleadings are crafted to be as vague as possible in the allegations

18  concerning fraud, Marland, in his deposition, could not identify any specific misrepresentations

19  of material fact upon which he justifiably relied in entering the December 2002 Agreement.[150]

20  Neither has Marland identified any specific fact Thelen concealed from him, which Thelen had a

21  duty to disclose and which, had he known of it, would have justifiably caused him not to enter

22  the Agreement.[151]

23         In order to set aside the December 2002 Agreement on the basis of fraud, Marland must

24  prove that Thelen made a material misrepresentation, with knowledge or belief of its falsity, with

---

[147]   Answer, ¶¶ 92-110.

[148]   Answer, ¶¶ 92-110.

[149]   Answer, ¶¶ 92-110.

[150]   Thurm Decl., Ex. A (Marland Depo.) at 245:19-270:04.

[151]   Thurm Decl., Ex. A (Marland Depo.) at 277:15-283:13.

392680.02

1    the intent to defraud, and that he actually and justifiably relied on the misrepresentation.  *See*

2    *Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 974 (1997); *Mirkin v. Wasserman*,

3    5 Cal. 4th 1082, 1088 (1993).  "The absence of any one of these required elements will preclude

4    recovery."  *Wilhelm v. Pray, Price, Williams & Russell*, 186 Cal. App. 3d 1324, 1331 (1986).

5         When asked repeatedly under oath to identify what specific lies he believed Thelen had

6    told him, Marland gave evasive and non-responsive answers:[152]

7         Q.  In what ways do you believe you were lied to in connection with negotiations
         of the 2002 agreement?

8         A.  In what ways at that time?

9         Q.  Then or now.

10        A.  At the time, had I been able to imagine that these people were swindling me,
         it's clear that I wouldn't have done business with them, but how could I imagine
11        that a lawyer worthy of that name could play with his client as if with a
         marionette.  It's true that I don't speak English very well.  It's true that I don't—
12        I'm not familiar with American law.  It's true that I don't have any other lawyers
         who are litigators in California law, but would I have had to hire another
13        California law litigator that I would have then had to have verified by a third
         California law litigator . . . .
14

15        Q.  Mr. Marland, all I want to know from you is in connection with the 2002
         agreement, what lies do you believe were made by the Thelen lawyers to you. . . .
16
         A.  All of the reproaches that I was talking about are not specifically linked to
17        this, that or the other protocol.  Excuse me for the word, but seems to me as if
         there is here a conspiracy.  Every manipulation, every bad action of the protocol
18        of 2002 seems all to work together.  And if you ask me specifically for what
         reproaches I would have for the agreement of 2002, this is something that I would
19        have to insert into a totality and you know this very well, because Gary prepared a
         document that he made me with all of my trust sign, and if I have understood
20        everything, this document allowed, this document allowed you to have absolution
         for everything that you had done wrong.  That's my answer.
21
         Q.  Are there specific facts that you now believe you were given by the Thelen
22        lawyers in connection with the negotiations of this agreement that you now
         believe were false?
23
         A.  I don't understand the question, but if I do understand it, I have already
24        answered it.[153]

25    And so on.[154]  Marland's responses to deposition questioning as to what facts he believed Thelen

26

27    ―――――――――――――――
     [152]  Thurm Decl., Ex. A (Marland Depo.) at 245:19-270:04.
     [153]  Thurm Decl., Ex. A (Marland Depo.) at 245:19-250:19.
28   [154]  Thurm Decl., Ex. A (Marland Depo.) at 245:19-270:04.

1  had concealed from him were similarly evasive.[155]  Marland cannot meet his burden of proving

2  that that he was induced to enter into the December 2002 Agreement by fraud.

3  **C.    Even if Marland could plead or prove he was induced into the Agreement by fraud,**
**he knowingly accepted benefits under the Agreement and thereby ratified it.**

4

5        An agreement induced by fraud is voidable but not void.  *Federal Deposit Ins. Corp v.*

6  *Dureau*, 212 Cal. App. 3d 956, 965 n.4 (1989).  The party claiming fraud must take steps to undo

7  or rescind the agreement.  Accepting the benefits of a voidable agreement is inconsistent with a

8  claim of fraud, and results in a ratification of the agreement.  *LeClercq v. Michael*, 88 Cal. App.

9  2d 700, 702 (1948); *Eustache v. Lynch*, 43 Cal. App. 2d 486, 491 (1941); Cal. Civ. Code § 1589.

10       Before seeking to undo the December 2002 Agreement in February 2006, Marland

11  accepted more than $19 million paid by Thelen under that Agreement.[156]  When Thelen made the

12  first payment in June 2004, Marland was already receiving legal advice from Andrew Hayes

13  about potential claims against Thelen.  When Thelen made the second payment in December

14  2005, Hayes had already threatened legal action against Thelen over the enforceability of the

15  December 2002 Agreement.[157]  Indeed, just *six weeks* after accepting more than $14 million

16  under the Agreement, Marland initiated the New York arbitration, alleging that the Agreement

17  was invalid and unenforceable.[158]  Thus, with knowledge of the December 2002 Agreement, and

18  whatever grounds he believes exist to invalidate it, Marland accepted the benefits under the

19  Agreement.  He ratified the Agreement and is now bound by it.

20  **D.    Marland's second and third counterclaims are barred by the plain terms of the**
**December 2002 Agreement.**

21

22       In his second counterclaim, Marland seeks damages for Thelen's alleged breach of the

23  June 1999 fee-sharing agreement.[159]  But the December 2002 Agreement replaced the June 1999

24  agreement in its entirety.[160]  After December 2002, Thelen no longer had any obligations under

---

25  [155]  Thurm Decl., Ex. A (Marland Depo.) at 277:15-283:13.

26  [156]  *See supra* footnotes 125-130.

      [157]  *See supra* footnotes 131-133.

27  [158]  FAC ¶ 48; Answer ¶ 48, Ex. A.

      [159]  Answer, ¶¶ 57-65.

28  [160]  Thurm Decl., Ex. T, p. 1.

1    the June 1999 Agreement; therefore, its payment to Marland of 35% of its fees cannot constitute

2    a breach of that Agreement.

3        Similarly, in his third counterclaim, Marland seeks damages for Thelen's alleged bad

4    faith denial of the existence of the February 1999 and June 1999 Agreements.  California does

5    not recognize the tort of bad faith denial of contract.  *Freeman & Mills, Inc. v. Belcher Oil Co.*,

6    11 Cal. 4th 85 (1995).  Even if it did, Marland's claim would fail.  Marland alleges that Thelen

7    misrepresented that the Insurance Commissioner had provided the required consent to the

8    December 2002 Agreement—*i.e.,* that the Agreement required the Commissioner to consent to

9    the "entire Agreement" but he only consented to the fee-sharing provisions.[161]  As discussed

10   above, Marland's interpretation of the consent provision contradicts the plain language of the

11   Agreement, and the intent of the drafter.  Thelen gave Marland truthful information about the

12   effectiveness of the December 2002 Agreement.  Marland's second counterclaim fails as a matter

13   of law.

14   **E.    Marland's first, fourth and fifth counterclaims are barred by the December 2002**
         **Agreement.**

15

16       Marland's first, fourth and fifth counterclaims for breach of fiduciary duty, fraud, and

17   negligence, respectively—allege that Thelen breached duties, concealed information and

18   misrepresented facts to Marland in 1998, 1999, 2001 and 2002.[162]  Whatever claims Marland

19   contends arise out of Thelen's conduct prior to the execution of the December 2002 Agreement

20   are barred by the mutual release provision.

21       Interpretation of the mutual release provision is governed by principles of contract

22   interpretation.  *Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (1992) . Where a contract is clear and

23   unambiguous, it is interpreted by the language therein without resort to extrinsic evidence.

24   *Niederer v. Ferreira*, 189 Cal. App. 3d 1485, 1499 (1987); *see also Lloyd's Underwriters v.*

25   *Craig and Rush, Inc.*, 26 Cal. App. 4th 1194, 1197 (1994); Cal. Civ. Code § 1636.  Interpretation

26   of a contract is a question of law "which may be resolved on summary judgment."  *Niederer*,

27

28   [161] Answer, ¶¶ 66-73.
     [162] Answer, ¶¶ 6-36; 50-56; 74-86.

392680.02

1    189 Cal. App. 3d at 1499; *see also Fidelity & Deposit Co. v. Charter Oak Fire Ins. Co*., 66 Cal.

2    App. 4th 1080, 1088 (1998).

3          In *Winet*, a client and his former attorney entered into a settlement agreement that clearly

4    stated the parties' intentions to release each other from all claims, known or unknown, suspected

5    or unsuspected.  The agreement also contained an explicit waiver of the benefits of Civil Code

6    section 1542.  *Winet*, 4 Cal. App. 4th at 1163.  Several years later, the client sued his former

7    attorney for malpractice.  The court held that the settlement agreement barred all further claims,

8    notwithstanding the client's alleged subjective intention not to relinquish his right to sue his

9    attorney in the future.  *Id.* at 1168-69.

10         As in *Winet*, the mutual release provision in the December 2002 Agreement is clear,

11   unambiguous, and broad in scope.  As such, the release provision bars any and all claims by

12   Marland against Thelen that existed, or may have existed, at the time the December 2002

13   Agreement was executed.  *See, e.g., Chaganti v. Ceridian Benefts*, 2004 WL 1877733 (N.D.Cal.

14   Aug. 23, 2004).

15   **F.    The Court should permanently enjoin the New York arbitration commenced by
           Marland in February 2006.**

16

17         Thelen is entitled to a permanent injunction of the New York arbitration Marland

18   initiated on February 13, 2006.  Marland's arbitration demand relies on the arbitration provision

19   in the February 1999 Agreement.[163]  But the December 2002 Agreement expressly supersedes

20   the February 1999 Agreement and does not contain an arbitration clause.[164]  To the contrary, the

21   December 2002 Agreement requires the parties to resolve disputes in a California court under

22   California law.[165]  Accordingly, because Thelen has demonstrated as a matter of law that the

23   December 2002 Agreement is valid, it is entitled to a permanent injunction barring Marland from

24   proceeding with the New York Arbitration.  *See LAWI/CSA Consol., Inc. v. Wholesale & Retail*

25   *Food Distrib.,* 849 F.2d 1236, 1241 (9th Cir. 1988).

26

27   _____
     [163]  FAC ¶ 48; Answer ¶ 48 & Ex. A.
     [164]  Thurm Decl., Ex. T.
28   [165]  Thurm Decl., Ex. T, § 9.

392680.02

1    If the Court determines that questions of fact exist as to the validity of the December

2  2002 Agreement, Thelen is still entitled to preliminarily enjoin Marland from proceeding with

3  the New York Arbitration until a final judgment is entered.  After Thelen filed this action, the

4  parties stipulated to a stay of the New York Arbitration until the Court entered a final order on

5  Thelen's request for injunctive relief.[166]  Marland filed his counterclaims, seeking the same relief

6  sought through the arbitration.[167]  Thelen seeks to extend this stay, by Court order, until a final

7  disposition of all claims asserted in this action.

8    In order to obtain preliminary injunctive relief, Thelen must show: (1) a likelihood of

9  success on the merits; (2) a substantial threat that it will suffer irreparable injury if the injunction

10 is denied; (3) the balance of hardships favors Thelen; and (4) the injunction will not disserve the

11 public interest.  *Textile Unlimited, Inc. v. A.BMH & Co., Inc.*, 240 F.3d 781, 786 (9th Cir. 2001).

12 First, as demonstrated above, Thelen has a high likelihood of success on the merits because the

13 December 2002 Agreement is valid.  If it is, the New York Arbitration must be preliminarily

14 enjoined for the same reasons permanent injunctive relief is appropriate.  Second, there is a

15 substantial threat that Thelen will suffer irreparable injury without an injunction because it may

16 be forced to arbitrate without its consent.  *Id*. at 789; *see also World Group Secs. v. Ko*, 2004 WL

17 1811145, at *7 (N.D.Cal. Feb. 11, 2004).  Third, the balance of hardships tips in Thelen's favor.

18 Marland's counsel has stated unequivocally that "Marland's plan is to litigate his [counter]claims

19 at the jury trial beginning August 6."[168]  Fourth, the public interest favors an injunction here.

20 "Judicial economy is always a policy consideration" in evaluating the public interest.  *State of*

21 *Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1390 (9th Cir. 1988).  Unless Marland is

22 enjoined from proceeding with the New York Arbitration, he may seek to litigate his claims in

23 two forums, simultaneously.  For these reasons, if the Court does not enter a permanent

24 injunction, it should at a minimum preliminarily enjoin Marland from proceeding with the New

25 York Arbitration until a final disposition of this case.

26

27  [166]  Stipulation and Order, Docket Item No. 13.

28  [167]  Counterclaims, ¶¶49-56 & 82-86.
    [168]  Hur Decl., Ex. 37.

392680.02

1

# IV.    CONCLUSION

2      For the reasons set forth above, Plaintiff, Counter-Defendant, Counter-Counterclaimant

3  Thelen Reid Brown Raysman & Steiner LLP respectfully requests that this Court grant this

4  motion.

5  Dated:  April 5, 2007                                    KEKER & VAN NEST, LLP

6
                                                   By:  /s/ Wendy J. Thurm
7                                                        WENDY J. THURM
                                                         Attorneys for Plaintiff, Counter-Defendant
8                                                        and Counter-Counter-Claimant
                                                         THELEN REID BROWN RAYSMAN &
9                                                        STEINER LLP fka THELEN REID &
                                                         PRIEST LLP
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND OTHER RELIEF;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. C 06-2071 VRW

392680.02