# EXHIBIT 8

DONALD W. CARLSON [Bar No.: 79258] dcarlson@ccplaw.com
GUY D. CALLADINE [Bar No.: 99431] gcalladine@ccplaw.com
CARLSON, CALLADINE & PETERSON LLP
353 Sacramento Street, 16th Floor
San Francisco, California 94111
Telephone:     (415) 391-3911
Facsimile:      (415) 391-3898

ANDREW W. HAYES (*pro hac vice*)
HAYES & HARDY LLP
1 Rockefeller Plaza, Suite 1005
New York, New York 10020
Telephone:     (212) 554-3120
Facsimile:      (212) 554-3121

Attorneys for Defendant,
Counterclaim-Plaintiff and
Counter-Counter Defendant
FRANÇOIS MARLAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THELEN REID BROWN RAYSMAN & STEINER LLP, fka THELEN REID & PRIEST LLP,<br><br>    Plaintiff and Counterclaim-Defendant,<br><br>vs.<br><br>FRANÇOIS MARLAND,<br><br>    Defendant and Counterclaim-Plaintiff | CASE NO.:    C-06-02071 VRW<br><br>**NOTICE OF MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| THELEN REID BROWN RAYSMAN & STEINER LLP, fka THELEN REID & PRIEST LLP,<br><br>    Counter-Counterclaimant,<br><br>vs.<br><br>FRANÇOIS MARLAND, PHILIPPE BRUNSWICK and SUSANNAH MAAS,<br><br>    Counter-Counter Defendants. | **Date:  May 10, 2007**<br>**Time:  2:00 p.m.**<br>**Courtroom:  6**<br><br>**Judge:  Vaughn R. Walker** |

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT .................................................................4

II. STATEMENT OF FACTS ...................................................................5

    A.    Marland's Documents And Information Lead The
          DOI To Obtain "The Portages" By January 1999 ..................................5

    B.    Recognizing The Prospect Of Protracted Litigation, Thelen Negotiates
          A Contingent Fee Agreement With A Large Potential Premium And
          With The Stated Goal Of Having Thelen Represent The DOI As Well
          As Marland ............................................................................5

    C.    Fontana Persuades The DOI To Repudiate Its Agreement With The
          Attorney General By Insisting That Thelen Serve As Lead Counsel,
          Misleads Marland About Why The Agreement Collapsed, Bullies
          The Attorney General, And Assures Marland That He Need Not Care
          About The Attorney General. ....................................................8

    D.    Thelen Reassured Marland In May 1999 That There Was "No Risk"
          He Could Be Compelled To Produce Documents He Did Not Want
          To Produce................................................................................10

    E.    The "Side Letter Agreement" Shows That Thelen Knew From June
          1999 Onward That Marland Would Not Produce The Document Unless
          His Security Could Be Assured. ...............................................10

    F.    Aware That Marland Will Not Produce The Document, Thelen Signs
          The June 1999 Agreement To Associate Counsel And The Amendment
          To The Attorney-Client Agreement. ...........................................11

    G.    Thelen Gets The DOI To Approve The Fee-Sharing Provision
          In The June 1999 Agreement To Associate Counsel, But Conceals
          The Side Letter Agreement And Later Misrepresents That Agreement
          To The DOI. ..............................................................................13

    H.    In August 2001, Thelen Responds To The AG's Conflict Charges
          By Falsely Stating That Marland Had Signed A Waiver. ....................14

    I.    Marland's Conflict Waiver Requires That Thelen Give His Interests
          Precedence Over The DOI's – A Reservation Thelen Ignores, And
          Conceals From The AG And The DOI..........................................14

    J.    The September 2001 Amendments Re-Confirm The June 1999
          Fee-Sharing Percentages, Install Thelen As "General Counsel" To
          RoNo So That It Can Continue Directing Rono's Actions, And Make
          Brunswick "Associated Counsel" With Thelen. ...............................16

    K.    Shortly After The September 2001 Amendments, Thelen Seeks To
          Renegotiate Its Fee; Marland Responds Promptly; Thelen Delays,
          Changes The Deal, And Then Brings In Carvill, Who Is Told

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

Case 3:06-cv-02071-VRW    Document 684    Filed 04/05/2007    Page 4 of 42

To Negotiate The Best Possible Deal For Thelen. ...................................19

L.   Thelen Decides To "Be More Aggressive" With Marland In
     The Summer Of 2002, And Uses A Variety Of Bad Faith
     Tactics To Achieve The Best Possible Deal For Thelen. ......................................20

M.   Thelen Has Disavowed Any Claim That The Release In The
     December 2002 Agreement Complies With The Rules Of Professional
     Conduct, And The DOI Has Made Clear That It Only Approved The
     Fee-Sharing Agreement In The December 2002 Agreement. ...........................23

N.   Apart From The December 2002 Agreement, Thelen Never Purported
     To Terminate The June 1999 Agreement To Associate Counsel, As
     Amended On September 2001. ...........................................................24

O.   Going Beyond Even Its Counter-Counterclaims, Thelen Withholds
     Over $600,000 Due To European Counsel Under Thelen's Own
     Reading Of The December 2002 Agreement. ........................................24

P.   Thelen Was On Notice of Marland's Claims From At Least February
     2006, Within The Statute Of Limitations, But Waited To File Affirmative
     Counter-Counterclaims Against Marland Until After The Statute Of
     Limitations Ran. ...........................................................................25

III. ARGUMENT ................................................................................26

A.   The December 2002 Agreement Is Unenforceable Because Thelen
     Failed To Make The Necessary Disclosures And Failed To Obtain
     The DOI's Consent To The "Entire Agreement", Both Of Which
     Were Express Preconditions To The Agreement's Effectiveness ...........................26

B.   Thelen Has Not Pled And Cannot Prove That It Made The Disclosures to
     Marland Required By Rule 3-300 Of The Rules of Professional Conduct
     Before Seeking Consent From the DOI to The December 2002 Agreement ...........29

C.   Thelen's Counter-Counterclaims Are Contrary To The Facts, Fail To
     State A Claim And Barred By The Statute of Limitations. .......................................34

D.   Thelen Is Liable As A Matter Of Law For The Difference Between
     The Fees Payable Under The June 1999 Agreement And The
     December 2002 Agreement, And In Any Event Should Be Ordered To
     Pay The $612,500 It Has Withheld Since July 2006 ............................................36

IV. CONCLUSION ................................................................................37

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111


MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT (FED. R. CIV. P. 56)                    CASE NO.: C-06-02071 VRW

1

TABLE OF AUTHORITIES

2

CASES

BGJ Associates, LLC v. Wilson, 113 Cal. App. 4th 1217, 1229-30 (2003)......26  30, 31, 32

Bilbie v. Lumley, 2 East 469, 102 E.R. 448 (1802) ...........................................................35

Bradner v. Vasquez, 41 Cal. 2d 147, 149-51 (1954) .........................................................33

Brisbane v. Dacres, 5 Taunt. 143, 128 E.R. 641 (1815) ...................................................35

Denton v. Smith, 101 Cal. App. 2d 841, 844 (1951). ................................................. 26, 33

Dordovitch v. Haltzman, 190 F.3d 125, 142-43 (3d Cir. 1999) ........................................ 32

Drake v. Becker, 303 N.E.2d 212, 216-17 (Ill. App. Ct. 1973)....................................31, 33

FMG of Kansas City, Inc., 861 P.2d 830, 842-43 (Kan. App. 1993) ................................33

Flatt v. Superior Court, 9 Cal. 4th 275, 284-85 (1994)................................................31, 33

Goldstein & Price v. Tonkin & Mondl, 974 S.W.2d 543, 548 (Mo. App. (1998)...............32

Heller, Horowitz & Feit, P.C. v. Stage II Apparel Corp., 704 N.Y. 2d 240, 241 (2000)..32

Hunniecutt v. State Bar, 44 Cal. 3d 362, 372-73 (1998) ....................................... 26, 31, 33

In re Hefron, 771 N.E.2d 1157, 1162 (Ind. 2002)............................................................33

In re Thayer, 745 N.E.2d 207, 212 (Ind. 2001) ................................................................33

In re Washington Trust Deed Service Corp., 224 B.R. 109 (9th Cir. B.A.P. 1998)...........28

Jordan v. Ray Schools-Chicago, 49 Ill. App. 2d 1, 8 (1964). ......................................... 32

Ketchum v. Moses, 24 Cal. 4th 1122, 1132 (2001) ..........................................................32

Los Angeles Rams Football Club v. Cannon, 185 F.Supp. 717, 722 (S.D. Cal.1960) ......28

Miller v. Solomon, 199 N.E.2d 660, 666 (Ill. App. 1964). ...............................................32

Nissan Fire and Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000) ...... 25

Rader v. Thrasher, 57 Cal. 2d 244, 253 (1962). .............................................................. 32

Santa Clara-San Benito Chapter of Nat'l Elec. Contractors' Ass'n v.
Local Union No. 332,  40 Cal.App.3d 431, 436, 114 Cal.Rptr. 909, 912 (1974)..............29

Severson & Werson v. Bollinger, 235 Cal. App. 3d 1569, 1572 (1991) .....................26, 32

Schultz v. Harney, 27 Cal. App. 4th 1611, 1623 (1994)....................................................35

Smith v. Randall, 51 Cal. App. 2d 195, 196-97 (1942) ....................................................35

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

TREATISES

1 B. Witkin et al., SUMMARY OF CALIFORNIA LAW, Contracts § 776
(10th Ed. (Westlaw version) 2007) ......................................................................28

4 Witkin, *Cal. Procedure*, Pleading, § 522, p. 612. ..................................................28, 35

Restatement (Second), The Law Governing Lawyers, § 18 comm. E ...........................31

STATUTES AND RULES

Cal. Civ. Code § 1605 ........................................................................................... 33

California Rules of Prof. Conduct Rule 3-300 .................................................... 2,

Probate Code Sections 16002 ........................................................................... 33

Probate Code Section 16004 ........................................................................ 30, 33

Federal Rules of Civil Procedure, Rule. 56 ......................................................... 2

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that at 2:00 p.m. on May 10, 2007, or at such other date and time ordered by the Court, located at 450 Golden Gate Avenue, San Francisco, California, defendant and counterclaimant FRANCOIS MARLAND ("Marland") will, and hereby does, move this Court, pursuant to Fed. Rule Civ. P. 56 for an order granting Marland summary judgment on (1) the following Affirmative Defenses: First (Failure to State a Claim), Third (Failure to Fulfill a Condition Precedent), and Sixth through Ninth (No Representation by Independent Counsel; Unfairness and Lack of Consideration; Unconscionability, Coercion, Threat of Client Abandonment; and Violation of the California Rules of Professional Conduct); (2) Count Two of Marland's Revised Amended Counterclaims (Breach of Contract); (3) dismissing the Second Amended Counter-Counterclaims of Plaintiff Thelen Reid Brown Raysman & Steiner LLP ("Thelen"), filed March 19, 2007; and (4) dismissing Thelen's affirmative defenses insofar as they apply to Count Two of Marland's Revised Amended Counterclaims.

This motion is brought pursuant to Fed. R. Civ. P. 56 on the grounds that there is no genuine issue of material fact regarding each of the following issues: (i) the "December 2002 New Agreement to Associate Counsel" never took effect because Thelen did not make the disclosures required by that agreement, and the California Department of Insurance ("DOI") declined to approve the "entire agreement" , both of which were preconditions to its effectiveness; (ii) Thelen has not pleaded and cannot carry its burden of proving that the December 2002 Agreement was objectively fair and reasonable and supported by consideration, as is required under California law for it to enforce that agreement; and (iii) Thelen has not pled and cannot prove that it made the necessary disclosures to Marland required by Rule 3-300 of the Rules of Professional Conduct in advance of seeking approval of the December 2002 Agreement, rendering the agreement void. Thus, regardless of the merits of Thelen's affirmative defenses to Marland's claims for damages or forfeiture of Thelen's fees above and beyond the amounts set forth in the September 2001 Amendments to the Attorney-Client Agreement and the Agreement to Associate Counsel, Thelen is obligated to honor those agreements and pay the 52.5% of its fees received to date to the European Counsel.

2

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

Summary judgment is also sought on Thelen's "Counter-Counterclaims," on the grounds that Thelen's cause of action for money had and received will not lie on the undisputed facts regarding to the funds paid to date by Thelen to the European Counsel, and Thelen was on notice of the facts underlying its declaratory judgment action by July 2002, making that claim untimely under the statute of limitations.

This Motion is based on the following memorandum of points and authorities, the Declarations of Andrew W. Hayes and Richard Zitrin submitted herewith, the allegations in the parties' pleadings, and other documents that are a matter of record and whose authenticity is not in dispute. As stated in the Hayes Dec., all references in the following Memorandum of Points and Authorities to hearing transcripts, pleadings and discovery responses are to documents created or served in connection with this action, copies of which are submitted herewith in Volume I of that Declaration and identified therein by name, date, and party (*e.g.*, "1/3/07 Hearing Tr. at __"); all references "Ex. __" are to deposition exhibits marked in this action, using their exhibit numbers as given in the depositions, or to other documents identified in the Hayes Declaration, and all such exhibits are submitted herewith as Volume II of the Hayes Declaration; references to "[witness] Dep." are to the excerpts of depositions taken in this action, and submitted herewith as Volume III of the Hayes Declaration, tabbed by witness name for ease of reference.

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

3

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. PRELIMINARY STATEMENT

The two key issues underlying the relief sought in this motion can be understood in the context of two *omissions* from Thelen's own pleadings:

- Thelen chose not to allege that the contract it seeks to enforce – the December 2002 New Agreement to Associate Counsel – ever actually took effect (because it knew that the DOI did not approve the "entire agreement", and that approval was a prerequisite to the agreement taking effect); and

- Thelen's Complaint and Amended Complaint both omitted any claim that the December 2002 Agreement was objectively fair and reasonable and complied with the California Rules of Professional Conduct.

After the first omission was challenged in a motion to dismiss, Thelen added the missing allegation and belatedly attached the DOI's consent (which it had omitted from its preliminary injunction motion); Thelen later told the Court that Thelen's understanding of the meaning of its own agreements was "is not fully formed".[1]

Thelen has not tried to cure its pleading defect on the second point – apparently because it intends to claim that Marland "evolved" from a client to a business partner by the summer of 2002, so Thelen did not need to comply with the Rules of Professional Conduct in negotiating the December 2002 Agreement. That is consistent with Thelen partner Gary Fontana's insistence that Thelen was permitted to treat Marland as a business partner *rather than* as a client;[2] in the statement by Thelen's counsel here that Thelen terminated the Attorney-Client Agreement "in part to effect an arms'-length negotiation of the [December 2002] agreement";[3] and it explains why Thelen's 30(b)(6) witness could not state whether the release clause in the December 2002 Agreement complied with the disclosure requirements of the Rules of Professional Conduct.[4]

Thelen's position is untenable as a matter of law. Marland (individually and through RoNo LLC, created to disguise his identity) was Thelen's client; he retained Thelen to seek a contingent-fee deal with the DOI that Thelen would share with Marland; he relied on Thelen's

---

[1] 1/3/07 Hearing Tr. (Hayes Dec. Vol. I), at 10.
[2] Fontana Dep. (Hayes Dec. Vol. II) at 399:5-400:10.
[3] 1/3/07 Hearing Tr., at 19.
[4] O'Neal Dep. 333:5-22.

4

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

advice in abandoning the *qui tam* action after Thelen sabotaged the cooperation agreement between the AG and the DOI; he relied on Thelen's advice that there was "no risk" he would have to produce documents he did not want to produce; and he took Thelen's assertions that he was "counsel to the DOI" at face value when Thelen used the threat of abandonment to pressure him to reduce his recovery in the December 2002 agreement. The facts also show that Thelen failed to make disclosures that the parties had agreed to make to the DOI, and that Thelen was required to obtain from Marland, in connection with that agreement, and Thelen failed to get the DOI to approve the "entire agreement", which was a precondition of the new agreement.

## II. STATEMENT OF FACTS

A. **Marland's Documents and Information Lead the DOI to Obtain "the Portages" by January 1999.**

In the early 1990s, Credit Lyonnais and others used secret fronting agreements ("portages") to hide their interest in the acquisition of Executive Life Insurance Co. ("ELIC") by a small French insurance company (called "MAAF") from the California Department of Insurance ("DOI"), acting as ELIC's conservator. These agreements were kept secret because Credit Lyonnais was then owned by the French state, and its acquisition of a California insurance company violated both federal and state laws and regulations.

Thelen has acknowledged that Marland was the "original source" whose disclosures of the existence of the portages led to the payment of over one billion dollars in fines, penalties, and damages paid to date by various defendants, as well as multiple criminal convictions. Without Marland's information, the portages would have remained secret and ELIC policyholders would not have received the hundreds of millions of dollars they have received in recent years.

Marland's disclosures included documents from his own files that he gave to Thelen's predecessor firm, Reid & Priest, in about 1998.[5] Marland had those documents because he had been a board member of MAAF at the time it agreed to front for Credit Lyonnais.[6] Although

[5] Id.
[6] Marland Dep. 517:2-9.

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

5

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1    Marland gave Thelen many documents,[7] he did not give Thelen one particular document – an early

2    version of the portage between Credit Lyonnais and MAAF – because he believed (and Thelen

3    later agreed) that doing so would identify him as the source of the information and expose him to

4    criminal prosecution (and other retaliation) in France.[8]   Marland also told Thelen that it would not

5    need his copy of that document because it could be obtained from the parties.[9]

6          Marland's information was reflected in a memo Thelen prepared,[10] which was given to the

7    California Department of Insurance ("DOI"), and prompted it to begin its own investigation.  By

8    January 1999 the DOI had obtained copies of what DOI counsel Harry LeVine referred to as "the

9    portages" – agreements confirming Marland's information and confirming the terms of the portage

10   described in the one document Marland withheld.  The DOI then used these portages to prepare its

11   own action against Credit Lyonnais and others, with any assistance from Marland.[11]

12   **B.    <u>Recognizing the Prospect of Protracted Litigation, Thelen Negotiates a Contingent</u>

13        <u>Fee Agreement with a Large Potential Premium and with the Stated Goal of Having</u>
          <u>Thelen Represent the DOI as Well as Marland.</u>**

14         Thelen first proposed that Marland be retained as a consultant, paid on a contingent fee

15   basis.[12]  Thelen has been asked to explain how it understood that it was possible to pay a

16   contingent fee to a potential fact witness, and failed to do so.[13]  In late 1998, Thelen partner Gary

17   Fontana sought to negotiate an agreement with the DOI.  Fontana did not consider filing a *qui tam*

18   case until after those negotiations proved unsatisfactory.[14]

19         Before filing the *qui tam* action, Fontana negotiated and signed the "February 1999

20   Attorney-Client Agreement" with Marland.[15]  Fontana's partner Stephen O'Neal (then Thelen's

21   managing partner and now the firm's Chairman) told Fontana to include a clause in the agreement

22   requiring Marland to furnish his copy of the early *contrat de portage* within 30 days,[16] but that

23   ---
     [7] Marland Dep. 516:12-23.
24   [8] Carvill Dep. 236:19-24.
     [9] Marland Dep. 367:19-24.
25   [10] Ex. 86.
     [11] LeVine Dep. 14-15.
26   [12] Ex. 84.
     [13] Thelen's Responses and Objections to Marland's First Set of Interrogatories (Hayes Dec. Vol.
27   I), No. 3, at 5.
     [14] Fontana Dep. 212:24-213:3.
28   [15] Ex. 2.
     [16] Ex. 16 at TRP15902.

                                                      6

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1  clause was not included in the final document.[17] (In fact, Marland consistently refused to give his

2  copy of the *portage* to Thelen.[18]) The agreement also omits any reference to Fontana's promise to

3  O'Neal that Thelen would not invest more than $200,000 in the case as "due diligence" before

4  making an informed decision about whether to actually proceed with the case.[19]

5       As Fontana testified, the parties intended to have Thelen use its representation of Marland

6  to negotiate a representation of the DOI, and share fees from that representation with Marland.[20]

7  Thus the February 1999 Attorney-Client Agreement recited that Thelen was being retained to

8  represent Marland in pursuing possible recoveries against the defendants "on behalf of the

9  Commissioner and the State of California"; the "Scope of Services" to be rendered included

10  "providing legal advice and assistance to the Commissioner of Insurance and/or the Attorney

11  General in connection with the qui tam litigation" and "initiating or participating in other civil or

12  administrative actions relating to possible claims".[21]

13       As with all contingent-fee agreements, Thelen signed the February 1999 Attorney-Client

14  Agreement based on its own analysis of the risks and rewards of the proposed litigation.[22] The

15  agreement provided for Thelen to receive 40% of any relator's share of recoveries obtained in

16  1999, and 50% of any recoveries after 1999 (regardless of whether the Attorney General

17  intervened).[23] In negotiating this potentially huge up-front bonus from a quick settlement, Thelen

18  was aware of the risk of expensive, long-term litigation: a January 1999 internal Thelen analysis

19  noted that if they were unable to block the privatization of Credit Lyonnais or re-open the

20  conservatorship proceeding, "we will face a well-financed group of defendants," including that a

21  bank owned by the French state and others who made billions from Executive Life's junk bonds.[24]

22  ///

23  ///

24

25  [17] *See* Ex. 2.
    [18] Marland Dep. 401:21-402:6.
26  [19] O'Neal Dep. 185:16-186:6; *see* Ex. 26, 27.
    [20] Fontana Dep. 456:8-21.
27  [21] Ex. 2 at pp. 1, 2.
    [22] Fontana Dep. 246:1-248:1.
28  [23] Ex. 2 at 2.
    [24] Ex. 17 at 6-7.

7

C.    **Fontana Persuades the DOI to Repudiate its Agreement with the Attorney General by Insisting that Thelen Serve as Lead Counsel, Misleads Marland about why the Agreement Collapsed, Bullies the Attorney General, and Assures Marland that he Need Not Care about the Attorney General.**

After Thelen's *qui tam* action and the DOI's own action against an overlapping group of defendants were both filed on February 18, 1999, Fontana continued to negotiate with the DOI for a contingent-fee retainer, and negotiated with the California Attorney General's office ("AG") and the DOI regarding an agreement to work together.[25]  According to Brian Taugher, who was then in charge of the case for the AG's office, an agreement was reached for the AG to appear as counsel for the DOI and prosecute the two actions jointly, and for the whistleblower to be paid from the total recoveries in *both* cases.[26]  This agreement offered Marland less than the 15% statutory rate, it assured him of a share of a larger pie than if he simply pursued his *qui tam* action.[27]  Also, this deal would not require Thelen to expend millions as lead counsel.

Asked why this deal was not implemented, Taugher explained that Fontana (who went over LeVine's head to reach an agreement with the DOI in late May 1999)[28] persuaded the DOI that Thelen (*i.e.*, Fontana) should represent the DOI, rather than the AG's office.[29]  (When Fontana later reported this to Brunswick, Fontana added the statement that the AG had refused Fontana's demand that Marland's anonymity be absolutely protected – a demand Taugher did not recall, and disputed, pointing out that the AG had as much ability as Thelen to preserve Marland's anonymity, and was prepared to do so.[30])

(Fontana's habit of "embellishing" facts to impress his audience by telling them what they want to hear is confirmed by a note managing partner Stephen O'Neal wrote in June 1999:  in response to a series of messages from O'Neal questioning the wisdom of the representation and Fontana's failure to follow firm procedures, Fontana told O'Neal that Artemis (a French company

---

[25] Fontana Dep. 108:5-23.
[26] The rate – a sliding scale from 13% to 7% to 5% to 7% for various tranches of recoveries, was based on a previous *qui tam* case involving the Bank of America.  The percentages were apparently the same as the AG's previous offer to Marland, and the DOI's later offered to Thelen.
[27] Ex. 70A.
[28] *See* LeVine Dep. 30-31.
[29] Taugher Dep. 33-35.
[30] Taugher Dep. 50-53.

8

CARLSON CALLADINE & PETERSON LLP
333 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1    controlled by Pinault) had has offered $100 million to settle.[31] In fact, Artemis had not even been

2    sued, Fontana wrote Artemis a letter in *July* 1999 disclaiming any intention of suing Artemis, and

3    Artemis' counsel flatly denied making any $100 million offer.[32] Fontana claims that the offer was

4    actually $1 million, and his partner somehow confused $1 million with $100 million.[33])

5    On May 25, 1999 – the same day Thelen signed its retainer with the DOI[34] – Fontana called

6    Taugher and made a series of demands that the Attorney General was supposed to agree to within

7    hours, including putting the *qui tam* action "on ice".[35] We do not know all of Fontana's

8    communications during this time because he did not follow Thelen's document retention policy

9    (more precisely, he was not even *aware* of the policy[36]), but the documents we have leave no

10    doubt that Fontana sabotaged any cooperation agreement with the Attorney General's office.

11    Fontana also told Marland that he need not care whether the AG and the DOI resolve their

12    differences, boasting that "since we control access to our client, the most that the AG could do

13    would be to go to court to complain about our failure to cooperate."[37] Fontana added that "[e]ven

14    if the court were to compel us to abandon the qui tam case, that would not hurt us since we now

15    have the CDOI claims to pursue."[38] In response to this and similar statements, Marland agreed

16    with the DOI's request that he abandon, and seek to dismiss, his *qui tam* action in favor of a fee-

17    sharing agreement in the DOI's action.[39]

18    Fontana's advice and tactics here were disastrous, deliberate, unforced errors. If Thelen

19    had allowed the AG to serve as lead counsel, Thelen would not have needed to renegotiate its

20    retainer with Marland – because it would not have incurred nearly as much in fees, and because

21    the case would have resolved sooner. And antagonizing the AG's office was foolish in and of

22    itself: a May 23, 2002 Thelen memo discussing the "main problems" with the case labeled the

23    Attorney General as "most problematic of all", adding that "the AG's approach to the case has

---

24    [31] Ex. 29.
25    [32] Weigel Dep. 10:13-17; *see* Ex. 110.
      [33] Fontana Dep. 29:3-21.
26    [34] *See* Ex. 3.
      [35] Ex. 30.
27    [36] Fontana Dep. 10:2-11:3; *cf.* Ex. 1.
      [37] Ex. 127 at 2.
28    [38] *Id.*
      [39] *See* Ex. 5.

9

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1    been devastating to us, costing us a great deal of uncompensated time and effort, and probably

2    delaying the case a full year."[40]

3    **D.    Thelen Reassured Marland in May 1999 that there was "No Risk" He Could be**

4    **Compelled to Produce Documents He did not Want to Produce.**

5         At the same time Fontana was negotiating with the DOI, reaction to the litigation in France

6    gave Marland concern for his family's safety and his possible criminal liability.  Marland thus

7    faxed a letter to his French and American counsel on May 19, 1999 stating that he did not have,

8    and would not produce, any documents other than those he had already provided.[41]  In fact, copies

9    of Marland's business papers were still in his mother's townhouse in Paris, but he lived in Geneva,

10   and they were not in his possession or custody.[42]  (Indeed, Thelen apparently never believed that

11   Marland could have been compelled to produce those files.[43])

12        Fontana did not believe Marland's May 19 letter was true – he believed the document

13   existed, but did not know where it was – but he did believe Marland wrote the letter out of genuine

14   fear for his safety.[44]  Fontana thus responded by telling Marland what he wanted to hear:  that he

15   would not have produce any documents he did not want to produce.  Thus Fontana's May 25,

16   1999 memo to Brunswick stated:  "So long as the original of the cdp is in a safe place, there is *no*

17   *risk* that it can be obtained without our client's consent." (emphasis added).[45]

18   **E.    The "Side Letter Agreement" Shows that Thelen Knew from June 1999 Onward that**

19   **Marland Would Not Produce the Document Unless His Security Could be Assured.**

         Marland reiterated his concerns about producing any additional documents to Fontana in

20   person two weeks later, on June 2-3, 1999, when they were in London to meet with AUSA Jeffrey

21   Isaacs and representatives of the Federal Reserve.  Fontana again sought to accommodate those

22   concerns – and the increasing pressure Fontana was getting from O'Neal – by drafting a letter

23   (dated June 2, 1999 and referred to as the "Side Letter Agreement") which sharply reduced

24

25   40  Ex. 33 at p. 1, 2.
     41  Ex. 14.
26   42  Marland Dep. 497:18-498:9.
     43  Even Carvill, who used the charge of "spoliation" repeatedly in the course of negotiating the
27   December 2002 Agreement, admitted that he did not believe Marland could be required to produce
     documents against his will.  *See* Carvill Dep. 351:12-352:8.
28   44  Fontana Dep. 75:25-76:8.
     45  Ex. 127 at p. 5.

10

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1    Marland's share of any recovery (and increased Thelen's share) under certain circumstances.[46]

2    Thelen has tried to overlook or mischaracterize this agreement,[47] but it is extremely important for

3    what it includes, what it omits, and how Thelen later misused it.

4         The Side Letter Agreement does *not* discuss the circumstances under which Marland will

5    or will not produce any documents he had not already produced.  Rather, the letter addresses the

6    consequences of Marland's refusal to *testify*, because of his concerns for his safety:

7    • If Marland refuses to testify before the grand jury *"subject to a confidentiality*
8      *agreement with the U.S. Department of Justice that fully protects my identity and*
      *assures me that I will not be compelled to produce documents that may be in my*
9      *possession or control against my will"*, his share of any recoveries will reduced by
      two-thirds.[48]
10

11   • If Thelen, after making *"all reasonable efforts to find other competent witnesses who*
      *are willing to testify to the same facts"*, believes it is *"essential"* for Marland to give a
12     deposition in Europe or testify in court in the United States and Marland refuses to do
      so, his share of any recover will be reduced by half.[49]
13

14   Thus if Marland refused to testify before the grand jury because he would be required to produce

15   documents, *his share is unchanged*.  And as Thelen partner Karl Belgum explained, the clause

16   regarding testimony in deposition or trial assumed that if Marland testified in the civil case, his

17   identity as the whistleblower was revealed.[50]  The agreement thus did *not* contemplate that

18   Marland would be penalized for refusing to produce documents while his identity was still secret,

19   nor that he would testify unless it was necessary *and* he was willing to disclose his role as

20   whistleblower.[51]

21   ///

22   ///

23   ///

24
---
[46] *See* Ex. 6.
25   [47] Thelen's designated 30(b)(6) witness O'Neal was unable to testify that the document was an
     agreement between Thelen and Marland.  O'Neal Dep. 60:4-19.
26   [48] Ex. 6 at 1 (paragraph "1)", 2 (paragraph "3)").
     [49] *Id.* at 2 (paragraphs "2)" & "4)".
27   [50] *See* Belgum Dep. 64-68.
     [51] The agreement also shows that Thelen did not intend to call Marland as a witness unless
28   absolutely necessary.  However, Fontana seemed not to realize that the agreement itself created
     ethical issues, since it could be portrayed as payment in exchange for testimony.

11

**F.    Aware that Marland Will Not Produce the Document, Thelen Signs the June 1999 Agreement to Associate Counsel and the Amendment to the Attorney-Client Agreement.**

The Side Letter Agreement thus confirms what Carvill admitted in his deposition – Thelen knew as of the London meetings in June 1999 that Marland was not going to produce his copy of the initial *portage* unless he could be assured of his personal safety and freedom from prosecution in France, which Thelen could not do.[52]  Yet during those same London meetings, Thelen also entered into the "June 1999 Agreement to Associate Counsel" with Marland, his French counsel Philippe Brunswick and his Swiss counsel Susannah Maas (referred to collectively as the "European Counsel") and the "Amendment to the RoNo Attorney Client Agreement".[53]

The June 1999 Agreement to Associate Counsel reflected the parties' agreement to apply the compensation formula of the February 1999 Attorney-Client Agreement to recoveries from Thelen's representation of the DOI.[54]  The percentages set forth in the June agreement differed from the prior agreement because the Thelen and Marland had agreed to pay Brunswick a separate fee (10% if the case settled in 1999, 5% thereafter), split between Marland and Thelen.[55]

The drafting of the June 1999 Agreement to Associate Counsel has no reference to European Counsel (including Marland) producing any additional documents (Brunswick had struck out language to that effect in an earlier draft).  This agreement, including the addition of Brunswick and Maas, was a "fig leaf" to disguise its real purpose, which to compensate Marland; Thelen hired other counsel to serve as actual "local counsel" in France and Switzerland.[56]

The "Amendment to RoNo Attorney-Client Agreement,"[57] signed at the same time, reflected the DOI's request that Thelen and Marland dismiss the *qui tam* action (which, in fact,

---

[52] Carvill Dep. 364:19-365:7.
[53] Ex. 4 and 5, respectively.  The Side Letter Agreement states that it is an amendment to the "Agreement to Associate European Counsel" and the February 1999 Attorney-Client Agreement.
[54] Fontana Dep. 456:8-22.
[55] The February 1999 Agreement provided for a 60/40 split between Marland and Thelen for recoveries in 1999, and 50/50 for recoveries thereafter; the June 1999 Agreement provided for a 65/35 split between Marland and Thelen for recoveries in 1999 and 52.5/47.5 thereafter.
[56] Carvill Dep. p. 374:3-10.
[57] Ex. 5.

12

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1    they were not able to do *sua sponte*), and provided for Marland to pay Thelen's fees in negotiating

2    with the DOI and other government agencies.  This agreement contains no disclosures, no

3    consents, and no waivers, yet it appears to be the document Thelen now relies on as constituting

4    Marland's "informed waiver" of Thelen's conflicts over the next two years.

### G.    Thelen Gets the DOI to Approve the Fee-Sharing Provision in the June 1999 Agreement to Associate Counsel, but Conceals the Side Letter Agreement and Later Misrepresents that Agreement to the DOI.

7        Thelen firm management was told in a June 4, 1999 memo (sent from Belgum after

8    discussion with Fontana) that the London meetings were a success and that Marland "acquitted

9    himself well".[58]  The only sour note was a discussion of how the DOI's in-house counsel, LeVine,

10   flew to London to attend the meetings even though Fontana had purportedly told him that he could

11   not attend; as the memo noted, LeVine was very suspicious and hostile towards Thelen.[59]

12       Thelen's June 4 memo also noted the need to submit the June 1999 Agreement to

13   Associate Counsel and the Side Letter Agreement to the DOI for its approval.[60]  Carvill also

14   admitted that Thelen was obliged to submit the Side Letter Agreement to the DOI, because it

15   varied the fee-sharing agreement between Thelen and Marland.[61]  Thelen eventually sent the DOI

16   a consent to the fee-sharing provision in the June 1999 Agreement to Associate Counsel in

17   December 1999.[62]  But Fontana chose *not* to submit the Side Letter Agreement to the DOI, or even

18   tell the DOI about the substance of the agreement.[63]

19       Fontana testified that he concealed the Side Letter Agreement from the DOI because he

20   believed he could persuade Marland to produce his copy of the early *portage* if it ever became

21   necessary to do so, and until that time there was no need to disclose the agreement to the DOI.[64]

22   That does not square with the facts:  when Thelen demanded that Marland produce the document

23   in June 2002, Thelen still had not disclosed the Side Letter Agreement to the DOI.  Instead,

---

[58]  Ex. 70A at p.8.
[59]  *Id.* at p. 8-9.
[60]  *Id.* at p. 6 & n.2.
[61]  Carvill Dep. 193:9-197:4; *see id.* 183:21 184:19.
[62]  Ex. 7.
[63]  Thelen's Responses to Marland's First Set of Interrogatories (Hayes Dec. Vol. I), No. 43.
[64]  Fontana Dep. p. 79:2-25.

13

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1    Thelen later told the DOI that Marland had breached some obligation that he had to produce the

2    document – contrary to the terms of the Side Letter Agreement and the parties' stated intentions in

3    entering into that agreement and the June 1999 Agreement to Associate Counsel, as well as

4    Carvill's testimony that Thelen knew from June 1999 onward that Marland would not produce the

5    document unless his security could be assured.[65]

6    **H.    In August 2001, Thelen Responds to the AG's Conflict Charges by Falsely Stating**
7    **that Marland had Signed a Waiver.**

8         Little happened in the case relating to Marland from mid-1999 through the summer of

9    2001, when the Attorney General decided to lift the seal on the *qui tam* action and intervene.

10   Shortly thereafter, the AG's office told Thelen that it had an unwaivable conflict in representing

11   both the *qui tam* relator and the DOI, and should be disqualified.[66]  Thelen responded to the AG's

12   charges by telling the DOI that Marland had already executed a written waiver of any conflicts.[67]

13        Thelen's statement was false.  Marland had executed no conflict waiver.  Asked to identify

14   the waiver, Thelen witnesses have apparently referred to the "Amendment to RoNo Attorney

15   Client Agreement",[68] which as noted does not ever *refer* to any conflicts, actual or potential, nor

16   seek any waiver of any conflicts.  Thelen has conflated an agreement that could only executed

17   *after* a waiver was given with the actual disclosure and informed consent that constitute the

18   waiver.  In fact, shortly after Fontana told the AG Marland had signed a waiver, he began pressing

19   Marland to actually sign one.

20

21   **I.    Marland's Conflict Waiver Requires that Thelen Give his Interests Precedence over**
22   **the DOI's – a Reservation Thelen Ignores, and Conceals from the AG and the DOI.**

23        In September 2001, Belgum sent Brunswick a draft waiver which included a recital that in

24   the event of any actual conflict between the interest of Marland and the DOI, Thelen would put the

25   DOI's interests ahead of Marland's.[69]  Brunswick rejected that provision, and the final version is

26   ---
     [65] Fontana Dep. 75:25-76.8; Carvill Dep. 364:19-365:7.
27   [66] Ex. 134.
     [67] Ex. 135 at p.2.
28   [68] *See* Fontana Dep. 184:10-186:13,187:21-188:19,188:25-189:19,190:19-192:18,193:7-194:12.
     [69] Ex. 8.

14

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1    silent as to which client's interests take precedence in the event of an actual conflict.[70]

2         The waiver letter also makes no reference to the fact that Marland had a continuing interest

3    in having as much of any given recovery allocated to the *qui tam* case as possible, because he and

4    Thelen were entitled to a greater share of any recovery from that action than from the DOI action.

5    This may seem obvious to American lawyers, but it was not obvious to Europeans with no

6    knowledge of the statute, and who had been told in 1999 about an "offer" from the AG to provide

7    the same 13%/7%/5%/7% payment that the DOI later offered.  In fact, in the absence of any

8    cooperation agreement between the AG and the DOI, Marland's interests were as follows:

9

10   • Marland was entitled to 15% of any recoveries in the *qui tam* case, as well as
     reimbursement of counsel fees and expenses (the latter provisions applying in the event
11   of "any settlement" of a qui tam action);

12   • in the DOI case, Marland and Thelen shared a sliding-scale percentage fee:  13% of the
     first $150 million, 7% of the next $150 million, 5% of the next $200 million, and 7%
13   of any amounts above that (*i.e.*, above $500 million); this works out to 8% of the first
     $500 million, or almost half of what would be paid if the recoveries were obtained in
14   the *qui tam* action.

15

16        When Brunswick sent the signed waiver to Belgum, it contained two important conditions,

17   set forth in a cover letter.  First, the waiver was conditional on Marland having valid agreements in

18   both the *qui tam* and DOI actions allowing him to share in any recoveries.  Second, Marland had

19   signed the waiver on the understanding that "[i]n case the consequences of the conflict cannot be

20   avoided and TR&P can therefore not continue to represent the Client, RoNo and the

21   Commissioner, the priority shall be given by TR&P to the Client and RoNo, unless otherwise

22   agreed by the Client."[71]

23        Thelen's 30(b)(6) witnesses regarding its understanding of its agreements with Marland

24   testified that they did not understand what that reservation meant.[72]  According to Thelen, since

25   Marland had decided to "ride the horse" of the DOI's action, his interests were aligned with the

26

27   [70] *Id.* at 2-3.
     [71] *Id.* at 1.
28   [72] O'Neal Dep. 310:17-311:19; Carvill Dep. 98:12-101:1.

                                                    15

1   DOI's and there could be no actual conflict.[73]

2          Belgum who testified after Carvill, added the gloss that Brunswick's reservation was only

3   intended to apply if the AG pressed its disqualification motion and Thelen was actually

4   disqualified from representing both clients.[74]  But that begs the question of what Thelen is

5   permitted to do if an actual conflict arises later – as it did, such as when RoNo sought

6   reimbursement of expenses out of the funds allocated to settle the *qui tam* action, and the DOI

7   opposed RoNo's request.  According to Belgum the conflict waiver permitted Thelen to place the

8   DOI's interests ahead of RoNo's – and, indeed, permitted Thelen to appear in direct opposition to

9   the interests of its erstwhile client (RoNo) in the *same* action in which it had represented the client.

10         Thus Belgum reads the deleted language from Belgum's draft waiver right back into the

11  document, and give it precedence over the reservation that appears in Brunswick's cover letter.[75]

12  In fact, Belgum went a step further, claiming insisted that RoNo's motion for reimbursement of

13  expenses was a breach of some obligation RoNo owed to the DOI.[76]

**J.    The September 2001 Amendments Re-Confirm the June 1999 Fee-Sharing Percentages, Install Thelen as "General Counsel" to RoNo so that it can Continue Directing RoNo's Actions, and Make Brunswick "Associated Counsel" with Thelen.**

17         At the same time Thelen was obtaining the waiver, Fontana agreed that it was appropriate

18  to amend the parties' agreements to confirm that the fee-sharing percentages between Marland,

19  Thelen and Brunswick were the same regardless of which action the recoveries were received in,

20  and address some other issues that had arisen since 1999, particularly in response to the AG's

21  intervention.[77]  To do this, Fontana drafted twin agreements: an "Amendment to Attorney-Client

22  Agreement" and an "Amendment to Agreement to Associate Counsel" (referred to as the

23  "September 2001 Amendments").[78]  The September 2001 Amendments had three salient points:

---

[73] Carvill Dep. 100:12-23.
[74] Belgum Dep. 151-56.
[75] Belgum Dep. 157-58.
[76] Belgum Dep. 159-61.
[77] Fontana Dep. 472:22-473:17.
[78] Ex. 9 and 10, respectively.

16

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

- The fee-sharing formula in the February 1999 Attorney-Client Agreement was amended to the same 52.5%/47/5% ratio provided for in the June 1999 Agreement to Associate Counsel;

- Thelen was to substitute out as counsel of record in the RoNo action (i.e., the *qui tam* action), to be replaced by Beck DeCorso, but was appointed "general counsel" to RoNo; and

- The Attorney Client Agreement was amended to add Brunswick as a party to the agreement itself, and to recite that Brunswick was "associated with Thelen as counsel to Marland and RoNo."

The purpose of the revised fee-sharing percentages was clear: to ensure that Thelen's and Marland's shares were the same regardless of whether a recovery was obtained in one case or another (again, there was no disclosure of Marland's interest in having any recovery allocated to the *qui tam* action rather than the DOI action). But the timing of these amendments is significant. By September 2001, Thelen knew that the worst-case scenario it had envisioned in 1999 had been fulfilled, if not exceeded: Credit Lyonnais had been privatized and the "deep-pocket[ed]" defendants (including the French state and billionaire Francois Pinault) had hired scores of lawyers from a half-dozen top firms to mount a spare-no-expense, scorched-earth defense (hardly surprising, given the billions of dollars DOI was seeking). Several "copycat" lawsuits, including one by NOHLGA, had been filed. The AG's intervention and its attack on Thelen's dual representation raised the prospect of further delays and costs caused by friction between those two government agencies. And there was no immediate prospect of criminal indictments that might act as a *deus ex machina* to compel defendants to settle.

In short, Thelen knew well before September 2001 there was going to be no quick kill. Thelen knew as of September 2001 that any resolution might take years more time and millions more in fees. Knowing that, Fontana signed the Sept 2001 Amendments reaffirming the fee-sharing percentages from the June 1999 Agreement to Associate Counsel.[79]

The purpose of the general counsel provision was also clear: as Fontana testified, this allowed Thelen to direct RoNo's actions even though it had deflected the AG's conflict charges by

---

[79]  Carvill Dep. 20:1-8, 21:16-22:19.

17

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1. substituting in new counsel of record for RoNo in the *qui tam* litigation.[80]  Interestingly, Belgum

2. admitted that it would defeat the purpose of having another firm substitute in as counsel for RoNo

3. if Thelen continued to direct RoNo's actions.[81]  (Belgum was sensitive to this because he wrote

4. the June 2004 email to his partners noting that *"we continue to have a very serious conflict of*

5. *interest if we ever take the position that we represent RoNo and the Commissioner at the same*

6. *time."*[82])  For his part, Carvill testified that *his* understanding of the purpose of the "general

7. counsel" clause was simply to allow Thelen to take care of "tax matters" and the like for RoNo.[83]

8. But Carvill did not expressly confirm that understanding with Brunswick, did not draft the

9. September 2001 Amendments, and Fontana (who did) evidently had a broader view of Thelen's

10. role as RoNo's general counsel.[84]  And Thelen's responses to Marland's requests for admission

11. now establish that Thelen represented RoNo as its general counsel from December 2002 through

12. February 2005.[85]

13.

14.     The purpose of the final change – Brunswick's appointment as "associated counsel" with

15. Thelen – is disputed.  Thelen's 30(b)(6) witness again pleaded ignorance regarding the meaning of

16. the statement that Brunswick was associated with Thelen as counsel to Marland.[86]  Fontana

17. insisted that this provision did not mean what it said.[87]  On its face, however, the amendment

18. shows that Brunswick, who had already negotiated for his own 5% fee, paid equally by Thelen

19. and Marland, wanted to be co-counsel with Thelen in representing RoNo and Marland.

20. **K.     Shortly after the September 2001 Amendments, Thelen Seeks to Renegotiate its Fee;**

21. **Marland Responds Promptly; Thelen Delays, Changes the Deal, and then Brings in**
    **Carvill, who is Told to Negotiate the Best Possible Deal for Thelen.**

22.

23.     Less than two months later, in November 2001, Fontana and another Thelen partner told

---

[80]  Fontana Dep. 192:19-194:7.
[81]  Belgum Dep. 227-29.
[82]  Ex. 13.
[83]  Carvill Dep. 88:20-89:4.
[84]  Carvill Dep. 274:2-15; Fontana Dep. 311:5-11, 312:15-313:5.
[85]  Thelen's Responses to Marland's First Set of Interrogatories, No.1, at p. 4.
[86]  Carville Dep. 95:3-96:10.
[87]  Apparently because Brunswick did not become a Thelen associate or employee, which hardly exhausts the meaning of the word "associated." *See* Fontana Dep. 495:2-16.

18

1   Marland that it needed to renegotiate its fee agreement to ensure that it recovered a significant

2   portion of its lodestar in the event of a low recovery.[88]  Thelen has never claimed that anything

3   changed in the case after the September 2001 Amendments that would justify a renegotiation of

4   Thelen's fee.  Rather, Thelen simply decided it wanted a bigger fee, or greater assurance of

5   recovery in case of a small settlement, and told Fontana to renegotiate.

6          The record shows that Thelen approached this as a business negotiation, not an attorney-

7   client matter.  When Marland objected on principle to renegotiating Thelen's fee, Fontana's

8   partner wrote that it "truly made me want to throw up, these are the people who brought you the

9   Vichy Gvt."[89]  In a February 2002 memo, Fontana wrote that Marland "complained bitterly that

10  we were treating him as a "business partner" rather than as a client of the firm."[90] – a distinction

11  that Fontana, in his deposition, stated that he understood, but disputed, insisting that they were

12  entitled to treat Marland a business partner, albeit one who also happened to be a client.[91]

13         Marland nevertheless made a prompt counter-offer in December 2001 for Thelen to have a

14  larger percentage of a small recovery.[92]  Thelen then delayed responding, while it considered

15  whether to negotiate or simply resign, as O'Neal was urging.  Finally in April 2002, Thelen

16  responded to Marland's proposal, sending a draft amendment with a new provision for Thelen to

17  receive advance payment of up to 50% of its lodestar from the DOI.[93]  Marland responded by

18  raising a concern that such a provision might undermine Thelen's incentive to maximize its total

19  recovery, and there were further discussions.[94]

20         At this point – mid-May 2002 – Thelen management asked Carvill to take over.  Carvill

21  opened a new billing number, called Fee Advice, that was neither malpractice nor collection[95]

22  Carvill's instructions were simple:  *negotiate the best deal he could for Thelen*, keeping in mind

23  that different partners had different views of what was "best" for the firm (*i.e.*, larger net fee vs.

24

25  [88]  *See* Ex. 77.
    [89]  *Id.*

26  [90]  Ex. 80 at 2 n.2.
    [91]  Fontana Dep. 399:5-400:10

27  [92]  Ex. 115.
    [93]  Ex. 115.

28  [94]  *Id.*; *see* Belgum Dep. 268-73.
    [95]  Ex. 130; Carvill Dep. 318:8-320:15.

19

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

greater cash advances).[96]  Carvill was, however, clear that he was *not* instructed to negotiate an agreement that was reasonable for both sides,[97] nor to use his best own judgment to reach a new agreement.[98]  And Carvill definitely was not instructed to reach an agreement that was best for Marland while still giving Thelen an incentive to stay in the case rather than resign.[99]

**L.     Thelen Decides to "Be More Aggressive" with Marland in the Summer of 2002, and uses a Variety of Bad Faith Tactics To Achieve the Best Possible Deal for Thelen.**

An August 2002, slide show presentation from Thelen's Executive Committee (which ran the firm day-to-day) to Thelen's Partnership Council recommended that the firm "Be more aggressive w/Mr. X."[100]  This recommendation had the support of Carvill, Fontana, and Belgum.[101] (The same briefing memo stated that "Liability will be established despite Mr. X's failure to produce evidence."[102])  There were three ways for Thelen to "be more aggressive":

- Threaten to resign, imposing various deadlines to reach a new agreement;

- Use the DOI, claiming that it wanted Thelen to renegotiate its agreement with Marland, or that it might terminate any payments to Marland because he had destroyed his copy of the *portage* in July 2001, after Brunwick's offices, home and car were broken into;[103] and, most directly,

- Press Marland for his copy of the early *portage* between MAAF and Credit Lyonnais, and use his refusal to produce the document as leverage to claim he was not cooperating.

Thelen used each of these tactics in the summer of 2002.  Specifically,

- Thelen used three kinds of withdrawal threats:

    o In July 2002, Carvill sent a notice of termination of the February 1999 Attorney-Client Agreement – not because Thelen was actually resigning from the ELIC litigation, but because (as the notice stated) Carvill wanted to negotiating a *new* agreement;[104]

    o Beginning in about July 2002, Thelen repeatedly told Marland (and Brunswick) that it was urgent for the parties to reach a new agreement because if they did not Thelen would withdraw from the ELIC litigation -- although the August 2002

---

[96] Carvill Dep. 331:1-333:2.
[97] Carvill Dep. 328:11-329:11.
[98] Carvill Dep. 335:25-336:9.
[99] Carvill Dep. 335:19-24.
[100] Ex. 75 at 14.
[101] *Id.*
[102] *Id.* at 11.
[103] Marland Dep. 434:23-435:8.  Thelen does not dispute that these occurred.
[104] Ex. 35.

20

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

proposed waiting until a new Commissioner was elected in 2003 to actually seek DOI approval of a new agreement;[105] and

o  Thelen also told Marland that Fontana and Belgum might leave the firm and enter into a new agreement with the DOI, without compensating Marland at all.[106]

• Thelen also misused its relationship with the DOI in two ways:

o  From June through November 2002, Thelen referred to the need to disclose Marland's destruction of his *portage* to the DOI as if it were some sword of Damocles that might prompt the DOI to abruptly terminate its agreement with Thelen and Marland – *without disclosing that Carvill had already told DOI counsel LeVine by August 2002 that Marland did not have the document*;[107] and

o  Thelen repeatedly claimed that Marland was counsel to the DOI, and thus Marland's destruction of the document he said he would never produce was "spoliation", which created grave risks[108] – *even though Thelen has now admitted that it did not consider Marland to be counsel to the DOI, and LeVine testified that he was not concerned about Marland's document because the DOI had already "got the contracts separately" by January 1999.*[109]

• Shortly after Carvill was brought in, Thelen suddenly asked for Marland to give them his copy of the early *portage* – and Marland refused, explaining that could not do so because he had destroyed the document in July 2001.[110]

Each of these points is significant, but two bear particular emphasis. First, Thelen has told the Court that it terminated the attorney-client agreement "in part to effect an arms'-length negotiation of the [December 2002] agreement."[111] In other words, Thelen terminated the agreement so that it could have a freer hand in renegotiating the agreement. Indeed, the termination notice itself recites that it is a step in the process of reaching a new agreement, and Carvill later extended the effective date of his termination notice as a "goodwill gesture" to encourage Marland to agree to Thelen's terms for that new agreement. Thelen's position is, apparently, that it was entitled to negotiate in that way because the new agreement would not include an attorney-client relationship. However that point was not clear from the notice, and in any event that is not what happened – Carvill admitted, reluctantly, that the December 2002

---

[105]  See Ex. 75 at 12, 13. Carvill testified that the only firm deadline he was ever given by management was for an agreement with the DOI in February 2003. Carvill Dep. 270:11-272:24.
[106]  Marland Dep. 167:15-168:13.
[107]  Ex. 116, 117, 123 (each of these documents was withheld as "privileged", and only produced in response to the Court's February 21, 2007 Order).
[108]  Ex. 45.
[109]  LeVine Dep. 35-36.
[110]  Carvill Dep. 363:1-12.
[111]  1/3/07 Tr. at 19.

21

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1    Agreement reinstated Thelen's role as "general counsel" to RoNo.

2         Second, the closer one looks at Thelen's request for Marland's document, the more it

3    appears to be a setup, to pressure Marland about a document Thelen had told him he would not

4    have to produce and did not expect him to ever produce. But *even assuming* the request was *bona*

5    *fide*, Thelen used this admission as a cudgel to pressure Marland to reduce his compensation:

- Carvill claimed that Marland had breached some representation to the DOI that the document was available, ignoring Fontana's advice in May 1999 that Marland would not have to produce the document if he did not want to.

- Carvill claimed that because Marland's destruction of the document "destroyed his value as a witness", it was "tantamount to his being unable or unwilling to testify", and thus justified invoking the 50% fee reduction in the Side Letter Agreement.[112] This gets things precisely backwards: Thelen never intended Marland to testify, the Side Letter Agreement provided for a reduction in his fee if he refused to testify *even without* having to produce the document, and the Side Letter Agreement itself undermined Marland's credibility by appearing to pay him for testifying.[113]

- Carvill claimed that Marland was counsel to the DOI and had endangered the DOI's legal position by engaging in "spoliation."[114] But Thelen now admits that Marland was *not* counsel to the DOI.

- Carvill repeatedly stated that the parties had to reach a new agreement so that they could disclose the "document situation" to the DOI, and suggested that the Commissioner might fire Thelen and Marland[115] – without disclosing that Carvill had told LeVine by August 2002 that Marland did not have the document.[116]

Carvill's tactics succeeded in getting Marland and Brunswick to agree to an amendment

that included the following terms: (a) the European Counsel's percentage of any recoveries was

reduced from 52.5% to 35% -- as the DOI's LeVine noted to Carvill, quite a chunk of the

recovery; (b) Thelen would resume its role as RoNo's general counsel pursuant to the September

2001 amendment to the February 1999 Attorney-Client Agreement; (c) Thelen agreed to represent

Marland in the event that any defendant tried to block any payments due to Marland, up to

---

[112] Ex. 64 at M2020 ¶ 1.
[113] Marland Dep. 501:24-502:15.
[114] Ex. 43 ¶ 9.
[115] *E.g.*, Ex. 43 at p.1 ¶ 6.
[116] Ex. 116, 117, 123. In October 2002 Carvill noted that LeVine had been told that Marland was not going to produce the document – but even this lacked the clarity of Thelen's internal memos, which noted that LeVine had been told flat-out that Marland "does not have the document."

22

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1   $100,000 in fees; (d) the parties exchanged releases; and (e) the agreement would be presented to

2   the Commissioner of the DOI, and *"the effectiveness of this entire Agreement is conditioned on the*

3   *Commissioner providing his consent."* (emphasis in the original).[117]

4

5   **M.    Thelen has Disavowed Any Claim that the Release in the December 2002 Agreement
           Complies with the Rules of Professional Conduct, and the DOI has Made Clear that it
6          Only Approved the Fee-Sharing Agreement in the December 2002 Agreement.**

7        Stephen O'Neal and Wynne Carville were designated as Thelen's 30(b)(6) representatives

8   regarding its understanding of the parties' agreements.  O'Neal testified at length regarding his

9   experience as a litigator and his understanding of the broad sweep of release clauses in general,

10  but when asked if the release at issue sufficed to constitute a valid release of claims by a client

11  against his or her counsel – the very issue before the Court – he had no answer.[118]

12       Carvill declined to testify on behalf of Thelen regarding its interpretation of the release, but

13  Thelen has stated that it intends to be bound by his understanding at the time he drafted the

14  agreements,[119] and on that point, Carvill testified that when he drafted the release he was operating

15  under the assumption that Thelen was going to terminate its representation of Marland, and he did

16  *not* draft the release to be effective in the context of an ongoing attorney-client relationship.[120]

17  Upon reflection, Carvill added that he did *not* believe the language of the release clause was

18  sufficient under California law to constitute a valid release in an ongoing attorney-client

19  relationship.[121]

20       In short, Thelen is not claiming (or, at least, should be precluded from claiming) that the

21  release in the December 2002 Agreement is valid under the Rules of Professional Conduct for

22  ongoing attorney-client relationships – notwithstanding (a) Carvill's admission that the December

23  2002 Agreement reinstated Thelen as general counsel to RoNo; (b) the recital in the agreement

24  itself that it was effective as of July 2002; and (c) the provision in the agreement for Thelen to

25

26  [117] Ex. 11 at C.2(a).
    [118] *Compare* O'Neal Dep. 326:22-333:4 *with* O'Neal Dep. 333:5-22; *see also* O'Neal Dep. 297:5-
27  298:7 (declines to testify on Thelen's behalf regarding other aspects of the release).
    [119] 1/3/07 Tr. at 9-10.
28  [120] Carvill Dep. 168:17-170:17; *see also* 151-52.
    [121] Carvill Dep. 170:18-171:10.

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

23

represent Marland in the future if any defendants sought to block payments to him.

**N. Apart from the December 2002 Agreement, Thelen Never Purported to Terminate the June 1999 Agreement to Associate Counsel, as Amended on September 2001.**

The December 2002 Agreement recites that it is intended to supercede all previous agreements between the parties (though the specific agreement to re-instate Thelen as general counsel to RoNo takes precedence over this general recital). However, apart from the December 2002 Agreement, there is no other document reflecting a rescission or amendment of the June 1999 Agreement to Associate Counsel, as amended in September 2001.

On the contrary, the December 3, 1999 consent letter that Thelen drafted for the DOI to sign, approving Thelen's payment of 52.5% of its fees to the European Counsel, refers to them as "various attorneys in Europe who assisted in the initial development of the case."[122] There is nothing in that consent which suggests that the June 1999 fee-sharing agreement was conditioned on future work and assistance from the European Counsel. Thus if the December 2002 Agreement is void or unenforceable, the June 1999 Agreement, as amended in September 2001, becomes the operative agreement among the parties.

**O. Going Beyond Even its Counter-Counterclaims, Thelen Withholds over $600,000 Due to European Counsel under Thelen's own Reading of the December 2002 Agreement.**

Thelen has asserted counter-counterclaims against the European Counsel on the theory that if the December 2002 Agreement is void, then it is entitled to litigate whatever claims it had prior to signing that agreement. Even if that is correct, however, it does not mean that Thelen starts on a blank slate, ignoring the June 1999 Agreement. Nor can Thelen ignore the plain terms of the December 2002 Agreement, which states that in the event of a dispute over the amounts owed, Thelen is obligated to pay the undisputed portion of the funds.

Yet since last summer (before filing its counter-counterclaims), Thelen has admitted to withholding $612,500 due and payable to the European Counsel under the December 2002 Agreement, on the theory that *if* Marland prevails on his claim to void that agreement, Thelen is

[122] Ex. 7.

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

then free to ignore the June 1999 Agreement and not pay a dime to European Counsel until some unspecified future date. This "heads I win, tails you lose" approach is documented in an exchange between counsel.[123] According to Thelen, if Marland succeeded in his claims, he could end up with *less* money than if he lost – *and* Thelen is entitled to withhold money that, under its reading of the parties' agreements, is due and payable to Marland until Thelen loses on its Counter-Counterclaims.

## P.    Thelen Was On Notice of Marland's Claims from at Least February 2006, Within the Statute of Limitations, But Waited to File Affirmative Counter-Counterclaims Against Marland until After the Statute of Limitations Ran.

The evidence shows that Thelen was told in June 2002 that Marland had destroyed his copy of the portage in July 2001, and that Thelen considered suing the European Counsel him as early as 2001 over what Fontana felt was an insufficient level of cooperation.[124] Thelen's supplemental privilege log described several documents concerning the implications of paying the European Counsel their share of the settlement funds that Thelen received. The fact is that Thelen was aware, from early 2005 at least, of possible litigation over the validity of the December 2002 Agreement, and chose not to file a declaratory judgment *before making the payments* to confirm the parties' rights and obligations. Instead, Thelen chose to wait until October 2006 – after its motion to dismiss Marland's counterclaims was denied – to file its Counter-Counterclaims, seeking an affirmative recovery from the European Counsel based on facts known to Thelen more than four years before.

## III.    ARGUMENT

A moving party may prevail on summary judgment where it can show the absence of evidence on an essential element on which the opposition has the burden of proof.[125] Thelen, as the party seeking to enforce the 2002 Agreement, has the burden of proving that the conditions precedent to the contract were fulfilled. Thelen also has a heavy substantive burden: in

---

[123]  Ex. 136.
[124]  Fontana Dep. pp. 699:12-700:15.
[125]  *Nissan Fire and Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir. 2000).

25

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

California, as in most states, a change in the economic relationships between attorney and client to

the attorney's advantage is *presumed* void and unenforceable unless the attorney can establish that

(1) all of the disclosure and other requirements of Rule 3-300 of the California Rules of Professional Conduct ("CRPC") are satisfied,[126] and

(2) In the case of an increase in compensation for an existing engagement, the fee agreement is

(a) fair and reasonable in accordance with Rule 3-300;[127]

(b) for services not already falling within those contemplated by an existing fee agreement;[128] and

(c) supported by genuinely new consideration.[129]

The latter three requirements will be dealt with in Section B.3. But the Court need not

reach the lack of evidence on those three points, because Thelen has no evidence that it met the

disclosure requirements of Rule 3-300. Indeed, Thelen cannot even prove that it fulfilled all the

conditions precedent to the contract.

**A. The December 2002 Agreement Is Unenforceable Because Thelen Failed To Make The Necessary Disclosures And Failed To Obtain The Doi's Consent To The "Entire Agreement", Both Of Which Were Express Preconditions To The Agreement's Effectiveness.**

> **1.  The Agreement Goes Beyond the Customary Fee-Splitting Requirements, Requiring Disclosure of the Background Circumstances to the DOI and the DOI's Consent to "this Entire Agreement."**

Marland is eager to have a jury consider the facts and circumstances of Thelen's conduct,

but that is not necessary for the Court to find that the December 2002 Agreement is unenforceable.

Section C.2(a) of that Agreement states, in full (emphasis in the original):

> Disclosure and Consent: the Parties expressly acknowledge that the fee splitting terms of this Agreement shall be disclosed to the Commissioner, that the circumstances leading to this change shall be disclosed to the Commissioner and that his consent to this Agreement shall be sought as part of an effort to obtain his agreement to pay Advances as provided in paragraph B above. The effectiveness of this entire Agreement is conditioned on the Commissioner providing his

---

[126] *BGJ Associates, LLC v. Wilson,* 113 Cal. App. 4th 1217, 1229-30 (2003).

[127] *Hunniecutt v. State Bar,* 44 Cal. 3d 362, 372-73 (1998) (Predecessor provision to 3-300).

[128] *Severson & Werson v. Bollinger,* 235 Cal. App. 3d 1569, 1572 (1991). *See also, Jordan v. Ray Schools-Chicago,* 49 Ill. App. 2d 1, 8 (1964).

[129] *Denton v. Smith,* 101 Cal. App. 2d 841, 844 (1951).

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1  consent.[130]

2      This goes beyond the usual fee-splitting agreement in two ways: it requires disclosure to

3  the Commissioner of "the circumstances leading to this change" and requires the Commissioner's

4  consent "to this Agreement" -- not "the fee splitting terms of this Agreement." The two adjacent

5  provisions are obviously connected, and their intent is clear: instead of obtaining the usual client

6  approval of a fee-sharing agreement, the parties agreed to disclose *why* the fee-sharing agreement

7  had changed and obtain the DOI's approve of the "entire agreement", including the releases.

8      This approach made sense given the fact that – as Thelen appears to insist, even now – that

9  the releases constituted bargained-for consideration between the parties that inextricably

10  intertwined with the revised fee-sharing ratios. And indeed there were other economic terms

11  between Thelen and Marland in the agreement (*e.g.*, Thelen's agreement to represent Marland in

12  the future at no charge, up to $100,000 in fees, if a defendant sued to block any payments to

13  Marland), and terms that could be deemed to have an economic value (such as a reference to the

14  circumstances under which Marland would testify). Given the intertwined nature of these

15  provisions, it was entirely reasonable for the parties to agree that the Commissioner approve the

16  "entire agreement", and not just the fee-sharing provision, for the agreement to take effect.

17      The facts here show that (a) Thelen did not make the disclosures referred to in Section

18  C.2(a), and (b) the DOI declined to approve anything in the agreement other than the fee-sharing

19  clause. Because these conditions precedent were not fulfilled, the December 2002 Agreement did

20  not take effect, and the agreement is unenforceable by Thelen.

21      **2.  Instead of Disclosing the True Circumstances to the DOI, Thelen Concealed the
22  Side Letter Agreement and its Advice to Marland and Misled the DOI.**

23      Thelen's discovery responses admit that it never gave the Side Letter Agreement to the

24  DOI, nor communicated the substance of that agreement to the DOI. Thelen also never told the

25  DOI that it knew from June 1999 onward that Marland was not going to produce the document.

26  Instead, Thelen told the DOI the *opposite*: that Marland had breached an obligation he had to

27  produce his copy of the portage to Thelen. Thelen thus did not honestly disclose "the

28  ─────────────
[130]  Ex. 11 at 7.

27

circumstances leading to" the change in the fee-sharing percentages to the Commissioner.

### 3. The DOI Made Clear it Was not Approving Anything in the December 2002 Agreement other than the Revised Fee-Sharing Ratios.

Gary Cohen has served as the DOI's General Counsel since early 2003, and he signed the 2004 consent that Thelen omitted from its initial pleadings. That consent, and Cohen's deposition testimony, makes clear that the DOI was not approving the entire agreement, but only the specific fee-sharing clause in the agreement:

> The California Department of Insurance ("CDOI") has reviewed the New Agreement to Associate Counsel entered into December 8, 2002 between Thelen Reid & Priest and certain other parties referred to collectively therein as European Counsel (the "Agreement"), a copy of which is attached hereto.

> CDOI hereby gives its consent, pursuant to Rule 2-200 of the Rules of Professional Conduct of the State Bar of California, to the fee sharing agreement contained in the Agreement.

Cohen's testimony confirms this view. Cohen testified that while he has been at the DOI, it has taken no position regarding Thelen's agreements with Marland, believing those to be a matter between Thelen and Marland.[131] When Belgum asked Cohen to sign the consent in mid-2004, Cohen first added numerous *disclaimers* stating that the DOI was not expressing any opinion regarding any aspect of the agreement. After Belgum provided authority for the position that those disclaimers were not necessary, Cohen agreed to sign the consent without the disclaimers -- because he was satisfied that they were not necessary and that his "consent" was nothing more than the minimum consent required under Rule 2-200.[132]

Under California law, a condition precedent in a contract must be fulfilled for duties under the contract to attach.[133] If a contract states that it conditioned upon the approval of a third party, that approval is an essential part of the *formation* of the contract itself – the contract only becomes valid upon the approval of the third party.[134] In one well-known case, the court analyzed a series of contracts that each contained the following clause:

[131] Cohen Dep. 33.
[132] Ex. 101, 102; Cohen Dep. 130-33.
[133] *See, e.g.*, 1 B. Witkin et al., SUMMARY OF CALIFORNIA LAW, Contracts § 776 (10th Ed. (Westlaw version) 2007) ("A condition precedent is an *act* that must be performed or an uncertain *event* that must happen before the promisor's duty of performance arises.").
[134] *Los Angeles Rams Football Club v. Cannon*, 185 F.Supp. 717, 722 (S.D. Cal.1960).

28

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

> This agreement contains the entire agreement between the parties and there are no oral or written inducements, promises or agreements except as contained herein. This agreement shall become valid and binding upon each party hereto only when, as and if it shall be approved by the Commissioner.[135]

The court held that until the Commissioner's approval was obtained, the "contract" was not valid, because the condition of approval was clear-cut and specific:

> This clause is too definite to be ignored. It jumps out at you. The words employed are too strong to permit of ambiguity. Their selection was obviously made with great care so that there would be no dispute about their meaning, and this court attaches to them the only meaning it can- that is, that the agreement shall only become valid and binding if, as and when approved by the Commissioner.[136]

Since Thelen has failed to obtain the Commissioner's consent to the 2002 Agreement (as opposed to merely the fee-sharing provision therein), the 2002 Agreement is not valid. This conclusion is bolstered by more recent cases.[137]

### 4. Thelen's Own Documents Refute its Initial "Ratification" Argument.

The problem for Thelen is that if that minimal consent satisfied Section C.2(a) of the Agreement, the entire clause would be superfluous, since Rule 2-200 requires, at a minimum, client consent to a fee-sharing agreement.[138] That is presumably why Thelen skirted the entire issue in its Complaint, omitting Cohen's consent and relying on a "ratification" argument as the basis for enforcing the December 2002 Agreement. But that ratification argument has been refuted by the facts, as discussed below, in connection with Thelen's Counter-counterclaims.

///

---

[135] *Id.* at 721.

[136] *Id.* at 722.

[137] *In re Washington Trust Deed Service Corp.*, 224 B.R. 109 (9th Cir. B.A.P. 1998), held that a bankruptcy trustee who repudiated an agreement which was conditioned on the bankruptcy court's approval could not be held to have breached the subject contract where the approval was refused:

> California courts have stated that when two parties execute a contract with the understanding that the approval of a third party is necessary for the agreement to take effect, the contract is not complete until the third party has approved. Until that happens neither party is bound by the agreement.

*Id.* at 114 (citing *Santa Clara-San Benito Chapter of Nat'l Elec. Contractors' Ass'n v. Local Union No. 332*, 40 Cal.App.3d 431, 436, 114 Cal.Rptr. 909, 912 (1974)) (internal quotations omitted, emphasis added).

[138] Given the intertwined nature of the economic and other terms in the agreement, Rule 2-200 might well require approval of more than just the fee-sharing ratio. The Court need not reach this issue, however, because the parties agreed to require approval of the entire agreement.

29

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

**B.      Thelen Has Not Pled And Cannot Prove That It Made The Disclosures To Marland Required By Rule 3-300 Of The Rules Of Professional Conduct Before Seeking Consent From The Doi To The December 2002 Agreement.**

Thelen has never contended and has offered no evidence that it provided Marland any guidance as to the flagrant conflicts, questionable legality and patent unfairness of its dual representation and negotiations leading up to the December 2002 Agreement. Instead it appears to rely on the fact that Marland was advised to consult with Brunswick before agreeing to accept a reduced share, and warranted that he did so.[139] Thelen has also contended that such rules do not apply to Marland because his attorney-client relationship had terminated in mid-2002 and he became a business partner in the litigation.[140]

Neither argument avoids the effect of failing to comply with the disclosure requirements of Rule 3-300. To satisfy that Rule, at any stage at which there is a potential or actual adverse interest benefiting the attorney, a full panoply of disclosure requirements arise. The attorney must give "all that reasonable advice against himself that he would have given him against a third person."[141] Thus, the court in *BGJ Associates* expressly rejected the argument that an attorney satisfies the requirement that he self-evaluate his potential fiduciary breaches and the fairness of transaction by passing the buck to independent counsel.[142] Had Thelen passed on its own self-dealing it would have disclosed not only the many facts described above that had been misrepresented and concealed but provided opinions at each critical point as to:

1.  The potential economic effects of each revision and how each change could potentially benefit and/or prejudice attorney and client under various scenarios;

2.  That, under *Severson* (discussed *infra*), because Thelen had never reserved the right to increase its fees based on changed circumstances, the proposed changes in the fee sharing arrangements were not enforceable under California law;

3.  That even where an express right to renegotiate fees is reserved, unanticipated difficulties in the prosecution of a case are not considered adequate consideration to increase a contingency percentage;

---

[139] Thelen Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction p. 8, 23-25.
[140] *Id.* at p. 14, 1-5.
[141] *BGT Associates, supra,* 113 Cal. App. 4th 1229, *quoting, Beery v. State Bar,* 43 Cal. 3d 802, 813 (1987).
[142] *Id.* at 1226.

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

4. That the changes Thelen was requesting were presumptively invalid and the product of fraud and duress under Probate Code Section 16004.

Thelen has never pled, nor contended, nor produced evidence that it provided advice to Marland on the fairness or lawfulness of the modifications leading up to the December 2002 Agreement. Marland testified that he agreed not because he received balanced and fair legal advice from Thelen, but because they extorted the agreement by threatening to withdraw and making false assertions as to the DOI's position and Marland's own status as "counsel to the Commissioner".[143]

Nor is the alleged termination of the client relationship relevant. First, the termination of the *qui tam* engagement did not terminate the overall attorney-client relationship – which even Carvill's termination message indicates he was seeking to re-negotiate, not end; the RoNo relationship was either never terminated, or was terminated in September 2002 and then reinstated in December 2002, effective as of July 2002.

Second, the Rule 3-300 requirements applied at the outset and through all negotiations to change the relationships.[144] Courts have consistently rejected the assertion that a firm can drop a client like a "hot potato" to evade the adverse interest requirements.[145] And even a formal and complete termination of an engagement does not relieve an attorney of his duties under the adverse interest rules when he continues to have dealings with the former client as to the recovery covered by the prior engagement.[146] Because there was gross non-compliance with the disclosure requirements of Rule 3-300, the 2002 Agreement is void.[147]

**3. Thelen Has Not Pled And Cannot Meet Its Burden Of Proving That The 2002 Agreement Was Fair, Reasonable, And Supported By Adequate Consideration.**

Amendments to attorney-client agreements during an ongoing representation are "subject to special scrutiny."[148] "A transaction between an attorney and client which occurs during the

---

[143] *Drake v. Becker*, 303 N.E. 2d 212, 216-17 (Ill. App. Ct. 1973) (Agreement procured through threats to withdraw void.)
[144] Declaration of Richard Zitrin, submitted herewith, at ¶¶ 5-6.
[145] *Flatt v. Superior Court*, 9 Cal. 4th 275, 284-85 (1994).
[146] *Hunniecutt v. State Bar*, 44 Cal. 3d 362, 371-72 (1988).
[147] *BGJ, Associates Ltd.*, 112 Cal. App. 4th at 1231.
[148] Restatement (Second), The Law Governing Lawyers, § 18 comm. e (citing Restatement Second, Contracts, § 89(a)).

31

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1   relationship and which is advantageous to the attorney is presumed to violate that fiduciary duty

2   and to have been entered into without sufficient consideration and under undue influence."[149]

3     Thelen's Complaint and Amended Complaint avoided alleging that the December 2002

4   Agreement was an objectively fair and reasonable amendment to the parties' prior agreements –

5   either the 1999 agreements or the September 2001 Amendments.  The principal consideration

6   Thelen's witnesses pointed to in support of the 2002 Agreement is the assertion that Thelen would

7   resign if Marland did not reduce his share, which is not valid consideration as a matter of law.[150]

8     Every fee agreement from 1999 forward contemplated the same basic objective – a

9   recovery for Thelen and Marland from the perpetrators of the ELIC acquisition fraud.  In no

10  instance did Thelen reserve the right to increase its fees based on foreseen or unforeseen

11  difficulties in prosecuting the claims inclusive of Marland's unwillingness or inability to produce

12  the *contrat.*

13    High percentage contingency fee contracts are allowed in the first instance precisely

14  because there are wide potential swings in the fortunes of the case, a substantial element of risk

15  and long periods of unreimbursed work.[151]  By the same token, unless an attorney reserves the

16  right to increase fees based on extra work, he has absolutely no right to do so.[152]  Although the

17  leading case deals with hourly fee agreements, California also recognizes that an attorney has no

18  right to seek a rate increase after the fee for the engagement has already been established, unless

19  he unambiguously reserves the right to do so.[153]

20    Moreover, even if Thelen had reserved the right to increase its fee, there would be no

21  recognized additional consideration.  Even unforeseen difficulties do not qualify as new

[149]  *BGJ Assocs., LLC v. Wilson*, 113 Cal. Ap. 4th 1217, 1227 (2003) (internal quotations and citations omitted); *Denton v Smith*, 101 Cal App 2d 841 (1951).
[150]  *See* Cal. Civ. Code § 1605.  The presumption of undue influence in all contracts created after a fiduciary relationship arises was found in Cal. Civ. Code § 2234, now Probate Code §§ 16002 and 16004.  The presumptions apply with equal force and effect to attorneys.  *BGJ Associates*, 113 Cal App 4th at 1227.
[151]  *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001); *Rader v. Thrasher*, 57 Cal. 2d 244, 253 (1962).
[152]  *Dordovitch v. Haltzman*, 190 F.3d 125, 142-43 (3d Cir. 1999); *Goldstein & Price v. Tonkin & Mondli*, 974 S.W. 2d 543, 548 (Mo. App. 1998); *Jordan v. Ray-Schools Chicago, Inc.*, 199 N.E. 2d 827, 829 (Ill. App. 1964); *Miller v. Solomon*, 199 N.E. 2d 660, 666 (Ill. App. 1964).
[153]  *Severson & Werson v. Bollinger*, 235 Cal.App. 3d 1569, 1572 (1991).

32

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1    consideration.[154]  Here the unavailability of the *contrat* was not only foreseeable but an agreed

2    term of the engagement.  Moreover, under principles of mutuality of contract, some genuinely new

3    and unanticipated legal work would have to be undertaken to establish consideration from

4    Thelen's perspective.[155]  Again the same unified engagement covered by the 1999 Agreement was

5    simply re-negotiated on better terms for Thelen in 2002.

6          Finally, modified agreements negotiated in the face of threats to withdraw are deemed

7    unenforceable as a matter of law.[156]  For all of the foregoing reasons, Marland submits Thelen can

8    not carry its burden of proving the agreement was fair and reasonable as required by Rule 3-300

9    and Section 16004 of the Probate Code.

10          Instead of meeting its burden under the law as a fiduciary, Thelen is apparently going to

11    argue instead that it was *not* bound by the Rules of Professional Conduct, or indeed any fiduciary

12    obligations, when it renegotiated its agreements with Marland in the summer of 2002: as Fontana

13    put it, Thelen was entitled to treat Marland as a business partner, *not* a client.  The reasons that

14    argument is legally wrong have been discussed above.  To reiterate, an attorney has no privilege to

15    terminate a relationship to free himself of the conflict rules.[157]  Moreover, there were multiple

16    failures to comply with Rule 3-300 in the negotiations leading up to the purported termination.[158]

17    Third, the relationship was not terminated and even when a relationship is terminated all the

18    ethical rules continue to apply as to any recovery that was the subject of the original

19    relationship.[159]

20          In any event, Thelen's position raises a clear legal issue:  Whether Thelen was bound by

21    the Rules of Professional Conduct (and Civil Code § 1605, and Probate Code Sections 16002 and

22

---

23    [154] *Heller, Horowitz & Feit, P.C. v. Stage II Apparel Corp.*, 704 N.Y. 2d 240, 241 (2000); *Jordan, supra*, 199 N.E. 2d at 829.

24    [155] *See, Bradner v. Vasquez*, 41 Cal. 2d 147, 149-51 (1954); *Denton, supra*, 101Cal. App. 2d at

25    844.

26    [156] *See, In re Hefron*, 771 N.E. 2d 1157, 1162 (Ind. 2002); *In re Thayer*, 745 N.E. 2d 207, 212 (Ind. 2001); *FMG of Kansas City, Inc.*, 861 P.2d 830, 842-43 (Kan. App. 1993); *Drake, supra*, 303 N.E. 2d at 216-17.

27    [157] *Flatt v. Superior Court*, 9 Cal. 4th 275, 284-85 (1994).

28    [158] *Hunniecutt v. State Bar*, 44 Cal. 3d 362, 372-73 (1998); *Zitrin Decl.* ¶6(a)-(c).
[159] *Zitrin Decl.* ¶6(d).

33

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

16004) in negotiating its new agreement with Marland in 2002. This issue is particularly
appropriate for summary judgment because (a) parties' relationship is defined by a limited set of
agreements whose authenticity is undisputed; (b) Thelen's motives are largely undisputed –
Thelen's counsel told the Court that Carvill terminated the original Attorney-Client Agreement so
that he could negotiate a new agreement at "arms length", and Carvill was clear that his goal was
to negotiate the best possible new deal for Thelen, not an objectively fair or reasonable agreement;
and (c) Thelen (through its 30(b)(6) witnesses) has not claimed that the release clause in the 2002
Agreement complies with the Rules of Professional Conduct regarding releases in an ongoing
attorney-client relationship.

Thus the Court can, and should, decide the question of Thelen's status and obligations
under the Rules of Professional Conduct in 2002 as a matter of law.

**C.    Thelen's Counter-Counterclaims Are Contrary To The Facts, Fail To State A Claim, And Barred By The Statute Of Limitations.**

Thelen has insisted that its counter-counterclaims, for declaratory judgment and money had
and received, are not actually some attempted end-run around the statute of limitations on claims
that Thelen knew about in July 2002, but chose not to assert until October 2006. Assuming that is
true, the gist of Thelen's "money had and received" counter-counterclaims is simple: *if* Marland
prevails in voiding the release clause in the December 2002 Agreement, or the entire agreement,
*then* Marland should be required to repay all the money he and the other European Counsel have
received, because (Thelen claims) that money was paid pursuant to the 2002 Agreement.

This assertion is now disproved: copies of the wire payment instructions, attached to
Thelen's summary judgment motion, show that the funds (wired to Maas, not Marland) were
described as "Executive life Settlement"; not payments "pursuant to" one or another agreement.[160]
They are therefore insufficient to support the assertion that Marland "ratified" the December 2002
Agreement by allowing Maas to accept an unspecified payment.

Even if there had been some ratification of payments "pursuant to" the 2002 Agreement, that

---

[160]   *See* Declaration of Roger J. Robles in Support of Thelen's Motion for Partial Summary
Judgment, March 9, 2007, Ex. C (wire transmission information).

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1    would have been because Thelen told the European Counsel that the 2002 Agreement had been

2    approved by the Commissioner, notwithstanding the Commissioner's limited consent, noted

3    above. In short, any "ratification" or acceptance of payments "pursuant to" the 2002 Agreement

4    was based entirely on Thelen's representations, which were incorrect.

5         Thelen is also wrong on the law. Money had and received is a "common count" cause of

6    action; it is applied to situations "where one person has received money or its equivalent under

7    such circumstances that in equity and good conscience he ought not to retain it and which *ex*

8    *aequo et bono* belongs to another." *Philpott v. Superior Court*, 1 Cal.2d 512, 523 (1934). Witkin

9    states that the claim may apply where a contract is "void",[161] but the cases show that this refers to

10   situations in which defendant received money "for the use of the plaintiff",[162] and the services

11   were *not rendered* because the contract was void.[163] In short, a claim for money had and received

12   requires that the defendant (a) received funds for the benefit of, or on account for, the plaintiff, (b)

13   did *not* pay over the funds or render the services promised, and thus (c) in equity and good

14   conscience should not be allowed to keep the funds. Thelen cannot meet *any* of these prongs:

15       (a)   The funds were not paid on account for, or for the benefit, of Thelen; they were paid by
16       Thelen in exchange for past consideration received from Marland – *i.e.*, his agreement in
         1999 – to allow Thelen to represent the DOI, and abandon his own *qui tam* action.

17       (b)   The funds in question were paid in 2005 and 2006 – after discovery was closed, and
18       indeed after the trial; there was *no* expectation that the European Counsel was supposed to
         *do* anything with the money for Thelen's benefit.

19       (c)   Thelen apparently intends to argue that if Marland prevails on his claims – *i.e.*, if the
20       Court finds that Thelen breached the Rules of Professional Conduct, or the 2002 Agreement
         was void for lack of consideration, Marland has to *pay back* money he already received,
21       which he would be allowed to keep if the 2002 Agreement were valid. In other words, if
         Marland wins, he loses. Whatever the merits of Thelen's position as a matter of contract
22       law, Thelen cannot seriously claim that *equity and good conscience* support such a result.

23   In short, the facts here do not support a claim for money had and received; even if they did, the

24   claim would not lie because equity and good conscience would not countenance the result.

25   _____

26   [161]  4 Witkin, *Cal. Procedure*, Pleading, § 522, p. 612.
     [162]  *Schultz v. Harney*, 27 Cal. App. 4th 1611, 1623 (1994).
27   [163]  *E.g.*, *Smith v. Randall*, 51 Cal. App. 2d 195, 196-97 (1942) (plaintiff stated a claim for money
     had and received because he had paid money to buy securities and the contract for sale of
28   securities was void). By contrast, courts have long held that when payment is made pursuant to a
     mistake of *law* regarding whether a payment is required, the cause of action will not lie. *Bilbie v.
     Lumley*, 2 East 469, 102 E.R. 448 (1802), *Brisbane v. Dacres*, 5 Taunt. 143, 128 E.R. 641 (1815).

35

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

1    The facts also confirm that Thelen's claim for a declaratory judgment is untimely.[164]  The

2  Court indulged Thelen at the pleading stage, but we are now at summary judgment, and it is clear

3  that Thelen had notice of the relevant "facts" more than four years before Thelen's October 2006

4  counter-counterclaims.  Thelen's pleadings apparently tried to bring its claims within the four-year

5  statute of limitations for breach of contract, by referring to statements in a November 2002 letter

6  from Marland, but the facts show that Thelen knew in *June* 2002 that Marland had destroyed his

7  copy of the portage, and Carvill discussed this with Marland in person in *July* 2002.[165]

8    Moreover, if the scores of documents on Thelen's supplemental privilege log (dated March

9  6, 2007) signify anything, it is that Thelen was well aware from February 2005 onward that

10  Marland might sue to challenge the 2002 Agreement.  Thelen made a deliberate choice not to

11  bring a declaratory judgment action *before* it paid the millions of dollars that it now seeks to claw

12  back, and it is simply too late for it to do so now.  Thelen's declaratory judgment claim is

13  therefore time-barred and should be dismissed.

14  **D.    Thelen Is Liable As A Matter Of Law For The Difference Between The Fees Payable**

15  **Under The June 1999 Agreement And The December 2002 Agreement, And In Any**
   **Event Should Be Ordered To Pay The $612,500 It Has Withheld Since July 2006.**

16    If the Court holds that the 2002 Agreement is void for any of the reasons set forth above,

17  and dismisses Thelen's counter-counterclaims, then the parties' rights are governed by the June

18  1999 Agreement to Associate Counsel and the Attorney-Client Agreement, as amended in

19  September 2001– *i.e.*, 52.5% of the fees Thelen has received to date.  The only issues that would

20  be left for trial are Marland's claims for damages and forfeiture of Thelen's fees beyond the

21  amounts due under the June 1999 Agreement, and Thelen's affirmative defenses to those claims.

22    In the alternative and at a minimum, the Court should enter summary judgment that Thelen

23  is obligated to pay the European Counsel the $612,500 that Thelen has admitted it owes the

24  European Counsel under the 2002 Agreement, plus interest, which it has been withholding since

25

26  _____
[164]  Thelen first asserted this claim as expressly seeking a declaration of the parties' rights as of
27  *December 2002;* when Marland pointed out the legal defect in such a claim, Thelen hurried to
withdraw and amend its pleading, and then re-pled it with only minor word changes, but now re-
28  cast as seeking a declaration of the parties' rights and obligations as of 2007.
[165]  *See* Ex. 114.

1   last summer. Thelen's withholding of these funds is flatly contrary to Section B.2(b) of the 2002

2   Agreement, which states that "[i]n the event of a dispute between the parties regarding such

3   payment, TR&P shall immediately pay to the EC [European Counsel] any and all undisputed

4   amounts." Since Thelen claimed that the 2002 Agreement is the operative agreement, and

5   Marland was claiming that Thelen owed the European Counsel more than what was due under that

6   agreement, there would seem to have been no dispute that Thelen should have paid the $612,500 –

7   particularly since at the time Thelen withheld the money it had not filed any counterclaims (or

8   counter-counterclaims) against Marland or the European Counsel.

9       In other words, Thelen admits that it has to pay these funds if it prevails in this action.

10   Since Thelen's counterclaims are pled as "conditional" upon Marland's prevailing on his own

11   claims, it still has asserted no basis to withhold those funds now, *pendente lite*. Those funds

12   should have been paid last summer, and should be paid forthwith, even if the Court does not enter

13   summary judgment on Count Two of Marland's Counterclaims.

14

15              **IV.  CONCLUSION**

16       For all the messy facts of what happened, the governing legal rules leave little room for

17   argument: Thelen was not entitled to renegotiate its deal with Marland three years into a case

18   because it was worried it might not make a bonus. Thelen was not entitled to misrepresent and

19   bully its client into agreeing to that renegotiation. And Thelen did not make the disclosures and

20   reservations that would have permitted it to renegotiate its fee. Accordingly, Marland is entitled to

21   summary judgment that the 2002 Agreement is void.

22   Dated:  April 5, 2007

23                               CARLSON, CALLADINE & PETERSON, LLP

24

25

26                               EDWARD F. DONOHUE
                                 Attorneys for Defendant,
27                               FRANCOIS MARLAND

28

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111