# EXHIBIT 9

```
1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3

4  THELEN REID BROWN RAYSMAN        )

5  & STEINER LLP,                   )

6                   PLAINTIFF,      )   CASE NO. C06-2071 VRW

7  VERSUS                           )   MAY 10, 2007

8                                   )   SAN FRANCISCO, CALIFORNIA

9  FRANCOIS MARLAND, ET AL.,        )

10                  DEFENDANTS.     )

11 _____ )

12       BEFORE THE HONORABLE VAUGHN R. WALKER, CHIEF JUDGE

13                  UNITED STATES DISTRICT COURT

14 APPEARANCE:

15 FOR PLAINTIFF:       KEKER & VAN NEST LLP
                        BY:  ROBERT VAN NEST, ESQ.
16                      WENDY J. THURM
                        ATTORNEY AT LAW
17                      BENJAMIN BERKOWITZ, ESQ.
                        BENEDICT HUR, ESQ.
18                      710 SANSOME STREET
                        SAN FRANCISCO, CALIFORNIA 94111
19

20 FOR DEFENDANTS:      HAYES & HARDY LLP
                        BY:  ANDREW W. HAYES, ESQ.
21                      1 ROCKEFELLER PLAZA
                        SUITE 1005
22                      NEW YORK, NEW YORK 10020

23

24 REPORTED BY:         JUANITA GONZALEZ

25                      CSR NO. 3003
```

```
 1  MAY 10, 2007                       SAN FRANCISCO, CALIFORNIA

 2       THE CLERK:  CALLING CIVIL CASE 06-2071, THELEN REID

 3  VERSUS MARLAND, ET AL.

 4       MR. VAN NEST:  GOOD AFTERNOON.  BOB VAN NEST FOR

 5  PLAINTIFF THELEN REID.  I'M HERE WITH WENDY THURM, BENEDICT HUR,

 6  AND BEN BERKOWITZ, OF OUR OFFICE.

 7       THE COURT:  GOOD AFTERNOON.

 8       MR. HAYES:  GOOD AFTERNOON.  ANDREW HAYES FOR

 9  MR. MARLAND.  I WAS GOING TO BE JOINED BY MY CO-COUNSEL

10  MR. DONAHUE, BUT HE HAD A FAMILY MEDICAL SITUATION AND WAS

11  CALLED OUT OF THE STATE, SO I WILL BE HANDLING THE ARGUMENT

12  MYSELF.

13       THE COURT:  SORRY TO HEAR THAT.  SO YOU WILL HAVE YOUR

14  HANDS FULL.

15       MR. HAYES:  YES, YOUR HONOR.

16       THE COURT:  ALL RIGHT.  WELL, THERE ARE A NUMBER OF

17  MOTIONS ON CALENDAR THIS AFTERNOON, AND I WOULD FIRST ASK

18  COUNSEL IF THEY HAVE ANY SUGGESTIONS HOW THEY WOULD LIKE TO

19  PROCEED, HOW THEY THINK IT WOULD BE MOST EXPEDITIOUS TO PROCEED.

20  I'LL TELL YOU WHAT I WOULD LIKE TO DEAL WITH AT SOME LENGTH IS

21  THE -- ARE THE ISSUES RELATED TO THE AUGUST, 2002 AGREEMENT,

22  ITS VALIDITY.  I BELIEVE THAT IS THELEN'S MOTION FOR SUMMARY

23  JUDGMENT ON THE FIRST CAUSE OF ACTION.

24       MR. VAN NEST:  IT IS.  BY WAY OF SUGGESTION, YOUR

25  HONOR, I UNDERSTAND THAT THAT MOTION IS GOING TO REQUIRE PERHAPS
```

1   MORE TIME THAN THE OTHERS.  WE HAD DIVIDED IT UP A LITTLE BIT

2   AND THOUGHT MAYBE THE STATUTE OF LIMITATIONS MOTION WOULD BE A

3   GOOD PLACE TO START, AND MISS THURM WAS PLANNING TO ARGUE THAT.

4   BUT WE WILL START WHEREVER YOUR HONOR WISHES.

5           THE COURT:  WHY DO YOU THINK THE STATUTE OF LIMITATIONS

6   SHOULD GO FIRST?

7           MR. VAN NEST:  WE HAD HOPED ONE OR THE OTHER OF THE

8   MOTIONS WOULD RESOLVE THE WHOLE CASE, AND ALTHOUGH THE --

9           THE COURT:  THE STATUTE OF LIMITATIONS ISSUE, OR THE

10  VALIDITY OF THE AUGUST 2000 AGREEMENT?

11          MR. VAN NEST:  WE HAD HOPED THE VALIDITY OF THE

12  DECEMBER, 2002 AGREEMENT WOULD RESOLVE THE CASE, BUT

13  UNFORTUNATELY THERE ARE A COUPLE OF CLAIMS ARISING FROM CONDUCT

14  THAT OCCURRED IN 2004 AND 2005 AFTER THE DECEMBER, 2002

15  AGREEMENT, AFTER THE RELEASE, AND, THEREFORE, THOSE CLAIMS ARE

16  SUBJECT TO THE STATUTE OF LIMITATIONS MOTION.  EVERYTHING ELSE

17  IS SUBJECT TO THE VALIDITY OF THE 2002 AGREEMENT.

18          THE COURT:  SO YOU WANT TO --

19          MR. HAYES:  WE'LL DO THEM WHATEVER ORDER WILL BE MOST

20  HELPFUL TO THE COURT, OBVIOUSLY.

21          THE COURT:  LET'S TALK ABOUT THE 2002 AGREEMENT.

22          MR. VAN NEST:  OKAY.

23          THE COURT:  WHO WILL HANDLE THAT?

24          MR. VAN NEST:  I AM, YOUR HONOR.  ACTUALLY, I'LL DEAL

25  WITH THEM TOGETHER.  THEY'RE CROSS MOTIONS TO THE 2002

1 AGREEMENT.  WE MOVED ON THE FIRST CAUSE OF ACTION AND MR. HAYES

2 HAS HAS MOVED ON SOME OF HIS COUNTER CLAIMS, BUT ESSENTIALLY

3 THIS BOILS DOWN TO ONE ISSUE; THAT IS WHETHER OR NOT MR. MARLAND

4 CAN DEMONSTRATE HE HAS ENOUGH PROOF TO GO TO THE JURY.  THE

5 QUESTION IS WHETHER OR NOT THIS AGREEMENT WAS EITHER  INDUCED BY

6 FRAUD OR OTHERWISE NOT ENFORCEABLE; BECAUSE, IF NOT, IF THE

7 AGREEMENT IS VALID, THEN AS YOUR HONOR I THINK HAS NOTED

8 PREVIOUSLY, THE RELEASE PROVISIONS BAR VIRTUALLY ALL THE CLAIMS

9 AND THE DECEMBER, 2002 AGREEMENT REPLACES ANY ALL OF THE EARLIER

10 AGREEMENTS BETWEEN PARTIES, AND THAT'S PRETTY MUCH THE END OF

11 THE GAME.

12        SO I WANT TO COVER THREE ISSUES ON THIS AGREEMENT. THE

13 FIRST ISSUE IS FRAUD.  THE SECOND ISSUE IS COMPLIANCE WITH THE

14 RULES OF CONDUCT.  THE THIRD ISSUE IS RATIFICATION.  THE POINT

15 ON THE FRAUD IS THERE HAS BEEN NOT ONLY A FAILURE OF PLEADING,

16 BUT A FAILURE OF PROOF.  AFTER ALL OF THE DISCOVERY ATTEMPTS,

17 THERE SIMPLY PLEA ARE NOT ANY DOCUMENTS OR NO TESTIMONY, NO

18 EVIDENCE, TO SUPPORT A CLAIM THAT MR. MARLAND WAS LIED TO IN

19 CONNECTION WITH NEGOTIATING THE 2002 AGREEMENT.  I'LL COVER THAT

20 AT SOME LENGTH.

21        THE SECOND POINT IS THAT THE AGREEMENT COMPLIES WITH

22 THE RULES OF PROFESSIONAL CONDUCT.  IF IT'S VIEWED AS A RELEASE,

23 THEN RULE 3400 APPLIES AND THERE IS NO DISPUTE THAT THEY

24 COMPLIED WITH THAT RULE.  IF YOU LOOK AT IT AS A FIDUCIARY

25 AGREEMENT AND CONTINGENT AGREEMENT, THEN MR. MARLAND COMPLIED

1  WITH ALL OF THE REQUIREMENTS THERE AS WELL.  THE ONE PROVISION

2  MR. MARLAND RELIES ON, 3-300, SIMPLY DOES NOT APPLY HERE BECAUSE

3  THAT GOVERNS BUSINESS DEALS BETWEEN ATTORNEYS AND CLIENTS.  REAL

4  ESTATE DEALS, JOINT VENTURES, DOESN'T.

5          THE COURT:  THIS WAS A JOINT VENTURE, WASN'T IT?

6          MR. VAN NEST:  NOT REALLY.  THIS WAS -- STARTED OFF AS

7  A STRAIGHT CONTINGENT FEE DEAL AND --

8          THE COURT:  THAT'S A JOINT VENTURE.

9          MR. VAN NEST:  WELL, I SUPPOSE, THEN, EVERY CONTINGENT

10 FEE ARRANGEMENT IS A JOINT VENTURE.  RULE 3-300 DOES NOT APPLY

11 TO CONTINGENT FEE DEALS.  IT APPLIES BASED -- IT'S BASED ON CASE

12 LAW ON DEALS LIKE REAL ESTATE DEALS, YOUR HONOR, OR PARTNERSHIP

13 INVESTMENT DEALS.  ALL THE CASES DEALING WITH IT INVOLVE THINGS

14 OTHER THAN FEE AGREEMENTS.  THERE IS NO CASE WHICH HOLDS THAT A

15 CONTINGENT FEE, ATTORNEY/CLIENT AGREEMENT, OR A FEE SHARING

16 AGREEMENT IS GOVERNED BY 3-300.  3-300 IS FOR THAT SITUATION

17 WHEN A LAWYER WHO HAS A PRE-EXISTING RELATIONSHIP WITH A CLIENT

18 ENTERS INTO ANOTHER TYPE OF BUSINESS TRANSACTION OUTSIDE OF THE

19 USUAL FEE AGREEMENT, BE IT A CONTINGENCY OR HOURLY AGREEMENT.

20         THE COURT:  THERE'S CERTAINLY A PRIOR AGREEMENT HERE

21 BETWEEN THE PARTIES.

22         MR. VAN NEST:  THERE WAS, BUT THERE AGAIN, THE CRUX OF

23 THE DECEMBER AGREEMENT REALLY IS TO SHARE FEES ARISING OUT OF

24 LITIGATION IN WHICH THELEN IS SEVERING AS CONTINGENT COUNSEL,

25 AND UNDER THOSE CIRCUMSTANCES I THINK THE RAMIREZ CASE WE CITED

1  IS PROBABLY CLOSEST ON POINT.

2        THAT CASE WAS A CONTINGENT FEE AGREEMENT HERE IN SAN

3  FRANCISCO.  HALFWAY THROUGH, THE LAWYER BELIEVED THAT THE CASE

4  WAS NO LONGER GOING TO BE ECONOMIC BASED ON WHAT HAD HAPPENED SO

5  FAR.  HE HAD A TERMINATION CLAUSE AND HE ELECTED TO USE IT.  HE

6  RENEGOTIATED WITH THE CLIENT AND THE CLIENT MADE THE SAME KIND

7  OF CHALLENGE THAT MR. MARLAND IS MAKING HERE, NAMELY; YOU CAN'T

8  DO THAT, YOU CAN'T RENEGOTIATE IN THE MIDDLE, YOU CAN'T WITHDRAW

9  IN THE MIDDLE.  THE CALIFORNIA COURT OF APPEALS SAID, "NO,

10  THAT'S WRONG.  THIS WAS A CONTINGENT FEE ARRANGEMENT.  THE

11  LAWYER HAS A RIGHT TO RE-EVALUATE AS HE GOES ALONG, HAS A RIGHT

12  TO WITHDRAW," AND HERE THEY CLEARLY HAD A WRITTEN RIGHT TO

13  WITHDRAW, AND THERE IS NOTHING WRONG WITH THAT RE-NEGOTIATION AS

14  LONG AS THE WITHDRAWAL OF THE LAWYER DOES NOT PREJUDICE THE

15  CLIENT WITH RESPECT TO THE LAWSUIT.  AS LONG AS YOU DON'T LEAVE

16  THEM IN THE LURCH WITH A TRIAL PENDING OR A MOTION PENDING OR

17  SOME IMPORTANT HEARING, YOU HAVE THE RIGHT TO DO IT.

18        NOW, ADMITTEDLY, STURDEVANT DID NOT EXPRESSLY ADDRESS

19  RULE 3-300.  IT WASN'T RAISED.  BUT IT ADDRESSED A SIMILAR

20  PROVISION IN THE PROBATE CODE, PROBATE CODE SECTION 16004 WHICH

21  GOVERNS RELATIONS BETWEEN TRUSTEES AND BENEFICIARIES AND

22  GENERALLY APPLIES TO ATTORNEYS AND CLIENTS.  THE COURT THERE

23  SAID, "WHERE THE CLIENT IS REPRESENTED BY INDEPENDENT COUNSEL

24  AND IS BEING REPRESENTED BY THAT COUNSEL IN THE RE-NEGOTIATION

25  OR NEGOTIATION OF THE FEE AGREEMENT, THE PROBATE CODE DOESN'T

1  APPLY.  THE PARTIES ARE AT ARMS LENGTH AND THE PROBATE CODE

2  PROVISION DOESN'T COME INTO PLAY.

3        WE WOULD SUBMIT ON THE SECOND POINT, YOUR HONOR, THAT

4  THERE SIMPLY IS NO AUTHORITY FOR APPLYING RULE 3-300 TO A

5  CONTINGENT FEE ATTORNEY/CLIENT AGREEMENT OR TO A FEE SHARING

6  AGREEMENT.  AND THE CASES THAT MARLAND RELIES ON LIKE BGJ AND

7  HUNNIECUTT ARE EITHER SEPARATE, STAND ALONE REAL ESTATE

8  TRANSACTIONS OR INVESTMENT AGREEMENTS WHERE THE CLIENT HAS

9  LOANED THE LAWYER MONEY TO INVEST, OR WHERE THEY'RE GOING INTO

10 SOME KIND OF A BUSINESS VENTURE TOGETHER, AND THERE SIMPLY IS NO

11 CASE THAT HOLDS THAT UNDER CIRCUMSTANCES SUCH AS WE HAVE HERE,

12 3-300 WOULD APPLY.  AND RAMIREZ, BY IMPLICATION, SAYS TO THE

13 CONTRARY.

14        THE THIRD POINT THING I WANTED TO TALK ABOUT BEYOND THE

15 FRAUD AND BEYOND THE RULES OF PROFESSIONAL CONDUCT, IS

16 RATIFICATION.  AND WHAT I AM GOING TO TELL YOUR HONOR ABOUT

17 RATIFICATION IS, EVEN IF YOU DISAGREE WITH US ON POINT ONE, THE

18 FRAUD POINT, OR, TWO, THE RULES OF PROFESSIONAL CONDUCT, WE'RE

19 ENTITLED TO SUMMARY JUDGMENT ON RATIFICATION.  YOU CANNOT ACCEPT

20 THE BENEFITS OF A CONTRACT KNOWING THAT YOU HAVE GROUND OR

21 BELIEVING YOU HAVE GROUND TO VACATE IT OR INVALIDATE IT.  THAT'S

22 EXACTLY WHAT HAPPENED HERE, AS I'LL GET TO.  MR. MARLAND, AFTER

23 THE TIME IN WHICH HE CLAIMS HE WAS DEFRAUDED AND AFTER THE TIME

24 HE CLAIMS HE HAD GROUND TO VACATE THE AGREEMENT, HE ACCEPTED

25 14 MILLION DOLLARS IN PAYMENT WITHOUT A PEEP, WITHOUT ANY

1  OBJECTION, WITHOUT CONTRADICTION.  AND YOU CAN'T DO THAT.  ONCE

2  HE DECIDED --

3          THE COURT:  IT'S PRETTY HARD FOR TURN DOWN THAT KIND OF

4  MONEY.

5          MR. VAN NEST:  INDEED.  HE THE ELECTION AT THAT TIME.

6  HE HAD A RIGHT TO ELECT -- IF HE FELT HE HAD BEEN DEFRAUDED, HE

7  COULD PURSUE THE FRAUD AND SEEK RECISION OR HE COULD ACCEPT THE

8  BENEFIT OF THE AGREEMENT AND TAKE THE MONEY.  THAT'S EXACTLY

9  WHAT HE DID.  SO WHAT I WOULD LIKE TO DO IS START ON THE FRAUD

10 POINT, UNLESS YOUR HONOR HAS QUESTIONS ABOUT STURDEVANT.

11         THE COURT:  GO AHEAD.

12         MR. VAN NEST:  BUT WITH RESPECT TO FRAUD, WE HAVE TWO

13 POINTS.  ONE IS, AS WE POINTED OUT IN THE BRIEF, THAT THERE HAS

14 BEEN A COMPLETE FAILURE OF PLEADING HERE.  IN NONE OF THESE

15 PLEADINGS DOES MR. MARLAND ARTICULATE THE SPECIFIC

16 MISREPRESENTATIONS THAT HE SAYS WERE LIES THAT INDUCED HIM INTO

17 THIS AGREEMENT.  BUT WE'RE NOT STANDING ON PLEADINGS, OBVIOUSLY,

18 AT THIS LATE STAGE OF THE GAME.  WE HAVE BEEN THROUGH DISCOVERY,

19 A LOT OF IT, AND YOUR HONOR WILL SEE FROM THE RECORD THAT'S BEEN

20 SUBMITTED, THERE'S SIMPLY AN ABSOLUTE FAILURE OF PROOF ON THIS

21 FRAUD POINT.

22         WE SPENT THREE DAYS DEPOSING MR. MARLAND.  I ASKED HIM

23 REPEATEDLY TO IDENTIFY FOR ME THE STATEMENTS THAT WERE MADE TO

24 HIM THAT HE NOW CLAIMS WERE FALSE, AND HE REPEATEDLY REFUSED TO

25 DO SO.  HE TALKED ABOUT CONSPIRACIES AND MANIPULATION AND BULLY

1  TACTICS AND UNFAIRNESS, BUT WHEN I ASKED HIM, "WOULD YOU PLEASE

2  IDENTIFY FOR ME WHAT YOU WERE TOLD THAT IS FALSE," HE SIMPLY

3  TALKED AROUND THE QUESTION.  SO WE TOOK IT ANOTHER WAY.  WE WENT

4  LAWYER BY LAWYER.  WE ASKED, "HAVE YOU MET WITH MR. FONTANA

5  DURING THE CRITICAL PERIOD?"

6          "YES, I DID."

7          " WHAT DID YOU TALK ABOUT WITH HIM?"

8          "I DON'T RECALL.  MAYBE IT WAS DEPOSITIONS, MAYBE IT

9  WAS HEARING.  I DON'T RECALL WHAT I TALKED ABOUT WITH FONTANA."

10         "HAD YOU HAD TELEPHONE CONTACT WITH FONTANA?"

11         "YES, I DID."

12         "WHAT DID HE SAY TO YOU ABOUT -- ON THE TELEPHONE --

13 ABOUT THIS AGREEMENT?"

14         "I DON'T RECALL."

15         "YOU MET WITH MR. CARVILL IN NEW YORK?"

16         "YES, I DID."

17         "WHAT DID YOU TALK ABOUT?"

18         "I DON'T RECALL.  IT WAS A SHORT MEETING.  I DON'T

19 SPEAK ENOUGH ENGLISH AND HE DOESN'T SPEAK ENOUGH FRENCH."

20         NOW, THE PERSON THAT DID HAVE THE MEETING HAS REFUSED

21 TO TESTIFY ABOUT THEM.  MR. BRUNSWICK WAS MR. MARLAND'S LAWYER

22 THROUGHOUT THIS PERIOD.  MR. BRUNSWICK DID ALL OF THE

23 NEGOTIATING WITH MR. CARVILL.  MR. BRUNSWICK, AS YOUR HONOR IS

24 AWARE, HAS SIMPLY REFUSED TO TESTIFY, RELYING ON THE PARIS BAR

25 RULE; SO THERE IS NO EVIDENCE FROM MR. BRUNSWICK THAT GOES TO

1  THIS ISSUE OF MISREPRESENTATION.

2          WE ASKED MR. MARLAND, "WHAT DID MR. BRUNSWICK TELL YOU

3  HAD BEEN REPRESENTED BY THE THELEN LAWYERS?"

4          HE ASSERTED THE PRIVILEGE AND SAID, "THAT'S PRIVILEGED.

5  I'M NOT GOING TO TESTIFY ABOUT THAT."

6          SO THERE IS NO EVIDENCE THAT HE HEARD A STATEMENT

7  INDIRECTLY.  WE ASKED HIM WHETHER HE READ THE E-MAIL TRAFFIC, OF

8  WHICH THERE WAS A GREAT DEAL OVER THE SUMMER.

9          "I DON'T REMEMBER READING ANY OF THE E-MAIL TRAFFIC.  I

10 DON'T READ ENGLISH.  I READ FRENCH.  SO I DON'T RECALL THAT."

11         WE ASKED HIM, "DID YOU READ THE AGREEMENT?  ARE THERE

12 MISREPRESENTATIONS IN THE AGREEMENT?"

13         "I SIGNED THE AGREEMENT WITHOUT READING IT.  I TRUSTED

14 MR. BRUNSWICK WHEN HE TOLD ME IT WAS OKAY.  HE TOLD ME THE

15 ECONOMICS.  I SIGNED IT."

16         SO WITH RESPECT TO WHAT POSSIBLY MR. MARLAND IS GOING

17 TO PRESENT IN TERMS OF MISREPRESENTATIONS, A, THAT HE HEARD, OR

18 B, THAT HE RELIED ON, THERE IS ABSOLUTELY NOTHING TO SUPPORT ANY

19 OF THAT IN THE RECORD.

20         NOW, THE ONE STATEMENT THAT HE DOES REMEMBER, HE CAN'T

21 REMEMBER WHO SAID IT OR WHERE OR WHEN; BUT THE ONE STATEMENT

22 THAT HE REMEMBERS IS THE STATEMENT THAT, "IF YOU DON'T

23 RE-NEGOTIATE THIS DEAL, YOU'LL GET NOTHING".  WELL, THAT IS NOT

24 A STATEMENT OF FACT THAT CAN CONSTITUTE THE BASIS FOR A FRAUD

25 CLAIM.  THAT'S A STATEMENT ABOUT SOMEONE'S OPINION OF A RISK

1    THAT COULD HAPPEN IN THE FUTURE.  SO THAT ONE STATEMENT IS THE

2    ONE STATEMENT I WAS ABLE TO TEASE OUT OF MR. MARLAND IN THREE

3    DAYS.  EXCUSE ME, YOUR HONOR.  THAT ONE STATEMENT, "IF YOU DON'T

4    NEGOTIATE YOU'LL GET NOTHING," SIMPLY CANNOT BE THE BASIS FOR A

5    FRAUD CLAIM, BECAUSE IT'S NOT A STATEMENT OF FACT THAT CAN BE

6    PROVEN TRUE OR FALSE; IT'S SOMEONE'S OPINION ABOUT THE FUTURE,

7    AN ARGUMENT ONE MAKES, AND AT THE TIME, IT WAS TRUE.  IT WAS

8    CERTAINLY THE CASE THAT THELAN HAD THE RIGHT TO WITHDRAW AS

9    COUNSEL FOR THE COMMISSIONER AND IF THELAN HAD WITHDRAWN AS

10   COUNSEL FOR THE COMMISSIONER, THERE WAS A VERY HIGH LIKELIHOOD

11   NOT ONLY THELAN GETS NOTHING BUT MARLAND WOULDN'T GET ANYTHING

12   EITHER.  SO AT THE END OF THE DAY OUR POINT ON FRAUD IS THERE

13   AIN'T NO -- THERE IS NOTHING IN THE RECORD TO SUPPORT THE

14   CLAIMS.

15           THE COURT:  WE'LL END ON THAT.  WE HAVE TO TAKE A

16   RECESS IN THIS PROCEEDINGS TO CONVENE ANOTHER MATTER, SO IF YOU

17   WOULD BE SO GOOD AS TO STEP ASIDE A MOMENT.

18           MR. VAN NEST:  SHALL WE ABANDON THE COUNSEL TABLE AS

19   WELL?

20           THE COURT:  YES.  YOU CAN LEAVE YOUR ITEMS THERE, BUT

21   WE HAVE A VERDICT TO TAKE.

22

23               (PAUSE IN THE PROCEEDINGS FOR THE

24                TAKING OF A VERDICT ON ANOTHER MATTER.)

25

1          THE COURT:  BACK ON THE RECORD.

2          THE CLERK:  RECALLING CIVIL CASE 06-2071, THELEN REID

3    VERSUS MARLAND.

4          THE COURT:  VERY WELL.  EXCUSE THE INTERRUPTION,

5    MR. VAN NEST.  WE'RE BACK WITH THELEN VERSUS MARLAND.  YOU WERE

6    IN MID ARGUMENT.

7          MR. VAN NEST:  I WAS, YOUR HONOR.

8          JUST TO RECAP, I SAID I HAD THREE MAIN POINTS.  I

9    COVERED ONE.  THAT IS THE FRAUD POINT, THERE BEING NO EVIDENCE

10   IN THE RECORD TO SUPPORT IT.

11         I WANT TO TURN TO THE SECOND POINT, WHICH IS THE RULES

12   OF PROFESSIONAL CONDUCT.  THEY WERE MET HERE.  THEY WERE CLEARLY

13   MET HERE, AND WE'RE ENTITLED TO SUMMARY JUDGMENT ON THIS BASIS

14   OF THE TAB.  IT'S FAIR TO SAY THERE WERE TWO OBJECTIVES TO THIS

15   DECEMBER '02 AGREEMENT.  ONE WAS TO RELEASE CLAIMS THAT HAD BEEN

16   MADE BETWEEN MARLAND AND THELEN OVER THE SUMMER AND FALL OF

17   2002, AND IS A RELEASE BETWEEN A LAWYER AND A CLIENT.

18         THE RULES OF PROFESSIONAL CONDUCT HAVE CERTAIN

19   REQUIREMENTS SET FORTH IN THE RULE 3-400.  THERE REALLY ARE TWO.

20   ONE IS THAT YOU LET THE CLIENT KNOW THAT HE OR SHE HAS THE RIGHT

21   TO CONSULT WITH THEIR OWN LAWYER, AND, TWO, YOU GIVE THEM A

22   REASONABLE OPPORTUNITY TO DO THAT BEFORE THE RELEASE ARE SIGNED.

23   THERE IS NO DISPUTE, BOTH OF THOSE REQUIREMENTS WERE MET HERE.

24         MR. MARLAND HAD TWO INDEPENDENT LAWYERS, MR. CHATEAU

25   AND MR. BRUNSWICK, WITH HIM THE WHOLE WAY, AND WITH HIM

1  THROUGHOUT 2002 AS THIS AGREEMENT WAS NEGOTIATED, AND MR.

2  BRUNSWICK WAS DIRECTLY INVOLVED IN IT.

3          SECONDLY, HE CERTAINLY HAD AN OPPORTUNITY TO CONSULT

4  WITH THEM.  THE AGREEMENT WASN'T DONE QUICKLY.  IT TOOK SIX TO

5  EIGHT MONTHS TO NEGOTIATE, AND SO HE HAD EVERY OPPORTUNITY TO

6  GET THEIR ADVICE.

7          THE SECOND OBJECTIVE OF THE AGREEMENT WAS AS A FEE

8  SHARING AGREEMENT.  RE-NEGOTIATION OF THE FEE SHARING AGREEMENT

9  HAD PRE-EXISTED SO THAT THE AGREEMENT MEETS ALL THE REQUIREMENTS

10 OF THE LAW.  IT'S WRITTEN, IT'S SIGNED, FULLY NEGOTIATED WITH

11 LAWYERS ON BOTH SIDES.  NO ONE IS CLAIMING IT'S UNCLEAR OR

12 AMBIGUOUS.  THERE WAS CLEARLY CONSIDERATION FOR IT.  BOTH SIDES

13 EXCHANGED RELEASES, AND THELEN AGREED TO CONTINUE REPRESENTING,

14 TO CONTINUE SHARING FEES WITH MR. MARLAND.

15          THE COURT:  TELL ME ABOUT MR. CHATEAU.  WHO IS HE?

16          MR. VAN NEST:  MR. CHATEAU IS A LAWYER WHO WHEN THE

17 SAGA BEGAN, WAS A PARTNER AT THELEN.  THE ONE THAT INTRODUCED

18 ACTUALLY WAS REID AND PRIEST, BUT THEN THELEN AND REID AND

19 PRIEST MERGED AND MR. CHATEAU WHO HAD BEEN A LONG TIME LAWYER

20 AND FRIEND OF MR. MARLAND INTRODUCED HIM TO MR. FONTANA, AND

21 THAT'S HOW THE THELEN FIRM GOT INVOLVED.  MR. CHATEAU SHORTLY

22 THEREAFTER LEFT THE MERGED FIRM THE WENT TO A NEW YORK FIRM,

23 INTERNATIONAL FIRM WITH OFFICES IN NEW YORK, PRACTICED IN NEW

24 YORK FOR AMERICANS COMPANIES AND FRENCH COMPANIES, AND HE GAVE

25 ADVICE TO MR. MARLAND THROUGHOUT THIS PERIOD, AND LONG PAST

1  DECEMBER 2002.

2        THE COURT:  HOW MUCH IN ADVANCE OF DECEMBER, 2002 DID

3  MR. CHATEAU LEAVE THELEN AND PRIEST?

4        MR. VAN NEST:  I BELIEVE HE LEFT IN 2000 -- 1999 IS

5  WHEN HE LEFT THELEN AND WENT TO ANOTHER FIRM.  AND, OF COURSE,

6  MR. BRUNSWICK WAS REPRESENTING MR. MARLAND BEFORE HE MET THELEN.

7        THE COURT:  HE IS A FRENCH LAWYER?

8        MR. VAN NEST:  RIGHT.  HE IS A FRENCH LAWYER THAT

9  SPEAKS IN ENGLISH AND REPRESENTS COMPANIES WITH BUSINESS IN THE

10  UNITED STATES, HAS, AND CONTINUES TO DO SO.  AND MR. BRUNSWICK

11  CONTINUED REPRESENTING MR. MARLAND, AND HE WAS THE ONE THAT DID

12  MOST OF THE NEGOTIATING.  HE IS THE ONE THAT TALKED WITH AND

13  EXCHANGED CORRESPONDENCE WITH MR. CARVILL FROM THELEN.  SO THERE

14  IS NO QUESTION, THERE IS NO DISPUTE THAT THESE TWO LAWYERS WERE

15  INVOLVED.  THEY WERE INDEPENDENT.  THEY WERE REPRESENTING

16  MARLAND.  YOU ONLY NEED ONE, BUT HE HAD TWO, AND THEY HAD PLENTY

17  OF TIME TO DO IT IN.

18        WITH RESPECT TO THE RELEASE PART OF IT, THE 3-400

19  APPLIES.  THAT HAS BEEN SATISFIED.  I DON'T THINK THERE IS A

20  DISPUTE ABOUT THAT.  MR. MARLAND IS CLAIMING THAT THERE WERE

21  FIDUCIARY DUTIES INVOLVED HERE ARISING OUT OF 3-300 WHICH, AS

22  I'VE SAID, DOES NOT APPLY.  3-300 ON IT'S FACE TALKS ABOUT

23  MEMBERS -- LAWYERS ENTERING INTO BUSINESS TRANSACTIONS WITH

24  CLIENTS.  THERE IS NO CASE THAT HOLDS THAT 3-300 APPLIES TO THE

25  NEGOTIATION OF A CONTINGENT FEE AGREEMENT OR THE RE-NEGOTIATION

1  OF A CONTINGENT FEE AGREEMENT.  THAT'S WHY --

2          THE COURT:  HOW ARE THOSE DUTIES OF THE ATTORNEY

3  DIFFERENT IN THE CONTEXT OF A  3-300 SITUATION AND A CONTINGENT

4  FEE ARRANGEMENT?

5          MR. VAN NEST:  THEY'RE DIFFERENT IN THIS RESPECT.  IF

6  3-300 APPLIES, THEN THE LAWYER HAS TO ESTABLISH NOT ONLY THAT

7  THE CLIENT HAD SEPARATE COUNSEL, NOT ONLY THAT THE CLIENT HAD AN

8  OPPORTUNITY TO CONSULT, BUT THAT THE AGREEMENT IS FAIR AND

9  REASONABLE.  SO UNDER 3-300 -- AND I'LL TALK ABOUT THAT IN A

10 MINUTE, BECAUSE I THINK WE HAVE ESTABLISHED THAT, TOO.  BUT THE

11 PRIMARY DIFFERENCE BETWEEN THESE IS THE LAWYER HAS THE BURDEN TO

12 SHOW THAT IT'S FAIR AND REASONABLE.  AND THERE IS SOME CASE LAW

13 THAT SUGGESTS THAT THE LAWYER HAS TO GIVE FURTHER ADVICE TO THE

14 CLIENT, ALTHOUGH THAT'S REALLY NOT PART OF THE RULE ITSELF.

15         NOW, IN STURDEVANT, WHAT HAPPENS WAS JIM STURDEVANT WAS

16 REPRESENTING A PLAINTIFF IN A DISCRIMINATION CASE UNDER A

17 CONTINGENT FEE ARRANGEMENT AND THE TRIAL COURT GRANTED SUMMARY

18 JUDGMENT.  STURDEVANT THEN SAID, "I'M NOT GOING TO CONTINUE

19 CARRYING ALL THE COST MYSELF OR WORKING WITHOUT PAY AND I NEED

20 SOME GUARANTEE THAT YOUR CLIENT WILL ACCEPT A REASONABLE

21 SETTLEMENT IF I CONTINUE".

22         SHE CONSULTED HER OWN LAWYER, THEY RENEGOTIATED, A DEAL

23 WAS DONE, THE UNDERLYING CASE WAS RESOLVED, AND SHE SUED, JUST

24 AS MARLAND HAS HERE, CLAIMING, "OH, NO.  THE LAWYER HAD

25 ADDITIONAL FIDUCIARY DUTIES.  THE PROBATE CODE REQUIRES THAT HE

1    TREAT ME AS FIDUCIARY.  THIS IS NOT AN ARMS LENGTH TRANSACTION.

2    HE DIDN'T HAVE THE RIGHT TO WITHDRAW IN THE FIRST PLACE.  THE

3    COURT OF APPEAL COMPLETELY DISAGREED WITH THAT AND SAID THREE

4    THINGS THAT ARE IMPORTANT.

5            ONE, THERE IS NOTHING REQUIRING A LAWYER IN A

6    CONTINGENT FEE ARRANGEMENT TO STAY FOREVER.  YOU CAN WITHDRAW,

7    YOU CAN RENEGOTIATE, AS LONG AS YOU DO NO PREJUDICE TO THE

8    CLIENT'S LAWSUIT.

9            TWO, IF THE CLIENT IS SOPHISTICATED AND HAS ITS OWN

10   LAWYERS AND WAS ADVISED BY THOSE LAWYERS, THAT ANY PRESUMPTION

11   OF UNDUE INFLUENCE OR BREACH OF FIDUCIARY DUTY IS LIFTED.

12           THREE, THE PROBATE CODE, WHICH IS ANALOGOUS TO 3.300

13   HERE, DOES NOT APPLY TO THE NEGOTIATION BETWEEN THE LAWYER AND

14   THE CLIENT OVER THE FEE AGREEMENT.

15           THAT'S PROBABLY THE MOST IMPORTANT POINT.  THE PROBATE

16   CODE PROVISION EXEMPTS PRESUMPTION OF UNDUE INFLUENCE WHEN THE

17   AGREEMENT RELATES TO HIRING OR COMPENSATION.  SO WHAT WE'RE

18   SAYING IS THERE IS NO CASE LAW THAT TREATS CONTINGENT FEE

19   AGREEMENTS AS SUBJECT TO 3-300, AND THERE SHOULDN'T BE, BECAUSE

20   THERE ARE DIFFERENT REQUIREMENTS FOR NEGOTIATING CLIENT FEE

21   AGREEMENTS.  HERE THE PENALTY ENFORCED BY LAW FOR THE LAWYER

22   THAT IS WITHDRAWING IS, "YOU DON'T GET PAID ANYTHING FOR YOUR

23   WORK".  IF THE LAWYER WITHDRAWS WITHOUT CAUSE FROM A CONTINGENT

24   FEE AGREEMENT, HE OR SHE FORFEITS PAY, CAN'T COME IN ON ANY  --

25           THE COURT:  IF THE CLIENT GOES ON AND EVENTUALLY

1  SECURES A RECOVERY, THE ATTORNEY CAN COME BACK AND RECOVER THE

2  COSTS THAT WERE EXPENDED IN PROSECUTING THE SUIT UP TO THE POINT

3  HE WAS THROUGH.

4          MR. VAN NEST:  I DON'T KNOW ABOUT COSTS.  THAT MAY BE

5  RIGHT, BUT CERTAINLY THERE IS NO CLAIM FOR QUI TAM MERITS

6  RECOVERY FOR ANY OF YOUR ATTORNEY TIME.  AND THAT'S WHAT'S

7  IMPORTANT HERE.  SO CERTAINLY -- IT'S CERTAINLY THE CASE THAT IF

8  YOU WITHDRAW VOLUNTARILY --

9          THE COURT:  I THOUGHT THERE WAS A QUI TAM MERIT CLAIM

10 THE ATTORNEY CAN BRING IN THE EVENT THAT THERE WAS EVENTUALLY A

11 RECOVERY AND THE ATTORNEY COULD ESTABLISH THAT, BUT FOR HIS

12 SERVICES, THE RECOVERY NEVER WOULD HAVE BEEN OBTAINED.

13         MR. VAN NEST:  THAT'S GENERALLY RIGHT IF THE LAWYER HAS

14 BEEN FIRED, BUT NOT IF THE LAWYER VOLUNTARILY WITHDRAWS WITHOUT

15 CAUSE.  IN OTHER WORDS, IF IT'S THE LAWYER THAT LEAVES AND SAYS,

16 "I DON'T WANT ANY MORE TO DO WITH IT," THERE IS NO QUI TAM

17 MERITS, AND THAT'S WHAT THE COURT IN STURDEVANT SAYS; THAT THE

18 RESORT IS THE ENFORCEMENT MECHANISM.  IF I AM -- IF YOU'RE THE

19 CLIENT AND I'M THE LAWYER AND YOU FIRE ME AND YOU THEN GET A

20 RECOVERY WITH NEW COUNSEL, THEN I HAVE A QUI TAM MERITS, BUT NOT

21 IF I'M THE ONE THAT WALKS.

22         POINT ONE, WE DO NOT BELIEVE THAT 3-300 APPLIES, FOR

23 ALL OF THESE REASONS.  THIS WAS NOT A COMMERCIAL BUSINESS

24 TRANSACTION LIKE A REAL ESTATE DEAL, SO ON.  TWO, EVEN IF IT

25 WERE, WE HAVE MET THE REQUIREMENTS AND THEY HAVE BE ESTABLISHED

1  AS A MATTER OF LAW.  AT THE TIME THIS AGREEMENT WAS

2  RENEGOTIATED, THELEN HAD SPENT ELEVEN MILLION DOLLARS IN FEES

3  AND COSTS.  MARLAND HAD INVESTED NO MONEY OF HIS OWN WHATSOEVER.

4  THE CIRCUMSTANCES HAD CHANGED BECAUSE MARLAND NOW ADMITTED THAT

5  HE HAD DESTROYED A KEY DOCUMENT, ONE OF THESE PORTAGE AGREEMENTS

6  AT THE CENTER OF THE EXECUTIVE LITIGATION.  SO HE HAD DESTROYED

7  THAT, RENDERING HIMSELF COMPLETELY INEFFECTIVE AS A WITNESS.

8          THELEN HAD A RIGHT TO WITHDREW FROM ITS ATTORNEY/CLIENT

9  RELATIONSHIP WITH MR. MARLAND.  UNDER THEIR PRE-EXISTING

10  AGREEMENT THERE WAS A RIGHT TO WITHDRAW WITHOUT CAUSE, AND

11  MR. MARLAND HAD HIS OWN SEPARATE LAWYERS NEGOTIATING.  SO TO THE

12  EXTENT EVEN IF YOU WERE TO FIND 3-300 APPLIES, ALL THE

13  REQUIREMENTS HAVE BEEN MET.  HE WAS GIVEN NOTICE OF THE RIGHT TO

14  COUNSEL.  HE WAS GIVEN AN OPPORTUNITY TO CONSULT.  HE DID

15  CONSULT.  HE HAD PLENTY OF TIME TO DO THAT, AND THE TERMS ARE

16  FAIR AND REASONABLE BASED ON WHAT WAS FACING THE PARTIES SIDE BY

17  SIDE AT THE TIME.  I THINK, YOUR HONOR, IF YOU LOOK AT ANY OF

18  THE CASES THAT DISCUSS 3.300 THAT ARE RELIED UPON BY MARLAND,

19  THEY'RE A FAR CRY FROM THIS.  NONE OF THEM ARE FEE CASES,

20  CONTINGENCY FEE CASES OR FEE SHARING CASES.  THEY'RE ALL CASES

21  WHERE THE LAWYER AND THE CLIENT, OUTSIDE OF ANY LITIGATION

22  RELATIONSHIP, GO OFF AND DO A SEPARATE BUSINESS TRANSACTION.

23  THEY EITHER INVEST MONEY TOGETHER OR BUY REAL ESTATE OR THEY

24  INVEST IN PROPERTY, OR THEY UNDERTAKE SOME OTHER SEPARATE

25  BUSINESS TRANSACTION.  AND THAT'S HOW RULE 3.300 HAS ALWAYS BEEN

1  UNDERSTOOD.

2        NOW, MY THIRD POINT AND FINAL POINT ON THIS MOTION IS

3  RATIFICATION.  EVEN IF YOU DISAGREE WITH POINTS ONE AND TWO, THE

4  AGREEMENT IS NOT VOID.  IT'S MERELY VOIDABLE.  IN OTHER WORDS,

5  IF IT'S INDUCED BY FRAUD, IT'S NOT AUTOMATICALLY VOID.  IT'S

6  VOIDABLE AT THE OPTION OF THE DEFRAUDED PARTY.  IF IT DOESN'T

7  COMPLY WITH THE RULES OF PROFESSIONAL CONDUCT, IT'S VOIDABLE AT

8  THE OPTION OF THE CLIENT. BUT CALIFORNIA LAW IS CLEAR, AND WE

9  CITED THIS IN THE LECLAIRE(PHONETIC) VERSUS MICHAEL CASE, IF THE

10 CLIENT BECOMES AWARE, THE CONTRACTING PARTY BECOMES AWARE OF

11 FACTS THAT HE THINKS ARE FRAUD, THAT THE AGREEMENT WAS INDUCED

12 BY FRAUD, HE HAS TO PROMPTLY MAKE AN ELECTION.  HE CAN SUE FOR

13 RECISION AND SEEK WHATEVER COMPENSATION, WHATEVER CONSIDERATION

14 HE GAVE, BACK, OR AFFIRM THE AGREEMENT, ACCEPT THE BENEFIT, AND

15 GO FORWARD.

16        NOW, HERE, CLEARLY WHAT HAPPENED IS THE LATTER, AND THE

17 CHRONOLOGY IS TELLING.  THE AGREEMENT WAS EXECUTED IN DECEMBER,

18 2002.  NO LATER THAN THE FALL OF '03, MR. MARLAND DIRECTED

19 MR. CHATEAU TO FIND A LAWYER TO ANALYZE HIS RIGHTS VIS-A-VIS

20 THELEN.  BY MARCH OF '04 MR. HAYES HAD BEEN RETAINED ON BEHALF

21 OF MR. MARLAND AND HE HAD WRITTEN A MEMORANDUM OUTLINING

22 MR. MARLAND'S CLAIMS AGAINST THELEN.  IN JUNE OF '04 THELEN

23 RECEIVED THE FIRST PORTION OF ITS CONTINGENT RECOVERY AND

24 E-MAILED MR. MARLAND AND SAID, "WE HAVE FIVE MILLION DOLLARS

25 PAYABLE TO YOU AND EUROPEAN COUNSEL UNDER THE DECEMBER 2002

1  AGREEMENT.  DO YOU HAVE ANY OBJECTION TO THE CALCULATION OR THE

2  AMOUNT?"  AND MR. MARLAND SIMPLY SAID, "HERE IS THE FAX, HERE IS

3  THE WIRE TRANSFER NUMBER.  I'LL TAKE THE MONEY".

4          THAT HAPPENED JUNE OF '04.  NOW, SEVEN MONTHS LATER, IN

5  FEBRUARY OF '05, IN MR. HAYES' E-MAIL TO THE THELEN FIRM, HE'S

6  CLAIMING THAT THE AGREEMENT HAD BEEN INDUCED BY FRAUD AND

7  OUTLINING THE BASIS FOR THEIR CLAIMS INDUCED BY FRAUD IN

8  VIOLATION OF THE RULES OF CONDUCT, RIDDLED BY CONFLICT,

9  ETCETERA, AND THAT IT WAS INVALID.  THAT HAPPENED IN FEBRUARY.

10 IN DECEMBER, 10 MONTHS LATER, THELEN AGAIN E-MAILED MR. MARLAND.

11 "WE NOW HAVE 14 MILLION DOLLARS, 14 MILLION DOLLARS IN MONIES

12 DUE AND OWING TO YOU UNDER THE DECEMBER 2002 AGREEMENT.  WHAT

13 SHOULD WE DO WITH THEM?"

14          MR. MARLAND SAID, "SEND THEM TO THE SAME WIRE TRANSFER

15 IN SWITZERLAND".  AND THEY DID.  HE DIDN'T MAKE ANY OBJECTION,

16 HE DIDN'T COMPLAINT ABOUT THE AMOUNT.  HE DIDN'T RAISE FRAUD.

17 AND CALIFORNIA LAW IS CLEAR, YOUR HONOR, PARTICULARLY IN THIS

18 AREA OF FRAUD, THAT YOU HAVE TO MAKE AN ELECTION AND YOU HAVE TO

19 MAKE IT PROMPTLY.  IF HE HAD MADE THE ELECTION AND SOUGHT

20 RECISION, SOUGHT TO INVALIDATE THE AGREEMENT BASED ON FRAUD, HE

21 NEVER WOULD HAVE RECEIVED THE MONEY.  THAT WOULD HAVE BEEN

22 PLACED IN ESCROW IF THAT MONEY WOULD BE AT ISSUE.  HE DIDN'T DO

23 THAT.  HE WAITED.  HE SAT ON HIS RIGHTS, AND THIS IS APART FROM

24 ANY STATUTE OF LIMITATIONS ARGUMENT, WHICH MISS THURM WILL

25 ADDRESS.  HE ACCEPTED THE MONEY KNOWING OR BELIEVING THAT HE HAD

1  A BASIS TO INVALIDATE THE AGREEMENT BASED ON FRAUD.  YOU CANNOT

2  DO THAT.   THE CIVIL CODE MAKES CLEAR, SECTION 1589, THIS

3  LECLAIRE VERSUS MICHAEL CASE MAKES CLEAR THAT YOU HAVE ELECTION,

4  YOU HAVE TO EXERCISE IT PROMPTLY OR YOU LOSE IT.   AND HERE HE

5  ACCEPTED THE 19 MILLION DOLLARS.   HE LOST THE RIGHT TO CLAIM

6  FRAUD.

7            THE COURT:   ALL RIGHT.   THANK YOU.   MR. VAN NEST.

8            MR. HAYES:   GOOD AFTERNOON, YOUR HONOR.

9            I WOULD LIKE TO BEGIN -- I WOULD ACTUALLY LIKE TO BEGIN

10 WITH RULES OF PROFESSIONAL CONDUCT, BECAUSE IF MR. VAN NEST IS

11 WRONG ABOUT THOSE AND WE'RE RIGHT, YOU DON'T GET TO THE FRAUD.

12 IF THE AGREEMENT IS GOVERNED BY 3-300, AND 3-300 REQUIRES THEM

13 TO MAKE DISCLOSURES BEYOND JUST THE ECONOMIC TERMS OF THE DEAL,

14 THEY LOSE THE RATIFICATION ARGUMENT, BUT WE DON'T GET TO FRAUD.

15 THE ONLY ARGUMENT THEY'VE GOT LEFT IS RATIFICATION.   THIS IS

16 CLEAR FROM THE PAPERS.   IT'S CLEAR FROM THEIR REPLY BRIEF.

17           THEIR REPLY BRIEF HAS ONE SENTENCE THAT SAYS, "IF IT'S

18 SHOWN THAT THE ATTORNEY/CLIENT AGREEMENT BETWEEN --" OR, "THE

19 2002 AGREEMENT COMPLIED WITH RULE 3-400".   ONE SENTENCE IN

20 THERE, IN THEIR REPLY.   SO WE DON'T HAVE TO GET TO THE FRAUD IF

21 WE'RE RIGHT ABOUT WHAT 3-300 REQUIRES, BECAUSE THEY DON'T ARGUE

22 THAT THEY DID ANYTHING MORE THAN DISCLOSE THE ECONOMIC TERMS.

23           THE COURT:   WHY DOES 3-300 APPLY?

24           MR. HAYES:   OKAY.

25           THE COURT:   MR. VAN NEST TELLS ME ITS NEVER BEEN

1  APPLIED TO OTHER CONTINGENCY FEE AGREEMENTS.

2        MR. HAYES:  WELL, IT CERTAINLY WAS NOT APPLIED IN

3  RAMIREZ.  NOBODY RAISED IT IN RAMIREZ.  NOT ONLY NO OPINION,

4  THERE IS NO BASIS FOR BELIEVING ANYONE EVER RAISED IT ANYWHERE.

5  IN FACT, THE WORDS USED IN THE RAMIREZ OPINION ON TWO OCCASIONS

6  IS A SECOND SUPPLEMENTAL AGREEMENT BETWEEN STURDIVANT AND

7  RAMIREZ.  THAT PHRASE APPEARS ON PAGE NINE 12 OF 21 CAL.APP.4,

8  AND, IN FACT, IN THE DISCUSSION SECTION, ONE OF THE HEADINGS,

9  HEADING SECTION THREE, ON PAGE 916 OF CAL.APP.4TH, REFERS TO THE

10 TERMS OF THE SUPPLEMENTAL RETAINING AGREEMENT.  NOT THE AMENDED

11 AGREEMENT, NOT THE REVISED AGREEMENT, NOT THE RENEGOTIATED

12 AGREEMENT, BUT A SUPPLEMENTAL AGREEMENT.

13        THE COURT:  IT'S STILL A CONTINGENT FEE AGREEMENT.

14        MR. HAYES:  AND MR. VAN NEST IS FLAT WRONG ABOUT

15 WHETHER THE PROBATE CODE APPLIES TO IT, BECAUSE THAT'S EXACTLY

16 WHAT THE COURTS DO, APPLY THE PROBATE CODE THAT APPEARS IN THAT

17 SECTION THREE OF THE ANALYSIS OF HEAD NOTE EIGHT.

18        IF YOU LOOK  ON PAGE 561 OF 26 CAL RPTR. 2D, PAGE 917

19 OF 21 CAL.APP. 4,  SECOND PARAGRAPH, THE THIRD SENTENCE DOWN,

20 FOURTH SENTENCE DOWN, "WHEREAS, HERE THE TRUSTEE ATTORNEY

21 PRODUCES EVIDENCE OF TRANSACTIONS CONDUCTED AT ARMS LENGTH WITH

22 AN INTELLIGENT, EXPERIENCED, SOPHISTICATED CLAIMANT, THE TRIAL

23 COURT IS ENTITLED TO CONSIDER THE BURDEN OF PROOF IS MET".

24        TURNING TO 16004 AT THE BEGINNING OF THE PARAGRAPH.

25 THE STURDEVANT COURT SAYS, "WELL, LET'S LOOK AT 16004".  IN

1 FACT, IT SAYS, "WE SEE NO REASON WHY THAT STATUTE SHOULD NOT

2 APPLY TO THAT RELATIONSHIP IN THE ATTORNEY/CLIENT RELATIONSHIP".

3 SO I STURDEVANT SAYS -- STURDEVANT MET HIS BURDEN OF PROOF.  IT

4 DOES NOT SAY 16004 DOESN'T APPLY.

5         NOW, AT THE END OF THAT PARAGRAPH, THE STURDEVANT COURT

6 SAYS -- THE LAST SENTENCE  -- "SPECIFICALLY EXEMPT FROM --" THE

7 LAST SENTENCE OF THE PARAGRAPH.  ACTUALLY, NEXT TO LAST IN THAT,

8 THE LAST SENTENCE OF 16004.  "SPECIFICALLY EXEMPT FROM THE

9 PRESUMPTION OF UNDUE INFLUENCE IN AN AGREEMENT RELATING TO

10 HIRING OR COMPENSATION OF TRUSTINGS ATTORNEY, EVEN WHEN THERE IS

11 A PRE-EXISTING ATTORNEY/CLIENT RELATIONSHIP".  AND FOR THAT IT'S

12 LIKE IN VELAVIE LECLERK, NEITHER DEALT WITH A RENEGOTIATION.

13         VELAVIE DEDALT WITH RENEGOTIATION, BUT NO CLAIM 3-300.

14 LFRM L HUH CHIP WAS A CASE INVOLVING CHALLENGE TO CONDEMNATION

15 PROCEEDINGS ,AND THE PLAINTIFF DECIDED TO CHANGE THE CLAIMS THAT

16 THE PLAINTIFF WAS ASSERTING TO THE PARTIES RENEGOTIATING THE

17 AGREEMENT.  THE ISSUE WAS WHAT FEE WAS DUE TO COUNSEL, NO CLAIM

18 OF 3.300 EVER RAISED.  MOREOVER STURDEVANT REMANDS THE CASE FOR

19 HEARING TO SEE WHETHER THE SETTLEMENT WAS FAIR.  IT DOES THAT

20 BECAUSE OF THE FISCAL ISSUES RENEGING IN 16004 AND 3-300.

21         NOW, THELEN SAYS THIS CASE WHICH THEY CALL RAMIREZ --

22 STURDEVANT IS A LEADING CASE.  IT HASN'T BEEN CITED BY ANYONE

23 ANYWHERE FOR ANY OF THESE PROPOSITIONS.  NOT THE PROPOSITION

24 THEY'RE RELYING ON.  IF THE COURT GETS TO THE POINT OF HAVING A

25 TRIAL AND HEARING FROM MR. ZITRIN ABOUT THE RELEVANCE OF THIS

1  CASE, MR. ZITRIN WILL HAVE QUITE A BIT TO SAY OF THE RELEVANCE

2  OF RAMIREZ TO ANY 3.300 ANALYSIS.

3           NOW, COMING BACK TO THE BASIC POINT, WHETHER THIS IS

4  GOVERNED BY 3-300, PUTTING ASIDE WHERE STURDEVANT CHANGED THE

5  LAW, CHANGED WHAT THE RULE SAYS.  THE RULE SAYS A LAW FIRM

6  ENGAGING IN BUSINESS TRANSACTIONS WITH A CLIENT IS SUBJECT TO

7  3-300.  THAT'S WHAT THELEN SAYS THEY DID HERE.  WE HAVE GARY

8  FONTANA'S DEPOSITION.  MR. FONTANA SAYS, "ACTUALLY, IT WASN'T

9  EVEN EITHER/OR ATTORNEY/CLIENT BUSINESS RELATIONSHIP".

10          I ASKED, "WAS IT A LITTLE BIT OF BOTH?" --  AT PAGE

11 399.  THEREFORE, HE HAD A FEE SHARING AGREEMENT AND HE HAD A

12 CLIENT RELATIONSHIP.  THERE IS A FEE SHARING RELATIONSHIP.  SO

13 THAT'S A BUSINESS DEAL.  IT'S EVEN EASIER THAN THE QUESTION

14 ABOUT WHETHER 3-300 GOVERNS RENEGOTIATION OF A CONTINGENT FEE

15 ONE-ON-ONE WITH A CLIENT IN THAT CASE.  SURE, THERE IS NO CASE

16 THAT'S DEALT WITH THAT ISSUE.  WE DON'T HAVE TO GET TO THAT,

17 BECAUSE HERE THEY'RE RENEGOTIATING A FEE-SHARING DEAL -- HADN'T

18 REPRESENTATION OF THE DEPARTMENT OF INSURANCE.  THAT'S A

19 BUSINESS DEAL.

20          NOW, WE DO SAY THAT THE TERMS OF THAT WAS GOVERNED BY

21 THE ORIGINAL ATTORNEY/CLIENT AGREEMENT, AND THE FEE SHARING

22 AGREEMENT WAS SUPPOSED TO BE GOVERNED BY THE -- NOT THE

23 DOCUMENTS -- SO THAT WAS THE PARTIES' UNDERSTANDING WHEN THEY

24 WENT INTO THIS DEAL, BUT THE FACT IS THIS IS NOT -- NOT EVEN A

25 SIMPLE ONE-ON-ONE NEGOTIATIONS.  THIS WAS YOUR CLIENT AND PART

1  OF YOUR ROLE AS CLIENT -- YOU BROUGHT US INTO A CASE, WE GOT

2  THIS OTHER REPRESENTATION, AND NOW WE WANT TO RENEGOTIATE THIS

3  OTHER DEAL WITH OUR OTHER DEAL.  TO DO THAT I NEED TO

4  RENEGOTIATE WITH YOU FIRST.  AM I GOVERNED BY 3-300?  UNLESS

5  RAMIREZ IS REPEALED, BGJ OR BGJ IS BAD LAW, BGJ IS CLEARLY ON

6  POINT.

7          IN FACT, TALKING ABOUT THE FACTS OF THESE CASES IS VERY

8  HELPFUL.  BGJ INVOLVED A CLIENT WHO IS SUING A RAILROAD AND THE

9  LAWYER SAID, "YOU KNOW, THERE IS A DEAL TO BE HAD HERE.  LET'S

10 FORM A JOINT VENTURE.  BUT AS PART OF THE JOINT VENTURE CLIENT,

11 YOU NEED TO DROP YOUR LAWSUIT".  THE CLIENT ORIGINALLY WENT

12 ALONG.  THEN THE TERMS OF THE DEAL THAT THE LAWYER PUT ON THE

13 TABLE WERE UNREASONABLE.  THE LAWYER VIOLATED 3-300.

14          SO BGJ IS A CASE INVOLVING A LAWYER WHO GOT A CLIENT TO

15 DROP A LAWSUIT, JUST AS THELEN DID TO MARLAND HERE.  MARLAND

16 SAID, "OKAY".  AND, BY THE WAY, WHEN HE SAID, OKAY," THIS WAS

17 IN MAY AND JUNE OF 1999, THELEN DID NOT ADVICE HIM TO SEEK OTHER

18 COUNSEL.  THELEN DID NOT MAKE ANY DISCLOSURES.  I DON'T KNOW THE

19 MERE ECONOMIC TERMS OF THE DEAL AND THERE IS NO RELEASE.

20 CLEARLY, IN JUNE 1999, AGREEMENTS WERE SUBJECT TO 3.300 AND THEY

21 DON'T EVEN CLAIM THEY COMPLIED WITH ANY OF 3.300 EXCEPT IN THE

22 MERE ECONOMIC TERMS OF THE DEAL.  AND THE SIDE LETTER AGREEMENT

23 ENTERED INTO JUNE 1999, NO EVIDENCE AND NO CLAIM THAT MARLAND

24 HAD TIME TO CONSULT WITH INDEPENDENT COUNSEL ABOUT THE EFFECT OF

25 THIS SIDE LETTER AGREEMENT OF JUNE 1999, WHICH IS THE THING THEY

```
 1  RELIED ON 2002.

 2       THE COURT:  MR. VAN NEST TELLS ME MARLAND HAD PLENTY OF

 3  COUNSEL IN 2002.

 4       MR. HAYES:  HE HAD A FORMER THELEN PARTNER WHO HAD AN

 5  INTEREST IN THE THELEN FIRM, MR. CHATEAU.

 6       THE COURT:  WHAT'S THE EVIDENCE OF THAT?

 7       MR. HAYES:  I BELIEVE THAT IT CAME OUT AT MR. CLATEAU'S

 8  DEPOSITION.  I THINK MR. CHATEAU TESTIFIED THE FACT HE HAD AN

 9  INTEREST IN THELAN'S FEE.  HE TOLD MARLAND.  CHATEAU SAID, "I

10  DIDN'T DRAFT PAPERS".  ONE THING IS CLEAR FROM CLATEAU'S

11  DEPOSITION; HE DIDN'T DRAFT PAPERS.  HE IS A CORPORATE LAWYER.

12  HE IS NOT ADMITTED IN CALIFORNIA, BUT IN NEW YORK.

13       BY SEPTEMBER, 2001, BRUNSWICK NEGOTIATED HIS OWN FIVE

14  PERCENT FEE AND HAS MADE SURE THAT HE IS AFFILIATED, NOT IN THE

15  SENSE OF BEING AN EMPLOYEE, BUT ASSOCIATED WITH THELEN AS

16  COUNSEL FOR HIS OWN FIVE PERCENT FEE.  HE HAS HIS OWN STAKE IN

17  THE DEAL BY THE SUMMER 2002.  THAT IS AN ISSUE WE DON'T NEED TO

18  GO INTO, BUT THEY HAVE THEM -- THEY WERE FULLY INDEPENDENT.

19       I WANT TO KNOW IF YOU HAVE ANY QUESTIONS ABOUT THAT.

20       THE COURT:  WELL, I'D LIKE TO KNOW WHERE IN THE RECORD

21  I CAN FIND THAT.

22       MR. HAYES:  I JUST DON'T HAVE THAT HANDY, YOUR HONOR.

23  SORRY.  MAY EVEN BE WE HAD IT, I THINK IN THE PLEADINGS, MAY

24  HAVE BEEN ADMITTED IN THE PLEADINGS.

25       THE COURT:  CHATEAU HAD AN INTERESTS IN THE ***FEW AND
```

1  TO BE RECOVERED FOR.

2          MR. HAYES:  THE LATTER IS CLEAR AND THE LATTER IS IN

3  THE RECORD IN THE ATTORNEY/CLIENT, YES.  THE LATTER IS IN THE

4  ATTORNEY/CLIENT RECORD AND WAS DISCUSSED AT LENGTH.

5          MR. VAN NEST:  THE LATTER OF BRUNSWICK'S INTEREST IS

6  THE --

7          MR. HAYES:  IT'S EXHIBIT 9, SEPTEMBER 2001.

8          THE COURT:  EXHIBIT 9 TO --

9          MR. HAYES:  PLAINTIFF'S EXHIBITS ON SUMMARY JUDGMENT .

10         THE COURT:  OKAY.

11         MR. HAYES:  YOU CAN HAVE MY COPY.

12         THE COURT:  THIS IS EXHIBIT 9 TO THE  --

13         MR. HAYES:  DECLARATION.  VOLUME TWO, DECLARATION OF

14 ANDREW HAYES.  THE EXHIBIT STATES AT THE BEGINNING, IT'S AN

15 AGREEMENT BETWEEN THELEN, BRUNSWICK AND -- RIGHT THERE AT THE

16 TOP.  REFERS TO MR. GIMMING(PHONETIC) SUBSTITUTING OUT AS

17 COUNSEL, THELEN SUBSTITUTING OUT -- SUBSTITUTING IN.  ON PAGE

18 TWO, PARAGRAPH SEVEN, "THE ATTORNEY/CLIENT AGREEMENT IS FURTHER

19 AMENDED TO STATE THAT BRUNSWICK HAS ALSO BEEN ASSOCIATED WITH

20 TRB TO RENDER LEGAL SERVICES TO RONO AND THE CLIENTS.  AND IN

21 ACKNOWLEDGMENT OF THAT FACT, PARAGRAPH 7(B) OF THE

22 ATTORNEY/CLIENT AGREEMENT, IS HEREBY AMENDED TO READ AS

23 FOLLOWS".  THEN IT SPECIFIES BRUNSWICK GETS FIVE PERCENT.

24         THE COURT:  OKAY.

25         MR. HAYES:  HE IS NOT INDEPENDENT.

```
1            THE COURT:  ALL RIGHT.  CARVILLE'S INTERESTED IN

2  THELEN'S RECOVERY.

3            MR. HAYES:  CHATEAU.  CHATEAU HAD A -- SORRY, YOUR

4  HONOR, IT WAS ONE OF THE FIRST DEPOSITIONS.  I DON'T RECALL

5  WHERE IT IS IN THE RECORD.  I JUST DON'T RECALL.  AND I DON'T

6  THINK IT'S ANYTHING WE PUT IN OUR MOTION.  I BELIEVE IT WAS IN

7  HIS DEPOSITION.  THERE WAS A LETTER AGREEMENT AS AN EXHIBIT AT

8  HIS DEPOSITION, BUT I DON'T RECALL THAT.

9            THE COURT:  YOU'LL REPRESENT TO THE COURT THAT CHATEAU

10 HAD AN INTEREST IN THELEN'S --

11           MR. HAYES:  FEE.

12           THE COURT:  -- FEE.

13           MR. HAYES:  ABSOLUTELY.  ABSOLUTELY.  YES.  SO IF

14 THEY'RE WRONG ABOUT 3-300, THEN WE GO TO RATIFICATION.  NOW, MR.

15 VAN EST IS, AGAIN, QUITE WRONG ON THE LAW.

16           THEY CITE TWO CASES.  ONE FROM THE 1930'S AND ONE FROM

17 THE 1940'S.  USTICH -- AND THE OTHER ONE ESCAPES ME.  LECLERK.

18 NOW USTICH HELD THAT, QUOTE, "ACCEPTANCE BY APPELLANT AS A

19 SIGNER OF THE BENEFIT OF THE CONTRACT OF RELEASE, IF SUBSEQUENT

20 TO AN ATTEMPTED RECISION AMOUNTS TO A WAIVER OF THE RIGHT TO

21 ASSERT THE INVALIDITY OF THE RELEASE AND CONSTITUTED A

22 RATIFICATION".  THAT IS 4030 CAL.APP.2ND, 491.

23           I BELIEVE USTICH WAS PURCHASE OF PROPERTY OUT OF

24 BANKRUPTCY.  A PERSON GAVE NOTICE THEY WERE GOING TO RESCIND AND

25 THEN THEY DIDN'T FOLLOW THROUGH THAT NOTICE AND THEY CONTINUED
```

1   TO HOLD THE PROPERTY, DIDN'T DO WHATEVER WOULD BE NECESSARY TO

2   TENDER IT BACK.  A TRANSACTION WHERE YOU GOT SOMETHING, NOT

3   DOLLARS, BUT A THING.  NOW, THAT IS RATIFICATION, YOUR HONOR.

4        LE CLERK IS A CASE FROM THE 1940'S THAT HELD THAT

5   RECISION WAS UNAVAILABLE, BUT NOTED THAT THE DEFRAUDED PARTY

6   COULD STILL SUE FOR DAMAGES.  IT WENT ON TO NOTE THAT THE TRIAL

7   COURT FOUND THERE WERE NO DAMAGES -- ACTUALLY, THERE WAS NO

8   FRAUD.  BUT EVEN LE CLERK DOESN'T SUPPORT THE PROPOSITION THAT

9   IF YOU ACCEPT THE BENEFIT OF THE CONTRACT, IF YOU GET NOTHING,

10  YOU HAVE TO GO AWAY.  YOU CAN STILL SUE FOR DAMAGES.

11        NOW, BOTH THOSE CASES INVOLVE CONVEYANCES OF THINGS FOR

12  MONEY -- RECISION GIVING SOMETHING BACK.  WITH LE CLERK, IT WAS

13  A RESTAURANT.  AND THEY DIDN'T TRY TO GIVE THE RESTAURANT BACK.

14  IN LE CLERK THEY BOUGHT THE RESTAURANT AND THE GUY WHO SOLD THEM

15  THE RESTAURANT OPENED UP A NEW ONE DOWN THE ROAD, AND AFTER THE

16  GUY OPENED UP THE NEW ONE DOWN THE ROAD, THEY MADE THREE OR FOUR

17  MORE PAYMENT ON THE RESTAURANT, AND AFTER THEY MADE THESE

18  PAYMENTS THEY SAID, "WAIT A MINUTE.  YOU SAID YOU WEREN'T GOING

19  TO GO INTO THE RESTAURANT BUSINESS.  NOW YOU'RE COMPETING WITH

20  US.  WE WANT TO SUE FOR RECISION".  THAT'S LE CLERK.

21        THIS POINTS UP ANOTHER THING WHERE MR. VAN NEST IS

22  WRONG ON THE LAW.  BOTH OF THOSE CASES THAT THEY CITE REFER TO

23  RATIFICATION OR DEFER RATIFICATION AS EXCEPTIONS OF THE BENEFIT

24  AFTER, QUOTE, "FULL KNOWLEDGE OF THE FACT".  THAT'S IN LE CLERK,

25  88 CAL. APP. 2ND, PAGE 702.  HERE IF YOU READ, THEY HADN'T

1 BRIEFED AND NOTICE IS RATIFICATION.

2      THELEN TOLD THIS COURT IN ITS BRIEF, "WELL, MARLAND

3 ACCEPTED A PAYMENT JUNE 2004." RATIFICATION. THAT'S BALONEY.

4 THERE IS NOT A CASE THAT THEY CITE OR CASE THEY CAN FIND THAT

5 SAYS THAT IT'S AFTER FULL NOTICE OF THE FACT.

6      MR. VAN NEST "WRITTEN A MEMO OUTLINING MARLAND'S CLAIMS

7 AGAINST THELEN". I THINK HE IS REFERRING TO IT INADVERTENTLY

8 THROUGH THAT PRIVILEGED DOCUMENT. THEY PRIDE THEMSELVES IS

9 ATTORNEYS -- HOPE HE DIDN'T READ IT BEFORE RETURNING IT, SINCE

10 HE SAID "PRIVILEGED, CONFIDENTIAL ATTORNEY WORK PRODUCT". I

11 DON'T KNOW HOW I CAN RELATE TO THE COURT THAT THE MEMO OUTLINES

12 MARLAND'S CLAIMS. BUT IT SEEMS LIKE IT.

13      IN ANY EVENT, ON THAT ISSUE, THEY SEEM CONFUSES AS TO

14 THE FACTS, AS TO THE QUESTION, WITH KNOWING THE FACTS. THEY

15 CONFUSE THEORIES WITH NOTICE. MR. VAN NEST SAID SOMETHING ABOUT

16 FEBRUARY 2000 -- 2005 HE SAYS, "GARY, WE STILL NEED TO TALK

17 ABOUT THE SEQUENCE OF EVENTS THAT LED TO ALL THESE AGREEMENTS.

18 IF YOU HAVE QUESTIONS, BEFORE YOU COME TO ANY CONCLUSIONS, I

19 WANT TO TALK TO YOU". THAT'S WHAT THE DOCUMENT SAYS.

20      THE COURT CAN SEE MR. FONTANA'S REQUEST IS, "WHAT? I

21 DON'T REMEMBER YOU EVER ASKING ME TO TALK ABOUT THESE THINGS

22 BEFORE." WHICH IS ALSO BALONEY. BUT IN ANY EVENT, THE FACT

23 THAT I AM ASKING WHETHER THEY DEFRAUDED MARLAND DOESN'T MEAN I

24 HAD NOTICED MARLAND. THAT IS EXACTLY THE OPPOSITE. AS THE

25 COURT KNOWS, NOTICE COMES FROM KNOWLEDGE OF THE FACT, NOT A

1  POTENTIAL THEORY.  YOU'VE GOT TO HAVE FACTS.

2         I WANT TO TURN TO THEIR COMMENTS ABOUT THE PAYMENT. THE

3  PAYMENT JUNE 2004, AS WE SAID IN OUR BRIEF, THAT ITSELF IS A

4  BADGE OF FRAUD.  THEY SAID, "JUST GOT THEIR MONEY.  UNDER THE

5  2002 AGREEMENT YOU'RE ENTITLED TO 35 PERCENT.  HERE IS OUR

6  CALCULATION".  AND THEY DIDN'T SAY -- MR. VAN NEST USED THESE

7  WORDS -- SAID, "WHAT SHOULD WE DO WITH IT?"

8         IT'S NOT WHAT THE DOCUMENT SAYS.  THE DOCUMENT SAYS,

9  "PLEASE TELL US WHAT ACCOUNT WE SHOULD SEND THIS MONEY TO".

10 THAT IS KIND OF DIFFERENT, BECAUSE THE AGREEMENT SAYS, "PAYMENTS

11 SHALL BE MADE TO AN ACCOUNT DESIGNATED BY SUSSANAH MASS.  THELEN

12 IS SAYING, "WERE READY TO MAKE THAT PAYMENT.  HERE IS THE

13 CALCULATION.  TELL US THE ACCOUNT TO SEND IT TO".  HE DIDN'T

14 SAY, "WHAT WOULD YOU LIKE US TO DO WITH IT, HOLD ON TO IT, OR

15 PUT IT IN THE BUSINESS?"  THAT'S JUST A LITTLE BIT OF TWISTING

16 OF THE FACTS.

17        IN ANY EVENT, IT'S PAYMENT THAT, AS I SAID, IT SEEMS TO

18 BE UNDISPUTED, ITSELF ERRONEOUS, BECAUSE THE TIME OF THE JUNE

19 2002 PAYMENT, THE 2002 AGREEMENT HADN'T BEEN APPROVED BY THE

20 DEFENDANT AT ALL, NO CONSENT WHATSOEVER.  THE DEFENDANT DIDN'T

21 CONSENT TO THE 2002 AGREEMENT, TO THE EXTENT IT CONSENTED AT

22 ALL, UNTIL AUGUST 2004.  SO WHEN THELEN WRITES TO THE EUROPEAN

23 COUNSEL, JOINTLY, BY THE WAY -- THEY WROTE TO ALL THREE JOINTLY

24 AND SAID, "WE HAVE RECEIVED THIS MONEY.  TELL US WHERE TO SEND

25 IT.  TELL US THE ACCOUNT".  THEY DON'T SAY, "OH, TECHNICALLY

1 SPEAKING, THE 2002 AGREEMENT HAS NOT BEEN RATIFIED OR APPROVED

2 ANY WAY BY THE DEFENDANT, SO WE ACTUALLY OWE YOU 52.5 PERCENT,

3 BUT ONLY WANT TO SEND YOU 35".  THEY DIDN'T SAY THAT.

4         SO THE IDEA THAT ACCEPTING THE 2004 PAYMENT CONSTITUTES

5 RATIFICATION IS A LEGAL ATTEMPT, BECAUSE THEY DIDN'T 'S HAVE

6 FULL NOTICE OF THE FACT.  NOW.  THE SECOND PAYMENT WAS IN

7 DECEMBER 2005.  THIS IS WHERE MR. VAN NEST IS, "WHAT SHALL WE DO

8 WITH IT?"  THE SECOND PAYMENT CAME ABOUT TWO MONTHS BEFORE

9 MARLAND FILED FOR ARBITRATION.  THEY DON'T CLAIM THAT MARLAND

10 DID ANYTHING BETWEEN DECEMBER 2005, FEBRUARY 2006 CONSTITUTING

11 RATIFICATION, NO OVERT ACT.  MARLAND DOESN'T SAY, "I WAS

12 THINKING OF SUING YOU, BUT SEND ME THE MONEY".  AND RATIFICATION

13 REQUIRES SOME ACT, INCLUDING, OF COURSE, CONTINUED POSSESSION OF

14 A THING AS IN THE CASES THEY RELY ON, USTICH AND LE CLERK.

15         IF YOU BUY A RESIDENCE OR PURCHASE A NOTE OR GET

16 SOMETHING OUT OF BANKRUPTCY AND DON'T TRY TO GIVE THAT THING

17 BACK, THAT MAY BE RATIFICATION, BUT HERE WE HAVE ACCEPTANCE OF

18 MONEY.  SO OH WANTED TO OPPORTUNITY TO THE RD IF I INDICATION

19 ANALYSIS THAT THEY DON'T MENTION THE WITHIN THAT OCCURRED AFTER

20 WITH TWO T IN FACT IT OCCURRED IN BGJ ASSOCIATES.  BGJ

21 ASSOCIATES AFTER FINDING THAT RILE 3-300 APPLIED AND HAD NOT BE

22 COMPLIED WITH WENT TO ON TO CONSIDER A RATIFICATION ARGUMENTS

23 MUCH THE FACT IN BGJ ASSOCIATES ABOUT RATIFICATION FOR ACTUALLY

24 FRP STRONGER AND IN FAVOR OF THE CLIENTS IN THAN THE FACT HERE.

25 BGJ ASSOCIATES FTS LAWYER WHO ADVISEMENT D 3-300 FLY SAID WAIT A

1  MINUTE.  WE HAD THERE TRANSACTION ANSWER THEY SIGNED THESE OTHER

2  DOCUMENTS AND THEY TOLD US THAT ELSE LAWYER THE KNEW LAWYER WE

3  HIRED SAID AN AFTER STRONG RESERVATIONS ABOUT THE DEAL BUT JUST

4  GOING TO SIGN THIS AND HE SIGNED IT.  AND HE WENT FORWARD WITH

5  THE DEAL.  THAT'S GOT TO BE RATIFICATION.  THAT WAS THE ARGUES

6  MANY THEY PLAYED.  AND THE COURT REJECTED THAT.  THIS APPEARS IN

7  113 CAL.APP.4TH, PAGE 1230, RIGHT AT THE VERY END OF 1229, 1230.

8  SO BGJ ASSOCIATES MAKES CRYSTAL CLEAR THAT MR. VAN NEST IS WRONG

9  WHEN HE SAYS IF YOU HAVE NOTICE, IF YOU HIRED ANOTHER LAWYER, IF

10  YOU THINK YOU MAY HAVE CLAIMS AND YOU STILL DO THINGS IN

11  FURTHERANCE OF THE DEAL, THAT'S RATIFICATION.  HE IS JUST FLAT

12  WRONG.  NO RATIFICATION.

13         FINALLY, EVEN IF BGJ SAYS THIS THING EXISTS,

14  RATIFICATION CAN'T APPLY HERE BECAUSE WE'RE JUST TALKING ABOUT

15  MONEY.  I MEAN, YOUR HONOR, IF I SOLD YOUR -- WELL, IF ONE OF

16  YOU TWO SOLD A CAR AND THEY HAD A DISAGREEMENT, RENEGOTIATED,

17  AND THE GUY KEPT MAKING PAYMENTS ON THE NOTE FOR THE TRUCK AND

18  THE CAR, BUT HE ONLY GOT THE CAR, NEVER GOT THE TRUCK, HE KEPT

19  MAKING PAYMENTS, THEN SUED AND SAID, "I WANT YOU TO GIVE ME THE

20  TRUCK NOW".

21         THE DEFENDANT CAN SAY, "YOU RATIFIED IT BY KEEPING THE

22  CAR.  YOU HAVE TO GIVE THE CAR BACK BEFORE YOU SUE FOR THE

23  TRUCK, OTHERWISE IT'S RATIFICATION".  THAT'S NOT WRONG, YOUR

24  HONOR.  IT'S GOT TO BE SOMETHING INCONSISTENT WITH THE RELIEF

25  YOU'RE SEEKING.  IT'S ALL SUPPORTED BY LE CLERK WHICH SAYS YOU

1    HAVE TO CHOOSE DAMAGES RECISION.  SO HERE ALL YOU GOT WAS MONEY,

2    AND YOU'RE CLAIMING YOU'RE ENTITLED TO MORE MONEY.  YOU CAN'T BE

3    HELD TO RATIFY BY TAKING LESS THAN YOU THING YOU'RE OWED.

4              NOW, TURNING TOP FRAUD.

5              THE COURT:  WHAT WAS THE DATE OF THE FIRST AGREEMENT

6    THAT THELEN AND MARLAND ENTERED INTO?

7              MR. HAYES:  FEBRUARY, 1999.

8              THE COURT:   EFFECTIVE 1999.

9              MR. HAYES:  YES.

10             THE COURT:  WHEN IN FEBRUARY?

11             MR. HAYES:  I BELIEVE THE 13TH OR 14TH, BUT --

12   FEBRUARY 13, 1999.

13             SORRY.  17TH.  THE COMPLAINT IS FILED ON THE 18TH.

14             THE COURT:  MR. CHATEAU LEFT THELEN REID ON THE 28TH OF

15   FEBRUARY, 1999?

16             MR. HAYES:  YES.

17             THE COURT:  YOU SAY HE HAD AN INTEREST IN THELEN'S FEE?

18             MR. HAYES:  OH, YES.  THERE IS DOCUMENTS, A LETTER

19   AGREEMENT BETWEEN CHATEAU AND THE FIRM CONFIRMING, BECAUSE HE

20   BROUGHT THE CASE TO THE FIRM.  I BELIEVE IT'S FIVE PERCENT OF

21   THELEN'S PREMIUM BEING MEASURED AS -- I DIDN'T MARK IT.

22             THE COURT:  WHERE DO I FIND IT?

23             MR. HAYES:  I DIDN'T MARK IT AS AN EXHIBIT IN CLATEAU'S

24   DEPOSITION.  I DON'T THINK YOU WILL FIND IT.  I DON'T REMEMBER

25   THAT.  I HAVE CHATEAU'S DEPOSITION HERE AND I CAN TRY TO MULTI

1    TASK OR DO  IT A LITTLE LATER.

2          THE COURT:  ALL RIGHT.  DO IT A LITTLE LATER IN THE

3    HEARING.  PERHAPS MR. VAN NEST CAN BE OF SOME HELP.

4          MR. HAYES:  I'D LIKE TO TURN TO FRAUD NOW.  THEY HAVE

5    MADE -- WHICH I SAID WE DON'T NEED TO GET TO.  THEY MADE THE NO

6    IMMEDIATE ARGUMENT BY RELYING ON THE MARLAND DEPOSITION AND THEY

7    RELY ON HIS DEPOSITION IN WHICH MR. VAN NEST DIDN'T SHOW

8    MR. MARLAND ANY OF THE CORRESPONDENCE BACK AND FORTH, VIRTUALLY

9    NONE OF THE CORRESPONDENCE BACK AND FORTH BETWEEN CARVILL AND

10   BRUNSWICK.  ON TOP OF THAT MR. VAN NEST JUST SAYS THINGS ABOUT

11   THE TESTIMONY THAT AREN'T TRUE.

12         PAGE 24 OF OUR OPPOSITION BRIEF, WE HAVE CITATIONS TO

13   PAGE AND LOG OF MARLAND'S TESTIMONY WHERE HE SITTING THERE IN

14   HIS DEPOSITION WITH HALF THE DOCUMENTS IN FRONT OF HIM, BELIEVED

15   THELEN HAD MISLED HIM.  THE REPLY BRIEF CALLS THIS A CONCOCTION

16   BY MARLAND'S COUNSEL.  I DID NOT ALTER THE TRANSCRIPT.  THE

17   TRANSCRIPT SAYS WHAT IT SAYS.

18         IN PARTICULAR, MR. VAN NEST STOOD HERE AND TOLD YOU

19   THAT HE DIDN'T REMEMBER ANYTHING FONTANA TOLD HIM.  THAT'S NOT

20   TRUE.  MR. VAN NEST WAS SITTING THERE IN THE ROOM LAST FALL WHEN

21   MR. MARLAND SAID THAT HE REMEMBERED FONTANA TELING HIM IT WAS A

22   GOOD AGREEMENT FOR MARLAND, A GOOD AGREEMENT, AND HE SHOULD SIGN

23   IT BECAUSE, QUOTES, "THE PLATE WOULD GET BIGGER".  PAGE 255 LINE

24   22 THROUGH 256, LINE FIVE.  NOT A FABRICATION BY MY COUNSEL --

25   BY HIS COUNSEL -- MARLAND'S COUNSEL.  MR. VAN NEST MISSPOKE.

1          NOW, WHAT THELEN DID NOT SAY -- WHAT FONTANA DID NOT

2    SAY WAS THAT HE, FONTANA, WAS PUSHING THELEN TO INCREASE

3    THELEN'S FEE.  MARLAND DIDN'T SAY THAT IN HIS DEPOSITION BECAUSE

4    WE HADN'T HAD THE DOCUMENT YET.  WE GOT DOCUMENTS, EXHIBIT 114,

5    FROM THEIR SO-CALLED PRIVILEGE DOCUMENTS IN MARCH.  WHEN CARVILL

6    REACHED AN AGREEMENT WITH MARLAND IN JULY OF 2002 -- I DON'T

7    KNOW IF IT WILL BE ACCEPTABLE TO AN EXECUTIVE COMMITTED.  I

8    ASKED MR. CARVILL WHAT THAT MEANS.  HE SAID, "WELL, MR. FONTANA

9    WANTED A BIGGER SHARE FOR THE FIRM," AND YET MARLAND RECALLS

10   FONTANA TELLING HIM IT'S A GOOD AGREEMENT BECAUSE THE PLATE

11   WOULD GET BIGGER.  THAT'S WHAT HE REMEMBERS FONTANA SAYING.  HE

12   REMEMBERS HE THREATENED THAT FONTANA AND BRUNSWICK WOULD QUIT

13   THE FIRM AND THAT HE WOULD GET NOTHING.  IF THEY TOOK THE CASE

14   WITH THEM, HE WOULD GET NOTHING.  HE REMEMBERS THELEN INVOKING

15   THE DOCUMENT CONSTRUCTION ISSUES AND HE TESTIFIED THAT THAT

16   THOUGHT WAS WRONGFUL BECAUSE GARY SAID HE DIDN'T HAVE TO USE THE

17   DOCUMENT.  HE DIDN'T WANT TO.

18          MARLAND SPECIFICALLY RECALLED AND TESTIFIED THAT HE WAS

19   TOLD THE DOI DID NOT WANT HIM TO GET RECOVERY.  THAT'S PAGE 164,

20   LINES 18 TO 20 OF HIS DEPOSITION.  AGAIN, NOT A FABRICATION BY

21   ME.  IT'S MR. VAN NEST'S STATEMENT THAT MARLAND DIDN'T RECALL

22   ANYTHING.  HE MISREPRESENTED THAT TESTIMONY AS WELL.  SO HERE IS

23   THELEN'S -- MARLAND'S LAWYER -- SAYING TO THEIR CLIENT THAT THE

24   OTHER CLIENTS DON'T WANT MARLAND TO GET ANYTHING.  MARLAND IS

25   THINKING, "WELL, MAYBE I BETTER CUT A DEAL".

```
 1          THE FACT IS, YOUR HONOR, YOU DON'T GET OUT OF A FRAUD,
 2  A CLAIM, BY SAYING, "WELL, MARLAND DIDN'T TESTIFY IN HIS
 3  DEPOSITION THAT HE NOW KNOWS THE DEPARTMENT OF INSURANCE TOOK NO
 4  POSITION ON WHAT SHARE HE SHOULD GET.  WE DON'T PROVE A FRAUD
 5  PURELY FROM MARLAND, BUT IN FACT NO ONE TESTIFIED ABOUT THAT
 6  POINT, AND WE KNOW THAT FROM THE DEPOSITION OF TOUR(PHONETIC)
 7  AND LE VINE THE DOI TOOK NO POSITION REGARDING MARLAND'S SHARE.
 8  SO THAT'S FRAUD.  THEY LIED TO HIM ABOUT WHAT THE DOI SAID --
 9  "YOU BETTER TAKE THIS DEAL BECAUSE THE DOI WILL OTHERWISE CUT
10  YOU OFF.  NOT EVEN JUST TESTIMONY.  WE HAVE EXHIBITS.  THIS IS
11  ONE OF THEIR EXHIBITS FROM MR. HUR'S DECLARATION.  IT'S OCTOBER
12  22, 2002 E-MAIL FROM CARVILL TO BRUNSWICK, THE ONE THAT WE FLAG
13  AT THE BEGINNING OF OUR REPLY BRIEF BECAUSE IT SHOWED
14  MR. CARVILL NOW AT THE TIME THAT HE HAD TO COMPLY WITH 3-300  IN
15  RENEGOTIATING WITH THE DOI.
16          CARVILL WRITES, " WE STILL NEED TO GO TO THE
17  COMMISSIONER, MAKE THE NECESSARY DISCLOSURES AND ADVICE HIM --"
18  PARENTHESIS -- "OUR MUTUAL CLIENTS --" CLOSE PARENTHESIS -- THAT
19  THESE DISCLOSURES ENTITLE HIM TO RESCIND BOTH OUR AGREEMENT AND
20  EC AGREEMENT".  NOW, THELEN IN IT'S REPLY BRIEF SAYS, "WELL, WE
21  DON'T HAVE ANY EVIDENCE THAT CARVILL DIDN'T BELIEVE MARLAND WAS
22  COUNSEL TO THRE COMMISSIONER.  THAT'S IRRELEVANT.  THELEN
23  ANSWERED INTERROGATORY 50 -- ANSWERS, "THELEN NEVER BELIEVED
24  MARLAND WAS COUNSEL TO THE COMMISSIONER".  THAT'S THE ANSWER OF
25  THE CORPORATE ENTITY THAT IS INVOLVED HERE, AND CARVILL WAS
```

1  SAYING OCTOBER 2002 AND BEFORE AND AFTER THAT MARLAND'S -- THE

2  COMMISSIONER IS MARLAND'S CLIENT AND HE IS SAYING, "WE TO HAVE

3  MAKE THESE DISCLOSURES".  NO EVIDENCE THAT THEY EVER MADE THOSE

4  DISCLOSURES.  SEEMS QUITE UNLIKELY THEY DID.  WHY?  BECAUSE

5  LE VINE -- DOI WASN'T GOING TO PRODUCE THE DOCUMENTS. DOI WASN'T

6  RELYING ON PRODUCING DOCUMENTS, NO EVIDENCE THAT DOI WAS, NONE

7  WHATSOEVER.  BUT THAT'S WHAT THEY TOLD MARLAND.  THAT'S FRAUD,

8  MISREPRESENTING STATUS AS COUNSEL.

9         THEY CITE A COUPLE OF CASES OF STATEMENTS OF

10  OPINION -- NOT EVEN ACTIONABLE.  IT'S NOT A TRUE STATEMENT.

11  OPINION ARE NEVER ACTIONABLE WHEN A LAWYER TELLS US SOMETHING

12  CERTAINLY THAT INVOLVES A LEGAL CONCLUSION, YOUR HONOR, TENDS TO

13  BELIEVE THAT THE LAWYER ACTUALLY BELIEVES WHAT THEY'RE TELLING

14  YOU.  WHEN A LAW FIRM DOESN'T, IT DOESN'T MATTER IF THE GUY IS

15  SITTING AT THE MOMENT TELLING YOU THE FIRM DOESN'T 0 BELIEVE IT,

16  BUT THE GUY IS TELLING YOU IT IS NOT TRUE SINCE THE LAW FIRM IS

17  IN A FIDUCIARY RELATIONSHIP IT'S THE LEAST CONSTRUCTIVE FRAUD,

18  SO THEY LIED TO HIM ABOUT HIS STATUS ABOUT THE DOI EXPECTING HE

19  WOULD HAVE EVER PRODUCED THE DOCUMENTS AND COUNTING ON THAT AND

20  RETAINING MARLAND.  I MEAN, HE SAYS IN EARLIER E-MAIL THAT IF

21  THE DOI RELIED ON MARLAND BEING WILLING TO TESTIFY TO PRODUCE

22  THE DOCUMENT IN PROVING EUROPEAN COUNSEL AGREEMENT.  THAT'S NOT

23  TRUE, WE KNOW.  THE DOI YOU DIDN'T APPROVE OF COUNSEL'S

24  AGREEMENT 'TILL DECEMBER '99 AND WE HAVE TESTIMONY FROM CARVILL

25  AND BELGUM THAT LEVINE WAS TOLD SUMMER 1999, IN JUNE, THAT

1  MARLAND MIGHT NEVER PRODUCE THE DOCUMENT.  WE DIDN'T KNOW THAT.

2  BRUNSWICK DIDN'T KNOW THAT.  MARLAND DIDN'T IN 2002.  WE ONLY

3  KNOW THAT FROM DEPOSITIONS IN THIS CASE.

4        SO IN 2002 CARVILL SAYS DOI WAS RELYING ON MARLAND T

5  PRODUCE THIS DOCUMENT AND AGREEING TO GIVE MARLAND A DIME IF WE

6  KNOW THAT WAS FALSE.  SO THAT'S TRUE.  MOREOVER  -- I KNOW WE

7  GAVE YOU A LOT, BUT IF THE COURT GETS TO THE ISSUE OF FRAUD, THE

8  FACT IS WE DIDN'T MOVE FOR SUMMARY JUDGMENT THAT THE AGREEMENT

9  IS VOID BECAUSE OF FRAUD.  THEY MOVED TO DISMISS OUR AFFIRMATIVE

10 DEFENSE.  ALL WE HAVE TO DO IS COME UP WITH ENOUGH EVIDENCE OF

11 FRAUD IF THE COURT GOES TO THE ISSUE OF FRAUD TO GET TO A JURY

12 AND HAVE A JURY DECIDE AND HEAR INTO HERE CARVILL AND FONTANA

13 AND HEAR FROM THEM, HAVE THEM EXPLAIN WHY THEY'RE SAYING MARLAND

14 WAS CONSISTENT WITH WHAT THEY TOLD THE DOI.  THAT'S ALL WE HAVE

15 TO GET TO IN TERMS OF FRAUD AT THIS STAGE; SO I DON'T THINK WE

16 WANT TO HANG UP THIS MOTION ***FOLLOW ENOUGH EVIDENCE OF FRAUD

17 BECAUSE THIS IS, FOR THE PURPOSE FOR WHICH FRAUD IS BEING RAISED

18 HERE, THOSE ARE MY RESPONSES TO THE THREE POINTS.

19        THE COURT:  ALL RIGHT.  SIT DOWN.  LET'S ASSUME THAT

20 THEY HAD AN INTEREST IN THELEN'S FEE AND BRUNSWICK HAD AN

21 INTEREST IN RONO'S RECOVERY.  HOW DOES THAT MAKE BRUNSWICK'S

22 POSITION AND CHATEAU'S POSITION ADVERSE TO MARLAND'S?

23        MR. HAYES:  WELL, I AM NOT SURE IT MAKES THEM ADVERSE

24 BECAUSE MAYBE BRUNSWICK IS NOT FULLY INDEPENDENT, BECAUSE

25 MARLAND REACHED A NEW DEAL WHEN THELEN AND BRUNSWICK GET

1  ACCEPTED.  I GUESS TO TRY TO GET A SHARE OF THE FEE.  SO OUR

2  POSITION IS BRUNSWICK WAS SELF INTERESTED, NOT THAT HE WAS

3  ADVERSE.  I MEAN -- YOU COULD RUN THROUGH THAT.  YOU SAID HE WAS

4  SELF INTERESTED.  SO THAT'S OUR POSITION.  AND WE SAID CHATEAU

5  AND MARLAND KNEW CHATEAU HAD THIS INTEREST.  AGAIN, I DON'T KNOW

6  THAT IS IN THE RECORD, BUT THAT'S WHAT I AM ADVISED IS THE CASE.

7  BUT IT'S MORE IMPORTANT CHATEAU DID NOT GET INVOLVED IN THE

8  DRAFTING.

9         THE COURT:  ALL RIGHT.  THANK YOU.  VERY QUICKLY,

10 MR. VAN NEST.

11        MR. VAN NEST:  YES, YOU HONOR.

12        THE COURT:  WHAT ABOUT THIS INTEREST OF BRUNSWICK AND

13 CHATEAU, WHETHER THEY'RE TRULY INDEPENDENT.

14        MR. VAN NEST:  THREE POINTS.  ONE, THIS WAS NEVER

15 CONTESTED IN THE PAPERS.  BUT, TWO, I THINK AS YOUR YOUR HONOR

16 NOTED, BRUNSWICK'S INTEREST AS SET FORTH IN THIS AGREEMENT IS IN

17 RONO.  HE IS BEING COMPENSATED BY THE CLIENT IN THAT PARTICULAR

18 FASHION AND HE HAS ALWAYS TAKEN THE POSITION, AND SO HAS CHATEAU

19 THAT THEY WERE LAWYERS FOR MARLAND.  THEY'RE THE ONES THAT ARE

20 RESISTING DISCOVERY ASSERTING THE PRIVILEGE.  THEY'RE THE ONES

21 THAT HAVE ALWAYS TAKEN THE POSITION THEIR COMMUNICATIONS WITH

22 MARLAND WERE CONFIDENTIAL FROM THELEN AND --

23        THE COURT:  FIRST YOU RELY ON THEIR REPRESENTATION OF

24 MARLAND IN INVESTIGATING THE DECEMBER 2002 AGREEMENT.

25        MR. VAN NEST:  I AM.  AND ALL THE RULE REQUIRES IS THAT

1    HE BE GIVEN NOTICE THAT HE HAS THE RIGHT TO CONSULT WITH

2    INDEPENDENT COUNSEL AND GIVE HIM AN OPPORTUNITY TO DO THAT.  WHO

3    HE CHOOSES TO CONSULT WITH, YOUR HONOR, OR HOW HE CHOOSES TO

4    COMPENSATE THEM IS UP TO HIM.  AND I KNOW FOR A CERTAINTY THAT

5    BRUNSWICK WAS NOT SHARING ANY OF THELEN'S FEE.  HIS WAS COMING

6    FROM THE  CLIENT FROM THE MARLAND SIDE.

7           WITH RESPECT TO CHATEAU, I DON'T THINK THERE IS

8    ANYTHING IN THE RECORD AS TO CHATEAU AND I DON'T KNOW WHETHER HE

9    WAS SHARING A FEE IN SOME FASHION AS A FORMER PARTNER OF THELEN,

10   BUT I KNOW AS TO BRUNSWICK AND  --

11          THE COURT:  THEY WERE SHARING A FEE WITH THELEN.  THAT

12   WOULD MAKE HIS POSITION ADVERSE TO MARLAND'S, WOULD IT NOT?

13          MR. VAN NEST:  I'M NOT SURE.  IT DEPENDS ON THE TERMS

14   OF IT.  AGAIN, ALL THE RULE REQUIRES, YOUR HONOR, IS THAT

15   MARLAND WILL BE GIVEN NOTICE THAT HE CAN CONSULT WITH OTHER

16   LAWYERS AND HAD AN OPPORTUNITY TO DO SO.  IF HE CHOSE TO CONSULT

17   WITH CHATEAU, NO LONGER A THELEN PARTNER, OR BRUNSWICK, I DON'T

18   THINK IT MATTERS HOW THEY'RE PAID.

19          THE COURT:  CHATEAU'S INTEREST NOT DISCLOSED TO MARLAND

20   WOULD NOT BE A FACTOR?

21          MR. VAN NEST:  THERE IS ABSOLUTELY NO EVIDENCE OF THAT

22   EITHER.  CHATEAU, REMEMBER, YOUR HONOR, THE WHOLE REASON THAT

23   MARLAND GOT TO THELEN IN THE FIRST PLACE IS THAT HE KNEW

24   CHATEAU.  HE WAS HIS FRIEND.  I JUST  --

25          THE COURT:  BUT BY 2002 CHATEAU HAD LEFT THELEN, BEEN

1  GONE THREE YEARS OR MORE THAN THREE YEARS, AND MARLAND

2  PRESUMABLY WAS LOOKING TO CHATEAU TO REPRESENT HIS INTERESTS.

3         MR. VAN NEST:  NO DOUBT.

4         THE COURT:  AND WHETHER IN FACT MARLAND HAD INDEPENDENT

5  REPRESENTATION WHICH WAS TRULY INDEPENDENT, WOULD DEPEND ON

6  WHETHER OR NOT CHATEAU HAD AN INTEREST IN THELEN'S FEE.

7         MR. VAN NEST:  I'LL SAY TWO THINGS, YOUR HONOR.  ONE IS

8  THAT HAS NOTHING DO WITH BRUNSWICK, AND BRUNSWICK IS CLEARLY

9  INDEPENDENT AND CLEARLY BEEN COMPENSATED ON MARLAND'S SIDE.

10        TWO, THE RULE DOESN'T REQUIRE THAT HE ACTUALLY GIVE ANY

11  ADVICE.  ALL THE RULE REQUIRES IS THAT HE BE GIVEN NOTICE OF THE

12  RIGHT TO SEEK ADVICE FROM INDEPENDENT COUNSEL AND AN OPPORTUNITY

13  TO DO SO.  WE DON'T HAVE ANYONE TO PROVE THEY'RE INDEPENDENT,

14  THEY WERE INDEPENDENT, BUT --

15        THE COURT:  BUT YOU'RE ASSUMING THAT COMPLIANCE WITH

16  THE CODE OF PROFESSIONAL CONDUCT HERE WOULD VITIATE ANY FRAUD.

17  THAT COMPLIANCE WITH THE PROFESSIONAL RULES WOULD ELIMINATE ANY

18  POSSIBLE CLAIM FOR FRAUD THAT MARLAND COULD MAKE.

19        MR. VAN NEST:  WE'RE NOT TAKING THAT POSITION.

20        THE COURT:  THAT'S YOUR OPINION, ISN'T IT?

21        MR. VAN NEST:  NO.  OUR POSITION IS THAT HE HAS

22  PRESENTED TWO ATTACKS TO THE AGREEMENT.  ONE IS FRAUD.  AND THAT

23  FAILS BECAUSE HE HASN'T PRESENTED ANY EVIDENCE OF IT.  THE OTHER

24  IS IF HE IS CLAIMING THAT WE VIOLATED THE -- THELEN VIOLATED THE

25  RULES OF PROFESSIONAL CONDUCT.  WE'RE NOT SAYINGS COMPLIANCE

1   WITH RULES OF PROFESSIONAL CONDUCT VITIATES FRAUD.

2           THE COURT:  ARE YOUR SIMPLY ASSERTING THAT AS A

3   DEFENSE?

4           MR. VAN NEST:  NO.  WHAT I AM SAYING IS HE HAS

5   PRESENTED TWO ATTACKS ON THIS AGREEMENT, AND THEIR MAIN ONE IS

6   THAT IT WAS INDUCED BY FRAUD.  THE OTHER IS THAT IT'S VOIDABLE

7   AND UNENFORCEABLE BECAUSE IT DIDN'T COMPLY WITH THE RULES OF

8   PROFESSIONAL CONDUCT.  ALL I'M DOING IS ADDRESSING EACH OF THOSE

9   TWO PRONGS.

10          IT'S NOT OUR POSITION THAT COMPLIANCE WITH THE RULES

11  SOMEHOW VITIATES FRAUD.  IT IS OUR POSITION THAT ON RATIFICATION

12  IF YOU HAVE KNOWLEDGE OF THE FACT AND AFFIRM THE AGREEMENT, THEN

13  THAT DOES VITIATE FRAUD.  BUT AS TO THE RULES OF PROFESSIONAL

14  CONDUCT, WE'RE NOT ARGUING THAT COMPLIANCE WITH THOSE VITIATES

15  FRAUD.

16          I'M SAYING TWO THINGS ON THE RULES.  ONE IS THAT 3.300

17  DOES NOT APPLY.  AND WITH RESPECT TO THAT, MR. HAYES MADE TWO

18  KEY ADMISSIONS.  ONE IS THAT THE DECEMBER 2002 AGREEMENT IS A

19  FORM OF CONTINGENT FEE AGREEMENT, AND HE DIDN'T PRESENT A SINGLE

20  CASE, AND THERE ISN'T ONE, IN WHICH 3.300, WHICH IS INTENDED FOR

21  BUSINESS TRANSACTIONS, HAS BEEN APPLIED TO A CONTINGENT FEE

22  CONTRACT.  THERE IS NO SUCH CASE.  THERE IS NO SUCH LAW.

23          RAMIREZ HELD TO THE CONTRARY.  WHEN YOU'RE NEGOTIATING

24  A FEE WITH A CLIENT, THE PROBATE CODE IN THAT INSTANCE HAS AN

25  EXCEPTION AND DOESN'T APPLY AND AS LONG AS THE CLIENTS HAS

1  SEPARATE REPRESENTATION AND THE SUBJECT MATTER IS A FEE

2  AGREEMENT, NOT A BUSINESS TRANSACTION, IT DOESN'T APPLY.

3       SECONDLY, WE'RE SAYING THELEN COMPLIED WITH THE RULE

4  EVEN IF IT DID APPLY HERE, BECAUSE HE WAS GIVEN NOTICE OF THE

5  RIGHT TO HAVE INDEPENDENT COUNSEL.  HE HAD AN OPPORTUNITY TO

6  CONSULT WITH HIM, AND THE DEAL IS FAIR AND REASONABLE, AND

7  NOTHING MR. HAYES SAID HAS PROVIDED THE COURT WITH ANY

8  AUTHORITIES FOR THE APPLICATION OF 3.300 TO THIS TRANSACTION,

9  BECAUSE THERE ISN'T ANY.  IT DOESN'T APPLY.

10       I THINK THE FACT THAT BRUNSWICK WAS CLEARLY INDEPENDENT

11  AND CLEARLY HAS BEEN FROM DAY ONE TAKEN THE POSITION THAT HE IS

12  MR. MARLAND'S LAWYER AND HE WOULDN'T TESTIFY BECAUSE HE WAS MR.

13  MARLAND'S LAWYER, BECAUSE  HIS COMMUNICATIONS WITH MARLAND ARE

14  CONFIDENTIAL FROM THELEN, PROVES THE POINT.  THEY HAVE TAKEN THE

15  POSITION THAT THESE COMMUNICATIONS THAT MARLAND HAD WITH BOTH --

16  BOTH BRUNSWICK AND CHATEAU ARE PROTECTED BY THE ATTORNEY/CLIENT

17  PRIVILEGE.

18       TURNING TO RATIFICATION, I WANT TO GIVE A ROAD MAP

19  WHERE I GOT THE EVIDENCE I TALKED ABOUT.  POINT ONE IS EVIDENCE

20  THAT BY MARCH OF '04 MR. HAYES HAD DONE A MEMO COMES FROM

21  EXHIBIT "O" TO MISS THURM'S DECLARATION.  IT'S HIS PRIVILEGE LOG

22  AND ITEM 56 SAYS "MEMO REVIEW AND ANALYSIS OF POSSIBLE CLAIMS BY

23  RONO".  SO I HAVEN'T READ ANY PRIVILEGED MEMOS OR FAILED TO

24  RETURN THEM OR ANY SUCH THING.  I AM READING HIS PRIVILEGE LOG

25  WHICH IS ATTACHED TO EXHIBIT "O" TO MISS THURM'S DECLARATIONS

1  AND IT'S ITEM 56 AT PAGE FOUR.

2          WITH RESPECT TO THE FIRST PAYMENT OF FEES IN JUNE, I AM

3  LOOKING AT EXHIBIT ONE TO BELGUM'S DEPOSITION WHICH SAYS POINT

4  BLANK "ATTACHED HERETO IS THE CALCULATION FOR PAYMENT PURSUANT

5  TO THE TERMS OF THE NEW AGREEMENT TO ASSOCIATE COUNSEL OF

6  DECEMBER 20, 2002.  IF YOU HAD ANY COMMENTS, QUESTIONS,

7  OBJECTIONS OR CORRECTIONS REGARDING THE CALCULATION OF THE

8  AMOUNT, PLEASE LET ME KNOW.  OTHERWISE, WE'LL MAKE PAYMENT".

9  THAT WAS IN JUNE.  THAT'S WHAT THE MEMO SAYS.  THAT'S WHAT I

10 REPRESENTED TO THE COURT.  I TOLD YOUR HONOR THAT IN FEBRUARY OF

11 2005 MR. HAYES SENT AN E-MAIL TO BOB BLUM.  THE E-MAIL IS

12 EXHIBIT ONE TO THE BLUM DECLARATION AND THE E-MAIL SAYS, QUOTE,

13 "THE RELEASE WAS PROCURED BY FRAUD, SPECIFICALLY IN THELEN'S

14 INSISTENCE THAT THE COMMISSIONER CONSIDERED MARLAND TO BE

15 COUNSEL," ETCETERA, ETCETERA, ETCETERA.  HE ASSERTS SOME OTHER

16 BASIS FOR VOIDING THE AGREEMENT, BUT THE FRAUD ONE SUPPORTED BY

17 THE SAME FACTS HE IS RELYING ON TO DAY WAS SET FORTH IN FEBRUARY

18 AND THE FINAL DOCUMENTS I RELIED ON, YOUR HONOR, WAS THE WIRE

19 TRANSFER E-MAIL IN DECEMBER OF '02 -- SORRY -- '05.  THAT'S

20 EXHIBIT 2 TO FONTANA'S DECLARATION.

21          AGAIN, MR. FONTANA SAYS, "AS YOU KNOW, IN ACCORDANCE

22 WITH THE DECEMBER 2002 AGREEMENT--" HE REFERS TO IT AS JULY

23 AGREEMENT -- THAT IS THE EFFECTIVE DATE OF IT -- "PAYMENTS AFTER

24 EUROPEAN COUNSEL'S 35 PERCENT SHARE IS TO BE MADE TO MASS".  SO

25 THOSE ARE THE DOCUMENTS AND THE LAW THAT WE'RE RELYING ON.  IT'S

1  VERY SIMPLE AND SET FORTH IN THIS LE CLERK CASE.

2       THE LE CLERK CASE IS A CASE IN WHICH ONE OF THE

3  CONTRACTING PARTIES FELT HE HAD A BASIS FOR FRAUD, BUT HE

4  CONTINUED ACCEPTING THE BENEFIT OF THE AGREEMENT AND ONLY

5  THEREAFTER DID HE SEEK TO VOID IT, AND LE CLERK SAID, "A

6  DEFRAUDED PARTY MUST EXERCISE HIS ELECTION TO RESCIND WITH

7  REASONABLE PROGRESS AFTER DISCLOSING THE FRAUD.  A DELAY IS

8  EVIDENCE OF A WAIVER OF THE FRAUD AND AN ELECTION TO TREAT THE

9  CONTRACT AS CONSISTENT.  ANY ACTS INDICATING AN ATTEMPT TO ABIDE

10 BY THE COURT ARE EVIDENCE OF AFFIRMATION."

11       MR. MARLAND AND THELEN HAD EXCHANGED RELEASES OF

12 CONTESTED CLAIMS.  WHEN MR. MARLAND ACCEPTS THE 19 MILLION UNDER

13 THAT AGREEMENT, HE WAS THINKING THAT THE CONTRACT IS VALID AND

14 NOT VOIDING IT AND THAT THE RELEASES WOULD BIND BOTH HE AND

15 THELEN.

16       AND, FINALLY, BEFORE I SIT DOWN,  THE ONLY POINT I WANT

17 TO MAKE ON THE FRAUD CLAIM, WHICH WE'LL SAVE FOR LAST, IS THAT

18 I'LL STAND ON EVERYTHING I SAID.  THE POINT IS THAT MR. HAYES

19 MADE STATEMENTS HE IS ATTRIBUTING TO MR. MARLAND.  NONE OF THEM

20 ARE STATEMENTS OF FACT THAT COULD POSSIBLY SUPPORT A FRAUD

21 CLAIM.  EVEN IF MR. FONTANA TOLD HIM IT'S A GOOD AGREEMENT, YOU

22 SHOULD SIGN IT, THAT'S NOT FRAUD.  THAT'S DISCUSSION BETWEEN

23 PARTIES TO A NEGOTIATION.  I WOULD I ADVISE THE COURT THAT

24 MR. MARLAND COULDN'T REMEMBER WHEN WHERE OR IF THAT HAD BEEN

25 SAID OR NOT, WHEN AND IF MR. MARLAND WAS TOLD FONTANA AND BELGUM

1  MIGHT QUIT AND TAKE THE CASE WITH THEM, THAT IS NOT A STATEMENT

2  OF FACT.  IT'S A STATEMENT "IF YOU DON'T NEGOTIATE, YOU MAY GET

3  NOTHING".  ALL THESE THINGS ARE THE SORT OF STATEMENTS, EVEN IF

4  THEY WERE MADE, THAT ARE MADE IN THE COURSE OF A NEGOTIATION.

5  THEY ARE NOT STATEMENTS OF MATERIAL FACTS THAT CAN FORM THE

6  BASIS FOR RELIANCE AND, THEREFORE, THE BASIS FOR FRAUD SIMPLY

7  CAN'T STAND AND I WOULD YOUR HONOR THE COURT TO REVIEW CAREFULLY

8  THE RECORDS AND ALL THESE STATEMENTS.  IT'S JUST NOT THERE.

9        THE COURT:  YOU WANTED TO ARGUE THE STATUTE OF

10  LIMITATIONS POINT.  IS THAT ON THE PAPERS?

11        ANYTHING FURTHER?

12        MR. VAN NEST:  THE ONLY OTHER MOTION SET FOR TODAY, BUT

13  AGAIN, WE WILL SUBMIT ON THE PAPERS, IS THE MOTION TO DISMISS

14  THE COUNTER CLAIM FOR FAILURE TO JOIN INDISPENSABLE PARTY.

15  SUBMIT THAT ON THE PAPERS.

16        THE COURT:  MR. HAYES.

17        MR. HAYES:  WHICH ISSUE OR ANY OF THEM ABOUT THE MOTION

18  TO JOIN.  I HAVE SOMETHING I NEED TO ADD.

19        THE COURT:  VERY WELL.

20        MR. HAYES:  TO THE EXTENT WE ARE THINKING OF ADDING

21  MISS MASS, SHE IS PREPARED TO EXECUTE AN ASSIGNMENT TO

22  MR. MARLAND IF THE COURT FINDS SHE IS INDISPENSABLE SHE IS

23  PREPARED TO EXECUTE AN ASSIGNMENT.  THE MAIN CASE THEY RELY ON

24  IS THE CASE THAT HE HELD THAT THAT DIDN'T SOLVE THE PARTY

25  PROBLEM BECAUSE OF THE HARRODS CASE BECAUSE  THERE IT'S BEING

1  DONE TO FRAUDULENTLY CREATE FEDERAL JURISDICTION.  THAT IS NOT

2  LIMIT ISSUE.  THE FACT THAT A PARTY CAN MAKE AN ASSIGNMENT AND

3  GO INTO A LAWSUIT HAS REALLY NOT BEEN QUESTIONED ANYWHERE.  I

4  DON'T THINK THAT IS AN ISSUE.  SHE IS PREPARED TO DO THAT.  I

5  UNDERSTAND MR. BRUNSWICK IS PREPARED TO DO THAT, ALTHOUGH I

6  HAVEN'T SPECIFICALLY CONFIRMED THAT WITH HIS COUNSEL, AND THERE

7  MAYBE SOMETHING TO WORK OUT THERE, BUT I WANTED TO ADD THIS

8  ABOUT MR. BRUNSWICK.

9       YOU WILL RECALL LAST AUGUST, THE FIRST TIME I HAD THE

10  PLEASURE OF BEING HERE, THE CASE MANAGEMENT CONFERENCE, I SAID

11  THERE IS AN ISSUE THAT BRUNSWICK MIGHT BE AN INDISPENSABLE

12  PARTY.  MISS THURM TOOK EXCEPTION AND SAID I HADN'T MENTIONED IT

13  IN THE REPORT.  AND I SAID, "SINCE MR. MARLAND HAS CLAIMS

14  AGAINST MR. BRUNSWICK, MR. BRUNSWICK -- I'VE SINCE LEARNED MR.

15  MARLAND AND MR. BRUNSWICK ARE PARTIES TO AN ARBITRATION

16  AGREEMENT BETWEEN THEMSELVES PROVIDING FOR RESOLUTION OF

17  DISPUTES BETWEEN THEMSELVES IN GENEVA.  SO THAT MEANT THAT

18  MARLAND THINKS HE IS AN INDISPENSABLE PARTY HERE BECAUSE HE WILL

19  RESOLVE THE ISSUE IN GENEVA.  I THINK IT'S QUITE LIKELY AS PART

20  OF THAT ARBITRATION AGREEMENT MR. BRUNSWICK WOULD ASSIGN ANY

21  CREDITS HE MIGHT HAVE WITH THELEN TO EITHER MR. MARLAND OR

22  EUROPEAN COUNSEL WITH MR. MARLAND ACTING AS THEIR AGENT.

23       I DID NEED TO ADD THOSE TWO THINGS ON THAT.

24       I NEED TO ANSWER A COUPLE OF OTHER QUESTIONS.

25       THE ISSUE OF CHATEAU'S FEE DOES NOT APPEAR TO COME UP

1  IN HIS DEPOSITION TRANSCRIPT.  IT DID COME UP IN MARLAND'S

2  INTERROGATORY RESPONSES WHERE IT WAS NOTED -- OF COURSE, YOU

3  DON'T USUALLY RESPOND OBJECTIVELY TO INTERROGATORY RESPONSES.

4  IT'S DOCUMENTED IN A LETTER THAT'S BEEN PRODUCED BY THELEN.

5  IT'S SOMETHING I HAD IN A SET OF THE DEPOSITION EXHIBITS.  I

6  DIDN'T MARK IT.  IT'S PART OF THE RECORD OF DISCOVERY IN THIS

7  CASE.  IT'S NOT PART OF THE RECORD BEFORE THE COURT ON THIS

8  MOTION, BUT I DON'T THINK IT CAN BE CREDIBLY DISPUTED AND I'M

9  PRETTY SURE THE AMOUNT IS FIVE PERCENT OF THE NET FEE.

10          THE COURT:  VERY WELL.  YOU MAY WISH TO SUBMIT THAT.

11          MR. HAYES:  THEN THERE IS ONE THING MR. VAN NEST SAID

12  WHICH I'M SURE WAS JUST INADVERTENT, BUT BRUNSWICK'S -- THIS IS

13  PART OF THE RECORD -- WAS DISCUSSED IN DEPOSITION.  MR. FONTANA

14  ACKNOWLEDGED, I BELIEVE, THQAT BRUNSWICK'S FEE THAT WAS BEING

15  PAID JOINTLY BY THELEN AND MARLAND, HALF AND HALF FROM THELEN

16  AND FROM MARLAND, REFLECTED IN DEPOSITION EXHIBIT 25, REFLECTED

17  IN OTHER EXHIBITS.  THIS IS WHY THE FEE NUMBERS ARE DIFFERENT.

18  THE ATTORNEY/CLIENT AGREEMENT WAS 60-40, 50-50.  60-40 FOR THE

19  FIRST YEAR, 50-50 AFTER THE FIRST YEAR.  THAT'S IN FEBRUARY '99.

20          JUNE '99, THE ATTORNEY/CLIENT AGREEMENT PROVIDES FOR

21  SIXTY-TWO-POINT-FIVE OR, ACTUALLY, 65-35 AND THEN

22  FIFTY-TWO-POINT-FIVE, FORTY-SEVEN-POINT-FIVE.  THAT'S ACTUALLY

23  THE SAME THING.  THE ONLY DIFFERENCE IS BRUNSWICK GOT ADDED AND

24  GOT TEN PERCENT IF THE CASE SETTLED IN '99, PAID FIVE FROM

25  THELEN AND FIVE FROM MARLAND, AND FIVE PERCENT IF THE CASE

1  SETTLED AFTER '99, TWO AND-A-HALF FROM THELEN, TWO-AND-A-HALF

2  FROM MARLAND, SO, 50-50, GOING TO FIFTY TWO POINT FIVE, FORTY

3  SEVEN POINT FIVE TO REFLECT THE FACT THAT THELEN AND MARLAND ARE

4  EACH PAYING BRUNSWICK A FIVE PERCENT FEE.  I ASSUME THAT MR. VAN

5  NEST WAS SIMPLIFYING, BUT TO THE EXTENT THAT ISSUE IS RELEVANT,

6  THAT IS A FACT.

7          THE COURT:  THANK YOU.

8          MR. HAYES:  WE ALSO HAVE THE ISSUE OF MARLAND.

9          THE COURT:  THANK YOU.

10         MR. HAYES:  THANK YOU.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8          I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

9   TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

10

11

12

13

14

15

16

17

18   _Juanita Gonzalez_

19   JUANITA GONZALEZ

20   CSR NO. 3003

21

22

23

24

25