DONALD W. CARLSON [Bar No.: 79258] dcarlson@ccplaw.com
GUY D. CALLADINE [Bar No.: 99431] gcalladine@ccplaw.com
CARLSON, CALLADINE & PETERSON LLP
353 Sacramento Street, 16th Floor
San Francisco, California 94111
Telephone:     (415) 391-3911
Facsimile:     (415) 391-3898

ANDREW W. HAYES (*pro hac vice* pending)
HAYES & MALONEY LLP
1 Rockefeller Plaza, Suite 1005
New York, New York  10020
Telephone:     (212) 554-3120
Facsimile:     (212) 554-3121

Attorneys for Defendant,
FRANÇOIS MARLAND

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| THELEN REID BROWN RAYSMAN & STEINER LLP, | ) ) ) | Case No.:     C-07-5663 VRW |
| | ) ) | **DEFENDANT FRANÇOIS MARLAND'S** |
| Plaintiff, | ) ) | **NOTICE OF LODGING IN OPPOSITION TO THELEN'S EX** |
| v. | ) ) | **PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER** |
| FRANÇOIS MARLAND, | ) ) | **AND OTHER RELIEF** |
| Defendant. | ) ) | Judge:     Vaughn R. Walker |

Defendant François Marland hereby submits the following documents and information

relating to Plaintiff Thelen Reid Brown Raysman & Steiner LLP's ("Thelen") Ex Parte

Application for a temporary restraining order and other relief.

1.     A November 9, 2007 e-mail from Andrew W. Hayes to Thelen regarding setting a

discovery schedule relating to Thelen's expected motion for a preliminary injunction and a

November 13, 2007 response from Benjamin W. Berkowitz, counsel for Thelen, refusing to

provide Federal Rule of Civil Procedure 30(b)(6) deposition witnesses on any of the topics

described. A true and correct copy of my e-mail and Mr. Berkowitz' letter in response are

attached hereto as Exhibits A and B, respectively.

CARLSON CALLADINE & PETERSON LLP
353 SACRAMENTO STREET
16TH FLOOR
San Francisco, CA 94111

2.     The International Dispute Resolution Procedures, Mediation and Arbitration Rules of the International Centre for Dispute Resolution[1] (the "ICDR Rules").  A true and correct copy of the ICDR Rules, taken from American Arbitration Association's[2] website on November 14, 2007, is attached hereto as Exhibit C.

3.     Relevant pages from the 30(b)(6) deposition transcript of Plaintiff Thelen by and through Wynne S. Carvill, conducted on December 14, 2006, in *Thelen v. Marland I*, Case No. C-06-02071 VRW, are attached hereto as Exhibit D.

Exhibits A and B, Mr. Berkowitz' exchange with me, are relevant as they evidence Thelen's position regarding the substance and timing of its expected motion for a preliminary injunction.

Exhibit C, the ICDR Rules, is relevant because Paragraph 1 of Article 15 ("Pleas as to Jurisdiction") states: "The tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."[3]

Exhibit D, pages 112-128 from the 30(b)(6) deposition of Thelen in *Thelen v. Marland I*, is relevant because Thelen repeatedly refused to answer whether or not the arbitration clause from the February 1999 Attorney-Client Agreement, as amended on September 18, 2001 was incorporated into the December 2002 New Agreement to Associate Counsel.

Dated: November 15, 2007

CARLSON, CALLADINE & PETERSON LLP
HAYES & MALONEY LLP

By: _Andrew W. Hayes_
ANDREW W. HAYES
Attorneys for Defendant
FRANÇOIS MARLAND

---

[1] International Centre for Dispute Resolution, *International Dispute Resolution Procedures, Mediation and Arbitration Rules*, http://www.adr.org/sp.asp?id=28144&printable=true (Eff. September 1, 2007).

[2] "The International Centre for Dispute Resolution (ICDR) is the international division of the American Arbitration Association. . ."  *Id.*

[3] International Centre for Dispute Resolution, *International Dispute Resolution Procedures, Mediation and Arbitration Rules*, Art. 15, http://www.adr.org/sp.asp?id=28144 &printable=true# Pleas.

2

# EXHIBIT

# A

## Andrew W. Hayes

**From:**      Andrew W. Hayes
**Sent:**      Friday, November 09, 2007 9:11 PM
**To:**        Wendy Thurm (wthurm@kvn.com)
**Subject:**   PI Motion discovery

Wendy,

You should now have the TRO response, and previously received the amended description of the arbitration claims.

I don't know what schedule you have in mind for Thelen's PI moton, and of course it may change based on what happens with the TRO application, but the coming Thanksgiving holiday, the appellate briefing schedule, and other commitments made me realize that if you want to have the PI motion heard before December 10, we need to plan that discovery now.  Specifically, if we are going to have any depositions, we need to have them next week, ideally on the 15th, or on the 14th (possible, but not good) or 16th (second choice).

The depositions would be of Thelen by and through its 30(b)(6) representatives.  The subjects would be the following:
(1) Thelen's knowledge of and agreement with the representation that it made to the Court regarding payment of the $612,500,
(2) When Thelen decided to repudiate that representation,
(3) Who at Thelen decided to repudiate its representation,
(4) Why Thelen decided to repudiate its representation.
(5) Thelen's understanding of the relationship between the 1999 Attorney-Client Agreement and the 2002 Agreement, and particularly whether the former is incorporated in the latter (you will recall that I asked Mr. Carvill questions about that topic, and he refused to answer; Thelen's entire Complaint is now predicated on the assertion that the 1999 Agreement was not incorporated into the 2002 Agreement).
(6) Thelen's purpose in agreeing to pay its share of the abeyance fee of the ICDR.
(7) Thelen's consideration, if any, of whether to allow the stay of arbitration to expire.
(8) Any discussion or deliberation within Thelen regarding whether to argue the arbitrability of Marland's proposed new claims before the ICDR or in Court.

Given the time pressures we may face, I am eager to see if we can pre-empt many of my questions, and perhaps entire topics, by stipulation, and if we could address enough topics in that manner we would not need a deposition.  However, Thelen should be on notice that Marland is seeking discovery regarding these topics, by deposition if necessary.

If there are any other topics that need to be addressed (such as topics that are raised in Thelen's TRO reply, or in its PI motion), I will let you know as soon as I can.  If you have any similar topics that you believe are appropriate for discovery from Marland, please let me know promptly.

I will be in the office on Monday, notwithstanding the court holiday, and available to discuss this at your convenience.

Andrew

# EXHIBIT

# B

LAW OFFICES

# KEKER & VAN NEST
## LLP

710 SANSOME STREET
SAN FRANCISCO, CA 94111-1704
TELEPHONE (415) 391-5400
FAX (415) 397-7188
WWW.KVN.COM

BENJAMIN BERKOWITZ
BBERKOWITZ@KVN.COM

November 13, 2007

**VIA FIRST CLASS MAIL AND EMAIL**

Andrew W. Hayes
Hayes & Maloney LLP
One Rockefeller Plaza, Suite 1005
New York, NY 10020

Re:    *Thelen Reid Brown Raysman & Steiner LLP v. Francois Marland, et al.*
       Case No. C-07-5663

Dear Andrew:

    I write in response to your e-mail to Wendy Thurm sent Friday evening after 6 p.m.  You requested Rule 30(b)(6) depositions of Thelen on eight topics in advance of a hearing on Thelen's expected Motion for a Preliminary Injunction, which has not yet been filed or scheduled for hearing.  As I explained to Matthew Friedman, our office lost power yesterday morning and our systems were not up and running until after 3:30 p.m. yesterday afternoon.  We have now had the opportunity to consult with Thelen, and provide the following response.

    First, the nature and scope of Thelen's Motion for Preliminary Injunction will be informed by the hearing before the Court on November 15, and the Court's ruling on Thelen's TRO Application.  You appear to have assumed that Thelen will seek to resolve all of its claims in its new Complaint by way of a PI Motion.  Thelen has not made any such decision, and will not do so until the hearing on November 15.  Your discovery requests, therefore, are premature.

    Second, you request discovery regarding Thelen's "repudiation" of its "representation" to the Court that it would pay Marland $612,500 pursuant to the December 2002 Agreement if judgment were entered on Thelen's behalf.  (Topics 1-4).  The premise of these topics is both argumentative and fallacious.  Even disregarding that, the subject of the obligation to pay the $612,5000 is irrelevant to the subject of the TRO application, which is whether or not a valid arbitration agreement exists.

406282.01

Andrew W. Hayes
November 13, 2007
Page 2

Third, you request discovery regarding the intent of the drafters of the December 2002 Agreement, apparently to show that an arbitration clause in a prior agreement applies here. You already conducted this discovery in the first case. You are now barred by claim and issue preclusion from re-litigating those questions again.

Fourth, you request discovery regarding Thelen's "purpose for agreeing to pay the abeyance fee" to the ICDR. (Topic No. 5). As stated in the e-mail you received from Wendy Thurm on September 27, 2007, Thelen agreed to pay the abeyance fee in order to suspend the arbitration pending resolution of Marland's appeal of the Court's August 3, 2007 Order. Thelen's agreement to pay the abeyance fee is irrelevant to whether or not an arbitration agreement exists and irrelevant to your assertion that Thelen "waived" its right to seek equitable relief from the Court for being forced into arbitration. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995); *Nagrampa v. Mailcoups, Inc.*, 469 F.3d 1257 (9th Cir. 2006 ) (en banc).

Similarly, "Thelen's consideration, if any, of whether to allow the stay of arbitration to expire" and "discussion or deliberation within Thelen regarding whether to argue the arbitrability of Marland's proposed new claims before the ICDR or in Court" are also irrelevant to the instant motion. (Topics 7-8). Neither of these topics bear on whether or not a valid arbitration agreement exists between the parties, and both directly seek work product and attorney-client privileged communications. Thelen will not provide discovery regarding these topics.

Because none of the topics you have identified are appropriate for discovery, Thelen will not provide a Rule 30(b)(6) deposition witness on any of them. If you would like to discuss this further, please feel free to give me a call.

Very truly yours,

BENJAMIN W. BERKOWITZ

BWB/jas

# EXHIBIT

# C

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

# *International Dispute Resolution* PROCEDURES

**(Including Mediation and Arbitration Rules)**
**Amended and Effective September 1, 2007**
Summary of Changes

**TABLE OF CONTENTS**

**INTERNATIONAL DISPUTE RESOLUTION PROCEDURES**

INTRODUCTION
International Mediation
International Arbitration

INTERNATIONAL MEDIATION RULES
M-1. Agreement of Parties
M-2. Initiation of Mediation
M-3. Representation
M-4. Appointment of the Mediator
M-5. Mediator's Impartiality and Duty to Disclose
M-6. Vacancies
M-7. Date and Responsiblities of the Mediator
M-8. Responsibilities of the Parties
M-9. Privacy
M-10. Confidentiality
M-11. No Stenographic Record
M-12. Termination of Mediation
M-13. Exclusion of Liability
M-14. Interpretation and Application of Procedures
M-15. Deposits
M-16. Expenses
M-17. Cost of Mediation
M-18 Language

INTERNATIONAL ARBITRATION RULES

R-1. Commencing the Arbitration
Notice of Arbitration and Statement of Claim
Statement of Defense and Counterclaim
Amendments to Claims

R-2. The Tribunal
Number of Arbitrators
Appointment of Arbitrators
Impartiality and Independence of Arbitrators
Challenge of Arbitrators
Replacement of an Arbitrator

R-3. General Conditions
Representation
Place of Arbitration
Language
Pleas as to Jurisdiction
Conduct of the Arbitration
Further Written Statements
Notices
Evidence
Hearings
Interim Measures of Protection

Experts
Default
Closure of Hearing
Waiver of Rules
Awards, Decisions and Rulings
Form and Effect of the Award
Applicable Laws and Remedies
Settlement or Other Reasons for Termination
Interpretation or Correction of the Award
Costs
Compensation of Arbitrators
Deposit of Costs
Confidentiality
Exclusion of Liability
Interpretation of Rules
Emergency Measures of Protection

ADMINISTRATIVE FEES
Fees
Refund Schedule
Suspension for Nonpayment
Hearing Room Rental

## INTRODUCTION

The international business community uses arbitration to resolve commercial disputes arising in the global marketplace. Supportive laws are in place. The New York Convention of 1958 has been widely adopted, providing a favorable legislative climate that enables the enforcement of arbitration clauses. International commercial arbitration awards are recognized by national courts in most parts of the world, even more than foreign court judgments. A key component to the successful resolution of an international commercial dispute is the role played by the administrative institution. The International Centre for Dispute Resolution ® (ICDR) is the international division of the American Arbitration Association (AAA) charged with the exclusive administration of all of the AAA's international matters. The ICDR's experience, international expertise and multilingual staff forms an integral part of the dispute resolution process. The ICDR's international system is premised on its ability to move the matter forward, facilitate communications, ensure that qualified arbitrators and mediators are appointed, control costs, understand cultural sensitivities, resolve procedural impasses and properly interpret and apply its International Arbitration and Mediation Rules. Additionally, the ICDR has many cooperative agreements with arbitral institutions around the world for facilitating the administration of its international cases.

### International Mediation

The parties might wish to submit their dispute to an international mediation prior to arbitration. In mediation, an impartial and independent mediator assists the parties in reaching a settlement but does not have the authority to make a binding decision or award. International Mediation is administered by the ICDR in accordance with its International Mediation Rules. There is no additional administrative fee where parties to a pending arbitration attempt to mediate their dispute under the ICDR's auspices.

If the parties want to adopt mediation as a part of their contractual dispute settlement procedure, they can insert the following mediation clause into their contract in conjunction with a standard arbitration provision:

> *If a dispute arises out of or relates to this contract, or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation in accordance with the International Mediation Rules of the International Centre for Dispute Resolution before resorting to arbitration, litigation, or some other dispute resolution procedure.*

If the parties want to use a mediator to resolve an existing dispute, they can enter into the following submission:

> *The parties hereby submit the following dispute to mediation administered by the International Centre for Dispute Resolution in accordance with its International Mediation Rules. (The clause may also provide for the qualifications of the mediator(s), method of payment, locale of meetings, and any other item of concern to the parties.)*

The ICDR can schedule the mediation anywhere in the world and will propose a list of specialized international mediators.

### International Arbitration

As the ICDR is a division of the AAA, parties can arbitrate future disputes under these rules by inserting either of the following clauses into their contracts:

> *"Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be determined by arbitration administered by the International Centre for Dispute Resolution in accordance with its International Arbitration Rules."*

> or

> *"Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be determined by arbitration administered by the American Arbitration Association in accordance with its International Arbitration Rules."*

The parties may wish to consider adding:

(a) "The number of arbitrators shall be (one or three)";

(b) "The place of arbitration shall be (city and/or country)"; or

(c) "The language(s) of the arbitration shall be _____."

Parties are encouraged, when writing their contracts or when a dispute arises, to request a conference, in person or by telephone, with the ICDR, to discuss an appropriate method for selection of arbitrators or any other matter that might facilitate efficient arbitration of the dispute. Under these rules, the parties are free to adopt any mutually agreeable procedure for appointing arbitrators, or may designate arbitrators upon whom they agree. Parties can reach agreements concerning appointing arbitrators either when writing their contracts or after a dispute has arisen. This flexible procedure permits parties to utilize whatever method they consider best suits their needs. For example, parties may choose to have a sole arbitrator or a tribunal of three or more. They may agree that arbitrators shall be appointed by the ICDR, or that each side shall designate one arbitrator and those two shall name a third, with the ICDR making appointments if the tribunal is not promptly formed by that procedure. Parties may mutually request the ICDR to submit to them a list of arbitrators from which each can delete names not acceptable to it, or the parties may instruct the ICDR to appoint arbitrators without the submission of lists, or may leave that matter to the sole discretion of the ICDR. Parties also may agree on a variety of other methods for establishing the tribunal. In any event, if parties are unable to agree on a procedure for appointing arbitrators or on the designation of arbitrators, the ICDR, after inviting consultation by the parties, will appoint the arbitrators. The rules thus provide for the fullest exercise of party autonomy, while assuring that the ICDR is available to act if the parties cannot reach mutual agreement. By providing for arbitration under these rules, parties can avoid the uncertainty of having to petition a local court to resolve procedural impasses. These rules, as administered by the IDCR, are intended to provide prompt, effective and economical arbitration services to the global business community.

Whenever a singular term is used in the rules, such as "party," "claimant" or "arbitrator," that term shall include the plural if there is more than one such entity.

Parties filing an international case with the International Centre for Dispute Resolution, or the AAA, may do so by directly contacting the ICDR in New York or the Dublin, Ireland office, or by contacting any one of the AAA's regional offices.

Further information about these rules can be secured by contacting the International Centre for Dispute Resolution at 888-855-9575 or by visiting the ICDR's Web site at www.icdr.org.

## INTERNATIONAL MEDIATION RULES

### M-1. Agreement of Parties

Whenever parties have agreed in writing to mediate disputes under these International Mediation Rules, or have provided for mediation or conciliation of existing or future international disputes under the auspices of the International Centre for Dispute Resolution, the international division of the American Arbitration Association, or the American Arbitration Association without designating particular rules, they shall be deemed to have made these rules, as amended and in effect as of the date of the submission of the dispute, a part of their agreement.

The parties by mutual agreement may vary any part of these procedures including, but not limited to, agreeing to conduct the mediation via telephone or other electronic or technical means.

### M-2. Initiation of Mediation

Any party or parties to a dispute may initiate mediation under the ICDR's auspices by making a request for mediation to any of the ICDR's regional offices or case management centers via telephone, email, regular mail or fax. Requests for mediation may also be filed online via AAA WebFile at www.adr.org.

The party initiating the mediation shall simultaneously notify the other party or parties of the request. The initiating party shall provide the following information to the ICDR and the other party or parties as applicable:

   i. A copy of the mediation provision of the parties' contract or the parties' stipulation to mediate.
   ii. The names, regular mail addresses, email addresses, and telephone numbers of all parties to the dispute and representatives, if any, in the mediation.
   iii. A brief statement of the nature of the dispute and the relief requested.
   iv. Any specific qualifications the mediator should possess.

Where there is no preexisting stipulation or contract by which the parties have provided for mediation of existing or future disputes under the auspices of the ICDR a party may request the ICDR to invite another party to participate in "mediation by voluntary submission". Upon receipt of such a request, the ICDR will contact the other party or parties involved in the dispute and attempt to obtain a submission to mediation.

### M-3. Representation

Subject to any applicable law, any party may be represented by persons of the party's choice. The names and addresses of such persons shall be communicated in writing to all parties and to the ICDR

### M-4. Appointment of the Mediator

Parties may search the online profiles of the ICDR's Panel of Mediators at www.aaamediation.com in an effort to agree on a mediator. If the parties have not agreed to the appointment of a mediator and have not provided any other method of appointment, the mediator shall be appointed in the following manner:

   i. Upon receipt of a request for mediation, the ICDR will send to each party a list of mediators from the ICDR's Panel of Mediators. The parties are encouraged to agree to a mediator from the submitted list and to advise the ICDR of their agreement.
   ii. If the parties are unable to agree upon a mediator, each party shall strike unacceptable names from the list, number the remaining names in order of preference, and return the list to the ICDR If a party does not return the list within the time specified, all mediators on the list shall be deemed acceptable. From among the mediators who have been mutually approved by the parties, and in accordance with the designated order of mutual preference, the ICDR shall invite a mediator to serve.
   iii. If the parties fail to agree on any of the mediators listed, or if acceptable mediators are unable to serve, or if for any other reason the appointment cannot be made from the submitted list, the ICDR shall have the authority to make the appointment from among other members of the Panel of Mediators without the submission of additional lists.

### M-5. Mediator's Impartiality and Duty to Disclose

ICDR mediators are required to abide by the *Model Standards of Conduct for Mediators* in effect at the time a mediator is appointed to a case. Where there is a conflict between the *Model Standards* and any provision of these Mediation Procedures, these Mediation Procedures shall govern. The *Standards* require mediators to (i) decline a mediation if the mediator cannot conduct it in an impartial manner, and (ii) disclose, as soon as practicable, all actual and potential conflicts of interest that are reasonably known to the mediator and could reasonably be seen as raising a question about the mediator's impartiality.

Prior to accepting an appointment, ICDR mediators are required to make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a potential or actual conflict of interest for the mediator. ICDR mediators are required to disclose any circumstance likely to create a presumption of bias or prevent a resolution of the parties' dispute within the time-frame desired by the parties. Upon receipt of such disclosures, the ICDR shall immediately communicate the disclosures to the parties for their comments.

The parties may, upon receiving disclosure of actual or potential conflicts of interest of the mediator, waive such conflicts and proceed with the mediation. In the event that a party disagrees as to whether the mediator shall serve, or in the event that the mediator's conflict of interest might reasonably be viewed as undermining the integrity of the mediation, the mediator shall be replaced.

**M-6. Vacancies**

If any mediator shall become unwilling or unable to serve, the ICDR will appoint another mediator, unless the parties agree otherwise, in accordance with section M-4.

**M-7. Duties and Responsibilities of the Mediator**

   i.  The mediator shall conduct the mediation based on the principle of party self-determination. Self-determination is the act of coming to a voluntary, uncoerced decision in which each party makes free and informed choices as to process and outcome.
  ii.  The mediator is authorized to conduct separate or ex parte meetings and other communications with the parties and/or their representatives, before, during, and after any scheduled mediation conference. Such communications may be conducted via telephone, in writing, via email, online, in person or otherwise.
 iii.  The parties are encouraged to exchange all documents pertinent to the relief requested. The mediator may request the exchange of memoranda on issues, including the underlying interests and the history of the parties' negotiations. Information that a party wishes to keep confidential may be sent to the mediator, as necessary, in a separate communication with the mediator.
  iv.  The mediator does not have the authority to impose a settlement on the parties but will attempt to help them reach a satisfactory resolution of their dispute. Subject to the discretion of the mediator, the mediator may make oral or written recommendations for settlement to a party privately or, if the parties agree, to all parties jointly.
   v.  In the event a complete settlement of all or some issues in dispute is not achieved within the scheduled mediation session(s), the mediator may continue to communicate with the parties, for a period of time, in an ongoing effort to facilitate a complete settlement.
  vi.  The mediator is not a legal representative of any party and has no fiduciary duty to any party.

**M-8. Responsibilities of the Parties**

The parties shall ensure that appropriate representatives of each party, having authority to consummate a settlement, attend the mediation conference.

Prior to and during the scheduled mediation conference session(s) the parties and their representatives shall, as appropriate to each party's circumstances, exercise their best efforts to prepare for and engage in a meaningful and productive mediation.

**M-9. Privacy**

Mediation sessions and related mediation communications are private proceedings. The parties and their representatives may attend mediation sessions. Other persons may attend only with the permission of the parties and with the consent of the mediator.

**M-10. Confidentiality**

Subject to applicable law or the parties' agreement, confidential information disclosed to a mediator by the parties or by other participants (witnesses) in the course of the mediation shall not be divulged by the mediator. The mediator shall maintain the confidentiality of all information obtained in the mediation, and all records, reports, or other documents received by a mediator while serving in that capacity shall be confidential.

The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any adversary proceeding or judicial forum.

The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitral, judicial, or other proceeding the following, unless agreed to by the parties or required by applicable law:

   i.  Views expressed or suggestions made by a party or other participant with respect to a possible settlement of the dispute;
  ii.  Admissions made by a party or other participant in the course of the mediation proceedings;
 iii.  Proposals made or views expressed by the mediator; or
  iv.  The fact that a party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

**M-11. No Stenographic Record**

There shall be no stenographic record of the mediation process.

**M-12. Termination of Mediation**

The mediation shall be terminated:

   i.  By the execution of a settlement agreement by the parties; or
  ii.  By a written or verbal declaration of the mediator to the effect that further efforts at mediation would not contribute to a resolution of the parties' dispute; or
 iii.  By a written or verbal declaration of all parties to the effect that the mediation proceedings are terminated; or
  iv.  When there has been no communication between the mediator and any party or party's representative for 21 days following the conclusion of the mediation conference.

**M-13. Exclusion of Liability**

Neither the ICDR nor any mediator is a necessary party in judicial proceedings relating to the mediation. Neither the ICDR nor any mediator shall be liable to any party for any error, act or omission in connection with any mediation conducted under these procedures.

**M-14. Interpretation and Application of Procedures**

The mediator shall interpret and apply these procedures insofar as they relate to the mediator's duties and responsibilities. All other procedures shall be interpreted and applied by the ICDR.

**M-15. Deposits**

Unless otherwise directed by the mediator, the ICDR will require the parties to deposit in advance of the mediation conference such sums of money as it, in consultation with the mediator, deems necessary to cover the costs and expenses of the mediation and shall render an accounting to the parties and return any unexpended balance at the conclusion of the mediation.

**M-16. Expenses**

All expenses of the mediation, including required traveling and other expenses or charges of the mediator, shall be borne equally by the parties unless they agree otherwise. The expenses of participants for either side shall be paid by the party requesting the attendance of such participants.

**M-17. Cost of the Mediation**

There is no filing fee to initiate a mediation or a fee to request the ICDR to invite parties to mediate.

The cost of mediation is based on the hourly mediation rate published on the mediator's ICDR profile. This rate covers both mediator compensation and an allocated portion for the ICDR's services. There is a four-hour minimum charge for a mediation conference. Expenses referenced in Section M-16 may also apply. \If a matter submitted for mediation is withdrawn or cancelled or results in a settlement after the agreement to mediate is filed but prior to the mediation conference the cost is $250 plus any mediator time and charges incurred.
The parties will be billed equally for all costs unless they agree otherwise.

If you have question about mediation costs or services visit our website at www.icdr.org or contact us at +01.888.855.9575.

**M-18 Language**

If the parties have not agreed otherwise, the language(s) of the mediation shall be that of the documents containing the mediation agreement.

Conference Room Rental

The costs described above do not include the use of ICDR conference rooms. Conference rooms are available on a rental basis. Please contact your local ICDR office for availability and rates.

**INTERNATIONAL ARBITRATION RULES**

**Article 1**

1. Where parties have agreed in writing to arbitrate disputes under these International Arbitration Rules or have provided for arbitration of an international dispute by the International Centre for Dispute Resolution or the American Arbitration Association without designating particular rules, the arbitration shall take place in accordance with these rules, as in effect at the date of commencement of the arbitration, subject to whatever modifications the parties may adopt in writing.
2. These rules govern the arbitration, except that, where any such rule is in conflict with any provision of the law applicable to the arbitration from which the parties cannot derogate, that provision shall prevail.
3. These rules specify the duties and responsibilities of the administrator, the International Centre for Dispute Resolution, a division of the American Arbitration Association. The administrator may provide services through its Centre, located in New York, or through the facilities of arbitral institutions with which it has agreements of cooperation.

**R-1. Commencing the Arbitration Notice of Arbitration and Statement of Claim**

**Article 2**

1. The party initiating arbitration ("claimant") shall give written notice of arbitration to the administrator and at the same time to the party against whom a claim is being made ("respondent").

2. Arbitral proceedings shall be deemed to commence on the date on which the administrator receives the notice of arbitration.

3. The notice of arbitration shall contain a statement of claim including the following:

    (a) a demand that the dispute be referred to arbitration;

    (b) the names, addresses and telephone numbers of the parties;

    (c) a reference to the arbitration clause or agreement that is invoked;

    (d) a reference to any contract out of or in relation to which the dispute arises;

    (e) a description of the claim and an indication of the facts supporting it;

    (f) the relief or remedy sought and the amount claimed; and

    (g) may include proposals as to the means of designating and the number of arbitrators, the place of arbitration and the language(s) of the arbitration.

4. Upon receipt of the notice of arbitration, the administrator shall communicate with all parties with respect to the arbitration and shall acknowledge the commencement of the arbitration.

## Statement of Defense and Counterclaim

### Article 3

1. Within 30 days after the commencement of the arbitration, a respondent shall submit a written statement of defense, responding to the issues raised in the notice of arbitration, to the claimant and any other parties, and to the administrator.

2. At the time a respondent submits its statement of defense, a respondent may make counterclaims or assert setoffs as to any claim covered by the agreement to arbitrate, as to which the claimant shall within 30 days submit a written statement of defense to the respondent and any other parties and to the administrator.

3. A respondent shall respond to the administrator, the claimant and other parties within 30 days after the commencement of the arbitration as to any proposals the claimant may have made as to the number of arbitrators, the place of the arbitration or the language(s) of the arbitration, except to the extent that the parties have previously agreed as to these matters.

4. The arbitral tribunal, or the administrator if the arbitral tribunal has not yet been formed, may extend any of the time limits established in this article if it considers such an extension justified.

## Amendments to Claims

### Article 4

During the arbitral proceedings, any party may amend or supplement its claim, counterclaim or defense, unless the tribunal considers it inappropriate to allow such amendment or supplement because of the party's delay in making it, prejudice to the other parties or any other circumstances. A party may not amend or supplement a claim or counterclaim if the amendment or supplement would fall outside the scope of the agreement to arbitrate.

## R-2. The Tribunal

## Number of Arbitrators

### Article 5

If the parties have not agreed on the number of arbitrators, one arbitrator shall be appointed unless the administrator determines in its discretion that three arbitrators are appropriate because of the large size, complexity or other circumstances of the case.

## Appointment of Arbitrators

### Article 6

1. The parties may mutually agree upon any procedure for appointing arbitrators and shall inform the administrator as to such procedure.

2. The parties may mutually designate arbitrators, with or without the assistance of the administrator. When such designations are made, the parties shall notify the administrator so that notice of the appointment can be communicated to the arbitrators, together with a copy of these rules.

3. If within 45 days after the commencement of the arbitration, all of the parties have not mutually agreed on a procedure for appointing the arbitrator(s) or have not mutually agreed on the designation of the arbitrator(s), the administrator shall, at the written request of any party, appoint the arbitrator(s) and designate the presiding arbitrator. If all of the parties have mutually agreed upon a procedure for appointing the arbitrator(s), but all appointments have not been made within the time limits provided in that procedure, the administrator shall, at the written request of any party, perform all functions provided for in that procedure that remain to be performed.

4. In making such appointments, the administrator, after inviting consultation with the parties, shall endeavor to select suitable arbitrators. At the request of any party or on its own initiative, the administrator may appoint nationals of a country other than that of any of the parties.

5. Unless the parties have agreed otherwise no later than 45 days after the commencement of the arbitration, if the notice of arbitration names two or more claimants or two or more respondents, the administrator shall appoint all the arbitrators.

## Impartiality and Independence of Arbitrators

### Article 7

1. Arbitrators acting under these rules shall be impartial and independent. Prior to accepting appointment, a prospective arbitrator shall disclose to the administrator any circumstance likely to give rise to justifiable doubts as to the arbitrator's impartiality or independence. If, at any stage during the arbitration, new circumstances arise that may give rise to such doubts, an arbitrator shall promptly disclose such circumstances to the parties and to the administrator. Upon receipt of such information from an arbitrator or a party, the administrator shall communicate it to the other parties and to the tribunal.

2. No party or anyone acting on its behalf shall have any ex parte communication relating to the case with any arbitrator, or with any candidate for appointment as party-appointed arbitrator except to advise the candidate of the general nature of the controversy and of the anticipated proceedings and to discuss the candidate's qualifications, availability or independence in relation to the parties, or to discuss the suitability of candidates for selection as a third arbitrator where the parties or party designated arbitrators are to participate in that selection. No party or anyone acting on its behalf shall have any ex parte communication relating to the case with any candidate for presiding arbitrator.

## Challenge of Arbitrators

### Article 8

1. A party may challenge any arbitrator whenever circumstances exist that give rise to justifiable doubts as to the arbitrator's impartiality or independence. A party wishing to challenge an arbitrator shall send notice of the challenge to the administrator within 15 days after being notified of the appointment of the arbitrator or within 15 days after the circumstances giving rise to the challenge become known to that party.

2. The challenge shall state in writing the reasons for the challenge.

3. Upon receipt of such a challenge, the administrator shall notify the other parties of the challenge. When an arbitrator has been challenged by one party, the other party or parties may agree to the acceptance of the challenge and, if there is agreement, the arbitrator shall withdraw. The challenged arbitrator may also withdraw from office in the absence of such agreement. In neither case does withdrawal imply acceptance of the validity of the grounds for the challenge.

## Article 9

If the other party or parties do not agree to the challenge or the challenged arbitrator does not withdraw, the administrator in its sole discretion shall make the decision on the challenge.

## Replacement of an Arbitrator

## Article 10

If an arbitrator withdraws after a challenge, or the administrator sustains the challenge, or the administrator determines that there are sufficient reasons to accept the resignation of an arbitrator, or an arbitrator dies, a substitute arbitrator shall be appointed pursuant to the provisions of Article 6, unless the parties otherwise agree.

## Article 11

1. If an arbitrator on a three-person tribunal fails to participate in the arbitration for reasons other than those identified in Article 10, the two other arbitrators shall have the power in their sole discretion to continue the arbitration and to make any decision, ruling or award, notwithstanding the failure of the third arbitrator to participate. In determining whether to continue the arbitration or to render any decision, ruling or award without the participation of an arbitrator, the two other arbitrators shall take into account the stage of the arbitration, the reason, if any, expressed by the third arbitrator for such nonparticipation, and such other matters as they consider appropriate in the circumstances of the case. In the event that the two other arbitrators determine not to continue the arbitration without the participation of the third arbitrator, the administrator on proof satisfactory to it shall declare the office vacant, and a substitute arbitrator shall be appointed pursuant to the provisions of Article 6, unless the parties otherwise agree.

2. If a substitute arbitrator is appointed under either Article 10 or Article 11, the tribunal shall determine at its sole discretion whether all or part of any prior hearings shall be repeated.

## R-3. General Conditions

## Representation

## Article 12

Any party may be represented in the arbitration. The names, addresses and telephone numbers of representatives shall be communicated in writing to the other parties and to the administrator. Once the tribunal has been established, the parties or their representatives may communicate in writing directly with the tribunal.

## Place of Arbitration

## Article 13

1. If the parties disagree as to the place of arbitration, the administrator may initially determine the place of arbitration, subject to the power of the tribunal to determine finally the place of arbitration within 60 days after its constitution. All such determinations shall be made having regard for the contentions of the parties and the circumstances of the arbitration.

2. The tribunal may hold conferences or hear witnesses or inspect property or documents at any place it deems appropriate. The parties shall be given sufficient written notice to enable them to be present at any such proceedings.

## Language

## Article 14

If the parties have not agreed otherwise, the language(s) of the arbitration shall be that of the documents containing the arbitration agreement, subject to the power of the tribunal to determine otherwise based upon the contentions of the parties and the circumstances of the arbitration. The tribunal may order that any documents delivered in another language shall be accompanied by a translation into the language(s) of the arbitration.

## Pleas as to Jurisdiction

## Article 15

1. The tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

2. The tribunal shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the tribunal that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

3. A party must object to the jurisdiction of the tribunal or to the arbitrability of a claim or counterclaim no later than the filing of the statement of defense, as provided in Article 3, to the claim or counterclaim that gives rise to the objection. The tribunal may rule on such objections as a preliminary matter or as part of

the final award.

## Conduct of the Arbitration

### Article 16

1. Subject to these rules, the tribunal may conduct the arbitration in whatever manner it considers appropriate, provided that the parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case.

2. The tribunal, exercising its discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute. It may conduct a preparatory conference with the parties for the purpose of organizing, scheduling and agreeing to procedures to expedite the subsequent proceedings.

3. The tribunal may in its discretion direct the order of proof, bifurcate proceedings, exclude cumulative or irrelevant testimony or other evidence, and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

4. Documents or information supplied to the tribunal by one party shall at the same time be communicated by that party to the other party or parties.

## Further Written Statements

### Article 17

1. The tribunal may decide whether the parties shall present any written statements in addition to statements of claims and counterclaims and statements of defense, and it shall fix the periods of time for submitting any such statements.

2. The periods of time fixed by the tribunal for the communication of such written statements should not exceed 45 days. However, the tribunal may extend such time limits if it considers such an extension justified.

## Notices

### Article 18

1. Unless otherwise agreed by the parties or ordered by the tribunal, all notices, statements and written communications may be served on a party by air mail, air courier, facsimile transmission, telex, telegram or other written forms of electronic communication addressed to the party or its representative at its last known address or by personal service.

2. For the purpose of calculating a period of time under these rules, such period shall begin to run on the day following the day when a notice, statement or written communication is received. If the last day of such period is an official holiday at the place received, the period is extended until the first business day which follows. Official holidays occurring during the running of the period of time are included in calculating the period.

## Evidence

### Article 19

1. Each party shall have the burden of proving the facts relied on to support its claim or defense.

2. The tribunal may order a party to deliver to the tribunal and to the other parties a summary of the documents and other evidence which that party intends to present in support of its claim, counterclaim or defense.

3. At any time during the proceedings, the tribunal may order parties to produce other documents, exhibits or other evidence it deems necessary or appropriate.

## Hearings

### Article 20

1. The tribunal shall give the parties at least 30 days advance notice of the date, time and place of the initial oral hearing. The tribunal shall give reasonable notice of subsequent hearings.

2. At least 15 days before the hearings, each party shall give the tribunal and the other parties the names and addresses of any witnesses it intends to present, the subject of their testimony and the languages in which such witnesses will give their testimony.

3. At the request of the tribunal or pursuant to mutual agreement of the parties, the administrator shall make arrangements for the interpretation of oral testimony or for a record of the hearing.

4. Hearings are private unless the parties agree otherwise or the law provides to the contrary. The tribunal may require any witness or witnesses to retire during the testimony of other witnesses. The tribunal may determine the manner in which witnesses are examined.

5. Evidence of witnesses may also be presented in the form of written statements signed by them.

6. The tribunal shall determine the admissibility, relevance, materiality and weight of the evidence offered by any party. The tribunal shall take into account applicable principles of legal privilege, such as those involving the confidentiality of communications between a lawyer and client.

## Interim Measures of Protection

### Article 21

1. At the request of any party, the tribunal may take whatever interim measures it deems necessary, including injunctive relief and measures for the protection or conservation of property.

2. Such interim measures may take the form of an interim award, and the tribunal may require security for the costs of such measures.

3. A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

4. The tribunal may in its discretion apportion costs associated with applications for interim relief in any interim award or in the final award.

## Experts

### Article 22

1. The tribunal may appoint one or more independent experts to report to it, in writing, on specific issues designated by the tribunal and communicated to the parties.

2. The parties shall provide such an expert with any relevant information or produce for inspection any relevant documents or goods that the expert may require. Any dispute between a party and the expert as to the relevance of the requested information or goods shall be referred to the tribunal for decision.

3. Upon receipt of an expert's report, the tribunal shall send a copy of the report to all parties and shall give the parties an opportunity to express, in writing, their opinion on the report. A party may examine any document on which the expert has relied in such a report.

4. At the request of any party, the tribunal shall give the parties an opportunity to question the expert at a hearing. At this hearing, parties may present expert witnesses to testify on the points at issue.

## Default

### Article 23

1. If a party fails to file a statement of defense within the time established by the tribunal without showing sufficient cause for such failure, as determined by the tribunal, the tribunal may proceed with the arbitration.

2. If a party, duly notified under these rules, fails to appear at a hearing without showing sufficient cause for such failure, as determined by the tribunal, the tribunal may proceed with the arbitration.

3. If a party, duly invited to produce evidence or take any other steps in the proceedings, fails to do so within the time established by the tribunal without showing sufficient cause for such failure, as determined by the tribunal, the tribunal may make the award on the evidence before it.

## Closure of Hearing

### Article 24

1. After asking the parties if they have any further testimony or evidentiary submissions and upon receiving negative replies or if satisfied that the record is complete, the tribunal may declare the hearings closed.

2. The tribunal in its discretion, on its own motion or upon application of a party, may reopen the hearings at any time before the award is made.

## Waiver of Rules

### Article 25

A party who knows that any provision of the rules or requirement under the rules has not been complied with, but proceeds with the arbitration without promptly stating an objection in writing thereto, shall be deemed to have waived the right to object.

## Awards, Decisions and Rulings

### Article 26

1. When there is more than one arbitrator, any award, decision or ruling of the arbitral tribunal shall be made by a majority of the arbitrators. If any arbitrator fails to sign the award, it shall be accompanied by a statement of the reason for the absence of such signature.

2. When the parties or the tribunal so authorize, the presiding arbitrator may make decisions or rulings on questions of procedure, subject to revision by the tribunal.

## Form and Effect of the Award

### Article 27

1. Awards shall be made in writing, promptly by the tribunal, and shall be final and binding on the parties. The parties undertake to carry out any such award without delay.

2. The tribunal shall state the reasons upon which the award is based, unless the parties have agreed that no reasons need be given.

3. The award shall contain the date and the place where the award was made, which shall be the place designated pursuant to Article 13.

4. An award may be made public only with the consent of all parties or as required by law.

5. Copies of the award shall be communicated to the parties by the administrator.

6. If the arbitration law of the country where the award is made requires the award to be filed or registered, the tribunal shall comply with such requirement.

7. In addition to making a final award, the tribunal may make interim, interlocutory or partial orders and awards.

8. Unless otherwise agreed by the parties, the administrator may publish or otherwise make publicly available selected awards, decisions and rulings that have been edited to conceal the names of the parties and other identifying details or that have been made publicly available in the course of enforcement or otherwise.

**Applicable Laws and Remedies**

**Article 28**

1. The tribunal shall apply the substantive law(s) or rules of law designated by the parties as applicable to the dispute. Failing such a designation by the parties, the tribunal shall apply such law(s) or rules of law as it determines to be appropriate.

2. In arbitrations involving the application of contracts, the tribunal shall decide in accordance with the terms of the contract and shall take into account usages of the trade applicable to the contract.

3. The tribunal shall not decide as amiable compositeur or ex aequo et bono unless the parties have expressly authorized it to do so.

4. A monetary award shall be in the currency or currencies of the contract unless the tribunal considers another currency more appropriate, and the tribunal may award such pre-award and post-award interest, simple or compound, as it considers appropriate, taking into consideration the contract and applicable law.

5. Unless the parties agree otherwise, the parties expressly waive and forego any right to punitive, exemplary or similar damages unless a statute requires that compensatory damages be increased in a specified manner. This provision shall not apply to any award of arbitration costs to a party to compensate for dilatory or bad faith conduct in the arbitration.

**Settlement or Other Reasons for Termination**

**Article 29**

1. If the parties settle the dispute before an award is made, the tribunal shall terminate the arbitration and, if requested by all parties, may record the settlement in the form of an award on agreed terms. The tribunal is not obliged to give reasons for such an award.

2. If the continuation of the proceedings becomes unnecessary or impossible for any other reason, the tribunal shall inform the parties of its intention to terminate the proceedings. The tribunal shall thereafter issue an order terminating the arbitration, unless a party raises justifiable grounds for objection.

**Interpretation or Correction of the Award**

**Article 30**

1. Within 30 days after the receipt of an award, any party, with notice to the other parties, may request the tribunal to interpret the award or correct any clerical, typographical or computation errors or make an additional award as to claims presented but omitted from the award.

2. If the tribunal considers such a request justified, after considering the contentions of the parties, it shall comply with such a request within 30 days after the request.

**Costs**

**Article 31**

The tribunal shall fix the costs of arbitration in its award. The tribunal may apportion such costs among the parties if it determines that such apportionment is reasonable, taking into account the circumstances of the case.

Such costs may include:

      (a) the fees and expenses of the arbitrators;

      (b) the costs of assistance required by the tribunal, including its experts;

      (c) the fees and expenses of the administrator;

      (d) the reasonable costs for legal representation of a successful party; and

      (e) any such costs incurred in connection with an application for interim or emergency relief pursuant to Article 21.

**Compensation of Arbitrators**

**Article 32**

Arbitrators shall be compensated based upon their amount of service, taking into account their stated rate of compensation and the size and complexity of the case. The administrator shall arrange an appropriate daily or hourly rate, based on such considerations, with the parties and with each of the arbitrators as soon as practicable after the commencement of the arbitration. If the parties fail to agree on the terms of compensation, the administrator shall establish an appropriate rate and communicate it in writing to the parties.

**Deposit of Costs**

**Article 33**

1. When a party files claims, the administrator may request the filing party to deposit appropriate amounts as an advance for the costs referred to in Article 31, paragraphs (a), (b) and (c).

2. During the course of the arbitral proceedings, the tribunal may request supplementary deposits from the parties.

3. If the deposits requested are not paid in full within 30 days after the receipt of the request, the administrator shall so inform the parties, in order that one or the other of them may make the required payment. If such payments are not made, the tribunal may order the suspension or termination of the proceedings.

4. After the award has been made, the administrator shall render an accounting to the parties of the deposits received and return any unexpended balance to the parties.

**Confidentiality**

**Article 34**

Confidential information disclosed during the proceedings by the parties or by witnesses shall not be divulged by an arbitrator or by the administrator. Except as provided in Article 27, unless otherwise agreed by the parties, or required by applicable law, the members of the tribunal and the administrator shall keep confidential all matters relating to the arbitration or the award.

**Exclusion of Liability**

**Article 35**

The members of the tribunal and the administrator shall not be liable to any party for any act or omission in connection with any arbitration conducted under these rules, except that they may be liable for the consequences of conscious and deliberate wrongdoing.

**Interpretation of Rules**

**Article 36**

The tribunal shall interpret and apply these rules insofar as they relate to its powers and duties. The administrator shall interpret and apply all other rules.

**Emergency Measures of Protection**

**Article 37**

1. Unless the parties agree otherwise, the provisions of this Article 37 shall apply to arbitrations conducted under arbitration clauses or agreements entered on or after May 1, 2006.
2. A party in need of emergency relief prior to the constitution of the tribunal shall notify the administrator and all other parties in writing of the nature of the relief sought and the reasons why such relief is required on an emergency basis. The application shall also set forth the reasons why the party is entitled to such relief. Such notice may be given by e-mail, facsimile transmission, or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties.
3. Within one business day of receipt of notice as provided in paragraph 2, the administrator shall appoint a single emergency arbitrator from a special panel of emergency arbitrators designated to rule on emergency applications. Prior to accepting appointment, a prospective emergency arbitrator shall disclose to the administrator any circumstance likely to give rise to justifiable doubts to the arbitrator's impartiality or independence. Any challenge to the appointment of the emergency arbitrator must be made within one business day of the communication by the administrator to the parties of the appointment of the emergency arbitrator and the circumstances disclosed.
4. The emergency arbitrator shall as soon as possible, but in any event within two business days of appointment, establish a schedule for consideration of the application for emergency relief. Such schedule shall provide a reasonable opportunity to all parties to be heard, but may provide for proceedings by telephone conference or on written submissions as alternatives to a formal hearing. The emergency arbitrator shall have the authority vested in the tribunal under Article 15, including the authority to rule on her/his own jurisdiction, and shall resolve any disputes over the applicability of this Article 37.
5. The emergency arbitrator shall have the power to order or award any interim or conservancy measure the emergency arbitrator deems necessary, including injunctive relief and measures for the protection or conservation of property. Any such measure may take the form of an interim award or of an order. The emergency arbitrator shall give reasons in either case. The emergency arbitrator may modify or vacate the interim award or order for good cause shown.
6. The emergency arbitrator shall have no further power to act after the tribunal is constituted. Once the tribunal has been constituted, the tribunal may reconsider, modify or vacate the interim award or order of emergency relief issued by the emergency arbitrator. The emergency arbitrator may not serve as a member of the tribunal unless the parties agree otherwise.
7. Any interim award or order of emergency relief may be conditioned on provision by the party seeking such relief of appropriate security.
8. A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with this Article 37 or with the agreement to arbitrate or a waiver of the right to arbitrate. If the administrator is directed by a judicial authority to nominate a special master to consider and report on an application for emergency relief, the administrator shall proceed as in Paragraph 2 of this article and the references to the emergency arbitrator shall be read to mean the special master, except that the special master shall issue a report rather than an interim award.
9. The costs associated with applications for emergency relief shall initially be apportioned by the emergency arbitrator or special master, subject to the power of the tribunal to determine finally the apportionment of such costs.

**ADMINISTRATIVE FEES**

The administrative fees of the ICDR are based on the amount of the claim or counterclaim. Arbitrator compensation is not included in this schedule. Unless the parties agree otherwise, arbitrator compensation and administrative fees are subject to allocation by the arbitrator in the award.

**Fees**

An initial filing fee is payable in full by a filing party when a claim, counterclaim or additional claim is filed. A case service fee will be incurred for all cases that proceed to their first hearing. This fee will be payable in advance at the time that the first hearing is scheduled. This fee will be refunded at the conclusion of the case if no hearings have occurred.

However, if the administrator is not notified at least 24 hours before the time of the scheduled hearing, the case service fee will remain due and will not be refunded.

These fees will be billed in accordance with the following schedule:

| Amount of Claim | Initial Filing Fee | Case Service Fee |
|---|---|---|
| Above $0 to $10,000 | $750 | $200 |
| Above $10,000 to $75,000 | $950 | $300 |
| Above $75,000 to $150,000 | $1,800 | $750 |
| Above $150,000 to $300,000 | $2,750 | $1,250 |
| Above $300,000 to $500,000 | $4,250 | $1,750 |
| Above $500,000 to $1,000,000 | $6,000 | $2,500 |
| Above $1,000,000 to $5,000,000 | $8,000 | $3,250 |
| Above $5,000,000 to $10,000,000 | $10,000 | $4,000 |
| Above $10,000,000 * | | |
| Nonmonetary Claims** | $3,250 | $1,250 |

**Fee Schedule for Claims in Excess of $10 Million** .

The following is the fee schedule for use in disputes involving claims in excess of $10 million. If you have any questions, please consult your local AAA office or case management center.

| Claim Size | Fee | Case Service Fee |
|---|---|---|
| $10 million and above | Base fee of $ 12,500 plus .01% of the amount of claim above $ 10 million. | $6,000 |
| | Filing fees capped at $65,000 | |

** This fee is applicable only when a claim or counterclaim is not for a monetary amount. Where a monetary claim amount is not known, parties will be required to state a range of claims or be subject to the highest possible filing fee.

Fees are subject to increase if the amount of a claim or counterclaim is modified after the initial filing date. Fees are subject to decrease if the amount of a claim or counterclaim is modified before the first hearing.

The minimum fees for any case having three or more arbitrators are $2,750 for the filing fee, plus a $1,250 case service fee.

Parties on cases held in abeyance for one year by agreement, will be assessed an annual abeyance fee of $300. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be closed.

**Refund Schedule**

The ICDR offers a refund schedule on filing fees. For cases with claims up to $75,000, a minimum filing fee of $300 will not be refunded. For all other cases, a minimum fee of $500 will not be refunded. Subject to the minimum fee requirements, refunds will be calculated as follows:

' 100% of the filing fee, above the minimum fee, will be refunded if the case is settled or withdrawn within five calendar days of filing.

' 50% of the filing fee will be refunded if the case is settled or withdrawn between six and 30 calendar days of filing.

' 25% of the filing fee will be refunded if the case is settled or withdrawn between 31 and 60 calendar days of filing. No refund will be made once an arbitrator has been appointed (this includes one arbitrator on a three-arbitrator panel). No refunds will be granted on awarded cases.

Note: the date of receipt of the demand for arbitration with the ICDR will be used to calculate refunds of filing fees for both claims and counterclaims.

**Suspension for Nonpayment**

If arbitrator compensation or administrative charges have not been paid in full, the administrator may so inform the parties in order that one of them may advance the required payment. If such payments are not made, the tribunal may order the suspension or termination of the proceedings. If no arbitrator has yet been appointed, the ICDR may suspend the proceedings.

**Hearing Room Rental**

The fees described above do not cover the rental of hearing rooms, which are available on a rental basis. Check with the ICDR for availability and rates.

© 2007 American Arbitration Association, Inc. All rights reserved. These Rules are the copyrighted property of the American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services. Any unauthorized use or modification of these Rules may violate copyright laws and other applicable laws. Please contact 800.778.7879 or websitemail@adr.org for additional information.

AAA175

AAA MISSION & PRINCIPLES    PRIVACY POLICY    TERMS OF USE    TECHNICAL RECOMMENDATIONS          ©2007 AMERICAN ARBITRATION ASSOCIATION. ALL RIGHTS RESERVED

# EXHIBIT

# D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---


THELEN, REID, BROWN, RAYSMAN & STEINER
LLP, fka THELEN REID & PRIEST LLP,

    Plaintiff/Counter-Defendant,

vs.              No. C 06-2071 VRW

FRANCOIS MARLAND,

    Defendant/Counter-Claimant,
--------------------------------//
THELEN REID BROWN RAYSMAN &
STEINER LLP, fka THELEN REID
& PRIEST LLP,
    Counter-Counter-Claimant,
vs.
FRANCOIS MARLAND and SUSANNAH
MAAS,
    Counter-Counter-Defendants.
-------------------------------//


DEPOSITION OF

WYNNE S. CARVILL
Thursday, December 14th, 2006
Pages 266 through 290 are Deemed
Condifential and are Bound Separately


REPORTED BY:
KARLA SHALLENBERGER, CSR #10725

1   there and what the language looks like to me.          13:39

2   Q.   Please do.  Take whatever time you think is      13:40

3   necessary.  If you find a severability clause, I would    13:40

4   appreciate you pointing it out.                          13:40

5   **A.   I don't think there is one here.**              **13:40**

6   Q.   I don't think so either.                          13:40

7   **A.   I don't think there is one in it.**              **13:40**

8   **So the answer to your question is, no, I do**        **13:40**

9   **not remember drafting the severability clause.**      **13:40**

10   Q.   Although, of course, the answer doesn't          13:40

11   necessarily follow from the fact that one isn't in      13:40

12   here?                                                    13:40

13   **A.   Correct, that doesn't necessarily follow,**     **13:40**

14   **but I realized I did not answer your question.  And I**  **13:40**

15   **didn't think I did, but if I looked at it and found it**  **13:40**

16   **then --**                                            **13:40**

17   Q.   Yes.                                              13:40

18   **A.   All right.**                                    **13:40**

19   Q.   Yes, absolutely.                                  13:40

20   But that's what I want to focus in on, do              13:40

21   you recall proposing or drafting a severability clause    13:40

22   that certain clauses would be severable, or certain      13:40

23   clauses would not be severable, or would take effect      13:40

24   or not take effect regardless of whether the            13:41

25   Commissioner approved the agreement?                    13:41

**Page 112**

1    A.    I don't remember drafting such a clause, or    13:41

2    having a prior draft that had it.  We might look    13:41

3    through the drafts and find one, but I certainly don't    13:41

4    recall one at this time.    13:41

5    Q.    Okay.  Now -- actually, I want to come back    13:41

6    to page six to that clause G.  I want to ask you about    13:41

7    subparagraph five.    13:41

8    A.    Yes.    13:41

9    Q.    Subparagraph five reflects an agreement for    13:41

10    Thelen to provide legal services to Marland in the    13:41

11    future if certain events happen, correct?    13:41

12    A.    Correct.    13:41

13    Q.    Would you characterize that as a kind of    13:41

14    attorney-client agreement?    13:41

15    A.    I didn't think about it at the time.  I    13:42

16    remember how this got there, but I don't remember a    13:42

17    process of saying or thinking, now, does this -- is    13:42

18    this an attorney-client agreement here?  I don't    13:42

19    recall going through that process.    13:42

20    Q.    Okay.    13:42

21    A.    I recall the history of that clause, and    13:42

22    that history does not, would not lead me there.    13:42

23    Q.    Well, paragraph four reflects the    13:42

24    reinstatement of an attorney-client agreement for, at    13:42

25    least, some purposes, correct?    13:42

**Page 113**

1    **A.   To RoNo, yes.**                    **13:42**

2    Q.   Okay.  And this September 18, 2001        13:42

3    amendment to the attorney-client agreement we looked    13:42

4    at earlier today -- it's Exhibit 9 if you want to look    13:42

5    at it again.                        13:43

6    **A.   All right.**                      **13:43**

7    Q.   It refers to -- right underneath "Recital,"    13:43

8    the very first recital refers to an attorney-client    13:43

9    agreement dated February 17th, amended June 2nd, 1999,    13:43

10   right, in the very first recital?            13:43

11   **A.   In the very first recital, yes, February**    **13:43**

12   **17, amended June 2nd.**                **13:43**

13   Q.   On page two of Exhibit 9, paragraph nine    13:43

14   states that all other terms of the attorney-client    13:43

15   agreement not directly contradicted by the terms of    13:43

16   this agreement remain unchanged.  Do you see that?    13:43

17   **A.   Yes, I do.**                    **13:43**

18   Q.   And if you want to take out the        13:43

19   attorney-client agreement, Exhibit 2, I will direct    13:43

20   your attention to page six, paragraph 23, "Arbitration    13:44

21   of Disputes."  Do you see that?            13:44

22   **A.   I see that.**                    **13:44**

23   Q.   Okay.  You understood in 2002 that Thelen    13:44

24   and Marland had agreed to arbitrate any disputes about    13:44

25   the attorney-client agreement, right?        13:44

1       **MS. THURM:** Object to the form of the          13:44

2   question.                                    13:44

3       **THE WITNESS:** All I can tell you is that I      13:44

4   recall knowing in 2002 that there was an arbitration    13:44

5   clause in the original attorney-client agreement.      13:44

6       **MR. HAYES:** Q.  Okay.  And did you take any     13:44

7   steps in 2002 to provide for the recision of the       13:44

8   arbitration agreement contained in the original        13:45

9   attorney-client agreement, notwithstanding the fact    13:45

10  that paragraph G4 was reinstating RoNo's role as       13:45

11  counsel, general counsel to RoNo -- I'm sorry,         13:45

12  Thelen's role as general counsel to RoNo?              13:45

13      **A.   I think I understand your question, and if    13:45**

14  **I do, the answer is yes.                          13:45**

15      Q.   What steps did you take to rescind the        13:45

16  arbitration agreement in the February 1999            13:45

17  attorney-client agreement notwithstanding the         13:45

18  reinstatement of that agreement to the extent that     13:45

19  Thelen was serving as general counsel to RoNo?        13:45

20      **MS. THURM:** Object to the form of the          13:45

21  question.                                    13:45

22      **THE WITNESS:** I drafted and then received      13:45

23  European Counsel's suggestions and worked on further   13:45

24  drafts of a new agreement, the purpose of which was to  13:45

25  supersede and replace all agreements.  And near the    13:46

1  end I accepted one modification, and that was -- on       13:46

2  the issue of prior agreements, and that was, all       13:46

3  right, we'll do the general counsel, meaning, that       13:46

4  Dana Fox will do these functions.       13:46

5         That is the only part of the prior       13:46

6  agreements I understood survived.  Because we       13:46

7  undertook that duty, it's immediately superseded.       13:46

8     Q.   I'm sorry, the last sentence you said       13:46

9  because we undertook that duty.       13:46

10    **A.   Let me get the language.  I was looking for**       13:46

11   **the language.**       13:46

12    Q.   Sure.       13:46

13    **A.   It was reinstated and immediately**       13:46

14   **superseded except for one narrow function, and that**       13:47

15   **was the Dana Fox role.  So I believe, rightly,**       13:47

16   **wrongly, I believe that everything prior was over**       13:47

17   **except to the extent that we had to do the Dana Fox**       13:47

18   **function.**       13:47

19    Q.   Well, if I could use that phrase of yours       13:47

20   for current purposes, the Dana Fox function, or Dana       13:47

21   Fox role, it was your understanding when you signed       13:47

22   this December 2002 agreement that if there was some       13:47

23   dispute over what Dana Fox did or didn't do, or should       13:47

24   or shouldn't have done, that pursuant to the clause G4       13:47

25   here in the December 2002 agreement, and the provision       13:47

1  which refers to the September 2001 amendment, which        13:47

2  specifies that all other provisions in the February        13:48

3  1999 agreement are unchanged, that that dispute over        13:48

4  what Dana Fox did or didn't do, or should or shouldn't      13:48

5  have done would be subject to arbitration, correct?        13:48

6      **A.   I never considered that issue.**                 **13:48**

7      Q.   You had in mind specifically an intention          13:48

8  to supersede the arbitration clause in the February         13:48

9  1999 agreement when you were drafting this December         13:48

10  2002 agreement?                                            13:48

11     **A.   I had the intention to supersede, to**            **13:48**

12  **replace everything, and only at the end when I**            **13:48**

13  **received in this sort of a last punch list, something**     **13:48**

14  **from Brunswick where Brunswick wanted us to assume**        **13:48**

15  **that role, which I understood was the Dana Fox role, I**    **13:48**

16  **said okay.**                                                **13:48**

17     Q.   Okay.  Respectfully, sir, I'm not sure you         13:48

18  answered my question.  If you understood --                 13:49

19     **A.   Here is why I'm putting it this way.  When**       **13:49**

20  **I received that suggestion from Phillipe Brunswick, I**     **13:49**

21  **did not sit down and try to figure out how much**           **13:49**

22  **baggage from prior agreements that might draw in.  So**     **13:49**

23  **I didn't have a view of it then.  I didn't think about**    **13:49**

24  **it.  I'm telling you, the only thing I thought about**      **13:49**

25  **was, okay, to the Dana Fox function.**                      **13:49**

1    Q.   I understand.  I thought you had intended          13:49

2  or implied something different in a previous answer.      13:49

3  I may have misunderstood you.                             13:49

4    **A.   No, okay.**                                      **13:49**

5    Q.   Let me make sure I understand.  Let me try         13:49

6  it this way then -- actually, if I may, being a lawyer    13:49

7  and focusing on arbitration issues, let me recall to      13:49

8  your mind that well-settled legal principal that a        13:49

9  party cannot validate an arbitration agreement on the     13:50

10  grounds that the entire contract was procured by         13:50

11  fraud.  The party has to allege and prove that the       13:50

12  arbitration agreement within the contract itself was     13:50

13  procured by fraud.  You are familiar with that rule      13:50

14  from Prime and Paint (phonetic)?                         13:50

15    **A.   I understand what you're saying.  I am not**    **13:50**

16  **agreeing or disagreeing.  I understand.**              **13:50**

17    Q.   You have heard of it?                             13:50

18    **A.   That position.**                                **13:50**

19    Q.   And you're familiar with Prime and Paint?         13:50

20    **A.   I've heard of it.**                             **13:50**

21    Q.   Fine.

22    **A.   Whether I'm prepared to answer questions**      **13:50**

23  **about it, Prime and Paint --**                         **13:50**

24    Q.   I am not going to ask you any questions           13:50

25  about Prime and Paint.  I was trying to give context.    13:50

1  If it's not helpful, I will stop.                    13:50

2      **A.   The reason why I am saying this is I didn't**      **13:50**

3  **consider it.  So you're asking me to testify as to**        **13:50**

4  **what was my view when I was drafting these agreements,**    **13:50**

5  **as to what the effect was with putting this in at the**     **13:50**

6  **end given the arbitration clause, I will tell you I**       **13:50**

7  **didn't consider it.**                    **13:51**

8      Q.   That's it almost exactly.  Let me just now     13:51

9  try to restate it.                    13:51

10     **A.   Okay.**                    **13:51**

11     Q.   Understanding that you were trying to        13:51

12  replace all prior agreements between the parties with     13:51

13  a new agreement?                    13:51

14     **A.   Correct.**

15     Q.   Apart from that, you did not have in mind      13:51

16  in drafting the December 2002 agreement, any further     13:51

17  and specific thought of rescinding, or revoking, or      13:51

18  dissolving the agreement for arbitration of disputes     13:51

19  that was contained in the February 1999 agreement?      13:51

20     **A.   Sure I did.**                    **13:51**

21     Q.   You did?                    13:51

22     **A.   In the sense that I knew there was an**      **13:51**

23  **arbitration clause here.  And as the person who**       **13:51**

24  **initially drafted the new agreement to associate**      **13:51**

25  **counsel, I didn't include it.**                    **13:51**

1    Q.    Okay.  So you were aware that was a clause,    13:51

2    and you wanted to not have that kind of clause in the    13:51

3    new agreement?                              13:51

4    **A.    It was not among the list of clauses I**    **13:51**

5    **chose to put in the new agreement.**                **13:52**

6    Q.    Indeed, okay.  But then did it occur to you    13:52

7    or not that when you agreed to Brunswick's suggestion    13:52

8    that is reflected here in paragraph G4, you were    13:52

9    reimporting the arbitration agreement from the    13:52

10    February 1999 attorney-client agreement?    13:52

11    **A.    And my answer, I think I have said it three**    **13:52**

12    **times now, is it that I did not think about it.  So,**    **13:52**

13    **how can I tell you that, yes, I believed I was, or no,**    **13:52**

14    **I believed I wasn't.**                    **13:52**

15    Q.    No --                              13:52

16    **A.    It never crossed my mind.**                **13:52**

17    Q.    Okay.  But, you had an intention to get rid    13:52

18    of it and you didn't realize you were importing it    13:52

19    back in?                              13:52

20    **A.    I'm not agreeing? --**                    **13:52**

21    **MS. THURM:** Objection to the form of the

22    question.  Excuse me.  Assumes facts not in evidence    13:52

23    and argumentative.                        13:52

24    **THE WITNESS:** I am not agreeing that I    13:52

25    imported it or that I didn't import it.  I am saying    13:53

1   my intention was not to include it when I initially        13:53

2   drafted it, and a later point I agreed to a language        13:53

3   change.  When I agreed to that language change, I gave       13:53

4   no consideration to that point.                              13:53

5       **MR. HAYES:** Q.  Okay.                                 13:53

6       **A.   And you or someone else can fault me for          13:53**

7   **that, and Counsel and Thelen and you can argue the         13:53**

8   **significance of that, but as a percipient witness, my      13:53**

9   **testimony is I didn't consider it.  It didn't cross my     13:53**

10  **mind.                                                      13:53**

11      Q.   I am asking now for your nonexpert opinion          13:53

12  testimony, looking at this clause with the other            13:53

13  agreements in front of you, would you agree that to         13:53

14  the extent there is a dispute about what you refer to       13:53

15  as the Dana Fox role, that dispute is subject to            13:53

16  arbitration?                                                13:54

17      **A.   Let me tell you why I will not answer that        13:54**

18  **question.  And that is, since I have taken the bench,      13:54**

19  **I have had numerous occasions to read the law in          13:54**

20  **arbitration agreements and make rulings on motions to     13:54**

21  **compel arbitration.  There is no way I can answer what     13:54**

22  **my thoughts were then on that if I formed an opinion       13:54**

23  **back then, which I didn't.  But to answer that            13:54**

24  **question today in terms of my current knowledge, I        13:54**

25  **would be answering in terms of my experience as a         13:54**

1  bench officer based on the motions to compel          13:54

2  arbitration and the rulings I have made on that.  And      13:54

3  I don't think that is within the province of what a        13:54

4  percipient witness is called upon to do.              13:54

5      Q.   Is there a rule or statute that you are        13:54

6  aware of which prevents you from answering my              13:55

7  question?                                          13:55

8      A.   I believe you're asking for expert          13:55

9  testimony.                                        13:55

10     Q.   What rule prevents you from answering my      13:55

11 question because you believe I am asking for expert        13:55

12 testimony?                                       13:55

13        MS. THURM: Objection.  The question is        13:55

14 argumentative.                                   13:55

15        THE WITNESS: I'm not going there, in part      13:55

16 because if I were to offer an opinion on this, or if I     13:55

17 were to decide a case on this motion, I would go back      13:55

18 and read the authorities, with this in mind, and try      13:55

19 to come up with a reasoned analysis on it.  I don't        13:55

20 think that is my job as a percipient witness.            13:55

21        MR. HAYES: Q.  I am not asking you to go        13:56

22 back and read anything, sir.  I am just asking why you     13:56

23 believe you cannot answer the question?                13:56

24        MS. THURM: The witness has stated his          13:56

25 reason.  The question is asked and answered.  The        13:56

1   witness has given you the best testimony he feels          13:56

2   comfortable giving, so.                          13:56

3        **MR. HAYES:** Wendy, we can all agree that          13:56

4   because the witness has said it that he is not          13:56

5   answering the question.

6        **MS. THURM:** That's right.

7        **MR. HAYES:** It's wrong to say --          13:56

8        **MS. THURM:** You've asked it four times and          13:56

9   he can provide that same answer.                  13:56

10        **MR. HAYES:** Wendy, that' not what I'm

11   doing --

12        **MS. THURM:** You can spend your seven hours          13:56

13   that way, Andrew, or --                          13:56

14        **MR. HAYES:** Wendy --

15        **MS. THURM:** -- you can go on.

16        **MR. HAYES:** -- I am trying to understand          13:56

17   all of the bases that the witness is asserting for          13:56

18   refusing to answer the --                          13:56

19        **MS. THURM:** I think he has answered it.          13:56

20        **MR. HAYES:** I'm sorry, I hadn't finished          13:56

21   talking.  No, he hasn't, okay, he said one thing, then          13:56

22   has expanded on it.  I am allowed to make my record          13:56

23   about why the witness does not believe it is          13:56

24   appropriate for him to answer the question.  He may be          13:56

25   right.  But, I am still entitled to make my record,          13:56

1  and that is what I am trying to do.  And starting to          13:57

2  chime in about asked and answered three times is              13:57

3  inappropriate.  It is a simple question --                    13:57

4          **MS. THURM:** Is it inappropriate --                 13:57

5          **MR. HAYES:** Stop talking over --                    13:57

6          **MS. THURM:** It's inappropriate --                  13:57

7          **MR. HAYES:** Forget it.  Wendy, you're going

8  to let me finish, okay, that's how it's going to work.    13:57

9          **MS. THURM:** Okay, Andrew.                          13:57

10         **MR. HAYES:** I am not finished.                      13:57

11         **MS. THURM:** Why don't you finish?  Go              13:57

12 ahead.                                                         13:57

13         **MR. HAYES:** Thank you.  I would simply like    13:57

14 to make sure we have a clear and complete record on it     13:57

15 without your feeling that you need to make speaking         13:57

16 objections or interrupt me repeatedly, as you have         13:57

17 just done in the last couple of minutes.  Can I do         13:57

18 that now please?                                              13:57

19         **MS. THURM:** Go ahead, Andrew.  Finish your     13:57

20 speech and then I'll make mine, and then the witness       13:57

21 can answer the question for the 15th time.                  13:57

22         **MR. HAYES:** Actually, I was going to have       13:57

23 the question read back again.  If you want to make a       13:57

24 speech, go ahead.

25         **MS. THURM:** Are you done now?                    13:57

1    **MR. HAYES:** Can we have the question read        13:57

2    back please?                            13:57

3    **MS. THURM:** Okay.                    13:58

4    (Whereupon, the record was read by the

5    Reporter.)

6    **QUESTION:** "What rule prevents you from answering my        13:55

7        question because you believe I am                13:55

8        asking for expert testimony?"                13:55

9    **MR. HAYES:** Go ahead and read the answer.

10    (Whereupon, the record was read by the

11    Reporter.)

12    **ANSWER:**    "I'm not going there, in part because if I        13:55

13        were to offer an opinion on this, or if        13:55

14        I were to decide a case on this motion,        13:55

15        I would go back and read the            13:55

16        authorities, with this in mind, and try        13:55

17        to come up with a reasoned analysis on        13:55

18        it.  I don't think that is my job as a        13:55

19        percipient witness."                13:55

20    **MR. HAYES:** What did I say after that?

21    (Whereupon, the record was read by the

22    Reporter.)

23    **QUESTION:** "I am not asking you to go back and read        13:56

24        anything, sir.  I am just asking why        13:56

25        you believe you cannot answer the            13:56

1    question?"                          13:56

2         **MR. HAYES:** That's when Wendy interrupted.

3         **MS. THURM:** No, that's when Wendy made      13:59

4    objections, just like all the objections that you made      13:59

5    at Mr. Marland's deposition and Mr. Chateau's      13:59

6    deposition, and I am sure you will do at Mr.      13:59

7    Brunswick's deposition when questions are asked more      13:59

8    than one time over.                          13:59

9         Mr. Marland had the benefit of not only      13:59

10   hearing the questions in English but in French several      13:59

11   times, and on many occasions you objected that Mr. Van      13:59

12   Ness' questions were asked and answered and encouraged      13:59

13   him to move along.  Sometimes he followed your      14:00

14   instructions -- your request and sometimes he didn't.      14:00

15   I have every right to sit here and make the same      14:00

16   objection.  And it's the only time I have counseled      14:00

17   you not to get overly aggressive with the witness and      14:00

18   to move on, which is fewer times than happened      14:00

19   certainly in Mr. Marland's deposition.  The witness      14:00

20   can provide any additional information.  He is welcome      14:00

21   to do that.                          14:00

22         **THE WITNESS:** Do you want me to go on, or      14:00

23   do you want to ask a question, or do you want to talk      14:00

24   to her?                          14:00

25         **MR. HAYES:** Q.  I wanted to finish what I      14:00

1  was saying --                                      14:00

2  **A.   Okay.                                     14:00**

3  Q.    -- when I was interrupted.                  14:00

4  **A.   I am listening.  You have my attention,      14:00**

5  **sir.                                            14:00**

6  Q.    Thank you.                                  14:00

7        (Whereupon, the record was read by the

8        Reporter.)

9  **QUESTION:** "I am not asking you to go back and read      14:01

10        anything, sir.  I am just asking why          13:56

11        you believe you cannot answer the             13:56

12        question?"                                    13:56

13        **MR. HAYES:** Q.  Let's do it this way, sir,     14:01

14  Exhibit 2, the attorney-client agreement contains an      14:01

15  arbitration clause, correct?                        14:01

16  **A.   Correct.                                   14:01**

17  Q.    Exhibit 9, the amendment to attorney-client    14:01

18  agreement does not rescind or revoke the arbitration      14:01

19  clause in the February 1999 attorney-client agreement,      14:01

20  correct?                                            14:02

21  **A.   Correct.                                   14:02**

22  Q.    Paragraph G4 of Exhibit 11 in the December     14:02

23  2002 new agreement to associate counsel specifies that      14:02

24  the attorney-client agreement shall be immediately      14:02

25  superseded by this new agreement except that TR&P      14:02

1  shall resume its role as general counsel to RoNo as          14:02

2  provided in the September 18, 2001 amendment to the          14:02

3  attorney-client agreement, correct?                          14:02

4  **A.   Correct.**                                            **14:02**

5  Q.   Okay.  Can you give us any reason why          14:02

6  disputes regarding TR&P's service to RoNo as general          14:02

7  counsel as provided in the September 18th, 2001          14:02

8  amendment to the attorney-client agreement would not          14:02

9  be subject to arbitration?                          14:02

10  **A.   I could become an advocate here and try to     14:03**

11  **use what I know about this subject to make an argument     14:03**

12  **based on my current knowledge, or I could undertake,     14:03**

13  **as I would as a bench officer, to do research and come     14:03**

14  **up with a correct answer, or I can do what I think a     14:03**

15  **percipient witness is obligated to do, which is, to     14:03**

16  **tell you what I thought at the time that I was     14:03**

17  **involved in the underlying events.  I think that's all     14:03**

18  **I am obligated to do.                          14:03**

19  Q.   Okay.  From what you have just said, am I     14:03

20  correct in understanding that there is nothing about     14:03

21  your current position as a judicial officer as such     14:03

22  that prevents or excuses you from answering my     14:03

23  question?                          14:04

24  **A.   I am not asserting my privilege as a bench     14:04**

25  **officer, if that's what you're asking.  I am not     14:04**

1  **asserting any privilege as a bench officer.**

2  Q.   I am asking that and also privilege in the        14:04

3  broadest possible sense, yes, sir, that is what I was        14:04

4  asking.                                      14:04

5  **A.   Well, privilege in the broader sense to the        14:04**

6  **extent that it might call upon me to draw upon              14:04**

7  **discussions I have had or may have had with people          14:04**

8  **since this dispute arose, I mean, you know, it's            14:04**

9  **theoretically possible I advanced an argument that was      14:04**

10  **an attorney-client issue, all right, but I'm not going      14:04**

11  **to go there and discuss whether that's a problem or         14:05**

12  **not, but I am not asserting any privilege.                  14:05**

13  Q.   Okay.  I believe I have now understood        14:05

14  fully and completely your reasons for not answering        14:05

15  the question.  Is there any other reason or?        14:05

16  **A.   No, no.                                  14:05**

17  Q.   Thank you, very much.                      14:05

18  **A.   I respect the fact I may be wrong and you        14:05**

19  **may get Judge Walker, his Honor, to take me to task on     14:05**

20  **it.                                          14:05**

21  Q.   And he might then turn out to be wrong.  We     14:05

22  are all just trying to do the right thing, so let's        14:05

23  move on.                                      14:05

24  **A.   A judge can be wrong in a deposition.  He        14:05**

25  **isn't wrong in court.                          14:05**

1    Q.    With Judge Walker, I will stipulate to         14:05

2    that.  All right, let's move on, sir.                14:05

3         Now, page seven, paragraph C1 --                14:05

4    **A.    Yes, sir.**                                      **14:05**

5    Q.    -- I just want to make sure that what you      14:05

6    have said before covers this.  I believe it does, but    14:05

7    let's be clear.  The representation by counsel that is    14:06

8    referred to here, you understood that European Counsel    14:06

9    was relying on Brunswick and perhaps also Miss Maas    14:06

10   and Mr. Marland themselves; is that right?           14:06

11   **A.    And Francois Chateau.**                         **14:06**

12   Q.    And Chateau, okay.                             14:06

13   **A.    And there may have been others, but those**     **14:06**

14   **are the only ones I can name as possibilities.  I**     **14:06**

15   **guess Beck DeCorso, but --**                          **14:06**

16   Q.    You -- I don't mean to interrupt you.          14:06

17   **A.    When I say "Beck DeCorso," I only say that**     **14:06**

18   **because I know that they were involved in the matter,**    **14:06**

19   **but I have no knowledge on that subject in terms of --**    **14:06**

20   **as far as I know, they were in daily communication**     **14:06**

21   **with Beck DeCorso, or never said a word to them, I**     **14:06**

22   **have no idea.**                                       **14:06**

23   Q.    Usually one tells a witness not to           14:06

24   anticipate the next question, but when you answer it,    14:07

25   I don't think I should chide you for it.            14:07