# EXHIBIT

# 1

# NEW AGREEMENT TO ASSOCIATE COUNSEL

Thelen, Reid & Priest L.L.P. ("TR&P"), on the one hand, and SCP Brunswick & Associates ("Brunswick"), Susannah Maas ("Maas"), and Francois Marland ("Marland") (jointly "European Counsel" or "EC"), on the other, hereby enter into the following agreement (the "Agreement") effective July 1, 2002:

## RECITALS

WHEREAS TR&P and Marland entered into an Attorney Client Agreement ("Attorney Client Agreement") dated February 17, 1999, pursuant to which Marland and RoNo retained TR&P to serve as counsel in its legal actions against Altus and others, related to the sale of certain business and other assets of Executive Life Insurance Co. ("ELIC"), which Attorney Client Agreement was amended on September 18, 2001 by a "Amendment to Attorney Client Agreement" and thereafter terminated by TR&P pursuant to a July 8, 2002 letter; and

WHEREAS thereafter, with the express consent of Marland and RoNo, TR&P entered into an Attorney Client Agreement with the Commissioner of the California Department of Insurance ("DOI") dated May 25, 1999 ("Commissioner Agreement"), wherein TR&P agreed to serve as counsel to the Commissioner in litigation pending against Altus Finance, SA. ("Altus") and other defendants in the Federal District Court in Los Angeles arising out of defendants' actions to obtain control over the business and other assets of ELIC and to pursue those and whatever other claims the Commissioner may have arising out of the same facts and circumstances (hereinafter referred to as the "ELIC claims"); and

WHEREAS TR&P and European Counsel then entered into an Agreement to Associate Counsel ("Original Agreement") executed on June 3 and June 30, 1999, completed with a side letter of June 2, 1999, and amended on September 18, 2001, where by the parties would jointly prosecute the ELIC claims; and

WHEREAS TR&P desires to re-negotiate the Commissioner Agreement in order to obtain advances, but needs to restructure the agreements between the parties as a predicate to such negotiations with the Commissioner; and

WHEREAS TR&P also desires to re-negotiate the fee splitting terms under the Original Agreement, for various reasons that were discussed among the parties during the preceding months; and

WHEREAS to facilitate TR&P's negotiations with the Commissioner the parties desire to replace the Attorney Client Agreement and Original Agreement and any and all other agreements between TR&P, on the one hand, and either Marland, RoNo or the European Counsel, on the other, with this new Agreement as the sole agreement between them;

NOW THEREFORE, in consideration for the mutual agreements contained herein and for other good and valuable consideration, the parties hereto agree as follows:

M 000028

A.    **Definitions**

      1.    The "Litigation" as used herein means any lawsuit in which TR&P has been retained to represent the California Insurance Commissioner ("Commissioner") or RoNo LLC ("RoNo") with respect to claims arising out of the Executive Life Insurance Company rehabilitation and transactions related thereto, including

-    *Harry W. Low v. Altus Finance S.A., et al.,* U.S. Dist. Ct., C.D. Cal., Case No. 99-02829 AHM (CWx)(the "Commissioner's Action");

-    *State of California ex rel. RoNo v. Altus Finance S.A.,* U.S. Dist. Ct., C.D. Cal., Case No. CV 01 8587 AHM (CWx), including the California Attorney General's complaint in intervention in that action captioned *State of California ex rel. RoNo v. Altus Finance S.A.,* (referred to collectively herein as the "*RoNo* Action");

-    *Sierra National Insurance Holdings, Inc. v. Credit Lyonnais S.A.,* U.S. Dist. Ct., C.D. Cal., Case No. 01-01339 AHM (CWx) (the "*Sierra* Action").

-    *Carranza-Hernandez v. Altus Finance Corporation,* U.S. Dist. Ct., C.D.Cal., Case No. CV 99 08375 AHM;

-    *Carranza-Hernandez v. Artemis S.A.,* U.S. Dist. Ct., C.D. Cal., Case No. CV 00 09593 AHM (CWx);

-    *Harry W Low v. SDI Vendome S.A., et al.,* U.S. Dist. Ct., C.D. Cal., Case No. CV 02-5983 AHM.

      2.    "Net Recovered Fees" as used herein means the amount of fees recovered by TR&P as a result of its representation of the Commissioner on the ELIC claims in the Commissioner's Action or RoNo on its claims in the *RoNo* Action, after payment of "Reimbursed Expenses."

      3.    "Reimbursed Expenses" as used herein means any expenses reasonably incurred by TR&P, the beneficial owner of RoNo, Brunswick or EC in connection with their representation of or contribution to the Commissioner in the Commissioner's Action or of RoNo in the *RoNo* Action not already fully reimbursed by the Commissioner or RoNo; and said expenses shall be reimbursed out of fee recoveries in the Commissioner's Action or in the *RoNo* Action prior to the calculation of Net Recovered Fees.

B.    **Services and Compensation**

      1.    Assistance to Be Provided by European Counsel

M 000029

   (a)  EC agrees to provide legal assistance, information and strategic advice as requested by TR&P in connection with its investigation and prosecution of the ELIC claims on behalf of the Commissioner.

   (b)  Upon the request of TR&P, and unless disabled or otherwise unavailable for reasons beyond his control, Marland agrees to come to the United States and testify before a federal grand jury or in the Commissioner's Action on the following terms and conditions:

     (i)  With respect to grand jury testimony, Marland agrees to appear voluntarily in Los Angeles so long as that appearance is subject to a confidentiality agreement with the United States Department of Justice that protects his identity and assures him that he will not be compelled to produce documents against his will that may be in his possession or control.

     (ii)  TR&P will make all reasonable efforts to avoid the necessity of Marland testifying in the Commissioner's case. In the event that TR&P determines that such appearance cannot be avoided without prejudice to the position of the Commissioner, Marland agrees to voluntarily provide deposition testimony in Europe and come to the United States to testify in court.

     (iii)  This paragraph B.1(b) supercedes any prior agreement between the parties on the subject of Marland either appearing to testify or provide documents in connection with the Litigation or any proceedings related thereto.

  2.  Fees to be Paid to European Counsel

   (a)  The Formula

   Except as provided herein below, TR&P agrees to pay to EC, jointly, a portion of the legal fees that TR&P receives for its representation of the Commissioner on the ELIC claims in the Commissioner's Action or RoNo in the *RoNo* Action in the amount of thirty-five percent (35%) of the Net Recovered Fees.

   (b)  Payment process

   Payment to EC shall be made in the form of a cashiers check or wire transfer payable to Maas, or as directed by her, and shall be made within ten (10) business days following TR&P's receipt of readily available funds from the Commissioner. In the event of a dispute between the parties regarding such payment, TR&P shall immediately pay to EC any and all undisputed amounts. In the event any third-party disputes EC's right to receive such payment, TR&P shall nevertheless pay such amounts unless a court order or other valid legal process bars TR&P from making such payments.

   (c)  Expense reimbursement

M 000030

The parties agree that TR&P will pay Reimbursed Expenses out of recovered fees prior to the calculation of Net Recovered Fees. To the extent insufficient fees are recovered to pay all Reimbursed Expenses, reimbursement shall be made to each party proportionately based on the total Reimbursed Expenses to which each party is entitled. Except as provided in this paragraph, TR&P shall have no obligation to pay any costs or expenses incurred by EC in fulfilling their obligations under this Agreement to prosecute and support the Litigation.

Separate and apart from the formula stated in subparagraphs (a) above, TR&P also agrees to reimburse EC for any litigation expenses advanced to TR&P by EC, to the extent TR&P obtains reimbursement for such expenses from the Commissioner.

### (d)     Advances by the Commissioner

In light of the substantial investment of professional time being made by TR&P in working on the Litigation, which time has not yet been compensated, TR&P may seek to obtain from the Commissioner one or more advances of funds to TR&P to be credited against any future right to recovery of attorneys fees in the Commissioner's Action. All such advances of funds to TR&P that are actually received by TR&P are referred to herein as "Advances." TR&P may request that such Advances be made subject to an agreement by the Commissioner that such Advances will be non-recourse, i.e., that TR&P's obligation to repay those Advances will be waived to the extent the ultimate obligation of the Commissioner to pay attorneys fees to TR&P is less than the amount of such Advances.

### (e)     Security for European Counsel

European Counsel is, subject to the following provisions, entitled to fifteen percent (15%) of the Advances.

(i)     If permitted by the Commissioner, EC shall be immediately paid fifteen percent (15%) of each of the Advances.

(ii)     If payment to EC of a portion of the Advances is not permitted by the Commissioner, but the Commissioner does permit an escrow arrangement as described herein, TR&P agrees to set aside fifteen percent (15%) of any Advances for services performed, and to place such funds in an interest bearing escrow account as security for the payment to EC of its share of the Net Recovered Fees at the end of the case. The funds in that escrow account may only be used to pay EC its share of the Net Recovered Fees when TR&P is entitled to a recovery of fees under the Commissioner's Agreement. Under no circumstances may the funds in the escrow account be claimed by TR&P. The term "Net Advances" as used herein refers to the Advances less the principal amount thereof placed into escrow as security for EC. In the event there is no recovery, the escrowed funds will be refunded to the Commissioner together with any interest earned thereon.

(iii)     The escrow account shall be established by TR&P and EC on terms that reflect the above provisions and provide that the escrowed funds plus interest shall be disbursed to EC upon any of the following events: (i) entry of final judgment in the Commissioner's

M 000031

Action, (ii) execution of a settlement agreement in the Commissioner's Action resolving the case as to all defendants, or (iii) the written consent of both EC and TR&P.

        (iv)    The escrow account shall bear interest in favor of the EC.

        (f)      **Settlement of Final Fees**

In the event fees paid by the DOI are reduced by the amount of one or more Advances, the amounts paid by TR&P to EC under the formula in subparagraph (a) shall be calculated as follows:

        (i)    If the DOI allows immediate payment to EC of 15% of Advances, or if an escrow is established as provided in B.2(e) above, then upon receipt of any fee award:

        (A)    TR&P shall first pay Reimbursed Expenses out of the fees paid to it by DOI. The amount of any deducted Advances shall then be added back to the remainder of such fees paid by DOI to calculate the Net Recovered Fees.

        (B)    The formula in subparagraph (a) shall be used to determine the ~~amount due from TR&P to EC. In applying the formula, to the extent TR&P has paid 15% of each Advance to EC, TR&P shall pay the balance due under the formula. If instead, TR&P has~~ escrowed a portion of the Advances for the benefit of EC, the escrowed amount shall first be used to pay the fees due to EC under the formula, and then the remainder (if any) due to EC shall be paid from the fees paid to TR&P. For example, if the formula were to indicate that seven million dollars ($7 million) was due to EC, but three million dollars ($3 million) had been paid or escrowed for the benefit of EC, TR&P would be obligated to pay EC four million dollars ($4 million) in addition to the portion escrowed.

        (C)    In the event the Commissioner charges TR&P interest on Advances or discounts fees ultimately paid to TR&P to reflect interest on the Advances, then the cost of the interest shall be borne by TR&P and EC in the proportion that each shared in the Advances. For example, if the Advances total $2 million, the principal amount in the escrow account would be $300,000; if the Commissioner "charges" $100,000 in interest on the Advances, then 15% (or $15,000) of the $100,000 is to be borne by EC, and the balance of the interest would be borne by TR&P. Otherwise, the escrowed funds shall accrued interest for the benefit of EC and the interest shall not be included in the calculation of the amounts payable to EC.

        (ii)    If there is no escrow established as provided in B.2(e) above, then upon receipt of any fee award:

        (A)    TR&P shall first pay EC out of the fee award paid to it by DOI 17.647058% of any Advances previously received by TR&P ("EC True Up") to bring TR&P and EC to an 85/15 split that would have existed if 15% of Advances had been escrowed.

        (B)    TR&P shall next pay Reimbursed Expenses out of the fees paid to it by DOI as a fee award.

M 000032

(C)    To calculate the Net Recovered Fees, the amount of any deducted Advances and the EC True Up shall then be added back to the remainder of such fee award paid by DOI.

(D)    The formula in subparagraph (a) shall be used to determine the amount due from TR&P to EC. The EC True Up shall be credited against that amount and the balance paid to EC from the remainder of fee award paid by DOI.

(iii)    Whether or not there is an escrow, TR&P payments to EC pursuant to the formula may be up to and include the total amount of fees paid by DOI if necessary under the formula; however, under no circumstances shall application of the formula in subparagraph (a) obligate TR&P to pay to EC any portion of amounts advanced to it by DOI except as provided in the security provisions above.

The foregoing provisions concerning Advances are intended to provide TR&P with flexibility to re-negotiate the Commissioner Agreement with the DOI. The parties to this Agreement recognize that there is no assurance that the Commissioner will re-negotiate the Commissioner Agreement. The parties hereto also acknowledge that there is no assurance that TR&P will continue with its representation of the Commissioner in the Commissioner's Action.

(g)    Other Consideration

(i)    European Counsel and the beneficial owner of RoNo agree not to appeal the decision in the *RoNo* Action and to bring to a conclusion the representation of RoNo by all outside counsel. In reaching this decision, European Counsel and the beneficial owner of RoNo are relying on current litigation counsel for RoNo (Beck DeCorso) rather than TR&P.

(ii)    To facilitate the close out of the *RoNo* Action, TR&P will pay the outstanding and future invoices due the Beck DeCorso for its services to RoNo up to the amount previously paid by EC. Thereafter, Beck DeCorso fees shall be paid by TR&P and EC on a 50/50 basis. Said payments by TR&P (as with the prior payments to Beck DeCorso by beneficial owner of RoNo) are "Reimbursed Expenses" subject to the reimbursement provisions of this Agreement.

(iii)    In the event of any recovery by or to either RoNo or TR&P as a result of the *RoNo* Action, whether denominated "fees" or otherwise, said recovery shall be included in the calculation of Net Recovered Fees and distributed based on the application of the formula herein.

(iv)    TR&P and Marland agree that their previously terminated Attorney Client Agreement shall be deemed to be re-instated and immediately superceded by this Agreement except that TR&P shall resume its role as general counsel to RoNo as provided in the September 18, 2001 Amendment to the Attorney Client Agreement.

(v)    TR&P and Marland agree that in the future TR&P will provide legal services to Marland in the event that an action is commenced in the United States to block or otherwise prevent the distribution to EC of the funds to which EC is entitled under paragraph B.2 above. TR&P shall provide such services without charge for fees (as opposed to disbursements) up to

M 000033

the first one hundred thousand dollars ($100,000) in fees and thereafter at TR&P's then current usual and customary rates.

(vi)     TR&P acknowledges that the past performance of the EC in connection with the Original Agreement together with the consideration recited herein is good and sufficient consideration for the performance of this Agreement and that EC's past performance shall not be raised as grounds for any further revision in the formula set forth in B.2(a) above.

## C.     Other Terms

### 1.     Representation by Counsel

TR&P, on the one hand, and European Counsel, on the other, are each represented by and are relying exclusively on their own counsel and neither is relying on the other for legal advice regarding this Agreement, its terms or effect, or its enforceability under the laws of any jurisdiction. Marland specifically waives any conflict that might otherwise arise from the fact that pursuant to the Attorney Client Agreement TR&P represented him with respect to the *RoNo* Action and related matters, and he acknowledges that he is relying on the advice of separate and independent counsel with respect to his decision to enter into this new Agreement and its meaning under California law.

### 2.     The Commissioner

(a)     Disclosure and consent:  The Parties expressly acknowledge that the fee splitting terms of this Agreement shall be disclosed to the Commissioner, that the circumstances leading to this change shall be disclosed to the Commissioner and that his consent to this Agreement shall be sought as part of an effort to obtain his agreement to pay Advances as provided in paragraph B above. The effectiveness of this entire Agreement is conditioned on the Commissioner providing his consent.

(b)     Confidentiality:  The Parties further agree that any copy of the Agreement disclosed to the Commissioner or others (or portion thereof so disclosed) shall redact the name of Marland and any references that would be tantamount to disclosing his identity. The parties further agree to take all necessary and lawful steps to continue to preserve the confidentiality of his identity.

(c)     Other Issues:  TR&P represents that it has orally disclosed to the Commissioner the fact that EC is not in a position to produce a copy of any "contrat de portage."

### 3.     Mutual Release

For the mutual consideration reflected herein, the parties hereby release and forever discharge one another from any and all claims they might have against one another for any breach by the other of any prior agreement between them or professional obligation of one to the other or any other obligation whether sounding in tort or contract, including, but not limited to,

M 000034

any claim that Marland or EC failed to perform any services, to deliver any documents or otherwise to fulfill any obligations of any kind to TR&P, or any claim that TR&P failed to perform any services, to adequately protect the interests of its clients (Marland/RoNo), to disclose any conflict, to obtain any required waiver or otherwise to discharge any obligations of any kind to Marland, RoNo or EC.

The parties expressly acknowledge and waive the provisions of California Civil Code section 1542, which reads:

> Civil Code Section 1542: A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

Both Parties have had the benefit of the advice of independent counsel in considering the significance of this Mutual Release and neither is relying on the advice of the other in deciding to enter into it.

4.    Notices

All notices, requests, consents and other communications required to be in writing shall be deemed duly given only if (a) delivered personally or by facsimile (with hard copy by first class mail), or (b) mailed first class postage prepaid, or (c) sent by overnight courier, to the parties hereto at the following addresses or facsimile numbers:

If to TR&P -

Gary Fontana, Thelen Reid & Priest LLP, 101 2d Street, San Francisco, CA, USA 94105. Facsimile 415-371-1211.

If to European Counsel -

Philippe Brunswick, Avocat, SCP Brunswick & Assoc., 51 Avenue Raymond Pont Care, 75116 Paris, France. Facsimile 331-5365-0564,

and

Francois Marland, Avocat, domiciled at SCP Brunswick & Assoc., 51 Avenue Raymond Pont Care, 75116 Paris, France. Facsimile 331-5365-0564,

and

Susannah Maas, Avocat, 6 Rue Eynard, Geneva, Switzerland. Facsimile 41-22-319-7333.

Page 8

All notices, requests, consents and other communications will be deemed, if done as required herein, given upon delivery in the case of personal delivery and otherwise upon dispatch. Any party hereto may change the address or facsimile number or other information for purposes of notice by giving notice of the change as provided herein.

**5.     No Assignment**

No party may assign its rights or obligations hereunder without the prior written consent of the other parties.

**6.     Entire Agreement**

This Agreement represents the entire agreement between the parties hereto with respect to the subject matter hereof.

**7.     Joint and Several Liability**

Except where responsibility is allocated to one of them by name, SCP Brunswick & Assoc., Susana Maas and Francois Marland shall be jointly and severally responsible for their obligations under this Agreement and shall be solely responsible of allocating the burdens and benefits of this Agreement among themselves.

**8.     Amendment**

This Agreement may be amended only in writing executed by each of the parties hereto.

**9.     Governing Law and Consent to Jurisdiction**

This Agreement shall be construed and enforced under the laws of the State of California applicable to contracts to be wholly performed within the State. By signing this Agreement, EC and each of them hereby consent to jurisdiction in the State of California to enforce any rights arising hereunder and consent to service of process in the same manner as provided for the provision of notice herein.

**10.     Execution in Counterparts**

For the convenience of the parties hereto, this Agreement may be executed in counterparts.

IN WITNESS WHEREOF, this Agreement has been signed by and on behalf of the parties hereto on the dates indicated below. It shall take effect when signed by all parties.

Dated: December 19, 2002                    THELEN REID & PRIEST LLP

M 000036

By: _____
            Partner

Dated: December ___, 2002

By: _____
            François Marland

Dated: December 6, 2002

SCP Brunswick & Assoc.

By: _____
            Philippe Brunswick

Dated: December 7, 2002

By: _____
            Susannah Maas

12/4/02/Draft 10

M 000037

# EXHIBIT

# 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---


THELEN, REID, BROWN, RAYSMAN & STEINER
LLP, fka THELEN REID & PRIEST LLP,

     Plaintiff/Counter-Defendant,

vs.               No. C 06-2071 VRW

FRANCOIS MARLAND,

    Defendant/Counter-Claimant,
--------------------------------//
THELEN REID BROWN RAYSMAN &
STEINER LLP, fka THELEN REID
& PRIEST LLP,
    Counter-Counter-Claimant,
vs.
FRANCOIS MARLAND and SUSANNAH
MAAS,
    Counter-Counter-Defendants.
-------------------------------//


DEPOSITION OF

WYNNE S. CARVILL
Thursday, December 14th, 2006
Pages 266 through 290 are Deemed
Condifential and are Bound Separately


REPORTED BY:
KARLA SHALLENBERGER, CSR #10725

1

        I N D E X
2  DEPOSITION OF WYNNE S. CARVILL

3                        PAGE

4  EXAMINATION BY MR. HAYES              6

5  AFTERNOON SESSION              103

6  EXAMINATION BY MS. THURM           238

7  FURTHER EXAMINATION BY MR. HAYES        268

8

9  Transcript marked confidential:

10  Pages 266 through 290 are deemed

11  confidential and are

12  bound separately

13

14  Counter-Counter-Defendants Exhibits

15  52                        6

16

17

18

19

20

21

22

23

24

25

1          A P P E A R A N C E S

2  FOR THE PLAINTIFF:

3      KEKER & VAN NEST LLP

4      BY:  WENDY THURM, Attorney at Law

5      710 Sansome Street

6      San Francisco, California 94111

7      (415) 391-5400

8

9  FOR THE COUNTER-COUNTER DEFENDANT

10  **MARLAND AND MAAS:**

11     HAYES & HARDY LLP

12     BY: ANDREW HAYES, Attorney at Law

13     1 Rockfeller Plaza, Suite 1005

14     New York, New York

15     (212) 554-3120

16

17  TAKEN AT:

18  CARLSON, CALLADINE & PETERSON LLP

19  353 Sacramento Street, 16th Floor

20  San Francisco, California 94111

21

22

23          ---o0o---

24

25

1          DEPOSITION OF WYNNE S. CARVILL

2

3      BE IT REMEMBERED that pursuant to Notice of

4  Taking Deposition, and on Thursday, December 14th,

5  2006, commencing at the hour of 9:33 a.m. thereof, at

6  the Law Offices of CARLSON, CALLADINE & PETERSON

7  before me, KARLA SHALLENBERGER, a Certified Shorthand

8  Reporter in the State of California, there personally

9  appeared

10              WYNNE S. CARVILL,

11

12  called as witness by the defendants, who being by me

13  first duly sworn, was hereafter examined and testified

14  as hereinafter set forth.

15

16              ---oOo---

17

18

19

20

21

22

23

24

25

1      THE VIDEOGRAPHER: Good morning.  This          09:32

2    marks the beginning of videotape number one of volume          09:32

3    one in the deposition of Wynne Carvill in the matter          09:32

4    of Thelen, Reid, Brown, Raysman, and Steiner LLP, fka          09:32

5    Thelen Reid & Priest LLP versus Francois Marland as          09:32

6    filed in the United States District Court, Northern          09:32

7    District of California.  Case number C 06-2071 VRW.          09:32

8          Today's date is December 14th, 2006.  The          09:32

9    time is 9:33 a.m.  This deposition is being taken at          09:33

10    the law offices of Carlson, Calladine in San          09:33

11    Francisco.  The deposition was noticed by defense          09:33

12    counsel.  Videotape is being produced for same.  The          09:33

13    video operator is Alan Britton and the court reporter          09:33

14    is Karla Shallenberger, both representing U.S. Legal          09:33

15    Support.          09:33

16          Counsel, will you please identify          09:33

17    yourselves and whom you represent.          09:33

18      MR. HAYES: Andrew Hayes, Hayes & Hardy LLP          09:33

19    for Mr. Marland.          09:33

20      MS. THURM: Wendy Thurm, Keker & Van Nest          09:33

21    LLP for Thelen and the witness for purposes of today.          09:33

22      THE VIDEOGRAPHER: Thank you.  And now the          09:33

23    court reporter may begin the deposition.          09:33

24          WYNNE S. CARVILL,

25     having been first duly sworn, testified as follows:

1      EXAMINATION BY MR. HAYES:

2           **MR. HAYES:** Q.  Good morning, Judge          09:33

3   Carvill.                                    09:33

4      **A.    Good morning, sir.**                    **09:33**

5      Q.    You are currently a sitting Judge?          09:33

6      **A.    Yes, I am.**                          **09:34**

7      Q.    Where is that?                      09:34

8      **A.    Alameda County.**

9      Q.    Here in California?                   09:34

10     **A.    Yes, sir.**                            **09:34**

11     Q.    Judge Carvill, in your courtroom, is it       09:34

12  okay for a lawyer to compensate a witness based on the    09:34

13  value of the witness's testimony to the case?         09:34

14     **A.    No, it is not.**                       **09:34**

15     Q.    Is it okay for a lawyer to share the         09:34

16  client's recovery with the client in different amounts    09:34

17  based on how helpful the client's testimony was to the    09:34

18  case?                                    09:34

19     **A.    How helpful his testimony, no.**            **09:34**

20     Q.    Yeah, let's take a look at the document       09:34

21  marked as Exhibit Number 52.                   09:34

22          (Whereupon, Exhibit No. 52 was marked

23          for identification.)                   09:34

24          **MR. HAYES:** Q.  This is a document entitled    09:34

25  Thelen, Reid, Brown, Raysman & Steiner LLP's Answers      09:34

1  to Francois Marland's Revised Amended Counterclaims       09:34

2  and Thelen, Reid, Brown, Raysman & Steiner LLP's          09:35

3  Amended Counter-Counterclaims Against Francois Marland    09:35

4  and Susannah Maas.                                        09:35

5          The document is dated quite recently so I         09:35

6  have no reason to believe you have seen it before, but    09:35

7  I am going to ask you about a couple of passages in       09:35

8  it.  I would suggest the best way to proceed is for me    09:35

9  to tell you where I am going to direct your attention     09:35

10  and you then feel free to look around as much as you     09:35

11  want.                                                    09:35

12  **A.  Fine.                                              09:35**

13      Q.  Let me know what you're ready.                   09:35

14  **A.  Fine.                                              09:35**

15      Q.  Let's turn to counterclaims which begin on,      09:35

16  actually page 12, entitled at the top "Thelen Amended    09:35

17  Counter-Counterclaims against Francois Marland and       09:35

18  Susannah Maas."                                          09:35

19          Oh, one preliminary, if I could, Judge, is       09:35

20  it okay if I refer to the firm that used to be known     09:35

21  as Thelen, Reid & Priest LLP and is now known as         09:36

22  Thelen, Reid, Brown, Raysman & Steiner LLP as            09:36

23  "Thelen," right?                                         09:36

24  **A.  That's fine.                                       09:36**

25      Q.  Good.                                            09:36

1    **A.    I understand what you're saying.**          **09:36**

2        Q.    All right.  I want to focus your attention        09:36

3    on a particular passage in the counter-counterclaims        09:36

4    that appears on page 17, paragraph number 25.  It        09:36

5    refers to a document called a June 1999 side agreement        09:36

6    which is attached as Exhibit E to the amended        09:36

7    counter-counterclaims.  And after you have had a        09:37

8    chance to read that paragraph, and above and below it        09:37

9    as much as you would like, I would just like to first        09:37

10   ask you if you were familiar with that document that        09:37

11   is referenced in this paragraph?        09:37

12       **MS. THURM:** Exhibit E can be found also in        09:37

13   this document.        09:37

14       **MR. HAYES:** Oh, yes, we copied all the        09:37

15   exhibits.        09:37

16       **MS. THURM:** It's on the page at the top        09:37

17   marked one of three, document 78 at the top.  Judge,        09:37

18   if you would like to find that easily.        09:37

19       **MR. HAYES:** Q.  Yes, please feel free to        09:37

20   look at that as well.        09:37

21       **MS. THRUM:** So at the top there, the        09:37

22   markings that come along with the electronic file in        09:37

23   federal court, yeah, the next document after that.        09:37

24   There you go.        09:37

25       **THE WITNESS:** All right, I have read the        09:37

1   paragraph and I see the Exhibit to which it refers.        09:37

2       **MR. HAYES:** Q.  Okay, now, at the time you        09:38

3   were dealing with Mr. Marland and other folks involved        09:38

4   in the Executive Life litigation, was it your        09:38

5   understanding that this document that is referenced        09:38

6   there is the June 1999 side agreement and was, in        09:38

7   fact, an agreement between Mr. Marland and Thelen?        09:38

8       **MS. THURM:** Objection.  Vague as to time.        09:38

9       **THE WITNESS:** At the time I began to become        09:38

10  involved in this, I understood Exhibit E, what you        09:38

11  referred to as the June "99 side agreement, was one        09:38

12  of the documents between Thelen and Mr. Marland.        09:38

13      **MR. HAYES:** Q.  I'm sorry, you said        09:38

14  "document" in your answer.  I was asking whether you        09:38

15  understood it was an agreement between Thelen and        09:38

16  Marland?        09:38

17      **A.   It was one of the agreements between Thelen        09:38**

18  **and Marland.**        **09:38**

19      Q.   Okay.  Did you ever have any understanding        09:38

20  that the so-called June 1999 side agreement was not a        09:39

21  valid and binding agreement?        09:39

22      **A.   No.**        **09:39**

23      Q.   Is it still your understanding today that        09:39

24  except to the extent the June 1999 side agreement may        09:39

25  have been altered, amended, or rescinded, that the        09:39

1  agreement would otherwise be valid and enforceable by    09:39

2  Thelen?                                    09:39

3        **MS. THURM:** Objection.  Vague and                09:39

4  ambiguous.                                  09:39

5        **THE WITNESS:** If you're asking my             09:39

6  understanding at the time?                      09:39

7        **MR. HAYES:** Q.  No, I'm asking your          09:39

8  understanding today, sir.                        09:39

9     **A.    And the reason why I asked that             09:39**

10  **clarification, I am here to testify as a percipient       09:39**

11  **witness in terms of my understanding in 2002, 2003.  I    09:39**

12  **am not here to opine on any opinions I may have today      09:39**

13  **based on, not only information in that time frame, but     09:39**

14  **subsequent developments.                      09:40**

15    Q.   Okay.                              09:40

16    **A.   I am not here, in other words as an expert     09:40**

17  **or a judicial officer.  I am here as percipient        09:40**

18  **witness.                                09:40**

19    Q.   And it's your understanding of the Rules of    09:40

20  Evidence that percipient witnesses can't render          09:40

21  opinion testimony based on the knowledge and the date     09:40

22  they testify?                              09:40

23    **A.   I am here to testify as to my              09:40**

24  **understandings at the time.                   09:40**

25    Q.   Could you answer my question please, sir?      09:40

1  **A.**   **And your question is?**           **09:40**

2  Q.   We'll have it read back.

3      (Whereupon, the record was read by the

4      Reporter.)

5  **QUESTION:** "And it's your understanding of the Rules     09:40

6      of Evidence that percipient witnesses     09:40

7      can't render opinion testimony based on     09:40

8      the knowledge and the date they     09:40

9      testify?"     09:40

10     **MS. THURM:** Objection. Vague and     09:40

11 ambiguous.     09:40

12     **THE WITNESS:** A witness can testify to his     09:40

13 or her understanding, but is not obligated to form     09:41

14 current expert opinion, and I do not intend to do that     09:41

15 here.     09:41

16     **MR. HAYES:** Q. Well, sir, I am not asking     09:41

17 for your expert opinion. I am just asking whether you     09:41

18 have any understanding today while you are here in     09:41

19 this room under oath, as to whether the June 1999 side     09:41

20 agreement between Marland and Thelen is a valid and     09:41

21 enforceable contract? Can you answer that question     09:41

22 please?     09:41

23     **MS. THURM:** Objection. Assumes facts not     09:41

24 in evidence. Vague and ambiguous. Argumentative.     09:41

25     **THE WITNESS:** Today -- let me reframe it.     09:41

1        At all times after the execution of an        09:41

2   agreement which superseded this, it was no longer an        09:41

3   enforceable agreement.  That was my understanding back        09:41

4   in 2003, and I don't know of anything since then that        09:41

5   has changed that.        09:41

6        **MR. HAYES:** Q.  So can we infer from your        09:42

7   answers you have just given that, but for the document        09:42

8   executed in 2002 that superseded the June 1999 side        09:42

9   agreement, the June 1999 side agreement would remain a        09:42

10  valid and enforceable contract?        09:42

11       **MS. THURM:** Objection.  Calls for a legal        09:42

12  conclusion.        09:42

13       **THE WITNESS:** At the time the superseding        09:42

14  agreement was executed, until it was executed, I        09:42

15  believe the side agreement was a valid and enforceable        09:42

16  agreement, and I know of nothing since then other than        09:42

17  the agreement that superseded it that would change my        09:42

18  view of that.        09:42

19       **MR. HAYES:** Q.  Okay.  Let me draw your        09:42

20  attention to page 19 of Exhibit 52, paragraph 33, in        09:43

21  particular.  And within that paragraph, specifically        09:43

22  the sentence that ends the paragraph, which reads in        09:43

23  its entirety quote:        09:43

24       "Moreover, Thelen informed Brunswick that        09:43

25       Marland's destruction of the contrat de        09:43

1    portage - a document which was central        09:43

2    to Marland's testimony and critical to        09:43

3    his own credibility- effectively        09:43

4    destroyed Marland's value as a trial        09:43

5    witness for CDOI."        09:43

6        Do you see that sentence?        09:43

7    **A.    Yes, I see that.**        **09:43**

8    Q.    You were among the people at Thelen who        09:43

9    informed Brunswick that Marland's destruction of the        09:44

10   contrat de portage effectively destroyed Marland's        09:44

11   value as a trial witness; is that correct?        09:44

12       **MS. THURM:** Objection.  Assumes facts not        09:44

13   in evidence.        09:44

14       **THE WITNESS:** I informed either Brunswick        09:44

15   or Marland or both of them.  Whether there were others        09:44

16   that said that to one or both of them, I can't tell        09:44

17   you.        09:44

18       **MR. HAYES:** Q.  Okay.  You told Brunswick        09:44

19   that Marland's destruction of a document destroyed his        09:44

20   value as a trial witness, correct?        09:44

21   **A.    Words to that effect.**        **09:44**

22   Q.    Okay.  And you told Brunswick that because        09:44

23   Marland had effectively destroyed his value as a trial        09:44

24   witness, Thelen was entitled to reduce Marland's share        09:44

25   of the overall recovery that went to Thelen and the        09:44

1  European Counsel, correct?                    09:45

2      A.   Not exactly.  I said it raised that issue.    09:45

3      Q.   You don't recall telling Brunswick that    09:45

4  because Marland had destroyed his value as a trial    09:45

5  witness, Thelen might be entitled to declare him in    09:45

6  breach of the European Counsel agreement and receive    09:45

7  nothing from Thelen's recovery in the Executive Life    09:45

8  litigation?                    09:45

9      A.   The answer to that question is, yes,    09:45

10  because you used the words "might be entitled."  In    09:45

11  other words, I said that was a possibility, that was a    09:45

12  real possibility we have to deal with.    09:45

13      Q.   You were of the opinion in the summer of    09:45

14  2002 that Marland's destruction of the contrat de    09:46

15  portage destroyed his value as a trial witness,    09:46

16  correct?                    09:46

17      MS. THURM: Objection.  Asked and answered.    09:46

18      THE WITNESS: I was of the opinion that was    09:46

19  most likely the case.                    09:46

20      MR. HAYES: Q.  Okay.  And you were also of    09:46

21  the opinion that because Marland had likely destroyed    09:46

22  his value as a trial witness, Thelen was entitled to    09:46

23  reduce the European Counsel's share of any fee awarded    09:46

24  in the Executive Life litigation, correct?    09:46

25      A.   That we might be entitled to do that, yes.    09:46

1   Q.   What is the difference between being          09:46

2  entitled to doing something and maybe being entitled      09:46

3  to do something?                          09:46

4   **A.   Because it requires an interpretation of**      **09:46**

5  **the agreement that indicates that his compensation**      **09:46**

6  **might be reduced under certain conditions, which I**      **09:46**

7  **will just refer to as disability.  So there was an**      **09:46**

8  **issue as to whether his destruction of the document**      **09:46**

9  **disabled him as a witness so as to invoke those**      **09:46**

10 **causes.**                          **09:47**

11      **A document itself does not address**      **09:47**

12 **destruction of the document, so I am sure we would**      **09:47**

13 **have an argument as to whether or not -- in fact, we**      **09:47**

14 **did have an argument as to whether or not that is a**      **09:47**

15 **fair construction of that agreement.**          **09:47**

16  Q.   Putting aside whether destruction of the      09:47

17 document constituted what you referred to as          09:47

18 disability, I want to ask you a slightly different      09:47

19 question, you had no doubt whatsoever in the second      09:47

20 half of 2002 that Thelen was entitled to reduce      09:47

21 Marland's and the European Counsel's share of any fee      09:48

22 awarded in the Executive Life litigation to the extent      09:48

23 that Marland's actions had reduced or destroyed his      09:48

24 value as a trial witness, correct?              09:48

25      **MS. THURM:** Objection.  Asked and answered.      09:48

1   Argumentative.                                    09:48

2          **THE WITNESS:** Incorrect.               09:48

3          **MR. HAYES:** Q.  Did you have any concerns    09:48

4   as you were negotiating the 2002 new agreement to      09:48

5   associate counsel regarding the appropriateness of      09:48

6   reducing the European Counsel's share based on       09:48

7   Marland's value as a trial witness?                09:48

8      **A.    Can I have that read back?**              **09:48**

9      Q.    Sure.

10         (Whereupon, the record was read by the

11         Reporter.)

12  **QUESTION:**      "Did you have any concerns as you were     09:48

13         negotiating the 2002 new agreement to       09:48

14         associate counsel regarding the          09:48

15         appropriateness of reducing the          09:48

16         European Counsel's share based on         09:48

17         Marland's value as a trial witness?"      09:48

18         **THE WITNESS:** I don't think I viewed it     09:49

19  that way.  I am not sure if I thought of it that way.    09:49

20         **MR. HAYES:** Q.  What was your understanding    09:49

21  in the second half of 2002 regarding the basis on      09:49

22  which Thelen was entitled to reduce the European     09:49

23  Counsel's share of any fee award?              09:49

24         **MS. THURM:** Objection to the form of the      09:49

25  question.                                  09:49

1      **THE WITNESS:** I had several reasons to    09:49

2  think that Thelen was in a position to reduce the    09:49

3  European Counsel's share.  Not one, but several    09:50

4  reasons.  One reason was it changed circumstances,    09:50

5  quite apart from any document issue.  My understanding    09:50

6  of the original agreement was that it came in a    09:50

7  context with a certain set of assumptions as to what    09:50

8  the parties anticipated happening, and those    09:50

9  circumstances changed.    09:50

10      Beyond that, there is the issue of the    09:50

11  document, the contrat de portage, and that issue had    09:50

12  several permutations.  One permutation was the problem    09:50

13  presented by the fact that Marland and Thelen had    09:51

14  jointly represented to the department that that    09:51

15  document was in a safe place and thus impliedly told    09:51

16  the department that it was available.  So there was an    09:51

17  issue as to that aspect in whether both Marland and    09:51

18  Thelen, European Counsel and Thelen were at risk as    09:51

19  far as our representation and commission.    09:51

20      Third, there was the issue of whether or    09:51

21  not, because the document either never existed or had    09:51

22  been destroyed, the agreement that you referred to as    09:51

23  the 1999 side agreement was somehow implicated.    09:52

24      And fourth, there was the issue of the    09:52

25  covenant of good faith and fair dealing that existed    09:52

1  between the parties to their earlier contract.  So it          09:52

2  had all of those permutations.  That might not be          09:52

3  exhaustive, but those are the four that come to mind          09:52

4  now as to concerns I had in that time frame.          09:52

5      Q.    Okay.  First, a small point, you have twice          09:52

6  said that I referred to the June 1999 side agreement          09:52

7  as the "June 1999 side agreement."  To the extent it          09:52

8  gives you any comfort, paragraph 25 on page 17 of          09:52

9  Thelen's counter-counterclaim on line 13 refers to a          09:52

10  document entitled quote, "The June 1999 side          09:53

11  agreement," so it's a phrase that both parties are          09:53

12  using here.          09:53

13      **A.    I am not trying to dispute that.  I am just**          09:53

14  **trying to make it clear that I am referring to what we**          09:53

15  **have been talking about in this transcript.  I am not**          09:53

16  **trying to suggest that.  It's your characterization**          09:53

17  **that I somehow am trying to distance myself.  I'm not**          09:53

18  **trying to suggest that.**          09:53

19      Q.    Fine.  Secondly, with regard to your          09:53

20  statement about what you can recall right now, let me          09:53

21  ask how much time you have spent preparing for this          09:53

22  deposition, can you tell us?          09:53

23      **A.    Yes, I have spent a minimum of nine hours**          09:53

24  **and I would say a maximum of 15, 16.**          09:53

25      Q.    Over what time period?          09:53

1    **A.   The last ten days.**                    **09:53**

2    Q.   Okay.  And you reviewed documents relating      09:54

3    to the dispute?                          09:54

4    **A.   I did.**                              **09:54**

5    Q.   You reviewed many documents reflecting your     09:54

6    communications with Mr. Brunswick in 2002?          09:54

7    **A.   Yes.**                                **09:54**

8    Q.   You reviewed documents in which you --      09:54

9    sorry, start again.                        09:54

10         You reviewed documents in which you        09:54

11   detailed for Mr. Brunswick in 2002 the reasons you     09:54

12   believe Thelen had at that time for reducing the     09:54

13   European Counsel's share of any recovery, correct?     09:54

14   **A.   Those were among the documents I reviewed.     09:54**

15   Q.   Right, fair enough.                    09:54

16         Now, the first reason you mentioned as a       09:54

17   basis you felt was appropriate for Thelen to invoke to     09:54

18   reduce the European Counsel's share was what you     09:55

19   referred to as changed circumstances?           09:55

20   **A.   Correct.**                            **09:55**

21   Q.   Okay.  What circumstances had changed from     09:55

22   September 2001 to July of 2002 in the Executive Life     09:55

23   litigation?                             09:55

24   **A.   I don't believe I ever focused on that     09:55**

25   **specific time frame.**                      **09:55**

1    Q.    You were aware in the summer of 2002 that    09:55

2    Mr. Fontana had signed an amendment to both the    09:55

3    attorney-client agreement and to the European Counsel    09:55

4    agreement in September 2001, correct?    09:55

5    **A.    There was an intervening amendment in that    09:55**

6    **time frame.  I can't say it was September, but    09:55**

7    **approximately a year before I got involved, maybe 18    09:55**

8    **months before I got involved there was an amendment.    09:56**

9    Q.    Okay, we'll get to that.  Did you consider    09:56

10    that amendment relevant in reaching any conclusions    09:56

11    regarding the relevant time frame for invoking a    09:56

12    changed circumstances basis -- as a basis for    09:56

13    renegotiating the fee-sharing percentage?    09:56

14    **A.    No.    09:56**

15    Q.    Up until I have asked you the question just    09:56

16    now a minute ago, did it ever occur to you that the    09:56

17    relevant time period for determining when    09:56

18    circumstances had changed was from the last proceeding    09:56

19    amendment, which I'll represent to you was in    09:56

20    September 2001?    09:56

21    **A.    I don't remember if I thought about that.    09:56**

22    Q.    Okay.    09:56

23    **A.    I might have.  I just can't today tell you    09:56**

24    **I did.    09:56**

25    Q.    Fair enough.  What circumstances had    09:56

1  changed from the time of the party's original          09:57

2  agreements in 1999 to the summer of 2002 that you          09:57

3  believed, in the summer of 2002, entitled Thelen to          09:57

4  reduce the European Counsel's share?          09:57

5          **MS. THURM:** Object to the form of the          09:57

6  question.          09:57

7          **THE WITNESS:** Excuse me a minute.          09:57

8          **MR. HAYES:** Q.  Okay.          09:57

9      **A.   I'm suffering from the shame thing going          09:57**

10  **around town so every once in a while I need to clear          09:57**

11  **my head.          09:57**

12      Q.   Not a problem.  It wasn't the best          09:57

13  question.  Let me have it read back.          09:57

14          (Whereupon, the record was read by the

15          Reporter.)          09:58

16  **QUESTION:** "Fair enough.  What circumstances had          09:56

17          changed from the time of the party's          09:57

18          original agreements in 1999 to the          09:57

19          summer of 2002 that you believed, in          09:57

20          the summer of 2002, entitled Thelen to          09:57

21          reduce the European Counsel's share?"          09:57

22          **THE WITNESS:** Your prior question referred          09:58

23  to my belief, and that's how I am going to answer it          09:58

24  because I think we both know I wasn't there in "99.          09:58

25          So, with that understanding, my belief was,          09:58

1  based on the documents and discussions with people at      09:58

2  Thelen at the time, was that the understanding that      09:58

3  was from the French side was the political situation      09:58

4  in France surrounding the privatization of Credit      09:58

5  Lyonnais, and I may be mispronouncing it, was such      09:58

6  that before that could go forward which had all sorts      09:58

7  of political imperatives behind it, this matter had to      09:58

8  be resolved.  And so the question was, what was the      09:59

9  appropriate strategy that our French colleagues in      09:59

10  Thelen could devise to bring this matter to conclusion      09:59

11  in a relatively short time frame.  And the issue was,      09:59

12  was it going to be before the end of the year or might      09:59

13  it spill over into the next year.      09:59

14        There had not been any serious discussion      09:59

15  of what would happen if the privatization went forward      09:59

16  without the settlement, and we found ourselves in      09:59

17  years of high-stakes, expensive litigation, so that      09:59

18  was my belief.  Again, I wasn't there in '99, but that      10:00

19  was what I believed.      10:00

20     Q.    Okay.  I understand and appreciate the      10:00

21  qualification that you weren't around in 1999, but I      10:00

22  hope you understand and appreciate that I am trying to      10:00

23  ask you for your understanding in late 2002 of what      10:00

24  had changed since 1999 that would justify      10:00

25  renegotiating the fee-sharing percentage between      10:00

1  Thelen and the European Counsel?                    10:00

2      A.    Right, and I guess I should have continued.    10:00

3  The fact that we were having discussions with our        10:00

4  European colleagues in 2002 and 2003, meant, by          10:00

5  definition, that that set of assumptions I just          10:00

6  described, was obviously incorrect.  It didn't settle    10:00

7  within six to 12 or 10 to 18 months, and we were in      10:01

8  protracted litigation.  And it was litigation that had   10:01

9  been complicated by the intervention of the AG, by the   10:01

10  in fact we did not get indictments out of the grand      10:01

11  jury, that Judge Matts had not set a trial date, and     10:01

12  all sorts of things that made this, at least from        10:01

13  Thelen's perspective, speaking from a perspective of     10:01

14  firm management, not necessarily the litigation team,    10:01

15  but from management's perspective, a nightmare.          10:01

16     Q.    You're not actually telling us that the        10:01

17  prospect of the attorney general intervening in the      10:01

18  Quitam litigation wasn't something that was litigated    10:01

19  before the case was filed, are you?                      10:01

20      MS. THURM: Objection.  Argumentative.               10:01

21      THE WITNESS: Not the intervention, but the          10:01

22  extent of litigation in controversy between the          10:01

23  department and the AG.                                   10:02

24      MR. HAYES: Q.  Okay.  And you're not                10:02

25  telling us that Thelen didn't know in 1999 that there    10:02

1  was a chance that the privatization of the Credit          10:02

2  Lyonnais might go forward without resolving any issues     10:02

3  relating to the acquisition of Executive Life,             10:02

4  correct?                                                   10:02

5     A.   **Anything was and is possible.**                 10:02

6     Q.   Right.  And Thelen was aware in 1999 that          10:02

7  it was possible the privatization of Credit Lyonnais       10:02

8  will go forward without the resolution of the              10:02

9  Executive Life situation, correct?                         10:02

10    **A.   I have to assume that everyone understood**       10:02

11 **that anything was possible.**                             10:03

12    Q.   So you're telling us that what had changed         10:03

13 from 1999 to 2002 was that one of the possibilities        10:03

14 had turned into a reality?                                 10:03

15    **A.   No, what I am saying is that what Marland**       10:03

16 **and Fontana discussed as their plan and what we relied**  10:03

17 **on in terms of the explanation for Marland and**          10:03

18 **Brunswick as to what we could expect hadn't panned**      10:03

19 **out.  Further, when I became involved, my**               10:03

20 **understanding was that both sides agreed to that.**       10:03

21    Q.   When you say both sides agreed to that,            10:03

22 what "that" are you referring to?                          10:03

23    **A.   That the circumstances had changed and the**      10:03

24 **relationship should be renegotiated.  I say that**        10:03

25 **because the reason I got involved was I was told that**   10:04

1  there was an agreement in principle to change the          10:04

2  percentages based on conversations between the French       10:04

3  and Gary Fontana that we actually reduced that to          10:04

4  writing and sent it to them, and for some reason it        10:04

5  wasn't being signed.                          10:04

6          But we had gotten to, at that point,          10:04

7  because I understood that everyone agreed there had        10:04

8  been a change in circumstance -- that's before I          10:04

9  talked to anyone on the French side of this.  But when     10:04

10  I got involved, my understanding was everyone            10:04

11  recognized it was changed circumstances.  There was an     10:04

12  agreement in principle and it was a draft.              10:04

13    Q.    What was that understanding based on?          10:05

14        MS. THURM: Asked and answered.              10:05

15        THE WITNESS: Are you referring to my            10:05

16  understanding?                      10:05

17        MR. HAYES: Q.  Yes.                    10:05

18    A.    Right.  Discussions with Gary Fontana, Karl      10:05

19  Belgum, and perhaps members of the executive            10:05

20  committee.  But what stands out in my mind is Gary        10:05

21  Fontana and Karl Belgum saying -- we discussed this.      10:05

22  There is a draft we sent to the -- in the course of       10:05

23  those discussions, I had the impression that this had     10:05

24  been addressed with the European Counsel, and there      10:05

25  was an agreement that was changed circumstances that      10:05

1  justified an amendment.  That's where I am.                    10:05

2      Q.   You understand, just first as a general        10:05

3  matter, that there is a difference between changing         10:06

4  the relative shares of two parties to a fee-sharing         10:06

5  agreement on the one hand, and on the other hand,            10:06

6  renegotiating an agreement so that one party can get        10:06

7  advances against its fees while leaving the overall         10:06

8  shares intact, correct?                                10:06

9      A.   Absolutely, I understood that then.  I         10:06

10  understand that now.                                   10:06

11     Q.   Okay.  And how certain are you that the        10:06

12  understanding you had when you got into the            10:06

13  negotiations in 2002 was that the French side, as you      10:06

14  referred to them, had agreed to change their           10:06

15  percentage, as opposed to having agreed to renegotiate     10:06

16  the deal so that Thelen could get advances?            10:06

17     A.   I hesitate for one reason, let me explain      10:07

18  it, I believe that initially the discussions with the     10:07

19  European Counsel before my involvement was to change       10:07

20  the percentages to protect Thelen on the low end.  And     10:07

21  that at some point, firm management raised the cash        10:07

22  flow issue and added that to the issues on the table.      10:07

23  I am not sure as to when that second element entered       10:07

24  the discussions.                                       10:07

25     Q.   Fair enough.  Let's go over some of the        10:07

1  basics.  You were a partner in the firm then known as        10:07

2  Thelen, Reid & Priest in 1999, correct?                        10:08

3     **A.   Yes.**                                       **10:08**

4     Q.   Were you a member of firm management?              10:08

5     **A.   I was general counsel on various            10:08**

6  **committees, so I considered myself firm -- within firm    10:08**

7  **management, quality speaking, I wasn't a member of the    10:08**

8  **executive committee, so depending on exactly what you     10:08**

9  **mean.**                                         **10:08**

10    Q.   Well, there are different aspects within        10:08

11 management, so your answer was entirely appropriate.      10:08

12         When were you general counsel of the firm?      10:08

13    **A.   From the early '90s until I left.         10:08**

14    Q.   And Mr. Robert Blum served as your deputy?      10:08

15    **A.   No, I didn't have a deputy.              10:08**

16    Q.   If there is a document which we may have       10:08

17 time to get to later, I will represent to you is a       10:08

18 document from late '98 or early '99 says, "Bob Blum       10:08

19 has reviewed this draft container agreement to confirm    10:08

20 that it comports with California law."                10:09

21         Can you tell us what capacity Mr. Blum       10:09

22 would have been acting in?                          10:09

23    **A.   Sure, my job had several facets but on any    10:09**

24 **given situation I could do it myself or ask one of my     10:09**

25 **partners to do it.  And if it was an employment claim,   10:09**

1   for example, I might well call one of my employment     10:09

2   partners and ask him or her, "Can you handle this     10:09

3   claim?" If it was a conflict issue, I might well ask     10:09

4   Bob to handle it. They weren't deputies. It's just     10:09

5   that I knew who my partners were and what their     10:09

6   comparative strengths and expertise, sets of expertise     10:09

7   were, and so from time to time I would ask someone to     10:09

8   do something.     10:09

9       So, I'm not sure of the document you're     10:09

10   referring to, but I would not be surprised if on     10:10

11   something like this I would have asked Bob, "Would you     10:10

12   take care of this for us?"     10:10

13     Q.  Okay. When did you leave the firm?     10:10

14     A.  November 14th, 2003.     10:10

15     Q.  And from 1999 through November 2003, did     10:10

16   you hold any other positions that might be categorized     10:10

17   one way or the other as being part of firm management?     10:10

18     A.  What was the beginning date?     10:10

19     Q.  1999?     10:10

20     A.  1999, right after the merger I was on the     10:10

21   partnership council.     10:10

22     Q.  Sorry, just for the record, that is the     10:10

23   merger between Thelen, Marin, Johnson and Bridges &     10:10

24   Priest?     10:10

25     A.  Obviously not the current one, but the     10:10

1  first of the two mergers the firm has gone through,          10:10

2  and it was the one between Thelen, Marland and Reid &          10:11

3  Priest.  There was a partnership council which was the          10:11

4  governing body.  We had an executive committee.  I was          10:11

5  not on the executive committee.  I was on the          10:11

6  partnership council.  General counsel, chair risk          10:11

7  management committee.  For part of that time, the          10:11

8  latter part I was co-chair of the litigation          10:11

9  department, national litigation department.          10:11

10  Commercial litigation, co-chair of the commercial          10:11

11  litigation department.          10:11

12    Q.   Okay.          10:11

13    A.   There were probably some other ones, but          10:11

14  those are the ones that stick out.  I mean, there may          10:11

15  have been some other committee.          10:11

16    Q.   Okay.  When were you chair of the risk          10:11

17  management committee?          10:11

18    A.   From the early '90s until I left.          10:11

19    Q.   And can you describe for us your          10:11

20  understanding of what your responsibilities were as          10:11

21  chairman of the risk management committee?          10:12

22    A.   The risk management committee is          10:12

23  responsible for formulating and implementing risk          10:12

24  management policies, and as chair, that was all of our          10:12

25  responsibilities, but as chair, obviously, I had          10:12

1  **greater responsibility in that regard than other**          10:12

2  **committee members.**                                    10:12

3     Q.   And risk management is one of those phrases     10:12

4  that sounds intuitive, and the intuitive response may      10:12

5  even be correct, but if you can just flush out a          10:12

6  little bit more for us what you understood to be your      10:12

7  particular areas of concern as chair of the risk          10:12

8  management committee?                              10:12

9     **A.   The role of the risk management committee**      10:12

10  **or risk management at Thelen was to try to develop**       10:12

11  **policies and procedures that would reduce the risk of**      10:13

12  **claims against the firm.**                            10:13

13     Q.   Okay.  And these claims included claims of     10:13

14  malpractice or improper conduct, correct?              10:13

15     **A.   Among others.**                              10:13

16     Q.   Okay.  Were the firm's risk management        10:13

17  policies followed with regard to the initial            10:13

18  attorney-client agreement between Thelen and Marland?     10:13

19     **A.   I don't know.**                              10:13

20     Q.   You don't know?  I didn't hear your answer.    10:13

21     **A.   I don't know, and the reason is, when you**      10:13

22  **open a new matter, there is a whole bunch of steps**      10:13

23  **that you're supposed to do.  I haven't gone back to**      10:13

24  **investigate if each of those steps was -- how each of**     10:13

25  **those steps was handled.**                           10:13

1    Q.    Do you recall being copied at the time in        10:13

2    1999 on memos by your partner Steve O'Neal which said,        10:13

3    in part, that the firm's risk management committee,        10:14

4    risk management procedures had not been followed?        10:14

5        MS. THURM: Objection to the form of the        10:14

6    question.                                10:14

7        THE WITNESS: What was the date you were        10:14

8    telling me?                            10:14

9        MR. HAYES: Q.  1999?                    10:14

10    A.    That was 1999 when Steve wrote the memo?        10:14

11    Q.    Uh-hum, yes, I'm sorry, if it helps the        10:14

12    trace, it was, "To say that the firm's risk management    10:14

13    procedures had not been followed would be an        10:14

14    understatement"?                        10:14

15    A.    I don't remember that specific            10:14

16    characterization.  I do recall that Steve O'Neal's        10:14

17    position was that since this involved a contingent fee    10:14

18    agreement, he had to approve it, and he hadn't        10:14

19    approved it.  I remember in general that being Steve's    10:15

20    position, so if that is what you are referring to, I    10:15

21    understand what you're saying.  If you're asking me    10:15

22    about some other aspect of the intake process that    10:15

23    Steve was referring to, I am not sure if I know what    10:15

24    you're talking about.                        10:15

25    Q.    That's fine, but I wanted your recollection    10:15

1  of something he said.  Whatever he was referring to          10:15

2  may be in the document in part or in whole, and we may     10:15

3  get to the document, but --                                10:15

4      **A.   I am not saying that I remember that             10:15**

5  **characterization.  All I can tell you is that I           10:15**

6  **remember Steve was in a position at the time where he     10:15**

7  **believed that he needed to sign off on this, and he       10:15**

8  **hadn't signed off on that.  That I definitely             10:15**

9  **remember.                                                 10:15**

10     Q.   Fair enough.  And your recollection of the         10:15

11  events that you just testified to, is that something       10:15

12  you recall from 1999 or later?  If it helps, I can         10:15

13  rephrase the question.                                     10:16

14         The recollection you just testified to, is          10:16

15  that something you recall learning of before you           10:16

16  personally got involved in renegotiating the              10:16

17  fee-sharing agreement or not?                              10:16

18     **A.   I became more familiar with it when I            10:16**

19  **became involved.  However, prior to my becoming          10:16**

20  **involved, I knew that Steve and Gary had a               10:16**

21  **disagreement on that point.                              10:16**

22     Q.   Okay.                                              10:16

23     **A.   I had no reason to, you know, put my nose        10:16**

24  **into it prior to May of 2002.                            10:16**

25     Q.   Right, so before you got personally                10:16

1  involved, you were aware there was some disagreement?      10:16

2      A.    **Right, between Gary and Steve.**              10:16

3      Q.    Right.  Let me show you a document that was      10:16

4  previously marked as an exhibit which was not stapled      10:16

5  for some reason.  If you want to take a second we can      10:16

6  grab a stapler.  But let me just introduce it for the      10:17

7  record.  It's Plaintiff's Exhibit 17.  It was used at      10:17

8  the deposition of Mr. O'Neal.  It is a January 21st,      10:17

9  1999 memo to Steve O'Neal from Gary L. Fontana,      10:17

10  subject, proposal to represent the California      10:17

11  Department of Insurance.  Production Number TR&P 306      10:17

12  through TR&P 348.  That includes attachments that were      10:17

13  attached to the document when it was produced and      10:17

14  which, as I understand it, are referred to in the      10:17

15  document.                              10:17

16          And if it helps, Judge Carvill, I am just      10:17

17  going to refer to a couple of passages in this, so      10:17

18  again, if I will do that, you look around as you see      10:17

19  fit?                              10:17

20      A.    **Sure.**                      10:17

21      Q.    Okay.  Now on page three of the document,      10:17

22  there is a heading entitled "Francois Marland (Mr.      10:18

23  X)," do you see that?                      10:18

24      A.    **Yes, sir.**                      10:18

25      Q.    And you see the last paragraph of regular      10:18

1  text in the page reads quote, "French attorneys are        10:18

2  barred from maintaining a legal practice while serving      10:18

3  in a business capacity.  As a result, since 1987           10:18

4  Francois has been a non-practicing attorney and has         10:18

5  the status of an "inactive" member of the French bar.       10:18

6  Under French bar rules, he is not entitled to be            10:18

7  called an avocat."                                          10:18

8    **A.   Do you see that, yes.                              10:18**

9    Q.   Let me then ask you to turn to page four.           10:18

10 Do you see there is a heading, "Entitled proposed           10:18

11 contracts"?                                                 10:19

12   **A.   Yes, sir.                                          10:19**

13   Q.   It refers to a proposed representation              10:19

14 having two parts, do you see that in the first              10:19

15 sentence?                                                   10:19

16   **A.   Correct.                                           10:19**

17   Q.   Okay.  On the next page, page five, there           10:19

18 is a reference to a fee-sharing agreement with              10:19

19 Marland, do you see that?                                   10:19

20   **A.   Yes.                                               10:19**

21   Q.   Okay.  Now, in the first full paragraph of          10:19

22 the text on page five, the last sentence reads quote,       10:19

23 "The proposed fee-sharing agreement Exhibit B has been      10:19

24 reviewed by Bob Blum to assure that it complies with        10:19

25 ethical requirements established by California law."         10:19

1        Do you see that sentence?                    10:19

2    A.    Yes, I do see that.                         10:19

3    Q.    Okay.  Do you recall being involved in any    10:19

4    way in the review of the proposed fee-sharing        10:19

5    agreement referred to in this memo?              10:19

6    A.    I could have been, but I don't recall.  I    10:20

7    don't recall being involved in that in 1999.        10:20

8    Q.    Including, just to be absolutely certain, I    10:20

9    believe you have answered this way, but to be certain    10:20

10    for the record, you don't recall being involved even    10:20

11    just to the extent of suggesting that the agreement be    10:20

12    reviewed by Mr. Blum, and not you, yourself, preparing    10:20

13    the agreement; is that right?                   10:20

14    A.    I don't recall that, but that is my          10:20

15    hesitancy, but that could have definitely happened.    10:20

16    Somebody could have said, could you look at this, and    10:20

17    for whatever reason I said, "Bob, do you have time,"    10:20

18    and I sent it to Bob.  And I would not remember that    10:20

19    if that happened.                               10:20

20    Q.    Did you ever have any concerns about        10:20

21    whether the initial fee-sharing agreement between    10:20

22    Thelen and Marland was unenforceable or unethical    10:20

23    under California law because Marland was not entitled    10:20

24    to be called an avocat?                         10:20

25        MS. THURM: Object to the form of the          10:21

1    question and vague as to time.  Vague and ambiguous.    10:21

2    **THE WITNESS:** I remember that when I got    10:21

3    involved in this, I was told that Marland had    10:21

4    reactivated his status as a member of the French bar.    10:21

5    And at that point I don't recall making an inquiry or    10:21

6    considering whether or not if there had been a problem    10:21

7    before then, it was cured by that or not.    10:21

8        I just remembered -- I don't know if I    10:21

9    thought about that or not.  I remember though when I    10:22

10    was getting into this the first time and saying what    10:22

11    is this about, what is that about, and being told,    10:22

12    well, Marland has reactivated his status.  That I    10:22

13    remember.    10:22

14    Q.   Do you recall having an opinion at the time    10:22

15    you got involved as to whether the June 1999    10:22

16    fee-sharing agreement was or was not enforceable    10:22

17    because it had been signed before Marland had    10:22

18    reactivated his status?    10:22

19    **MS. THURM:** Objection.  Asked and answered.    10:22

20    **THE WITNESS:** I don't recall considering    10:22

21    that, but I suspect I did.  I just don't recall if I    10:22

22    remember what I just said about him becoming an active    10:22

23    member.  And I can't imagine, in the course of    10:23

24    learning that and not going through my mind, gee, what    10:23

25    was the status before then.  But that is me trying to    10:23

1    reconstruct what I might have thought rather than          10:23

2    digging out of a memory bank what I actually thought.       10:23

3         **MR. HAYES:** Q.  Sure, okay.  And perhaps my         10:23

4    question wasn't as precise as it could have been.  Let      10:23

5    me see if I can rephrase it slightly.                       10:23

6         To the extent you recall having any                    10:23

7    thoughts on this issue of Marland's status as active        10:23

8    or inactive, was it your understanding that the fact        10:23

9    that Marland had reactivated his bar status meant that      10:24

10   the 1999 fee-sharing agreement was, as of his              10:24

11   reactivation, now a valid agreement.                        10:24

12   **A.   I considered the agreement, at the time I**          **10:24**

13   **became involved, a valid and enforceable agreement.**     **10:24**

14   Q.   Okay.                                                  10:24

15   **A.   The process I went through to get there, I**         **10:24**

16   **can't tell you.**                                         **10:24**

17   Q.   That's fine.  That's fine.                             10:24

18        And I take it then that any issues or                  10:24

19   concerns that you might have had regarding Marland's        10:24

20   status in 1999 did not play any role in your view of       10:24

21   the appropriateness of renegotiating percentages, or       10:24

22   recoveries, or anything in 2002, correct?                   10:24

23        **MS. THURM:** Objection.  Calls for                   10:24

24   speculation in light of the witness's testimony.           10:25

25        **MR. HAYES:** Q.  Let me just rephrase it.            10:25

1    A.   I'm sorry.                          10:25

2    Q.   That's fine.  It's a small point.  I am not      10:25

3  doing a good job of taking care of it.              10:25

4          Any issues that there might have been          10:25

5  regarding Marland's status as an active or inactive        10:25

6  member of the bar in 1999 played no role in your          10:25

7  approach to renegotiating European Counsel's share in        10:25

8  2002, correct?                             10:25

9    A.   I hesitate for one reason, and that is,        10:25

10  when I got involved, there was a proposal on the table      10:25

11  to amend the agreement, and so I went through this        10:25

12  archeology exercise to try to see what are these other    10:26

13  agreements that people are talking about, and some of      10:26

14  them were self-explanatory, others I didn't              10:26

15  understand, so I started asking people, what is the        10:26

16  story with this, why was it executed, trying to piece      10:26

17  together what happened.  And in doing that I quickly      10:26

18  decided, look, if I have to read multiple documents        10:26

19  and interview people to understand what the              10:26

20  relationship is, it's time for a superseding            10:26

21  agreement.                             10:26

22          And whether the avocat issue was one of        10:26

23  those things I thought about or not, I can't tell you.    10:26

24  But what I am saying is, just that whole process led      10:26

25  me to say, look, let's have a new agreement so          10:26

1    **everyone just has to look at one document and**          10:26

2    **understand what it is.**                                 10:27

3        Q.   Uh-hum, I appreciate that.  That was a          10:27

4    responsive answer, but it was responding to a broader     10:27

5    issue and I want to focus in on a very narrow issue.      10:27

6    Putting aside whether you were desirous of having an      10:27

7    entirely new superseding agreement or event, when you     10:27

8    got back involved -- when you got personally involved     10:27

9    in the negotiation between the parties, you did not       10:27

10   think that Marland's prior status as an avocat or         10:27

11   inactive avocat proceeded a basis to reduce the           10:27

12   European Counsel's share?                                 10:27

13       **A.   No, no.  And --**                              10:27

14       Q.   Totally separate?                                10:27

15       **A.   Totally separate, and when I gave you my**      10:27

16   **list of reasons earlier in this deposition, I did not** 10:27

17   **include that.**                                         10:27

18       Q.   Right.                                           10:27

19       **A.   And that was a conscious exclusion.**          10:27

20       Q.   Okay.  When you reached the conclusion that      10:27

21   it would be better to have a single superseding           10:28

22   agreement, was that based in part on any concerns you     10:28

23   might have had that prior agreements might have been      10:28

24   unenforceable or unethical?                               10:28

25       **A.   I'm not sure.  I didn't have a specific**      10:28

1   concern about enforceability or unethical violations        10:28

2   such that I said, "Look, we have to get this new        10:28

3   agreement to fix this." But, again, I do recall just        10:28

4   from a general risk management point of view, not        10:28

5   being comfortable with the fact that, for me to        10:28

6   understand what is going on, I not only have to read        10:28

7   multiple documents, I have to interview people to say        10:28

8   what does this mean, what is the origin of that, and        10:28

9   whenever you are in a situation like that, I think        10:29

10   it's time to clear things up.        10:29

11      Q.   I appreciate that, but I was asking a more        10:29

12   focused question regarding ethical concerns?        10:29

13      A.   And I think I answered in this sense, I        10:29

14   don't recall having a specific concern about        10:29

15   enforceability or ethical violations that I was trying        10:29

16   to fix. But I do recall not liking what I found and        10:29

17   thinking it was time for a new agreement.        10:29

18         So, for example, the avocat issue that you        10:29

19   raised, if that presented an ethical issue that's one        10:29

20   of the things that, again, in a new agreement you        10:29

21   resolve those problems.        10:29

22      Q.   Let's take a look at a document we        10:29

23   previously marked --        10:29

24      A.   Let me add one clarification, if I wasn't        10:30

25   going to do a new agreement, if I was going to go with        10:30

1  **an amendment, then I would have to run down all the**          10:30

2  **questions you're asking me.**                              10:30

3      Q.   So you're telling us that you reached a          10:30

4  decision to have a superseding agreement separate from      10:30

5  reaching any firm conclusions regarding whether there      10:30

6  were any ethical issues in any of the previous            10:30

7  agreements between the parties, correct?                10:30

8      **A.   I decided to have a new agreement before I**       10:30

9  **formed an opinion as to whether or not there was an**        10:30

10 **enforceability or ethical issue.**                          10:30

11     Q.   Right.  And it follows from what you just       10:30

12 said that you had not determined that all of the prior     10:30

13 agreements were, in fact, entirely ethical and            10:31

14 appropriate and reasonable and fair before you decided    10:31

15 to have a superseding agreement, correct?                10:31

16     **A.   That follows my last answer, I did not form**       10:31

17 **an opinion.**                                           10:31

18     Q.   Okay.  Let me show you a document we            10:31

19 previously marked as Exhibit 6.  It may be that          10:31

20 Exhibit E to the counter-counterclaims is a cleaner       10:31

21 copy of this same document, so you may want to refer      10:31

22 to that if you wish.  It's intended to be the same        10:31

23 document.  It is dated June 2nd, 1999.  It's a letter     10:31

24 to Gary L. Fontana regarding participation as witness     10:31

25 in U.S. litigation.  It has confidential                 10:31

1  attorney-client privilege written at the top, some        10:32

2  initials at the bottom, and the second page has what        10:32

3  Mr. Marland has testified is his signature, as well as        10:32

4  some other handwriting.                            10:32

5  **A.   All right.**                          **10:32**

6  Q.   This was one of the documents that you        10:32

7  reviewed when you got personally involved in the        10:32

8  negotiation of the European Counsel, correct?        10:32

9  **A.   Correct.**                          **10:32**

10  Q.   And it's one of the documents you reviewed        10:32

11  in preparation for your testimony here today?        10:32

12      **MS. THURM:** Objection.  You can ask the        10:32

13  witness whether the document refreshed his        10:32

14  recollection, but as to specific documents, the        10:32

15  witness is not obligated to tell you whether he        10:32

16  reviewed any particular document in preparation for        10:32

17  his deposition unless it refreshed his recollection,        10:32

18  so unless the question is rephrased, I instruct the        10:32

19  witness not to answer.                        10:32

20      **MR. HAYES:** I agree with you.  I took the        10:32

21  same position when your associate asked a similar        10:32

22  question.

23      **MS. THURM:** I reviewed the transcript.  He        10:32

24  reformulated his question at your request.  So        10:32

25  therefore, let's take the deposition in the same mode.        10:33

1          **MR. HAYES:** Q.  As chair of the firm's risk          10:33

2    management committee, had you ever seen an agreement          10:33

3    like this before between Thelen and a client?          10:33

4    **A.    No.                                10:33**

5      Q.    As chair of Thelen's risk management          10:33

6    committee, did you have any understanding as to          10:33

7    whether it was permissible to vary a client's recovery          10:33

8    based on whether or not the client testified before a          10:33

9    grand jury?                                10:33

10          **MS. THURM:** Objection.  Incomplete          10:33

11    question.  Object to the form of the question.          10:33

12          **THE WITNESS:** I want to answer your          10:33

13    question, and I want to make sure I understand.  Are          10:33

14    you asking me in the context of the risk management          10:34

15    agreement deliberations of doing what we addressed          10:34

16    this as a policy issue?                    10:34

17          **MR. HAYES:** Q.  Let's start with that.          10:34

18    **A.    Or if you're asking me something else about    10:34**

19    **when I saw this document?                    10:34**

20      Q.    Let's start -- I was asking more about          10:34

21    policy, so let's start with that?                10:34

22    **A.    All right, so the question is, we did not    10:34**

23    **have a risk management policy on it because I believe    10:34**

24    **it's covered by the Rules of Professional Conduct, and    10:34**

25    **our risk management policies were not designed to    10:34**

1 replicate that, but to address interpretations or          10:34

2 implementations of those responsibilities.  So we          10:34

3 didn't go to, for example, the committee and say,          10:34

4 "Gee, is this a good one to include?"          10:34

5     Q.   When you say you understood the Rules of          10:35

6 Professional Conduct covered it, you're telling us you          10:35

7 had an understanding when you were chair of Thelen's          10:35

8 risk management committee, that the Rules of          10:35

9 Professional Conduct addressed the issue of varying a          10:35

10 client's recovery based on whether the client          10:35

11 testified either at trial or before a grand jury?          10:35

12     A.   No, the Rules of Professional Conduct          10:35

13 set -- cover a number of circumstances when as to both          10:35

14 fee-sharing, compensation of witnesses, et cetera.          10:35

15        I don't think we had ever had a situation          10:35

16 that I was aware of where we had a client or witness          10:35

17 that was outside the territorial limits of the United          10:35

18 States and beyond the subpoena powers of the courts,          10:36

19 and how those rules should apply if you had a witness          10:36

20 or a client in that situation.          10:36

21        So, if you're asking me did a risk          10:36

22 management committee formulate a policy as to how to          10:36

23 apply the rules to that unique fact situation, the          10:36

24 answer is no.          10:36

25     Q.   That was my first question.  My second          10:36

1  question was, what rule, or rules, or decisions        10:36

2  interpreted in the professional conduct did you        10:36

3  understand govern the issue of varying a client's       10:36

4  recovery based on whether they testified before a       10:36

5  grand jury?                                    10:36

6      A.   I don't know if it's in the Rule Four or      10:36

7  Rule Five, but there is a rule.  I think it may be      10:36

8  5310 or 4310, somewhere in there, that makes it       10:36

9  unethical to keep a witness from testifying.  So to    10:37

10 compensate a witness, to make that witness unavailable   10:37

11 for a deposition, or court appearance, or grand jury,    10:37

12 whatever, that is unethical.                     10:37

13      I am not aware of or I wasn't aware at the       10:37

14 time and I'm not aware now of another rule that       10:37

15 addresses whether you can compensate a witness who is   10:37

16 not otherwise available at the courts to make himself   10:37

17 available.                                    10:37

18      The rule I am aware of is when the           10:37

19 compensation is for the exact opposite purpose, that    10:37

20 is keeping a witness aware from a forum.  That rule     10:37

21 clearly exists.  I'm not sure if there is a           10:38

22 correlative rule about whether you can do the opposite   10:38

23 of what the rule prohibits.                       10:38

24    Q.   Okay.  Is there an ethical rule in          10:38

25 California about compensating a witness based on the    10:38

1  value of his or her testimony?                    10:38

2        **MS. THURM:** Object to the form of the            10:38

3  question.                                          10:38

4        **THE WITNESS:** The value?  There is a rule      10:38

5  against compensating a witness regarding, I believe, I      10:38

6  forget how it's framed, the substance of his            10:38

7  testimony.  So, it sounds -- I can't compensate a        10:38

8  witness to say, gee, if you testify the light is        10:38

9  green, I will pay you, or if you will testify about      10:38

10 the accident, I will pay you.                       10:38

11        I'm talking about my understanding at the      10:39

12 time, not something formulated since then.  But at the   10:39

13 time, this whole issue of witness compensation, he was    10:39

14 not being compensated for the usefulness of his         10:39

15 testimony, but whether he would make himself            10:39

16 available.  And if he would make himself available by    10:39

17 submitting to the jurisdiction of the court, that       10:39

18 would effect his compensation.                      10:39

19    Q.    And you understood that pursuant to this      10:39

20 June 2nd, 1999 agreement, Mr. Marland agreed to make     10:39

21 himself available to testify before a grand jury so     10:39

22 long as that was subject to a confidentiality          10:39

23 agreement that protected his identity and assured that   10:39

24 he did not have to produce documents that might be in    10:39

25 his possession or control against his will, as          10:40

1 indicated on the bottom of the first page of Exhibit    10:40

2 6; is that right?

3    **A.   Are you referring to the handwritten?    10:40**

4    Q.   No, the first page, paragraph numbered one    10:40

5 at the very bottom of the first page.    10:40

6    **A.   "Subject to confidentiality and assures    10:40**

7 **that I will not be compelled to produce documents that    10:40**

8 **may be in my possession or control against my will,"    10:40**

9 **so both those conditions are in that paragraph.    10:40**

10    Q.   Okay.  And paragraph numbered two, you    10:40

11 understood at the time you first reviewed this    10:40

12 document, Mr. Marland had agreed to testify or to    10:40

13 provide deposition testimony and to testify in court    10:40

14 subject to --    10:41

15    **A.   I will voluntarily come to the United    10:41**

16 **States to testify and to provide deposition testimony    10:41**

17 **and there are other conditions.    10:41**

18    Q.   Okay.  Now, nothing in Exhibit 6 refers to    10:41

19 the usefulness, credibility, or value of any testimony    10:41

20 Mr. Marland might give, correct?    10:41

21    **A.   Correct.    10:41**

22    Q.   Okay.  And the only way Exhibit 6 might    10:41

23 possibly be an ethical agreement between Thelen and    10:41

24 Mr. Marland, is if it is understood as relating to the    10:41

25 ability to compel him to testify in the United States    10:41

1    as opposed to being an agreement based on the value or     10:41

2    usefulness of his testimony, correct?          10:41

3         **MS. THURM:** Object to the form of the          10:41

4    question.                    10:41

5         **THE WITNESS:** I don't know if I thought          10:42

6    about it at the time, but when I looked at this          10:42

7    agreement, I thought it was enforceable and it was          10:42

8    valid because I construed it as the former rather than          10:42

9    the latter.                    10:42

10        **MR. HAYES:** Q.  Okay.  Now, let me come          10:42

11   back to your answers you were giving a few minutes ago     10:42

12   regarding in the context of your service as chair of          10:42

13   the risk management committee.               10:42

14        I believe you said but I want to be sure          10:42

15   that you're not aware of any instance in which Thelen     10:42

16   had an agreement with a client that varied the          10:42

17   client's recovery based on whether the client          10:42

18   testified or not, correct?               10:42

19   **A.   I am not aware of any.  I understand that     10:42**

20   **I'm not representing that I've read every Thelen fee     10:42**

21   **agreement, but I'm not aware of any.          10:43**

22   Q.   And beyond what we have just been          10:43

23   discussing, you are not aware of any ethical rules or     10:43

24   issues that address the situation of varying a          10:43

25   client's recovery based on whether the client          10:43

1  testifies?                                    10:43

2      **MS. THURM:** Object to the form of the          10:43

3  question.  Can I have the question read back please.      10:43

4      (Whereupon, the record was read by the

5      Reporter.)

6  **QUESTION:** "And beyond what we have just been          10:43

7      discussing, you are not aware of any         10:43

8      ethical rules or issues that address        10:43

9      the situation of varying a client's         10:43

10      recovery based on whether the client        10:43

11      testifies?"                              10:43

12      **THE WITNESS:** I have already answered that     10:43

13  question, and I am aware of ethical rules.  I        10:43

14  indicated the rule is that you can't vary the        10:43

15  compensation so as to reward or pay a client for not      10:44

16  testifying.                                 10:44

17      **MR. HAYES:** Q.  Right, I didn't mean -- I     10:44

18  expressly tried to include that in my question, apart      10:44

19  from what you already told us.                    10:44

20      **A.   Okay, all right.  Nothing comes to mind.**      **10:44**

21      Q.   Okay.  All right.  It's now, whatever,      10:44

22  three hours before 1:44 p.m., do you want to take a      10:44

23  break now?                                  10:44

24      **MS. THURM:** Sure.                      10:44

25      **THE VIDEOGRAPHER:** The time is 10:44 a.m.,      10:44

1  we are off the record.                          10:44

2       (Whereupon, a recess was taken.)          10:59

3       **THE VIDEOGRAPHER:**The time is 10:59 a.m.,     10:59

4  we are on the record.                           10:59

5       **MR. HAYES:**Q.  Okay, Judge Carvill, I      10:59

6  actually wanted to come back to Exhibit 17.      10:59

7       **A.  All right, I have it.**              **10:59**

8       Q.   We were at page five of the document.  I    10:59

9  want to now turn to page six.  In the middle of the      11:00

10 page there is -- just below the middle there is a      11:00

11 reference to quote, "Our initial strategy" close      11:00

12 quote.                                   11:00

13      **A.  Let me find that.**                  **11:00**

14      Q.   Sure.                            11:00

15      **A.  In the second paragraph?**           **11:00**

16      Q.   Yes.                             11:00

17      **A.  Correct.**                        **11:00**

18      Q.   Okay.  So the initial strategy referred to    11:00

19 an early meeting with persons in France, correct?      11:00

20      **A.  Correct.**                        **11:00**

21      Q.   Okay.  And the next paragraph begins with      11:00

22 the statement that quote, "If that fails to produce      11:00

23 prompt results, we will prepare a motion on behalf of      11:00

24 the Commissioner," and the sentence continues.  Do you      11:00

25 see that?                                11:00

1  **A.   Correct.**                              **11:00**

2     Q.   And the motion was to reopen the Executive      11:00

3  Life case on the grounds of fraud, do you see that?      11:01

4  **A.   Correct.**                              **11:01**

5     Q.   Do you have any understanding of why that      11:01

6  didn't happen, why the motion was never filed?      11:01

7  **A.   No.**                              **11:01**

8     Q.   Now, the last paragraph on the page      11:01

9  carrying over on the top of page seven reads quote,      11:01

10  "If we are unsuccessful in getting prompt relief in      11:01

11  France or via a motion to reopen the Los Angeles case      11:01

12  before the Credit Lyonnais reorganization is      11:01

13  finalized, we will face a well-financed group of      11:01

14  defendants in Los Angeles that will include Altus      11:01

15  France, Credit Lyonnais, Leon Black and others who      11:01

16  benefited from the junk bond sale."      11:01

17  **A.   Correct.**                              **11:02**

18     Q.   "In that event, we would have to reassess      11:02

19  the merits of the case in light of subsequent      11:02

20  developments - most importantly evidence, if any, that      11:02

21  John Garamendi or his senior staff were aware of and      11:02

22  acquiesced in the fraud."      11:02

23  **A.   Correct.**                              **11:02**

24     Q.   Would it be fair to say that Thelen was      11:02

25  aware in 1999 that if its initial legal strategy      11:02

1  didn't work, that it would face a group of            11:02

2  deep-pocketed defendants?            11:02

3      **MS. THURM:** Objection to the form of the        11:02

4  question.  Assumes facts not in evidence.            11:02

5      **THE WITNESS:** It's fair to say that what        11:02

6  you just read was stated by Gary Fontana to Steve        11:02

7  O'Neal.  And that was one of many things going on        11:03

8  then, but that was said to Steve O'Neal.            11:03

9      **MR. HAYES:** Q.  And Mr. Fontana was a        11:03

10  partner when he said it?            11:03

11      **A.    Absolutely.**            **11:03**

12      Q.    And Mr. Fontana was going to be the person    11:03

13  in charge of the case?            11:03

14      **A.    Absolutely.**            **11:03**

15      Q.    Okay.  Now let me ask you to turn to page    11:03

16  eight.  There is a sub point number three that reads    11:03

17  "Proposed Staffing."            11:03

18      **A.    Correct.**            **11:03**

19      Q.    Okay.  That sub point carries over to page    11:03

20  nine.  And I want to focus your attention on the first    11:03

21  full paragraph which begins on page nine, which begins    11:03

22  with the name Francois Chateau and Gary Fontana?        11:03

23      **A.    Correct.**            **11:04**

24      Q.    And do you see the last sentence of that    11:04

25  paragraph when reads quote, "Despite the high stakes,    11:04

1  this is not likely to ever become an                    11:04

2  associate-intensive case."                    11:04

3        Do you see that?                    11:04

4  **A.   Correct.**                    **11:04**

5  Q.   When Thelen enters into retainer agreements    11:04

6  with clients, it can be expected to make a          11:04

7  professional judgment regarding the amount of time and    11:04

8  effort that the case might entail, correct?          11:04

9  **A.   One would hope so.**                    **11:04**

10       **MS. THURM:** Object to the form of the          11:04

11  hypothetical.                    11:04

12       **MR. HAYES:** Q.  Would it be fair to say       11:04

13  with the benefit of hindsight that Mr. Fontana made a    11:04

14  bad prediction in this case?                    11:04

15       **MS. THURM:** Object to the form of the          11:04

16  question as it relates to the sentence in this       11:04

17  memorandum, which is discussing a case different from    11:04

18  the one or ones that were filed.                    11:04

19       **THE WITNESS:** Well, there are a lot of       11:05

20  things in that memo that Gary states as far as what he    11:05

21  expects that didn't pan out that way.          11:05

22       **MR. HAYES:** Q.  Okay.  Now, you understand    11:05

23  there is a difference between making an incorrect       11:05

24  prediction regarding what will happen and          11:05

25  circumstances actually changing, correct?          11:05

1      **A.   I am not sure.  I can see one could make**        11:05

2   **that distinction, but we get into a lot of arguments**        11:05

3   **as to what those two concepts mean or whether this or**        11:06

4   **that scenario fits into one category or the other, so**        11:06

5   **I am not sure you can make that distinction.**        11:06

6      Q.   Well, I am not talking about a particular        11:06

7   case right now.  I am about to, but I was first asking        11:06

8   a general question of whether you believe a        11:06

9   distinction can be made between, on the one hand, a        11:06

10   situation which someone says, "There are a variety of        11:06

11   the things that could happen, but I am highly        11:06

12   confident that X is going to happen, although if X        11:06

13   didn't happen, Y and Z might happen," on the one hand.        11:06

14   And on the other hand saying five years later or three        11:06

15   years later, "Y and Z have now happened," and those        11:06

16   constitute changed circumstances.  You can see a        11:06

17   distinction between those two?        11:06

18   **A.   Yes.**        **11:06**

19      Q.   Okay, now, let's take a look at the        11:06

20   original attorney-client agreement between Marland and        11:06

21   Thelen, which is Exhibit 2.  I believe it's attached        11:07

22   to the amended answer.  I will give you a separate        11:07

23   copy here.  Take whatever time you need to review        11:07

24   this.  I am going to ask you about a few parts of it.        11:07

25        You recall this was one of the documents        11:07

1  you reviewed when you got personally involved in the        11:07

2  negotiations between Thelen and European Counsel,        11:07

3  correct?                                    11:07

4    **A.    Yes, sir.**                          **11:07**

5    Q.    Now, in paragraph two, the first page there      11:07

6  is a reference to quote, "Their own knowledge of        11:07

7  events surrounding the ELIC rehabilitation/liquidation      11:07

8  proceedings."

9        Do you see that phrase?                    11:08

10    **A.    Yes, sir.**                          **11:08**

11    Q.    And you see that refers to the knowledge of    11:08

12  Thelen, Reid & Priest attorneys?                  11:08

13    **A.    Yes, sir.**                          **11:08**

14    Q.    You understood at the time that Mr. Fontana    11:08

15  had had some personal experience in litigating issues      11:08

16  regarding the Executive Life litigation, correct?        11:08

17    **A.    Absolutely.**                        **11:08**

18    Q.    Now, there is a reference further down in      11:08

19  that paragraph.  It's a sentence that's a little long.    11:08

20  Let me read it for the record.                    11:08

21        "While the department has indicated a        11:08

22        willingness to retain TR&P to conduct a      11:08

23        further investigation and pursue          11:08

24        potential claims against the Altus        11:08

25        defendants, it has been unwilling to      11:08

1      date to pay any fee to client for the          11:08

2      information that he has provided, nor          11:09

3      has it been willing to pay legal fees          11:09

4      to TR&P that are adequate to allow TR&P          11:09

5      to fully compensate client for the          11:09

6      information and strategic assistance          11:09

7      that he has provided, and expects to          11:09

8      provide, in pursuing these claims."          11:09

9      Do you see that sentence?          11:09

10     **A.    Yes, you read it correctly.**          **11:09**

11     Q.    Did you have any understanding at the          11:09

12   time -- let's first focus on 1999 -- regarding the          11:09

13   state of negotiations or discussions between Thelen          11:09

14   and the DOI regarding a potential retainer agreement?          11:09

15     **A.    In 1999, I had no knowledge of that, that I**          **11:09**

16   **can now recall.  I suspect I had no knowledge at the**          **11:09**

17   **time.**          **11:09**

18     Q.    Okay, when you got personally involved in          11:09

19   negotiations with the European Counsel in the 2002          11:09

20   time frame, did you learn anything, or do you recall          11:09

21   learning anything about negotiations between the DOI          11:09

22   and Thelen in 1999 over possible contingent fees or          11:10

23   other terms of representations?          11:10

24     **A.    You are asking me what I learned in 2002 on**          **11:10**

25   **that subject?**          **11:10**

**Page 57**

1    Q.    Yeah?                              11:10

2    **A.    In '99?**                        **11:10**

3    Q.    Yes?                               11:10

4    **A.    Yes.**                           **11:10**

5    Q.    Did you have any understanding that prior      11:10

6    to filing the DOI action against the Executive Life      11:10

7    defendants, separate from the Quitam action -- let me      11:10

8    go back for more background.                   11:10

9         In February 1999, Thelen filed a Quitam      11:10

10    case on behalf of RoNo LLC, correct?              11:10

11    **A.    I believe that happened the first half the**      **11:10**

12    **1999.**                                **11:10**

13    Q.    Yes, indeed.                        11:10

14    **A.    If you pressed me on the date, I would have**      **11:10**

15    **to check.**                            **11:10**

16    Q.    That's not relevant right now.              11:10

17    **A.    Okay.**                          **11:11**

18    Q.    You understand that at about the same time,      11:11

19    I'll represent to you, in fact, it was the same day,      11:11

20    the Commissioner of Insurance filed his own action      11:11

21    against a substantially similar set of defendants      11:11

22    alleging substantial similar claims as had been set      11:11

23    forth in the Quitam case?                      11:11

24    **A.    I believe that happened.**                **11:11**

25    Q.    Okay.  Now, did you have any understanding      11:11

1  in your negotiations of the December 2002 new        11:11

2  agreement to associate counsel, regarding whether the        11:11

3  Commissioner had made any particular offer or offers        11:11

4  to Thelen of a contingent fee retainer prior to the        11:11

5  Commissioner filing his own action with counsel other        11:11

6  than Thelen?        11:11

7      **A.   I believe that Thelen approached the        11:11**

8  **Commissioner with such a proposal.  I don't recall if        11:11**

9  **that was rejected outright, or if there was a        11:12**

10  **counterproposal that was unacceptable.        11:12**

11      Q.   Did you have an understanding in December        11:12

12  2002 as to whether the December 2002 agreement        11:12

13  addressed itself to any issues that might have arisen        11:12

14  between Marland, Thelen, and the Commissioner over the        11:12

15  negotiation of a retainer agreement between Thelen and        11:12

16  the Commissioner?        11:12

17      **MS. THURM:** Can I have the question read        11:12

18  back please?        11:12

19      **MR. HAYES:** You know what, I will come back        11:12

20  to it later.  Let me finish up with this.        11:12

21      Exhibit 2, that is, specifically, paragraph        11:12

22  five of "Background"?        11:12

23  **A.   Yes, sir.        11:12**

24      Q.   States that, "Client wishes to engage TR&P        11:12

25  to represent his interests, individually and as        11:13

1   embodied in RoNo, in pursuing possible recoveries          11:13

2   against the Altus defendants on behalf of the              11:13

3   Commissioner and the State of California."                 11:13

4          Do you see that?                                    11:13

5   **A.   Yes, sir.**                                    **11:13**

6   Q.   Okay.  Now, the scope of services then               11:13

7   follows, do you see that the first thing that TR&P         11:13

8   agrees to do is file a Quitam complaint?                   11:13

9   **A.   Yes, sir.**                                    **11:13**

10  Q.   The second thing is to file a motion to              11:13

11  reopen the ELIC rehabilitation?                            11:13

12  **A.   Yes, sir.**                                    **11:13**

13  Q.   Do you have any understanding why that               11:13

14  didn't happen?                                             11:13

15  **A.   No.  You are referring to the second one?     11:13**

16  Q.   Yes, filing the motion to reopen?                    11:13

17  **A.   I have no understanding as to why that        11:13**

18  **particular course of action was not pursued.       11:13**

19  Q.   Okay.  Item C within the scope of                    11:13

20  representation refers to providing legal advice and       11:13

21  assistance to the Commissioner of Insurance and/or the    11:13

22  California Attorney General in connection with the         11:13

23  Quitam litigation.  Do you see that?                       11:14

24  **A.   Yes, sir.**                                    **11:14**

25  Q.   And then you see item F refers to                    11:14

1    representing clients's interests in any appellate          11:14

2    proceedings that may arise from any of the foregoing          11:14

3    actions.  Do you see that?                    11:14

4    **A.    Yes, sir.**                    **11:14**

5    Q.    Now, the attorney's fee provisions follow          11:14

6    and the fee payable to Thelen is different depending          11:14

7    on when the claims against the Altus defendants were          11:14

8    settled?                    11:14

9    **A.    Correct.**                    **11:14**

10    Q.    And it's your understanding that it is          11:14

11    common in a contingent fee situation for the          11:14

12    percentage of the contingent fee to vary depending on          11:14

13    the time the case is resolved, correct?          11:14

14    **A.    That general characteristic of fee**          **11:14**

15    **agreements is correct, whether this particular one is**          **11:15**

16    **common.**                    **11:15**

17    Q.    Fair enough, I meant in general?          11:15

18    **A.    In general, yes.**                    **11:15**

19    Q.    Okay.  Was there any reason why Thelen          11:15

20    didn't include some alternative clause which would          11:15

21    provide for protracted litigation, or lodestar over a          11:15

22    certain amount, or some other protection for Thelen if          11:15

23    the case dragged on longer than it might have been          11:15

24    expected?                    11:15

25        **MS. THURM:** Object to the form of the          11:15

1  question.  Assumes facts not in evidence.          11:15

2  **THE WITNESS:** If you're asking me do I have      11:15

3  any knowledge as to why that was not here in this      11:15

4  draft, the answer is no.                    11:15

5  **MR. HAYES:** Q.  Okay, I am also asking you      11:15

6  whether, as far as you're aware, anything prevented      11:15

7  Thelen from proposing to Marland other or additional      11:16

8  or further terms that might address the situation in      11:16

9  which the defendants refused to settle and choose to      11:16

10  litigate, and the case drags on for years because the      11:16

11  judge doesn't set a trial date or the magistrate judge      11:16

12  doesn't rule on motions, or any number of other things      11:16

13  that happen all the time in litigation might happen?      11:16

14  **MS. THURM:** Object to the form of the      11:16

15  question.  Assumes facts not in evidence.  Go ahead.      11:16

16  **THE WITNESS:** I have no knowledge on that      11:16

17  subject.                          11:16

18  **MR. HAYES:** Q.  Okay.  Now, on page three      11:16

19  of Exhibit 2, there is a reference to European      11:16

20  Counsel.                         11:16

21  **A.   Yes.**                       **11:16**

22  Q.   And there is a statement in the second      11:16

23  sentence in this paragraph of European Counsel which      11:17

24  reads quote, "Such counsel shall initially not      11:17

25  participate in any litigation filed in the United      11:17

1  States without the express consent of TR&P."          11:17

2       Do you see that?                          11:17

3  **A.  Yes, sir.**                          **11:17**

4  Q.   Do you recall learning in the 2002 time          11:17

5  frame that Brunswick had become associated with Thelen      11:17

6  as counsel to Marland?                        11:17

7  **A.  I understood that Brunswick and Susannah**      **11:17**

8  **Maas, along with Mr. Marland, were European Counsel.**    **11:17**

9  **I'm not sure if you're asking me something different**    **11:17**

10 **from that.**                          **11:17**

11      **MR. HAYES:** Q.  I am asking you something      11:17

12 different.  I am jumping over that point.          11:17

13 **A.  All right.  What additional information are**    **11:17**

14 **you asking?**                          **11:17**

15 Q.   Let's lay the foundation.  You understand      11:17

16 that later in 1999 there was an agreement, a          11:18

17 fee-sharing agreement between Thelen and a group        11:18

18 people referred to as the European Counsel?          11:18

19 **A.  Correct.**                          **11:18**

20 Q.   Okay.  And the European Counsel were Mr.      11:18

21 Marland, Miss Maas and Mr. Brunswick?          11:18

22 **A.  Correct.**                          **11:18**

23 Q.   Do you recall that in addition to the        11:18

24 agreement between Thelen and the European Counsel,      11:18

25 that as of September 2001 there was an agreement      11:18

1  between Thelen and Marland pursuant to which Brunswick     11:18

2  became associated with Thelen as counsel to Marland?     11:18

3     **A.   I understand it was a 2001 agreement which     11:18**

4  **may address the subject matter.  I am having trouble     11:18**

5  **with that characterization.                   11:18**

6     Q.   We'll get to it later.  The last sentence     11:18

7  refers to the European Counsel clause that states,     11:19

8  "TR&P shall reimburse client for one half of the fees     11:19

9  incurred for such European Counsel to the extent that     11:19

10  TR&P recovers its contingent legal fees or it's     11:19

11  awarded legal fees by a court in an amount sufficient     11:19

12  to make the reimbursement."                 11:19

13       Do you see that?                     11:19

14  **A.   Yes, sir.                         11:19**

15     Q.   Now, did you have an understanding of     11:19

16  whether there was any relationship between the     11:19

17  relative fee percentages set forth in this     11:19

18  attorney-client agreement and the fee-sharing     11:19

19  percentages in the June 1999 agreement to associate     11:19

20  counsel, which I will show you if you want?     11:19

21       **MS. THURM:** Vague as to time.     11:19

22       **THE WITNESS:** I don't recall what my     11:19

23  understanding on that was.     11:19

24       **MR. HAYES:** Q.  We'll get to that document     11:19

25  too.  Let me move on to page four.  Paragraph 12     11:19

1  refers to TR&P being entitled to receive its          11:20

2  contingent share of any settlement or of -- sorry,          11:20

3  settlement of or judgment on any of the claims.  Do          11:20

4  you see that reference?                    11:20

5    **A.   Yes, sir.**                    **11:20**

6    Q.   So, "To the full extent allowable under          11:20

7  California law, notwithstanding any decision by client          11:20

8  to disregard TR&P or to substitute other counsel in          11:20

9  its place."                    11:20

10      Do you see that?                    11:20

11    **A.   Yes, sir.**                    **11:20**

12    Q.   Now, California law doesn't permit          11:20

13  discharged counsel to receive a contingent fee, does          11:20

14  it?                    11:20

15      **MS. THURM:** Object.  Calls for a legal          11:20

16  conclusion.                    11:20

17      **THE WITNESS:** The question you just asked          11:20

18  in the phraseology of this paragraph, I am not making          11:20

19  the link.  Are you talking about client discharging a          11:20

20  firm, or firm discharging client?  What are you          11:21

21  talking about?                    11:21

22      **MR. HAYES:** Q.  Client discharging firm?          11:21

23    **A.   Right, client discharging firm, and your**          **11:21**

24  **question is?**                    **11:21**

25    Q.   Whether you understood when you were          11:21

1  general counsel to Thelen, that California law did not     11:21

2  permit a law firm that had been discharged by the          11:21

3  client to recover a contingent fee as opposed to           11:21

4  quantum marritt (phonetic) fee?                            11:21

5      **A.    On that point, with respect to this clause,    11:21**

6  **I don't recall considering that in 2002, 2003.           11:21**

7      Q.    I am asking about your understanding             11:21

8  generally.  If it changed during the time you were         11:21

9  Thelen general counsel, you can tell me, but I am          11:22

10  asking you generally because my understanding is that     11:22

11  California law, like most states, does not permit a       11:22

12  discharged lawyer to recover a contingent fee and         11:22

13  limites the recover to a quantum marritt fee?             11:22

14      **MS. THURM:** To the extent you are asking           11:22

15  him to state what California law says or doesn't say,     11:22

16  calls for a legal conclusion.  Go ahead.                  11:22

17      **THE WITNESS:** My recollection on that              11:22

18  general issue back then was I was thinking about it in    11:22

19  terms of a discharge of Thelen by the CEOI.  And I can    11:22

20  recall having thoughts on that subject then, but not      11:22

21  thinking about it in the context of the other            11:22

22  situation, that is, European Counsel, or Mr. Marland,     11:22

23  or whatever, discharging Thelen.                          11:23

24      **MR. HAYES:** Q.  Okay.  Let's go to page            11:23

25  six, paragraph 22, "Termination and right to              11:23

1  withdraw."                                    11:23

2  **A.   Okay.                                  11:23**

3    Q.   When you were general counsel at Thelen, do     11:23

4  you have any understanding regarding whether when a        11:23

5  law firm terminates its representation of a client in     11:23

6  a pending matter, the law firm has an obligation to        11:23

7  move in court where the matter is pending to be           11:23

8  relieved as counsel?                          11:23

9    **A.   In 2002, 2003, I understood that if we were     11:23**

10 **counsel of record in a lawsuit and wanted to withdraw,     11:23**

11 **that required action by the court as opposed to simply     11:23**

12 **a private agreement with the client.                  11:23**

13       **MR. HAYES:** Q.  Okay, that partially         11:24

14 answered my question, but I was asking about           11:24

15 terminating the representation.  So let me refocus the     11:24

16 question for you.                             11:24

17       Isn't it true that even if counsel is          11:24

18 permitted under the terms of the retainer agreement to     11:24

19 terminate the agreement, terminating counsel must also     11:24

20 make a motion in the court where the action is pending     11:24

21 to be relieved as counsel?                     11:24

22       **MS. THURM:** Objection.  Incomplete          11:24

23 hypothetical.  Calls for a legal conclusion.          11:24

24       **THE WITNESS:** Back in 2002, 2003, I believe     11:24

25 my understanding was that if Thelen were to withdraw     11:24

1    from the case where it was counsel of record, some          11:24

2    form of motion was required.  I say "some form of          11:24

3    motion" because, you know, federal/state, Nevada, New          11:25

4    York, there may be variations, but something had to be          11:25

5    done in terms of the court now.                    11:25

6          If there was already substitute counsel          11:25

7    lined up so it was a substitution of counsel as          11:25

8    opposed to just a withdrawal, the action might be          11:25

9    different, so I am not quite sure if you're including          11:25

10   all circumstances or whether there is already          11:25

11   substitute counsel.                    11:25

12          **MR. HAYES:** Do you need the question read          11:25

13   back?                         11:25

14          **THE WITNESS:** If there is not substitute          11:25

15   counsel so the client is allowed in pro per, my          11:25

16   understanding was you needed to involve the court in          11:25

17   that process.                    11:26

18          **MR. HAYES:** Q.  Okay.  Now, subparagraph C          11:26

19   paragraph 22 --                    11:26

20   **A.   Yes.**                         **11:26**

21       Q.    -- states that, "The withdrawing party          11:26

22   shall assign to the other parties all its rights under          11:26

23   this agreement, and any claim that may have" -- that's          11:26

24   how it's written.  It probably should be "that it may          11:26

25   have" -- "to any recovery or award as a result of its          11:26

1  pursuit of the Quitam litigation."                    11:26

2         Do you see that clause?                    11:26

3   **A.   I see that clause.**                    **11:26**

4   Q.   Did Thelen ever assign all its rights under    11:26

5  this February 1999 agreement to Marland?            11:26

6   **A.   We never executed an assignment.**            **11:26**

7   Q.   Now, let's turn to the document that has    11:26

8  been previously marked as Exhibit 4.  It is entitled,    11:27

9  "Agreement to Associate Counsel."  There is a        11:27

10  signature of June 3rd, 1999 of Thelen, Reid and Priest    11:27

11  by Gary Fontana, as well as Mr. Marland, and what    11:27

12  appears to be Mr. Brunswick and Miss Maas.  Take    11:27

13  whatever time you need to rereview it.  My first    11:27

14  question is simply whether this is one of the        11:27

15  documents that you reviewed when you got personally    11:27

16  involved in the negotiations between Thelen and    11:27

17  European Counsel?                        11:27

18   **A.   Yes.**                        **11:27**

19   Q.   Okay.  Do you recall ever reviewing the    11:27

20  drafts of this agreement prior to the final executed    11:28

21  version, of course?                    11:28

22   **A.   You're asking me not if I have subsequently    11:28**

23  **seen drafts, but if at the time I saw a draft prior to    11:28**

24  **its execution?**                    **11:28**

25   Q.   No, that was a bad question.  Let me redo    11:28

1  it.                                 11:28

2        When you got personally involved in the        11:28

3  negotiations between Thelen and the European Counsel,     11:28

4  do you recall ever seeing a draft of this document        11:28

5  Exhibit 4 that differed in any way from the final        11:28

6  executed version?                        11:28

7     **A.   I might have, but I don't recall --        11:28**

8     Q.   Okay.                        11:28

9     **A.   -- seeing it.                    11:28**

10    Q.   Do you recall seeing a draft which        11:28

11  specified that the European Counsel will provide        11:28

12  documents to Thelen?                    11:28

13    **A.   I may have, but I don't recall.  You are        11:29**

14  **asking me what I saw in 2002.  I might have seen such     11:29**

15  **a document, but I don't recall seeing such a document.    11:29**

16    Q.   Okay.  Do you recall Mr. Brunswick telling        11:29

17  you in 2002 that in negotiating this agreement to        11:29

18  associate counsel in 1999, he had specifically struck     11:29

19  out a clause from a draft which stated that the        11:29

20  European Counsel would provide documents to Thelen?        11:29

21    **A.   At some point Mr. Brunswick communicated        11:29**

22  **that position to me.                    11:29**

23    Q.   Okay.  And did you then follow up and        11:29

24  determine whether he was right or wrong?            11:29

25    **A.   I think, I am not sure, but I think he sent     11:29**

1  me -- we exchanged packages on respective positions,        11:29

2  and I think he included something like that in his        11:30

3  package.                        11:30

4      Q.    As best you can recall, Mr. Brunswick        11:30

5  never -- withdraw it.                    11:30

6          Do you recall ever disputing Mr. Brunswick        11:30

7  that, in fact, he had struck out from a draft of this        11:30

8  agreement to associate counsel a clause calling for        11:30

9  the European Counsel to provide documents to Thelen?        11:30

10     A.    I do not recall disputing with Mr.        11:30

11  Brunswick his characterization of that that is what he        11:30

12  did.                            11:30

13     Q.    Okay.  Here is a document previously marked        11:30

14  as Exhibit 14.  It is a fax dated May 19th, 1999 from        11:30

15  Francois Marland to Susannah Maas, Gary Fontana,        11:31

16  Francois Chateau, Phillippe and Herve Temime.        11:31

17          When did you first see this document, sir?    11:31

18     A.    Sometime in 2002.                11:31

19     Q.    When did you first become aware that Mr.        11:31

20  Marland had said in writing to Gary Fontana in May of        11:31

21  1999 that he did not detain and had not detained        11:31

22  documents other than those which had already been        11:31

23  handed over to Mr. Fontana?                11:31

24     A.    I don't know.  He may have mentioned it,        11:31

25  and this subject may have come up when we met with him        11:31

1  **in Paris in June of '99, or it may have come up later.**     **11:31**

2     Q.   The "him" in your previous answer was Mr.     11:32

3  Marland?                              11:32

4     **A.   I'm sorry I was referring to Mr. Brunswick.**     **11:32**

5  **I thought.**                          **11:32**

6     Q.   That's okay.  You may have answered my     11:32

7  question, but now I am not sure.  Let's do it again.     11:32

8     **A.   I thought you were asking me about whether**     **11:32**

9  **I remember Mr. Brunswick making those representations**     **11:32**

10  **to me.**                              **11:32**

11     Q.   No, I'm sorry that wasn't my question.     11:32

12  Let's do it again.                     11:32

13        Exhibit 14 is a fax from Mr. Marland?     11:32

14     **A.   Okay, correct.**                 **11:32**

15     Q.   Okay.  When do you recall first being     11:32

16  advised that Mr. Marland had said in writing in May of     11:32

17  1999 that he was not going to produce any documents     11:32

18  beyond those he already furnished?             11:32

19     **A.   All right, I understood the question**     **11:32**

20  **correctly originally, and that is, Mr. Brunswick may**     **11:32**

21  **have told me that in Paris in June of 2002.  Mr.**     **11:32**

22  **Marland most likely told me that in New York later on**     **11:33**

23  **that summer, so the answer is depending on you're**     **11:33**

24  **asking Mr. Marland telling me that.**         **11:33**

25     Q.   That's okay.  Uh-hum, but the "that" that     11:33

1   Mr. Brunswick and/or Mr. Marland told you, is that Mr.     11:33

2   Marland had said in writing in May of 1999 that he     11:33

3   wasn't going to produce anymore documents, correct?     11:33

4       A.   I missed the "in writing" part.     11:33

5       Q.   Right.     11:33

6       A.   At some point the "in writing" part that     11:33

7   they told me that -- their position was they had said     11:33

8   that in writing was called to my attention, and that     11:33

9   was called to my attention after the more general     11:34

10  point, and I can't recall when they followed up with     11:34

11  "and we set it in writing."     11:34

12      Q.   Okay, so when you first became involved in     11:34

13  negotiations between Thelen and European Counsel, you     11:34

14  were not aware that Mr. Marland had said anything like     11:34

15  what is contained in Exhibit 14 back in May of 1999,     11:34

16  correct?     11:34

17      A.   When I first became involved?     11:34

18      Q.   Yes.     11:34

19      A.   The "anything like" the answer is no.  I     11:34

20  mean, I disagree with your question because of the     11:34

21  "anything like."  Because I did get information on     11:34

22  this during my initial involvement in the case when I     11:34

23  was looking at the documents and talking with Karl and     11:34

24  Gary.     11:34

25      Q.   Okay.  So your initial information from     11:34

1   Karl and Gary was that Marland had been extremely          11:34

2   reluctant to produce the documents but would, if          11:35

3   necessary, produce it; is that a fair          11:35

4   characterization?          11:35

5      A.   No.  What I was referring to was early on,          11:35

6   they shared with me the instance -- the incident with          11:35

7   Mr. Isaacs of the U.S. Attorney's office and someone          11:35

8   from the FDIC, or Federal Reserve in London, where in          11:35

9   the course of the interview Mr. Marland made a          11:35

10  statement that was inconsistent with what my partners          11:35

11  had thought, and there was a side bar, and so early on          11:35

12  I understood based on that that Mr. Marland had a          11:35

13  concern about identity and criminal prosecution in          11:36

14  France, and because of that he was very sensitive on          11:36

15  the document issue.          11:36

16     Q.   Okay.  We have five minutes left.  Let's          11:36

17  not take a break except to change the tape.  Let's          11:36

18  keep going.          11:36

19        THE VIDEOGRAPHER:Right.          11:36

20        MR. HAYES:Now.          11:36

21        THE VIDEOGRAPHER:This is the end of tape          11:36

22  number one in volume number one in the deposition of          11:36

23  Wynne Carvill.  The time is 11:36 a.m.  We are off the          11:36

24  record.          11:36

25        (Whereupon, a recess was taken.)          11:42

1        **THE VIDEOGRAPHER:** This is the beginning of     11:42

2    tape number two in volume number one in the deposition     11:42

3    of Wynne Carvill.  The time is 11:42 a.m.  We are on     11:42

4    the record.                               11:42

5        **MR. HAYES:** Q.  Okay, Judge Carvill, do you     11:42

6    recall ever saying in words or substance to Gary     11:42

7    Fontana, "Gary, what is going on with the fact that     11:42

8    Marland told you in 1999 he wasn't going to produce     11:42

9    anymore documents?"                       11:42

10      **A.    Without accepting your particular          11:42**

11   **characterization of that, I did inquire of Gary what     11:42**

12   **is going on with the documents.                11:43**

13      Q.    Okay.  And what was Mr. Fontana's response?     11:43

14      **A.    Gary's response, and obviously stating a     11:43**

15   **position rather than quoting, was that, "Look, Marland     11:43**

16   **is very sensitive about his identity.  In addition,     11:43**

17   **there is now the issue of possible criminal          11:43**

18   **prosecution in France, and as a result" -- and this     11:43**

19   **may have been how I learned about the Isaac situation,     11:43**

20   **that story was recounted.                    11:43**

21      **And I understood from talking to Gary that,     11:43**

22   **my belief of what he believed was that those two     11:43**

23   **concerns meant that Thelen could -- the document may     11:43**

24   **be unavailable unless those concerns could be     11:44**

25   **addressed.  And further, that in any event, look, he     11:44**

1  assured us that he would never have to produce it          11:44

2  because it would come up in discovery.  So we both          11:44

3  thought that we'd get into discovery and we won't have          11:44

4  to deal with whether or not he is going to produce his          11:44

5  to either expose his identity or subject him to this          11:44

6  criminal issue in France.                    11:44

7     Q.   Okay, can you fix a date or range of dates          11:44

8  when Mr. Fontana conveyed the statements you just          11:44

9  related?                              11:44

10    A.   Sometime between when I first got involved          11:44

11  in this in late May or early June, and the end of my          11:44

12  trip to Paris.                        11:45

13    Q.   Late May, early June of 2002?               11:45

14    A.   2002, shortly thereafter the month of June,          11:45

15  or maybe it was early July, but in that six-week time          11:45

16  frame I went to Paris with -- the litigation team was          11:45

17  therefore the purpose of meeting with Brunswick and          11:45

18  Marland.  And we met with Brunswick, I met with          11:45

19  Brunswick, and that is when the document issue began          11:45

20  to be discussed.  And that's when I heard about the          11:45

21  Isaac's story and the concern about the two issues I          11:45

22  mentioned.                          11:45

23       Whether I heard about it before I went to          11:45

24  Paris or when I was in Paris, I can't tell you in that          11:45

25  time frame.                          11:45

1    Q.   I understand.  Thank you.  And it was also       11:45

2  in that time frame when you recall Mr. Brunswick        11:45

3  saying to you, in effect, that Mr. Marland had sent a       11:45

4  fax in May of 1999 stating that he wouldn't produce       11:46

5  anymore documents?                            11:46

6        **MS. THURM:** Objection.  Assumes facts not       11:46

7  in evidence.                          11:46

8        **THE WITNESS:** No, it was in that time       11:46

9  frame, particularly in our meeting with Brunswick,       11:46

10  that I heard his position about there being no        11:46

11  commitment to produce the document.  Whether he added       11:46

12  that in writing back then or later, I can't recall.       11:46

13        **MR. HAYES:** Q.  Okay.  I want to then focus       11:46

14  on this Exhibit 14 and ask if you ever recall saying       11:46

15  to anyone else at Thelen, in words or substance, "Hey       11:46

16  fellows, Marland sent us this fax in May of 1999,       11:46

17  weren't we on notice then that he wasn't going to       11:46

18  produce it," or "Hey fellows, Marland sent us this fax       11:46

19  in May of 1999, what did we do after that to ensure       11:46

20  that we might be able to get the document?"       11:46

21    **A.   I remember having those discussions on that       11:47**

22  **subject matter, without accepting your             11:47**

23  **characterization.                        11:47**

24    Q.   Okay.  With whom did you have those       11:47

25  discussions?                        11:47

1    A.    I had those discussions with the litigation    11:47

2  team, and by that I mean Gary Fontana, and it may also    11:47

3  have included Karl Belgum, so that's why I just    11:47

4  doesn't mention Gary, and also firm management.    11:47

5    Q.    Okay, who in firm management did you have    11:47

6  those discussions with?    11:47

7    A.    One or more members of the executive    11:47

8  committee.    11:47

9    Q.    Who were those folks at that time?    11:47

10    A.    Well, Ridge Gary was chair, Tom Eigo    11:47

11  (phonetic) was vice chair, Michelle Johnson was head    11:47

12  of operations.  I forget her title, but she was on it.    11:47

13  I think Jonathan Siegfried was still on it.  And I    11:47

14  don't recall if Chuck Fernwald (phonetic) or Steve    11:48

15  O'Neal was on it, but I think one of those two.  There    11:48

16  may have been another, but I doubt it.    11:48

17    Q.    Do you recall anyone, either on the    11:48

18  litigation team or in Thelen firm management, telling    11:48

19  you in response to your raising this issue of    11:48

20  Marland's May 1999 fax, that Thelen had taken steps to    11:48

21  ensure that the document would be produced or would be    11:48

22  available if it became absolutely necessary?    11:48

23        MS. THURM: Objection.  The question is    11:48

24  compound.  I am just going to caution the witness and    11:48

25  instruct the witness, to the extent he had    11:48

1  communications with one or more members of the          11:48

2  executive committee at the time, and now he understood     11:48

3  to be for the purpose of providing legal advice to the     11:48

4  executive committee, I instruct him not to answer the      11:48

5  question on the grounds of attorney-client privilege.      11:49

6  The question was compound.  So if you want to break it     11:49

7  up, go ahead.                              11:49

8       **MR. HAYES:** I will break it up.            11:49

9    Q.   Did anyone on the litigation team ever say      11:49

10 to you in response to your raising the issue of this      11:49

11 May 1999 fax from Marland, in words or substance,        11:49

12 "Don't worry, Wynne, we told Marland that we would       11:49

13 issue him a friendly subpoena as part of a subpoena to    11:49

14 all of the directors of MAAF so that he could produce     11:49

15 the document in response to my subpoena and wouldn't     11:49

16 identify him as a whistleblower"?                 11:49

17    **A.   The friendly subpoena issue may have come       11:49**

18 **up, but in the discussions with the litigation team,       11:49**

19 **but I don't recall that.  I mean, that's the sort of       11:49**

20 **thing, that in talking with Gary and Karl in terms of       11:49**

21 **about this document, I would not be surprised if that       11:49**

22 **came up.  I can't recall if it did.                11:50**

23    Q.   In your experience as a litigator, a        11:50

24 friendly subpoena is one way to get a document from a     11:50

25 reluctant witness in a situation like that, isn't it?     11:50

1    A.    I disagree with the notion that that was my        11:50

2  view at the time or now.  I mean, the problem was, as        11:50

3  it was articulated to me was that -- from the            11:50

4  litigation team -- was that there are three copies of        11:50

5  this document.  There are the two signatures, and          11:50

6  Marland is the go-between.  He had the third copy.         11:50

7  The third original, if you will, of this document.         11:50

8  And if it was produced, since the bad guys knew where        11:50

9  the other two were, it would be obvious where the          11:50

10  third one came from, and that was my understanding of        11:50

11  the problem.                            11:50

12        So a friendly subpoena doesn't protect the        11:50

13  identity of Marland because if the document comes          11:51

14  forward in that process, and it's the original, the        11:51

15  concern was "Ah, we know who Mr. X is."  And if          11:51

16  it's -- I don't pretend to be an expert on French law        11:51

17  or know exactly the concern, but my understanding was        11:51

18  that Marland's concern was that if it was known that        11:51

19  he had retained the third copy of this document, he        11:51

20  would be subject to criminal prosecution.            11:51

21    Q.    Okay.                        11:51

22    A.    So a friendly subpoena does not solve that        11:51

23  if it, one, identifies Marland -- well, you see the        11:51

24  point.  I'm not saying you agree with that.          11:51

25    Q.    I see the point you're raising --

1    **A.    I understand you don't agree with it, but**    11:51

2    **you understand what my answer is?**    11:51

3    Q.    Yes, right.  Let me just very briefly, on    11:51

4    the first part of your answer, do you recall that    11:51

5    Marland was involved in this Executive Life affair    11:51

6    because he was a director of MAAF, the entity that was

7    fronting for Credit Lyonnais, "MAAF" being M-A-A-F?

8    **A.    He was an officer, director, of one of**    11:52

9    **those entities.  And I accept your representation it**    11:52

10    **was MAAF, I probably knew that at the time.**    11:52

11    Q.    Right, okay, do you understand what I'm    11:52

12    referring to you as a friendly subpoena, I believe I    11:52

13    said in my question, and I want to emphasize, that it    11:52

14    could have been letters rotatory, actually, directed    11:52

15    to all of directors of MAAF for any documents relating    11:52

16    to Executive Life?    11:52

17    **A.    I understand that.**    11:52

18    Q.    And your answer is still that had Marland    11:52

19    produced the document in response to letters rotatory    11:52

20    directed to all of the directors of MAAF, it would    11:52

21    have somehow identified Marland as the whistleblower?    11:52

22    **A.    No, my point is, if Thelen receives such a**    11:52

23    **document and then goes out and uses it, the bad guys'**    11:52

24    **reaction is, "Oh, there is the third copy.  That is**    11:53

25    **what Marland had," and therefore he is identified.**    11:53

**Page 81**

1    Q.   Okay.  Now, that concern you just referred    11:53

2    to regarding the disclosure of Marland's identity, was    11:53

3    not obviated by any changed circumstances in 2000,    11:53

4    2001 or 2002, was it?    11:53

5    **A.   Marland's concern, as I understood it about    11:53**

6    **the document, and as I characterize it, I understand    11:53**

7    **you don't accept it, but I characterize it as being    11:53**

8    **two-fold.  I didn't understand that to be a changed    11:53**

9    **circumstance, with one caveat, I am not sure if the    11:53**

10   **understanding about criminal prosecution was an    11:54**

11   **understanding that the litigation team had before or    11:54**

12   **after the original agreement was entered into.    11:54**

13          **It may have been that at the time of the    11:54**

14   **original agreement they understood the identity but    11:54**

15   **didn't understand the criminal prosecution issue, I am    11:54**

16   **not quite sure of the timing of their understanding    11:54**

17   **about the criminal concern as opposed to the identity    11:54**

18   **concern.    11:54**

19   Q.   Okay.  All right.  Now, with regard to the    11:54

20   other -- well, sorry, with regard to the criminal --    11:54

21   potential criminal liability, it was your    11:54

22   understanding from Gary that this was -- this    11:54

23   potential liability was something Marland took very    11:54

24   seriously, correct?    11:55

25   **A.   I understood from either Gary or Karl or    11:55**

1  both.                                    11:55

2     Q.   Okay, and that concern to the extent Thelen      11:55

3  was ever aware of it, that concern never changed,        11:55

4  correct?                                  11:55

5     A.   I can't say anything about that concern          11:55

6  after November 2003.  With that qualification, the       11:55

7  answer is yes.                            11:55

8     Q.   Fair.  Now, with regard to finding the           11:55

9  other two documents, the other two copies of the         11:55

10  document, did anyone ever tell you that Credit          11:55

11  Lyonnais' offices in Paris suffered a fire during the    11:55

12  1990s?                                   11:55

13     A.   I may have been told that.  I don't recall      11:55

14  at the time.  I don't recall now if I was told that at   11:55

15  the time.                                11:55

16     Q.   Okay, okay.  Now, let me come back to           11:55

17  Exhibit 4.                               11:56

18     A.   I have Exhibit 4.                        11:56

19     Q.   I believe you do, sir, it's the agreement       11:56

20  to associate counsel in June 1999?          11:56

21     A.   Right.                              11:56

22     Q.   Okay.  And if you want to have Exhibit 2 in     11:56

23  front of you at the same time, I want to draw your       11:56

24  attention to the fee-sharing percentage on page two of   11:56

25  Exhibit 4?                               11:56

1    **A.    I see that.**                              **11:56**

2    Q.    In reference to 65-percent of the          11:57

3    settlement before the end of 1999, and 52-percent paid    11:57

4    to European Counsel after January 1, 2000?        11:57

5    **A.    I see that.**                              **11:57**

6    Q.    Okay.  Did you have any understanding at    11:57

7    the time you got involved in renegotiating the party's    11:57

8    agreements in 2002, that there was a relationship    11:57

9    between the fee-sharing percentage here in Exhibit 4    11:57

10   and the percentage of fees to be paid to Thelen    11:57

11   pursuant to the attorney-client agreement, Exhibit 2?    11:57

12       **MS. THURM:** Object to the form of the    11:57

13   question.                              11:57

14       **THE WITNESS:** I'm sorry --          11:57

15       **MR. HAYES:** Q.  It's okay.

16   **A.    -- let's have Exhibit 2 so I can make    11:57**

17   **sure.  Here it is.  You did invite me, I just didn't    11:57**

18   **know if I needed it.**                          **11:57**

19   Q.    One of the reasons your counsel may have    11:58

20   objected is that the percentages are different,    11:58

21   obviously?                              11:58

22       **MS. THURM:** That's not why I objected.    11:58

23       **THE WITNESS:** I don't need to know about    11:58

24   the objection.  What I do need is the question

25   again --

**Page 84**

1      MR. HAYES: Q.  Let me rephrase it.          11:58

2      A.    -- to see what you're talking about.          11:58

3      Q.    Do you understand that the fee-sharing          11:58

4  percentage in the European Counsel agreement was          11:58

5  supposed to reflect the percentage of recoveries paid          11:58

6  as attorney's fees in the attorney-client agreement,          11:58

7  with the difference being compensation of Mr.          11:58

8  Brunswick of ten-percent of any recovery or any          11:58

9  settlement prior to the end of 1999, and five-percent          11:58

10 after that time, and the 10-percent and five-percent          11:58

11 being amounts that were split eventually between          11:58

12 Thelen and Marland?          11:58

13     A.    Let me cut to the part of the question that          11:59

14 I understand.  On Exhibit 4, the percentages, I don't          11:59

15 recall having any understanding as to how the 65, 52          11:59

16 point five percentages there related to what Mr.          11:59

17 Brunswick would get.  I think that was in your          11:59

18 question.          11:59

19     Q.    Yes.          11:59

20     A.    I don't recall.  I understood Mr. Brunswick          11:59

21 was getting compensated, but I don't have a          11:59

22 recollection of having an understanding about how          11:59

23 these percentages were linked to Mr. Brunswick.          11:59

24     Q.    You don't recall Mr. Fontana telling you in          11:59

25 words or substance, or by forwarding you an e-mail,          11:59

1   that he had expressly agreed with Mr. Brunswick and          11:59

2   Mr. Marland that the fee-sharing percentages under the       12:00

3   European Counsel agreement should mirror the                 12:00

4   attorney's fees percentages provided for in the             12:00

5   attorney-client agreement?                                   12:00

6         **MS. THURM:** Objection.  Argumentative.              12:00

7         **THE WITNESS:** The "mirror" part, I don't            12:00

8   recall.                                                      12:00

9         **MR. HAYES:** Q.  Do you recall Mr. Fontana           12:00

10  telling you he had agreed to some kind of equivalence        12:00

11  or parity to avoid the moral hazard of having Thelen         12:00

12  recover more depending on which case the recovery was        12:00

13  classified in?                                               12:00

14     **A.   I do recall an issue about, and having           12:00**

15  **discussions at the time about how you go from             12:00**

16  **compensation in Quitam to compensation in the European   12:00**

17  **Counsel agreement, all right, and that you had to work    12:01**

18  **through the logic of that.  How that relates to the       12:01**

19  **percentage that Mr. Brunswick gets, I don't recall.       12:01**

20     Q.   Okay.  I moved off of that.                         12:01

21     **A.   Okay, I'm sorry.                                 12:01**

22     Q.   That's all right.                                   12:01

23     **A.   I thought you were trying to develop that.       12:01**

24     Q.   I had been just a moment ago, so it's              12:01

25  entirely appropriate.                                        12:01

1    But I was trying to get over that and just     12:01

2  go more --                                       12:01

3    **A.   Fine, I'm sorry, I was --              12:01**

4    Q.   That's fine.                              12:01

5    **A.    -- still focused on trying to figure that     12:01**

6  **piece out.                                     12:01**

7    Q.   Okay.  Did you have an understanding when     12:01

8  you got personally involved in 2002, that there was     12:01

9  supposed to be parity or equivalence between the     12:01

10  amount Thelen would recover from a recovery in the     12:01

11  Quitam action, and the amount Thelen would retain as     12:02

12  its own fee pursuant to a fee-sharing agreement     12:02

13  relating to the CDOI action?                     12:02

14    **A.   I understand that the percentages Thelen     12:02**

15  **was to receive under the agreement to associate     12:02**

16  **counsel were negotiated against the backdrop that     12:02**

17  **there was already an existing agreement on Quitam.     12:02**

18  **So, obviously, that was an issue of negotiation.  As     12:02**

19  **far as whether or not it was supposed to be parity,     12:02**

20  **however, you define that, I don't recall that.     12:02**

21    Q.   Okay.  All right.  I hand you Exhibits     12:02

22  previously marked as numbers 9 and 10.  Here are     12:03

23  copies for your counsel.  For the record, Exhibit 9 is     12:03

24  an amendment to attorney-client agreement.  It says     12:03

25  "Draft" at the top, but it has initials and     12:03

1   signatures.                                12:03

2       And Exhibit 10 is an amendment to agreement    12:03

3   to associate counsel that is not signed by Mr.     12:03

4   Fontana.  It is signed by the other parties.       12:03

5       First, do you recall seeing these documents    12:03

6   or unsigned versions of these documents when you were    12:03

7   beginning to get personally involved in this matter in    12:04

8   2002?                                      12:04

9   **A.   I suspect I did.  And my hesitancy is I**       12:04

10  **certainly recall a 2001 agreement.  As I am looking at**    12:04

11  **two, the amendment to the attorney-client agreement**       12:04

12  **and the agreement to associate counsel, it would make**     12:04

13  **sense that I saw both.  But I don't have a specific**       12:04

14  **recollection of whether I saw both or simply saw a**        12:04

15  **2001 amendment.**                              12:04

16  Q.   Okay.  To the extent that matters, they are    12:04

17  often together?                                12:04

18  **A.   I know.**                                  12:04

19  Q.   Let me draw your attention now to paragraph    12:04

20  seven -- sorry, Exhibit 9, second page, paragraph       12:04

21  seven, which states that quote, "The attorney-client    12:05

22  agreement is further amended to state that Brunswick    12:05

23  has also been associated with the TR&P to render legal    12:05

24  services to RoNo and the client."              12:05

25      Do you see that?                           12:05

1     **A.    The first sentence of paragraph seven, yes,**     12:05

2  **you have read it.**                                12:05

3     Q.    And then you see an amendment to paragraph     12:05

4  7B of the attorney-client agreement to provide for     12:05

5  Brunswick to receive five-percent of any gross        12:05

6  recoveries that client or RoNo receives?              12:05

7     **A.    Correct.**                                 12:05

8     Q.    Now, this amendment to attorney-client       12:05

9  agreement says -- I'm turning back to page one, that  12:05

10  TR&P will substitute out as trial counsel in the RoNo  12:06

11  action, do you see that?  Sorry --                    12:06

12     **A.    Yes.**                                     12:06

13     Q.    -- paragraph two.                            12:06

14     **A.    I see that.  You have read it correctly.**     12:06

15     Q.    Sorry.  And at the end of paragraph one it   12:06

16  refers to TR&P remaining general counsel to RoNo and  12:06

17  counsel to client pursuant to the terms of the        12:06

18  attorney-client agreement; do you see that?           12:06

19     **A.    Correct.**                                 12:06

20     Q.    Do you have any understanding of why Thelen  12:06

21  remained general counsel to RoNo?                     12:06

22     **A.    My understanding was that there was an**     12:06

23  **attorney at Thelen by the name of Dana Fox who did all**     12:06

24  **of the things for RoNo that needed to be done to keep**     12:06

25  **it a valid corporation in good standing in California,**     12:06

1  and that that job of keeping RoNo a valid,                12:06

2  appropriately -- a corporation in good standing in        12:07

3  California, that was a task that we did.  And that's       12:07

4  what Dana Fox did.  That was my understanding.            12:07

5     Q.   Did you have any understanding either way         12:07

6  regarding whether Thelen wanted to remain general          12:07

7  counsel to RoNo so that it could direct the Beck           12:07

8  DeCorso firm with regard to its actions in the Quitam      12:07

9  matter?                                     12:07

10    A.   I can't speak to that either way.            12:07

11    Q.   You don't recall ever mentioning that          12:07

12 either way?                                 12:07

13    A.   Well, I certainly knew that Beck DeCorso       12:07

14 was in the Quitam action, and whether or not -- the       12:07

15 linkage of that to general counsel, I don't have an       12:08

16 understanding of that.  I mean, parties could agree       12:08

17 for Thelen to direct Beck DeCorso without attaching a     12:08

18 label to Thelen as general counsel, so that is my         12:08

19 difficulty.  I don't know if the term "general            12:08

20 counsel" was adopted so as to affect what you             12:08

21 described.                                   12:08

22    Q.   Okay.  And you don't have any recollection       12:08

23 one way or the other whether, in fact, Thelen did or       12:08

24 did not direct Beck DeCorso in litigation, correct?        12:08

25    A.   I don't really know what the extent of          12:08

1 **Thelen's interactions with Beck DeCorso were.**          **12:08**

2   Q.   Okay.  Let me now go right up to the very     12:08

3 beginning of this document, Exhibit 9, and I want to     12:08

4 draw your attention to the fact that it's actually an     12:08

5 agreement between Thelen, Reid and Prist, LLP, SCP     12:08

6 Brunswick and Associates and the individual executing     12:09

7 this agreement below as client; do you see that?     12:09

8   **A.   Yes, I do.**          **12:09**

9   Q.   And do you see that page 30 is signed by     12:09

10 Gary Fontana?          12:09

11   **A.   You are correct.**          **12:09**

12   Q.   Okay.  So, looking at this document now,     12:09

13 you don't have any doubt that, as least of this date,     12:09

14 Mr. Brunswick became associated with Thelen as counsel     12:09

15 to Marland and RoNo, do you?          12:09

16     **MS. THURM:** Objection to the form of the     12:09

17 question.          12:09

18     **THE WITNESS:** Here is what I don't     12:10

19 understand about your question.  I understand Phillipe     12:10

20 Brunswick had a relationship with Marland, and I     12:10

21 understand there were provisions made for his     12:10

22 compensation out of both pockets.          12:10

23     When you say "associated with Thelen," I am     12:10

24 not quite sure what you're trying to embrace on that.     12:10

25     **MR. HAYES:** Q.  Well, at a minimum I am     12:10

1  trying to embrace what is referred to in paragraph        12:10

2  seven on Exhibit 9.  But before we have my question        12:10

3  reread, I want to make sure I understand something in        12:10

4  the answer you just gave.  And I appreciate you        12:10

5  responded in part to my question and you asked me to        12:10

6  clarify another part.                                  12:10

7        You said that you understood Mr. Brunswick        12:10

8  was getting compensation out of both pockets, the        12:10

9  pockets being Thelen and Marland, correct?        12:10

10  **A.   Yes.**                                **12:11**

11  Q.   Okay.  Now let's have my question read back        12:11

12  read with the clarification that I am not necessarily        12:11

13  referring to anything more than what is generally        12:11

14  understood to be an association of one lawyer with        12:11

15  another lawyer, one firm with another firm, as stated        12:11

16  in paragraph seven of Exhibit 9.                12:11

17        (Whereupon, the record was read by the

18        Reporter.)                                12:12

19  **QUESTION:** "So, looking at this document now, you        12:09

20        don't have any doubt that, as least of        12:09

21        this date, Mr. Brunswick became        12:09

22        associated with Thelen as counsel to        12:09

23        Marland and RoNo, do you?"        12:09

24  **MS. THURM:** My objection still stands.        12:12

25  **THE WITNESS:** I have no doubt the obvious,        12:12

1    paragraph seven says what it says, and that phrase        12:12

2    associated with it is there.                              12:12

3          Other than that meaning that both Thelen            12:12

4    and Brunswick had an attorney-client relationship with    12:12

5    Marland, I am not sure what you're asking me.             12:12

6          And also, I see the percentages here in            12:12

7    that paragraph and I'm trying to recall what my          12:12

8    recollection was as to -- I knew Brunswick was getting    12:12

9    paid in the sense that he had a piece of the             12:12

10   contingency.  I don't recall what my understanding was   12:13

11   as to exactly how that was carved out between Marland    12:13

12   and Thelen.  I obviously knew Brunswick was getting a    12:13

13   piece of it.                                             12:13

14         **MR. HAYES:** Q.  Was it your understanding,      12:13

15   in the summer of 2002, that Mr. Brunswick was           12:13

16   providing independent advice to Mr. Marland?            12:13

17   **A.    Yes.**                                          **12:13**

18   Q.    And was it your understanding, in the             12:13

19   summer of 2002, that Mr. Brunswick was providing        12:13

20   advice to Mr. Marland regarding matters of California   12:13

21   law?                                                    12:13

22   **A.    On everything.**                                **12:13**

23   Q.    And when you say it was your understanding        12:13

24   Mr. Brunswick was providing independent advice, do you  12:13

25   mean to say it was your understanding in the summer of  12:13

1  2002 that Mr. Brunswick did not suffer from any          12:13

2  conflict of interest as between Thelen and Marland          12:14

3  when Mr. Brunswick provided advice to Mr. Marland?          12:14

4      **A.   I was not aware of any.**                         **12:14**

5      Q.   When you say you weren't aware of any, is          12:14

6  that because you were not aware that Mr. Brunswick was          12:14

7  already affiliated, or associated rather, with Thelen          12:14

8  pursuant to Exhibit 9?                          12:14

9      **A.   No, the reason why I say I was unaware of**          **12:14**

10 **it, if there was such a conflict, is that my**          **12:14**

11 **understanding when I went to Paris to renegotiate the**          **12:14**

12 **agreement, was European Counsel was going to get a**          **12:14**

13 **share of what Thelen got, and Mr. Brunswick, as part**          **12:14**

14 **of European Counsel was going to share in that piece**          **12:14**

15 **of what European Counsel got.**                    **12:14**

16      **And put another way, I thought that if the**          **12:15**

17 **situation was such that Marland didn't get anything,**          **12:15**

18 **then Brunswick wouldn't get anything, and the extent**          **12:15**

19 **that -- I thought their issues, interests were**          **12:15**

20 **aligned.  I thought that Brunswick and Marland's**          **12:15**

21 **interests were aligned in terms of what their**          **12:15**

22 **financial stake was, in terms of getting money from**          **12:15**

23 **the CDOI case through the Thelen contingency.**          **12:15**

24      Q.   Were you aware in the summer of 2002 that          12:15

25 Brunswick was, as you said a few minutes ago, getting          12:15

1  paid out of both pockets, or was that something that      12:15

2  you came to understand later?                             12:16

3      A.    My understanding was -- it wasn't as if we      12:16

4  were paying Brunswick an hourly rate or something.  It    12:16

5  was that Brunswick and Marland had a piece of Thelen's    12:16

6  contingency.  That was my understanding.  And if we       12:16

7  reduced European Counsel's compensation, then all of      12:16

8  the European Counsel will suffer.                         12:16

9      Q.    Well, you understood in the summer of 2002      12:16

10  that the European Counsel included Marland, Brunswick     12:16

11  and Maas, right?                                          12:16

12     A.    Correct.                                         12:16

13     Q.    Okay.  Did it occur to you to question why       12:16

14  Maas is not mentioned in Exhibit 9 and Brunswick is?      12:16

15     A.    No, because I assumed European Counsel had       12:16

16  their own arrangements that were none of my business,     12:17

17  and whether Marland was going to pay Maas, or             12:17

18  Brunswick was going to pay Maas, or she was doing it      12:17

19  pro bono, that really wasn't my business.  And I sort     12:17

20  of didn't think I was privy to what exactly their         12:17

21  arrangements were.                                        12:17

22     Q.    Given that understanding that you say you        12:17

23  had in the summer of 2002, I take it then you either      12:17

24  were not aware of, or attached no weight whatsoever to    12:17

25  the provisions of paragraph seven here in Exhibit 9,      12:17

1  or even the fact that it's an agreement between          12:17

2  Thelen, Brunswick, and Marland; is that right?          12:17

3     **A.   All right, the question again please.          12:18**

4     Q.   I will try to simplify it a little bit.          12:18

5          Given what you have said is your          12:18

6  understanding of the relationship among Marland, Maas,          12:18

7  and Brunswick in the summer of 2002, it's fair to say          12:18

8  that to the extent you were mindful at all of what was          12:18

9  set forth here in Exhibit 9, you understood it to          12:18

10  either restate facts that already existed, or to be          12:18

11  irrelevant, correct?          12:18

12     **A.   Correct.          12:18**

13     Q.   And now that we have been talking about it          12:18

14  a bit, I do want to re-ask the question.          12:18

15          Is it your best recollection of whether you          12:18

16  were really mindful of what was set forth here in          12:19

17  Exhibit 9 at all when you were negotiating with          12:19

18  Brunswick in the summer of 2002, can you tell us?          12:19

19     **A.   I can't recall if I was specifically aware          12:19**

20  **of the 47 point 505, I can't recall that.  I do recall          12:19**

21  **that Brunswick had a piece of the contingency.          12:19**

22     Q.   Right.  You don't recall whether that          12:19

23  five-percent piece came from some agreement among the          12:19

24  European Counsel themselves, or from some agreement          12:19

25  that involved Thelen, or some combination of those,          12:19

1  right?                          12:19

2  **A.    Correct.**                    **12:19**

3     Q.    And you were not thinking in the summer of    12:19

4  2002 that your negotiations with Brunswick were    12:19

5  affected in any way by the fact that he was associated    12:19

6  with Thelen pursuant to a September 2001 agreement,    12:19

7  correct?                        12:20

8  **A.    Associated with Thelen?  I did not view him    12:20**

9  **as associated with Thelen.  I viewed him as Marland's    12:20**

10 **attorney.**                        **12:20**

11    Q.    Okay.  Now, you left Thelen in November    12:20

12 2003?                          12:20

13 **A.    Correct.**                    **12:20**

14    Q.    That's when you resigned from the    12:20

15 partnership and became a judge essentially?    12:20

16 **A.    Correct.**                    **12:20**

17    Q.    Okay.  Let me just hand you a document and    12:20

18 ask you if you have seen it before.  It was previously    12:20

19 marked as Exhibit 13.  It says production number TR&P    12:20

20 7440.  It is an e-mail exchange among Katherine    12:21

21 McQueen, Karl Belgum, Gary Fontana, with copies to    12:21

22 Charles Dyke on June 18th, 2004.  Subject, Mr. X.  I    12:21

23 want to focus your attention on the statement by Mr.    12:21

24 Belgum in the middle message, which reads quote:    12:21

25        "Note, before we say anything to anyone    12:21

1    about representing Mr. X, be aware that         12:21

2    we continue to have a very serious               12:21

3    conflict of interest if we ever take            12:21

4    the position that we represent RoNo and          12:21

5    the Commissioner at the same time.               12:21

6    We are about to file a brief in the Cal         12:21

7    Supreme Court urging to the RoNo case            12:21

8    dismissal by MATS be upheld.  We                12:21

9    absolutely cannot be representing RoNo           12:21

10   at the same time.  If we do, we will be          12:21

11   giving the AG a huge stick to hit us            12:22

12   with on an ethical violation, and we            12:22

13   will deserve every whack we take.  We           12:22

14   will be right back in the same                  12:22

15   miserable suit we were in two years             12:22

16   ago.  This is very important."                  12:22

17   Do you see that statement?                      12:22

18   **A.   I definitely do.**                           **12:22**

19   Q.   Before you left the firm, do you recall any    12:22

20   of your partners at Thelen telling you that Thelen had    12:22

21   a very serious conflict of interest in representing    12:22

22   both RoNo and the Commissioner at the same time?         12:22

23   **MS. THURM:** Vague as to time.                  12:22

24   **THE WITNESS:** I recall -- first of all,        12:22

25   before I was involved in June of 2002, I had no        12:22

1   knowledge.  In the period I was involved from June of        12:23

2   '02 to November of '03, to the extent I had knowledge        12:23

3   on this, well, my understanding was that Thelen and        12:23

4   Marland had decided to switch horses from RoNo to the        12:23

5   CDOI litigation.  That was a joint decision, and both        12:23

6   believing that the best way to maximize the dollars        12:23

7   was to back the CDOI course.  And for that reason,        12:23

8   there wasn't a conflict.                    12:23

9           As to all of the steps between '99 and 2002        12:23

10  that got them there, I don't know if somewhere along        12:23

11  that line there was a serious conflict or not.        12:24

12          **MR. HAYES:** Q.  Okay.  Let me hand you a        12:24

13  document previously marked as Exhibit 8.  This is a        12:24

14  three-page document -- sorry, four pages with        12:24

15  production numbers with TR&P 995 through 998.  First        12:24

16  page is a September 19th, 2001 letter from Phillipe        12:24

17  Brunswick to Karl Belgum and Gary Fontana.  It refers        12:24

18  to an attached conflict letter which is dated        12:24

19  September 6th, 2001.  On the top signed September        12:24

20  18th, 2001 by Mr. Marland.  And last page is a        12:24

21  September 18th, 2001 agreement by Dana Fox on behalf        12:25

22  of LLC.                              12:25

23          Have you ever seen this document before,        12:25

24  sir?                                  12:25

25      **A.   Yes, I have.**                    **12:25**

1    Q.    Did you see it in the 2002 time period?        12:25

2    **A.    I believe I did.  I don't have a specific        12:25**

3    **recollection of when or how I saw it, but I believe I        12:25**

4    **saw it.                                        12:25**

5    Q.    Okay.  And do you recall learning, at the        12:25

6    time you saw the letter, that the conflict waiver Mr.        12:25

7    Marland had given specified, as indicated on the first        12:25

8    page, last paragraph in Mr. Brunswick's letter, quote,        12:25

9    "In case the consequences of the conflict of interest        12:25

10   cannot be avoided and TR&P can, therefore, not        12:25

11   continue to represent the client, RoNo and the        12:26

12   Commissioner, the priority shall be given by TR&P to        12:26

13   the client and RoNo, unless otherwise agreed by the        12:26

14   client."                            12:26

15        Do you see that?                        12:26

16   **A.    I see that.                        12:26**

17   Q.    Were you aware of that condition on the        12:26

18   waiver at the time you were personally involved in        12:26

19   this issue?                            12:26

20   **A.    I believe I saw this in that time frame,        12:26**

21   **and I believe I read it.  Beyond that, I am not sure        12:26**

22   **what you're asking me.                        12:26**

23   Q.    Do you recall mentally processing the        12:26

24   statement that is reflected in the last paragraph of        12:26

25   Mr. Brunswick's letter that Marland had given a        12:26

1   conflict waiver that was limited as stated in that        12:26

2   paragraph, that if there was an unavoidable conflict,      12:27

3   the priority should be given to the client RoNo unless     12:27

4   otherwise agreed to by Mr. Marland?                         12:27

5       **A.   I remember processing this to the extent        12:27**

6   **that I have no idea what that means.                      12:27**

7       Q.   Do you recall not understanding what that          12:27

8   meant when you read it?                                     12:27

9       **A.   I don't understand how to apply it.              12:27**

10      Q.   I see.  So you're not -- you recall reading        12:27

11  that and saying to yourself in words or substance,          12:27

12  "I'm not really sure what Brunswick means by that"?         12:27

13      **A.   I understand that Brunswick wants to have        12:27**

14  **some priority.  What that means in different              12:27**

15  **situations and how that works out when we have, we        12:27**

16  **both have an attorney-client relationship with the        12:27**

17  **Commissioner, and we both have fiduciary duties to the    12:27**

18  **department and the Commissioner, I have a hard time        12:28**

19  **sort of figuring out -- I did at the time -- what does    12:28**

20  **this mean?  If we both have a fiduciary duty to the       12:28**

21  **department, how do I give -- what does he expect me to    12:28**

22  **do in terms of giving priority to my co-counsel slash     12:28**

23  **client vis-a-vis our mutual client?                       12:28**

24      Q.   But you never asked Mr. Brunswick or Mr.           12:28

25  Marland to clarify this statement, did you?                 12:28

1    **A.  No.**                         12:28

2          **MS. THURM:** Object to the form of the        12:28

3    question.                          12:28

4          **MR. HAYES:** Q.  As far as you're aware,       12:28

5    Thelen never asked Mr. Brunswick or Mr. Marland to      12:28

6    clarify this statement?                  12:28

7    **A.   I know of no discussions about that        12:28**

8    **paragraph between Thelen and anyone among European       12:28**

9    **Counsel.**                       12:28

10   Q.   And speaking of fiduciary duties, you never    12:28

11   told anyone at the Department of Insurance that      12:29

12   Marland and Brunswick had purported to put some kind     12:29

13   of limitation on the conflict waiver, correct?       12:29

14   **A.   Correct.**                   12:29

15   Q.   As far as you're aware, no one else at     12:29

16   Thelen communicated that to the Department of      12:29

17   Insurance, correct?                   12:29

18   **A.   I don't know that.**              12:29

19   Q.   You're not aware of anyone at Thelen doing    12:29

20   that, are you?                    12:29

21   **A.   I have no personal knowledge of that having    12:29**

22   **been done.**                     12:29

23   Q.   Are you aware that the original conflict     12:29

24   waiver letter that Mr. Belgum sent to Mr. Brunswick     12:29

25   had a specific sentence in that specifying that in the     12:29

1   event of any actual conflict of interest, Marland     12:29

2   agreed that priority would be given to the       12:29

3   Commissioner and that that sentence was removed from    12:29

4   the final draft at Mr. Brunswick's or Mr. Marland's    12:29

5   insistence, were you aware of that at the time, sir?   12:29

6        **MS. THURM:** Objection.  Argumentative.    12:29

7        **THE WITNESS:** I was aware of reading the    12:29

8   cover letter to part 8 which Mr. Brunswick drafted,    12:29

9   and reading the attachment which Karl Belgum drafted.   12:30

10       **MR. HAYES:** Q.  My question --    12:30

11   **A.   And not getting it.**        **12:30**

12     Q.   My question is whether, after you didn't   12:30

13   get it, you checked or happened to see in any of the   12:30

14   prior drafts and noticed that a sentence Mr. Belgum    12:30

15   drafted specifying the priority be given to the     12:30

16   Commissioner had been removed from the final version?   12:30

17   **A.   I don't recall.  If the question is did I**    **12:30**

18   **recall seeing prior drafts of Karl Belgum's September**   **12:30**

19   **6th, 2001 letter, the answer is I may, but I don't**    **12:30**

20   **recall having seen it.  I may have but I don't recall**    **12:30**

21   **that I saw it.**        **12:30**

22     Q.   Okay.  If time allows, we may get to that   12:30

23   after lunch.  But right now it's 12:30.       12:30

24   **A.   Okay.**         **12:30**

25       **THE VIDEOGRAPHER:** The time is 12:30 p.m.    12:30

1  We are off the record.                    12:30

2       (Whereupon, the lunch recess was taken.)      13:24

3       A F T E R N O O N   S E S S I O N

4       **THE VIDEOGRAPHER:** The time is 1:24 p.m.      13:24

5  We are on the record.                    13:24

6       **MR. HAYES:** Q.  Good afternoon, Judge      13:25

7  Carvill.

8    **A.   Good afternoon, sir.**                 **13:25**

9    Q.   Let us resume with Exhibit 4, if you would,   13:25

10  the agreement to accessory counsel.            13:25

11   **A.   I have it.**                          **13:25**

12   Q.   Does this agreement have a provision for    13:25

13  termination in it anywhere where, sir?          13:25

14   **A.   I find no termination provision in it.**     **13:25**

15   Q.   It was your intention to have this          13:25

16  agreement be superseded by the new agreement you were    13:25

17  negotiating in 2002 which became the December 2002 new    13:26

18  agreement to associated counsel, correct?       13:26

19   **A.   Partially, partially correct.**            **13:26**

20   Q.   What part of the statement is incorrect?    13:26

21   **A.   My intent was to supersede all prior**        **13:26**

22  **agreements with either Mr. Marland or European Counsel**   **13:26**

23  **with a new agreement.**                       **13:26**

24   Q.   Okay, fair enough.  Now, let's turn -- oh,    13:26

25  sorry, let me just ask this then:  Apart from whatever    13:26

1  is provided for in the December 2002 new agreement to     13:26

2  associate counsel, are you aware of any other writing     13:26

3  that purports to terminate, or revoke, or appeal, or     13:27

4  dissolve the June 1999 agreement to associate counsel?     13:27

5    **A.    The agreement to associate counsel?  I am**     13:27

6  **aware of amendments to it, but I think we covered some**     13:27

7  **today.**                          13:27

8    Q.    Good point.                     13:27

9    **A.    I am not aware of a document that purports**     13:27

10  **to terminate it, other than the document that I was in**     13:27

11  **the process of negotiating with the European Counsel.**     13:27

12    Q.    Okay.  Let me hand you a document we     13:27

13  previously marked as Exhibit 11.                13:27

14    **A.    I have a copy of 8, did you mean to give me**     13:28

15  **another one of that.**                   13:28

16    Q.    No, this document is entitled "New     13:28

17  Agreement to Associated Counsel."  It does not have     13:28

18  production numbers on it.  I believe that's because it     13:28

19  was taken from the Exhibits to a court filing that     13:28

20  Thelen made.                        13:28

21        But, in any event, take whatever time you     13:28

22  need to look through it.  Tell me if you recognize it.     13:28

23    **A.    It looks to me like a true and correct copy**     13:28

24  **of the agreement that I negotiated between early June**     13:28

25  **and mid December 2002.**                 13:28

1    Q.    Okay.  Is that your signature on the last        13:28

2    page?                                                  13:28

3    **A.    Yes, sir.**                                    **13:28**

4    Q.    Okay.  Now, on the first page the third          13:29

5    "whereas" clause, do you see the reference to the       13:29

6    September 18th, 2001 amendment to the agreement to      13:29

7    associate counsel referred to in that clause as the     13:29

8    original agreement?                                     13:29

9    **A.    Yes, I see reference to original agreement.**   **13:29**

10   Q.    You see the reference to the September           13:29

11   18th, 2001 amendment?                                  13:29

12   **A.    Correct.**                                     **13:29**

13   Q.    And up in the very first recitation, do you      13:29

14   see the reference there to a September 18th, 2001       13:29

15   amendment to attorney-client agreement?                13:29

16   **A.    Yes, I do.**                                   **13:29**

17   Q.    Okay.  Now, on page six of the document          13:29

18   under paragraph G, subparagraph Roman numeral four, do  13:30

19   you see there is a reference there to the September     13:30

20   18th, 2001 amendment to the attorney-client agreement?  13:30

21   **A.    Yes, I do.**                                   **13:30**

22   Q.    Okay.  So, you not only negotiated this          13:30

23   document, you negotiate over a span of several months,   13:30

24   right?                                                  13:30

25   **A.    Correct.**                                     **13:30**

1    Q.   Okay.  You read multiple drafts of it?          13:30

**2    A.   Correct.                              13:30**

3    Q.   Okay.  You were aware at the time that you      13:30

4    signed it that the document referred to the September      13:30

5    18th, 2001 amendment to the attorney-client agreement?      13:30

**6    A.   Correct.                              13:31**

7    Q.   Okay.  What was your understanding at the       13:31

8    time of the purpose of paragraph G four on page six?       13:31

**9    A.   My understanding at the time was this was       13:31**

**10   an addition that European Counsel requested, and I        13:31**

**11   understood it to address the fact that Thelen had         13:31**

**12   previously done various things through Dana Fox of a       13:31**

**13   maintaining corporate status nature, and European         13:31**

**14   Counsel, being located in Paris or parts of Europe        13:31**

**15   rather than the United States, wanted us to do that.      13:32**

**16   And it is a point near the end and I said, fine, put      13:32**

**17   it in.                                13:32**

18   Q.   Was there a reason that was conveyed to you     13:32

19   for why the previously terminated attorney-client         13:32

20   agreement would be deemed to be reinstated and then        13:32

21   superseded as set forth in subparagraph four?      13:32

**22   A.   Was there a reason communicated to me, or       13:32**

**23   did I have an understanding?                      13:32**

24   Q.   Yes, first I'm asking was there a reason        13:32

25   communicated to you?                          13:32

1    A.   I can't recall if there was a reason          13:32

2 communicated to me.                              13:32

3    Q.   Did you have an understanding of the       13:32

4 purpose of this provision that the attorney-client      13:32

5 agreement would be reinstated and then superseded?      13:32

6    A.   My understanding was, although you didn't      13:32

7 have to do it this way, that they wanted us to assume     13:32

8 a role defined in that agreement.  While I wanted all      13:32

9 prior agreements just wiped off the board and have one     13:33

10 agreement that defined everything, they wanted us to      13:33

11 assume some task in the prior agreement.          13:33

12        Instead of trying to draft that task in       13:33

13 here, this was their way of saying, remember that       13:33

14 agreement that is being superseded, all right,        13:33

15 reinstate it, supersede it, but don't supersede it as     13:33

16 to this one function that we want continued.  And that    13:33

17 was their drafting.  I could have written it          13:33

18 differently, but that's what I thought was going on.     13:33

19    Q.   Uh-hum.  Focusing on the reinstatement, was     13:33

20 there any issue of preserving --                13:33

21    A.   Excuse me.                          13:33

22    Q.   Sure.  Focusing on the provision for        13:33

23 reinstating the previous attorney-client agreement,     13:33

24 was that based in any way on a concern to preserve the    13:33

25 attorney-client privilege?                     13:33

1    A.    I thought maybe that's a reason.  It didn't     13:34

2  seem like a reason to me, because -- oh wait, I'm     13:34

3  sorry.                                      13:34

4          My hesitancy is that I was thinking of the     13:34

5  question in terms of did they think that this had to     13:34

6  be in there to preserve past attorney-client     13:34

7  privileges.  And if that was what they were thinking     13:34

8  of, obviously you don't need to reinstate the     13:34

9  agreement for prior confidential communications to     13:34

10  remain confidential.  So that is what went through my     13:34

11  mind, but I don't know if that's what you're asking     13:34

12  me.  I'm sorry, I took a misstep.                13:34

13    Q.    That's all right.  Let me approach it this     13:34

14  way:  You sent a notice in July of 2002 giving what     13:35

15  you described as 30-days' notice of termination of     13:35

16  attorney-client?                              13:35

17    A.    Correct.                            13:35

18    Q.    Okay.  Did you have any concern in December     13:35

19  of 2002 that your communications with Mr. Brunswick     13:35

20  and/or Mr. Marland, after that notice of termination     13:35

21  took effect and before December 2002, might not be     13:35

22  privileged?                                  13:35

23    A.    Privileged as to whom?  Because they     13:35

24  continue to be European Counsel, so there was still an     13:35

25  umbrella of privilege as to our representation of the     13:35

1  **commission.**                                    **13:35**

2      Q.   Okay.  I appreciate you clarifying that.        13:35

3  So even though the attorney-client agreement was, as      13:36

4  you believed, terminated pursuant to the notice that      13:36

5  you had sent in the summer of 2002, the European         13:36

6  Counsel agreement continued up to the point when it      13:36

7  was superseded by this December 2002 agreement,          13:36

8  correct?                                    13:36

9      **A.   Correct.**                               **13:36**

10     Q.   Okay.  Was there any reason or purpose that    13:36

11  you were aware of for having this new agreement,         13:36

12  Exhibit 11, dated, or have an effective date of July     13:36

13  1, 2002 as indicated on the first page?                  13:36

14     **A.   I would have to look at the prior drafts to    13:37**

15  **be sure about this, but I think that is an artifact,      13:37**

16  **or may be an artifact from prior iterations where, at      13:37**

17  **one point, one of the formulas tied into invested        13:37**

18  **amount or the time spent before or after a certain       13:37**

19  **date was significant in the formula, so this may be an    13:37**

20  **artifact from one of those prior drafts in the formula    13:37**

21  **given there.  But I'm not sure.**                      **13:37**

22     Q.   Do you recall whether it was related in any     13:37

23  way to a desire to preserve or avoid any possible        13:37

24  challenge to the existence of attorney-client           13:38

25  privilege because the agreement was effective as the     13:38

1  date prior to when you sent the notice of termination?    13:38

2  **A.   I doubt that because, if I have a**    **13:38**

3  **communication with a nonclient and then later enter**    **13:38**

4  **into an attorney-client agreement with a retroactive**    **13:38**

5  **clause, insert the privilege based on it, I suspect I**    **13:38**

6  **would be taken to task about what was the intent of**    **13:38**

7  **the communication at the time.  So, I, you know --**    **13:38**

8  Q.   I am just asking.    13:38

9  **A.   I don't remember -- let's be precise, I**    **13:39**

10  **don't remember at the time having a July 1 date,**    **13:39**

11  **effective date in there for the purpose of preserving**    **13:39**

12  **a privilege.  I don't remember that.**    **13:39**

13  Q.   And your best recollection is that it might    13:39

14  have been related to some formula calculation, but you    13:39

15  are not sure about that either?    13:39

16  **A.   Right.  And the reason why I say -- well --**    **13:39**

17  Q.   Is that fair to say?    13:39

18  **A.   That's fair to say.**    **13:39**

19  Q.   Okay.  Now, the agreement didn't take    13:39

20  effect until and unless it was approved by the    13:39

21  Commissioner of insurance, correct?    13:39

22  **A.   Correct.**    **13:39**

23  Q.   Okay.  Do you recall proposing or drafting    13:39

24  severability clauses for this agreement?    13:39

25  **A.   I would have to look at it and see if it's**    **13:39**

1   there and what the language looks like to me.          13:39

2      Q.   Please do.  Take whatever time you think is     13:40

3   necessary.  If you find a severability clause, I would    13:40

4   appreciate you pointing it out.                      13:40

5      A.   I don't think there is one here.              13:40

6      Q.   I don't think so either.                     13:40

7      A.   I don't think there is one in it.             13:40

8          So the answer to your question is, no, I do    13:40

9   not remember drafting the severability clause.        13:40

10     Q.   Although, of course, the answer doesn't       13:40

11  necessarily follow from the fact that one isn't in     13:40

12  here?                                                13:40

13     A.   Correct, that doesn't necessarily follow,     13:40

14  but I realized I did not answer your question.  And I    13:40

15  didn't think I did, but if I looked at it and found it   13:40

16  then --                                              13:40

17     Q.   Yes.                                         13:40

18     A.   All right.                                   13:40

19     Q.   Yes, absolutely.                             13:40

20          But that's what I want to focus in on, do    13:40

21  you recall proposing or drafting a severability clause   13:40

22  that certain clauses would be severable, or certain    13:40

23  clauses would not be severable, or would take effect    13:40

24  or not take effect regardless of whether the         13:41

25  Commissioner approved the agreement?                 13:41

1    A.    I don't remember drafting such a clause, or    13:41

2 having a prior draft that had it.  We might look    13:41

3 through the drafts and find one, but I certainly don't    13:41

4 recall one at this time.                13:41

5    Q.    Okay.  Now -- actually, I want to come back    13:41

6 to page six to that clause G.  I want to ask you about    13:41

7 subparagraph five.                13:41

8    A.    Yes.                13:41

9    Q.    Subparagraph five reflects an agreement for    13:41

10 Thelen to provide legal services to Marland in the    13:41

11 future if certain events happen, correct?        13:41

12    A.    Correct.                13:41

13    Q.    Would you characterize that as a kind of    13:41

14 attorney-client agreement?            13:41

15    A.    I didn't think about it at the time.  I    13:42

16 remember how this got there, but I don't remember a    13:42

17 process of saying or thinking, now, does this -- is    13:42

18 this an attorney-client agreement here?  I don't    13:42

19 recall going through that process.        13:42

20    Q.    Okay.                13:42

21    A.    I recall the history of that clause, and    13:42

22 that history does not, would not lead me there.    13:42

23    Q.    Well, paragraph four reflects the    13:42

24 reinstatement of an attorney-client agreement for, at    13:42

25 least, some purposes, correct?        13:42

1    **A.    To RoNo, yes.**                    **13:42**

2    Q.    Okay.  And this September 18, 2001          13:42

3    amendment to the attorney-client agreement we looked      13:42

4    at earlier today -- it's Exhibit 9 if you want to look      13:42

5    at it again.                              13:43

6    **A.    All right.**                      **13:43**

7    Q.    It refers to -- right underneath "Recital,"     13:43

8    the very first recital refers to an attorney-client      13:43

9    agreement dated February 17th, amended June 2nd, 1999,     13:43

10   right, in the very first recital?              13:43

11   **A.    In the very first recital, yes, February     13:43**

12   **17, amended June 2nd.**                   **13:43**

13   Q.    On page two of Exhibit 9, paragraph nine      13:43

14   states that all other terms of the attorney-client      13:43

15   agreement not directly contradicted by the terms of      13:43

16   this agreement remain unchanged.  Do you see that?      13:43

17   **A.    Yes, I do.**                      **13:43**

18   Q.    And if you want to take out the          13:43

19   attorney-client agreement, Exhibit 2, I will direct      13:43

20   your attention to page six, paragraph 23, "Arbitration    13:44

21   of Disputes."  Do you see that?              13:44

22   **A.    I see that.**                      **13:44**

23   Q.    Okay.  You understood in 2002 that Thelen     13:44

24   and Marland had agreed to arbitrate any disputes about    13:44

25   the attorney-client agreement, right?          13:44

1       **MS. THURM:** Object to the form of the        13:44

2  question.                                  13:44

3       **THE WITNESS:** All I can tell you is that I        13:44

4  recall knowing in 2002 that there was an arbitration        13:44

5  clause in the original attorney-client agreement.        13:44

6       **MR. HAYES:** Q.  Okay.  And did you take any        13:44

7  steps in 2002 to provide for the recision of the        13:44

8  arbitration agreement contained in the original        13:45

9  attorney-client agreement, notwithstanding the fact        13:45

10 that paragraph G4 was reinstating RoNo's role as        13:45

11 counsel, general counsel to RoNo -- I'm sorry,        13:45

12 Thelen's role as general counsel to RoNo?        13:45

13      **A.   I think I understand your question, and if**        **13:45**

14 **I do, the answer is yes.**                       **13:45**

15      Q.   What steps did you take to rescind the        13:45

16 arbitration agreement in the February 1999        13:45

17 attorney-client agreement notwithstanding the        13:45

18 reinstatement of that agreement to the extent that        13:45

19 Thelen was serving as general counsel to RoNo?        13:45

20      **MS. THURM:** Object to the form of the        13:45

21 question.                                  13:45

22      **THE WITNESS:** I drafted and then received        13:45

23 European Counsel's suggestions and worked on further        13:45

24 drafts of a new agreement, the purpose of which was to        13:45

25 supersede and replace all agreements.  And near the        13:46

1  end I accepted one modification, and that was -- on    13:46

2  the issue of prior agreements, and that was, all    13:46

3  right, we'll do the general counsel, meaning, that    13:46

4  Dana Fox will do these functions.    13:46

5       That is the only part of the prior    13:46

6  agreements I understood survived.  Because we    13:46

7  undertook that duty, it's immediately superseded.    13:46

8     Q.   I'm sorry, the last sentence you said    13:46

9  because we undertook that duty.    13:46

10     **A.   Let me get the language.  I was looking for**    13:46

11  **the language.**    13:46

12     Q.   Sure.    13:46

13     **A.   It was reinstated and immediately**    13:46

14  **superseded except for one narrow function, and that**    13:47

15  **was the Dana Fox role.  So I believe, rightly,**    13:47

16  **wrongly, I believe that everything prior was over**    13:47

17  **except to the extent that we had to do the Dana Fox**    13:47

18  **function.**    13:47

19     Q.   Well, if I could use that phrase of yours    13:47

20  for current purposes, the Dana Fox function, or Dana    13:47

21  Fox role, it was your understanding when you signed    13:47

22  this December 2002 agreement that if there was some    13:47

23  dispute over what Dana Fox did or didn't do, or should    13:47

24  or shouldn't have done, that pursuant to the clause G4    13:47

25  here in the December 2002 agreement, and the provision    13:47

1  which refers to the September 2001 amendment, which      13:47

2  specifies that all other provisions in the February      13:48

3  1999 agreement are unchanged, that that dispute over      13:48

4  what Dana Fox did or didn't do, or should or shouldn't      13:48

5  have done would be subject to arbitration, correct?      13:48

6      **A.   I never considered that issue.**      **13:48**

7      Q.   You had in mind specifically an intention      13:48

8  to supersede the arbitration clause in the February      13:48

9  1999 agreement when you were drafting this December      13:48

10  2002 agreement?      13:48

11      **A.   I had the intention to supersede, to**      **13:48**

12  **replace everything, and only at the end when I**      **13:48**

13  **received in this sort of a last punch list, something**      **13:48**

14  **from Brunswick where Brunswick wanted us to assume**      **13:48**

15  **that role, which I understood was the Dana Fox role, I**      **13:48**

16  **said okay.**      **13:48**

17      Q.   Okay.  Respectfully, sir, I'm not sure you      13:48

18  answered my question.  If you understood --      13:49

19      **A.   Here is why I'm putting it this way.  When**      **13:49**

20  **I received that suggestion from Phillipe Brunswick, I**      **13:49**

21  **did not sit down and try to figure out how much**      **13:49**

22  **baggage from prior agreements that might draw in.  So**      **13:49**

23  **I didn't have a view of it then.  I didn't think about**      **13:49**

24  **it.  I'm telling you, the only thing I thought about**      **13:49**

25  **was, okay, to the Dana Fox function.**      **13:49**

1    Q.    I understand.  I thought you had intended    13:49

2  or implied something different in a previous answer.    13:49

3  I may have misunderstood you.    13:49

4    **A.    No, okay.**    **13:49**

5    Q.    Let me make sure I understand.  Let me try    13:49

6  it this way then -- actually, if I may, being a lawyer    13:49

7  and focusing on arbitration issues, let me recall to    13:49

8  your mind that well-settled legal principal that a    13:49

9  party cannot validate an arbitration agreement on the    13:50

10  grounds that the entire contract was procured by    13:50

11  fraud.  The party has to allege and prove that the    13:50

12  arbitration agreement within the contract itself was    13:50

13  procured by fraud.  You are familiar with that rule    13:50

14  from Prime and Paint (phonetic)?    13:50

15    **A.    I understand what you're saying.  I am not**    **13:50**

16  **agreeing or disagreeing.  I understand.**    **13:50**

17    Q.    You have heard of it?    13:50

18    **A.    That position.**    **13:50**

19    Q.    And you're familiar with Prime and Paint?    13:50

20    **A.    I've heard of it.**    **13:50**

21    Q.    Fine.

22    **A.    Whether I'm prepared to answer questions**    **13:50**

23  **about it, Prime and Paint --**    **13:50**

24    Q.    I am not going to ask you any questions    13:50

25  about Prime and Paint.  I was trying to give context.    13:50

1  If it's not helpful, I will stop.                          13:50

2      **A.    The reason why I am saying this is I didn't      13:50**

3  **consider it.  So you're asking me to testify as to        13:50**

4  **what was my view when I was drafting these agreements,     13:50**

5  **as to what the effect was with putting this in at the      13:50**

6  **end given the arbitration clause, I will tell you I        13:50**

7  **didn't consider it.                          13:51**

8      Q.    That's it almost exactly.  Let me just now      13:51

9  try to restate it.                          13:51

10     **A.    Okay.                          13:51**

11     Q.    Understanding that you were trying to        13:51

12  replace all prior agreements between the parties with      13:51

13  a new agreement?                          13:51

14     **A.    Correct.**

15     Q.    Apart from that, you did not have in mind      13:51

16  in drafting the December 2002 agreement, any further      13:51

17  and specific thought of rescinding, or revoking, or      13:51

18  dissolving the agreement for arbitration of disputes      13:51

19  that was contained in the February 1999 agreement?      13:51

20     **A.    Sure I did.                          13:51**

21     Q.    You did?                          13:51

22     **A.    In the sense that I knew there was an        13:51**

23  **arbitration clause here.  And as the person who        13:51**

24  **initially drafted the new agreement to associate        13:51**

25  **counsel, I didn't include it.                          13:51**

1    Q.    Okay.  So you were aware that was a clause,    13:51

2    and you wanted to not have that kind of clause in the    13:51

3    new agreement?                    13:51

4    **A.    It was not among the list of clauses I        13:51**

5    **chose to put in the new agreement.            13:52**

6    Q.    Indeed, okay.  But then did it occur to you    13:52

7    or not that when you agreed to Brunswick's suggestion    13:52

8    that is reflected here in paragraph G4, you were    13:52

9    reimporting the arbitration agreement from the    13:52

10    February 1999 attorney-client agreement?        13:52

11    **A.    And my answer, I think I have said it three    13:52**

12    **times now, is it that I did not think about it.  So,    13:52**

13    **how can I tell you that, yes, I believed I was, or no,    13:52**

14    **I believed I wasn't.                13:52**

15    Q.    No --                    13:52

16    **A.    It never crossed my mind.            13:52**

17    Q.    Okay.  But, you had an intention to get rid    13:52

18    of it and you didn't realize you were importing it    13:52

19    back in?                    13:52

20    **A.    I'm not agreeing? --                13:52**

21    **MS. THURM:** Objection to the form of the

22    question.  Excuse me.  Assumes facts not in evidence    13:52

23    and argumentative.                13:52

24    **THE WITNESS:** I am not agreeing that I    13:52

25    imported it or that I didn't import it.  I am saying    13:53

1  my intention was not to include it when I initially         13:53

2  drafted it, and a later point I agreed to a language         13:53

3  change.  When I agreed to that language change, I gave     13:53

4  no consideration to that point.                        13:53

5      **MR. HAYES:** Q.  Okay.                        13:53

6      **A.    And you or someone else can fault me for**         **13:53**

7  **that, and Counsel and Thelen and you can argue the**         **13:53**

8  **significance of that, but as a percipient witness, my**         **13:53**

9  **testimony is I didn't consider it.  It didn't cross my**         **13:53**

10  **mind.**                                    **13:53**

11      Q.    I am asking now for your nonexpert opinion     13:53

12  testimony, looking at this clause with the other         13:53

13  agreements in front of you, would you agree that to         13:53

14  the extent there is a dispute about what you refer to         13:53

15  as the Dana Fox role, that dispute is subject to         13:53

16  arbitration?                                13:54

17      **A.    Let me tell you why I will not answer that**         **13:54**

18  **question.  And that is, since I have taken the bench,**         **13:54**

19  **I have had numerous occasions to read the law in**         **13:54**

20  **arbitration agreements and make rulings on motions to**         **13:54**

21  **compel arbitration.  There is no way I can answer what**         **13:54**

22  **my thoughts were then on that if I formed an opinion**         **13:54**

23  **back then, which I didn't.  But to answer that**         **13:54**

24  **question today in terms of my current knowledge, I**         **13:54**

25  **would be answering in terms of my experience as a**         **13:54**

1    bench officer based on the motions to compel            13:54

2    arbitration and the rulings I have made on that.  And        13:54

3    I don't think that is within the province of what a          13:54

4    percipient witness is called upon to do.                13:54

5        Q.    Is there a rule or statute that you are        13:54

6    aware of which prevents you from answering my            13:55

7    question?                                13:55

8        A.    I believe you're asking for expert           13:55

9    testimony.                                13:55

10       Q.    What rule prevents you from answering my        13:55

11   question because you believe I am asking for expert        13:55

12   testimony?                            13:55

13        MS. THURM: Objection.  The question is            13:55

14   argumentative.                        13:55

15        THE WITNESS: I'm not going there, in part        13:55

16   because if I were to offer an opinion on this, or if I      13:55

17   were to decide a case on this motion, I would go back      13:55

18   and read the authorities, with this in mind, and try      13:55

19   to come up with a reasoned analysis on it.  I don't        13:55

20   think that is my job as a percipient witness.            13:55

21        MR. HAYES: Q.  I am not asking you to go          13:56

22   back and read anything, sir.  I am just asking why you      13:56

23   believe you cannot answer the question?                13:56

24        MS. THURM: The witness has stated his            13:56

25   reason.  The question is asked and answered.  The        13:56

1   witness has given you the best testimony he feels          13:56

2   comfortable giving, so.                          13:56

3          **MR. HAYES:** Wendy, we can all agree that          13:56

4   because the witness has said it that he is not          13:56

5   answering the question.

6          **MS. THURM:** That's right.

7          **MR. HAYES:** It's wrong to say --          13:56

8          **MS. THURM:** You've asked it four times and          13:56

9   he can provide that same answer.                      13:56

10         **MR. HAYES:** Wendy, that' not what I'm          13:56

11  doing --

12         **MS. THURM:** You can spend your seven hours          13:56

13  that way, Andrew, or --                          13:56

14         **MR. HAYES:** Wendy --

15         **MS. THURM:** -- you can go on.

16         **MR. HAYES:** -- I am trying to understand          13:56

17  all of the bases that the witness is asserting for          13:56

18  refusing to answer the --                          13:56

19         **MS. THURM:** I think he has answered it.          13:56

20         **MR. HAYES:** I'm sorry, I hadn't finished          13:56

21  talking.  No, he hasn't, okay, he said one thing, then          13:56

22  has expanded on it.  I am allowed to make my record          13:56

23  about why the witness does not believe it is          13:56

24  appropriate for him to answer the question.  He may be          13:56

25  right.  But, I am still entitled to make my record,          13:56

1   and that is what I am trying to do.  And starting to          13:57

2   chime in about asked and answered three times is             13:57

3   inappropriate.  It is a simple question --          13:57

4        **MS. THURM:** Is it inappropriate --          13:57

5        **MR. HAYES:** Stop talking over --          13:57

6        **MS. THURM:** It's inappropriate --          13:57

7        **MR. HAYES:** Forget it.  Wendy, you're going

8   to let me finish, okay, that's how it's going to work.    13:57

9        **MS. THURM:** Okay, Andrew.          13:57

10        **MR. HAYES:** I am not finished.          13:57

11        **MS. THURM:** Why don't you finish?  Go          13:57

12  ahead.                         13:57

13        **MR. HAYES:** Thank you.  I would simply like     13:57

14  to make sure we have a clear and complete record on it      13:57

15  without your feeling that you need to make speaking          13:57

16  objections or interrupt me repeatedly, as you have          13:57

17  just done in the last couple of minutes.  Can I do          13:57

18  that now please?                    13:57

19        **MS. THURM:** Go ahead, Andrew.  Finish your     13:57

20  speech and then I'll make mine, and then the witness        13:57

21  can answer the question for the 15th time.          13:57

22        **MR. HAYES:** Actually, I was going to have     13:57

23  the question read back again.  If you want to make a       13:57

24  speech, go ahead.

25        **MS. THURM:** Are you done now?          13:57

1      **MR. HAYES:** Can we have the question read        13:57

2  back please?                                    13:57

3      **MS. THURM:** Okay.                        13:58

4      (Whereupon, the record was read by the

5      Reporter.)

6  **QUESTION:** "What rule prevents you from answering my        13:55

7      question because you believe I am              13:55

8      asking for expert testimony?"                  13:55

9      **MR. HAYES:** Go ahead and read the answer.

10     (Whereupon, the record was read by the

11     Reporter.)

12 **ANSWER:**    "I'm not going there, in part because if I        13:55

13     were to offer an opinion on this, or if        13:55

14     I were to decide a case on this motion,        13:55

15     I would go back and read the              13:55

16     authorities, with this in mind, and try        13:55

17     to come up with a reasoned analysis on          13:55

18     it.  I don't think that is my job as a        13:55

19     percipient witness."                        13:55

20     **MR. HAYES:** What did I say after that?

21     (Whereupon, the record was read by the

22     Reporter.)

23 **QUESTION:** "I am not asking you to go back and read        13:56

24     anything, sir.  I am just asking why            13:56

25     you believe you cannot answer the              13:56

1    question?"                          13:56

2          **MR. HAYES:** That's when Wendy interrupted.

3          **MS. THURM:** No, that's when Wendy made        13:59

4    objections, just like all the objections that you made      13:59

5    at Mr. Marland's deposition and Mr. Chateau's          13:59

6    deposition, and I am sure you will do at Mr.           13:59

7    Brunswick's deposition when questions are asked more       13:59

8    than one time over.                     13:59

9          Mr. Marland had the benefit of not only       13:59

10   hearing the questions in English but in French several     13:59

11   times, and on many occasions you objected that Mr. Van    13:59

12   Ness' questions were asked and answered and encouraged   13:59

13   him to move along.  Sometimes he followed your          14:00

14   instructions -- your request and sometimes he didn't.     14:00

15   I have every right to sit here and make the same         14:00

16   objection.  And it's the only time I have counseled       14:00

17   you not to get overly aggressive with the witness and     14:00

18   to move on, which is fewer times than happened          14:00

19   certainly in Mr. Marland's deposition.  The witness       14:00

20   can provide any additional information. He is welcome    14:00

21   to do that.                          14:00

22          **THE WITNESS:** Do you want me to go on, or      14:00

23   do you want to ask a question, or do you want to talk     14:00

24   to her?                             14:00

25          **MR. HAYES:** Q.  I wanted to finish what I       14:00

1  was saying --                                    14:00

2  **A.   Okay.**                                   **14:00**

3  Q.    -- when I was interrupted.              14:00

4  **A.   I am listening.  You have my attention,**     **14:00**

5  **sir.**                                        **14:00**

6  Q.   Thank you.                              14:00

7       (Whereupon, the record was read by the

8       Reporter.)

9  **QUESTION:** "I am not asking you to go back and read      14:01

10      anything, sir.  I am just asking why          13:56

11      you believe you cannot answer the           13:56

12      question?"                               13:56

13      **MR. HAYES:** Q.  Let's do it this way, sir,     14:01

14  Exhibit 2, the attorney-client agreement contains an      14:01

15  arbitration clause, correct?                    14:01

16  **A.   Correct.**                               **14:01**

17  Q.   Exhibit 9, the amendment to attorney-client    14:01

18  agreement does not rescind or revoke the arbitration     14:01

19  clause in the February 1999 attorney-client agreement,     14:01

20  correct?                                    14:02

21  **A.   Correct.**                               **14:02**

22  Q.   Paragraph G4 of Exhibit 11 in the December     14:02

23  2002 new agreement to associate counsel specifies that     14:02

24  the attorney-client agreement shall be immediately     14:02

25  superseded by this new agreement except that TR&P     14:02

1  shall resume its role as general counsel to RoNo as          14:02

2  provided in the September 18, 2001 amendment to the          14:02

3  attorney-client agreement, correct?          14:02

4     **A.   Correct.**          **14:02**

5     Q.   Okay.  Can you give us any reason why          14:02

6  disputes regarding TR&P's service to RoNo as general          14:02

7  counsel as provided in the September 18th, 2001          14:02

8  amendment to the attorney-client agreement would not          14:02

9  be subject to arbitration?          14:02

10    **A.   I could become an advocate here and try to**          **14:03**

11 **use what I know about this subject to make an argument**          **14:03**

12 **based on my current knowledge, or I could undertake,**          **14:03**

13 **as I would as a bench officer, to do research and come**          **14:03**

14 **up with a correct answer, or I can do what I think a**          **14:03**

15 **percipient witness is obligated to do, which is, to**          **14:03**

16 **tell you what I thought at the time that I was**          **14:03**

17 **involved in the underlying events.  I think that's all**          **14:03**

18 **I am obligated to do.**          **14:03**

19    Q.   Okay.  From what you have just said, am I          14:03

20 correct in understanding that there is nothing about          14:03

21 your current position as a judicial officer as such          14:03

22 that prevents or excuses you from answering my          14:03

23 question?          14:04

24    **A.   I am not asserting my privilege as a bench**          **14:04**

25 **officer, if that's what you're asking.  I am not**          **14:04**

1  **asserting any privilege as a bench officer.**

2      Q.   I am asking that and also privilege in the       14:04

3  broadest possible sense, yes, sir, that is what I was       14:04

4  asking.                          14:04

5      **A.   Well, privilege in the broader sense to the     14:04**

6  **extent that it might call upon me to draw upon          14:04**

7  **discussions I have had or may have had with people        14:04**

8  **since this dispute arose, I mean, you know, it's         14:04**

9  **theoretically possible I advanced an argument that was     14:04**

10  **an attorney-client issue, all right, but I'm not going    14:04**

11  **to go there and discuss whether that's a problem or       14:05**

12  **not, but I am not asserting any privilege.             14:05**

13      Q.   Okay.  I believe I have now understood          14:05

14  fully and completely your reasons for not answering       14:05

15  the question.  Is there any other reason or?             14:05

16      **A.   No, no.                         14:05**

17      Q.   Thank you, very much.                  14:05

18      **A.   I respect the fact I may be wrong and you      14:05**

19  **may get Judge Walker, his Honor, to take me to task on    14:05**

20  **it.                               14:05**

21      Q.   And he might then turn out to be wrong.  We     14:05

22  are all just trying to do the right thing, so let's       14:05

23  move on.                           14:05

24      **A.   A judge can be wrong in a deposition.  He      14:05**

25  **isn't wrong in court.                    14:05**

1    Q.    With Judge Walker, I will stipulate to        14:05

2    that.  All right, let's move on, sir.        14:05

3        Now, page seven, paragraph C1 --        14:05

4    **A.    Yes, sir.**        **14:05**

5    Q.    -- I just want to make sure that what you        14:05

6    have said before covers this.  I believe it does, but        14:05

7    let's be clear.  The representation by counsel that is        14:06

8    referred to here, you understood that European Counsel        14:06

9    was relying on Brunswick and perhaps also Miss Maas        14:06

10   and Mr. Marland themselves; is that right?        14:06

11   **A.    And Francois Chateau.**        **14:06**

12   Q.    And Chateau, okay.        14:06

13   **A.    And there may have been others, but those        14:06**

14   **are the only ones I can name as possibilities.  I        14:06**

15   **guess Beck DeCorso, but --**        **14:06**

16   Q.    You -- I don't mean to interrupt you.        14:06

17   **A.    When I say "Beck DeCorso," I only say that        14:06**

18   **because I know that they were involved in the matter,        14:06**

19   **but I have no knowledge on that subject in terms of --        14:06**

20   **as far as I know, they were in daily communication        14:06**

21   **with Beck DeCorso, or never said a word to them, I        14:06**

22   **have no idea.**        **14:06**

23   Q.    Usually one tells a witness not to        14:06

24   anticipate the next question, but when you answer it,        14:07

25   I don't think I should chide you for it.        14:07

1  **A.   Okay.**                          14:07

2  Q.   Nevertheless, to the -- you did have in         14:07

3  mind when you drafted and reviewed this clause that        14:07

4  the European Counsel were, in fact, relying             14:07

5  exclusively on their own counsel?               14:07

6  **A.   Correct.**                        14:07

7  Q.   Okay.  Did you not have any specific         14:07

8  understanding that they were relying on Beck DeCorso,     14:07

9  although, as you say, they may have been?         14:07

10  **A.   Correct.**                       14:07

11  Q.   Okay.  The second sentence in this         14:07

12  representation by counsel clause refers to -- states,     14:07

13  "That Marland is specifically waiving any conflict       14:07

14  that might otherwise arise from the fact that TR&P       14:07

15  represented him with respect to the RoNo action."        14:07

16      Do you see that?                    14:08

17  **A.   Yes.**                          14:08

18  Q.   Did you consider this clause to be a         14:08

19  waiver -- a conflict waiver that complied with the       14:08

20  California Rules of Professional Conduct in and of       14:08

21  itself, or did you believe that this was restating a      14:08

22  waiver that had already been given in the fall of       14:08

23  2001, or something else?                 14:08

24  **A.   I can certainly say that when I drafted       14:08**

25  **this agreement, my view was that Thelen could not rely     14:08**

1    on any prior waivers, be it the '01 you referred to or    14:08

2    something else, in other words, all of that was behind    14:08

3    us.  And so it certainly wasn't my intent here to be    14:09

4    in a position to argue that, in executing this    14:09

5    agreement, somehow we could rely on a waiver executed    14:09

6    at some other time because we were replacing    14:09

7    everything.  Does that answer your question?  It    14:09

8    answers part of it.    14:09

9        Q.    It's responsive and I am happy to then    14:09

10    follow up.    14:09

11        Did you believe that this clause alone or    14:09

12    together with other provisions of this agreement met    14:09

13    the requirements for a conflict waiver under the    14:09

14    California Rules of Professional Conduct?    14:09

15        A.    Two things, when the agreement was    14:09

16    executed, I didn't think there was a need for a    14:10

17    conflict waiver because, at that time, he was not a    14:10

18    client.  Why is it here?  Because we started this    14:10

19    drafting process at a time when he was a client.    14:10

20        Q.    So I take it from your answer that by the    14:10

21    time this was executed, you did not have an    14:10

22    understanding that this clause, in and of itself, or    14:10

23    this agreement as a whole, constituted a valid and    14:10

24    enforceable conflict waiver under the California Rules    14:10

25    of Professional Conduct, correct?    14:10

1      **MS. THURM:** Objection to the form of the      14:10

2   question.                              14:11

3      **THE WITNESS:** No, at the time prior to the      14:11

4   termination of the attorney-client relationship, I was      14:11

5   trying to get a valid waiver in the agreement.  By the      14:11

6   time it was executed and there was no longer an      14:11

7   attorney-client agreement, then it follows as night      14:11

8   after day, of course it was a valid waiver because      14:11

9   there was nothing needed for there to be a valid      14:11

10  waiver.  In other words, if you start and if you are      14:11

11  in an attorney-client situation, and you're -- back      14:11

12  up.                                    14:11

13      First of all, this was started at a time      14:12

14  that he was a client, and that was the origin of      14:12

15  these.                                 14:12

16  Q.   Understood.                       14:12

17  **A.   At the time we executed it, he was not a      14:12**

18  **client.  It anticipated -- the agreement did      14:12**

19  **anticipate two situations where there might be a need      14:12**

20  **for a waiver.      14:12**

21      **As to the clause that you have previously      14:12**

22  **shown me, that had to do with what happens down the      14:12**

23  **road.  There is a challenge to money going to him.      14:12**

24  **This was not a valid waiver of that.  It couldn't be      14:12**

25  **because we didn't know who would file the lawsuit.      14:12**

1          If at the time the firm's largest client,      14:12

2  or any client filed a lawsuit, I mean, we couldn't      14:12

3  deal with that possibility of a future retention for      14:13

4  that role with any kind of a waiver.          14:13

5     Q.   Uh-hum.                    14:13

6     A.   As to the general counsel role, I did not      14:13

7  believe there was a conflict to waive, so I'm not sure   14:13

8  if I considered this as a valid waiver of a conflict     14:13

9  that you might posit coming out of that if, at the       14:13

10 time, I didn't think it was a conflict.  I think I       14:13

11 have addressed each of the arms and legs, but I may      14:13

12 have missed something.                 14:13

13    Q.   Well, you have been very responsive.  I      14:13

14 want to explore one avenue.  I think we can do it very   14:14

15 briefly to save time, but I still have to ask the       14:14

16 question.                        14:14

17         Are you able to tell us today whether you      14:14

18 believe this clause is a valid conflict waiver of any    14:14

19 conflicts that may have existed at the time the         14:14

20 agreement was signed?                 14:14

21         MS. THURM: Objection.  Incomplete          14:14

22 hypothetical and calls for speculation.  Calls for a    14:14

23 legal conclusion.                   14:15

24         THE WITNESS: Here is my problem, at that     14:15

25 time I didn't think there was a conflict.  I am not     14:15

1   sure today I know anything different than I knew then,      14:15

2   so, I don't know why the present tense would be            14:15

3   different.                                    14:15

4        But if you're assuming I know something and          14:15

5   that that is addressing your assumption, I have a          14:15

6   problem with that because, I don't know -- I know, for     14:15

7   example, there was a lot of water that went under the      14:15

8   bridge after I left, and I don't know the details of       14:15

9   that.  So I don't know if you're assuming I know some      14:15

10  of that in answering today and is giving you an answer     14:15

11  as to whether this is an effective waiver of that,         14:15

12  when I don't know what "that" is.  Do you see my           14:15

13  problem?                                      14:16

14      Q.   I do.  That was my next follow up, my next        14:16

15  avenue.  Let me do that.  I may come back to this          14:16

16  question.                                     14:16

17        Did you understand at the time, December of          14:16

18  2002, that to the extent that this clause was a waiver     14:16

19  of anything, that it was a prospective waiver, or just     14:16

20  a historical waiver -- let me rephrase it.                 14:16

21        Did you understand in December 2002 that            14:16

22  this clause was intended to be a valid and effective       14:16

23  waiver of potential future conflicts?                     14:16

24      **A.   I'm going to have to ask you to state the         14:17**

25  **question again because I have been reading that clause    14:17**

1  trying to recapture what I thought then.                14:17

2     Q.   Sure.                          14:17

3     A.   So now can you restate the question?           14:17

4     Q.   Let me also go back to another part of your    14:17

5  testimony.  It was your understanding by late 2002      14:17

6  that Marland's interest and Thelen's were aligned?      14:17

7     A.   Correct.                       14:17

8     Q.   Because Marland's interest was in having        14:17

9  the Commissioner achieve maximum recovery in his case   14:17

10  to maximize the amount of fees that would go to Thelen  14:17

11  and then be shared with Marland and European Counsel?   14:17

12     A.   Correct, as far as that was my thought         14:17

13  process at the time.                     14:18

14     Q.   Right.  So as you said, I believe, earlier     14:18

15  today, you didn't understand what this reservation was  14:18

16  in the last paragraph of the Exhibit 8, Mr.            14:18

17  Brunswick's letter, so Exhibit 8 is Mr. Brunswick's     14:18

18  September 19th letter?                    14:18

19     A.   Right, right, right.            14:18

20     Q.   You didn't understand what he could be         14:18

21  referring to because, as you understood it, even at     14:18

22  that point, summer of 2002, the parties' interests      14:18

23  were aligned in terms of maximizing the Commissioner's  14:18

24  recovery, correct?

25        MS. THURM: Object to the form of the

1  question because I'm not sure what that means.        14:18

2        **MR. HAYES:** I'll withdraw it.            14:18

3        **MS. THURM:** Please.                14:18

4        **MR. HAYES:** Q.  Let me now come back up to      14:18

5  December 2002.                    14:18

6    **A.   Okay.**                    **14:18**

7    Q.   Okay.  You did not draft this clause in        14:18

8  December, in the December 2002 new agreement to        14:18

9  associate counsel to be a waiver of potential future      14:18

10 conflicts, correct?                14:19

11   **A.   Let me be very precise what my problem is.**    **14:19**

12 **This was drafted at a time when there was still an**    **14:19**

13 **attorney-client agreement relationship, and at a time**    **14:19**

14 **when the language about general counsel to RoNo was**    **14:19**

15 **not in the agreement.  It carried forward in**        **14:19**

16 **subsequent drafts, and then right at the end the RoNo**    **14:19**

17 **clause that you have asked me about was put in there,**    **14:19**

18 **general counsel to RoNo.**                **14:19**

19     **I cannot recall whether at that time, when**    **14:19**

20 **European Counsel asked me to insert the general**        **14:19**

21 **counsel to RoNo, if at that time I said, "Well, let me**    **14:19**

22 **look at this agreement and, first of all see if there**    **14:19**

23 **is -- if I need a waiver, which I don't think I would**    **14:19**

24 **because it wouldn't apply to it then, but it's**        **14:20**

25 **anticipating becoming a client."**                **14:20**

1          Arguably, if we are going to assume that       14:20

2  general counsel role, did I then go through the         14:20

3  agreement, look for this and say, "Oh, we can do that       14:20

4  because it's covered here," I can't recall that.        14:20

5     Q.    Okay.                                14:20

6     A.    It certainly wasn't drafted at that time       14:20

7  where they give us the general counsel to RoNo, and I      14:20

8  respond by saying, "Okay, we'll do that, but let's        14:20

9  insert C1 to it to address that consequence."          14:20

10         I didn't think about that, and I didn't       14:20

11  think about it because, in my view, there was a         14:20

12  complete alignment of interest.  They were going --      14:20

13  RoNo needed a general counsel for all of this          14:20

14  paperwork, but they were contractually committed to       14:20

15  dismiss that case, and we were both throwing away our      14:21

16  fortune and our future between the CDOI.  So it wasn't      14:21

17  as if -- there were two horses, where I had to worry       14:21

18  about which horse was now taking the lead and what we      14:21

19  needed to do then.  I thought I had solved that         14:21

20  problem.                                   14:21

21         So I never looked at this, when the RoNo        14:21

22  clause came back in, and said, okay, we'll do that,       14:21

23  but C1 covers us because of this problem, because I       14:21

24  didn't think there was a problem.                 14:21

25     Q.    Uh-hum.  Okay, fair enough.  You were aware    14:21

1  in 2002 that, in fact, Marland had agreed to have the     14:21

2  RoNo action dismissed back in 1999, correct?     14:21

3      A.    There was some prior agreement to have it     14:22

4  dismissed.  And the procedural posture of it had     14:22

5  changed from then.  I cannot today recall those     14:22

6  iterations of the Quitam.  All I recall was we were --     14:22

7  again, we were doing a new agreement.  I thought the     14:22

8  understanding was we are going to put all of our ducks     14:22

9  on this one.  We kept language in the Quitam in there     14:22

10  if, for some reason, say 500 million dollars drops in     14:22

11  from that case, that was going to pass through the     14:22

12  formula.     14:23

13     Q.    Indeed.     14:23

14     A.    So because it was going to pass through the     14:23

15  formula, it didn't make any difference between as to     14:23

16  the sharing between Thelen and European Counsel,     14:23

17  whether it was one dollar on the CDOI and a billion in     14:23

18  the Quitam or vice versa.     14:23

19     Q.    Just to focus on that for a second, in     14:23

20  fact, you have a clause in this December 2002     14:23

21  agreement that expressly provided for recoveries in     14:23

22  either action to be shared based on the formula set     14:23

23  forth?     14:23

24     A.    Right, and part of that was so we wouldn't     14:23

25  have a conflict issue.     14:23

1    Q.    Right, okay.  Now, coming back to the        14:23

2    earlier branch of your statement, just if it helps        14:23

3    refresh your recollection, I would draw your attention        14:23

4    to paragraph 20 of Thelen's counter-counterclaims,        14:23

5    that is Exhibit 52.  It appears on page 16 of the        14:23

6    document.                                14:24

7    **A.    Page 16?**                        **14:24**

8    Q.    Page 16.                        14:24

9    **A.    The document, I have that page.  What was        14:24**

10   **the paragraph again?**                        **14:24**

11   Q.    It is paragraph 20.  While we are reading        14:24

12   it, we have five minutes left on this tape so let's

13   change the tape now.                        14:24

14   **THE VIDEOGRAPHER:**This is the end of tape        14:24

15   number two, volume number 1 in the deposition of Wynne        14:24

16   Carvill.  The time is 2:24, and we are off the record.        14:24

17        (Off the record.)

18   **THE VIDEOGRAPHER:**This is the beginning of        14:32

19   tape number three, in volume number one in the        14:32

20   deposition of Wynne Carvill.  The time is 2:32 p.m.        14:32

21   We are on the record.                        14:32

22   **MR. HAYES:**Q.  Judge Carvill, are you here        14:33

23   to testify today regarding Thelen's understanding of        14:33

24   the December 2002 agreement?                14:33

25   **A.    I was the person who negotiated the        14:33**

1  agreement.  No one knows more about it than me, on our     14:33

2  side, obviously, I don't pretend to say about your          14:33

3  side.  And I undertook to prepare myself by reviewing       14:33

4  documents so I could testify fully to that.                 14:33

5          On the other hand, I have taken the                 14:33

6  position with Thelen when they asked me to be a 30B6        14:33

7  witness, that I was unwilling to do an undertaking,         14:33

8  specifically if that undertaking meant now I was            14:33

9  obligated to go interview people and conduct an             14:33

10 investigation, do anything other than refreshing my         14:33

11 recollection from documents I wrote or received.            14:33

12         So, if Thelen wants to say I am their 30B6          14:34

13 witness on that subject, fine.  If not, all I can tell      14:34

14 you is, I don't know anyone else on our side of the         14:34

15 table, meaning, the plaintiff's side, who would know        14:34

16 more about the negotiations than I would.                   14:34

17         MS. THURM: And Thelen's position is that            14:34

18 we respect Judge Carvill's concern about being called       14:34

19 a 30B6 witness in light of the obligations generally        14:34

20 imposed by that rule on witnesses or parties to             14:34

21 investigate and provide the corporate entity's              14:34

22 knowledge on A, or B, or C.  And, in this instance,         14:34

23 all of Thelen's knowledge about why certain provisions      14:34

24 are in or not in the agreement and what certain terms       14:34

25 mean in the agreement as it was executed in 2002, come      14:35

1    from Judge Carvill and, therefore, he can testify as         14:35

2    to his understanding of the agreement, and Thelen           14:35

3    designates that as its 30B6 testimony on that topic.        14:35

4         **MR. HAYES:** Q.  Okay.  Well, let me try        14:35

5    some questions and we'll see how we do.                      14:35

6            Judge Carvill, is it Thelen's position in        14:35

7    this case that paragraph C1 on page seven of               14:35

8    Exhibit -- I'm sorry, let me start again.  Let me make      14:35

9    sure you have in front of you Exhibit 11, the December      14:35

10   2002 new agreement to associate counsel.                    14:36

11        **MS. THURM:** Before the break you had us         14:36

12   looking at Exhibit 52, do we need to put that aside         14:36

13   now?                                               14:36

14        **MR. HAYES:** Yes.                          14:36

15        **THE WITNESS:** I am with you.               14:36

16        **MR. HAYES:** Q.  Is it Thelen's position in      14:36

17   this case that paragraph C1 of Exhibit 11 constitutes       14:36

18   a valid and binding conflict waiver under the              14:36

19   California Rules of Professional Conduct?                   14:36

20        **MS. THURM:** Asked and answered.            14:36

21        **THE WITNESS:** At that time -- at the time I      14:36

22   drafted it to be a valid waiver.                       14:36

23        **MR. HAYES:** Q.  Can you tell the court        14:36

24   whether Thelen is taking the position in this lawsuit      14:36

25   that it is, in fact, a valid and binding waiver?           14:36

1     A.    That I can't tell you.  I haven't read any        14:36

2  pleadings in this case, so I can't tell you whether,        14:36

3  reviewing all of this, they have decided that my        14:36

4  attempt to make it a valid waiver was good or bad.        14:36

5     Q.    Okay.  And can you testify on behalf of        14:36

6  Thelen that the arbitration clause in the February        14:36

7  1999 attorney-client agreement does not apply, even to        14:37

8  disputes between Marland and Thelen regarding Thelen's        14:37

9  service as general counsel to RoNo under the December        14:37

10  2002 agreement?                                14:37

11     A.    I can't testify to Thelen's position.  I        14:37

12  can testify that it was my intent in drafting Exhibit        14:37

13  11 that it not be subject to any arbitration        14:37

14  provision.  That was my intent as the negotiator and        14:37

15  drafter.  Again, I don't know if I can testify as to        14:37

16  whether it's Thelen's position in the litigation.        14:37

17     Q.    I respectfully object and move to strike        14:37

18  everything after the first time you said Thelen's        14:37

19  position.                                14:37

20          With regard to the rest of your answer,        14:37

21  sir, I take it you weren't changing anything you were        14:37

22  testifying to earlier, you were just trying to restate        14:38

23  it?                                14:38

24     A.    Correct, correct.  I am not trying to        14:38

25  change anything.                                14:38

1    Q.   I understand.  I didn't think you were.  I      14:38

2  just wanted to be sure.                      14:38

3    **A.   And, sir, I don't want to always be**          **14:38**

4  **interjecting this about Thelen's position, but I don't**     **14:38**

5  **know how I can answer a question from you about**          **14:38**

6  **Thelen's position.  I understand why you may believe**      **14:38**

7  **you were entitled to a witness who will answer a**          **14:38**

8  **question framed that way, and I am not sure to either**      **14:38**

9  **quarrel with you or agree with counsel.  I'm just**          **14:38**

10  **trying to tell you what I did, and I was the most**          **14:38**

11  **knowledgeable person on the subject at that time.**          **14:38**

12    Q.   I appreciate that.  I appreciate your      14:38

13  efforts to give full and complete answers to the      14:38

14  things you feel comfortable testifying to to the best      14:38

15  of your ability.  That's not a question, sir.  I don't      14:38

16  think I have quarreled with you.  I don't like to      14:39

17  quarrel with Wendy.  I have to phrase these questions      14:39

18  this way to make my record.                      14:39

19    **A.   All right.**                      **14:39**

20    Q.   All right.  With regard to the release      14:39

21  clause in Exhibit 11, which appears at the bottom of      14:39

22  page seven and carries over to page eight -- I will      14:39

23  wait until you get there.                      14:39

24    **A.   I have it.**                      **14:39**

25    Q.   Can you tell us why you put this clause in      14:39

1  the agreement?                                    14:39

2        **MS. THURM:** Object to the form of the        14:39

3  question.                                         14:39

4        **THE WITNESS:** Are you asking me to go back     14:39

5  to the beginning in the original, or are you asking me     14:39

6  about the final product?                          14:39

7        **MR. HAYES:** Q.  Well, I was trying to save     14:39

8  a little bit of time, but let's go back a little bit.    14:40

9  This 1542 release -- can we call it that?            14:40

10     **A.   Correct.**                                **14:40**

11     Q.    That was in the draft agreement, at least     14:40

12  from the second draft, was it not?                  14:40

13     **A.   It may have been from the first draft.**     **14:40**

14     Q.   It may have well been from the first?         14:40

15     **A.   I hope it was.**                          **14:40**

16     Q.   Do you recall who put it in there?           14:40

17     **A.   I did.**                                  **14:40**

18     Q.   Okay.  Can you tell us why?                 14:40

19     **A.   Yes.**                                    **14:40**

20     Q.   Please do so.                               14:40

21     **A.   For reasons that my testimony today**        **14:40**

22  **illustrates, when I looked at this in late May, early**    **14:40**

23  **June, and I found myself having to go to Fontana and**     **14:40**

24  **Belgum to tell me, what does this mean, what does that**    **14:40**

25  **mean, and refer among multiple documents, I decided**       **14:40**

 1  early on the only thing I was going to be part of was      14:40

 2  a new agreement that superseded everything that           14:41

 3  preceded it.                                              14:41

 4          I wanted one document I could pick up and         14:41

 5  know what the party's respective obligations were.        14:41

 6  And I tried to do that by saying, "This is a new          14:41

 7  agreement which supersedes all prior agreements." And     14:41

 8  it probably reflects my background as a litigator,        14:41

 9  instead of treating a prior agreement some other way,     14:41

10  it's said just to make it clear, "Let's put a mutual      14:41

11  release in there.  No one is going to have to go back     14:41

12  and look at any of this old stuff."  You can see how      14:41

13  well I succeeded.                                         14:41

14      Q.   Are you telling us that the 1542 release         14:41

15  was put into the new draft agreement to associate         14:41

16  counsel without regard to any potential claims that       14:41

17  either side might have against the other, but simply      14:42

18  as a matter of wiping the slate clean?                    14:42

19      A.   Partially, as I looked at these agreements       14:42

20  and talked to Misters Fontana and Belgum about what       14:42

21  they meant, I could see ambiguities.  I could see         14:42

22  potential conflicts as to how this relates to that.       14:42

23  And certainly that made me aware of the possibility of    14:42

24  claims.  But at the time that I put it in, I was not      14:42

25  addressing any specific claim.                            14:42

1    Q.   When you --                          14:42

2    A.   Because at the time I put it in, I was not    14:42

3  aware of European Counsel then saying, Thelen, you      14:42

4  breached this or that duty to us, or you violated this    14:43

5  term of the agreement.  I wasn't aware of any claims      14:43

6  by European Counsel at that time.              14:43

7    Q.   Did you ever tell European Counsel that you    14:43

8  believed they might have -- they or some of them,      14:43

9  might have claims against Thelen which would be      14:43

10  incumbent in the release clause that you were      14:43

11  proposing?                          14:43

12    A.   With a correction as to the phraseology,    14:43

13  the answer is yes.                      14:43

14    Q.   Okay.  Please give us the answer yes with    14:43

15  the correction in phraseology you think is necessary.    14:43

16    A.   European Counsel made claims in my          14:44

17  negotiations saying, for example, that I was          14:44

18  misrepresenting the document situation, and that was      14:44

19  unfair, and that was bad faith, and other perjorative    14:44

20  terms, all right, and at the same time I was critical    14:44

21  of their performance.                  14:44

22        But they -- the latter part here is        14:44

23  irrelevant.  They were making statements to me        14:44

24  indicating that they thought the conduct I was engaged    14:44

25  in, or Thelen was engaged in and I, as a spokesman,      14:44

1    violated the agreements.  So while I might not agree       14:44

2    with their position that I was violating my duties, I       14:44

3    certainly recognize the claim when it's articulated to       14:44

4    me.                                    14:45

5        Q.    Although, with respect, sir, my question is       14:45

6    whether you told them that you believe they might have       14:45

7    claims?                                   14:45

8        A.    No.                                 14:45

9        Q.    The answer to that is no?                   14:45

10       A.    No, no, no, I didn't tell them -- I told       14:45

11    them I believe they are making claims, but I didn't       14:45

12    tell them I believe they had claims so as to, in       14:45

13    effect, give them opinion of what I thought about,       14:45

14    gee, this one has merit, no.                     14:45

15       Q.    Indeed, you never said to Brunswick or the       14:45

16    other European Counsel that any of the claims, as you       14:45

17    were referring to them, that were made to you had any       14:45

18    merit, correct?                               14:45

19       A.    I said I disagreed with them.             14:45

20       Q.    You never actually said in words or          14:45

21    substance, "I can understand why you believe we have       14:45

22    acted in bad faith, and rather than argue about that,       14:45

23    I would rather change releases," did you?            14:45

24       A.    No, to the first half; yes, to the second       14:46

25    half of your question.                          14:46

1    Q.    Now, you're not saying that it's typical        14:46

2    for parties who have a multiplicity of contracts and        14:46

3    wish to restate their various contracts into one        14:46

4    unified agreement, customarily exchange section 1542        14:46

5    releases as part of that new agreement, are you?        14:46

6    **A.    I had no and have no view on it.  I am a**        **14:46**

7    **litigator, and I have litigated transactions where**        **14:46**

8    **there were such releases, and I have certainly**        **14:46**

9    **litigated transactions where there weren't such**        **14:46**

10    **releases.  But I don't -- being a litigator in my**        **14:46**

11    **exposures to transactions, that unfortunate set, I'm**        **14:47**

12    **not prepared to tell you what is customary in a**        **14:47**

13    **transactional document.  I suspect those transactional**        **14:47**

14    **documents -- transactional lawyers like to handle**        **14:47**

15    **things differently.**        **14:47**

16    Q.    Okay.  Did Thelen have any custom or        14:47

17    practice when you were chair of their risk management        14:47

18    committee with regard to obtaining section 1542        14:47

19    releases from clients or former clients?        14:47

20    **MS. THURM:** Objection.  Compound.        14:47

21    **THE WITNESS:** I hesitate because -- with        14:47

22    the caveat the answer is no, I don't recall what the        14:47

23    caveat is.  I cannot recall if we had a practice in        14:48

24    collection actions where we had outside counsel        14:48

25    where -- and they tended to handle all of those        14:48

1    things, and as part of that process we said, of            14:48

2    course, after one of these releases you have to have a      14:48

3    1542 in.  I mean, so we may have had some policy about      14:48

4    1542s being practiced with respect to our                   14:48

5    understanding in retaining outside contingency fee          14:48

6    collection counsel.                                         14:48

7           Apart from that, I don't think we had a              14:48

8    policy or practice on the issue.                            14:48

9           **MR. HAYES:** Q.  Okay.  Can you recall any         14:48

10   other situations when you were chair of the risk            14:48

11   management committee where Thelen entered into a            14:48

12   section 1542 release with a client?                         14:48

13          **MS. THURM:** Object and say answer the             14:48

14   question yes or no.  And with respect to what matters       14:48

15   those might have been, the identity of the client, or       14:48

16   what the subject might have been, and instruct you not      14:48

17   to answer as protecting those clients' privileges.          14:49

18          **THE WITNESS:** Are you talking about then          14:49

19   current clients, or former clients, or both?               14:49

20          **MR. HAYES:** Q.  Let's start with current          14:49

21   clients?                                                    14:49

22   **A.   I can't recall a situation one way or the            14:49**

23   **other.                                                    14:49**

24   Q.   Are you saying you can't recall any other              14:49

25   situation where Thelen entered into a section 1542          14:49

1  release with a current client; is that right?        14:49

2  **A.    Correct, I can't -- maybe, but as I sit        14:49**

3  **here I can't recall one way or the other.        14:49**

4  Q.    And apart from simply disputes about the        14:49

5  amount of fees payable, or paid, or due and owing,        14:49

6  apart from dollar disputes, do you recall any other        14:49

7  situations while you were chairman of the risk        14:49

8  management committee where Thelen entered into a        14:49

9  section 1542 release for a former client?        14:50

10  **A.    Yes.        14:50**

11  Q.    How many times?        14:50

12  **A.    I don't know, but it would not be unusual        14:50**

13  **where there is a claim for malpractice and it's        14:50**

14  **resolved.  It wasn't surprising if our carrier said,        14:50**

15  **if you forgot to do it, where is that, so I mean --        14:50**

16  Q.    Fair enough.  Okay, and Thelen, like all        14:50

17  firms, was subject to claims of malpractice from time        14:50

18  to time, correct?        14:50

19  **A.    Correct.        14:50**

20  Q.    Okay.  Apart from situations where a client        14:50

21  had actually made a claim of malpractice, do you        14:50

22  recall a former client, do you recall any instances        14:51

23  where Thelen had sought a section 1542 release with a        14:51

24  former client?        14:51

25  **A.    The malpractice and the collection, those        14:51**

1  two categories aside, I cannot think of a situation as    14:51

2  I sit here today.  It might have happened.            14:51

3    Q.   Okay.  Did you ask for any legal opinion      14:51

4  from anyone else at the firm regarding the            14:51

5  prerequisites to enforcing a section 1542 release of    14:51

6  the kind you were contemplating in the December 2002    14:51

7  agreement?                              14:51

8    A.   No.                           14:51

9    Q.   Did you do any research yourself before      14:51

10  inserting that clause in the draft agreement?        14:51

11    A.   Simple --                        14:51

12      MS. THURM: Just caution you to answer the      14:51

13  question yes or no.  If the answer is yes, we'll have    14:51

14  to see.                              14:52

15      THE WITNESS: The answer is no.            14:52

16      MR. HAYES: Q.  Did you do any research        14:52

17  during the time the December 2002 new agreement was    14:52

18  being negotiated regarding the prerequisites for a      14:52

19  valid section 1542 release between attorney and client    14:52

20  or attorney and former client?                14:52

21    A.   Maybe.                          14:52

22    Q.   You don't recall whether you did, but you    14:52

23  may have?                            14:52

24    A.   May have.                        14:52

25    Q.   Okay.  To the extent you did any such      14:52

1    research, would you have diaried it to a particular        14:52

2    risk management time keeping account that Thelen had?        14:52

3        **A.   I would have diaried the time.  I don't**        14:52

4    **know if I would have diaried the specific task to the**        14:52

5    **level you're asking me about, 1542 releases research.**        14:52

6        Q.   Did you open a specific account or sub        14:53

7    account to reflect time spent on renegotiating the        14:53

8    agreements between Thelen and Marland?        14:53

9        **A.   Yes.**        14:53

10       Q.   Okay.  What was the name of that account?        14:53

11       **A.   It may have had a name.  At the time I**        14:53

12   **would have referred to it by number.  I cannot recall**        14:53

13   **what the number is, it would have started with 1515**        14:53

14   **and it would have had some suffix, and I just don't**        14:53

15   **remember what the suffix was.**        14:53

16       Q.   Do you recall when you opened it?        14:53

17       **A.   Shortly after I was tasked to do this.**        14:53

18       Q.   Okay.  And do you recall whether you ever        14:53

19   closed it?        14:53

20       **A.   No, I didn't close it.**        14:53

21       Q.   Okay.  Do you recall asking associates or        14:53

22   paralegals at the firm to review documents from the        14:54

23   client file to assist you in doing research?        14:54

24       **A.   Did I ask in the context of the 1515**        14:54

25   **matter --**        14:54

1     Q.    Yeah --                               14:54

2     **A.    -- an associate to review?**              **14:54**

3     Q.    Yes.  Let me ask it differently anyway.     14:54

4          To the extent you asked other people at      14:54

5  Thelen to assist you in what you referred to as the      14:54

6  1515 matter, did you give them any instructions        14:54

7  regarding whether to diary their time to the 1515       14:54

8  matter, or to the RoNo client matter?              14:54

9     **A.    I would not have tasked any timekeeper in**      **14:54**

10  **the firm in the context of this litigation, meaning,**      **14:55**

11  **the CDOI, RoNo, Thelen negotiation, et cetera, I**       **14:55**

12  **wouldn't have tasked any associate to bill time to**      **14:55**

13  **anything other than the 1515 account, if I did that.**      **14:55**

14  **I don't know that I did, but there would be no reason**      **14:55**

15  **for me to task an associate to do something and bill**      **14:55**

16  **it to RoNo or...**                          **14:55**

17    Q.    So I take it you were not aware that        14:55

18  associates or paralegals or both billed time to the      14:55

19  RoNo client matter which they described in their time     14:55

20  entries as reviewing and complying correspondence and     14:55

21  documents for Wynne Carvill?                  14:55

22    **A.    It wouldn't surprise me at all.**              **14:55**

23    Q.    Would it be appropriate for them to have      14:55

24  done that?                                 14:55

25    **A.    There were a lot of timekeepers on this**        **14:56**

1  matter.  I hope I told them all where to bill their          14:56

2  time.  But, if I told someone to do something and           14:56

3  didn't think about had I previously told them where to      14:56

4  bill it, and they billed it somewhere else, I mean,         14:56

5  did that happen, yeah, it certainly could have              14:56

6  happened.                                                   14:56

7      Q.    We are not suggesting anything more than          14:56

8  carelessness, sir, but the fact is -- the question is       14:56

9  whether it would be appropriate for them to have done       14:56

10 it?                                                         14:56

11     A.    That's not where I would have instructed          14:56

12 them to put the time and, no, they should not have          14:56

13 billed it there in my view, if they were doing it on        14:56

14 my instruction.                                             14:56

15     Q.    Right.  Okay.  Now, coming back to the            14:56

16 Exhibit 11 to the mutual lease page eight -- I'm            14:57

17 sorry, Exhibit 11.  I believe it's the one immediately      14:57

18 in front of you, sir.                                       14:57

19     A.    I want to correct my last answer.                 14:57

20     Q.    Please.                                           14:57

21     A.    It would not surprise me if I asked, for          14:57

22 example, something from Karl or Gary and they tasked        14:57

23 an associate or paralegal to do it and didn't tell          14:57

24 them, for whatever reason, that was for me and they         14:57

25 should bill it.  So the reason why I correct that is,       14:57

1  I didn't want to leave the impression that if someone     14:57

2  was billing time for something for Wynne Carvill, that     14:57

3  is because of the communication from me to that     14:57

4  timekeeper.  That's all.     14:57

5      Q.   I appreciate that.  That is a far from     14:57

6  improbable circumstance, so it's quite appropriate.     14:58

7  Let's turn to Exhibit 11 again.     14:58

8      A.   I have got it.     14:58

9      Q.   The release, page eight, right at the very     14:58

10  end, right after the quotation of section 1542 there     14:58

11  is a reference to both parties having the benefit of     14:58

12  advice of independent counsel.  Do you see that?     14:58

13      A.   Correct.     14:58

14      Q.   Now, to the extent you thought about it,     14:58

15  you thought Marland had the same independent counsel     14:58

16  you referred to earlier, correct, Brunswick, Maas,     14:58

17  himself, Chateau, possibly Beck DeCorso?     14:58

18      A.   Possibly someone I never heard of and     14:58

19  didn't know was playing a shadow role.     14:58

20      Q.   That's why I do want to come back and focus     14:58

21  in on this a little bit.  When you signed Exhibit 11,     14:58

22  did you have any actual understanding of which, if     14:59

23  any, independent counsel Marland had in considering     14:59

24  the significance of this release?     14:59

25      A.   Yes.     14:59

1    Q.    Whom did you think constituted Marland's    14:59

2  independent counsel?    14:59

3    **A.    I knew of Brunswick and I had reason from    14:59**

4  **European Counsel to believe that Francois Chateau was    14:59**

5  **involved.    14:59**

6    Q.    And it was your belief when you signed    14:59

7  Exhibit 11 that Chateau was independent counsel for    14:59

8  Marland?    14:59

9    **A.    Yes.    14:59**

10    Q.    Did you remember, when you signed Exhibit    14:59

11  11, that Chateau had an agreement with Thelen that    14:59

12  provided for Chateau to be compensated from a portion    14:59

13  of Thelen's fee from the Executive Life matter?    15:00

14    **A.    I learned that at some point.  I do not    15:00**

15  **know if it was before or after I signed this    15:00**

16  **agreement, but it's not something I knew early on, and    15:00**

17  **I am uncertain if I knew it at the time I drafted    15:00**

18  **this, or rather the time I executed this.    15:00**

19    Q.    You would agree that to the extent Chateau    15:00

20  had a -- sorry, start again.    15:00

21        You would agree that to the extent Chateau    15:00

22  had his own agreement to share in Thelen's fee from    15:00

23  this matter, that Chateau would then not be    15:00

24  independent counsel for Marland, correct?    15:00

25    **A.    No.    15:00**

1    Q.    Why do you believe that Chateau would still    15:00

2    constitute independent counsel for Marland in signing    15:00

3    this agreement, even though Chateau is a former Thelen    15:00

4    partner and had a fee-sharing deal with Thelen?    15:00

5    A.    Depending on the fact that I am not aware    15:00

6    of or not privy to what was his agreement, what was    15:00

7    his compensation terms, what disclosures had he    15:00

8    made -- all of those things, I have no knowledge of    15:01

9    any of that.    15:01

10    The fact that he might have gotten money    15:01

11    from Thelen or had a right to some percentage of the    15:01

12    overage, which is what I later learned, I had no    15:01

13    knowledge of what arrangement and what disclosure he    15:01

14    had with European Counsel, or what arrangement.    15:01

15    For example, as far as I knew, Chateau    15:01

16    could have had an agreement that whatever he got from    15:01

17    Thelen, he would put it in the pot and have it    15:01

18    distributed according to whatever private agreement    15:01

19    they had among themselves.  I didn't know.  I'm not    15:01

20    privy to it.    15:01

21    Q.    Well, sir, if you didn't know, how could    15:01

22    you be so sure that Chateau was independent?    15:01

23    A.    Because in my view -- first of all, it was    15:01

24    the before-and-after issue.  The before issue, before    15:01

25    I even had a knowledge of that in dealing with    15:02

1  Brunswick, Brunswick would, at times, either refer to        15:02

2  Chateau in terms of discussions, or ask me to send            15:02

3  something to him, or make references such that I knew          15:02

4  he was in communication with Chateau about drafts that        15:02

5  he was asking me to send to Chateau, so Chateau wasn't        15:02

6  calling me and giving me advice on this.                      15:02

7         I attempted to get Chateau involved at                15:02

8  certain points, and I don't think at any time, between        15:02

9  June of '02 and when I left the firm, I had any               15:02

10 communication from Chateau.  There may have been some         15:02

11 fax asking for something to be resent, but that would         15:02

12 be the most.  So he was clearly in their camp.                15:02

13    Q.   Are you telling us that, in fact, Chateau        15:03

14 was in their camp for all the reasons you just               15:03

15 mentioned and that means that he is independent              15:03

16 regardless of what financial arrangement he has with         15:03

17 Thelen?                                              15:03

18    A.   Well, first of all, it's not driven               15:03

19 necessarily by the financial arrangement he had with         15:03

20 Thelen.                                             15:03

21    Q.   Well, that's my question, to you, sir.  Is        15:03

22 it your understanding that Chateau could have been           15:03

23 independent counsel to Marland even if he had a             15:03

24 financial arrangement with Thelen to share in Thelen's       15:03

25 fee?                                               15:03

1    **A.    Completely possible.**                15:03

2    Q.    One other thing --              15:03

3    **A.    You need to know the other facts.**        15:03

4    Q.    Another thing, though, based on what you      15:03

5    said when you said you didn't know of Chateau's      15:03

6    arrangement at the time.  You will agree that what   15:03

7    matters for purposes of a party's knowledge at the   15:03

8    time this agreement was executed is not just your    15:04

9    knowledge at the time, but the knowledge of your     15:04

10   partners, right?                15:04

11       **MS. THURM:** Calls for a legal conclusion.     15:04

12       **THE WITNESS:** I didn't consider that in      15:04

13   this context at the time, but I do recall       15:04

14   understanding at the time that if Gary said something   15:04

15   to the other side or made a commitment to them, he is   15:04

16   a partner of the firm.  I mean, I understood that at   15:04

17   the time, I can't recall thinking that in the context   15:04

18   of Chateau, Francois Chateau.            15:04

19       **MR. HAYES:** Q.  I am not suggesting you      15:04

20   did.  I asked a more general question.        15:04

21   **A.    I answered it that way, more generally.**     15:04

22   Q.    The parties to this agreement are Thelen,    15:04

23   Reid and Priest, correct, Brunswick, Maas, and     15:05

24   Marland?

25   **A.    Correct.**                15:05

1    Q.    So what matters in determining the              15:05

2  knowledge of the parties is the knowledge of Thelen,        15:05

3  Reid and Priest, not the knowledge of Wynne Carvill,        15:05

4  correct?                                      15:05

5        **MS. THURM:** Object to the form of the              15:05

6  question.                                     15:05

7        **THE WITNESS:** I knew I was at risk of that        15:05

8  and the firm was at risk of that as a general matter.        15:05

9  I don't know if analyzing a particular situation, that        15:05

10  would necessarily be so.  But I understood that,           15:05

11  representing Thelen in this negotiation, that if           15:05

12  another partner makes a representation to the other         15:05

13  side, that has risk consequences to Thelen.               15:05

14    Q.    Okay.  Following up on that, did you ever          15:06

15  become aware that Gary Fontana had said to Francois        15:06

16  Marland that Marland would not have to produce any         15:06

17  documents he did not want to produce?                    15:06

18    **A.    I'm thinking about this because I'm having**        15:06

19  **trouble sorting out whether Gary told me that in that**     15:06

20  **framework, or if he told me that in a framework where**     15:07

21  **he was talking about the two concerns of Marland, and**    15:07

22  **basically saying, as long as those become a problem,**      15:07

23  **you don't have to produce -- as long as those continue**    15:07

24  **to be a problem, you don't have to produce anything.**      15:07

25  **I just don't recall if whatever Gary said, in that**         15:07

1  sense, to me was absolute or in that context.  That's      15:07

2  what I'm having a problem with.                            15:07

3    Q.   But you recall Mr. Fontana telling you that         15:07

4  at some point in 2002 or late 2001?                        15:07

5    **A.   I remember Fontana telling me Marland is**        15:07

6  **concerned with the documents, the contrat de portage,**      15:07

7  **and that these concerns were identity and criminal**     15:08

8  **prosecution.**                                           15:08

9    Q.   Right.                                              15:08

10   **A.   That's what I recall.**                           15:08

11   Q.   And did he ever say to you that he, Gary            15:08

12  Fontana, had told Marland that Marland would not have     15:08

13  to produce any documents he did not want to produce?      15:08

14   **A.   I can't recall.  I mean, I recall having**        15:08

15  **discussions about that, but only in the context of**    15:08

16  **those two concerns.**                                   15:08

17   Q.   Okay.  Did those two concerns ever go away          15:08

18  while you were at the firm?                               15:08

19   **A.   Not while I was at the firm.**                    15:08

20   Q.   Okay.                                               15:08

21   **A.   And the only thing I know is there was some**     15:08

22  **point as I was leaving the firm, somewhere in there,**      15:08

23  **there were notices of deposition for Marland, so**      15:08

24  **obviously I knew that events were unfolding.**          15:08

25   Q.   And let's just do a little bit more then            15:08

1    about Marland.  Did Gary Fontana ever tell you that he        15:08

2    believed their hotel room or rooms in Paris were being        15:09

3    bugged?                                                  15:09

4        **MS. THURM:** Whose rooms?                              15:09

5        **MR. HAYES:** Thelen's.                                 15:09

6        **THE WITNESS:** I don't recall him telling me          15:09

7    that seriously.  I can certainly believe that there        15:09

8    might have been a joke or something about that time,        15:09

9    you know, whether we were being watched, but I never       15:09

10   understood any of that to be serious.                     15:09

11       **MR. HAYES:** Q.  Oh no, I am asking if he             15:09

12   said things seriously to you such as what he said          15:09

13   quite seriously to me a few years ago?                    15:09

14       **A.   I can't recall it.  The reason -- there is**    15:09

15   **a lot of black humor around that kind of issue and --**  15:09

16       Q.    Yes, there often is.                            15:09

17       **A.    Often is.**                                    15:10

18       Q.    But not that much litigation involves           15:10

19   billion dollar claims against the French government?      15:10

20       **A.    Right, so I can remember that kind of, what**  15:10

21   **I took to be black humor.  But, I don't know if Gary**   15:10

22   **really believed that.  I don't know.**                  15:10

23       Q.    Okay.  You did not doubt the veracity of        15:10

24   the statements Brunswick made to you in the summer of     15:10

25   2002, that in 2001 Brunswick's office, home, and          15:10

1  country home and his car were all burgled on the same      15:10

2  night, did you?                              15:10

3      **A.   I remember him telling me that various**          15:10

4  **places had been burglarized, whether it was two, four,**     15:10

5  **or ten, I don't know, but Brunswick told me in a way**       15:10

6  **that I believed him that he had been a victim of a**         15:10

7  **burglary, and the circumstances were such that they**        15:11

8  **must have been looking for the identity of Mr. X.**          15:11

9      Q.   Okay.  You didn't doubt that at all, did      15:11

10  you?                                         15:11

11     **A.   I didn't doubt that.  I didn't know that,**        15:11

12  **but I believed that he believed that.**                    15:11

13     Q.   Right.  And you were quite clear it wasn't     15:11

14  black humor on his part?                        15:11

15     **A.   It was definitely not black humor on his**        15:11

16  **part.**                                      15:11

17     Q.   Have you seen the police reports about the     15:11

18  break-ins?                                    15:11

19     **A.   No.**                                   15:11

20     Q.   You didn't need to see them to believe that    15:11

21  it had happened?                              15:11

22     **A.   I believed then it happened and nothing has**    15:11

23  **happened since to change that belief.**                   15:11

24     Q.   Okay.  Now --                         15:11

25         **MS. THURM:** How much time is left on this      15:12

1  tape?                                      15:12

2        **THE VIDEOGRAPHER:** About 1.10 left on this.     15:12

3        **MS. THURM:** So we switched in between          15:12

4  lunch.                                     15:12

5        **THE VIDEOGRAPHER:** Yeah.                  15:12

6        **MS. THURM:** Okay.                         15:12

7        **MR. HAYES:** Q.  Returning now to the         15:12

8  release, sir, pages seven to eight.              15:12

9     **A.   Yes.**                                 15:12

10     Q.   It is not Thelen's position in this case      15:12

11  that the release is a release of prospective conduct,     15:12

12  is it?                                     15:12

13     **A.   I do not know Thelen's position.  I can        15:12**

14  **tell you what I understood at the time.**               15:12

15     Q.   Tell us what you understood at the time      15:12

16  about whether this release intended to cover conduct      15:12

17  occurring after the date the agreement was signed?      15:12

18     **A.   It does not.  It wasn't my intent in         15:13**

19  **drafting it, and my recollection was that it was not      15:13**

20  **intended to release future conduct, and I read it        15:13**

21  **again to make sure I hadn't failed to see something in     15:13**

22  **there.  I don't see where it releases something that     15:13**

23  **is going to happen in the future.**                  15:13

24       **1542 talks about exists in his favor at the     15:13**

25  **time, and that pretty clearly reflects what was going      15:13**

1  on here.                                15:13

2      Q.   Okay.  Did you have an understanding at the     15:13

3  time you signed this as to whether Thelen, as an          15:13

4  attorney for Marland, was required to make any            15:13

5  disclosure of potential claims that Marland might have    15:14

6  in order for the 1542 release to be effective?       15:14

7         MS. THURM: Object to the form of the          15:14

8  question.  Assumes facts not in evidence.          15:14

9         THE WITNESS: My understanding was at the      15:14

10  time this was signed, he was not a client and so we      15:14

11  did not have that obligation.                    15:14

12         MR. HAYES: Q.  Okay.  And if I asked the      15:14

13  same question with regard to Thelen's position in this    15:14

14  case now, would you give the same answer, or would you    15:14

15  say you were not in a position to answer?          15:14

16     A.   To every question that you ask that calls       15:14

17  for me to state Thelen's position in this litigation,     15:14

18  my answer is I cannot answer.  I have not reviewed the    15:14

19  pleadings.  I have not reviewed -- well, excuse me, I     15:14

20  have seen some of the pleadings, but I haven't sat       15:14

21  down to review all the pleadings, the briefs, et         15:15

22  cetera, so I am in no position to state what Thelen's     15:15

23  position is on any issue.                     15:15

24         MR. HAYES: Q.  I appreciate that, and that      15:15

25  does help us simplify things.                   15:15

1        Okay.  Let me turn now to a different          15:15

2   document.  Oh, I'm sorry, one last thing about the      15:15

3   release, sorry, I knew there was one other thing,       15:15

4   that's why I was hesitating.                     15:15

5        Did you -- let me lay the foundation.  You     15:16

6   mentioned earlier that Brunswick had stated grievances    15:16

7   or complaints to you that you understood to be him,      15:16

8   Brunswick, stating potential claims regarding Thelen's    15:16

9   conduct, right?                          15:16

10   **A.   Correct.**                        **15:16**

11   Q.   Okay.  Apart from issues that Brunswick       15:16

12   raised, at the time you signed Exhibit 11, did you      15:16

13   believe that Marland had any other claims or potential    15:16

14   claims that were actually being released by the       15:16

15   release provision in that agreement?              15:17

16      **MS. THURM:** Objection.  Compound.          15:17

17      **THE WITNESS:** So the first part of the       15:17

18   question, I am not sure, I'm going to have to explore    15:17

19   that.  The second part of the question, the answer is,   15:17

20   yes, they were releasing it.                    15:17

21      **MR. HAYES:** Q.  Okay.  But you did not have   15:17

22   in mind any particulars or even generalities of       15:17

23   potential claims that Marland was actually releasing    15:17

24   such as, if I may give you an extreme example, when     15:17

25   you met in Paris you had accidentally picked up his     15:17

1    wallet and it had a thousand dollars in it, nothing        15:18

2    like that was in your mind when you signed Exhibit 11,      15:18

3    correct?                                    15:18

4        **MS. THURM:** Objection.  Incomplete           15:18

5    hypothetical.  Object to the form of the question.        15:18

6        **THE WITNESS:** I have a hard time with that       15:18

7    question, but I think I can answer it precisely if I       15:18

8    don't have to deal with the hypothetical.             15:18

9        **MR. HAYES:** Q.  Well, sure, let me rephrase      15:18

10   it with a specific here.  I will do that right here.       15:18

11   Here is a document previously marked as Exhibit 29.        15:18

12   It is a document with production number TR&P 15953.        15:18

13   There is a copy of a June 4th, 1999 memo from Steve        15:19

14   O'Neal to Gary Fontana, copied to Karl Belgum, Walter      15:19

15   Brown, so I have no reason to believe you have seen it     15:19

16   before, but it does give a concrete example of what I      15:19

17   am talking about.                             15:19

18        If you see in the handwritten notes up top,       15:19

19   sir, "6/17/99, MTG," I will just represent to you Mr.      15:19

20   O'Neal identified his handwriting and read that text       15:19

21   for us as, "Meeting with Fontana, he says an offer has     15:19

22   been made to Artemis to settle for one hundred            15:19

23   million.  He will give me a memo next week containing      15:19

24   a financial analysis of why we should stay in the         15:19

25   case."                                     15:19

1    Okay?                              15:19

**2    A.    Okay.                          15:19**

3    Q.    Now, assuming that Mr. Fontana was not just    15:19

4  making things up when he told his partner that Artemis    15:19

5  had made an offer to settle for a hundred million         15:20

6  dollars, and representing to you that there is            15:20

7  absolutely nothing in the records suggesting that Mr.     15:20

8  Fontana ever communicated the hundred million dollar      15:20

9  settlement offer to Thelen's then client Mr. Marland,     15:20

10  did you have in mind when you signed Exhibit 11 that      15:20

11  Marland was releasing Thelen from any claim based on      15:20

12  Fontana's failure to report to his client a hundred       15:20

13  million dollar settlement offer?                          15:20

**14    MS. THURM:** Objection.  Incomplete         15:20

15  hypothetical.  Assumes facts not in evidence.            15:20

**16    THE WITNESS:** Yes.                      15:20

**17    MR. HAYES:** Q.  Okay.  You were not aware    15:20

18  of the report from Mr. Fontana of a hundred million      15:20

19  dollar settlement offer from Artemis, were you?          15:20

**20    A.    No, I wasn't.                      15:20**

21    Q.    Were you aware of this document until I    15:20

22  just showed it to you?                          15:21

**23    A.    I was not aware of it.  Just to make it    15:21**

**24  clear, you could put any document under my nose that    15:21**

**25  would reflect a fact scenario that you believe would    15:21**

1  give a rise to a claim by your client prior to the          15:21

2  execution of Exhibit 11, and as long as it related to          15:21

3  a Thelen partner or employee acting in the scope and          15:21

4  course of employment or partnership capacity, I          15:21

5  believed it was released.          15:21

6      Q.    And did you actually believe at the time          15:21

7  that Thelen didn't need to disclose that conduct even          15:22

8  if there was no way Marland could have known about it,          15:22

9  is that actually your belief at the time?          15:22

10      MS. THURM: Object to the form of the          15:22

11  question.  Argumentative.          15:22

12      THE WITNESS: My belief at the time was          15:22

13  that if there was not then an existing attorney-client          15:22

14  relationship between the parties, that is the purpose          15:22

15  of 1542 and the 1542 release.          15:22

16      MR. HAYES: Q.  Okay.  I appreciate that          15:22

17  clarification.          15:22

18      You are not -- since you did not have any          15:22

19  understanding at the time that Thelen was counsel to          15:22

20  Marland as of the time you signed the December 2002          15:22

21  new agreement, you did not have an opinion either way          15:23

22  about whether Thelen needed to make a disclosure of          15:23

23  potential claims to its client, correct?          15:23

24      MS. THURM: Object to the form of the          15:23

25  question.  Misstates his prior testimony.          15:23

1       **MR. HAYES:** Q.  Let me rephrase it, and I       15:23

2   will try to do it a little simpler.                   15:23

3       **MR. HAYES:** Q.  You weren't thinking either     15:23

4   way about whether a disclosure needed to be made to a     15:23

5   current client because you didn't believe Marland was     15:23

6   a current client, right?                              15:23

7   **A.   Almost.**                                     **15:23**

8   Q.   Almost?                                          15:23

9   **A.   In December the answer to that is yes, but      15:23**

10  **the origin of this mutual release goes back to the      15:23**

11  **time when he was a current client.  So your question      15:23**

12  **was, what was my belief in December when I executed,      15:23**

13  **the answer is yes, this was a complete, across the      15:24**

14  **board, unqualified release by both sides as to          15:24**

15  **anything either side might be able to dream up about      15:24**

16  **the other that related to their prior professional      15:24**

17  **relationship.**                                     **15:24**

18  Q.   Okay.  When you first drafted the clause        15:24

19  then and Marland was still a client of Thelen, did you     15:24

20  have any view at that time about whether you needed to     15:24

21  make any disclosures?                                15:24

22  **A.   I don't recall thinking about that.  I do      15:24**

23  **recall thinking about the whole issue about getting      15:24**

24  **independent counsel and my wanting to document that.      15:24**

25  **We didn't tell him he needed independent counsel.  He      15:25**

1   had it and we wanted to make sure he was relying on          15:25

2   it.  I can recall that thought process, but whether I        15:25

3   sat there and said, gee, I wonder if this happened,          15:25

4   "this" being Exhibit 9 --                    15:25

5          MS. THURM: 29.                    15:25

6          MR. HAYES: Q.  Yes, go ahead.              15:25

7          THE WITNESS: Excuse me.  If you're asking       15:25

8   me did I sit there and think as a hypothetical what          15:25

9   you have in Exhibit 29, and ask myself would this            15:25

10  release be good enough for this circumstance, I never        15:25

11  thought about that.                          15:25

12         MR. HAYES: Q.  Okay.  Now, when you first        15:25

13  included the section 1542 release, the first time you        15:25

14  did, in whatever first draft it was, whether it was          15:26

15  the second or the first, at that point Brunswick            15:26

16  hadn't made any complaints about bad faith or breach        15:26

17  of duty, had he?                          15:26

18     A.   Correct.                      15:26

19     Q.   Okay.                          15:26

20     A.   It was just part of my desire to get a         15:26

21  clean slate and start forward.                  15:26

22     Q.   Okay.                          15:26

23     A.   And then it morphed.                  15:26

24     Q.   Now, speaking of morphed, you mentioned       15:26

25  earlier that Thelen wanted to renegotiate the              15:26

1  attorney-client agreement in late 2001 for initially,      15:26

2  as you understood it, to get what might be called        15:26

3  downside protection if there was a very low recovery,      15:26

4  do you recall?                          15:26

5      **A.   I believe that was the initial concern.        15:26**

6  **Other concerns such as advances developed, but I        15:26**

7  **think, sequentially, the first concern was the          15:26**

8  **downside exposure.                      15:26**

9      Q.   Okay.  Now, that need to address the          15:26

10  downside exposure, was something that existed prior to    15:27

11  any dispute about Marland's having, not having,         15:27

12  producing, not producing, destroying, or bending,        15:27

13  folding, or spindling any contrat de portage, correct?    15:27

14      **A.   The downside concern, if we can call it        15:27**

15  **that, was a concern I understood had emerged before      15:27**

16  **there was a document issue.                  15:27**

17      Q.   Okay.  And the issue of or the desire of      15:27

18  Thelen to try to get advances had also emerged before    15:27

19  there was any issue about the document to the contrat    15:27

20  de portage, correct?                      15:27

21      **A.   I believe so.                      15:27**

22      Q.   Can you tell us why you did not first seek      15:27

23  to resolve the issue of the downside problem and/or      15:28

24  the advances so that Thelen could renegotiate with the    15:28

25  Commissioner without tying it in inexorably with the      15:28

1  issue of Marland's destruction of the document?          15:28

2        **MS. THURM:** Object to the form of the          15:28

3  question.                                      15:28

4        **THE WITNESS:** Can I have that question read      15:28

5  back?                                          15:28

6        **MR. HAYES:** Q.  Before you do that, I want      15:28

7  to give you a preface you told Brunswick by July --      15:28

8  well, let's take a later date.  By October 2002, you      15:28

9  had told Brunswick that unless Thelen could obtain      15:29

10  advances from the Commissioner and reimbursement of      15:29

11  its expenses which had been unreimbursed, Thelen was      15:29

12  going to resign the representation; do you recall      15:29

13  that?                                          15:29

14    **A.   I don't know if that's all I told them, but      15:29**

15  **I believe that at some point in the fall that was part      15:29**

16  **of what I was telling them.                      15:29**

17    Q.   I didn't mean to suggest it was the only      15:29

18  thing.  You had told him that among other things,      15:29

19  right?                                         15:29

20    **A.   I believe I told him we needed to deal with      15:29**

21  **the downside risk, and we needed to deal with advances      15:29**

22  **in order for us to stay in the case.              15:29**

23    Q.   Okay.  And those issues needed to be      15:29

24  addressed quite apart from addressing any issue of the      15:29

25  contrat de portage, correct?                    15:29

1    A.    Correct, if that issue was nonexistent, we     15:29

2    would still have to deal with downside and advances.     15:30

3    Q.    And even if Thelen and Marland had promptly     15:30

4    come to an understanding regarding the effect, if any,     15:30

5    of Marland's destruction of the contrat de portage,     15:30

6    Thelen still would have needed to renegotiate with the     15:30

7    Commissioner to get advances and reimbursement of its     15:30

8    expenses or it would have resigned the case, correct?     15:30

9    A.    Correct.

10    Q.    So my question to you, sir, in the fall of     15:30

11    2002 why did you insist on linking those two issues in     15:30

12    a new agreement with the European Counsel, the two     15:30

13    issues being the destruction of the document and its     15:30

14    effect on European Counsel's share, and the issue of     15:30

15    renegotiating the Commissioner to get advances?     15:30

16         MS. THURM:  Object to the form of the     15:30

17    question.     15:30

18         THE WITNESS:  I linked those issues     15:30

19    because, as the document issue unfolded  -- it wasn't     15:30

20    stationery, but as it unfolded, I realized that when I     15:31

21    went back to the Commissioner I needed to make a     15:31

22    disclosure.  And I couldn't go to the Commissioner and     15:31

23    say, "Commissioner Lull, we would like advances and we     15:31

24    would like to change the contingent fee agreement in     15:31

25    terms of various trenches to deal with these issues,     15:31

1  and have an agreement to address that," and after he    15:31

2  signed it, saying, "Oh, by the way, before I ever    15:31

3  approached you about this change, did I mention there    15:31

4  is this document problem?"    15:31

5      I couldn't do that.  I had to -- if I was    15:31

6  going to change it, I had to anyway, but certainly no    15:31

7  later than presenting an agreement to the    15:32

8  Commissioner, I had to deal with the disclosure issue.    15:32

9      **MR. HAYES:** Q.  And you believe you had to    15:32

10  disclose what you referred to as the document issue to    15:32

11  the commission because why?    15:32

12  **A.   Because as the document issue unfolded, I    15:32**

13  **learned that, as part of the negotiations for us to be    15:32**

14  **retained, and us to also get permission for the fee    15:32**

15  **splitting with European Counsel, there had been a    15:32**

16  **telephone conference call in which Mr. Brunswick and    15:32**

17  **Mr. Marland participated, and in that conversation    15:32**

18  **they told the Commissioner about the document and    15:32**

19  **represented that it was in a safe place.    15:33**

20  **    And I had reason to believe that that was a    15:33**

21  **material factor, not the sole factor, but a material    15:33**

22  **factor in our retention and permission to split fees    15:33**

23  **with European Counsel.    15:33**

24  Q.   So, you have told us why you believed you    15:33

25  had to disclose to the Commissioner that the contrat    15:33

1  de portage no longer existed.  You have not explained      15:33

2  why you had to reach an agreement on reducing the        15:33

3  European Counsel's share of any fee before you went to      15:33

4  the Commissioner to obtain cash advances from the        15:33

5  Commissioner?                          15:34

6         MS. THURM: He hasn't told you that because      15:34

7  that question wasn't asked.  Go ahead.            15:34

8         THE WITNESS: Can I have the question read      15:34

9  back?  I want to make sure I am answering it.        15:34

10        MR. HAYES: I will rephrase it.            15:34

11    Q.   Why did you insist on linking renegotiation      15:34

12  of the European Counsel's share of any fee with, in        15:34

13  the same agreement, with getting advances from the        15:34

14  Commissioner, instead of getting the European          15:34

15  Counsel's agreement that they would not share in any      15:34

16  advances, although their net recovery would be subject      15:34

17  to further negotiation based on your view of the        15:34

18  document issue, and you would then go to the          15:34

19  commission, make whatever disclosure you had to make,      15:34

20  and negotiate advances?                  15:35

21    A.   Advances --                    15:35

22        MS. THURM: Object to the form of the        15:35

23  question.                          15:35

24        THE WITNESS: I needed to go to the          15:35

25  Commissioner on advances and on the percentages, the      15:35

1   low-side issue that we previously discussed.  And I        15:35

2   suppose it's possible to do what you described, if        15:35

3   there was adequate disclosure.                             15:35

4          But we were talking about the document             15:35

5   issue, we were talking about changes in the                15:35

6   percentages.  And one thing was very clear from            15:35

7   European Counsel, and that is, if we're going to cut       15:35

8   some concessions here, not participating in advances,      15:35

9   and reducing the percentages, we don't want to hear        15:35

10  about this document issue anymore.                         15:36

11         The last thing they wanted, at least as I           15:36

12  understood their position was, Carvill comes in and        15:36

13  negotiates advances they don't participate in, an          15:36

14  adjustment of the percentages, goes to the                 15:36

15  Commissioner and does what he does, and then comes         15:36

16  back and says, "Now, about those percentages, the          15:36

17  document, we want an adjustment for that."                 15:36

18  Q.    When were you tasked to get involved in              15:36

19  this?                                                      15:36

20  **A.    End of May, early June, June of '02.               15:36**

21  Q.    Okay.  Now, was it your understanding that           15:36

22  any revision to the sharing percentages between Thelen     15:36

23  and European Counsel had to be disclosed to and            15:36

24  approved by the Commissioner?                              15:36

25         **MS. THURM:** Can I have the question read         15:37

1   back please?                                   15:37

2         **MR. HAYES:** Before we do that, let me go to      15:37

3   another exhibit.  I am going to ask the same question.      15:37

4   I want to make sure I get to this.  Here is a document      15:37

5   previously marked as Exhibit 7, dated December 1999,      15:37

6   on the letterhead of Thelen, Reid and Priest to      15:37

7   Richard D. Krenz, Special Deputy Insurance      15:37

8   Commissioner, from Gary Fontana and signed by what      15:37

9   appears to be Richard D. Krenz down at the bottom.      15:37

10        Do you see that, sir?                   15:37

11   **A.    Yes, sir.**                          **15:37**

12   Q.    You understand this to be a typical example      15:37

13   of a client consent to a fee-sharing agreement,      15:37

14   correct?                                   15:38

15   **A.    I understand it to be an example.**          **15:38**

16   Q.    Yes.                                 15:38

17   **A.    An example.**                         **15:38**

18   Q.    Okay, bad question.                     15:38

19        And you understood that, as a general      15:38

20   matter, California Rules of Professional Conduct      15:38

21   require client consent to any attorney fee-sharing      15:38

22   agreement, right?                           15:38

23   **A.    Correct.**                           **15:38**

24   Q.    Did you have an understanding that the      15:38

25   Commissioner needed to consent to the revised      15:38

1  fee-sharing agreement in Exhibit 11 even though,          15:38

2  pursuant to Exhibit 11, Thelen's relative share was        15:38

3  going up and the European Counsel's share was going        15:38

4  down?                                  15:38

5      **A.   Yes.**                           **15:38**

6      Q.   Okay.  And is that understanding based on        15:38

7  the fact that the rules of professional conduct          15:38

8  require client consent to not only any initial          15:38

9  fee-sharing agreement, but any amendment?            15:38

10        **MS. THURM:** Object to the form of the          15:38

11  question.                              15:38

12        **THE WITNESS:** I believed that it            15:39

13  required -- the rules of professional conduct required    15:39

14  disclosure whether it was going up or down.          15:39

15        **MR. HAYES:** Q.  Okay.              15:39

16      **A.   But I would add that it's not a simple as**      **15:39**

17  **up or down.**                          **15:39**

18      Q.   When you say it's not as simple, do you        15:39

19  mean the client has to consent to any material change    15:39

20  in terms of a fee-sharing agreement?              15:39

21      **A.   No, what I mean is, this example you have**      **15:39**

22  **given me, number seven, discloses the percentages and**   **15:39**

23  **discloses that it will not result in an increase of**      **15:39**

24  **legal fees.**                           **15:39**

25        **As I looked at the agreement that I was**        **15:39**

1  working on, there were not only percentages, but there      15:40

2  were other kinds of consideration, and so the issue in      15:40

3  my mind was, is it sufficient to simply disclose a      15:40

4  change in percentages, or does the -- to the extent      15:40

5  they are interrelated financial conditions that might      15:40

6  make, hypothetically, a 50/50 in fact be more like a      15:40

7  40/60 or whatever, do you have to disclose other      15:40

8  terms, what is the scope of the fee split as opposed      15:40

9  to the entire agreement?                              15:41

10         So my understanding of the Rules of      15:41

11  Professional Conduct 2-200 require consent of the fee      15:41

12  split, I wanted to make sure that I could show them      15:41

13  the agreement so that there would never be occasion to      15:41

14  quibble, "Well, you told them about the percentage but      15:41

15  you didn't tell them about," whatever, that someone      15:41

16  could argue, "Well, that is part of the fee split," so      15:41

17  I viewed it as a disclosure-consent issue in order to      15:41

18  make sure I covered the rule.                         15:41

19         MR. HAYES: Q.  Well, I'm not sure I      15:41

20  understand your answer.  Are you saying you believed      15:41

21  you needed to disclose everything, but only needed      15:41

22  consent for part of it?                               15:41

23     A.   I needed consent on the fee split, and the      15:41

24  question is, what is the scope of the fee split.  For      15:41

25  example, you have fee split of 65/35, is that      15:41

1  sufficient, or do you also have to tell them, "By the       15:42

2  way, that includes a calculation of the base that          15:42

3  includes anything we get in Quitam."                       15:42

4         So, percentage of what?  What's the base,           15:42

5  is it just the CDOI or the Quitam?  That's an example      15:42

6  of how robust is the definition of a "fee split."          15:42

7     Q.   Well, I am still not clear.  You are saying        15:42

8  the client doesn't need to consent to everything that      15:42

9  you disclosed to them?                                     15:42

10        MS. THRUM: Object to the form of the                15:42

11  question.                                                 15:42

12        THE WITNESS: They do.                               15:42

13        MS. THURM: Incomplete hypothetical, I               15:42

14  think.                                                    15:42

15        THE WITNESS: The client has to consent to           15:42

16  the terms of the fee split.  Wherever you go through      15:42

17  the document and how can you with certainty decide        15:43

18  what is in the fee split versus what is clearly not,      15:43

19  for example, the notice to -- the addresses to which      15:43

20  notice is to be sent are obviously not part of the fee    15:43

21  split, so that's an easy one.  We don't have to           15:43

22  disclose those addresses, or Marland's name.              15:43

23        But what about some of the other                    15:43

24  provisions, the example is the Quitam, do you have to     15:43

25  disclose what the base is on the percentages?  So I       15:43

1  guess I could have gone through the exercise of              15:43

2  parsing the agreement and coming up with a punch list       15:43

3  of everything that was arguably encompassed by the fee      15:43

4  split, or I could have an agreement and say this            15:43

5  agreement reflects a fee split and the terms of which       15:43

6  are self explanatory, will you consent to it?               15:43

7          I liked the latter.  That's what I                  15:44

8  anticipated.  I disclosed the agreement, and I would        15:44

9  get a very short letter similar to this saying they         15:44

10 had approved the fee split reflected in the agreement.      15:44

11    Q.   Okay.  So you're saying you had to disclose         15:44

12 the -- do you want to take a break now, I'm going to        15:44

13 continue on this line a little bit?

14         **THE VIDEOGRAPHER:**The time is 3:44 p.m.          15:44

15 We are off the record.                                      15:44

16         (Whereupon, a recess was taken.)

17         **THE VIDEOGRAPHER:**The time is 3:58 p.m.          15:58

18 We are on the record.                                       15:58

19      **MR. HAYES:**Q.  Judge Carvill, as I said, I          15:58

20 want to continue on this subject of consent.  I first       15:58

21 want to ask whether you discussed this topic with your      15:58

22 counsel during the break?                                   15:58

23         **MS. THRUM:**What is the topic?                    15:58

24         **MR. HAYES:**The topic I was just

25 questioning the witness on that I said I was going to       15:58

1  continue with after the break.                    15:58

2         **THE WITNESS:** The topic of consent being --    15:58

3  I'm sorry, I did take a break.  Can you -- "consent"    15:58

4  in the sense of --                    15:58

5         **MR. HAYES:** Q.  Did you discuss the        15:58

6  testimony you had just given and the questions I just    15:58

7  asked with your lawyer during the break?        15:58

8     **A.   Can I then have the last question because I    15:58**

9  **obviously had conversations with my attorney.  I don't    15:59**

10 **know if it was to that line of questioning or one        15:59**

11 **earlier.                          15:59**

12    Q.   Well, I'm only concerned right now with        15:59

13 whether you discussed the line of questioning about    15:59

14 getting consent, what kind of consent, or scope of    15:59

15 consent what --                    15:59

16   **A.   From the Commissioner?                15:59**

17   Q.   Yes.                    15:59

18   **A.   Right.  Can I answer that?            15:59**

19        **MS. THURM:** You can answer yes or no.        15:59

20        **THE WITNESS:** No.                15:59

21        **MR. HAYES:** Q.  Okay.  Now, you were        15:59

22 mentioning other kinds of consideration that, as I    15:59

23 believe you said, needed to be disclosed or should be    15:59

24 disclosed.  I want to first ask some questions about    15:59

25 other kinds of consideration.  Was it your        15:59

1    understanding that Thelen needed to disclose to the        15:59

2    Commissioner that it had agreed to provide free legal        15:59

3    services to Marland in the future up to a certain        15:59

4    dollar amount?                                        15:59

5        **A.    That is an excellent example of the issue        16:00**

6    **because, theoretically, in the fee split, Thelen could        16:00**

7    **have agreed to give another two-percent to European        16:00**

8    **Counsel and quote "pro bono services," or shaved and        16:00**

9    **said you are going to pay full standard rates.  So        16:00**

10   **that's an excellent example of what do I have to        16:00**

11   **include in that punch list so that the fee splitting        16:00**

12   **is approved.                                        16:00**

13       **At the time, at the time the pro bono        16:01**

14   **issue -- I didn't think that was part of the        16:01**

15   **fee-split, while the Quitam being part of the base        16:01**

16   **was, but I didn't want to have to draw those lines,        16:01**

17   **and why should I make that judgment call if I show        16:01**

18   **them the agreement and say this reflects a        16:01**

19   **fee-splitting agreement, please approve.        16:01**

20       Q.    Was the approval that was necessary an        16:01

21   approval merely of the spitting terms, or the        16:01

22   substance of the agreement, or something in between?        16:01

23       **A.    I was focused on 2-200 and getting that        16:02**

24   **required approval.  The other thing I was focused on,        16:02**

25   **which is part of the consent, I don't want to get        16:02**

1  consent under 2-200 for a fee-split and not disclose        16:02

2  something such as the document that might be used by        16:02

3  someone, a politically less favorable Commissioner to        16:02

4  say, "You guys failed to disclose that to us, or you        16:02

5  misrepresented, we're rescinding the agreement."        16:02

6      Q.    Uh-hum.  I'm sorry, I'm not sure you        16:03

7  answered my question.  Did you have an understanding        16:03

8  at the time that the Commissioner needed to approve --        16:03

9  sorry, let me ask it slightly differently.        16:03

10          Did you have an understanding, in December        16:03

11  2002, that the Commissioner needed to approve only the        16:03

12  revised fee-sharing agreement or something more than        16:03

13  that?        16:03

14      A.    My understanding at the time was that he        16:03

15  had to approve the quote "fee-split," whatever that        16:03

16  scope was, after a disclosure of anything else we had        16:03

17  to disclose.        16:03

18      Q.    And that requirement you just referred to        16:03

19  is a requirement imposed by rule 2-200 of the        16:03

20  California Rules of Professional Conduct, right?        16:03

21      A.    The first half, yes.        16:03

22      Q.    Okay.  And without whatever, without        16:03

23  consent, whatever he needed to consent to, without any        16:04

24  consent, the agreement is invalid, correct?        16:04

25          MS. THURM: Objection.  Calls for a legal        16:04

1 conclusion.                                    16:04

2      **THE WITNESS:** I thought we were in jeopardy      16:04

3 of the agreement being invalid unless he consented      16:04

4 pursuant to 2-200.                              16:04

5      **MR. HAYES:** Q.  Are you telling us that you      16:04

6 thought Thelen could have a revised fee-sharing      16:04

7 agreement with Marland that didn't need to be approved      16:04

8 by the Commissioner that might still be enforceable?      16:04

9      **MS. THURM:** Objection.  Misstates his      16:04

10 testimony.                                     16:04

11      **THE WITNESS:** I thought we needed his      16:04

12 consent.  If we didn't get it, did we have an argument      16:04

13 that the consent to the earlier one was still valid      16:05

14 for a revision that the did not increase the amount      16:05

15 going to the shared entity, I don't know, but I don't      16:05

16 want to test that, so that's why I used the word      16:05

17 "jeopardy" rather than giving you a conclusion.      16:05

18      At the time I thought we ought to get it      16:05

19 approved pursuant to 2-200.  Whether we had an      16:05

20 argument that might be valid, if we didn't, I didn't      16:05

21 want to test.                                  16:05

22      **MR. HAYES:** Q.  Why didn't you include a      16:05

23 clause requiring or stating that the validity of the      16:05

24 December 2002 fee agreement to associate counsel was      16:06

25 conditioned on the Commissioner providing his consent?      16:06

1        **MS. THURM:** I am going to object to the        16:06

2   form of the question because I think you paraphrased,        16:06

3   in part, a sentence from the agreement.  And it's a        16:06

4   paraphrase, so if you want to ask him about a specific        16:06

5   term that he included or that he thought, he can look        16:06

6   at the document, otherwise I object to the form of the        16:06

7   question.  Go ahead.                        16:06

8        **THE WITNESS:** You asked me why I included        16:06

9   that clause?

10       **MR. HAYES:** Q.  Yes, and I've asked your        16:06

11  counsel before that when she objects to form, just say        16:06

12  "object to the form" and not make speaking objections.        16:06

13    **A.   I am just trying to hang on to the                16:06**

14  **question.                                16:06**

15    Q.   No problem.                        16:06

16    **A.   I wanted that clause there about consent as        16:06**

17  **it was drafted so that -- and it be conditioned on        16:06**

18  **that because I was -- I had decided that I was going        16:06**

19  **to get that consent, all right, and I had decided that        16:07**

20  **I was going to get it after a disclosure, and if my        16:07**

21  **attempt met a reaction that was, in effect, you say        16:07**

22  **what, I didn't want to be bound by the agreement.        16:07**

23    Q.   Did you have any precedent rule, or legal        16:07

24  authority, or bar opinion that led you to believe that        16:07

25  an amendment to the fee-sharing provisions between        16:07

1 Thelen and Marland might be valid even if it wasn't          16:07

2 approved by the Commissioner?                                16:07

3    **A.    No.**                                    **16:07**

4    Q.    Okay.  Now, when you were negotiating the           16:07

5 December 2002 new agreement to associate counsel with        16:08

6 European Counsel, among the things you said to Mr.           16:08

7 Brunswick was the statement that Marland's destruction       16:08

8 of the document the contrat de portage entitled Thelen       16:08

9 to invoke the reduction provided for in the June 2002        16:08

10 side letter, do you recall that?                            16:08

11       **MS. THURM:** Object to the form of the             16:08

12 question.                                                   16:08

13       **MR. HAYES:** Q.  If it helps, you can take         16:08

14 the documents in front of you.  It's Exhibit 6.            16:08

15    **A.    Right, what I told Brunswick, on more than      16:08**

16 **one occasion, it was an issue of debate between us,**     **16:09**

17 **was that it was an issue as to whether the destruction**  **16:09**

18 **of the document, if that is what happened, was, in**      **16:09**

19 **effect, a self-inflicted disabling of Mr. Marland that**  **16:09**

20 **would trigger these clauses because -- where is the**     **16:09**

21 **language?  If I become unable or unwilling to testify,**  **16:09**

22 **there are certain consequences.**                         **16:10**

23       **Well, if you take action, that pretty much**       **16:10**

24 **ensures that the department would have no interest in**   **16:10**

25 **calling him, then query whether that is a breach of**     **16:10**

1    the covenant of good faith and dealing in a way to, in     16:10

2    effect, not have to testify based on your own actions.     16:10

3          A witness under this agreement could say,     16:10

4    A, "I'm unwilling to testify," or B, "I am willing to     16:10

5    testify but, by the way, I have done something that     16:10

6    you didn't know about that thoroughly and completely     16:10

7    impeaches me," but I am willing to testify, query     16:11

8    whether or not that is the same as being unwilling to     16:11

9    testify.                          16:11

10    Q.    The document you were referring to and the     16:11

11    document I was referring to in my question is Exhibit     16:11

12    6, the June 2 side letter, correct?                16:11

13    A.    Correct.                     16:11

14    Q.    Okay.  You're not saying that the June 2     16:11

15    side letter specifically addresses the situation where     16:11

16    Marland might be willing to testify but has destroyed     16:11

17    documents, correct?                16:11

18    A.    That is not expressly addressed in the     16:11

19    document that has been marked as Exhibit 6, correct.     16:11

20    Q.    Nor does Exhibit 6 address the situation of     16:11

21    where Marland is willing to testify but, as you say,     16:11

22    his credibility is destroyed, does it?          16:11

23    A.    It does not expressly address that.     16:11

24    Q.    Okay.  But Exhibit 6 does expressly address     16:11

25    the situation where Marland is willing to testify so     16:11

1  long as he is not required to produce documents he        16:12

2  doesn't want to produce; isn't that right?            16:12

3      **A.    There is the issue of documents in here.        16:12**

4  **I'm looking for it.                        16:12**

5      Q.    Right at the bottom of page one, sir?        16:12

6      **A.    Correct.  At the end it says, "In the        16:12**

7  **context of the grand jury, the DOJ fully protects my        16:12**

8  **identity, and assures me" -- I don't --            16:12**

9      Q.    "Assures me that"?                16:12

10     **A.    "Assures me that I will not be compelled to    16:12**

11 **produce documents that may be in my possession or        16:12**

12 **control against my will."                    16:12**

13     Q.    Okay.                        16:13

14     **A.    Yes, that is there.                16:13**

15     Q.    So Exhibit 6 contemplates that Mr. Marland    16:13

16 will testify and states that he will testify so long        16:13

17 as he is not required to produce documents he does not    16:13

18 want to produce, correct?                    16:13

19     **A.    In the grand jury context, correct.            16:13**

20     Q.    Uh-hum.  And is there anything in Exhibit 6    16:13

21 which suggests that notwithstanding what Marland wants    16:13

22 or desires, he may be required to produce documents he    16:13

23 otherwise doesn't want to produce under any possible    16:13

24 circumstances in the future?                16:13

25     **A.    The only express term on that is an        16:13**

1  assurance that in the context of appearing in response    16:14

2  to the Department of Justice and a grand jury, that he    16:14

3  has no such obligation.                        16:14

4      Q.   Okay.  Now, this agreement, Exhibit 6,    16:14

5  provided for a circumstance in which Mr. Marland's    16:14

6  recovery would be reduced and Thelen's would be    16:14

7  increased, correct?                        16:14

8      A.   It provided two such circumstances, yes.    16:14

9      Q.   Okay.  So, was Exhibit 6 ever disclosed to    16:14

10  the Commissioner?                        16:14

11      A.   I don't know.  I have no reason to believe    16:15

12  it was.                        16:15

13      Q.   Do you have any reason to believe that it    16:15

14  ever should have been?                        16:15

15          MS. THURM: Object to the form of the    16:15

16  question.                        16:15

17          THE WITNESS: Well, first of all, it could    16:15

18  not be, obviously, without consent from Mr. Marland.    16:16

19  So to the extent that your question about it should    16:16

20  have been, passes over that issue.  I don't mean    16:16

21  intentionally, but I want to make clear that that is    16:16

22  an issue here.                        16:16

23          I don't think that -- two different issues,    16:16

24  on the percentages and the change of percentages.  At    16:16

25  the time that I looked at this, I don't remember if I    16:17

1  looked at that, but I agree it's within my prior          16:17

2  testimony as the kind of issue that should be             16:17

3  disclosed and consent obtained.                           16:17

4       **MR. HAYES:** Q.  And --                            16:17

5       **A.   With, again, the caveat about if there is a**     16:17

6  **reduction, does that come within the rule, the**         16:17

7  **jeopardy discussion we had, because this reduces, and**     16:17

8  **that's a possibility.  But when I looked at 2-200 in**     16:17

9  **the other context, my view was, it's a change in the**     16:18

10 **percentages, we better be sure we are square with**        16:18

11 **2-200, and the same logic applies.**                      16:18

12      Q.   I think I understood you to be saying that,     16:18

13 yes, Exhibit 6, the June 2nd, 1999, side letter should     16:18

14 have been disclosed to the Commissioner, correct?          16:18

15      **A.   We were in jeopardy if it wasn't disclosed**     16:18

16 **since that it is arguably a modification of a**            16:18

17 **fee-sharing agreement, and if it wasn't disclosed, it**     16:18

18 **might be criticized pursuant to 2-200.**                  16:18

19      Q.   Okay.  And it also follows from your            16:18

20 testimony that absent consent by the Commissioner to       16:19

21 the revised fee-sharing provisions in this June 2nd        16:19

22 side letter, those revised fee-sharing provisions are      16:19

23 invalid and unenforceable, correct?                        16:19

24      **MS. THURM:** Objection to the form of the          16:19

25 question.                                                  16:19

1        **THE WITNESS:** My hesitancy is, when you say        16:19

2    "invalid and unenforceable," there is an issue as to        16:19

3    by whom, and who has a right to do something, is it        16:19

4    Marland, is it Thelen, is it the Commissioner.        16:20

5        **MR. HAYES:** Q.  So your answer to my        16:20

6    question depends on who is enforcing what right?        16:20

7    **A.    It may be.                    16:20**

8    Q.    Well, let's break it down then.        16:20

9        Isn't it true, and doesn't it, in fact,        16:20

10   follow from your previous testimony that absent        16:20

11   consent by the Commissioner, Thelen could not enforce        16:20

12   this agreement against its then client, Francois        16:20

13   Marland?                        16:20

14   **A.    I never considered that.            16:20**

15   Q.    Please consider it now.  Take whatever time        16:20

16   you need and give us your answer.            16:20

17        **MS. THURM:** Can I have the question read        16:20

18   back please.                    16:20

19        (Whereupon, the record was read by the

20        Reporter.)

21   **QUESTION:** "Isn't it true, and doesn't it, in fact,        16:20

22        follow from your previous testimony        16:20

23        that absent consent by the            16:20

24        Commissioner, Thelen could not enforce        16:20

25        this agreement against its then client,        16:20

1       Francois Marland?"                          16:20

2           **THE WITNESS:** It depends with Commissioner      16:21

3   consent, among other things.                    16:21

4           **MR. HAYES:** Q.  Sir, you are not aware of      16:21

5   any evidence the Commissioner consented to any part of    16:21

6   this June 2nd side letter, are you?              16:21

7       **A.   No, I am not.  But what I am saying is, the**   **16:21**

8   **issue is, when do you have to get consent, in ten**      **16:21**

9   **days, ten months, ten years, is it something that is**   **16:21**

10  **cured, I don't know.  I haven't considered that**        **16:22**

11  **question.**                                    **16:22**

12      Q.   During the time that you believed this      16:22

13  agreement to be valid, Thelen never got consent to it    16:22

14  or any part of it from the Commissioner, correct?      16:22

15      **A.   Correct.**                            **16:22**

16      Q.   Okay.  So, during the time you believed      16:22

17  that this June 2nd side letter was valid, now you      16:22

18  realize that, in fact, it was not enforceable by      16:22

19  Thelen against Marland because the Commissioner had      16:22

20  never consented, correct?                        16:22

21          **MS. THURM:** Objection to the form of the      16:22

22  question.                                        16:22

23          **THE WITNESS:** Incorrect.              16:22

24          **MR. HAYES:** Q.  On what basis could Thelen      16:22

25  have enforced this agreement against Marland between      16:22

1  June 2nd, 1999, and December 2002, sir?                16:22

2      A.    These issues were in the agreement that I        16:23

3  was seeking to get approval from -- wanted to finalize      16:23

4  and get approval from the Commissioner.              16:23

5          Let's assume for a minute that that never        16:23

6  happened, and let's assume for a minute that          16:23

7  management thought it was just hunky dorey that we        16:23

8  kept burning money in this case without any change.        16:23

9  To the extent you suggest I couldn't at that point        16:23

10  take this to the Commissioner and get his consent and      16:23

11  thus enforce it, that is a possibility.  It's not a        16:23

12  possibility I considered it at the time, but if you're      16:23

13  asking me what is the consequence of my reasoning in      16:23

14  terms of what I have articulated in terms of consent,      16:24

15  I am saying that that reasoning, if I wanted to          16:24

16  enforce this agreement, instead of supplant it with a      16:24

17  new agreement, which was my purpose, whether I could      16:24

18  enforce this or not, if I wanted to enforce it, I        16:24

19  would have to go to the Commissioner and say by the      16:24

20  way, there is a side letter.  We want the consent to      16:24

21  that as well.                              16:24

22      Q.    Okay.  Sir, with respect to you, you must      16:24

23  have misunderstood my question, so I am going to        16:24

24  object to your answer and move to strike it.          16:24

25          My question is whether this June 2nd, 1999,      16:24

1    side letter ever became valid and enforceable by          16:24

2    Thelen against Marland?  Can you answer that question          16:24

3    please?                                        16:24

4          **MS. THURM:** Objection.  Asked and answered.    16:24

5          **THE WITNESS:** No, it was supplanted.        16:25

6          **MR. HAYES:** Q.  When you say it was          16:25

7    "supplanted," do you actually mean to testify that          16:25

8    this is a valid and enforceable agreement even though          16:25

9    the Commissioner never approved it?              16:25

10          **MS. THURM:** Objection.  Argumentative.          16:25

11    Asked and answered.                          16:25

12          **THE WITNESS:** What I am saying is, it could    16:25

13    have been made enforceable.                      16:25

14          **MR. HAYES:** Q.  It never was, though, was      16:25

15    it?                                        16:25

16    **A.    No, it was supplanted.                    16:25**

17      Q.    Well, before it was supplanted though, you      16:25

18    referred to it many, many times to Mr. Brunswick as          16:25

19    justifying a reduction in the European Counsel's share      16:25

20    though, didn't you?                          16:25

21          **MS. THURM:** Objection.  Argumentative.      16:25

22          **THE WITNESS:** I referred to this document      16:25

23    and the disabling issue in my communications and          16:25

24    negotiations with European Counsel, yes, I did.      16:25

25          **MR. HAYES:** Q.  And you never said, "By the      16:25

1  way, this agreement that I am invoking is invalid and        16:25

2  unenforceable because the Commissioner has never              16:26

3  consented to it," did you?                                    16:26

4      **A.    I never said that.**                              **16:26**

5      Q.    Okay.  In fact, you never even said in              16:26

6  words or substance, "Phillipe, this June 2nd side             16:26

7  letter may not have come into effect yet because I            16:26

8  haven't gotten approval from the Commissioner, but if         16:26

9  we don't come to a new agreement, I am going to come          16:26

10  to the Commissioner and get approval, and then I can         16:26

11  invoke it?                                                    16:26

12      **A.    I never said that.  But I have no doubt**         **16:26**

13  **that the Commissioner would agree to anything that**        **16:26**

14  **would reduce Mr. X's share.**                               **16:26**

15      Q.    Including an agreement that reduced his            16:26

16  share based on whether he testified or not?                   16:26

17      **A.    His testimony in terms of the disclosure to**     **16:26**

18  **the Commissioner in terms of what Gary got in Exhibit**     **16:26**

19  **7 doesn't say anything about his commitment to**            **16:27**

20  **testify.**                                                  **16:27**

21      Q.    Indeed.                                            16:27

22      **A.    And we could not compel him to come to the**      **16:27**

23  **United States.  If we told the Commissioner we wanted**     **16:27**

24  **to reduce his share because he, in fact, is not**           **16:27**

25  **committed to come to the United States, and the**           **16:27**

1   percentage was reduced in this fashion describing the     16:27

2   substance of the letter much as Gary has in this          16:27

3   letter, I can't speak for the Commissioner obviously,     16:27

4   but it's not -- it doesn't follow for me that we           16:27

5   wouldn't get that approval.  I am pretty sure that if     16:27

6   it went the other way, we want a modification that        16:28

7   increases European Counsel's share, I am very            16:28

8   confident we wouldn't get approval as to that.            16:28

9       Q.   Your speculation though about what the          16:28

10  Commissioner would or wouldn't approve doesn't change    16:28

11  the fact that the June 2nd side letter never actually    16:28

12  became a valid and enforceable agreement, does it sir?   16:28

13        MS. THURM: Objection.  Asked and answered.         16:28

14  Argumentative.                              16:28

15        THE WITNESS: If 2-200 covers reductions as         16:28

16  well as increases, and if you're not looking into the    16:28

17  possibility of curing that, the answer is yes.           16:28

18        MR. HAYES: Q.  Now, I take it Thelen never         16:28

19  even disclosed to the Commissioner that it had an        16:28

20  agreement that provided Marland would testify only if    16:28

21  he were not compelled to produce documents he didn't     16:29

22  want to produce?                            16:29

23      A.   I don't know.  I haven't seen any written       16:29

24  disclosure, but I don't know.  I don't know if there     16:29

25  was an oral disclosure.  I'm not saying I have a         16:29

1   reason to believe.  I am just saying I have not seen a     16:29

2   written disclosure.                           16:29

3      Q.   So when you were telling Brunswick in the     16:29

4   fall of 2002 that the Commissioner believed that the     16:29

5   contrat de portage was in a safe place and would be     16:29

6   produced if necessary, you never said, "By the way, we     16:29

7   have told the Commissioner we have an agreement with     16:29

8   you that Marland doesn't have to produce it if he     16:29

9   doesn't want to"?                         16:29

10      MS. THURM: Objection to the form of the     16:30

11   question.                             16:30

12      THE WITNESS: I'm sorry, I lost whether you     16:30

13   asked me what I told our French friends, or the     16:30

14   Commissioner.  Can you just restate it or have it     16:30

15   reread?

16      MR. HAYES: Q.  Well, I was putting the two     16:30

17   together so let me break it down.               16:30

18      Up until you raised the issue of the          16:30

19   contrat de portage with the Commissioner in 2002, when     16:30

20   you made the disclosure that you say you made?     16:30

21   A.   Right.                           16:30

22      Q.   Do you know whether the Commissioner had     16:30

23   any understanding either way regarding whether Marland     16:30

24   would produce the document, or would not produce the     16:30

25   document, or would only produce them in certain     16:30

1  circumstances?                           16:30

2      A.   The only thing I knew from my              16:30

3  investigations as opposed to firsthand observation was    16:30

4  there was documentary evidence, and people would        16:30

5  testify that, knowing not only Thelen, but European       16:30

6  Counsel had expressly represented to the Department of    16:31

7  Insurance that the document was in a safe place and       16:31

8  thus that might be implied representation as to its        16:31

9  availability.                           16:31

10        I didn't know at the time of any express         16:31

11  representation as opposed to implied that it would be      16:31

12  produced in terms of evidence in a proceeding.  And I     16:31

13  make that qualification because the safe place          16:31

14  representation followed earlier representations that      16:31

15  Mr. Marland had access to documents, and if only an     16:31

16  agreement could be reached, he would get on a plane     16:31

17  and bring all of this with him.                16:31

18        So, earlier there is a representation that       16:32

19  he will bring documents, and later there is a           16:32

20  representation the document that we are talking about    16:32

21  was in a safe place.  That's what I knew.  I didn't       16:32

22  know of any express representation to the Commissioner   16:32

23  that I will make the document available in litigation.     16:32

24        MR. HAYES: Q.  Are you aware of any         16:32

25  disclosure to the Commissioner of any agreement        16:32

1  between Thelen and Marland which contemplated that        16:32

2  Marland might refuse to produce the document even if        16:32

3  asked?                                         16:32

4      A.    I know of no such disclosure of the            16:32

5  Commissioner before I made it.  Although, I do know --     16:33

6  correct it.  There may have been statements to the         16:33

7  department staff during the depositions that summer        16:33

8  that we don't have that document.  I don't know -- I       16:33

9  don't know whether the litigation team talked about        16:33

10  the document to the Commissioner's staff they were        16:33

11  reporting to, if the Commissioner's staff made an         16:33

12  inquiry and what the response was.  Although, I have      16:33

13  no reason to believe that any such dialogue included      16:33

14  the divulging of any attorney-client communications       16:33

15  with Mr. Marland.                              16:34

16          The only disclosure -- the first disclosure      16:34

17  that I know of about the document was the disclosure I     16:34

18  made in late 2002 to the Commissioner, that I know of.     16:34

19      Q.    And following up on your comment about the     16:34

20  litigation team, you're not aware of any disclosure       16:34

21  made by anyone at Thelen to anyone at the                16:34

22  Commissioner's office that Thelen had an agreement        16:34

23  with Marland addressing the circumstances where          16:34

24  Marland might refuse to produce documents or refuse to    16:34

25  testify, and that in that circumstance Marland's         16:34

1 recovery would be reduced, are you?                16:34

2    **A.    It might have happened.  I don't know of**      16:34

3 **it.**                                              16:34

4    Q.    Any action, you're not aware of any        16:34

5 evidence that it happened?                           16:34

6    **A.    No.**                                      16:34

7    Q.    Now, was it your understanding that Marland    16:34

8 was an important witness in the case?                16:35

9    **A.    When?**                                     16:35

10       **MS. THURM:** Object.                          16:35

11       **MR. HAYES:** Q.  Ever?                        16:35

12    **A.    Yes.**                                     16:35

13    Q.    When was that?                               16:35

14    **A.    My understanding was that when he came**    16:35

15 **forward as the whistle-blower, he had inside**       16:35

16 **information, he had documents, he will get on a plane**    16:35

17 **and come out here.  I understood at that point he was**    16:35

18 **viewed as, and again I wasn't there, but he was viewed**    16:35

19 **as important.**                                     16:35

20    Q.    Uh-hum.                                      16:35

21    **A.    To the extent to which that importance rose**    16:35

22 **or fell over time through the time of trial, I can't**    16:35

23 **track that graphic, but he certainly was at the**    16:35

24 **beginning.**                                        16:35

25    Q.    Well, then take look at Exhibit 2, the      16:35

1   attorney-client agreement.  And while you do that          16:35

2   we'll change the tape.                          16:35

3          THE VIDEOGRAPHER:This is the end of tape          16:36

4   number three in volume one in the deposition of Wynne          16:36

5   Carvill.  The time is 4:36 p.m.  We are off the          16:36

6   record.                          16:36

7          (Whereupon, a recess was taken.)          16:39

8          THE VIDEOGRAPHER:This is the beginning of          16:40

9   tape number four, volume number one in the deposition          16:40

10  of Wynne Carvill.  The time is 4:47 p.m.  We are on          16:40

11  the record.                          16:40

12         MR. HAYES:Q.  I have Exhibit 2 in front          16:40

13  of me.  Okay, now, do you see the reference under          16:40

14  background, first page.                          16:40

15  A.   Correct.                          16:40

16  Q.   The second paragraph, it's a clause I read          16:40

17  before.  I want to draw your attention to it again.          16:40

18  It's the clause stating that the department quote,          16:40

19  "Has been unwilling to date to pay any fee to client          16:40

20  for the information that he has provided."          16:40

21         Do you see that?                          16:40

22  A.   Yes.                          16:40

23  Q.   In your courtroom, is it permissible to pay          16:41

24  a fact witness for information?          16:41

25         MS. THURM:Objection.  Asked and answered.          16:41

1    **THE WITNESS:** I am not -- if that's the         16:41

2    same question you asked me right at the start of the         16:41

3    deposition, the answer is the same, but I think I said         16:41

4    you cannot pay -- you're asking for the value of his         16:41

5    testimony then?                                16:41

6    **MR. HAYES:** Q.  Uh-hum.  Now I am asking         16:41

7    about paying a fact witness for information.         16:41

8    A.    **For information?**                         16:41

9    Q.    Yeah, I will pay you a hundred thousand         16:41

10   dollars for that document Mr. Fact witness, please         16:41

11   give me the document you don't otherwise have to give         16:41

12   me; is that okay?                         16:41

13   A.    **That's a different question, whether you**         16:42

14   **can pay someone for the production of evidence, and to**         16:42

15   **the extent that you're talking about someone within**         16:42

16   **the United States, I think the answer is no.  To the**         16:42

17   **extent that you're talking about someone outside the**         16:42

18   **United States that has something valuable to sell,**         16:42

19   **say, a document, I am not sure if there is anything**         16:42

20   **improper about that, if that's the way to get the**         16:42

21   **document.**                         16:42

22   Q.    Well, I want to make sure you understand         16:42

23   the question.  The question is not happening to pay         16:42

24   someone to obtain information, and even highly         16:42

25   relevant evidence, the question is paying a fact         16:42

1  witness to provide evidence; is that okay?         16:42

2    **A.    To provide information or to come within         16:43**

3  **the subpoena power of the court?                16:43**

4    Q.    My question is to provide information?         16:43

5       **MS. THURM:** Calls for a legal conclusion         16:43

6  and incomplete hypothetical.                    16:43

7       **THE WITNESS:** If you pay an -- I am having      16:43

8  trouble with the question to the extent that you say,      16:43

9  "bring a fact witness."  If paying a fact witness to      16:43

10  come to the United States, at which point it would be      16:43

11  the subpoena power of the court and take his         16:43

12  deposition, is that paying him to supply information?      16:44

13  I have a problem with that.  Are you paying him to      16:44

14  come within the jurisdiction, or are you paying him to      16:44

15  testify, I don't know.                    16:44

16       **MR. HAYES:** Q.  So you're unable to answer      16:44

17  my question as posed?                    16:44

18    **A.    As posed, correct.                16:44**

19    Q.    Okay.  Do you know what information was      16:44

20  being referred to in this clause and in the         16:44

21  attorney-client agreement between Thelen and Marland,      16:44

22  which I read earlier referring to the unwillingness of      16:44

23  the department to pay any fee to Marland for the      16:45

24  information he has provided?                16:45

25    **A.    I did not write that.  I wasn't around at      16:45**

1  the time.  When I read it in 2002/2003, my          16:45

2  understanding from looking at the face of the document    16:45

3  was that the information, that the department had been    16:45

4  unwilling to compensate Mr. X for information, and       16:45

5  that they were also unwilling to do anything that       16:45

6  would compensate him directly for his assistance,       16:45

7  quite opposed to something narrower, like a document.    16:45

8      Q.    Two follow ups.  First, as a general          16:46

9  matter, are you aware of any way in which a party can    16:46

10  compensate someone with knowledge of relevant facts or    16:46

11  the location of relevant evidence except where that     16:46

12  person is a lawyer and you hire them as a lawyer, or    16:46

13  where that person is a whistle-blower and you          16:46

14  compensate them pursuant to a whistle-blower statute?    16:46

15      A.    Well those are two.                    16:46

16      Q.    Are you aware of any others, sir?          16:46

17      A.    And I have not exhausted all of the          16:46

18  possibilities, but the one that comes to mind that may    16:46

19  apply here is where, again, you have someone outside    16:46

20  the United States and you want that person to come to    16:47

21  the United States.                          16:47

22          Now, you're getting information by that       16:47

23  person coming to the United States or submitting to    16:47

24  that process, whether you're compensating him for the    16:47

25  information or for him coming to the jurisdiction, I    16:47

1  **don't have an opinion on that.**                    16:47

2     Q.   Do you have any understanding that you're        16:47

3  not allowed to pay someone to come to the United        16:47

4  States to provide testimony and except reimbursement      16:47

5  of their ordinary, reasonable expenses, including        16:47

6  travel expenses, and perhaps lost earnings from their     16:47

7  other job they would be doing but for coming and         16:47

8  providing the testimony?                    16:47

9     **A.   That is certainly that, when you're dealing     16:47**

10  **with someone within the United States that is subject     16:48**

11  **to the subpoena power of the court, I understand that     16:48**

12  **to be the general set of ground rules.  I don't know     16:48**

13  **if that same set of ground rules applies extra         16:48**

14  **territorially.**

15     Q.   Okay.  Now, to the extent that Thelen         16:48

16  believed Marland was an important fact witness who       16:48

17  might come testify, was it permissible for Thelen to      16:48

18  pay Marland to give them a document he might not        16:48

19  otherwise have to give them, knowing that Marland       16:48

20  might then come and testify and be subject to cross      16:48

21  examination and disclose on cross examination that he     16:48

22  was paid a lot of money to give a document?         16:48

23       **MS. THURM:** Objection to the form of the        16:48

24  question.  Incomplete hypothetical.             16:48

25       **THE WITNESS:** There are a lot of issues        16:48

1  there.  The most important one that is unclear is the        16:48

2  issue of his status as an attorney or purely as a fact        16:49

3  witness.                                    16:49

4         **MR. HAYES:** Q.  Well, you said --                16:49

5      **A.   The reason why I say that I understand          16:49**

6  **that -- well, I didn't deal with this in 1999 when I        16:49**

7  **was poking around and trying to figure out what          16:49**

8  **happened.  I understood that this was an issue back        16:49**

9  **then, and the European Counsel agreement, and him         16:49**

10 **being an attorney, although, I understand there was        16:49**

11 **also an issue as to whether he was an attorney at the       16:49**

12 **time or had -- that was an effort to deal with some of      16:49**

13 **these issues.                              16:49**

14        **So, at the time I understood that the          16:49**

15 **litigation team was concerned with this issue and         16:50**

16 **tried to address it through the attorney issue, so         16:50**

17 **when you asked me that last question, are you            16:50**

18 **admitting into your question the attorney issue or        16:50**

19 **not?                                     16:50**

20     Q.   I don't think it matters if the person is       16:50

21 going to be called as a fact witness.  I was basing my      16:50

22 question on your prior testimony that you understood       16:50

23 Marland to be an important fact witness.  If you mean      16:50

24 to distinguish in your answer between whether Marland      16:50

25 is a lawyer or inactive lawyer or not a lawyer at all,     16:50

1  go ahead and do so?                                    16:50

2      A.   He certainly could be an important fact        16:50

3  issue -- he certainly could be an important fact        16:50

4  witness.  At the time he came forward, he was the       16:50

5  whistle-blower.  He represented he had documents, and    16:51

6  it essentially was unclear whether other evidence        16:51

7  could be developed.                                      16:51

8          So at that point you have -- my                  16:51

9  understanding is, here is a potentially important fact   16:51

10 witness at the outset of the case, whether he remained   16:51

11 so or not depends on a lot of things.                    16:51

12     Q.   Right.  So, let me restate the question I       16:51

13 have been trying to get at.  To the extent Thelen        16:51

14 understood Marland was an important fact witness,        16:51

15 whether or not he was a lawyer, was it okay for Thelen   16:51

16 to agree to pay Marland money, other than               16:51

17 reimbursement of expenses to either come and testify,    16:51

18 or to produce a document, or both?                       16:51

19     A.   The attorney is certainly an important          16:52

20 factor.  If I have an important fact witness in Paris    16:52

21 who also is an attorney and has contributions to make,   16:52

22 I don't think Thelen -- I didn't, let me say at the      16:52

23 time, I didn't think Thelen was prohibited from hiring   16:52

24 that attorney who might also be a fact witness.          16:52

25     Q.   Okay.  But the initial agreement between        16:52

1  Thelen and Marland was an attorney-client agreement?    16:52

2  **A.    Correct.**                    **16:52**

3    Q.    Okay.  And someone who is an important fact    16:52

4  witness testifying on issues that might be    16:52

5  controverted is disabled from serving as counsel at    16:52

6  trial, isn't he, sir?    16:52

7  **A.    Serving as a counsel in front of a jury,    16:52**

8  **without client consent, I believe whether he is    16:52**

9  **disabled or not depends on which set of rules, and it    16:53**

10 **may also turn into client consent.  But if he is not    16:53**

11 **appearing in front of a jury, that's the concern, so    16:53**

12 **if he is -- lots of attorneys are retained in the case    16:53**

13 **and work on a case and provide information, and it    16:53**

14 **doesn't mean they are going to appear in the courtroom    16:53**

15 **as counsel of record.    16:53**

16   Q.    Indeed.  So, when you said to Brunswick in    16:53

17 the fall of 2002, that Marland's destruction of the    16:53

18 contrat de portage effectively destroyed his value as    16:53

19 a witness --    16:53

20 **A.    Right.    16:53**

21   Q.    -- did you mean one or more of the    16:53

22 following:  As a potential trial witness, as a witness    16:53

23 before the grand jury, or as a percipient witness who    16:53

24 could provide information also being a lawyer to the    16:53

25 U.S. Attorney's office, either on a formal or informal    16:53

1  basis?                                    16:54

2      A.    I meant his value in front of a jury where      16:54

3  he provides the valuable piece of information he has;      16:54

4  that he was the go-between between two very critical      16:54

5  persons there, and there is this document that is the      16:54

6  contrat de portage, and "I have the third copy and,      16:54

7  whoops, after I knew it was important to my testimony,      16:54

8  destroyed it," I think every lawyer would agree you      16:54

9  would have to think twice before you call such a      16:54

10  witness to prove that point.                16:54

11     Q.    Uh-hum, so you're talking about his value      16:54

12  as a trial witness?                        16:54

13     A.    Correct.                        16:54

14     Q.    Okay.  What chance was there that by the      16:54

15  summer of 2002 that Marland was going to be --      16:54

16  Marland, who is associated with Thelen, sharing a      16:54

17  contingent fee recovery would be allowed to maintain      16:54

18  that status and testify at trial?            16:55

19     A.    I could envision at the time, because this      16:55

20  was discussed in the context of the depositions that      16:55

21  were going on, that if Mr. Henan (phonetic) testified      16:55

22  at trial and said, "I have never seen, in the context      16:55

23  of this case, a document bearing the words contrat de      16:55

24  portage." And on cross examination the attorney for      16:55

25  the department said, "Do you mean to tell me that Mr.      16:55

1   Marland did not take to you," or from you, I forget       16:55

2   what it is at this point, "a document signed by you       16:55

3   that has at the top contrat de portage?"       16:55

4          And he said, "Absolutely not." It would be       16:55

5   perfectly permissible to put Mr. Marland on the stand       16:56

6   and say, "Not only did that happen, but here is a       16:56

7   copy." And then counsel will call a handwriting       16:56

8   expert to say that is a true and correct copy of Mr.       16:56

9   Henan's signature. I think Mr. Henan's testimony       16:56

10  would be of no value, and that entire side of the case       16:56

11  could then write off the jury, case over. So in that       16:56

12  scenario, I think he remained a potentially valuable       16:56

13  witness.       16:56

14     Q.   By the summer of 2002, was Mr. Marland a       16:56

15  valuable witness for any other fact other than the       16:56

16  existence of his early version of the contrat de       16:56

17  portage?       16:56

18        MS. THURM: Objection to the form of the       16:56

19  question.       16:56

20        THE WITNESS: I was not litigation counsel,       16:56

21  so I cannot give a definitive answer. But I can say       16:56

22  that, at the time talking to the litigation team, that       16:57

23  was the point, that scenario I just described, was the       16:57

24  point of which he had value.       16:57

25        MR. HAYES: Q. It was the document, right?       16:57

1    **A.   His ability to impeach Henan.  Whether they**     16:57

2    **had another reason to think he was a valuable witness,**     16:57

3    **I can't say.  I didn't discuss that.**                    16:57

4    Q.   Okay.  So what you understood about the          16:57

5    state of play in the summer of 2002 is not               16:57

6    inconsistent with a memo Brunswick wrote about          16:57

7    conversation that they had -- he, at least "he,"          16:57

8    Brunswick, had with Fontana in November 2001 in which     16:57

9    Brunswick writes that Fontana said that the existence     16:57

10   of the portage, and therefore viability, in French        16:57

11   F-A-U-T-E , was proved, correct?                     16:58

12        **MS. THURM:** Can I have the question read        16:58

13   back please.                              16:58

14        **MR. HAYES:** I'll simplify it.                 16:58

15   Q.   Marland's testimony by the summer of 2002     16:58

16   was not needed to prove that there had been portages,     16:58

17   various agreements reflecting a portage, it was merely     16:58

18   to refute Henan and Enses (phonetic), H-E-N-A-N, and     16:58

19   "Enses" as you wish.                        16:58

20   **A.   "As you wish," your guess is better than**        16:58

21   **mine.**                                 16:58

22   Q.   I am actually going off what Gary says.        16:58

23   Let me do the question again.

24        **MS. THURM:** In his obnoxious English.         16:58

25        **THE WITNESS:** Let's get the question.  I'm

1  focused.  Let's get the question.                16:58

2       **MR. HAYES:** Okay.  Your understanding of        16:58

3  the value of Marland's testimony is consistent with      16:58

4  the situation in which the existence of the portage      16:58

5  and, therefore, liability in general, had been          16:59

6  established, correct?                              16:59

7       **MS. THURM:** Object to the form of the         16:59

8  question.  Go ahead.                             16:59

9       **THE WITNESS:** I may be getting tired and      16:59

10  having a problem focusing.  I believe you asked me,      16:59

11  and the answer is, yes, I believe, for the purpose I     16:59

12  described, Mr. Marland remained a potentially           16:59

13  important witness for that impeachment purpose, even    16:59

14  though at some point the litigation team thought they    16:59

15  could prove the contrat de portage.  Is that what you   16:59

16  asked me?                                      16:59

17       **MR. HAYES:** Q.  Even though the litigation     16:59

18  team had already concluded in the fall of 2001 that     16:59

19  they could prove the portage?  It was essentially to    16:59

20  prove that Henan and Enses were liars about a          16:59

21  particular document reflecting the particular version   16:59

22  of the portage, right?                            16:59

23       **A.   A pretty important document but, yes, to**     16:59

24  **impeach those two witnesses.**

25       Q.   Okay, now --

1    **A.    When I answered that last question, I don't    17:00**

2  **know if it was the fall or the winter of 2001.        17:00**

3    Q.    Right.                    17:00

4    **A.    But I didn't take that as the important    17:00**

5  **part of your question.                    17:00**

6    Q.    That's okay, I am going to follow up with    17:00

7  another date.  When do you recall being told that the    17:00

8  U.S. Attorney had received permission to proceed with    17:00

9  indictments, would the date May 2002 help?        17:00

10    **A.    No, it wouldn't.  I know that that issue as    17:00**

11  **to whether they could proceed, and then there is also    17:01**

12  **the issue of when they could unseal, and I am        17:01**

13  **uncertain as to that sequence.                17:01**

14    Q.    You learned at some point that the U.S.    17:01

15  Attorney had told Thelen he had gotten authorization    17:01

16  to proceed with indictments for the grand jury,        17:01

17  correct?                    17:01

18    **A.    At some point I learned that the DOJ had    17:01**

19  **given authority to go forward with the indictments, to    17:01**

20  **seek indictments.  And I believe, as I recall, if I    17:01**

21  **recall correctly, there may have been a sealing issue    17:01**

22  **as well in terms of when that could be used and when    17:01**

23  **it could be unsealed.**

24    Q.    Sure.  Now, it was one of the goals of    17:01

25  Thelen's representation of the DOI, to try to get the    17:01

1  Department of Justice or other prosectorial          17:01

2  authorities to bring criminal charges, right?          17:01

3  **A.   Yes.**                              **17:02**

4      Q.    That would be advantageous because it's          17:02

5  hard for people to defend themselves in a civil trial          17:02

6  when they are either indicted or under investigation          17:02

7  and may be indicted?                           17:02

8  **A.    It's a good tactical position for a**          **17:02**

9  **plaintiff to be in.**                        **17:02**

10     Q.    Okay.  So the fact that it took longer than     17:02

11 one might have liked for the U.S. Attorney to get          17:02

12 around to obtaining indictments is not something          17:02

13 you're saying was a changed circumstance from February     17:02

14 1999 to December 2002, are you?                   17:02

15     **MS. THURM:** Objection to the form of the          17:02

16 question.                                 17:02

17     **THE WITNESS:** The changed circumstance was     17:02

18 the length of the litigation.  And there were multiple     17:02

19 factors feeding into that.  I would not single out one     17:02

20 and say, gee, the U.S. Attorney took X months, that's     17:03

21 a changed circumstance.  I didn't think of it that     17:03

22 way.                                   17:03

23     **MR. HAYES:** Q.  Let me come back to

24 indictments --                            17:03

25 **A.    By the way, on that changed circumstance --     17:03**

1    Q.   Please.                              17:03

2    A.   The reason why I am trying to think about      17:03

3  when I learned it is, this was somehow tied in the      17:03

4  U.S.'s position to what was going on in Iraq and      17:03

5  whether the French were or were not going to vote on      17:03

6  that UN resolution and all of that.               17:03

7    Q.   Uh-hum, I hear what you're saying.  I have      17:03

8  no idea.                                 17:03

9    A.   And one of the factors that plays into the      17:03

10  changed circumstances of all of these circumstances,      17:04

11  who would have thought back in 1999 that the U.S.      17:04

12  government is trying to get the French to go along      17:04

13  with something we were doing in the UN, and maybe for      17:04

14  that reason there is sitting on an indictment.         17:04

15       You can't just take an issue like, gee, it      17:04

16  sometimes takes a long time to get an indictment, that      17:04

17  is certainly not a changed circumstance.  I think you      17:04

18  have to look at the whole context.             17:04

19    Q.   The whole context including the fact that      17:04

20  in 1999 Credit Lyonnais was owned by the French      17:04

21  government, right?                         17:04

22    A.   Correct.

23    Q.   The whole context included the fact that      17:04

24  the CDR, which was the entity that contained Executive      17:04

25  Life claims, was in effect, backed by the French      17:04

1   government, correct?                          17:05

2      **A.   That general structure, I can't buy into**       **17:05**

3   **the acronyms and such, yes, you're right there was**       **17:05**

4   **one --**                                    **17:05**

5      Q.   That's --                          17:05

6      **A.   -- there was fronting for the French**       **17:05**

7   **government.  Whether --**                    **17:05**

8      Q.   Right.                            17:05

9      **A.   -- it was CDR or something else, I can't**       **17:05**

10  **tell you.**                                  **17:05**

11     Q.   Right, so in other words, a strategy which      17:05

12  entailed trying to get the Department of Justice to      17:05

13  indict Credit Lyonnais for fraud was tantamount to      17:05

14  getting to indict an arm of the French government for      17:05

15  fraud, correct?                               17:05

16     **A.   A party affiliated with the French**       **17:05**

17  **government, yes.**                           **17:05**

18     Q.   Okay.  And you're telling us that it       17:05

19  couldn't have reasonably been foreseen in 1999, or      17:05

20  1989, or 1979, or 2009 that diplomatic concerns might      17:05

21  have prolonged or complicated any effort to get the      17:05

22  Department of Justice to indict a bank owned by the      17:06

23  French government, are you?                    17:06

24     **MS. THURM:** Objection.  Argumentative.       17:06

25     **THE WITNESS:** I'm not saying that political      17:06

1    concerns such as that happened.  I am saying that          17:06

2    given the importance of the Iraq war and that UN            17:06

3    position, it was pretty unusual.                     17:06

4        **MR. HAYES:** Q.  I'm sorry, let's try the       17:06

5    question again.  With regard to 1999, you're saying it    17:06

6    could not have reasonably been foreseen that the           17:06

7    prospect of obtaining an indictment of a bank for          17:06

8    conduct when the bank was owned by the French              17:06

9    government might have raised diplomatic issues that         17:06

10   would have taken months if not years to resolve?          17:06

11       **A.   That would raise -- it might raise          17:06**

12   **diplomatic issues.  That it would raise things to the    17:06**

13   **magnitude we were talking about is a different matter.   17:06**

14       Q.   Okay.  Now, speaking of changed            17:07

15   circumstances, you had mentioned earlier this morning     17:07

16   a variety of changed circumstances.  Are you saying       17:07

17   that time and expense in excess of what was            17:07

18   anticipated or projected from one partner in the firm      17:07

19   to the other before the representation was undertaken,    17:07

20   constituted changed circumstances, without further        17:07

21   detail or information?                     17:08

22       **MS. THURM:** Can I have the question read       17:08

23   back please?                        17:08

24       (Whereupon, the record was read by the

25       Reporter.)

1  **QUESTION:** "Now, speaking of changed circumstances,      17:07

2          you had mentioned earlier this morning          17:07

3          a variety of changed circumstances.          17:07

4          Are you saying that time and expense in          17:07

5          excess of what was anticipated or          17:07

6          projected from one partner in the firm          17:07

7          to the other before the representation          17:07

8          was undertaken constituted changed          17:07

9          circumstances, without further detail          17:08

10         or information?"          17:08

11         **MS. THURM:** Objection to the form of the          17:08

12  question.          17:09

13         **THE WITNESS:** No, that is not the same.          17:09

14  Changed circumstance, the changed circumstance is what    17:09

15  happened in relationship to the representations of Mr.    17:09

16  Marland and Mr. Brunswick as to what was going to          17:09

17  happen in this event, in this circumstance.  They are     17:09

18  the experts in France; they are the experts on          17:09

19  politics, they are saying "Look, Thelen, this is a          17:09

20  quick kill, six months, maybe a year, there is no way    17:09

21  this is going to be privatized without this being          17:09

22  resolved," that is what I am saying.          17:09

23     Q.    Mr. Carvill, how many times in your career     17:09

24  has a client said, "All you have to do is write a          17:09

25  demand letter or send a threat letter or file a          17:09

1  complaint and the other side will capitulate," just        17:09

2  roughly, how many times has that happened?              17:09

3      **A.    It's definitely happened.                    17:09**

4      Q.    Many, many times, right?                    17:09

5      **A.    It is not an infrequent occurrence.           17:09**

6      Q.    Okay.  And what percentage would you say       17:10

7  are the times when the demand letter is sent, the        17:10

8  threat letter is sent, or the complaint was filed and     17:10

9  the other side capitulates in a quick kill?             17:10

10     **A.    It's a low percentage.  It depends on the     17:10**

11 **reason.**

12     Q.    But it's a low percentage, though, right?     17:10

13     **A.    It's a low percent.                         17:10**

14     Q.    So the fact that Gary Fontana said to Steve    17:10

15 O'Neal that this is not very likely to be an associate    17:10

16 intensive case and he turned out to be wrong, doesn't    17:10

17 constitute a changed circumstance, does it?            17:10

18     **MS. THURM:** Object to the form of the           17:10

19 question.                                    17:10

20     **THE WITNESS:** I disagree.                     17:10

21     **MR. HAYES:** Q.  You think it does.            17:10

22     **A.    It could be.                            17:10**

23     Q.    It could be?                            17:10

24     **A.    Yes.                                 17:10**

25     Q.    Because Fontana is relying on Marland and     17:10

1   Brunswick with regard to the amount of associate time        17:10

2   and effort that might be taken?                              17:10

3   **A.   No.**                                     **17:10**

4        **MS. THURM:** Object to the form of the           17:10

5   question.                                        17:10

6        **THE WITNESS:** No, that's not the issue.         17:10

7        **MR. HAYES:** Q.  Because I want to make sure     17:10

8   you've got the document in front of you.              17:10

9   **A.   I already saw it.**                     **17:10**

10  Q.   Right.

11  **A.   I know the document you're referring to.**

12  Q.   Right, he is referring to that even if they     17:11

13  fight, even if there is protracted litigation, it's        17:11

14  not likely to become an associate intensive case,         17:11

15  that's why I am saying, please, have a look at the         17:11

16  document?                                        17:11

17  **A.   It's an entirely different procedural          17:11**

18  **schema that they were talking about in terms of          17:11**

19  **reopening the liquidation of CDOI as opposed to --      17:11**

20  **well, the federal court fraud case.  I think you are    17:11**

21  **referring to part of Exhibit 17 that we discussed this   17:11**

22  **morning.**                                     **17:11**

23  Q.   Yes.                                        17:11

24  **A.   Where there is a discussion of strategy and    17:11**

25  **we are going to reopen the liquidation in that           17:11**

1  **context, this is what we plan to do, and it's not**          17:11

2  **going to be associate intensive.  That whole**          17:11

3  **litigation plan isn't where this case went.**          17:11

4      Q.    The Quitam litigation was contemplated          17:11

5  prior to Mr. Fontana writing that memo, wasn't it?          17:12

6      **A.    Yes, Quitam --**          17:12

7          **MS. THURM:** Objection to the form of the          17:12

8  question.          17:12

9          **THE WITNESS:** -- the Quitam was an early          17:12

10  consideration.          17:12

11          **MR. HAYES:** Q.  And the proposed          17:12

12  representation of the DOI had been discussed with the          17:12

13  DOI for weeks before that memo?          17:12

14      **A.    Yes, yes.**          17:12

15      Q.    Okay.  There was even a draft,          17:12

16  attorney-client agreement between Thelen and Marland,          17:12

17  right, it's attached as Exhibit --          17:12

18      **A.    Yes.**          17:12

19          **MS. THURM:** Object to the form of the          17:12

20  question.  Misstates the record.          17:12

21          **THE WITNESS:** There is a draft agreement          17:12

22  attached, attorney-client between Thelen and          17:12

23  Quackenbush and Thelen and Francois Marland.          17:12

24          **MR. HAYES:** Okay.          17:12

25          **MS. THURM:** I'm sorry, what was the          17:12

1   witness's last answer?                                    17:12

2          (Whereupon, the record was read by the

3          Reporter.)

4   **ANSWER:** "There is a draft agreement attached,            17:12

5          attorney-client between Thelen and            17:12

6          Quackenbush and Thelen and Francois            17:12

7          Marland."

8          **MR. HAYES:** Q.  Okay, now you are not            17:13

9   saying that Marland and Brunswick were making            17:13

10  decisions for Thelen with regard to whether they            17:13

11  should file a fraud claim, and/or a whistle-blower            17:13

12  claim, and/or make a motion in the insolvency court,            17:13

13  are you?                                    17:13

14  **A.   No.**                                    **17:13**

15     Q.    Okay.  And you're not saying that Marland            17:13

16  or Brunswick were directing Thelen's strategy with            17:13

17  regard to trying to get the Department of Justice or            17:13

18  the federal reserve to bring charges against parties            17:13

19  in France?                                    17:13

20     **A.   They were involved but, correct, they were            17:13**

21  **not directing that.**                                    **17:13**

22     Q.    Right.  Thelen devised a strategy you            17:13

23  thought would be most efficient and expeditious in its            17:14

24  clients best interests, and then conveyed that            17:14

25  strategy to its clients and got their approval, right?            17:14

1          **MS. THURM:** Object to the form of the          17:14

2  question.                          17:14

3          **THE WITNESS:** Devised part of the strategy.    17:14

4          **MR. HAYES:** Q.  Okay.                17:14

5    **A.    The U.S. litigation part.**                **17:14**

6     Q.    I see, and Thelen was relying on Brunswick     17:14

7  and Marland to do any research about whether the        17:14

8  French government might privatize Credit Lyonnais        17:14

9  while carving out Executive Life and other difficult     17:14

10  issues into a special purpose entity like the entity     17:14

11  that, in fact, is called the CDR, is that what you're     17:14

12  telling us?                          17:14

13          **MS. THURM:** Objection.  Argumentative.        17:14

14          **THE WITNESS:** When you say that's what I'm     17:14

15  telling you, I am trying to answer your questions.        17:14

16  What I am telling you is that the European political      17:14

17  strategy analysis was theirs, the U.S. litigation        17:14

18  strategy was ours, and between Fontana and Marland and   17:15

19  Brunswick, there was a discussion of what was going to   17:15

20  happen, what was the strategy, and in light of those     17:15

21  assumptions, 65, followed by 52 point five was a fair    17:15

22  way to do it.                        17:15

23          **MR. HAYES:** Q.  Now, Marland was right that   17:15

24  the French government was under pressure to privatize    17:15

25  Credit Lyonnais, wasn't it?                17:15

1      **A.   Yes.**                                    17:15

2      Q.   And the French government, in fact, did        17:15

3   relatively soon after February 1999 privatize Credit       17:15

4   Lyonnais, didn't it?                              17:15

5      **A.   They did relatively soon in the saga,**       17:15

6   **whether it was '99 or 2000, I can't tell you.**        17:15

7      Q.   Okay.  That is why I asked my question       17:15

8   about craving out a special-purpose entity.  Are you       17:15

9   saying that Marland as opposed to Thelen should have        17:16

10   anticipated the possibility that the French government       17:16

11   would have gone ahead and privatized Credit Lyonnais,        17:16

12   but carved out the Executive Life claims and other        17:16

13   claims into a special purpose entity?              17:16

14      **MS. THURM:**Object to the form of the        17:16

15   question.                                    17:16

16      **THE WITNESS:**No, because I don't know        17:16

17   enough about privatization in France, how it works,        17:16

18   and what Marland should know, did know, should have        17:16

19   known, could have known, all right.              17:16

20      What I understand was that given that        17:16

21   division of responsibility and relative expertise,        17:16

22   Fontana, Marland and Brunswick, as I understood, said       17:16

23   this is a good, this is a fair split.              17:16

24      And significantly you will notice that if       17:16

25   it goes on, and I think we have to -- the months are        17:17

1  ballpark, if it goes beyond seven or eight months,          17:17

2  whatever it is from the agreement to the end of year,      17:17

3  whatever the percentages change, if it goes on more         17:17

4  than that, that alone drops the percentages almost 13      17:17

5  percent or 12 percent.  So, in the party's agreement,     17:17

6  there was an understanding of the value of the passage    17:17

7  of time.                                      17:17

8         **MR. HAYES:** Q.  Speaking of that, the          17:17

9  structure of the parties attorney-client agreement       17:17

10 contemplated that Thelen might well make a substantial    17:17

11 premium on its lodestar if the case settled within the    17:17

12 year 1999, correct?                           17:17

13    **A.    Correct.**                         **17:17**

14    Q.    All right.  Is it not then also fair to say     17:17

15 that the structure of the parties retainer              17:18

16 contemplated that Thelen might make something less       17:18

17 than it's total lodestar if the case went on well past    17:18

18 1999?                                       17:18

19    **A.    Are you asking me is that a fair assumption    17:18**

20 **reading the agreement, are you asking me what I         17:18**

21 **understood the parties' understanding was at the time   17:18**

22 **they entered the deal?                          17:18**

23    Q.    Let's first start with the latter.          17:18

24    **A.    The latter, my understanding at the time      17:18**

25 **the parties entered the deal was that both sides, this   17:18**

1  is going to be profitable to both sides.  But as time        17:18

2  went on, the party bearing the burden of time was            17:18

3  Thelen, and so that even on a relatively short time          17:18

4  horizon of eight or nine months, it went on beyond           17:18

5  that, but that alone justified a drop of 12 and a half       17:18

6  percent, and the parties understood that Thelen was          17:18

7  the one that was principally prejudiced by the passage       17:19

8  of time.                          17:19

9      Q.   So are you also saying that the parties        17:19

10 understood in February 1999 that no matter how long          17:19

11 the case might drag on, Thelen would always be               17:19

12 entitled to recover at least its lodestar, more or           17:19

13 less?                             17:19

14     A.   No, no, that's not what I am saying.           17:19

15     Q.   Okay.  So let me come back to the other         17:19

16 branch of the questioning.                    17:19

17     A.   Okay.                         17:19

18     Q.   Looking at this agreement now, isn't it        17:19

19 fair to say that Thelen took a chance that if the case       17:19

20 settled early, it would make a substantial premium,         17:19

21 and if the case dragged on substantially, it might be        17:19

22 less than its lodestar or, indeed, nothing at all,           17:19

23 correct?                          17:19

24     A.   Looking at the agreement then in 2002/2003,     17:19

25 and I looked at the four corners of the agreement, I        17:20

1   saw that as a risk in the structure of the four          17:20

2   corners in the agreement.                          17:20

3       Q.   And you wanted to correct that risk, right?    17:20

4       A.   I wanted to address the fact that things       17:20

5   had dramatically changed.  And I understood from Gary    17:20

6   that French -- the French -- Gary had a discussion       17:20

7   about this, and there was an agreement to adjust.  It    17:20

8   wasn't me charging in there and saying "I don't like     17:20

9   your fee agreement.  I am changing it."  I am            17:20

10  responding to a situation where I'm told that there is   17:20

11  an agreement in principle, there is a draft on the       17:20

12  table, and for some reason it's not being signed, but    17:20

13  there is an agreement in principle, and can I close      17:20

14  the deal.                              17:21

15      Q.   Okay.  Now you mentioned earlier that --    17:21

16      A.   And --                        17:21

17      Q.   Please.                        17:21

18      A.   And if there is an agreement in principle    17:21

19  and the two parties in the agreement, Gary and Mr.      17:21

20  Marland, agree that it should be changed to adjust to   17:21

21  this because this is not what they contemplated or      17:21

22  intended, I don't see where it's my role coming in      17:21

23  initially to say, "Well, we are not going to change     17:21

24  this agreement."  I am being called in to document and  17:21

25  close on what I understand is an agreement in           17:21

1 **principle between the two negotiators based on changed**     17:21

2 **circumstances.**                                    17:21

3     Q.   You said that there was an agreement in        17:22

4 principle to renegotiate.  You also said that Gary led    17:22

5 you to believe that Marland had agreed to this          17:22

6 renegotiation because Marland agreed that              17:22

7 circumstances had changed?                          17:22

8     **A.   That they agreed that circumstances had**      17:22

9 **changed.**                                        17:22

10    Q.   Uh-hum, as opposed to European Counsel        17:22

11 agreeing to renegotiate an agreement because Gary had    17:22

12 said, "If we cannot renegotiate this agreement, Thelen    17:22

13 will have to withdraw, and that will hurt you, the       17:22

14 European Counsel"?                               17:22

15    **A.   I don't know when Gary brought that risk**       17:22

16 **up.  My understanding is that there was an agreement**    17:22

17 **to renegotiate based on changed circumstances, whether**   17:22

18 **or not that agreement in principle was arrived at**       17:22

19 **90-percent because Gary told them Thelen was going to**    17:23

20 **withdraw, and 10-percent because of their**            17:23

21 **acknowledgment of changed circumstances, or 10/90 the**    17:23

22 **other way, or 50/50, whatever, I don't know.**          17:23

23    Q.   Okay.  Now, you had also mentioned that the     17:23

24 original attorney-client agreement contemplated that      17:23

25 Thelen would bear the risk if the case dragged on        17:23

1　because Thelen would be investing the time and effort　　17:23

2　of its attorneys, is that fair?　　17:23

3　　**A.　Fair, I said that passage of time was**　　**17:23**

4　**disproportionately born by Thelen.**　　**17:23**

5　　Q.　Right.  Did you ever come to an opinion　　17:23

6　that the original attorney-client agreement　　17:23

7　contemplated that Marland and/or his lawyers,　　17:23

8　Brunswick and Maas, would invest an amount of time and　　17:24

9　effort proportional to the share that they were　　17:24

10　getting under the attorney-client agreement?　　17:24

11　　　**MS. THURM:** Object to the form of the　　17:24

12　question.　　17:24

13　　　**THE WITNESS:** My understanding was that in　　17:24

14　terms of their contribution in terms of strategy, and　　17:24

15　also their burden in France, you mentioned the　　17:24

16　burglaries, and those kinds of issues, their burden　　17:24

17　was relevantly front loaded, while other burden was　　17:24

18　relatively back loaded.　　17:24

19　　　**MR. HAYES:** Q.  Fair enough.  So, apart　　17:24

20　from the strain that the protracted litigation, high　　17:24

21　lodestar and unreimbursed expenses was putting on　　17:25

22　Thelen --　　17:25

23　　**A.　Right, aside from that.**　　**17:25**

24　　Q.　-- aside from that, you did not take the　　17:25

25　position in 2002 that the percentages between Thelen　　17:25

1  and European Counsel should be changed anyway because          17:25

2  the actual amount of lodestar time and expense of the          17:25

3  European Counsel being spent on the case was not          17:25

4  proportional to Thelen's time and expense, correct?          17:25

5      A.   I don't know if I articulated it that way.     17:25

6  I may have in my conversation with Brunswick.          17:25

7      Q.   Uh-hum.                          17:25

8      A.   Because one of the things I understood          17:25

9  about one of the formulas that I inherited early on, I     17:25

10  think Thelen had presented that their lodestar as of a     17:25

11  certain point, I think, was seven point five, and          17:26

12  there was in a sense an agreement in coming up with          17:26

13  that formula that we ought to -- and this is -- this     17:26

14  is what you read in the formula.  This is -- what is     17:26

15  the purpose of the formula, where is this seven point     17:26

16  five, where is the fraction, let's pick a time when,     17:26

17  for purposes of renegotiating, we'll simply agree that     17:26

18  our burdens were comparable, and then tie the future     17:26

19  distribution and contingent fee award based on how          17:26

20  this lodestar changed.                     17:26

21           And you can see that -- I am sure you know     17:26

22  it better than I now, you can see that in the early     17:26

23  documents that there was some conversation and that          17:26

24  concept was on the table, and that is the concept I     17:27

25  inherited --                          17:27

1    Q.    Okay.                          17:27

2    **A.    -- and started from.**              **17:27**

3    Q.    Now, understanding the parties can always    17:27

4    agree to whatever structure they want to agree to and    17:27

5    think is fair?

6    **A.    Right.**

7    Q.    You're not telling us that apart from the    17:27

8    fact that there was discussion of that formula that it    17:27

9    was actually the understanding of the parties in 1999    17:27

10   that the proportionate recovery of Thelen, European    17:27

11   Counsel, would be based in any way or was intended to    17:27

12   reflect in any way the relative lodestar of those two    17:27

13   entities, are you?                    17:27

14       **MS. THURM:** Object to the form of the    17:27

15   question.                          17:27

16       **THE WITNESS:** The relative contributions to    17:27

17   the extent lodestar includes the concept as it    17:27

18   certainly does in the United States of hours times    17:27

19   something, their contribution was -- no one was    17:27

20   pretending that their contribution was measured in    17:28

21   hours.                             17:28

22       **MR. HAYES:** Okay.                    17:28

23   **A.    It was, the contributions were deemed to be    17:28**

24   **equivalent as of a certain point of time.**          **17:28**

25   Q.    Okay.  And, in fact, quite apart from Mr.    17:28

1  Brunswick, Thelen retained other counsel in France and     17:28

2  elsewhere in Europe to be affiliated counsel to the     17:28

3  Commission of Insurance, correct, such as Cresar     17:28

4  Imenadiez (phonetic), correct?     17:28

5     A.   I don't know that name.  I do believe that     17:28

6  there were times when other European attorneys were     17:28

7  retained for this or that purpose.  What was the name     17:28

8  of them, whether it was to make their office available     17:28

9  for a deposition, or whether they were going to write     17:29

10  a treatise or this or that aspect, I don't know.     17:29

11     Q.   Okay.  When did you first anticipate that     17:29

12  there might need to be litigation between Thelen and     17:29

13  Marland over any aspects of their relationship?     17:29

14     A.   I am not sure.  If you're asking when did I     17:29

15  contemplate, I think that when I was meeting with     17:29

16  Brunswick in Paris, I could see that possibility.  I     17:29

17  think that would be the earliest.  I am not saying at     17:30

18  that time I thought it was a high possibility, but in     17:30

19  terms of when I first went over there and getting in     17:30

20  the case, my thoughts were we have got an agreement in     17:30

21  principle and you have heard me.  When I am in Paris     17:30

22  and we were in that meeting with Brunswick, I realized     17:30

23  that we may have had an agreement in principle at some     17:30

24  point, but it certainly doesn't sound like we are     17:30

25  there now, and there is acrimony in this room, that     17:30

1  **certainly leads one to think about, "Well, gee, this**      17:30

2  **could go sideways."**                                17:30

3      Q.   Sure.  I understand what you're saying.      17:30

4  With regard to your meeting in Paris with Brunswick,      17:30

5  did you meet in Paris with Mr. Marland as either alone      17:30

6  or with Mr. Brunswick?                              17:30

7      **A.   I went there for that, but I did not meet**      17:31

8  **with Mr. Marland.**                              17:31

9      Q.   Okay.  How many times do you recall meeting      17:31

10  with Mr. Marland, either him alone, or with others?      17:31

11      **A.   I believe three times.**                  17:31

12      Q.   Once in New York?                          17:31

13      **A.   Correct.**                              17:31

14      Q.   And when were the other two times?          17:31

15      **A.   I believe -- it's been some time, but I**      17:31

16  **believe he came out for a meeting with Gary Cohen.**      17:31

17      Q.   I didn't know you were at that meeting?      17:31

18      **A.   Yes.**                                  17:31

19      Q.   Your recollection of that date?            17:31

20      **A.   It was summer of '03.**                  17:31

21      Q.   Okay.  And the third time?                17:31

22      **A.   Shortly before that meeting with Mr. Cohen.**      17:31

23      Q.   Okay.                                    17:31

24      **A.   Excuse me, can we take a bathroom break?**

25      Q.   Yeah, sure.                              17:40

1          THE VIDEOGRAPHER:The time is 5:32 p.m.          17:40

2    We are off the record.                              17:40

3          (Whereupon, a recess was taken.)              17:40

4          MR. HAYES:Q.  Okay, Mr. Carvill, I have       17:40

5    asked you to put in front of you Exhibit 14 again.   17:40

6    **A.   Yes, sir.**                                   **17:40**

7    Q.   I have just a short line of questioning         17:40

8    regarding that document that we haven't touched on   17:41

9    earlier.  First question is this, was that document or   17:41

10   the substance of that document communicated to the   17:41

11   Commissioner in or about May 1999?                   17:41

12   **A.   I don't know.**                               **17:41**

13   Q.   Do you recall saying to Mr. Brunswick in        17:41

14   November 2002, that the contents of the May 1999 fax,   17:41

15   Exhibit 14, were never made known to the Commissioner?   17:41

16   **A.   The best of my knowledge, it was not.**       **17:41**

17   Q.   Should it have been?                            17:41

18   **A.   I don't know without further clarification**  **17:41**

19   **at the time as to what this really meant.  My**    **17:41**

20   **understanding was that Mr. Marland was very concerned**   **17:42**

21   **about his identity and criminal prosecution.  I didn't**   **17:42**

22   **know, but I thought that in this time frame, being**   **17:42**

23   **'99, he was insistent on not producing the document**   **17:42**

24   **because of those two concerns.**                   **17:42**

25   Q.   When you say you didn't know, you mean you      17:42

1   didn't know in 1999?                          17:42

2       A.    What I am saying is, I didn't -- well, I        17:42

3   didn't know anything in '99.                          17:42

4       Q.    Okay.                          17:42

5       A.    In terms of where I am in 2002, talking        17:42

6   with people about '99, my understanding of their state    17:42

7   of mind was this was a reflection of Marland's concern    17:43

8   about the two issues I mentioned, as opposed to a        17:43

9   retraction of "It is in a safe place."        17:43

10      Q.    Okay.  All right, I have a little more than    17:43

11  half an hour, but I understand you have some cross.        17:43

12  Except for follow-up on your cross, I have no further    17:43

13  questions.                          17:43

14          MS. THURM: Do you want to move?

15          MR. HAYES: I hate doing that.  If you

16  really want to, I will.

17          MS. THURM: No, no, don't, I'm happy to.        17:44

18  That's fine.                          17:44

19          THE WITNESS: I hear fine.                17:44

20          MS. THURM: Okay.

21          MR. HAYES: You're okay?

22          THE WITNESS: I'm fine.  Let's go.

23          MS. THRUM: That's fine.  Are we on the        17:44

24  record?                          17:44

25          THE VIDEOGRAPHER: You never went off.        17:44

1       MS. THURM: Sorry.                    17:44

2           EXAMINATION BY MS. THURM:           17:44

3       MS. THURM: Q.  Mr. Carvill, can you look      17:44

4   this way?                        17:44

5       A.    Ma'am.                    17:44

6       Q.    Thank you.  Did Phillipe Brunswick ever    17:44

7   describe to you any limitation on the scope of his    17:44

8   representation of Francois Marland?              17:44

9       A.    Absolutely not.                17:44

10      Q.    Okay.  What was your understanding as to    17:44

11  the scope of Mr. Brunswick's representation and advice   17:44

12  to Mr. Marland as you were negotiating the 2002      17:44

13  agreement?                      17:45

14      A.    He held himself as the person who was      17:45

15  negotiating on behalf of Mr. Marland, when he made the   17:45

16  demands or suggestions it was either "we" or "my      17:45

17  client."  He never led me to believe that he was    17:45

18  negotiating on his own behalf as apart from Mr.      17:45

19  Marland's.  And I received detailed, numerous and    17:45

20  detailed communications from him which I understood,    17:45

21  and read, and relied on based on I am being told what    17:45

22  Mr. Marland, and other European Counsel whose      17:45

23  interests I understood to be derivative of his,      17:45

24  wanted.                        17:45

25      Q.    Okay.  What did you understand was, if      17:45

 1  anything, was the scope of France Chateau's                17:46

 2  representation of Marland or European Counsel in the        17:46

 3  time period from the summer to the end of 2002?            17:46

 4      **A.   I knew he was consulting with them because**        **17:46**

 5  **there would be references to him by Mr. Brunswick,**          **17:46**

 6  **perhaps Mr. Marland, I can't recall, and from time to**        **17:46**

 7  **time I would be asked by European Counsel to send a**          **17:46**

 8  **draft to him, so I understood that he was a part of**          **17:46**

 9  **their team.**                                    **17:46**

10      Q.   Okay.  You told Mr. Hayes that you met with      17:46

11  Mr. Marland in person on three occasions; is that          17:46

12  correct?                                        17:46

13      **A.   Yes.**                                  **17:46**

14      Q.   Okay.  Once in the New York, that was a          17:46

15  meeting at Thelen's offices?                          17:46

16      **A.   Correct.**                                **17:46**

17      Q.   And who was present at that meeting?            17:46

18      **A.   Just Marland and myself.**                    **17:47**

19      Q.   Okay.  And how long did that meeting take        17:47

20  place?                                          17:47

21      **A.   My best guesstimate is three hours.**            **17:47**

22      Q.   Okay.  Can you describe for us whether you        17:47

23  experienced any difficulty and, if so, what the            17:47

24  difficulty was in communicating with Mr. Marland          17:47

25  during that meeting in New York?                       17:47

1    A.   No, I had no difficulty communicating with    17:47

2  him.  Every once in a while he might ask something,    17:47

3  like, "What do you mean by that," and I would have to    17:47

4  break it down and explain it.  But I inferred we were    17:47

5  communicating because his responses were appropriate    17:47

6  in the sense of when you make a statement to a person    17:47

7  or ask a question, if they come back with something    17:47

8  that is responsive and appropriate to the dialogue,    17:47

9  you assume you're communicating, as opposed to    17:47

10 something that suggests that we're not there at all.    17:48

11   Q.   Okay.  And what language were you speaking    17:48

12 and what language was Mr. Marland speaking during that    17:48

13 meeting in New York?                    17:48

14    A.   The conversation was entirely in English    17:48

15 with the exception of occasionally Mr. Marland would    17:48

16 use a French phrase and explain it to me.    17:48

17   Q.   Okay.  And then you indicated you had two    17:48

18 meetings with him.  It sounded like they were close    17:48

19 together in time in the summer, August of 2003?    17:48

20    A.   Correct.                    17:48

21   Q.   Okay.  Can you describe in a little bit    17:48

22 more detail the first meeting, who was present?    17:48

23    A.   The first meeting was, I believe, on the    17:48

24 weekend before we met with Gary Cohen.  We were at    17:48

25 Gary Fontana's house.  It was on a weekend, I recall,    17:48

1  because that's why we were meeting there as opposed to     17:48

2  the office.  Gary invited them over, or -- he invited     17:48

3  them over.  I don't know who wanted to have the     17:49

4  meeting, but he invited everybody, "Why don't you just     17:49

5  come to my house," so he invited us over.

6     Q.   Who was there at Gary's house?     17:49

7     A.   Gary, Phillipe Brunswick, Francois Marland,     17:49

8  and myself, and I believe, although not at the     17:49

9  meeting, Gary's wife may have been there.  I may have     17:49

10 seen her at the time but she didn't participate in the     17:49

11 meeting.     17:49

12    Q.   Okay.  And how long did that meeting at Mr.     17:49

13 Fontana's house last?     17:49

14    A.   Oh, anywhere's from 45 minutes to two     17:49

15 hours.     17:49

16    Q.   Okay.  And what language were you and Mr.     17:49

17 Fontana using to communicate with Mr. Marland during     17:49

18 that meeting?     17:49

19    A.   I can't recall if Gary used any French, but     17:49

20 I nearly flunked a year in high school because of my     17:50

21 poor performance in the subject, so I guarantee you I     17:50

22 neither spoke French or understood a word of it, other     17:50

23 than the pleasantries, like, you know, bonjour.     17:50

24    Q.   Okay.  Did you observe during that meeting     17:50

25 Mr. Brunswick translating into French any statement,     17:50

1  or comment, or any aspect of the conversation by        17:50

2  either yourself or Mr. Fontana?                17:50

3    **A.    I didn't observe anything that I understood    17:50**

4  **as translation.  I did see side bars between them,      17:50**

5  **since I don't speak French, I can't tell you if the      17:50**

6  **side bar was on strategy, or what did they mean,      17:50**

7  **because I don't speak French there were side bars.      17:50**

8    Q.    Okay.  And then the third time you were in    17:50

9  a face-to-face meeting with Mr. Marland it was either      17:51

10  the next day or shortly thereafter that meeting at Mr.    17:51

11  Fontana's house?                17:51

12    **A.    Within a few days after Gary Fontana's      17:51**

13  **house, we had a meeting with Gary Cohen, of the      17:51**

14  **department, and Gary was there, I was there, Marland      17:51**

15  **was there.  I am pretty sure Marland was there.  And,    17:51**

16  **yes, they both, Marland and Brunswick.  Someone else    17:51**

17  **may have come in and out of the meeting.  I forget if    17:51**

18  **Harry La Van (phonetic) was there.  I forget if Karl    17:51**

19  **Belgum came in at any particular time.  That was the    17:51**

20  **lineup.                17:51**

21    Q.    Okay.  And that meeting was conducted in      17:51

22  English?                17:51

23    **A.    Yes.                17:51**

24    Q.    How long did that meeting last?      17:51

25    **A.    I would say an afternoon.  It could have    17:51**

1  **been a morning, but it was a half day --**         **17:52**

2  Q.  Okay.            17:52

3  **A.  -- as I recall.**        **17:52**

4  Q.  Okay.  Sorry.  And then have you ever    17:52

5  spoken to Mr. Marland on the telephone?    17:52

6  **A.  Yes.**        **17:52**

7  Q.  On how many occasions?    17:52

8  **A.  I am not sure, although I believe the**    **17:52**

9  **meeting in New York followed Mr. Marland calling me,**    **17:52**

10  **and I remember it because I remember picking up the**    **17:52**

11  **phone and being surprised that he was on the other end**    **17:52**

12  **of the line.  And he was telling me that he was going**    **17:52**

13  **to be in New York.  He had been briefed on what**    **17:52**

14  **happened in Paris, and we ought to talk.**    **17:52**

15  Q.  Okay.  Are there any other times that you    17:52

16  can recall Mr. Marland calling you on the phone or    17:52

17  your calling him and speaking with him on the phone?    17:52

18  **A.  It may have happened, but I don't recall**    **17:52**

19  **it.  I believe that the only time he called me was to**    **17:52**

20  **set up that meeting.  There may have been some**    **17:53**

21  **logistical calls around that, for example, it may have**    **17:53**

22  **been that I confirmed the meeting by calling him back.**    **17:53**

23  **But that's all around the New York meeting and the**    **17:53**

24  **logistics of setting up the New York meeting.**    **17:53**

25  Q.  Okay.  In any of the times that you spoke    17:53

1  with Mr. Marland in 2002, either on the phone or in    17:53

2  person, did he ever tell you that the scope of Mr.    17:53

3  Brunswick's representation of Mr. Marland was limited    17:53

4  in any way?    17:53

5    **A.    No, he referred to him as "my attorney."    17:53**

6    Q.    Did Mr. Marland say to you words to the    17:53

7  effect that, "I'm  relying on Thelen to understand    17:53

8  what all the drafts or what the terms are of the 2002    17:54

9  agreement," what became known as the 2002 agreement?    17:54

10    **MR. HAYES:** Object to the form of the    17:54

11  question.    17:54

12    **THE WITNESS:** Mr. Marland never asked me to    17:54

13  give him advice, or told me he was relying on Thelen    17:54

14  to explain his rights under the earlier agreements.    17:54

15    **MS. THURM:** Q.  Okay, and my question had    17:54

16  been focused on 2002 before the agreement was signed,    17:54

17  but now focusing on the times you were with Mr.    17:54

18  Marland in 2003, during either the meeting at Mr.    17:54

19  Fontana's house, or the meeting with Mr. Cohen, or in    17:54

20  any preliminary discussions around those meetings, did    17:54

21  Mr. Marland tell you that, in fact, the    17:54

22  representations he made in the 2002 agreement where he    17:55

23  said in the agreement that he had independent counsel    17:55

24  were untrue?    17:55

25    **MR. HAYES:** Sorry, can I have that read    17:55

1  back please?                                    17:55

2       (Whereupon, the record was read by the

3       Reporter.)                                17:55

4  **QUESTION:** "Okay, and my question had been focused on       17:54

5       2002 before the agreement was signed,          17:54

6       but now focusing on the times you were         17:54

7       with Mr. Marland in 2003, during either        17:54

8       the meeting at Mr. Fontana's house, or         17:54

9       the meeting with Mr. Cohen, or in any          17:54

10      preliminary discussions around those          17:54

11      meetings, did Mr. Marland tell you            17:54

12      that, in fact, the representations he          17:54

13      made in the 2002 agreement where he           17:55

14      said in the agreement that he had             17:55

15      independent counsel were untrue?"             17:55

16      **MR. HAYES:** Object to the form of the        17:55

17  question.                                     17:55

18      **THE WITNESS:** Mr. Marland never told me       17:55

19  that any of the representations in the 2002 agreement     17:55

20  that was executed in December, any of those recitals     17:56

21  were false.                                   17:56

22      **MS. THURM:** Q.  Okay.  Now, you have         17:56

23  discussed a meeting -- or was if one or two meetings     17:56

24  that you had with Mr. Brunswick in Paris?           17:56

25      **A.**   Two.                              17:56

**Page 246**

1    Q.    Okay.  And that was approximately June         17:56

2  2002?                                17:56

3    **A.    Thereabouts.**                **17:56**

4    Q.    Okay.  Did you ever -- and then there was      17:56

5  the meeting at Mr. Fontana's house and the meeting     17:56

6  with Mr. Cohen that we just discussed that indicated   17:56

7  Mr. Brunswick was there, correct?             17:56

8    **A.    Correct.**                  **17:56**

9    Q.    Okay.  Did you ever -- did you have any       17:56

10  other face-to-face meetings with Mr. Brunswick other    17:56

11  than the ones we just identified?            17:56

12    **A.    I can't recall any, other than those four.**    **17:56**

13    Q.    Okay.  And you spoke with Mr. Brunswick by     17:56

14  phone on occasion?                     17:56

15    **A.    Yes, we both spoke by phone on more than**     **17:56**

16  **one occasion.**

17    Q.    Can you estimate by a magnitude of five the    17:57

18  rough number of times you spoke with Mr. Brunswick on   17:57

19  the phone?                          17:57

20    **A.    More than five, less than 15.**            **17:57**

21    Q.    Okay.  When was the last time you spoke       17:57

22  with Mr. Brunswick?                    17:57

23    **A.    I don't know if I spoke to him after the**      **17:57**

24  **meeting with Gary Cohen.  I might have, but I don't**   **17:57**

25  **have a recollection of talking with him on the phone**  **17:57**

1  **after the meeting with Gary Cohen.**                    17:57

2     Q.   Okay.  At any time, either in person or on    17:57

3  the phone, did Mr. Brunswick tell you that he was       17:57

4  relying on Thelen to provide legal advice to either     17:57

5  himself or Mr. Marland about any of the terms in the      17:57

6  new agreement to associated counsel?                17:57

7     **A.   Relying on us, no.  I say reliance because**    17:57

8  **obviously there was extensive negotiation where I say,**    17:57

9  **"I want it to read this way," and he comes back and**       17:57

10  **says "I want it to read this way," and I tell him,**      17:58

11  **"Why?  I want it this way."  And he tells me why he**       17:58

12  **wanted it that way.**                          17:58

13    Q.   Okay.  At any time in the period from the    17:58

14  end of May 2002 to the time the new agreement to       17:58

15  associated counsel was executed, did you ask Mr.       17:58

16  Brunswick for any advice about any position that       17:58

17  Thelen should take --                          17:58

18    **A.   No.**                          17:58

19    Q.   -- or would take?                    17:58

20    **A.   No.**                          17:58

21    Q.   What about with respect to Mr. Chateau,       17:58

22  same question?                          17:58

23    **A.   No.**                          17:58

24    Q.   Did Mr. Chateau or Mr. Brunswick provide    17:58

25  any unsolicited advice to you or to Thelen about what    17:58

1  Thelen could, or should, or would do with respect to        17:58

2  negotiating the 2002 agreement?                    17:58

3      **A.   Say that again.                    17:58**

4      **(Whereupon, the record was read by the**

5      **Reporter.)**

6  **QUESTION:** "Did Mr. Chateau or Mr. Brunswick provide        17:58

7          any unsolicited advice to you or to            17:58

8          Thelen about what Thelen could, or            17:58

9          should, or would do with respect to            17:58

10          negotiating the 2002 agreement?"            17:58

11          **THE WITNESS:** No, with the caveat, and that      17:59

12  is, both with their statements to me and my statements    17:59

13  to them, as with any negotiations, sometimes you say,        17:59

14  look, I want it to read this way, and hey, that works,      17:59

15  you see that works.  That doesn't hurt you either        17:59

16  because, given your concerns, this is how it works.        17:59

17          So in a negotiation when you're saying why      17:59

18  you want some language for your benefit, you may point    17:59

19  out why this language doesn't hurt them the way they      17:59

20  have just said it does, and vice versa.  I want to        17:59

21  complain about language they had, and they had --        17:59

22  Brunswick would come back and say, "Oh no, Wynne,        17:59

23  that's not what that means."                    17:59

24          So no, no advice either way, although in a      17:59

25  negotiation sometimes you will tell the person across      17:59

1  the contracts table why the language really shouldn't      17:59

2  be objectionable.                              17:59

3        **MS. THURM:** Q.  Okay.  Can you turn your        18:00

4  attention back to Exhibit 11 please.  That's the new      18:00

5  agreement to associate counsel.                    18:00

6    **A.   Yes.**                              **18:00**

7    Q.   Focusing your attention on page six on the      18:00

8  provision G4 that Mr. Hayes spent some time asking        18:00

9  questions about, do you see that?                  18:00

10   **A.   Yes.**                              **18:00**

11   Q.   Okay.  I am not going to read the whole        18:00

12  thing in the record -- I think it's been read in the      18:00

13  record.                                  18:00

14       Do you recall, without looking at any other      18:00

15  documents, who suggested the language that comprises      18:00

16  the second portion of the sentence that begins "Accept    18:00

17  that TR&P shall resume," et cetera, all the way to the    18:00

18  end?                                  18:00

19   **A.   That in the entire paragraph was from Mr.        18:00**

20  **Brunswick.**                            **18:01**

21   Q.   Okay.  What did Mr. Brunswick communicate      18:01

22  to you either orally or in writing as to the purpose      18:01

23  for including that language?                    18:01

24       **MR. HAYES:** Asked and answered.          18:01

25       **THE WITNESS:** He didn't use the Dana Fox      18:01

1  phrase that I have.  But his communication to me was          18:01

2  such that that is how I understood -- that is what my          18:01

3  understanding was of why it was wanted, based on what          18:01

4  was told to me.  They didn't use the shorthand I have,          18:01

5  that Dana Fox rule.                                  18:01

6      **MS. THURM:** Q.  Okay.  Did Mr. Brunswick          18:01

7  tell you, orally or in writing, that his purpose in          18:01

8  suggesting the language that ultimately became          18:01

9  subsection G4 was to, in fact, import or incorporate          18:02

10  all aspects of the February 17th, 1999 attorney-client          18:02

11  agreement between Thelen and Marland including all of          18:02

12  its amendments?                                  18:02

13      **MR. HAYES:** Object to the form of the          18:02

14  question.                                  18:02

15      **THE WITNESS:** Definitely not.          18:02

16      **MS. THURM:** Q.  Did Mr. Brunswick          18:02

17  communicate to you either orally or in writing when he          18:02

18  suggested this language that he intended to import any          18:02

19  portion of the February 17th, 1999 agreement?          18:02

20    **A.   No.**                          **18:02**

21    Q.   Okay.                          18:02

22    **A.   Other than the general counsel role to          18:02**

23  **RoNo.**                          **18:02**

24    Q.   Okay.  If you had -- if Mr. Brunswick had          18:02

25  communicate that to you --                  18:02

1    **A.    What?**                                    18:02

2        Q.    If Mr. Brunswick had communicated to you        18:02

3    that his intent in suggesting the language that became        18:02

4    G4, was to import, either in whole or in part -- no,        18:03

5    let me strike that.                                    18:03

6            If Mr. Brunswick had told you that his        18:03

7    intent in suggesting the language which became G4 was        18:03

8    to import the entirety of the February 17th, 1999        18:03

9    agreement into this agreement, would you have approved        18:03

10    that?                                            18:03

11        **MR. HAYES:** Object to the form of the        18:03

12    question.                                        18:03

13        **THE WITNESS:** I cannot answer that        18:03

14    hypothetical.  I can say that one of my bedrock        18:03

15    negotiating positions was we are going to have a new        18:03

16    agreement, and this slate was going to be wiped clean.        18:03

17    We are both going to go forward and we are not going        18:03

18    to look back at prior documents.  The concession here        18:03

19    about general counsel to RoNo at the end was, I        18:03

20    thought, a minor exception to, again, take care of        18:03

21    that corporate issue.                                18:04

22        **MS. THURM:** Q.  Okay, and did you have an        18:04

23    understanding based on the language Mr. Brunswick        18:04

24    drafted, and/or any communications you had with him        18:04

25    about his proposed language, that Mr. Marland was        18:04

1  requesting that the attorney-client agreement dated          18:04

2  February 17th, 1999 be imported into and incorporated          18:04

3  into this new agreement to associate counsel?          18:04

4        **MR. HAYES:** Object to the form of the          18:04

5  question.                                     18:04

6        **THE WITNESS:** I did not have the          18:04

7  understanding when I received this language that          18:04

8  either Brunswick or Marland were proposing anything          18:04

9  about importing prior agreements other than what was          18:04

10  necessary to get Dana Fox to do the usual corporate          18:05

11  stuff.                                     18:05

12        **MS. THURM:** Q.  Okay, Mr. Carvill, in the          18:05

13  course of your oral and written communications with          18:05

14  Mr. Brunswick, as this agreement was being negotiated,          18:05

15  did you have any communications with him either orally          18:05

16  or in writing about the concept of a mutual release?          18:05

17    **A.    Yes.**                            **18:05**

18    Q.    Okay.  What did you and Mr. Brunswick          18:05

19  discuss about the concept of a mutual release?          18:05

20    **A.    We had -- I had had conversations with Mr.**          **18:05**

21  **Brunswick about the document, which he vehemently**          **18:05**

22  **disagreed with.  During those conversations, if I made**          **18:05**

23  **a point he would frequently include as part of his**          **18:05**

24  **rejoiner that "Gary never told us this," or "Gary**          **18:05**

25  **never told us that," and on more than one occasion in**          **18:06**

1  talking about that release, the gist of the                18:06

2  conversation was this blunt, "Brunswick, we signed          18:06

3  this agreement.  I don't want to ever hear about this       18:06

4  document issue again."                                      18:06

5      Q.   You're representing -- you're paraphrasing          18:06

6  a statement by Mr. Brunswick?                               18:06

7      A.   Yes, Mr. Brunswick, never wants to hear             18:06

8  about this document issue again.  And my response to        18:06

9  him was, and "I don't ever want to hear again what          18:06

10  Gary did or did not tell you folks at any time prior.       18:06

11  This is a new start."                                       18:06

12          And that exchange of what he didn't want to         18:06

13  hear again and what I didn't want to hear again was         18:06

14  discussed as what we were trying to do with the mutual      18:06

15  release.                                                    18:06

16      Q.   Okay.  When you had discussions with Mr.           18:06

17  Brunswick on that point, did he say to you words to         18:06

18  the effect of something like, "I don't know what a          18:07

19  mutual release is"?                                         18:07

20      A.   No.                                                18:07

21      Q.   Okay.  Did he ever tell you that Mr. --            18:07

22  strike that.

23          Did Mr. Brunswick ever send you written             18:07

24  edits to the provision which eventually became a            18:07

25  mutual release provision, but it might have had a           18:07

1  different number in the various drafts or proposed        18:07

2  edits?

3      **A.    I received comments, inserts, and at times,**        **18:07**

4  **full red-lined proposals from Mr. Brunswick.  And I**        **18:07**

5  **believe that in one or more of those the mutual**        **18:07**

6  **release was the subject of those communications from**        **18:07**

7  **Mr. Brunswick.**                        **18:07**

8      Q.    Okay.  And when you had any discussions        18:07

9  with Mr. Brunswick about either the concept of a        18:08

10  mutual release or the terms to be used with respect to        18:08

11  the release that is, in fact, in Exhibit 11, did he        18:08

12  ever tell you that he was not communicating, you        18:08

13  should be clear, Mr. Carvill, that I am not authorized        18:08

14  to communicate on behalf of Mr. Marland when I have        18:08

15  these discussions with you, words to that effect?        18:08

16      **MR. HAYES:** Object to the form of the        18:08

17  question.                        18:08

18      **THE WITNESS:** Mr. Brunswick never said or        18:08

19  did anything in my entire dealings with him from day        18:08

20  one to the end, to lead me to believe anything other        18:08

21  than he was Mr. Marland's spokesperson.        18:08

22      **MS. THURM:** Q.  Okay, just his spokesperson        18:08

23  or --                        18:08

24  **A.    His lawyer.**                        **18:08**

25      Q.    -- any other role?                18:08

1    A.    His lawyer, he was negotiating this        18:08

2  agreement for Mr. Marland.                18:08

3    Q.    Okay.  I would like to turn your attention     18:08

4  now to -- I think it's Exhibit --              18:09

5    A.    And let me go back.                18:09

6    Q.    Yes, I'm sorry to interrupt you.          18:09

7    A.    There were times when Mr. Brunswick would     18:09

8  say "Send that to me," and in effect, "Expedite it and    18:09

9  can you also shoot one to Mr. Marland at this number     18:09

10  or that number."                    18:09

11    Q.    Okay.  Thank you for that clarification.     18:09

12  Let me ask you this:  When you met with Mr. Brunswick     18:09

13  and Mr. Marland in August of 2003, what were the --     18:09

14  what was the purpose or the purposes of either the     18:09

15  meeting at Mr. Fontana's house, or if it was connected     18:09

16  to the meeting with Mr. Cohen?              18:09

17    A.    My understanding of that meeting was that     18:09

18  it was a pre-meeting before we saw Gary Cohen.  They     18:10

19  wanted to know some background.  They had questions,     18:10

20  and we talked about the presentation and who would do     18:10

21  what.  One of the things they wanted to do, they told     18:10

22  us --                        18:10

23    Q.    I'm sorry, "they" being Mr. Marland and Mr.     18:10

24  Brunswick?                      18:10

25    A.    Correct, was make it clear to Mr. Cohen the     18:10

1  sacrifices and burdens they had born and why it was        18:10

2  important they be compensated for that sacrifice.  And      18:10

3  we talked about it in the context of it would be great      18:10

4  for both of us if we could get Gary Cohen to go along       18:10

5  with the December 2002 agreement as opposed to coming       18:10

6  forward with the fraction approach or this approach         18:11

7  that would require us to go back amongst ourselves as       18:11

8  European Counsel and Thelen and renegotiate their           18:11

9  deal.                                        18:11

10     Q.   Okay.                              18:11

11     A.   They made it clear, meaning, Brunswick and       18:11

12  Marland, that they didn't want to reopen that deal,        18:11

13  and I told them that we did not want to reopen that        18:11

14  deal.                                        18:11

15        And the hope was that if Gary Cohen, the          18:11

16  expressed hope was that if Gary Cohen could understand     18:11

17  how European Counsel and Thelen had gotten to December    18:11

18  2002, and why other things didn't work for us for one      18:11

19  reason for another, maybe he would relent from trying      18:11

20  to redo what our deal -- we had hoped our deal was         18:11

21  with Commissioner Low, that once we understood how we      18:12

22  had gotten to that, that Gary Cohen would approve the      18:12

23  European Counsel agreement.  And that was the             18:12

24  objective, the expressed objective of Brunswick,          18:12

25  Marland, Carvill and Fontana at that pre-meeting          18:12

1  **meeting at his house.**                                    18:12

2      Q.   Okay.  And just to provide a little bit        18:12

3  more background.  I think I know what you're talking        18:12

4  about, but can you just set the table or explain what      18:12

5  issue or issues were on the table in the discussions        18:12

6  with Mr. Cohen that made the 2002 agreement relevant        18:12

7  at that August 2003 meeting?                         18:12

8      A.   **After Commissioner Garimendi took office,**       18:12

9  **beginning with correspondence with Stromwasser and**        18:12

10 **Wertser (phonetic) that the department had retained to**      18:12

11 **look over our arrangement, and continuing thereafter**       18:13

12 **through the spring and early summer, there were a**          18:13

13 **series of proposals as to how the Thelen fee agreement**     18:13

14 **could be reworked which were totally incompatible with**     18:13

15 **the December 2002 agreement -- hourly rates, going**         18:13

16 **forward, buying out the contingency fee in exchange**        18:13

17 **for hourly rates.  They didn't like the word**              18:13

18 **"advances."**                                        18:13

19          **At one point Gary Cohen had what I call the**     18:13

20 **fractional approach, where the contingency at the end**      18:13

21 **would be reduced by some fraction that was driven by**       18:13

22 **the hourly compensation Thelen was paid from the date**      18:14

23 **Commission Garimendi took office forward.  And all of**      18:14

24 **those were very difficult for us to square with the**        18:14

25 **December 2002 agreement.**                            18:14

1          And I didn't want to reopen that, and          18:14

2   Brunswick and Marland when I came back saying, "Look,      18:14

3   the department" -- this was before the pre-meeting        18:14

4   saying, "The department wants this and the fractional      18:14

5   approach," or whatever, they were saying, "Well, wait      18:14

6   a minute.  We don't want to change the December '02        18:14

7   agreement to accommodate this.  We want the December       18:14

8   2002 agreement."  And so that was the debate from         18:14

9   Garimendi taking office up to the Gary Cohen meeting.      18:14

10     Q.    Okay.  And sometime after the meeting with     18:14

11  Gary Cohen did, in fact, Thelen and the Commissioner      18:15

12  did come to some agreement to amend or modify Thelen's    18:15

13  attorney-client agreement with the Commissioner?        18:15

14     A.    Before I left the firm, Gary Cohen told me     18:15

15  that, "Tell you what, Wynne, I understand.  We'll go      18:15

16  back and approve the 2002 agreement," which by the way   18:15

17  he had.                              18:15

18     Q.    Okay.                      18:15

19     A.    I had disclosed it to the new              18:15

20  administration with a letter from Stromwasser and        18:15

21  Wertser, and I had subsequently, I believe, provided     18:15

22  it to Gary Cohen, maybe more than once, but certainly    18:15

23  leading up to this meeting with European Counsel and     18:15

24  Mr. Cohen.                          18:15

25     Q.    Okay.  Do you have an understanding that     18:15

1  ultimately Thelen and the department were able to come    18:15

2  to an agreement that would provide -- where the    18:15

3  Commissioner had agreed to provide some advances to    18:16

4  Thelen which had been, one of the objectives, as I    18:16

5  understand your testimony to Mr. Hayes, in commencing    18:16

6  the discussions with both Brunswick and Marland on the    18:16

7  one hand, and the CDOI on the other?    18:16

8        **MR. HAYES:** Object to the form of the    18:16

9  question.    18:16

10        **THE WITNESS:** The time I left the firm, we    18:16

11  did not have a firm agreement.  However, in    18:16

12  discussions with Gary Cohen, he said to me that the    18:16

13  department was comfortable enough given the settlement    18:16

14  proposals on the table from the defendants in the    18:16

15  underlying litigation or some subgroup of them, were    18:16

16  substantial enough that the Commissioner was    18:16

17  confident, the department was confident enough that    18:16

18  the contingent fee from those settlements could cover    18:16

19  advances.    18:16

20        And based on that, they were going to make    18:16

21  advances to us before year end, which is the close of    18:16

22  our financial year and was very important.  I was    18:17

23  told, firm management told me "Get the money in the    18:17

24  door before the end of the year," and Gary Cohen    18:17

25  promised me that we would get advances before the end    18:17

1  of the year.                                    18:17

2      Q.   Okay.  Before you left to join the bench,     18:17

3  then based on those representations that Mr. Cohen had     18:17

4  made to you, even if they had not been memorialized     18:17

5  and, in fact, the advances were not yet in the door     18:17

6  before you left -- do you understand the preface to my     18:17

7  question?                                    18:17

8      **A.   Yes.**                                    **18:17**

9      Q.   Okay.  Was it your understanding when you     18:17

10  left Thelen that, in fact, the December 2002 agreement     18:17

11  would not need to be reopened or renegotiated on any     18:17

12  point in order to get to closure with the department?     18:17

13     **A.   My understanding was that it was a done     18:17**

14  **deal.**                                    **18:17**

15     Q.   Okay.  And --                          18:17

16     **A.   Done deal in fact in terms of paper with     18:18**

17  **European Counsel, and done deal in principle with Gary     18:18**

18  **Cohen.**                                    **18:18**

19     Q.   Okay.  And did you have an understanding     18:18

20  before you left Thelen as to whether that result, that     18:18

21  done deal as you have just described it, was     18:18

22  satisfactory to European Counsel at that time?     18:18

23     **A.   When I communicated to them that Gary     18:18**

24  **had -- well, I shouldn't say "them," to Brunswick that     18:18**

25  **Gary had come around and agreed to go along with what     18:18**

1  we had done in the December agreement, Brunswick          18:18

2  expressed relief to me.                          18:18

3      Q.    Okay.  Now I would like you to turn to what    18:18

4  was marked as Exhibit 2, which was that original          18:18

5  attorney-client agreement between Marland and Thelen,      18:18

6  and I want you to turn your attention to page six and      18:18

7  paragraph 22.                              18:19

8      A.    Yes.                          18:19

9      Q.    Okay.  I think Mr. Hayes asked you some        18:19

10  questions on this, and I don't have the transcript in      18:19

11  front of me, so I apologize if I re-ask you any          18:19

12  questions he asked you.                      18:19

13        Did you have this paragraph 22 in mind when      18:19

14  you sent a notice of intent to withdraw from this        18:19

15  agreement to Mr. Marland copying Mr. Brunswick and        18:19

16  Miss Maas in July of '02?                      18:19

17      A.    Absolutely.

18      Q.    Okay.  And did there come a time when        18:19

19  you -- well, let me ask you this question:  Did you        18:19

20  have an understanding that, in fact, the              18:19

21  attorney-client agreement was terminated at any point      18:19

22  in time?                                18:20

23      A.    My private belief in the fall of 2002 was I    18:20

24  terminated it on 30-days notice, and I gave European      18:20

25  Counsel one extension.                      18:20

1    Q.    Okay.  Mr. Hayes, I think, asked you about        18:20

2    whether Thelen ever provided a written assignment as        18:20

3    described here in subparagraph C; do you see that?        18:20

4        **MR. HAYES:** Object to the form of the        18:20

5    question.                                    18:20

6        **THE WITNESS:** I see 22 C, as in Charles,        18:20

7    that refers to "withdrawing parties shall assign."        18:20

8        **MS. THURM:** Q.  Okay.                    18:20

9    **A.    I see that language.**                    **18:20**

10    Q.    Okay.  I believe Mr. Hayes asked you        18:20

11    whether, in fact, Thelen ever provided a document or        18:20

12    an assignment to Mr. Marland that would effect in a        18:20

13    document that assignment?                    18:20

14        **MR. HAYES:** Same objection.                18:20

15        **MS. THURM:** Q.  Do you remember that        18:21

16    testimony?                                18:21

17    **A.    I remember being asked about this subject.**        **18:21**

18    Q.    Okay.  Did you have an understanding in        18:21

19    2002 as to the legal or other effect of Thelen        18:21

20    withdrawing from this agreement as it relates to        18:21

21    claims to -- well, let me -- as it relates to any        18:21

22    claim that any party may have to any recovery or award        18:21

23    as a result of the Quitam litigation?                18:21

24        **MR. HAYES:** Object to the form of the        18:21

25    question.                                18:21

1          **THE WITNESS:** My understanding at the time          18:21

2     was that when we withdrew, we no longer had a right to          18:21

3     recoveries from the Quitam action, and at some point          18:21

4     we would certainly have to assign, formally assign the          18:21

5     rights that we might otherwise have to payment from          18:21

6     that litigation. But our ability to claim from that          18:21

7     litigation died when my termination became effective.          18:22

8     That was my understanding.          18:22

9          **MS. THURM:** Q. Okay, and what that was          18:22

10    understanding based on?          18:22

11       **A.   Well, because we are withdrawing giving          18:22**

12    **30-days notice, and paragraph C defines the          18:22**

13    **consequences. Now, yes, we have to formally execute          18:22**

14    **an assignment so they can then prove, if they need to,          18:22**

15    **whether or not they have full rights. But our ability          18:22**

16    **to -- when I terminated this agreement, I understood          18:22**

17    **that we were not getting anything from the Quitam          18:22**

18    **action.          18:22**

19          **There is no way that if the next day the          18:22**

20    **French defendants went in to the AG and said, "I tell          18:22**

21    **you what, we like you better than Garimendi, how about          18:22**

22    **wrapping this all up for a half a billion dollars," my          18:23**

23    **understanding was I was out of luck because I had          18:23**

24    **withdrawn. And they could turn to me and say, "Give          18:23**

25    **me my assignment so I can get a check from the AG          18:23**

1  **without it being made jointly to you and Thelen.**        18:23

2      Q.    Okay.  And that not only -- that wasn't        18:23

3  only -- that was your understanding, and that was the        18:23

4  understanding of the executive committee at Thelen as        18:23

5  far as you knew, is that correct?        18:23

6          **MR. HAYES:** Object to the form of the        18:23

7  question.        18:23

8          **THE WITNESS:** I can only tell you what I        18:23

9  told the executive committee.        18:23

10          **MS. THURM:** Q.  I don't want you to tell me        18:23

11  that.        18:23

12          **MR. HAYES:** Wait a minute, are you        18:23

13  withdrawing the question?        18:23

14          **MS. THURM:** No, I asked a question as to        18:23

15  his understanding.        18:23

16          **MR. HAYES:** You made a representation.        18:23

17          **MS. THURM:** I didn't make a representation.        18:23

18  I asked a question.

19          **MR. HAYES:** Okay, why don't you ask a

20  question.  You realize that you are calling for a

21  waive of privilege if he answers, so go ahead.        18:24

22          **MS. THURM:** I don't think so.        18:24

23          **MR. HAYES:** Okay, great.        18:24

24          **MS. THURM:** Q.  Did you communicate to Mr.        18:24

25  Brunswick in the period of time from the end of May or        18:24

1  early June 2002 to the end of 2002, that Thelen was         18:24

2  willing to walk away from the Quitam, the CDOI, all         18:24

3  aspects of this with whatever had been spent already         18:24

4  in professional time by the firm; it could not             18:24

5  renegotiate its fee splitting with European Counsel        18:24

6  and obtain advances from CDOI?                             18:24

7      **A.    I communicated that to them.**                 18:24

8      Q.    Okay.  Was that representation true?             18:24

9      **A.    Absolutely, in the sense it was my marching**  18:25

10  **orders -- first of all, those were my instructions.**    18:25

11  **And two, I was well aware that, quite apart from any**    18:25

12  **confidential communications, that our continued burn**    18:25

13  **rate within the firm was a hot political issue, so I**    18:25

14  **took the direction I had seriously.**                     18:25

15     Q.    Okay.  Did you have an understanding as to       18:25

16  whether the possibility of Thelen withdrawing from its    18:25

17  representation of the Commissioner had been discussed     18:25

18  with the Commissioner in that same time period?           18:25

19     **A.    I discussed it with the Commissioner.**         18:25

20     Q.    Okay.  I'm going to designate this portion       18:25

21  to the extent I am asking Mr. Carvill about               18:26

22  communications he had with the Commissioner, I am         18:26

23  going to designate that portion of the transcript as      18:26

24  confidential under the protective order.                  18:26
        (Whereupon, the record is marked as
25      confidential.)

**Page 266**

1  STATE OF CALIFORNIA     )

2                          )

3  COUNTY OF SAN FRANCISCO )

4

5      I, Karla Shallenberger, do hereby certify:

6      That I am a Certified Shorthand Reporter, License

7  No. 10725 of the State of California;

8      I fully, truly and correctly took down in

9  shorthand writing all of the proceedings had and all

10 of the testimony given in said matter;

11     That I thereafter truly, fully and correctly

12 transcribed the same into typewriting, and that the

13 foregoing pages are a full, true and correct

14 transcript of my said notes taken at the time and

15 place therein stated.

16        IN WITNESS WHEREOF,  I have hereunto set my

17 hand

18
                    Karla Shallenberger
                    Certified Shorthand Reporter
19                  License No. 10725

20

21

22

23

24

25

1  U.S. LEGAL SUPPORT, INC.
   180 Montgomery St., Ste. 2180
2  San Francisco, CA 94104

3  Judge Wynne Carvill
   Superior Court of California County of Alameda
4  Berkeley Courthouse
   2120 Martin Luther King, Jr., Way
5  Berkeley, California 94704

6
   RE:  Marland v. TR&P
7  **DATE OF DEPOSITION:** December 14th, 2006

8  Dear Judge Carvill:
        Please be advised the original transcript of your
9  deposition is ready for your review.
        You have 35 days from the date of this letter to
10 read, correct if necessary, and sign your transcript.
   It will then be sealed and sent to the examining
11 attorney pursuant to the applicable law.  You are not
   required by law to read and sign your deposition.
12     You may either come to our office to
   read and sign the original transcript, or you may
13 contact your attorney or the attorney who arranged for
   you to be present at your deposition.  If they have
14 ordered a copy of the transcript, you may review their
   copy and make corrections by submitting them and
15 signing said copy.  If you choose to review your
   transcript at our office, please call for an
16 appointment.
        Should you have any questions regarding these
17 instructions, please call.

18 Sincerely,

19
   Karla Shallenberger, CSR No. 10725
20
   cc: All counsel
21     Original deposition

22

23

24

25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---


THELEN, REID, BROWN, RAYSMAN & STEINER
LLP, fka THELEN REID & PRIEST LLP,

      Plaintiff/Counter-Defendant,

vs.                 No. C 06-2071 VRW

FRANCOIS MARLAND,

    Defendant/Counter-Claimant,
---------------------------------//
THELEN REID BROWN RAYSMAN &
STEINER LLP, fka THELEN REID
& PRIEST LLP,
    Counter-Counter-Claimant,
vs.
FRANCOIS MARLAND and SUSANNAH
MAAS,
    Counter-Counter-Defendants.
--------------------------------//


DEPOSITION OF

WYNNE S. CARVILL

Thursday, December 14th, 2006

TESTIMONY MARKED AS CONFIDENTIAL
AND BOUND SEPARATELY


REPORTED BY:
KARLA SHALLENBERGER, CSR #10725

1            I N D E X

2  DEPOSITION OF WYNNE S. CARVILL

3                          PAGE

4  CONTINUED EXAMINATION BY MS. THURM          266

5  FURTHER EXAMINATION BY MR. HAYES          268

6

7  Transcript marked confidential:

8  Pages 266 through 290 are deemed

9  confidential and are

10  Bound Separately

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         A P P E A R A N C E S

2  FOR THE PLAINTIFF:

3      KEKER & VAN NEST LLP

4      BY:  WENDY THURM, Attorney at Law

5      710 Sansome Street

6      San Francisco, California 94111

7      (415) 391-5400

8

9  FOR THE COUNTER-COUNTER DEFENDANT

10  **MARLAND AND MAAS:**

11      HAYES & HARDY LLP

12      BY: ANDREW HAYES, Attorney at Law

13      1 Rockfeller Plaza, Suite 1005

14      New York, New York

15      (212) 554-3120

16

17  TAKEN AT:

18  CARLSON, CALLADINE & PETERSON LLP

19  353 Sacramento Street, 16th Floor

20  San Francisco, California 94111

21

22

23          ---o0o---

24

25

1        CONFIDENTIAL TRANSCRIPT:

2        **MS. THURM:** Q.  The period from mid 2002 to       18:26

3    the end of 2002, with whom at the Commissioner's        18:26

4    office, one or more folks, did you discuss the           18:26

5    possibility that Thelen might have to withdraw from      18:26

6    its reputation of the Commissioner?                      18:26

7        **A.    Commissioner Low, Senior Counsel Mr. Green,    18:26**

8    **I believe Mr. Levine was present, and I believe there    18:26**

9    **was another CDOI attorney, a woman whose name I cannot    18:26**

10   **recall because I didn't have occasion to meet her very    18:26**

11   **often.                              18:26**

12       Q.    So this communication you had with the        18:26

13   Commissioner's office was in a face-to-face meeting?     18:26

14       **A.    Yes.                          18:26**

15       Q.    Okay.  Was there only one occasion where      18:26

16   you had that discussion with them in 2002?              18:26

17       **A.    No.                           18:27**

18       Q.    Okay.  On how many occasions did you have     18:27

19   such discussions in 2002 with the Commissioner's        18:27

20   office?                                18:27

21       **A.    Well, when you say the "Commissioner's      18:27**

22   **office," do you mean the Commissioner was present?      18:27**

23       Q.    I mean the Department of Insurance, thank     18:27

24   you.                                 18:27

25       **A.    At least two times, maybe as often as five.    18:27**

1    Q.    Okay.  Did representatives of the                18:27

2  Department of Insurance make statements to you or          18:27

3  representations to you as to their views in responding     18:27

4  to your statements about Thelen might having to            18:27

5  withdraw if certain financial arrangements weren't         18:27

6  reached?                                      18:27

7         **MR. HAYES:** Object to the form of the            18:27

8  question.                                    18:27

9         **THE WITNESS:** It came up in the context,        18:27

10  the following context and got the following response:     18:27

11  I met with them and told them that the hottest issue,     18:27

12  there were a number of issues, but the hottest            18:28

13  financial issue was cash flow, and we need advances,      18:28

14  and it was a great deal of pressure within the firm       18:28

15  not to stay in the litigation if we can't do something    18:28

16  about the cash flow.                           18:28

17         **MS. THURM:** Q.  Okay.                  18:28

18     **A.    And to complete their response, again,        18:28**

19  **talking about Green and Low was that, "We may be able   18:28**

20  **to work something out.  What you need to do is see if   18:28**

21  **you could line up the policyholders."               18:28**

22         **And so I spent a good deal of time between      18:28**

23  **June and December talking with counsel for the          18:28**

24  **policyholders, the major policyholder groups seeing     18:28**

25  **what they wanted and would go along with in terms of    18:28**

1   **the change in the fee agreement.**

2      **I explained to them the importance of**      18:29

3   **advances, and was there some way we could do this that**   18:29

4   **would illicit the support of a policyholder, the key**    18:29

5   **policyholder representatives.**         18:29

6    Q.   Did you have an understanding based on the    18:29

7   discussions you had with the Department of Insurance    18:29

8   that at least in part, or there was a possibility that   18:29

9   the Commissioner would decide to permit Thelen to     18:29

10   withdraw and move on with the case with other counsel?   18:29

11    **A.   I didn't know that. I knew that they had**    18:29

12   **Morrison Forrester in the case to defend them on a**    18:29

13   **cross complaint. I made overtures about part of the**    18:29

14   **things -- one of the things we do is gee, no reason to**   18:29

15   **have two attorneys looking over these things. A lot**    18:29

16   **of the things that Morrison and Forrester were doing,**   18:30

17   **Thelen can do.**         18:30

18      **And they were resistant to that, and I**    18:30

19   **inferred from that that they were already thinking**    18:30

20   **about what would happen if we withdraw, I would have**   18:30

21   **counsel up to speed.**       18:30

22    **MS. THURM:** Okay. I have nothing further.   18:30

23    **FURTHER EXAMINATION BY MR. HAYES:**    18:30

24    **MR. HAYES:** Note the time.

25    Q.   Mr. Carvill, did you ever tell the folks at   18:30

1    the Department of Insurance that Thelen had set a          18:30

2    deadline by which it had to have an agreement to          18:30

3    receive advances or it would resign?          18:30

4        **A.    Yes, in the sense -- not in the sense that    18:31**

5    **here is the deadline, we have to have the money before    18:31**

6    **or we'll resign, but in the sense that we needed to    18:31**

7    **solve the cash flow this calendar year.  It doesn't    18:31**

8    **make a whole lot of difference if we get a check in    18:31**

9    **September or December 31st, but if we can't get cash    18:31**

10   **this year, we have a real problem.    18:31**

11       Q.    The "this year" you're referring to in this    18:31

12   answer and in your responses to Miss Thurm's questions    18:31

13   was 2003, correct?          18:31

14       **A.    2002, the issue also came in 2003.    18:31**

15       Q.    Yes.  When did you tell the Department of    18:31

16   Insurance that you had to have advances by the end of    18:31

17   2002 or Thelen would resign?          18:31

18       **A.    I didn't tell them "or Thelen would    18:31**

19   **resign."  I framed it in terms of we needed to solve    18:32**

20   **the cash-flow problem in a way that gets the cash in    18:32**

21   **the door this year or there is a lot of trouble in the    18:32**

22   **firm.    18:32**

23       Q.    Okay.  So you never actually told the    18:32

24   Commissioner that Thelen needed to have a new          18:32

25   agreement on advances by February 2003 or it would    18:32

1  resign at the same time you were telling Brunswick        18:32

2  that without a new agreement Thelen would resign by        18:32

3  2003?

4       **MS. THURM:** Object to the form of the        18:32

5  question.

6       **THE WITNESS:** Which Commissioner?        18:32

7       **MR. HAYES:** Q.  Well, whatever commissioner        18:32

8  you were talking to up to December 2002 -- let me        18:32

9  rephrase it.

10    **A.**  **The administration changed.**        **18:32**

11    Q.   I withdraw the question.        18:32

12       Though you told European Counsel when you        18:32

13  first got involved, that firm administration wanted        18:32

14  the renegotiation completed within a month, which at        18:33

15  that point was May of 2002, correct?        18:33

16    **A.**  **Correct.**        **18:33**

17    Q.   Okay.  Actually, you told Phillipe        18:33

18  Brunswick on July 1st, 2002 that Thelen management        18:33

19  wants the agreement finalized in a week, do you recall        18:33

20  that, correct?        18:33

21    **A.**  **Correct.**        **18:33**

22    Q.   Okay.  Now, you told Phillipe Brunswick        18:33

23  later in 2002 that without a new agreement by the end        18:33

24  of -- an agreement reached by the end of 2002, Thelen        18:33

25  would resign in February 2003 from representing the        18:33

1  Commissioner, correct?                                    18:33

2    **A.    That's correct.**                               **18:33**

3    Q.    Okay.  But you never told the Commissioner         18:33

4  that, without a new agreement in 2002, Thelen would        18:33

5  resign in February 2003, did you?                          18:33

6    **A.    I never told Commissioner Low that.**            **18:33**

7    Q.    Okay.  Did you ever tell any of                    18:33

8  Commissioner Low's staff in 2002 that if you did not       18:33

9  reach an agreement with the Commissioner on getting        18:33

10  advances that year, Thelen would resign in February       18:33

11  2003?                                                      18:34

12    **A.    I never told anyone on Commissioner Low's**     **18:34**

13  **staff that.**                                           **18:34**

14    Q.    Okay.  And Commission Low was Commissioner         18:34

15  during what time?                                          18:34

16    **A.    Through, I think, January 6th, 2003.**          **18:34**

17    Q.    Okay.  When Commission Low was replaced?           18:34

18    **A.    Correct.**                                       **18:34**

19    Q.    Did you give any deadline to Commissioner          18:34

20  Garimendi or his staff?                                    18:34

21    **A.    I told Gary Cohen that we really needed to**    **18:34**

22  **solve this fast.  We sort of hung on through -- after** **18:34**

23  **Commissioner Low said no, we hung on with the hope**    **18:34**

24  **that with the new administration and a reasonable**     **18:34**

25  **period of time, which should be no more than four to**  **18:34**

1  six weeks, we ought to be able to resolve it.  If not,    18:34

2  I may have mentioned that date of whatever it was in     18:34

3  February, we may have to withdraw.                    18:34

4      Q.   So February 2003 came and went without an    18:34

5  agreement and Thelen didn't withdraw, correct?        18:35

6      A.   Correct.                    18:35

7      Q.   And March, April, May, June, July, August    18:35

8  and September of 2003 came and went without an         18:35

9  agreement, correct?                    18:35

10     A.   Correct.                    18:35

11     Q.   Okay.  And you left the firm in November?    18:35

12     A.   Correct.

13     Q.   Okay.                    18:35

14     A.   '03.

15     Q.   Okay.  And so was it in October or November    18:35

16  '03 Gary told you, "Don't worry, it's a done deal"?    18:35

17     A.   It was in October or November.  Well, he     18:35

18  told me shortly after the European Counsel meeting     18:35

19  that they would go along with that structure.  There    18:35

20  was still the issue of how much of the advances, et    18:35

21  cetera, so I was fairly confident that in October,    18:35

22  early November that we were going to get advances.     18:35

23       I think he may have told me earlier he was    18:35

24  going to go with that structure.                    18:35

25     Q.   Okay.  Now, the reason European Counsel was    18:35

1  happy not to have to reopen the 2002 agreement, is        18:36

2  because the fractional approach that Mr. Cohen was        18:36

3  proposing in 2003 would have reduced the amount that       18:36

4  the European Counsel would receive from the amount set     18:36

5  forth in the December 2002 agreement, correct?        18:36

6      **A.    No, it depended on the amount of recovery.    18:36**

7  **A low-end recovery, they would have been better off.    18:36**

8  **A high-end recovery, they would have been -- a low-end    18:36**

9  **recovery, European Counsel is better off with a        18:36**

10 **fractional approach.  A high-end recovery they are       18:36**

11 **worse off.  So it depends on the exact settlement        18:36**

12 **scenario as to whether they are better or worse off.     18:36**

13     Q.   So you're not saying that the European       18:36

14 Counsel's resistance to reopening the 2002 agreement,    18:36

15 was based on anything other than their belief that      18:36

16 they were better off economically under the 2002       18:36

17 agreement than under the fractional approach that Gary    18:37

18 Cohen was proposing, correct?          18:37

19     **MS. THURM:** Object to the form of the       18:37

20 question.  Misstates his testimony.         18:37

21     **THE WITNESS:** I don't know.  They didn't     18:37

22 say to me -- European Counsel did not say to me that,    18:37

23 "We hate the new agreement.  We hate Gary Cohen's      18:37

24 proposal more.  And given the choice between two       18:37

25 terrible choices, we prefer December '02."  It was      18:37

1  never presented to me that way.                    18:37

2       **MR. HAYES:** Okay, now, very quickly before       18:37

3  we change the tape.  You said you never used the       18:37

4  phrase the "Dana Fox role" in negotiations with Mr.       18:37

5  Brunswick?                                         18:37

6  **A.    No.  I am saying that I don't recall him        18:37**

7  **using the Dana Fox role as a shorthand for general        18:37**

8  **counsel for RoNo.                                 18:38**

9  Q.    Okay.  Now, you didn't negotiate the       18:38

10  September 18th, 2001 amendment, right?             18:38

11  **A.    Correct.                                 18:38**

12  Q.    And you're not here to testify today       18:38

13  regarding Thelen's understanding of what services were     18:38

14  to be provided pursuant to that agreement, correct?     18:38

15  **A.    Correct.                                 18:38**

16  Q.    Let's change the tape.

17       **THE VIDEOGRAPHER:** This is the end of tape       18:38

18  number four in volume number one in the examination of     18:38

19  Wynne Carvill.  The time is 6:38 p.m.  We are off the       18:38

20  record.                                            18:38

21       (Whereupon, a recess was taken.)             18:50

22       **THE VIDEOGRAPHER:** This is the beginning of     18:50

23  tape number five in volume number one in the             18:50

24  deposition of Wynne Carvill.  The time is 6:50 p.m.       18:50

25  We are on the record.                              18:50

1      MR. HAYES: Q.   You had mentioned in your          18:50

2   response to one of Miss Thurm's questions that you and      18:50

3   Mr. Brunswick discussed the purpose of the mutual          18:51

4   release on more than one occasion?                    18:51

5      **A.   Yes, sir.**                          **18:51**

6      Q.   Okay.  You discussed it in writing on        18:51

7   several occasions as well with Mr. Brunswick?          18:51

8      **A.   Yes, sir.**                          **18:51**

9      Q.   Are you saying that you had discussions       18:51

10   about the scope of the release that were different       18:51

11   from or broader than what was set forth in your many      18:51

12   exchanges with Mr. Brunswick?                    18:51

13      **A.   I have to look at the many exchanges to see      18:51**

14   **if that were true or not.**                       **18:51**

15      Q.   Okay.                            18:51

16      **A.   I simply recall the idea that each of us        18:51**

17   **was saying things we didn't want to hear again.**        **18:51**

18      Q.   Now, the quote, unquote Gary said thing       18:51

19   that you referred to?                         18:51

20      **A.   Yes.**                            **18:51**

21      Q.   What Mr. Brunswick was telling you that        18:51

22   Gary said concerned whether Marland had to produce the    18:51

23   contrat de portage, correct?                     18:51

24      **A.   Among other things.**                   **18:51**

25      Q.   What else did Mr. Brunswick say that Gary      18:51

1 said that you believe was being resolved by the mutual    18:52

2 release?                                    18:52

3    A.   Well, things, for example, that may relate    18:52

4 to the document issue, but if that creates an    18:52

5 exploitation of evidence issue, that effects the value    18:52

6 of his testimony.  So I am not saying there is this    18:52

7 wide range of issues, but they were for the most part    18:52

8 related to some permutation of the document issue.    18:52

9    Q.   Okay.  Do you recall anything Mr. Brunswick    18:52

10 told you in effect Gary said that did not relate in    18:52

11 one way or another to the document issue?    18:52

12    A.   Let me look at the release and see if there    18:52

13 is anything in the release language that triggers    18:52

14 something like that.                    18:52

15    Q.   Please.

16    A.   "Failed to perform any services to    18:53

17 dramatically protect the interests of the clients, to    18:53

18 expose any conflict, to obtain any required waiver or    18:53

19 otherwise as charged," when I wrote that I had in mind    18:53

20 Mr. Brunswick's statements, but I can't pick out an    18:53

21 example of something that is not document related,    18:53

22 that somehow is connected to some permutation of the    18:53

23 document issues.                    18:53

24    Q.   Now, there was one area of Thelen's    18:53

25 dealings with European Counsel in which you did    18:54

1  purport to advise the European Counsel of during the    18:54

2  fall of 2002, and that was the subject of their rights    18:54

3  and claims that could be asserted if Thelen terminated    18:54

4  its representation of the Department of Insurance,    18:54

5  correct?    18:54

6        **MS. THURM:** Objection to the form of the    18:54

7  question.    18:54

8        **THE WITNESS:** You're saying I advised them    18:54

9  of the claims they could assert if we terminated our    18:54

10  representation of the CDOI?    18:54

11        **MR. HAYES:** Q.  Yes, I'm saying you told    18:54

12  them in writing that if no agreement is reached with    18:54

13  the CDOI and Thelen resigns its representation, that    18:54

14  Thelen may be able to claim X, Y, and Z, and European    18:54

15  Counsel may be able to get this or may not be able to    18:54

16  get anything, et cetera, as is set forth in the    18:54

17  document which I would rather not take the time to get    18:55

18  into.    18:55

19      **A.   I say that in the context of, when I am**    18:55

20  **telling them that we might withdraw, he is telling**    18:55

21  **me -- Brunswick is telling me that, in effect, "Well,**    18:55

22  **if you do that, we have claims."  And I am telling him**    18:55

23  **I have claims, and so if there is -- you know, if we**    18:55

24  **have to go there, we can have that situation where we**    18:55

25  **accuse you of X, Y, and Z, and you accuse us of A, B,**    18:55

1  C, but we don't really want to go there, do we.        18:55

2        It wasn't that I was advising him that he        18:55

3  had claims A, B and C, but those were the kinds of        18:55

4  things he was saying to me.  And, I, recognizing that        18:55

5  he is saying that if we terminate and wipe him out of        18:55

6  any recovery because we terminate the agreement with        18:55

7  the Commissioner, he has got some issues with us and        18:55

8  there may be a lawsuit for that.        18:56

9        Just like I say, "Yeah, we may have some        18:56

10  claims against you."  I am acknowledging that we had a        18:56

11  discussion where he has claims against us if we do        18:56

12  that.        18:56

13    Q.    Uh-hum, but weren't you telling him your        18:56

14  understanding of what Thelen and the European        18:56

15  Counsel's rights might be vis-a-vis the DOI if Thelen        18:56

16  terminated the --        18:56

17    A.    Oh, against the DOI?        18:56

18    Q.    -- agreement?        18:56

19    A.    I did discuss and say that if we withdraw        18:56

20  in terms of our right, even your curative right to get        18:56

21  paid, a lot depends on what happens when we go through        18:56

22  the withdrawal process.  I didn't know if the way it        18:56

23  would play out would be we would start down the road        18:57

24  with the Commissioner saying, Mr. Commissioner, you're        18:57

25  in breach because you have not been advancing fees.        18:57

**Page 279**

1   Q.   Or, indeed, reimbursing expenses?          18:57

2   **A.   "Not advancing fees," I meant reimbursing       18:57**

3 **expenses, thank you.                    18:57**

4   Q.   Right.                    18:57

5   **A.   So what if we do that trying to terminate      18:57**

6 **for cause, and the next day I get hand delivered a       18:57**

7 **check in an envelope with all of our payments for all      18:57**

8 **of our outstanding expenses in a letter saying "We       18:57**

9 **look forward to working for you."  What do I do the      18:57**

10 **next day?                    18:57**

11        **It could unfold a lot of different ways,      18:57**

12 **and what the consequences to Thelen and thus       18:57**

13 **derivatively to European Counsel would be dependent on     18:57**

14 **how that unfolded, and I didn't know how that was      18:57**

15 **going to unfold.                    18:57**

16   Q.   Right, but apart from not knowing how it      18:57

17 would unfold, you were also sharing with Brunswick and     18:58

18 European Counsel your understanding of how it might      18:58

19 unfold depending on particular facts, correct?      18:58

20   **A.   Yes.                    18:58**

21   Q.   Okay.  You didn't think that Brunswick,       18:58

22 and/or Chateau, and/or Marland were independently      18:58

23 researching the California Attorney Client Law to find     18:58

24 out Thelen's ability to recover if it terminated for      18:58

25 whatever various reasons, were you?          18:58

1          **MS. THURM:** Object to the form of the          18:58

2    question.                                    18:58

3          **THE WITNESS:** I disagree with that.  As I          18:58

4    am saying things, they, as far as I know, they may          18:58

5    well be saying between themselves or amongst          18:58

6    themselves, "Carvill is full of it, maybe we ought to          18:58

7    pick up the phone and ask Chateau if he knows the          18:58

8    answer to that or does he known someone in California          18:58

9    who can give us the answer to that so we know if          18:58

10   Carvill is just blowing smoke at us, or he is accurate          18:58

11   on that point."  I don't know if they did that.          18:59

12         **MR. HAYES:** Q.  You have no reason to think          18:59

13   they did, do you?                              18:59

14         **MS. THURM:** Object to the form of the          18:59

15   question.  Argumentative.                      18:59

16         **THE WITNESS:** They didn't say anything to          18:59

17   lead me to believe that they had, in fact, retained          18:59

18   California counsel to double-check whatever I said.          18:59

19         **MR. HAYES:** Q.  Okay.  And you would agree          18:59

20   that in terms of possible claims by or possible          18:59

21   litigation between Thelen and the DOI, the European          18:59

22   Counsel's interests and Thelen's interests are          18:59

23   aligned, correct?                              18:59

24   **A.   Maybe.**                                **18:59**

25   Q.   In some circumstances?                     18:59

1    **A.    Right.**                          18:59

2    Q.    If, for example, Thelen intended to declare    18:59

3  the Commissioner in breach for failure to reimburse        18:59

4  expenses?                              19:00

5    **A.    Right.**                          19:00

6    Q.    Then their interest would be aligned,        19:00

7  Thelen and European Counsel, correct?              19:00

8    **A.    Maybe.**                          19:00

9    Q.    How would it not be -- you know what, let    19:00

10 me not even go there in the interest of time.        19:00

11   **A.    The issue arises in possible**            **19:00**

12 **cross-complaints and the issues of the document and**    **19:00**

13 **all of that.**                          **19:00**

14   Q.    Yep, that's why I --                  19:00

15   **A.    All right.**                        **19:00**

16   Q.    When did you first consider the possibility    19:00

17 that Thelen might have to assert claims or be in        19:00

18 litigation with the Department of Insurance?          19:00

19   **A.    Might have to be?**                    **19:00**

20   Q.    Not "have to be," let me rephrase it.  I'm    19:00

21 trying to cut to the chase.                    19:00

22       When did you believe there was a reasonable    19:00

23 prospect of litigation between Thelen and the          19:00

24 Department of Insurance if no new agreement could be    19:01

25 reached, for example, on reimbursement of expenses?    19:01

1      A.    That depended on whether my tactical          19:01

2   decision was to go in on the breach theory that you        19:01

3   have to pay expenses or not.                    19:01

4      Q.   Right.                      19:01

5      A.    All right.  Because, as I thought of at the      19:01

6   time, okay, it's great, I can send them a letter about      19:01

7   the expenses and try to position a possible withdrawal      19:01

8   for cause.  But if they came back and paid, it would       19:01

9   be at the very, very least, very poor form to say,         19:01

10  "Thank you very much.  And, by the way, here is our        19:01

11  motion to withdraw."                    19:01

12     Q.   True.                      19:01

13     A.    So, I hadn't figured out which course I       19:02

14  would take and whether there would be litigation with      19:02

15  the Commissioner might well depend on those tactical       19:02

16  choices.                         19:02

17     Q.   Fair enough.  When did you first begin to      19:02

18  consider those tactical choices?                19:02

19     A.    Around the time I terminated, sent notice      19:02

20  of termination of the attorney-client agreement.          19:02

21     Q.   So around July 2002?                19:02

22     A.    Around there.  That was -- I say that         19:02

23  because as I started thinking about, "Gee, we may          19:02

24  actually have to withdraw," that is one of the factors     19:02

25  that leads me to send that letter.                19:02

1    Q.    Sure.  Okay.  Now --                    19:02

2        **MS. THURM:** Excuse me Mr. Hayes, can the        19:02

3    videographer tell me whether in total we have gone        19:02

4    over seven hours.                    19:02

5        **THE VIDEOGRAPHER:** Um, without your time, I

6    lost track.

7        **MS. THURM:** No, with my time.

8        **THE VIDEOGRAPHER:** Oh, with your time we

9    had seven twenty after that last disk, and we have        19:03

10    gone 13 minutes on this one.                19:03

11        **MS. THURM:** Okay, my questioning, I don't        19:03

12    think -- do you know how long my questioning went?        19:03

13        **THE VIDEOGRAPHER:** I don't.

14        **MR. HAYES:** I don't contemplate litigation        19:03

15    over it.                        19:03

16        **MS. THURM:** I contemplate that after seven        19:03

17    hours of your questioning we are going to be done.        19:03

18        **MR. HAYES:** Absolutely.

19        **THE WITNESS:** So, let's use your time.

20        **MR. HAYES:** Q.  So you're meeting with Mr.        19:03

21    Marland in New York --                    19:03

22    **A.    Yes.**                        **19:03**

23    Q.    -- let me first try to understand your        19:03

24    gauging his fluency in languages?                19:03

25    **A.    No.**                        **19:03**

**Page 284**

1  Q.   Did you ever learn any other languages?     19:03

2  **A.   I took some Latin in seventh and eighth     19:03**

3  **grade, which I nearly failed.  And I took some French     19:03**

4  **in ninth and tenth grade which I nearly failed.     19:03**

5  Q.   Okay.  So you don't try to do sort of     19:04

6  conversational Spanish or French, for instance, when     19:04

7  you're abroad?     19:04

8  **A.   No, I was in India once and tried to pick     19:04**

9  **up conversational Hindi and did not get past the     19:04**

10 **pleasantries.**

11     **MS. THURM:** If you can't do French.

12     **MR. HAYES:** Q.   Okay.  In your meeting with     19:04

13 Mr. Marland in New York -- sorry, did you diary that     19:04

14 time?     19:04

15 **A.   You mean did I record it?     19:04**

16 Q.   Yes?     19:04

17 **A.   Yes.     19:04**

18 Q.   Was that to the 1515 account?     19:04

19 **A.   Yes.     19:04**

20 Q.   Okay.  Did you review any documents with     19:04

21 him?     19:04

22 **A.   I believe I -- not that I reviewed     19:04**

23 **documents with him, but I believe I took current     19:04**

24 **drafts of the agreement that we could talk about     19:04**

25 **things if that's where we were going, but we didn't go     19:04**

1   there.  We talked about how we got there in terms of     19:05

2   our differences and concepts about how to resolve it.     19:05

3   But I don't remember Marland picking up the document     19:05

4   and saying, "I want you to write it this way."  We     19:05

5   didn't -- I had the documents there but I don't recall     19:05

6   us getting into those.     19:05

7     Q.   Okay.  And you never picked up a document     19:05

8   and said to Marland, "Here is what this means and,     19:05

9   here is what that means"?     19:05

10     A.   I don't think so.  I really don't think so.     19:05

11   We were talking concepts about percentages and, you     19:05

12   know, concepts, big picture.     19:05

13     Q.   Right.  Advances?     19:05

14     A.   Advances.     19:05

15     Q.   Escrow?     19:05

16     A.   Changes in percentages.     19:05

17     Q.   Right.     19:05

18     A.   Taking out some of the middle, pulling it     19:05

19   up, moving it up, taking care of the low end, those     19:05

20   kinds of concepts.     19:05

21     Q.   Sure.  You did discuss the document, you     19:05

22   discussed the document?     19:06

23     A.   Oh, yes.     19:06

24     Q.   Okay.  And you came away from that meeting     19:06

25   understanding that there was only one copy of the     19:06

1   portage agreement that Mr. Marland ever had, and he          19:06

2   never made a photocopy of it, and he destroyed it in          19:06

3   '91, is that correct?                                        19:06

4      **A.   I think '94.  That was -- I came out of**          19:06

5   **that meeting with the understanding it was one**           19:06

6   **document destroyed in '94, and I later had another**       19:06

7   **understanding, but out of that meeting I had the one**     19:06

8   **document in '94 understanding.**

9      Q.   Okay.  Have you seen any documents from any          19:06

10  source including Mr. Marland's testimony or                  19:06

11  translation of his interview with Perry Match or             19:06

12  anyone else in which you said, "Ah, yes, that's what         19:06

13  he said to me.  There was only one copy he ever had.         19:06

14  He never made a photocopy, and what I am reading here        19:06

15  is consistent with what I understand Mr. Marland said        19:06

16  to me"?                                                      19:07

17     **A.   I haven't read his testimony in any**              19:07

18  **context.**                                                 19:07

19     Q.   Okay.  So you're not able to say one way or          19:07

20  the other whether every other time other than what you       19:07

21  recall him saying to you, Mr. Marland has indicated          19:07

22  that he took one copy of the document from the               19:07

23  meeting, that when he sold his company he made a             19:07

24  photocopy of all his files, and that he had one set of       19:07

25  his files in Geneva and one set in Paris?                    19:07

1      A.    Correct, I had heard a two-document          19:07

2  version, I don't mean to be perjorative about it,          19:07

3  after as I write back to Brunswick that, in effect, if      19:07

4  there was a document destroyed in '94, there was fraud      19:07

5  in the inducement than in the agreement because there       19:07

6  was no document.  And then he went, "Oh, no, there          19:07

7  were two.  Yeah, there was one that was destroyed in        19:07

8  '94, but there is this one other one that was still in      19:07

9  existence as late as 2001."  So, yes, I did hear that,      19:07

10  but not at the New York meeting.                           19:08

11     Q.   Right.  Okay.  All right.  Yeah, I think           19:08

12  right when we broke I was just trying to finish up on      19:08

13  the September 2001, what you referred to as the Dana

14  Fox rule -- no, I covered that, all right, that's          19:08

15  fine.                                                      19:08

16          Let me then just finish up by asking, now         19:08

17  that we have had our day, with regard to the changed       19:08

18  circumstances  -- or sorry the reasons for reducing        19:08

19  European Counsel's share, you mentioned -- you said        19:09

20  there were several reasons.  You mentioned changed         19:09

21  circumstances?                                             19:09

22     A.   Correct.                                           19:09

23     Q.   You mentioned the issue of the document?          19:09

24     A.   Correct.                                           19:09

25     Q.   Then you mentioned a couple of other sub          19:09

1  points on the issue of the document, and you mentioned     19:09

2  the covenant of good faith and fair dealings between     19:09

3  the parties?                                    19:09

4     **A.   I remember that testimony.**                **19:09**

5     Q.   I actually didn't understand at the time     19:09

6  whether the covenant of good faith and fair dealings     19:09

7  related to anything other than good faith given     19:09

8  changed circumstances, and a duty of good faith on the     19:09

9  issue of the document, does it?                19:09

10        **MS. THURM:** Object to the form of the     19:09

11  question.  It's also beyond the scope of my          19:09

12  questioning or beyond the seven-hour time, I think, by     19:09

13  any calculation, and I object to the form of the     19:09

14  question.  Go ahead.                           19:09

15        **THE WITNESS:** This morning --          19:09

16        **MS. THURM:** Let me just say that I reserve     19:09

17  my rights to argue that any portion of the testimony     19:09

18  that comes in after this is impermissible as going     19:09

19  beyond the seven-hour time limit.  Go ahead.     19:09

20        **THE WITNESS:** My recollection is when I     19:09

21  gave you that list this morning, and I think there     19:09

22  were four, the fourth one was good faith, and in that     19:10

23  context I was referring to good faith in terms of both     19:10

24  the first issue, and that is when there is something     19:10

25  changed, certain hardships, et cetera, going back.     19:10

1  And also to when you are going to the department and        19:10

2  making a pitch in terms of a safe place and all of        19:10

3  that, there is an obligation of good faith in terms of        19:10

4  you don't tell a client in a pitch that I have        19:10

5  something in a safe place that you either don't have        19:10

6  or you later destroy and not bother to discuss that        19:10

7  with your co-venturer, and the implications it might        19:10

8  have to your joint obligations to this client you are        19:11

9  making a pitch to.        19:11

10     Q.   Do you recall any other reasons now for        19:11

11  reducing European Counsel's share beyond what you said        19:11

12  this morning and just now?        19:11

13        **MS. THURM:** Same objections.        19:11

14        **THE WITNESS:** I think I gave my view this        19:11

15  morning, earlier, and I can't recall exactly how I        19:11

16  phrased it.  All I can say is I have not thought of        19:11

17  something since this morning that I wish I had said        19:11

18  that I remembered I didn't say.        19:11

19        **MR. HAYES:** Well, that was precisely my        19:11

20  question.  You have answered it precisely.  And I        19:11

21  appreciate your candor and your patience.  Thank you        19:11

22  very much, sir.  I am done, sir.        19:11

23        **THE VIDEOGRAPHER:** This concludes the        19:11

24  deposition of Wynne Carvill.  The number of tapes used        19:12

25  was five.  The original videotape will be retained by        19:12

1 U.S. Legal Support.  We are off the record at 7:12        19:12

2 p.m.

3

4        (Whereupon, the deposition

5        concluded at 7:12 p.m.)

6

7    I, WYNNE S. CARVILL, hereby declare that I have read

8 the foregoing testimony, and the same is a true and

9 correct transcription of my said testimony except as I

10 have corrected.

11

12        _____

13            WYNNE S. CARVILL

14

15

16

17

18

19

20

21

22

23

24

25

1 STATE OF CALIFORNIA     )

2                         )

3 COUNTY OF SAN FRANCISCO )

4

5     I, Karla Shallenberger, do hereby certify:

6     That I am a Certified Shorthand Reporter, License

7 No. 10725 of the State of California;

8     I fully, truly and correctly took down in

9 shorthand writing all of the proceedings had and all

10 of the testimony given in said matter;

11     That I thereafter truly, fully and correctly

12 transcribed the same into typewriting, and that the

13 foregoing pages are a full, true and correct

14 transcript of my said notes taken at the time and

15 place therein stated.

16     IN WITNESS WHEREOF,  I have hereunto set my

17 hand

18

19              Karla Shallenberger
              Certified Shorthand Reporter
              License No. 10725
20

21

22

23

24

25

# EXHIBIT

# 3

1

2

3

4

5

6

7

8

9

10

11                    IN THE UNITED STATES DISTRICT COURT

12               FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14   THELEN REID BROWN RAYSMAN &              No C 06-2071 VRW
     STEINER LLP, fka THELEN REID &
15   PRIEST LLP,

16            Plaintiff and                   ORDER
              Counterdefendant,
17
              v
18
     FRANÇOIS MARLAND,
19
              Defendant and
20            Counterclaimant.
     _____/
21
     THELEN REID BROWN RAYSMAN &
22   STEINER LLP, fka THELEN REID &
     PRIEST LLP,
23
              Counter-
24            Counterclaimant,

25            v

26   FRANÇOIS MARLAND, SUSANNAH MAAS &
     PHILIPPE BRUNSWICK
27
              Counter-
28            Counterdefendants.
     _____/

The law firm plaintiff, counterdefendant and counter-
counterclaimant Thelen Reid Brown Raysman & Steiner LLP, formerly
known as Thelen Reid & Priest LLP ("Thelen"), and Francois Marland
("Marland") agreed in 1999 to pursue litigation against a state-
owned French bank for violation of various state and federal laws
and regulations in connection with the bank's undisclosed interest
in a California insurance company.  The agreement was memorialized
in a series of written agreements and amendments entered into over
the next several years.  Disagreements arose and in late 2002,
Thelen and Marland entered into what Thelen contends is a release,
the December 2002 agreement.  The terms and validity of that
December 2002 agreement are central to a series of motions now
before the court and key to the litigation as a whole.

Marland, nominally the defendant but in fact the
complaining party, alleges that this action represents the effort
of a "prominent law firm to stifle a former client's efforts to
arbitrate claims arising out of the law firm's self-dealing and
dishonesty" in using Marland as the "whistleblower on the billion-
dollar Executive Life fraud."  Doc #72 at 29.  Thelen alleges that
Marland's claims were released by the December 2002 agreement.

Consequently, Thelen moves for summary judgment, pursuant
to FRCP 56, on Thelen's first claim (for declaratory relief) and on
Marland's first through fifth counterclaims (for breach of
fiduciary duty; breach of contract; bad faith denial of contract;
intentional misrepresentation - failure to disclose known facts;
and negligence).  Doc #181.  In addition, Thelen moves for judgment
on the pleadings, pursuant to FRCP 9 and 12, on Marland's fifth

United States District Court

For the Northern District of California

2

1    affirmative defense (which variously states fiduciary

2    misrepresentations, concealment, professional misconduct and

3    failures to disclose).  Id.  Thelen also moves, pursuant to FRCP

4    65, for entry of a permanent injunction, or in the alternative,

5    preliminary injunction against arbitration proceedings commenced in

6    New York by Marland in February 2006.  Id.

7         Thelen moves separately and in the alternative for

8    summary judgment, also pursuant to FRCP 56, against Marland on his

9    first counterclaim for breach of fiduciary duty and fifth

10   counterclaim for negligence, on the argument that those claims are

11   time-barred.  Doc #144.  Finally, Thelen moves separately and in

12   the alternative for summary judgment, pursuant to FRCP 12(b)(7) and

13   19(a)-(b), against Marland on his second counterclaim for breach of

14   contract, on the argument that Marland failed to join indispensable

15   parties.  Doc #173.

16        Marland seeks summary judgment against Thelen on

17   Marland's first affirmative defense (for failure to state a claim),

18   third affirmative defense (for failure to fulfill a condition

19   precedent) and sixth through ninth affirmative defenses (for no

20   representation by independent counsel; unfairness and lack of

21   consideration; unconscionability, coercion and threat of client

22   abandonment; and violation of the California Rules of Professional

23   Conduct).  Doc #184.  In addition, Marland moves for summary

24   judgment, also pursuant to FRCP 56, on his second counterclaim (for

25   breach of contract), on Thelen's counter-counterclaims (for

26   declaratory relief and for "money had and received") and on

27   Thelen's affirmative defenses "insofar as they apply to Count Two

28

                                    3

United States District Court

For the Northern District of California

of Marland's Revised Amended Counterclaims" (for breach of contract).  Id.

Last, in this assortment of motions, counter-counterdefendant Susannah Maas ("Maas") moves to dismiss Thelen's counter-counterclaims against her, pursuant to FRCP 12(b)(2) and (b)(5).  Doc #171.

I

Despite the numerous motions at bar, the material facts are not disputed.  As explained below, what is disputed is not material to the disposition of claims at issue.

A

Thelen is a California limited liability partnership engaged in law practice.  Doc #11 at 1.  Marland is a citizen of France, a French attorney and currently a resident of Switzerland. Id.

In 1997, Marland approached the New York law firm of Reid & Priest, claiming to possess information about a July 1991 fronting agreement, or *contrat de portage*, through which Crédit Lyonnais, a French bank, had illegally acquired the insurance assets of Executive Life Insurance Company (ELIC), an insolvent California insurance company, at an auction conducted by the California Department of Insurance (CDOI) in 1991.  Doc #175, Ex B; Doc #11 (FAC) at ¶¶12-14; Doc #72 (Answer) at ¶¶12.  Marland wanted to know whether he could obtain a financial benefit by divulging

4

**United States District Court**
For the Northern District of California

to parties in the United States information about this *contrat de portage* which he claimed to possess.  Doc #175, Ex B.  After Reid & Priest merged with Thelen, Marrin, Johnson & Bridges in 1998, Marland flew to San Francisco at the request of Gary Fontana, a Thelen partner in San Francisco who had previously worked for other clients on ELIC-related proceedings.  Id.

After Fontana's meeting with Marland in San Francisco, Thelen partners met with representatives of CDOI and attempted to negotiate an agreement between CDOI and Marland.  Doc #175, Ex D. Thelen discussed having CDOI retain Thelen on a contingent-fee basis to pursue a claim against Credit Lyonnais, with an understanding that Thelen would share its legal fees with Marland as a way to compensate him.  Doc #175, Ex D at 210:23-211:7, Ex E at 13:21-14:7.  Thelen and CDOI could not agree on the terms of a contingent-fee agreement, so CDOI retained other attorneys on an hourly basis to file an action against Crédit Lyonnais.  Doc #175, Ex E at 13:21-14:7, 14:12-17:8, 21:13-23.

Evidently still anxious to get in on the pursuit of Crédit Lyonnais, Thelen then recommended that Marland initiate his own *qui tam* lawsuit on behalf of the state of California and CDOI. Doc #11 (FAC) at ¶20; Doc #72 (Answer) at ¶20.  In February 1999, Thelen and Marland signed an attorney-client agreement, providing that Thelen would file a *qui tam* lawsuit against Crédit Lyonnais and advise or assist CDOI and/or the California Attorney General in connection with the lawsuit, in exchange for a percentage of any recovery that Marland received.  Doc #175, Ex G (February 1999 agreement).  Marland agreed to pay Thelen 40% of any gross recovery

5

United States District Court

For the Northern District of California

if the case settled before November 1, 1999, and 50% if the case settled after that date.  Id at 2.  Paragraph 22 of the February 1999 agreement states:

> Either party shall have the right to withdraw from this Agreement without liability of any kind to the other provided that:
>
> (a) the party wishing to withdraw shall give thirty days written notice to the other;
>
> (b) the withdrawing party shall remain liable for any breach of its obligations under this Agreement prior to the date of withdrawal; and
>
> (c) the withdrawing party shall assign to the other party all its rights under this Agreement and any claim that may have [sic] to any recovery or award as a result of its pursuit of the qui tam litigation.

Doc #175, Ex G at ¶22.

To conceal Marland's role, Thelen then helped Marland incorporate an entity called RoNo LLC ("RoNo"), Doc #11 (FAC) at ¶20; Doc #72 (Answer) at ¶20, to serve as the named plaintiff in the *qui tam* lawsuit.  Marland alleges that, as part of this maneuver, Thelen rushed him to accept an unconsionable fee agreement and that Fontana signed the agreement without obtaining the necessary law firm approvals.  Doc #72 at 33, ¶13.  For reasons that will appear, the alleged lack of law firm approvals is not material.

On February 18, 1999, Thelen filed the *qui tam* lawsuit in San Francisco superior court.  Doc #11 (FAC) at ¶¶25-26; Doc #72 (Answer) at ¶¶25-26.  That same day, CDOI independently filed a separate complaint in Los Angeles County superior court against many of the same defendants.  Id.

Subsequently, and for reasons not clear in the record at bar, in May 1999, CDOI asked Thelen to represent CDOI in its

6

United States District Court
For the Northern District of California

lawsuit.  Doc #11 (FAC) at ¶27; Doc #72 (Answer) at ¶27.  In doing

so, CDOI agreed to allow Marland and Marland's European counsel,

Philippe Brunswick ("Brunswick") and Susannah Maas ("Maas"), to

share a portion of Thelen's legal fees if it succeeded in the

litigation.  Id.  CDOI and Thelen entered a written attorney-client

agreement on May 25, 1999.  Doc #175, Ex I.  CDOI agreed to pay

Thelen a sliding scale contingent fee.  Id at ¶5.  Thelen claims

that it informed Marland and Marland's European counsel of the

terms of CDOI's offer and of the potential conflicts between CDOI's

lawsuit and Marland's own *qui tam* lawsuit.  Doc #164-1 at ¶21.

Marland contends that Thelen never disclosed the conflicts that the

dual representation entailed.  Doc #72 at 34, ¶18.  Again a

dispute, but not one that matters.

    Thelen alleges that Marland's claim to possess a copy of

the July 1991 *contrat de portage* was critical to CDOI's decision to

retain Thelen and CDOI's consent to Thelen's sharing fees with

Marland.  Doc #164 at 5, ¶21.  Marland contends that Thelen never

told him he had an obligation to preserve or produce evidence that

might have identified him as the whistleblower.  Doc #72 at 33,

¶12.  Marland does not dispute telling Thelen that he had the

*contrat de portage* and that he never produced it.  What Thelen told

Marland about his obligation to produce the *contrat de portage* or

did not tell him does not matter, as will be explained.

    On June 2, 1999, Thelen and Marland executed a written

amendment to the February 1999 agreement under which Marland agreed

that Thelen would take all reasonable steps to dismiss the *qui tam*

\\

**7**

action.  Doc #175, Ex J.  CDOI had requested this move in exchange for its agreement to retain Thelen.  Id.

On June 3, 1999, Thelen, Marland, Brunswick and Maas entered an agreement to associate counsel.  Doc #175, Ex K ("June 1999 agreement").  Under the agreement, Thelen agreed to pay Marland, Brunswick and Maas, jointly and severally, a total of 52.5% of the legal fees that it received from CDOI after December 31, 1999.  Id.

In addition, Thelen and Marland signed an amendment to their attorney-client agreement and to the fee-sharing agreement, under which Marland's recovery would be reduced in certain circumstances.  Doc #175, Ex L ("June 1999 side letter").  In the letter agreement, Marland agreed to the following:

> 1) I have agreed with you and your law firm that, if requested, I will voluntarily come to the United States to testify before a federal grand jury in Los Angeles concerning the subjects addressed in my memorandum so long as that appearance is subject to a confidentiality agreement with the U.S. Department of Justice that fully protects my identity and assures that me [sic] that I will not be compelled to produce documents that may be in my possession or control against my will.

> 2) Second, in the event you believe it is essential to the effective prosecution of the civil case in which TR&P is currently representing the Commissioner of Insurance, and you request my testimony in that case, I have also agreed with you and your law firm that I will voluntarily come to the United States to testify in court and to provide deposition testimony in that case in Europe.  You and I have agreed to make all reasonable efforts to find other competent witnesses who are willing to testify to the same facts and, thus, avoid the necessity of my testifying in the civil case.  However, we cannot be sure these efforts will succeed.

> 3) In the event that I become unable or unwilling to testify before the grand jury as provided in Paragraph 1, I hereby agree that the amounts payable to European

8

United States District Court
For the Northern District of California

Counsel under the Agreement to Associate Counsel dated June 2, 1999 shall be reduced by two-thirds (66.67%) from what they would otherwise be. (i.e., 21 2/3 percent of total legal fees paid on or before 12/31/99 and 17.5 percent thereafter).

4) In the event that I testify before the grand jury as provided in Paragraph 1, but become unable or unwilling to testify in the civil case as provided in Paragraph 2, I hereby agree that the amounts payable to European Counsel under the Agreement to Associate Counsel dated June 2, 1999 shall be reduced by one-half (50 percent) from what they would otherwise be.  (i.e., 32.5 percent of the total legal fees on or before 12/31/99, and 26.25 percent thereafter).

Id.

In July 2001, the California Attorney General elected to intervene in the *qui tam* action.  Doc #175, Ex M at 142:24-143:4.  The Attorney General objected to Thelen's continued representation of RoNo as the *qui tam* relator.  Id at 144:20-145:16.  On September 10, 2001, Thelen withdrew from representing RoNo in the *qui tam* action and assisted Marland in retaining other counsel.  Id at 171:9-172:23; Doc #178, Ex 3.  Later in September 2001, Thelen and Marland signed an amendment to the February 1999 agreement, memorializing Thelen's withdrawal as counsel of record for RoNo in the *qui tam* action.  Doc #175, Ex N.  Thelen, however, continued to serve as "general counsel" to RoNo and "counsel" to Marland.  Id.  Also in September 2001, the parties executed an Amendment to the Agreement to Associate Counsel.  Doc #186, Ex 10.  This agreement maintained the same 52.5%/47.5% ratio provided in the June 1999 agreement.  Id.

Thelen alleges that by December 2001, CDOI's lawsuit had become much more costly than the parties had anticipated.  Doc #164-1 at ¶28.  Marland does not dispute this.  Thelen wanted to

9

**United States District Court**
For the Northern District of California

ask CDOI for a non-recourse advance to the firm.  Id.  The June 1999 agreement required Thelen to pay to Marland, Brunswick and Maas a percentage of any fees received from CDOI.  Thelen approached Marland to negotiate a restructuring of their fee sharing relationship.  Id at ¶¶28-29.

In June 2002, Thelen requested that Marland produce the July 1991 *portage*.  Doc #177, Ex 1.  Thelen states that it needed the document because Thelen partner Karl Belgum was preparing to depose the key defense witnesses in the ELIC litigation.  Doc #175, Ex M at 105:24-107:7.  According to Thelen, Marland refused to produce the document and said for the first time that he had destroyed it.  Doc #164 at ¶30.  Again, Marland does not contest this.

Sometime prior to July 2002, Thelen approached Marland in an attempt to restructure the terms of their fee-sharing agreement.  Doc #11 (FAC) at ¶34; Doc #72 (Answer) at ¶34.  Negotiations ensued.  Id.  Thelen's general counsel, Wynne Carvill, met with Brunswick at Brunswick's office in Paris in June 2002.  Doc #175, Ex R at 75:7-25.

On July 8, 2002, pursuant to the terms of the February 1999 agreement, Thelen gave Marland 30 days' written notice of its decision to withdraw from representing him.  Doc #175, Ex S.  The notice stated:

> Dear Mr Marland:
> As you know, we are working with Philippe Brunswick to negotiate a new, definitive agreement governing our relationship.  We had hoped to have this in place by now, but the process is taking more time than we had anticipated.

1

> Nevertheless, as we should clearly be able to conclude a new agreement during the month of July, we believe the time has come to send you thirty day (30) notice of termination of, and withdrawal from, the February 17, 1999 Attorney-Client Agreement pursuant to clause 22 of that document.  Please accept this letter as such notice.
>
> We would very much like to come to a new agreement within the next thirty days, but this notice is not contingent upon us doing so.

Id.  Thelen extended the notice period once, to August 30, 2002.  Doc #220, Ex 15.

In the six months following the June 2002 meeting in Paris, Carvill and Brunswick exchanged ten drafts of a "New Agreement to Associate Counsel."  Doc #176, Exs 3-36.

On December 19, 2002, Thelen, Marland, Brunswick and Maas entered a new agreement which replaced "any and all other agreements among them," effective July 1, 2002.  Doc #175, Ex T.  Under the terms of the December 2002 agreement, the percentage of Marland and European Counsel's recovery was reduced from 52.5% to 35% of the fees paid to Thelen by CDOI.  Id at ¶B.2(a).  Thelen also agreed to resume its role as general counsel to RoNo and agreed to represent Marland, at no charge for up to $100,000 in fees, in the event that any ELIC defendant tried to block payments to him.  Id at ¶B.2(g)(iv)-(v).

The December 2002 agreement includes a "Mutual Release" provision that states:

> For the mutual consideration reflected herein, the parties hereby release and forever discharge one another from any and all claims they might have against one another for any breach by the other of any prior agreement between them or professional obligation of one to the other or any other obligation whether sounding in tort or contract, including, but not limited to, any claim that Marland or EC [European Counsel] failed to

11

perform any services, to deliver any documents or otherwise to fulfill any obligations of any kind to TR&P, or any claim that TR&P failed to perform any services, to adequately protect the interests of its clients (Marland/RoNo), to disclose any conflict, to obtain any required waiver or otherwise to discharge any obligations of any kind to Marland, RoNo or EC.

The parties expressly acknowledge and waive the provisions of California Civil Code section 1542 * * *

Both Parties have had the benefit of the advice of independent counsel in considering the significance of this Mutual Release and neither is relying on the advice of the other in deciding to enter it.

Id at ¶C.3.

The December 2002 agreement further required the parties to obtain consent from CDOI:

Disclosure and consent: The Parties expressly acknowledge that the fee splitting terms of this Agreement shall be disclosed to the Commissioner, that the circumstances leading to this change shall be disclosed to the Commissioner and that his consent to this Agreement shall be sought as part of an effort to obtain his agreement to pay Advances as provided in paragraph N above. The effectiveness of this entire Agreement is conditioned on the Commissioner providing his consent.

Id at ¶C.2(a) (emphasis in original).

On August 2, 2004, CDOI provided its consent. Doc #175, Ex U. The signed consent states:

The California Department of Insurance ("CDOI") has reviewed the New Agreement to Associate Counsel entered into December 8, 2002 between Thelen Reid & Priest and certain other parties referred to collectively therein as European Counsel (the "Agreement"), a copy of which is attached hereto.

CDOI hereby gives its consent, pursuant to Rule 2-200 of the Rules of Professional Conduct of the State Bar of California, to the fee sharing agreement contained in the Agreement.

Id.

United States District Court
For the Northern District of California

12

United States District Court

For the Northern District of California

1    Here is what matters.  If valid and enforceable, the

2  December 2002 agreement displaces any claims that Marland might

3  otherwise have against Thelen, if such claims arose before December

4  19, 2002.  Marland, however, alleges that Thelen used the

5  litigation costs and the *portage* as a pretense to get Marland to

6  enter into the December 2002 agreement that reduced his share of

7  the recoveries from the ELIC litigation.  Doc #72 at 36-39.

8  Marland claims that Thelen terminated the February 1999 agreement

9  as a bargaining tool and that he was coerced into signing the

10  December 2002 agreement through intentional misrepresentations and

11  inadequate representation of his interests by Thelen.  Id at 37-39.

12    Thelen contends that, in reliance on the December 2002

13  agreement, it continued to expend time and resources on the ELIC

14  litigation and ultimately succeeded in obtaining nearly $1 billion

15  in settlements and judgments.  Doc #164 at ¶40.  Thelen has paid,

16  and Marland has accepted, over $19 million pursuant to the terms of

17  the December 2002 agreement.  Id.

18    According to Marland's privilege log, Marland, along with

19  his attorneys Francois Chateau and Phillipe Brunswick, met with

20  Andrew Hayes in September and December 2003.  Doc #143, Ex K, Nos

21  29, 48-49.  Hayes is Marland's counsel in this litigation.  As

22  early as March 2004, Hayes prepared a "Memorandum re: Review and

23  analysis re possible claims of RoNo."  Id at No 56.  On February 4,

24  2005, Hayes sent an email to Fontana at Thelen, officially

25  terminating Thelen as general counsel for RoNo.  Doc #145, Ex A at

26  TRP 010635.

27

28  \\

13

United States District Court

For the Northern District of California

On February 13, 2006, Marland commenced an arbitration proceeding against Thelen in New York City, asserting that the December 2002 agreement is unenforceable and that the release and waiver provisions of that agreement are void.  Doc #11, Ex G.

B

Thelen initiated this action against Marland, seeking to enforce the December 2002 agreement and to enjoin Marland from pursuing the New York arbitration.  Doc ##1, 11.  Thelen seeks: a declaratory judgment that (1) the December 2002 agreement is valid and enforceable; (2) Marland has released Thelen from the claims asserted in the New York arbitration proceeding; and (3) all claims of Marland and RoNo against Thelen arising from Thelen's performance of professional services for Marland or RoNo are barred by the statute of limitations embodied in Cal CCP § 340.6.  Thelen seeks an injunction prohibiting Marland from asserting any claims against Thelen which are released by the December 2002 agreement (including the claims asserted in the New York proceeding), and seeks an injunction prohibiting Marland from pursuing the New York arbitration proceeding.  Doc #11.

On May 23, 2006, Marland answered the complaint and served counterclaims against Thelen asserting essentially the same claims he had asserted in the arbitration, i e, that the December 2002 agreement never went into effect and that the February 1999 and June 1999 agreements remain valid and binding.  Doc #72. Marland asserts counterclaims for (1) breach of fiduciary duty; (2) breach of contract; (3) bad faith denial of contract; (4)

14

intentional misrepresentation - failure to disclose known facts; and (5) negligence.  Id.  In addition, Marland asserts the following affirmative defenses: (1) failure to state a claim; (2) failure to join an indispensable party; (3) failure to fulfill a condition precedent; (4) estoppel; (5) fiduciary misrepresentations, concealment, professional misconduct & failures to fully disclose; (6) no representation by independent counsel; (7) unfairness & lack of consideration; (8) unconscionability, coercion and threat of client abandonment; (9) violation of California Rules of Professional Conduct; (10) public policy against interfering with pending arbitrations; and (11) unclean hands.  Id.

In response, Thelen filed two counter-counterclaims against Marland and Marland's European counsel – Susannah Maas and Philippe Brunswick.  Doc #164.  Both counter-counterclaims are contingent on the court finding the December 2002 agreement invalid.  Id.  The first counter-counterclaim seeks a declaration of the rights and obligations of the parties in light of the parties' execution of the December 2002 agreement and the parties' subsequent conduct.  Id ¶¶ 44-49.  The second seeks a return of the $19 million Thelen paid to Marland, Maas and Brunswick, pursuant to the December 2002 agreement.  Id at ¶¶50-53.

\\

\\

\\

\\

United States District Court

For the Northern District of California

II

Because it is key to the entire litigation, the court first addresses the parties' respective summary judgment motions centered on the December 2002 agreement.  In reviewing a summary judgment motion, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the nonmoving party.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v Liberty Lobby, 477 US 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id.  The burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp v Catrett, 477 US 317, 322-23 (1986).  Summary judgment is granted only if the moving party is entitled to judgment as a matter of law.  FRCP 56(c).

The nonmoving party may not simply rely on the pleadings, however, but must produce significant probative evidence, by affidavit or as otherwise provided in FRCP 56, supporting the claim that a genuine issue of material fact exists. TW Elec Serv v Pacific Elec Contractors Ass'n, 809 F2d 626, 630 (9th Cir 1987).  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  Thornhill Publishing Co, Inc v GTE Corp, 594 F2d 730, 738 (9th Cir 1979).  The evidence presented by the nonmoving party "is to be believed, and all justifiable

inferences are to be drawn in his favor." <u>Anderson</u>, 477 US at 255. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id at 249.


A

Because the December 2002 agreement, if valid, trumps the other claims, the court first considers Thelen's motion for summary judgment on its claim for declaratory relief that the December 2002 agreement is valid.

The December 2002 agreement states that it "shall be construed and enforced under the laws of the state of California applicable to contracts to be wholly performed within the State." Doc #175, Ex T at 9. The parties agree that California law governs the court's interpretation of the agreement.

Under Cal Civ Code § 1550, the essential elements for a contract are: (1) parties capable of contracting, (2) their consent, (3) a lawful object and (4) a sufficient cause or consideration. In addition, any condition precedent in a contract must be performed before the promisor's duty of performance arises. Cal Civ Code § 1436.

Thelen argues that: (1) all conditions precedent to the December 2002 agreement have been met; (2) the signatories to the agreement were all competent adults capable of consent; (3) Marland, an attorney and "sophisticated businessman," consented to the agreement; (4) there was sufficient consideration for the

17

United States District Court
For the Northern District of California

agreement; and (5) the agreement had a lawful object: "to resolve disputes between the parties arising out of the prior agreements." Doc #181 at 18-21.

Marland does not dispute that the parties were capable of contracting and that they consented to the agreement. Doc #226. Marland argues, however, that: (1) the December 2002 agreement never took effect because Thelen did not make the disclosures required by that agreement, and CDOI declined to approve the "entire agreement," both of which were preconditions to its effectiveness; (2) Thelen cannot carry its burden of proving that the December 2002 agreement was objectively fair and reasonable and supported by consideration, as required by California law; (3) Thelen cannot prove that it made the necessary disclosures to Marland required by California Rule of Professional Conduct 3-300 in advance of seeking approval of the December 2002 agreement; and (4) the December 2002 agreement was induced by fraud. Doc #184 at 2; Doc #226 at 9-11, 23. The court addresses these points in turn.

1

"A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed." Cal Civ Code § 1436. Marland argues that Thelen failed to fulfill the "disclosure and consent" provision of the agreement. As described above, this provision states:

> Disclosure and consent: The Parties expressly acknowledge that the fee splitting terms of this Agreement shall be disclosed to the Commissioner, that the circumstances leading to this change shall be disclosed to the Commissioner and that his consent to this Agreement shall be sought as part of an effort to obtain his agreement to

18

1    pay Advances as provided in paragraph N above. **The**
2    **effectiveness of this entire Agreement is conditioned on**
     **the Commissioner providing his consent.**

3    Doc #175, Ex T at ¶C.2(a) (emphasis in original).

4                                    a

6        Marland first argues that Thelen failed to obtain CDOI's
7    consent to the "entire agreement" as opposed to just the fee-
8    sharing clause.  Doc #184 at 26.  Marland argues that the provision
9    should be interpreted to require CDOI's consent to the "entire
10   agreement."  Id at 26-27.  Thelen argues that the agreement only
11   required CDOI's consent to the "fee-splitting terms" pursuant to
12   Cal R Prof Conduct 2-200.  Doc #223 at 16.

13       Under California law, "a contract must be so interpreted
14   as to give effect to the mutual intention of the parties as it
15   existed at the time of contracting, so far as the same is
16   ascertainable and lawful."  Cal Civ Code § 1636.  "The language of
17   the contract is to govern its interpretation, if the language is
18   clear and explicit, and does not involve an absurdity."  Cal Civ
19   Code § 1638.  When possible, the intention of parties entering into
20   a written contract should be ascertained from the writing alone.
21   Cal Civ Code § 1639.  The "whole of a contract is to be taken
22   together, so as to give effect to every part, if reasonably
23   practicable, each clause helping to interpret the other."  Cal Civ
24   Code § 1641.  In addition, words in a contract that are wholly
25   inconsistent with its nature, or with the main intention of the
26   parties, shall be ignored.  Cal Civ Code § 1653.  If, even after
27   applying these rules of construction, uncertainty remains, the
28   language of the contract should be "interpreted most strongly

                                19

United States District Court

For the Northern District of California

against the party who caused the uncertainty to exist."  Cal Civ
Code § 1654.

Parol or extrinsic evidence is admissible to resolve an
ambiguity.  <u>WYDA Associates v Merner</u>, 42 Cal App 4th 1702, 1710
(1996).  In such cases, the court engages in a two-step process:
First, the court provisionally receives (without actually
admitting) all credible evidence concerning the parties' intentions
to determine "ambiguity," i e, whether the language is "reasonably
susceptible" to the interpretation urged by a party.  Id.  If in
light of the extrinsic evidence the court decides the language is
"reasonably susceptible" to the interpretation urged, the extrinsic
evidence is then admitted to aid in the second step - interpreting
the contract.  Id.  The trial court's determination of whether an
ambiguity exists is a question of law, subject to independent
review on appeal.  Id.  The trial court's resolution of an
ambiguity is also a question of law if no parol evidence is
admitted or if the parol evidence is not in conflict.  Id.  Where
the parol evidence is in conflict, the trial court's resolution of
that conflict is a question of fact and must be upheld if supported
by substantial evidence.  Id.  Furthermore, when two equally
plausible interpretations of the language of a contract may be
made, parol evidence is admissible to aid in interpreting the
agreement, thereby presenting a question of fact which precludes
summary judgment if the evidence is contradictory.  Id.

Marland's moving papers do not direct the court to any
extrinsic evidence supporting Marland's interpretation of the
"disclosure and consent" provision.  Doc #184.  Instead, Marland

20

relies on the "clear" intent of the provision stating that it "requires disclosure to the Commissioner of 'the circumstances leading to this change' and requires the Commissioner's consent 'to this Agreement' – not 'the fee splitting terms of this agreement.'" Doc #184 at 27.  Marland argues that "the two adjacent provisions are obviously connected, and their intent is clear: instead of obtaining the usual client approval for a fee-sharing agreement, the parties agreed to disclose why the fee-sharing agreement had changed and obtain the DOI's approve [sic] of the 'entire agreement,' including the releases."  Id.  The two adjacent provisions, in Marland's view, are those requiring disclosure of the: (1) "fee splitting terms" and (2) "circumstances leading to this change [in the fee splitting terms]."

          In support of its contrary interpretation, Thelen first points to Cal R Prof Conduct 2-200, which requires a client's written consent to the terms by which two attorneys will divide *fees*.  Doc #223 at 16.  Rule 2-200(A) states:

>          (A) A member shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder with the member unless:
>
>>          (1) <u>The client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division</u>; and
>
>>          (2) The total fee charged by all lawyers is not increased solely by reason of the provision for division of fees and is not unconscionable as that term is defined in rule 4-200.

Cal R Prof Conduct 2-200(A) (emphasis added).

\\

United States District Court
For the Northern District of California

1    Thelen also points to the negotiation of the December

2    2002 agreement.  Specifically, Thelen points to a letter from

3    Carvill to Brunswick, in which Carvill wrote, "I am presenting an

4    outline of the essential terms to the Commissioner * * * Please

5    understand that, as this is a fee-splitting arrangement, the

6    economic terms require his approval."  Doc #220, Ex 39 at M2230.

7    Finally, Thelen points to the fact that it never tried to

8    obtain a broader consent.  Doc #223 at 17.  Gary Cohen, general

9    counsel for CDOI and the person who executed CDOI's consent,

10   testified in deposition that Thelen never asked him to consent to

11   any portion of the December 2002 agreement other than the fee-

12   splitting terms:

13
          Q: Did anyone at Thelen ever tell you that the Department
14        had to consent to anything more than the fee-sharing
          provision contained in the new agreement to associate
15        counsel?

16        Cohen: No.

     Doc #219, Ex V at 38:25-39:3.
17

18       The court finds as a threshold determination that

19   Thelen's extrinsic evidence constitutes "credible evidence

20   concerning the parties' intentions" and, accordingly, establishes

21   an ambiguity in the contract.  WYDA at 1710.  The "disclosure and

22   consent" provision specifically references disclosure to the

23   Commissioner of the "fee splitting terms of the Agreement" and does

24   not reference any other specific terms.  But the provision also

25   calls for disclosure of "the circumstances leading to this change."

26   The court finds that it is ambiguous whether "this change" refers

27   to the change in the fee splitting terms or a broader change, such

28   as the change from the prior agreements to the December 2002

22

United States District Court

For the Northern District of California

agreement.  Accordingly, the court, after "provisionally receiving" Thelen's extrinsic evidence, finds that the language of the provision is "reasonably susceptible to the interpretation urged" by Thelen.  <u>WYDA</u> at 1710.  The court admits the extrinsic evidence and proceeds to the "second-step" of contract interpretation under the California guidelines.  Id.

"The trial court's resolution of an ambiguity is also a question of law if no parol evidence is admitted or if the parol evidence is not in conflict."  <u>WYDA</u> at 1710.  Marland identifies for the first time in his reply brief "extrinsic evidence" purportedly supporting his interpretation.  Doc #236.  Marland argues that Thelen "went beyond the minimum that Rule 2-200 required, and disclosed why the fee-sharing agreement had changed." Doc #236 at 11.  In support, Marland cites a number of letters wherein Carvill tells Brunswick that disclosure of the "document issue" [Marland's destruction of the *contrat de portage*] was a necessary part of obtaining CDOI's consent.  Doc #220, Exs 20, 22, 24, 30.  Marland also identifies two email exchanges between Thelen and Cohen as well as Cohen's deposition testimony.  Doc #186, vol 1, Ex 2; vol 2 Exs 101, 102.  These all show Cohen stating that his consent, on behalf of CDOI, was a consent only as to the fee-sharing agreement, and that, during the time he was at CDOI, the department never took a position with regard to any other provision in the December 2002 agreement.  Id.

The court notes that both parties also cite to Carvill's deposition testimony taken in this litigation regarding what he understood the provision to mean.  The court declines to consider

23

**United States District Court**
For the Northern District of California

this testimony as extrinsic evidence.  California case law establishes an objective standard for contract interpretation. "[I]t is now a settled principle of the law of contract that the undisclosed intentions of the parties are * * * immaterial; and that the outward manifestation or expression of assent is controlling."  <u>Titan Group, Inc v Sonoma Valley County Sanitation Dist</u>, 164 Cal App 3d 1122, 1127 (1985).  Contractual language is not controlled by "what either of the parties intended or thought its meaning to be."  <u>Citizens Utilities Co v Wheeler</u>, 156 Cal App 2d 423, 432 (1957).

        The court determines that Marland's extrinsic evidence is not "contradictory" to Thelen's extrinsic evidence.  Accordingly, resolution of the parties' intent does not depend on a finding of fact as to the "credibility" of the extrinsic evidence, and the court may interpret the "disclosure and consent" provision as a matter of law.  <u>WYDA</u> at 1710.

        Based on its examination of the extrinsic evidence, the court agrees with Thelen that the parties intended to obtain CDOI's consent to only the fee-splitting terms of the agreement and not to the entire agreement.  The court looks to Rule 2-200 as evidence of surrounding circumstances.  "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."  Cal Civ Code § 1647.  The court also looks to Rule 2-200 as evidence of usage or custom observed in the context of fee-splitting agreements. General usages of trade or course of dealing may supplement or explain an agreement.  Cal Civ Code § 1655.  The December 2002 agreement was a fee-splitting

24

agreement governed by Rule 2-200.  The parties' written communications leading up to the execution of the December 2002 agreement regularly referred to Rule 2-200, and the consent itself specifically refers to the rule, stating:

> CDOI hereby gives its consent, pursuant to Rule 2-200 of the Rules of Professional Conduct of the State Bar of California, to the fee sharing agreement contained in the Agreement.

Doc #175, Ex U.  Even Marland refers to "approval for a fee sharing agreement" as "the usual client approval."  Doc #184 at 27. Marland offers no reason why Thelen would have intended a broader consent.

The court also looks to the subsequent conduct of the parties.

> Acts of the parties, subsequent to the execution of the contract and before any controversy has arisen as to its effect, may be looked to in determining the meaning.  The conduct of the parties may be, in effect, a *practical construction* thereof, for they are probably least likely to be mistaken as to the intent.  "This rule of practical construction is predicated on the common sense concept that 'actions speak louder than words.'  Words are frequently but an imperfect medium to convey thought and intention.  When the parties to a contract perform under it and demonstrate by their conduct that they knew what they were talking about the courts should enforce that intent."

1 Witkin, Summary of California Law, Contracts § 215 (10th ed 2005) (emphasis in original) (citing <u>Crestview Cemetery Assn v Dieden</u>, 54 Cal 2d 744, 754 (1960)).  Here, Marland does not dispute that after the December 2002 agreement was signed but before this controversy arose, Thelen never attempted to obtain a broader consent.

Finally, Marland's "extrinsic evidence" is consistent with the court's interpretation.  Cohen admits that he never took a position regarding any provision of the agreement, other than the

25

**United States District Court**
For the Northern District of California

1    fee-splitting provision.  The language Marland cites from the

2    Carvill letters is consistent with the provision requiring

3    disclosure of "the circumstances leading to" the change in the fee

4    agreement.

5                                    b

6            Marland next argues that Thelen failed to disclose to

7    CDOI "the circumstances leading to" the change in the fee-sharing

8    percentages.  Marland argues that Thelen represented to CDOI that

9    Marland had breached an obligation to produce his copy of the

10   *contrat de portage* to Thelen.  Doc #184 at 27.  This argument

11   assumes that Marland's failure to produce the document (i e "the

12   document issue") was not a genuine reason leading to the new

13   agreement.  Marland fails to produce evidence to support this

14   position.  Specifically, Marland does not establish that such a

15   representation was an improper "disclosure."   The court discusses

16   this in detail below in connection with Marland's arguments on

17   "failure of consideration."  See infra, section IIA2.  The court

18   incorporates that discussion by reference here.  Moreover, Marland

19   points to nothing in the record indicating what he believes the

20   "real" circumstances leading to the change were.

21           While the court recognizes that it is difficult for

22   Marland to prove a negative, i e what Thelen did <u>not</u> disclose,

23   Marland's counsel had ample opportunity to depose CDOI and Thelen

24   witnesses and serve other discovery regarding discussions

25   surrounding the December 2002 agreement.  Nonetheless, Marland

26   points to no evidence regarding what was or was not said or

27   "disclosed" about the agreement.  Marland does not specify what

28   particular disclosure Thelen was supposed to make, and Marland

United States District Court
For the Northern District of California

offers no extrinsic evidence in support of his interpretation of
this part of the disclosure provision.  (While Marland argues that
"Thelen's discovery responses admit that it never gave the side
letter agreement to CDOI nor discussed that agreement with the
CDOI," Doc #184 at 27, Marland does not explain the relevance of
this point.  Moreover, Marland does not direct the court to these
"discovery responses" in the record.)

Even if Marland could establish a dispute of fact with
his submissions to the court – and the court finds that he cannot –
this would at most be a dispute of fact over what "the
circumstances leading to the change" actually were.  Marland's
burden here, however, is to show a disputed fact regarding what
Thelen told CDOI and *whether* those disclosures reflected the
circumstances leading to the new agreement.

Marland seems to be arguing that Thelen had a duty to
disclose what Marland believes were Thelen's true motives in
negotiating the new agreement.  Marland speculates that Thelen's
true motives were simply to reduce Marland's share and maximize
Thelen's recovery, all while threatening Marland with withdrawal.
Doc #184.  Marland also speculates that Thelen lied to CDOI all
along regarding Marland's obligation to produce the *portage*.  Id at
27-28.  The court does not interpret the "disclosure and consent"
provision to include an intent by the parties to make such a
damaging disclosure to CDOI.  "A contract must receive such an
interpretation as will make it reasonable if it can be done without
violating the intention of the parties.  In the absence of contrary
indication, it is assumed that each term of an agreement has a
reasonable rather than an unreasonable meaning."

27

United States District Court
For the Northern District of California

1    <u>Binder v Aetna Life Ins Co</u>, 75 Cal App 4th 832, 852 (1999)

2    (citations omitted).

3            Finally, as Thelen points out, the December 2002

4    agreement states "TR&P represents that it has orally disclosed to

5    the Commissioner the fact that EC [European Counsel] is not in a

6    position to produce a copy of any 'contrat de portage.'"  Doc #175,

7    Ex T at C.2(c).  Accordingly, CDOI was on notice that the document

8    was unavailable.  Marland is unclear as to what additional

9    disclosures were required and why.  Lack of clarity does not create

10   a disputed issue of fact.

11                                    2

12

13           Marland next argues that Thelen cannot prove that the

14   December 2002 agreement was objectively fair and reasonable and

15   supported by consideration, as required by California law.  Doc

16   #184 at 26, 31-34.  Marland's briefing on this point is fragmented

17   and confusing, but the court understands Marland to be making three

18   arguments:

19           (1) The December 2002 agreement was not fair and
             reasonable in accordance with Cal R Prof Conduct 3-300
20           and Cal Probate Code § 16004.  Id at 26, 33.

21           (2) Under <u>Severson & Werson v Bollinger</u>, 235 Cal App 3d
             1569, 1572 (1991), an attorney cannot seek a rate
22           increase after the fee for engagement has already been
             established, unless he reserves the right to do so.  Id
23           at 32.

             (3) The December 2002 agreement was not supported by
24           genuinely new consideration as required by <u>Denton v
             Smith</u>, 101 Cal App 2d 841, 844 (1951).  Id at 26.
25

26           Marland's first two arguments are dealt with easily.  As

27   discussed below in connection with Marland's Rule 3-300 argument,

28   the court finds that Rule 3-300 is not applicable to the December

                                      28

**United States District Court**
For the Northern District of California

2002 agreement.  See infra, section IIA3.  Nor does Cal Probate

Code    § 16004 apply:

> A transaction between the trustee and a beneficiary which
> occurs during the existence of the trust or while the
> trustee's influence with the beneficiary remains and by
> which the trustee obtains an advantage from the
> beneficiary is presumed to be a violation of the
> trustee's fiduciary duties. This presumption is a
> presumption affecting the burden of proof. <u>This
> subdivision does not apply to the provisions of an
> agreement between a trustee and a beneficiary relating to
> the hiring or compensation of the trustee.</u>

Cal Prob Code § 16004(c) (emphasis added).

A similar issue arose in <u>Ramirez v Sturdevent</u>, 21 Cal App

4th 904 (1994).  Ramirez retained Sturdevent on a contingency basis

to represent her in a wrongful termination case.  The contingency

agreement contained a provision permitting Sturdevent to withdraw

upon reasonable notice.  Sturdevent expended significant resources

litigating Ramirez's case, but the court granted summary judgment

for the employer.  Sturdevent was uncertain about Ramirez's chances

on appeal.  Sturdevent and Ramirez re-negotiated the contingency

agreement to include additional terms: Ramirez would pay $500 per

month against costs; she would pay appellate and post judgment

costs as incurred; and she would agree to accept any settlement

offer of at least $150,000.  After the court of appeal reversed the

trial court's grant of summary judgment, the case settled.  Ramirez

then sued Sturdevent for breach of fiduciary duty and sought to set

aside the supplemental fee agreement.

Ramirez argued in part that the additional terms of the

supplemental fee agreement gave an advantage to Sturdevent over

Ramirez and, as a result, that the agreement violated Probate Code

United States District Court

For the Northern District of California

§ 16004.   The state court made two findings that are relevant here.
First, the court found that Sturdevent had met the duty imposed by
Probate Code § 16004 by producing evidence that "the transaction
was conducted at arms-length with an intelligent, experienced, and
sophisticated client."  Id at 916.  The court noted that
"[Sturdevent] was entitled to withdraw from the case, and thus was
entitled to negotiate the terms under which he would continue.
Ramirez's interest in continuing with Sturdevent may have caused
her to agree to terms she otherwise would have refused, but that
fact does not by itself translate into duress or a breach of
fiduciary duty."  Id at 918.

Second, the court held that § 16004 did not apply to the
supplemental agreement in any event, pointing to the last sentence
in the section: "This subdivision does not apply to the provisions
of an agreement between a trustee and a beneficiary relating to the
hiring or compensation of the trustee."  The court noted that this
exemption had been "held to apply 'even where there is a pre-
existing attorney-client relationship.'"  Id at 917 (quoting Walton
v Broglio, 52 Cal App 3d 400, 404 (1975)).

Here, after Thelen notified Marland of its intent to
withdraw pursuant to the attorney-client agreement with Marland and
RoNo, the parties negotiated extensively over many months to reach
the December 2002 agreement.  Doc #220, Ex 21-38.  As discussed
below, the court finds that Marland, himself an experienced and
sophisticated attorney, had the benefit of independent
representation and advice from two other experienced and
sophisticated attorneys, Chateau and Brunswick.  See infra, section

30

United States District Court

For the Northern District of California

IIA6.  Accordingly, under the ruling in <u>Sturdevent</u>, Marland does not and cannot show that the December 2002 agreement was the product of undue influence.  Moreover, as discussed below, the court finds that the December 2002 agreement was a re-negotiated attorney-client agreement, placing it within the exemption to § 16004(c).

Marland cites <u>Severson & Werson v Bollinger</u>, 235 Cal App 3d 1569, 1572 (1991), for the proposition that an attorney cannot seek a rate increase after the fee for engagement has already been established, unless he reserves the right to do so.  Doc #184 at 32.  This misstates the holding in <u>Severson</u> and is otherwise contrary to California law.  <u>Severson</u> provides only that a law firm cannot change its rates unilaterally and without notice.  Id at 1570-72.  Under <u>Sturdevent</u>, Thelen was entitled to re-negotiate its fee agreement with Marland.  See also <u>Vella v Hudgins</u>, 151 Cal App 3d 515, 519 (1984) ("A contingency fee contract may be modified by the parties at any time during the subject litigation.")

Marland last argues that the December 2002 agreement lacked sufficient consideration.

> Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise.

Cal Civ Code § 1605.  "A written instrument is presumptive evidence of a consideration."  Cal Civ Code § 1614.

Marland claims that Thelen's agreement to release Marland from any claims Thelen might assert against Marland for Marland's

31

United States District Court

For the Northern District of California

destruction of the *contrat de portage* was inadequate consideration because, according to Marland, Thelen knew from June 1999 onward that Marland was not going to produce the document.  Doc #184 at 27. Specifically, Marland faxed a letter to his French and American counsel on May 19, 1999 stating:

> I do not detain – and have not detained – documents other than those which have already been handed over to you, and which might be of interest in the frame of the American proceedings related to the above captioned matter.  Any other interpretations will be wrongful and will call for an action which I will ask you to proceed with.

Doc #186, volume 2, Ex 14.

Again, Marland misses the focus of his burden to show a dispute of material fact.  At most Marland shows a dispute over whether his failure to produce the *contrat de portage* placed him in breach of any agreement with Thelen.  The issue here, however, is whether Thelen released Marland from liability for any such breach as consideration for the December 2002 agreement.  Granted, such consideration would have no value if Marland is correct that Thelen never actually believed that Marland had a duty to maintain the document.  Thelen does not, however, have to show that the destruction of the document constituted a breach.  Rather, Thelen has to show that it honestly believed that the destruction *could* constitute a breach, exposing Marland to potential liability under the prior agreements, which Thelen could later waive to effect consideration for a new agreement.

> The compromise or release of a doubtful or disputed claim, which is not wholly void, is good consideration for a unilateral contract * * * and it is likewise sufficient for a bilateral contract. * * * The compromise or release of a claim wholly invalid, or valid but worthless, is not sufficient consideration. * * *

32

United States District Court
For the Northern District of California

However, where the claim is doubtful or believed valid, the Restatement makes a distinction.  The First Restatement required an honest and reasonable belief in the possible validity of the claim or defense, but the Second Restatement (§ 74(1)) substitutes an alternative requirement of doubtfulness in fact or law or of honest belief.

1 Witkin, Summary of California Law, Contracts § 215 (10th ed 2005) (citations omitted).

(1) Forbearance to assert or the surrender of a claim or defense which proves to be invalid is not consideration unless

(a) the claim or defense is in fact doubtful because of uncertainty as to the facts or the law, or

(b) the forbearing or surrendering party believes that the claim or defense may be fairly determined to be valid.

(2) The execution of a written instrument surrendering a claim or defense by one who is under no duty to execute it is consideration if the execution of the written instrument is bargained for even though he is not asserting the claim or defense and believes that no valid claim or defense exists.

Restatement of Contracts (Second) § 74.  See also <u>Booth v Bond</u>, 56 Cal App 2d 153, 157 (1942) ("The cancellation of a pre-existing debt, the release of security or the forbearance to sue, even though it subsequently appears that the forbearer might not have been successful in the suit, furnish sufficient consideration to uphold a contract.")

The court is satisfied that Thelen has shown beyond reasonable dispute both (1) an honest belief in Marland's obligation to retain the *contrat de portage* and (2) doubtfulness in fact and law under the parties' prior agreements regarding Marland's obligation to retain the *contrat de portage*.

First, Thelen points out that Marland testified in this litigation in March 2007 that he always maintained that he had the

33

*contrat de portage* and other documents and that the statement in

his May 1999 fax that he did not "detain" any other documents was

false at the time he made it:

> Marland: Concerning the Portage contract, I don't
> understand, or maybe I understand too well why Mr. Van
> Nest keeps asking me about the contract of Portage. I
> always said that I had the contract of Portage and other
> documents. I said that I would never produce the
> contract of Portage because if I did produce it, I would
> have the expression "whistleblower" attached to my name
> immediately * * * I always said that I was in possession
> of this document as well as other documents.
> * * *
>
> Q: The question is whether or not the statement that you
> do not detain documents other than those that have been
> handed over was truthful or not.
>
> Marland: Obviously it's false. It was done specifically
> to prevent my being attacked and my home being broken
> into. And also to calm down my criminal lawyer.
>
> Q: What do you mean by that?
>
> Marland: Because he's somebody who is very close to the
> legal environment, and he was very fearful for me, and he
> said to me I certainly hope that you don't have any
> documents at your home or elsewhere, hence the letter.

Doc #175, Ex A at 401:21-402:6; 402:22-24; 437:7-21.

This is consistent with Carvill's testimony that Carvill

and Marland told CDOI in 1999 that the *contrat de portage* was "in a

safe place." Doc #219, Ex R at 350:5-25. This is also consistent

with Fontana's testimony that, notwithstanding Marland's statement

that he might not produce the document, Fontana believed that

Marland had the document and would produce it if called upon. Doc

#186, volume 3, Ex 3 (Fontana dep) at 74:14-15, 75:1-5. Fontana

also testified that Marland told CDOI in February or March of 1999

that Marland would do everything he could to cooperate with CDOI.

Id at 75:10-14. Fontana believed that Marland wrote the letter out

of fear for his safety but believed that Marland would "come to

34

realize he was protected." Id at 76:1-13. On May 25, 1999, six days after Marland faxed his letter stating he did not "detain" other documents, Fontana wrote a memo to Brunswick stating "[s]o long as the original of the "cdp" [*contrat de portage*] remains in safe keeping, there is no risk that it can be obtained without our client's consent." Doc #186, volume 2, Ex 127 at 5.

Moreover, Carvill has testified that he believed Marland's destruction of the *contrat de portage* destroyed his value as a trial witness:

> Q: You told Brunswick that Marland's destruction of a document destroyed his value as a trial witness, correct?
>
> Carvill: Words to that effect.
>
> Q: Okay. And you told Brunswick that because Marland had effectively destroyed his value as a trial witness, Thelen was entitled to reduce Marland's share of the overall recovery that went to Thelen and the European counsel, correct?
>
> Carvill: Not exactly. I said it raised that issue.
>
> Q: You don't recall telling Brunswick that because Marland had destroyed his value as a trial witness, Thelen might be entitled to declare him in breach of the European Counsel agreement and receive nothing from Thelen's recovery in the Executive Life litigation?
>
> Carvill: The answer to that question is, yes, because you used the words "might be entitled." In other words, I said that was a possibility, that was a real possibility we have to deal with.
>
> Q: You were of the opinion in the summer of 2002 that Marland's destruction of the contrat de portage destroyed his value as a trial witness, correct?
>
> [objection]
>
> Carvill: I was of the opinion that was most likely the case.

Doc #175, Ex R at 13:18-14:19.

\\

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> This is consistent with Karl Belgum's testimony:
>
> Q: Is there anything in the [June 1999 side letter] agreement which provides for Marland's recovery to be reduced based on his refusal or failure to produce documents? * * *
>
> Belgum: I always understood that his coming to trial to testify would subject him to a subpoena to produce documents. All right. He can't show up in a court in America, walk in a courtroom, and then say I'm not going to produce my documents. He would be subject to being subpoenaed for his documents if he did that. So I always believed that if he came – if he showed up in court in America, he would be putting his obligation to produce that document in play.

Doc #175, Ex M at 61:8-62:1.

Thelen also submits an August 2002 fax from Brunswick to Marland and Chateau. Doc #176, Exs 17-18 (certified translation). This fax preceded a letter that Brunswick wrote to Carvill, wherein Brunswick argued that Marland had never agreed to produce the *contrat de portage* and that Thelen had no basis to re-negotiate the fee-sharing agreement simply because Marland had destroyed the document. Doc #176, Ex 19. Brunswick's August 2002 fax to Marland and Chateau attaches a draft of the letter to Carvill. The fax also states:

> Dear Francois,
> Enclosed please find a draft letter which I propose that you send to Wynne Carvill following our discussion of Friday.
> As you can see, concerning Wynne, I am extremely firm and affirmative as to the fact that the TR&P request for renegotiation based on the absence of a "document" is totally unfounded.
> Between us, and in all confidentiality, the reality is not at all as I described it to Wynne.
> Indeed, when I return my entire file [sic], I found numerous documents that demonstrate that:
> 1 - At the time, Mr. X [Marland] had affirmed that he was in possession of a document and was able to communicate it if needed.
> 2 - This situation had been mentioned to the American authorities likely to take TR&P for counsel and to Jeffrey Isaacs.

36

**United States District Court**
For the Northern District of California

> **It seems to me that it results that there is a true problem in the affirmation made several times recently by Mr. X namely that the document would have been destroyed in 1994.**
> **It seems to me indeed that there is a risk that the American entities concerned will blame Mr. X for having affirmed that at the time, more particularly 1998, he was in possession of a document that today he indicates that he eliminated in 1994, and consequently that they blame him for having purely and simply lied to them.**

Doc #176, Exs 17-18.

While Marland attempts to diffuse this fax by explaining that the 1994 date was a "misunderstanding," Marland does not dispute the section of the fax describing his own affirmation that he would produce the document if needed. (Moreover, Thelen points out in its reply that, although Marland cites to Carvill's testimony as evidence of this "misunderstanding," Carvill in fact never testified that he misunderstood Marland's story about destroying the document. Doc #233 at 19; Doc #234 at 7-9.)

The combined evidence submitted by Thelen and summarized above supports a finding of both (1) an honest belief by Thelen in Marland's obligation to retain the *portage* and (2) doubtfulness in fact regarding Marland's obligation to retain the *contrat de portage*. Marland has not produced sufficient evidence to raise a material question of fact on either of these two points, each of which, standing alone, supports a finding of adequate consideration. See Restatement of Contracts (Second) § 74(1). Marland's May 1999 fax claiming that he did not "detain" the *contrat de portage* does not satisfy the "significant probative evidence" required of Marland. The evidence is particularly weak in light of Marland's testimony that the statement was false and that he "always" said he had the *portage*.

37

**United States District Court**
For the Northern District of California

1    Furthermore, even assuming arguendo that Thelen did not

2  believe it had a valid claim against Marland, Marland does not

3  dispute that the December 2002 agreement, whereby Thelen

4  surrendered the claim, was executed by both parties and that this

5  execution was bargained for via substantial negotiations by

6  attorneys on both sides, meeting the requirements for consideration

7  under Restatement § 74(2).

8    Carvill testified that, during his June 2002 meeting with

9  Brunswick in Paris, Carvill raised concerns about Marland's

10  admitted destruction of the *contrat de portage* and that Brunswick

11  stated that Marland had never committed to produce the document.

12    Carvill: I met with Brunswick, and that is when the
13    document issue began to be discussed * * *

14    Q: I understand.  Thank you.  And it was also in that
     time frame when you recall Mr. Brunswick saying to you,
15    in effect, that Mr. Marland had sent a fax in May of 1999
     stating that he wouldn't produce anymore documents? * * *

16    Carvill: No, it was in that time frame, particularly in
     our meeting with Brunswick, that I heard his position
17    about there being no commitment to produce the document.
     Whether he added that in writing back then or later, I
18    can't recall.

19  Doc #175, Ex R at 75:18-76:12.

20    After the June 2002 meeting, and in the six months that

21  followed, Carvill and Brunswick engaged in extensive negotiations

22  and exchanged ten drafts of a new agreement to associate counsel.

23  Doc #220, Exs 3-36; Doc # 219, Ex R (Carvill dep) at 246:13-20,

24  253:23-254:7.  During that time, they continued to discuss the

25  effect of Marland's admitted destruction of the *contrat de portage*.

26  Doc #219, Ex R (Carvill dep) at 188:4-189:14.  Doc #220, Exs 9-

27  14,16,19-20, 23-24, 28, 30-32.  Carvill stated that Marland's

28  conduct called into question the representations that Thelen and

38

United States District Court
For the Northern District of California

1  Marland made to CDOI in 1999.  Doc #220, Ex 22.  Carvill told

2  Brunswick that Thelen might pursue a claim against Marland for

3  breach of the parties' agreements.  Id, Ex 13 at M1814.  Carvill

4  also stated that Thelen might be entitled to invoke the June 1999

5  side letter agreement.  Doc #219, Ex R (Carvill dep) at 13:22-

6  15:15.

7       For his part, Brunswick told Carvill that he believed

8  that Thelen was "misrepresenting the document situation," acting

9  "in bad faith" and violating duties owed to Marland.  Doc #219, Ex

10  R (Carvill dep) at 146:7-147:4.  For example, on August 28, 2002,

11  Brunswick wrote to Carvill and argued that Marland had never agreed

12  to produce the *portage* and that Thelen had no basis to re-negotiate

13  the fee-sharing agreement based on the *portage*.  Doc #220, Ex 19.

14       These negotiations culminated in the execution of the

15  December 2002 agreement wherein the parties mutually released each

16  other from all claims, known and unknown.  Accordingly, the court

17  finds, and Marland does not dispute that, whether or not Thelen had

18  a valid claim, Thelen's surrender of the claim was bargained for in

19  the course of substantial negotiations.  This surrender satisfies

20  the consideration requirement under Restatement § 74(2).  The

21  California courts have often referred to the Restatement of

22  Contracts to assist it in resolving novel questions of contract

23  law, and there is no reason to think they would not do so in this

24  case.  See e g <u>Drennan v Star Paving Co</u>, 51 Cal 2d 409 (1958)

25  (adopting the Restatement of Contracts position); <u>Schaefer v</u>

26  <u>Williams</u>, 15 Cal App 4th 1243 (1993) (citing with approval the

27  Restatement of Contracts).

28  \\

1    Moreover, the court finds that the December 2002

2  agreement was supported by other consideration that constitutes

3  adequate consideration independent of the release of claims

4  relating to the *portage*.  See <u>Sturdevent</u>, supra at 916 ("As

5  Sturdevant was entitled to withdraw from the case, it was no breach

6  of fiduciary duty to fail to inform Ramirez otherwise.  It follows

7  that Sturdevant was further entitled to negotiate those conditions

8  under which he would continue to represent Ramirez, and that his

9  agreement to continue his representation afforded the consideration

10  for Ramirez's consent to the terms of the supplemental agreement.")

11  Similarly, having already withdrawn from the prior attorney-client

12  agreement, Thelen's agreement to continue its representation of

13  RoNo constituted consideration for Marland's consent to the terms

14  of the December 2002 agreement.  Likewise, Thelen's agreement to

15  represent Marland against efforts by ELIC defendants to block

16  payments also afforded consideration.

17    Marland's cited case <u>Denton v Smith</u>, 101 Cal App 2d 841,

18  844 (1951), is distinguishable on its facts.  In <u>Denton</u>, an

19  attorney filed an action for $1,361.56 alleged due to him for legal

20  services rendered to the defendant in connection with determining

21  the interest of the defendant in the estate of his deceased wife.

22  The California court of appeal upheld the state trial court's

23  judgment that the contract sued upon was without consideration

24  where the attorney did not agree to perform any services for the

25  defendant which would not already be performed by the attorney for

26  the administrator of the estate.  Id.

27  \\

28  \\

40

United States District Court
For the Northern District of California

1    Accordingly, as detailed in the above discussion, the

2  court finds as a matter of law that the December 2002 agreement was

3  supported by adequate consideration.

4                                    3

5    Marland next argues that Thelen failed to make the

6  disclosures to Marland required by Cal R Prof Conduct 3-300 before

7  seeking consent from CDOI for the December 2002 agreement.  Doc

8  #184 at 30.  Thelen correctly points out, however, that Rule 3-300

9  governs an attorney's conduct in entering into a business

10  transaction with a client and, accordingly, does not apply to the

11  December 2002 agreement.  Rule 3-300 states:

12        A member shall not enter into a business transaction with
          a client; or knowingly acquire an ownership, possessory,
13        security, or other pecuniary interest adverse to a
          client, unless each of the following requirements has
14        been satisfied:

15
          (A) The transaction or acquisition and its terms are fair
16        and reasonable to the client and are fully disclosed and
          transmitted in writing to the client in a manner which
17        should reasonably have been understood by the client; and

18
          (B) The client is advised in writing that the client may
19        seek the advice of an independent lawyer of the client's
          choice and is given a reasonable opportunity to seek that
20        advice; and

21
          (C) The client thereafter consents in writing to the
22        terms of the transaction or the terms of the acquisition.

23

24  Cal R Prof Conduct 3-300.

25    The court again applies the California guidelines for

26  contract interpretation, described above.  Thelen argues that,

27  based on surrounding circumstances, the December 2002 agreement

28  should be interpreted as a re-negotiated fee agreement and/or a

United States District Court
For the Northern District of California

settlement agreement.  Doc #223 at 19-23.  Thelen points out that
the February 1999 original attorney-client agreement contained an
express withdrawal provision, stating that either party could
withdraw on thirty days' written notice.  Doc #175, Ex G at ¶22.
On July 8, 2002, Thelen faxed Marland written notice of its intent
to withdraw and then, at Marland's request, extended the notice
period to August 30, 2002.  Doc #219, Ex S; Doc #220, Ex 15.  After
Thelen withdrew from representing Marland, the parties negotiated
extensively, over many months, before executing the December 2002
agreement.  Doc #220, Exs 21-38.

Thelen also argues that the agreement should be
interpreted as a settlement.  Thelen points out that, prior to
executing the agreement, Thelen claimed that Marland had breached
his obligations under the prior agreements.  See evidence cited at
Doc #223, footnotes 95-98.  Likewise, Marland accused Thelen of
misleading him, acting in bad faith and breaching duties owed under
the attorney-client relationship.  See evidence cited at Doc #223,
footnotes 99-102.  The December 2002 agreement effected a
settlement of all claims, known and unknown, between Thelen and
Marland.  Doc #175, Ex T at C.3.

In making his Rule 3-300 argument, Marland does not
specifically direct the court to any "extrinsic evidence" as such.
Marland does argue in the fact section of his motion that "[t]he
record shows that Thelen approached this as a business negotiation,
not an attorney-client matter."  Doc 184 at 19.  In support,
Marland points to an email written by Fontana's partner, stating:
"As a matter of principle, he [Marland] had a hard time with the
concept of renegotiating a deal (as I said to Gary [Fontana] later,

United States District Court

For the Northern District of California

1   this line truly made me want to throw up, these are the people who

2   brought you the Vichy Gvt)." Doc #186, Ex 77. While a tasteless

3   remark about its own client, the court does not see how Thelen's

4   slur evidences a contract for a business transaction, and Marland

5   affords no explanation. Marland next points to a February 2002

6   memo, wherein Fontana wrote that Marland "complained bitterly that

7   we were treating him as a 'business partner' rather than as a

8   client of the firm." Doc #186, Ex 80, n3. Marland's statement,

9   however, is not evidence and fails to show that Thelen actually *was*

10  treating him as a "business partner" let alone to show that the

11  agreement was one for a business transaction. FRE 801. Finally,

12  Marland points to Fontana's deposition testimony in this action.

13  Doc #184 at 19. As stated above, the court will not consider

14  after-the-fact testimony on the parties' intent where California

15  law requires evidence of intent *manifested at the time of*

16  *contracting*. In any event, Marland misrepresents the cited

17  testimony. Doc #224 at 19.

18       In sum, Marland's "extrinsic evidence" fails to establish

19  an ambiguity. Marland points to no language in the contract

20  "reasonably susceptible" to his business transaction

21  interpretation, and the court finds none on its own.

22       The court finds, based on the clear language of the

23  agreement, that it is not a contract for a business transaction but

24  rather a re-negotiated retention agreement and a settlement

25  agreement. Regarding the first interpretation, the contract

26  states:

27       Whereas TR&P also desires to re-negotiate the fee
    splitting terms under the Original Agreement [referring
28   to the February 1999 Attorney Client Agreement], for

43

1
2
3
4
5
6

> various reasons that were discussed among the parties
> during the preceding months.  Doc # 175, Ex T at 1.
>
> TR&P and Marland agree that their previously terminated
> Attorney Client Agreement shall be deemed to be re-
> instated and immediately superseded by this Agreement
> except that TR&P shall resume its role as general counsel
> to RoNo as provided in the September 18, 2001 Amendment
> to the Attorney Client Agreement.  Doc # 175, Ex T at
> B.2(g)(iv).

7
8
9
10
11
12
13
14
15
16
17

"Rule 3-300 is not intended to apply to the agreement by which the member is retained by the client, unless the agreement confers on the member an ownership, possessory, security, or other pecuniary interest adverse to the client.  Such an agreement is governed, in part, by rule 4-200."  Cal R Prof Conduct 3-300, Discussion.  The court finds nothing in the agreement that confers on Thelen a pecuniary interest adverse to Marland.  Rather, the agreement establishes a 35/65 split of legal fees paid by CDOI to Thelen. Marland can point the court to no terms in the agreement establishing a business relationship or suggesting an adverse interest, and the court can find none on its own.

18
19
20
21
22

In addition to being a retention contract, the court also interprets the December 2002 agreement as a settlement agreement based on the mutual release language copied above [see section I]. As such, Thelen correctly points out that the contract is governed by Cal R Prof Conduct 3-400:

23
24
25
26
27
28

> A member shall not:
>
> (A) Contract with a client prospectively limiting the
> member's liability to the client for the member's
> professional malpractice; or
>
> (B) Settle a claim or potential claim for the member's
> liability to the client for the member's professional
> malpractice, unless the client is informed in writing

44

1

           that the client may seek the advice of an independent
lawyer of the client's choice regarding the settlement
and is given a reasonable opportunity to seek that
advice.

Cal R Prof Conduct 3-400.

       Marland cites no authorities, and the court knows of
none, in which Rule 3-300 was applied to a contingency agreement, a
fee-splitting agreement or a settlement agreement.  Accordingly,
the court agrees with Thelen and finds that Rule 3-300 does not
apply.

4

       Finally, Marland argues that the December 2002 agreement
was induced by fraud.  Doc #226 at 9-11.  Marland's evidence is
again problematic.

       To show that he has a triable fraud claim, Marland must
point to facts that show that (1) Thelen made a material
misrepresentation of fact, (2) with knowledge or belief of its
falsity, (3) with the intent to defraud, and (4) Marland actually
and justifiably relied on the misrepresentation.  <u>Engalla v
Permanente Medical Group</u>, Inc, 15 Cal 4th 951, 974 (1997); <u>Mirkin v
Wasserman</u>, 5 Cal 4th 1082 (1993).  Marland identifies four
purported "misrepresentations" that he claims were the "main
arguments Thelen made in support of its demand for a better deal."
Doc #226 at 9:

       First, according to Marland's opposition brief, "Thelen's
main accusation was that the DOI had retained Thelen and agreed to
compensate Marland based on their [Thelen and Marland's]
representation that Marland had a copy of the portage that DOI did
not have and that Marland would produce the document if needed or

45

requested, and that Marland had now breached that representation." Doc #226 at 9. Marland's brief does not identify any specific statement made to him by Thelen on this topic. Marland does not cite to any evidence even suggesting that such a statement was made. Even if Thelen made the statement, Marland provides no evidence showing that the statement was false, that Thelen had an intent to defraud or that Marland relied on the statement.

Second, Marland claims that Wynne Carvill told Marland that Marland was "counsel to the Commissioner" and that his destruction of the *portage* was spoliation of evidence that could be attributed to the Insurance Commissioner. Id at 10-11. Thelen admits that, in corresponding with Brunswick, Carvill did use the term "counsel to the Commissioner." But Thelen points out that (1) there is no evidence that Carvill believed the statement to be false; (2) Carvill testified that he believed the statement was true when he made it, doc #235, Ex B at 376; (3) Marland's cited documents say nothing about spoliation being attributable to the Commissioner, doc #186, ex 43; (4) there no evidence that Carvill had an intent to defraud or that Marland relied on the statement.

Third, according to Marland's opposition brief, Thelen "concealed" from him that Thelen had told CDOI in August 2002 that Marland did not have the *portage*. Doc #226 at 11. Thelen points out that this is false, as Marland admits that Thelen told him in October 2002 that "LeVine [a Department lawyer] had been told that Marland was not going to produce the document," doc #226 at 11, and the new agreement was not executed until December 2002. Moreover, Marland again fails to present evidence showing that Thelen

\\

United States District Court

For the Northern District of California

concealed information, that there was an intent to defraud or that Marland relied on the concealment.

Fourth, according to Marland, Thelen made false statements to him to the effect that it "wanted to get the Commissioner to approve [the December 2002 agreement] as soon as possible" and concealed from Marland its decision to "slow down" the ELIC litigation "as much as possible" through the end of 2002 and wait for a new Commissioner to approve the December 2002 agreement. Doc #226 at 11. Marland's cited documents show Thelen representing to Marland in July 2002 that Thelen's negotiations with CDOI could not proceed until Thelen had reached an agreement with European Counsel. Doc #186, Exs 39, 43. Marland does not show how these statements were false. Marland's other cited documents, id at exs 75 & 121, do not support his assertion that Thelen agreed to slow down the ELIC litigation. The documents state that Thelen committed to investing an additional $2 million to litigating the ELIC matter even though they had not yet obtained CDOI's consent to modify the fee-sharing agreement with European Counsel. Even if Thelen had made a decision to "slow down," Marland does not show how this decision was concealed from him or that such concealment was material to his decision to enter the December 2002 agreement. At most, the alleged concealment caused Marland to feel rushed to enter the agreement. But it is difficult to see how Marland can make this claim given that he continued negotiating and did not execute the agreement for a full five months following the alleged misrepresentations.

In sum, the "misrepresentations" Marland identifies are not supported by admissible evidence. In order to survive summary

47

United States District Court
For the Northern District of California

judgment, Marland was required to "set forth, by affidavit or as otherwise provided in Rule 56, '*specific facts* showing that there is a genuine issue for trial.'"  TW Elec Services Inc v Pacific Elec Contractors Ass'n, 809 F2d 626, 630 (9th Cir 1987) (emphasis in original) (quoting FRCP 56(e)).  Marland does not provide specificity with respect to (1) the content of the statements; (2) the times, dates and places of the statements; (3) the identity of the speakers; or (4) what bases he has for believing the statements to be false.  Further, Marland does not even argue, much less support, that he actually, justifiably and detrimentally relied on these alleged statements.

Finally, Thelen points out that Marland, when asked under oath to identify the specific lies he believed Thelen had told him, gave evasive and non-responsive answers.  Doc #175, Ex A (Marland dep) at 245:19-270:04.  For example:

> Q: In what ways do you believe you were lied to in connection with negotiations of the 2002 agreement?
>
> A: In what ways at that time?
>
> Q: Then or now.
>
> A: At the time, had I been able to imagine that these people were swindling me, it's clear that I wouldn't have done business with them, but how could I imagine that a lawyer worthy of that name could play with his client as if with a marionette.  It's true that I don't speak English very well.  It's true that I don't - I'm not familiar with American law.  It's true that I don't have any other lawyers who are litigators in California law, but would I have had to hire another California law litigator that I would have then had to have verified by a third California law litigator * * *
>
> Q: Mr Marland, all I want to know from you is in connection with the 2002 agreement, what lies do you believe were made by the Thelen lawyers to you * * *
>
> A: All of the reproaches that I was talking about are not specifically linked to this, that or the other protocol.

United States District Court
For the Northern District of California

1
2
3
4
5
6

> Excuse me for the word, but seems to me as if there is
> here a conspiracy.  Every manipulation, every bad action
> of the protocol of 2002 seems all to work together.  And
> if you ask me specifically for what reproaches I would
> have for the agreement of 2002, this is something that I
> would have to insert into a totality and you know this
> very well, because Gary prepared a document that made
> me with all of my trust sign, and I have understood
> everything, this document allowed, this document allowed
> you to have absolution for everything that you had done
> wrong.  That's my answer.

7
8
9
10

> Q: Are there specific facts that you now believe you were
> given by the Thelen lawyers in connection with the
> negotiations of this agreement that you now believe were
> false?
>
> A: I don't understand the question, but if I do
> understand it, I have already answered it.

11  Id at 245:19-250:19.

12      Marland also testified that he did not recall speaking

13  with Fontana on the telephone in the second half of 2002.  Doc

14  #235, Ex A at 126:5-9.  While Marland met with Fontana twice during

15  that period, he could not recall what was discussed at either

16  meeting.  Id at 126:10-127:19.  Similarly, Marland testified that

17  he met with Carvill only once in New York and recalled that they

18  "spoke very little given that Carvill doesn't speak French and

19  [Marland] speaks so little English."  Id at 112:8-16, 130:5-12.

20  Marland did not negotiate over any of the terms of the agreement

21  with Carvill.  Id at 130:15-131:7.  Marland's recollection of his

22  meeting with Carvill is so vague that, if he saw Carvill today, he

23  would not recognize him.  Id at 113:14-116:16, 135:9-10.

24      Marland further testified that he did not review the

25  draft agreements exchanged by Carvill and Brunswick.  Id at 135:15-

26  22.  He could not recall whether he had reviewed any of the emails

27  between Carvill and Brunswick where Carvill made claims against

28  Marland.  Id at 150:11-18.  Marland also admitted that he signed

United States District Court

For the Northern District of California

1 the December 2002 agreement without reading it.  Id at 158:23-
2 160:8.

3                                    5

4          In his notice of motion, Marland states that he is
5 seeking summary judgment on his first, third, sixth, seventh,
6 eighth and ninth affirmative defenses.  Doc #184.  In these
7 affirmative defenses, Marland alleges that (1) Thelen's amended
8 complaint failed to state a claim, because Thelen did not plead
9 that the December 2002 agreement is fair and reasonable (first);
10 (2) Thelen failed to fulfill a condition precedent (third); (3)
11 Marland did not have the benefit of independent counsel to advise
12 him regarding the December 2002 agreement (sixth); (4) the release
13 and fee-sharing provisions are unfair and lack consideration
14 (seventh); (5) the release and fee-sharing provisions are
15 unconscionable and were procured through client abandonment
16 (eighth); and (6) Thelen violated the Rules of Professional Conduct
17 in negotiating the December 2002 Agreement (ninth).  Doc #72.

18          In his points and authorities, Marland argues only that
19 (1) Thelen failed to fulfill a condition precedent; (2) Thelen
20 failed to plead and cannot prove that it made disclosures to
21 Marland as required under Cal Rule Prof Conduct 3-300; and (3)
22 Thelen failed to plead and cannot prove that the December 2002
23 agreement was fair, reasonable and supported by adequate
24 consideration.  Doc #184.  These arguments relate only to Marland's
25 first, third, seventh and ninth affirmative defenses.  These
26 arguments have already been rejected by the court for reasons
27 discussed above.  Marland's motion for summary judgment on his
28 sixth and eighth affirmative defenses is not supported by his

                                     50

United States District Court
For the Northern District of California

points and authorities.  Accordingly, Marland's motion for summary
judgement on his affirmative defenses is DENIED.

**6**

The court finds that Thelen has met its burden of proof
on the validity of the December 2002 agreement.  Thelen has
established, without opposition, that the signatories to the
agreement were all competent adults capable of consent.  Thelen
points out that Marland is a sophisticated businessman and lawyer.
Doc #175, Ex A (Marland dep) at 13:17-14:13, 18:51-21, 32:2-37:21.
Marland received a law degree from the University of Paris X Law
School (Nantere) and practiced law in France from 1979 to 1987.
Id.  In 1987, Marland created the 2M Investment Corporation and
began purchasing interests in a wide variety of industries.  Id.
Until he sold his business in 1992, Marland oversaw the acquisition
of more than seventy companies.  Id.

As stated above, Marland received advice from attorneys
Francois Chateau and Philippe Brunswick throughout his relationship
with Thelen.  Chateau is licensed to practice law in Paris and New
York and is fluent in English and French.  Doc #176, Ex 1.  Chateau
represents European companies with interests in the United States
and United States companies investing in Europe.  Id.  Chateau also
advises clients in contract negotiations, intellectual property
issues and international tax planning.  Id.  Philippe Brunswick
graduated from the University of Paris Law School in 1976.  Doc
#175, Ex C (Brunswick dep) at 11:12-16.  Brunswick has drafted and
negotiated contracts in both French and English.  Id at 18:12-22.
Brunswick began representing Marland around 1987, including
drafting and negotiating contracts for Marland's companies and, on

51

United States District Court
For the Northern District of California

one occasion, negotiating a settlement agreement following
litigation.  Id at 54:24-57:25; Doc #175, Ex A (Marland dep) at
63:10-16.  In sum, there is no evidence that Marland or his
attorneys were incapable of understanding the terms of the December
2002 agreement.

As detailed above, Thelen has established beyond
reasonable dispute that there was sufficient consideration for the
agreement and that all conditions precedent to the agreement were
met.

Also discussed above, Thelen points out that the
agreement was governed by Cal R Prof Conduct 3-400 (governing an
attorney's conduct in negotiating a settlement of claims or
potential claims by a client).  Rule 3-400 requires the attorney to
(1) inform the client in writing that the client may seek the
advice of an independent lawyer of the client's choice regarding
the settlement; and (2) give the client a reasonable opportunity to
seek that advice.  Cal R Prof Conduct 3-400(B).  Thelen
establishes, and Marland does not dispute, that Thelen complied
with this rule.  The first draft agreement Carvill sent to
Brunswick stated, "[Thelen], on the one hand, and [Marland,
Brunswick and Maas] on the other, are each represented by and are
relying exclusively on their own counsel and neither is relying on
the other for legal advice regarding this Agreement, its terms or
effect, or its enforceability under the laws of any jurisdiction."
Doc #220, Ex 3 at M2128.  Carvill included this or similar language
in each draft he sent to Brunswick and in the drafts he sent to
Marland directly.  Id at Exs 5-6, 11-14, 21, 25, 29, 31.  Moreover,
it is undisputed that Marland had a reasonable opportunity to

United States District Court

For the Northern District of California

consult with independent counsel and did so.  Brunswick and Chateau provided Marland with legal advice over a six-month period.  See evidence cited in Doc #223 at footnotes 111-118.  California courts have upheld as valid settlement agreements between attorneys and clients where the client waived and released all known and unknown claims.  Winet v Price, 4 Cal App 4th 1159 (1992).

Finally, as detailed above, charges and counter-charges of bad faith were made by both sides, and terms were drafted, edited and re-written.  In the end, Thelen and Marland compromised their positions and resolved their claims through the December 2002 agreement.  Marland does not dispute that this is a "lawful object."  See Restatement of Contracts (Second) § 74; Winet v Price, 4 Cal App 4th 1159 (1992).

* * *

For all the above reasons, Thelen's motion for summary judgment on its first claim for declaratory relief that the December 2002 agreement is valid is GRANTED.

B

The court next addresses the parties' respective motions on the counterclaims and counter-counterclaims.

1

*Marland's Second & Third Counterclaims*

In his second counterclaim, Marland seeks damages for Thelen's alleged breach of the June 1999 fee-sharing agreement.  Doc #72 at 45-47.  In his third counterclaim, Marland seeks damages for Thelen's alleged "bad faith denial" of the existence of the

53

**United States District Court**

For the Northern District of California

1    February 1999 and June 1999 agreements.  Id at 47-48.  As discussed

2    above, the December 2002 agreement replaced "any and all other

3    agreements" between the parties, and the court has found that the

4    December 2002 agreement is valid and enforceable as a matter of

5    law.  Moreover, California does not recognize the tort of bad faith

6    denial of contract.  Freeman & Mills, Inc v Belcher Oil Co, 11 Cal

7    4th 85 (1995).  Accordingly, Thelen's motion for summary judgment

8    on Marland's second and third counterclaims is GRANTED.  Marland's

9    motion for summary judgment on his second counterclaim is DENIED.

                                    **2**

11                *Marland's First, Fourth & Fifth Counterclaims*

12           In his first, fourth and fifth counterclaims, Marland

13   seeks damages for breach of fiduciary duty, fraud and legal

14   malpractice, respectively.  Doc #72 at 41-51.  Thelen argues that

15   Marland's first and fifth counterclaims are barred by the

16   applicable one-year statute of limitations under Cal CCP § 340.6.

17   Doc #144.

18           The court need not reach Thelen's statute of limitations

19   argument.  To the extent Marland's first, fourth and fifth

20   counterclaims allege conduct occurring prior to the execution of

21   the December 2002 agreement, they are barred by the mutual release

22   provision of that agreement.  At the summary judgment hearing,

23   counsel for Thelen pointed out that Thelen's statute of limitations

24   motion was brought in part because these counterclaims include

25   allegations of conduct post-dating the December 2002 agreement.But

26   these allegations do not suffice to withstand summary judgment once

27   the December 2002 agreement has been held valid.  Marland's first,

28   fourth and fifth counterclaims rest on 48 numbered allegations,

                                    54

**United States District Court**

For the Northern District of California

1    beginning at page 29 of his revised amended answer and

2    counterclaims.  Doc #72.  Of these, only paragraphs 3(c), 16 and

3    41-46 allege conduct post-dating December 2002.  Paragraph 3(c) and

4    paragraphs 41-46 deal with Thelen's alleged failure to obtain

5    CDOI's consent to the "entire agreement" discussed at length in

6    IIA1a.  Paragraph 16 fails to allege a misrepresentation

7    independent of the December 2002 agreement.  Having found that

8    agreement valid, Marland's first, fourth and fifth counterclaims

9    fail.

10          Accordingly, Thelen's motion for summary judgment on

11   Marland's first, fourth and fifth counterclaims is GRANTED.

12                                    3

13                    *Thelen's Counter-Counterclaims*

14          Thelen's counter-counterclaims are contingent on the

15   court finding that the December 2002 is not valid and enforceable.

16   Doc #164-1 at ¶¶45, 52.  Accordingly, Marland's motion for summary

17   judgment on Thelen's counter-counterclaims is MOOT and DENIED.

18   Finally, and for the same reasons, Susannah Maas's motion to

19   dismiss Thelen's counter-counterclaims, Doc #171, is MOOT and

20   DENIED.  Philippe Brunswick and Susannah Maas are no longer parties

21   to this action.

22

23                                   III

24          The court next addresses Thelen's motion for preliminary

25   or permanent injunction of the New York arbitration.  Equitable

26   remedies, including permanent injunction and specific performance,

27   are "designed to enforce substantive law rights."  <u>Sullivan By and</u>

28   <u>Through Sullivan v Vallejo City Unified School Dist</u>, 731 F Supp

947, 956 (ED Cal 1990) (citation omitted ).  "[A]s a general rule, when forum state law defines the underlying substantive right, state law also governs the availability of such equitable remedies as a permanent injunction, specific performance * * *" Charles Alan Wright, et al, 19 Federal Practice and Procedure § 4513 at 447 (1996).  Accordingly, California law determines Thelen's right to permanent injunctive relief.

"A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action for tort or other wrongful act against a defendant and that equitable relief is appropriate." Syngenta Crop Protection, Inc v Helliker, 138 Cal App 4th 1135, 1166-67 (2006).  Cal Civil Code § 3422 states that a court may grant a permanent injunction "to prevent the breach of an obligation existing in favor of the applicant: (1) Where pecuniary compensation would not afford adequate relief; (2) Where it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief; (3) Where the restraint is necessary to prevent a multiplicity of judicial proceedings; or (4) Where the obligation arises from a trust."

It is clear from the above discussion that the parties have litigated their claims here to final resolution.  Indeed, this order eliminates those claims.  This resolution binds the parties on the litigated claims and moots the necessity of injunctive relief.  To the extent there remain other claims not here litigated, those claims may be arbitrated or litigated elsewhere. Injunctive relief is not required here.  Accordingly, Thelen's motion for a permanent injunction barring Marland from proceeding with the New York arbitration is DENIED AS MOOT.

1                                  IV

2          For the reasons given above, Thelen's motion for summary

3    judgment on its first claim for declaratory relief that the

4    December 2002 agreement is valid is GRANTED.  Thelen's motion for

5    summary judgment on Marland's second and third counterclaims is

6    GRANTED.  Thelen's motion for summary judgment on Marland's first,

7    fourth, and fifth counterclaims is GRANTED.  Thelen's motion for

8    summary judgment on Marland's fifth affirmative defense is GRANTED.

9    Thelen's motion for permanent injunction of the New York

10   arbitration is DENIED AS MOOT.  Marland's motion for summary

11   judgment on Marland's affirmative defenses is DENIED.  Marland's

12   motion for summary judgment on Marland's second counterclaim is

13   DENIED.  Marland's motion for summary judgment on Thelen's

14   affirmative defenses to count two of Marland's counterclaim is

15   DENIED AS MOOT.  Marland's motion for summary judgment on Thelen's

16   counter-counterclaims is DENIED AS MOOT.  Susannah Maas's motion to

17   dismiss Thelen's counter-counterclaims is DENIED AS MOOT.

18         The trial, currently scheduled to commence on August 6,

19   2007, is VACATED.  The clerk is DIRECTED to close the file and

20   terminate all motions.

21

22         SO ORDERED.

23

24

25   _____

26   VAUGHN R WALKER

27   United States District Chief Judge

28

                                   57

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT

# 4



# ATTORNEY-CLIENT AGREEMENT

Thelen Reid & Priest, LLP ("TR&P") and Francois Marland ("Client"), individually and as the beneficial owner of RoNo, LLC ("RoNo") hereby agree as follows:

## Background

1. Client has heretofore provided information to TR&P concerning certain matters within his personal knowledge relating to the circumstances under which Credit Lyonnais, S. A., Altus Finance, S.A. and other entities (collectively the "Altus Defendants") came to acquire control of certain portions of the bond portfolio and insurance assets of Executive Life Insurance Company ("ELIC").

2. Using that information and their own knowledge of events surrounding the ELIC rehabilitation/liquidation proceedings TR&P attorneys have been engaged in an effort to persuade the California Department of Insurance to initiate legal proceedings against Credit Lyonnais, Altus and other companies and individuals that acquired the bond portfolio and insurance assets of ELIC. While the Department has indicated a willingness to retain TR&P to conduct a further investigation and pursue potential claims against the Altus Defendants, it has been unwilling to date to pay any fee to Client for the information that he has provided, nor has it been willing to pay legal fees to TR&P that are adequate to allow TR&P to fully compensate Client for the information and strategic assistance that he has provided, and expects to provide, in pursuing these claims.

3. Client wishes to file a California False Claims Act (Qui Tam) complaint on behalf of the State of California and the Commissioner of Insurance against the Altus Defendants and pursue these claims with or without the assistance and participation of the Commissioner

4. At Client's request TR&P has caused RoNo to be formed as a Delaware limited liability corporation and has filed applications required for RoNo to be qualified to do business in the state of California. The parties understand that Client is and will remain, directly or indirectly, the beneficial owner of RoNo.

5. Client wishes to engage TR&P to represent his interests, individually and as embodied in RoNo, in pursuing possible recoveries against the Altus Defendants on behalf of the Commissioner and the State of California.

## Scope Of Services

6. TR&P agrees to provide all legal assistance and legal advice reasonably necessary to investigate and pursue claims against the Altus Defendants arising under California law in connection with the transactions by which they acquired control over the junk bond portfolio and insurance assets of ELIC, including:

    (a).    filing a qui tam complaint in San Francisco County Superior Court and pursuing claims against the Altus Defendants in that litigation;

Page 1

M 000001

(b). filing a motion to reopen the ELIC rehabilitation/liquidation proceedings in Los Angeles County Superior Court and pursuing claims against the Altus Defendants in that proceeding;

(c). providing legal advice and assistance to the Commissioner of Insurance and/or the California Attorney General in connection with the qui tam litigation;

(d). negotiating possible settlements with one or more of the Altus Defendants;

(e). initiating or participating in other civil or administrative actions relating to possible claims arising out of the transactions described herein; and

(f). Representing Client's interests in any appellate proceedings that may arise from any of the foregoing actions.

## Attorney Fees

7. In consideration for the services to be performed in connection with this representation, Client agrees to pay TR&P a fee calculated as follows:

(a). <u>Settlement Prior to November 1999.</u> In the event and to the extent that any of the claims against the Altus Defendants are settled prior to November 1, 1999, TR&P shall be paid a fee equal to forty (40%) of any gross recovery that Client or RoNo receives from any source as a result of the pursuit of these claims.

(b). <u>Subsequent Recoveries.</u> In the event and to the extent that claims against the Altus Defendants are settled or result in a judgment on or after November 1, 1999, TR&P shall be paid fifty percent (50%) of any gross recovery that Client or RoNo receives from any source as a result of the pursuit of these claims.

(c) <u>Partial Offset.</u> The amounts otherwise payable to TR&P as legal fees pursuant to subparagraphs (a) or (b) above shall be reduced by fifty percent (50 %) of the legal fees, if any, that TR&P is awarded by a Court, or recovers by way of settlement, for serving as counsel in the qui tam litigation.

Page 2



## Costs And Disbursements

8.)    Client shall reimburse TR&P for all costs and disbursements that TR&P incurs in the investigation and prosecution of the claims that are the subject of this Agreement, including filing fees, service of process charges, local and long distance travel (including meals, lodging, transportation and airfare), reproduction and photocopying costs, deposition transcripts, witness fees, long distance telephone and telecopier charges, postage, messenger and overnight delivery fees and charges for computerized legal research. For this purpose Client shall maintain a disbursement account with TR&P in an amount of not less than $20,000. TR&P will send Client monthly statement describing the expenses charged to the account, but the invoices will be paid from the disbursement account as long as sufficient funds remain. If the balance in the disbursement account drops below $10,000, TR&P will have the right to require that the account be restored to a balance of $20,000. All costs and disbursements reasonably incurred in the investigation or prosecution of these claims shall be reimbursed to Client (or TR&P, if it has incurred disbursements not previously reimbursed) out of any gross recovery before any allocation of legal fees or recoveries pursuant to paragraph 7.

9.)    TR&P shall have the right to ask that the Client make arrangements to pay costs and disbursements items exceeding $5000 and shall not incur any individual cost or disbursement in excess of $1000 without prior approval from Client.

## European Counsel

10.)    With the concurrence of TR&P, Client may, retain and associate counsel in France or elsewhere in Europe to assist in investigating and prosecuting these claims. TR&P agrees to cooperate with such counsel in developing strategies and negotiating with the Altus Defendants in Europe. Such counsel shall initially not participate in any litigation filed in the United States without the express consent of TR&P. All expenses incurred by Client for legal fees for such European counsel shall be borne by Client. TR&P shall reimburse client for one-half (50%) of the fees incurred for such European counsel to the extent that TR&P recovers its contingent legal fees or is awarded legal fees by a court in an amount sufficient to make the reimbursement.

## Attorney's Lien

11.)    Client, for himself and RoNo, hereby grants TR&P a lien on the claims or causes of action that are the object of this representation, on any sums recovered by way of settlement, and on any judgment that may be recovered, for the sums and percentage shares referred to in this Agreement for payment of attorneys fees due to TR&P pursuant to Paragraph 6.



M 000003

## Substitution Or Discharge Of Attorneys

12.)   TR&P shall be entitled to receive its contingent share of any settlement of or judgment on any of the claims that are the subject of this Agreement to the full extent allowable under California law, notwithstanding any decision by Client to discharge TR&P or to substitute other counsel in its place before or after such settlement or judgment is achieved.

## Favorable Outcome Not Guaranteed

13.)   Nothing in this Agreement and nothing said by TR&P to Client or any of his representatives shall be construed as a promise or guarantee about the outcome of this representation or the value of any claims that may be pursued.  Client acknowledges that all statements made by TR&P concerning these matters are statements of opinion only.

## Charges To Client Contingent On Recovery

14.)   The parties expressly understand that, in the event no recovery is obtained on the claims that are the subject of this Agreement, TR&P shall not make any charges to Client other than for costs and disbursement expenses incurred, nor shall Client be liable to pay any charges other than for costs or disbursements that TR&P may have incurred.

## Errors And Omissions Insurance

15.)   TR&P maintains errors and omissions insurance coverage that is applicable to the services that it is to render pursuant to this Agreement.

## Confidentiality

16.)   TR&P and Client each agree to maintain the confidentiality of any non-public information provided by Client concerning the background of the ELIC transactions and to disclose such information only (i) to parties and attorneys directly involved in the investigation or prosecution of the ELIC claims who have a need to know, or (ii) as may be required by law.

## Attorneys Fees Not Set By Law.

17.)   Client acknowledges that the attorney fees to be paid pursuant to this Agreement are not set by law and have been fairly negotiated between the parties.

## Notices.

18.)   All notices, requests, consents and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile (with the hard copy mailed by first class mail) or mailed (first class postage prepaid) or sent by overnight courier to the parties hereto at the following addresses or facsimile numbers:

Page 4

If to TR&P to:

       THELEN REID & PRIEST LLP
       2 Embarcadero Center
       Suite 2100
       San Francisco, CA 94111-3995
       Telecopier: 415-421-1068
       Attention: Gary Fontana, Esq.

If to Client, to:

       Francois Marland
       c/o Susana Maas
       Rue Eynard
       Geneva, Switzerland
       Telecopier: (41-22) 319-7333

All such notices, requests, consents and other communications will (i) if delivered personally to the address as provided in this Section, be deemed given upon delivery, (ii) if delivered by facsimile to the facsimile number as provided in this Section, be deemed given upon receipt, and (iii) if delivered by mail in the manner described above or by overnight courier to the address as provided in this Section, be deemed given upon receipt. Either party hereto from time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other party.

### No Assignments.

     19.) No party hereto may assign all or any portion of its rights or obligations hereunder without the prior written consent of the other party.

### Entire Agreement.

     20.) This Agreement represents the entire agreement between the parties hereto with respect to the subject matter hereof. Neither party hereto has made any representation or warranty to the other party hereto with respect to the subject matter hereof except as expressly set forth in this Agreement.

### Severability.

     21.) The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision hereof. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be construed to be only so broad as is enforceable.

Page 5

M 000005

### Termination and Right to Withdraw

22.)    Either party shall have the right to withdraw from this Agreement without liability of any kind to the other provided that:

(a)    the party wishing to withdraw shall give thirty days written notice to the other;

(b)    the withdrawing party shall remain liable for any breach of its obligations under this Agreement prior to the date of withdrawal; and

(c)    the withdrawing party shall assign to the other party all its rights under this Agreement and any claim that may have to any recovery or award as a result of its pursuit of the qui tam litigation.

### Arbitration of Disputes

23.)    All disputes which may arise concerning this Agreement shall be submitted to binding arbitration under the rules and regulations of the American Arbitration Association using a single arbitrator. The arbitration shall take place in New York City or such other place as the parties may agree. The arbitrator shall issue a written decision setting forth findings of fact and conclusions of law, which decision shall be final and binding on all parties. The arbitrator's award may be enforced in any court having jurisdiction by filing a petition to enforce such award. The cost of filing, including reasonable attorney's fees, may be recovered by the party that initiates the action to have the award enforced.

### Effective Date

24.)    This Agreement shall be construed and enforced under the laws of the State of California applicable to agreements made and to be wholly performed with such State.

25.)    This Agreement shall be effective upon execution by both parties.

In witness whereof, the parties have executed this Agreement on the dates shown below.

February 11 1999

FRANCOIS MARLAND, individually and as beneficial owner of RoNo, LLC

_____

February 11 1999

THELEN, REID, & PRIEST LLP

_____
By:  Gary L. Fontana

Page 6

M 000006

# EXHIBIT

# 5

1   KEKER & VAN NEST, LLP
    ROBERT A. VAN NEST - #84065 (rvannest@kvn.com)
2   WENDY J. THURM - #163558 (wthurm@kvn.com)
    STEVEN K. YODA - #237739 (syoda@kvn.com)
3   710 Sansome Street
    San Francisco, CA  94111-1704
4   Telephone:  (415) 391-5400
    Facsimile:  (415) 397-7188
5
    Attorneys for Plaintiff
6   THELEN REID & PRIEST LLP

7

8                          UNITED STATES DISTRICT COURT

9                       NORTHERN DISTRICT OF CALIFORNIA

10

11  THELEN REID & PRIEST LLP,              Case No. C 06-2071 VRW

12                        Plaintiff,
                                          STIPULATION AND [PROPOSED]
13            v.                          ORDER

14  FRANÇOIS MARLAND,

15                        Defendant.

16

17

18

19

20

21

22

23

24

25

26

27

28

372735.01
                          STIPULATION AND [PROPOSED] ORDER

WHEREAS Defendant François Marland ("Marland") initiated an arbitration proceeding against Plaintiff Thelen Reid & Priest LLP ("Thelen") in New York ("the New York Arbitration Proceeding") on February 13, 2006;

WHEREAS Thelen filed a Complaint for Declaratory and Injunctive Relief against Marland on March 21, 2006;

WHEREAS Thelen filed a Motion for Preliminary Injunction on March 24, 2006, seeking, in part, an order from this Court prohibiting Marland from proceeding with the New York Arbitration Proceeding;

WHEREAS the hearing on Thelen's Motion for Preliminary Injunction is currently scheduled for June 8, 2008;

WHEREAS the deadline for Marland to file an opposition to Thelen's Motion for Preliminary Injunction is May 11, 2006;

WHEREAS Marland filed a Motion to Dismiss on May 1, 2006;

WHEREAS  Thelen filed a First Amended Complaint on May 3, 2006;

WHEREAS Thelen and Marland desire to conduct discovery prior to this Court's resolution of Thelen's Motion for Preliminary Injunction;

NOW, THEREFORE, Thelen and Marland stipulate and agree as follows:

1.    The New York Arbitration Proceeding shall be stayed, until such time as this Court enters a final order on Thelen's Motion for Preliminary Injunction;

2.    Thelen's Motion for Preliminary Injunction shall be taken off-calendar;

3.    Marland shall Answer or move to dismiss Thelen's First Amended Complaint on May 23, 2006;

4.    After Marland files his Answer, the parties shall meet and confer regarding (a) the scope of discovery to be completed prior to the date on which Marland shall file his opposition to Thelen's Motion for Preliminary Injunction; and (b) a briefing schedule and new hearing date for Thelen's Motion for Preliminary Injunction.

372735.01

1       5.      This Stipulation and every part hereof is entered into in the interests of the

2   reaching an orderly and just resolution of the parties' disputes, without prejudice to any party's

3   position regarding the claims and defenses asserted in this action or in the New York Arbitration

4   Proceeding.  Nothing in this Stipulation shall be deemed to constitute a waiver of any substantive

5   or procedural right, claim, or defense of any party, except for such matters as are expressly set

6   forth herein.

7

8   Dated:  May 10, 2006                          KEKER & VAN NEST, LLP

9

10                                                By:   /s/ Wendy J. Thurm
                                                  WENDY J. THURM
11                                                Attorneys for Plaintiff
                                                  THELEN REID & PRIEST LLP
12

13

14  Dated:  May 10, 2006                          CARLSON, CALLADINE & PETERSON
                                                  LLP
15

16                                                By:   /s/ Guy D. Calladine
                                                  GUY D. CALLADINE
17                                                Attorneys for Defendant
                                                  FRANÇOIS MARLAND
18

19

20      **IT IS SO ORDERED.**

21

22  Dated:   May 22, 2006

23

24

25

26

27

28

# EXHIBIT

# 6

SIMPSON THACHER & BARTLETT LLP

425 LEXINGTON AVENUE
NEW YORK, N.Y. 10017-3954
(212) 455-2000

FACSIMILE (212) 455-2502

DIRECT DIAL NUMBER
212-455-3805

E-MAIL ADDRESS
jkerr@stblaw.com

October 15, 2007

Re:   Marland v. Thelen Reid & Priest, LLP
      No. 50 180 T 00082 06

Christian Alberti, Esq.
International Centre for Dispute Resolution
1633 Broadway, 10th Floor
New York, NY 10019

Dear Mr. Alberti:

        We write pursuant to your October 9, 2007 request for comments regarding the attempt by Claimant François Marland ("Marland") to reactivate the above-referenced arbitration proceeding against Respondent Thelen Reid Brown Raysman & Steiner LLP, formerly known as Thelen Reid & Priest LLP ("Thelen"). Marland's counsel informed us this afternoon that he intends to file an Amended Demand for Arbitration (the "Amended Demand"), but will not be able to do so today because of technical difficulties. Thelen cannot make any specific comments about the reactivation of the arbitration proceeding until it has had the opportunity to review the Amended Demand. Accordingly, Thelen will submit its comments per your October 9, 2007 request within 24 hours of receiving the Amended Demand.

        Please contact me if you have any questions.

                                            Very truly yours,

                                            /s/ John J. Kerr, Jr.

                                            John J. Kerr, Jr.

cc:   Andrew W. Hayes, Esq.

LOS ANGELES      PALO ALTO      WASHINGTON, D.C.      BEIJING      HONG KONG      LONDON      TOKYO